# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

THE ANDERSON LIVING TRUST f/k/a THE
JAMES H. ANDERSON LIVING TRUST;
THE PRICHETT LIVING TRUST; CYNTHIA
W. SADLER and ROBERT WESTFALL,

        Plaintiffs,

vs.                                                                                       No. CIV 12-0040 JB/KBM

WPX ENERGY PRODUCTION, LLC f/k/a
WPX ENERGY SAN JUAN, LLC; WILLIAMS
PRODUCTION COMPANY, LLC and WPX
ENERGY ROCKY MOUNTAIN, LLC f/k/a
WILLIAMS PRODUCTION RMT
COMPANY, LLC,

        Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendants' Motion to Dismiss Claims

in Plaintiffs' Fourth Amended Complaint, filed October 18, 2013 (Doc. 145)("MTD").   The

Court held a hearing on February 21, 2014.  The primary issues are: (i) whether the Court should

convert the MTD into a motion for summary judgment, and whether it should consider check

stubs attached by the Defendants or deposition transcripts and miscellaneous exhibits attached by

the Plaintiffs in ruling on the MTD; (ii) whether the Court should dismiss the first, second, fifth,

eleventh, and twelfth claims in the Plaintiffs' Fourth Amended Complaint for Underpayment of

Oil and Gas Royalties, filed September 27, 2013 (Doc. 129)("FAC"), pursuant to New Mexico's

statutes of limitations, to the extent that those claims cover conduct that occurred more than four

to six years before the lawsuit's filing, i.e., should the Court cut off damages incurred before four

to six years ago on those claims; and (iii) whether the Court should dismiss Plaintiffs' twelfth claim, breach of the implied covenant to market, on the ground that it is not recognized under New Mexico law.  The Court will not convert the MTD into a motion for summary judgment, but will consider the check stubs, because they are documents referenced in the FAC, they are central to the Plaintiffs claims, and the parties do no dispute their authenticity; it will not consider the Plaintiffs' deposition transcripts and exhibits, because they were produced in litigation.   The Court will not dismiss any claim, in whole or in part, on limitations grounds, because the Plaintiffs have alleged facts that might reasonably establish that the discovery rule delayed the accrual of the statutes of limitations.  The Court will, however, dismiss the twelfth cause of action, because the United States Court of Appeals for the Tenth Circuit has held that the theory underpinning the claim -- the marketable condition rule -- has no basis in New Mexico law. The Court will also dismiss the ninth cause of action without prejudice for failure to plead with particularity pursuant to the heightened pleading requirement of rule 9(b) of the Federal Rules of Civil Procedure; it will also dismiss the tenth cause of action with prejudice, because it is not an independent claim upon which relief can be granted, but rather an attempt to recite facts to establish two tolling doctrines.

## FACTUAL BACKGROUND

This matter arises from a dispute over the royalty payments that the Defendants, producers of oil and gas in New Mexico and Colorado, and working interest holders on oil and gas leases belonging to the Plaintiffs, owe to the Plaintiffs, royalty interest holders on the leases.

The San Juan Basin, one of the largest natural gas producing fields located in northwest New Mexico and southwest Colorado, was originally developed in the early 1950's by El Paso Natural Gas Company . . . .  The natural gas produced in the San Juan Basin is conventional gas which contains methane (natural gas) and entrained natural gas liquids ("NGLs"), such as ethane and butane.  In order to

> make the gas safe to enter the interstate pipeline, the NGLs must be removed from
> the gas stream.

Elliott Indus. LP v. BP Am. Prod. Co., 407 F.3d 1091, 1099 (10th Cir. 2005).  As this matter

comes before the Court on a Motion to Dismiss, the Court will assume that all facts in the FAC

are true.  See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)(stating that, to survive a

motion to dismiss, "[f]actual allegations must be enough to raise a right to relief above the

speculative level . . . on the assumption that all the allegations in the complaint are true (even if

doubtful in fact)").

The Plaintiffs in this matter all own interests in hydrocarbons derived from wells in the

States of New Mexico and Colorado.  See FAC ¶¶ 1-7, at 2-3.  The Plaintiffs reside in the

southwestern part of the United States of America, specifically, in the states of Utah (Anderson

Living Trust), Colorado (Pritchett Living Trust), Texas (Sadler), and New Mexico (Scanlon

Living Trust and Robert Westfall).  See FAC ¶¶ 1-7, at 2-3.  Defendants WPX Energy

Production, LLC, f/k/a WPX Energy San Juan LLC, Williams Production Company, LLC, and

WPX Energy Rocky Mountain, LLC, f/k/a Williams Production RMT Company, LLC ("WPX")

are producers and vendors of conventional natural gas, originating from the Fruitland coal

formation; of coalbed methane ("CBM") natural gas; and of other petroleum hydrocarbons from

wells in which the Defendants own lease-hold interests.[1]  See FAC ¶ 9, at 4.  "Plaintiffs each

---

[1] "Conventional natural gas" differs from "unconventional natural gas" in the manner, ease and cost associated with extracting the resources.  Conventional & Unconventional, Canadian Association of Petroleum Producers, http://www.capp.ca/CANADAINDUSTRY/ NATURALGAS/CONVENTIONAL-UNCONVENTIONAL/Pages/default.aspx  (last visited Apr. 24, 2012).  Conventional natural gas is produced from "relatively highly porous and permeable sandstone or carbone geologic formations."  Natural Gas: A Primer, Natural Resources Canada, (last modified Jan. 18, 2011), http://www.nrcan.gc.ca/energy/sources/natural- gas/1233#conventional.  Unconventional natural gas is produced from "coal seams  (. . . CBM), low permeability rocks . . . , or shale . . . ."  Id.

own a non-cost bearing interest in the revenues derived from the production and sale of hydrocarbons pursuant to the terms of oil and gas leases owned or partially owned by" the Defendants in the "subject wells," save for Scanlon Living Trust, which owns no interest in WPX lease-hold interests.  FAC ¶ 10, at 4.  The "subject wells" are "all wells in the States of New Mexico and Colorado in which [the Defendants own] all or a portion of the oil and gas leases under which non-cost bearing, royalty and/or overriding royalty payments are/were owed, and which produce or produced hydrocarbons."  FAC ¶ 11, at 4.  The Plaintiffs bring this action as a class against the Defendants on behalf of all owners of "non-cost bearing" royalty interests in the subject wells.[2]  FAC ¶ 13, at 6.

The Plaintiffs, or their predecessors, acquired their interests in the hydrocarbon revenues from the subject wells through executing oil-and-gas mining leases or permits with the Defendants.  See FAC ¶ 11, at 4.  All the leases were executed between October 17, 1945, and October 6, 1948, see FAC ¶ 26, at 10-12, meaning that the most recent lease was executed over sixty-three years before the Plaintiffs filed this lawsuit, see First Amended Complaint for Underpayment of Oil and Gas Royalties, filed in state court on December 5, 2011, filed in federal court on January 12, 2012 (Doc. 1-1).  Under the leases, the Defendants owe the

---

The Fruitland Coal formation is "one of the most prolific sources of U.S. coalbed methane reserves."  Mesa Royalty Trust: Topics: San Juan Basin Fruitland Coal Drilling, wikinvest (April 24, 2013, 11:14 AM EDT), http://www.wikinvest.com/stock/Mesa_Royalty_Trust_%28MTR%29/San_Juan_Basin_Fruitland_Coal_Drilling.  CBM natural gas is natural gas extracted from coal beds.  See Coalbed Methane, Wikipedia (Apr. 23, 2013), http://en.wikipedia.org/wiki/Coalbed_methane.

[2] The Plaintiffs exclude from the FAC "any claims previously asserted in prior cases in which such claims were determined by final judgment and/or settled by final order approving settlement at the time of this filing between the parties hereto, inclusive of putative Class Members."  FAC ¶ 21, at 9.  The Plaintiffs also exclude from the proposed class definition all "interests owned by any federal, state or municipal governmental bodies, as well as any interest held in trust by the federal government for any Indian tribe or organization."  FAC ¶ 21, at 9.

Plaintiffs a "duty to pay royalties on all hydrocarbons" for the value or price which the Defendants do or should receive from the "arm's length" sale of the hydrocarbons.  FAC ¶ 12, at 5.  The leases give the Plaintiffs a right to royalties in the "drip condensate," a liquid product which is recovered during the Defendants' oil and gas mining processes.[3]  FAC ¶ 28, at 12-13. The leases do not provide for the Defendants to calculate the Plaintiffs' royalty payments using the average sale price of a mixture of hydrocarbons from wells in which the Plaintiffs own a royalty interest and other wells in which the Plaintiffs do not own royalty interests.  See FAC ¶ 12, at 5-6.

The Defendants have not credited the Plaintiffs with the revenue derived from the drip condensate.  See FAC ¶ 29, at 13.  Currently, the Defendants calculate the Plaintiffs' royalty interests on the sale price received from the Defendants' affiliated intermediaries for hydrocarbons from wells in which the Plaintiffs own royalty interests, mixed with hydrocarbons from other wells in which the Plaintiffs do not own royalty interests.  See FAC ¶¶ 33-34, at 14. The Defendants' affiliated intermediaries sell the hydrocarbons at a significant profit, a profit which the Defendants do not pass on to the Plaintiffs.  See FAC ¶ 33, at 14.  Additionally, the Defendants' royalty payments to the Plaintiffs have not been consistent.  On "numerous

---

[3] Drip condensate is a "high-grade liquid which is sold like oil, that comes off of the production . . . ."  Transcript of Hearing at 20:10-15, taken June 19, 2012, filed July 5, 2012 (Doc. 54)(Brickell).  Drip condensate is a "very valuable commodity."  Tr. at 20:24-25 (Brickell).  The Department of Interior has defined drip condensate as:

> any condensate recovered downstream of the facility measurement point without resorting to processing.  Drip condensate includes condensate recovered as a result of its becoming a liquid during the transportation of the gas removed from the lease or recovered at the inlet of a gas processing plant by mechanical means, often referred to as scrubber condensate.

64 F.R. 43506-01.

instances," the Defendants have waited longer than forty-five or even ninety days after receiving revenue from the Plaintiffs' shares to pay the Plaintiffs their royalty interest.  FAC  ¶¶ 57-60, at 20-21.

The Defendants have not always disclosed to the Plaintiffs the gross volume of gas produced from the Plaintiffs' wells, the gross revenue or value the Defendants obtain from the gross production of gas, and the extent of costs that are deducted from the Plaintiffs' royalty payments.  See FAC ¶ 38, at 15-16.  One such cost that is deducted from the Plaintiffs' royalty payments is the cost of rendering marketable the natural gas and other hydrocarbons taken from the subject wells.  See FAC ¶ 51, at 18.

## PROCEDURAL BACKGROUND

The Plaintiffs assert nine causes of action that are either new to the FAC or have survived dismissal, see Memorandum Opinion, filed June 28, 2013 (Doc. 108)("Memo. Opinion"), and are carried over from previous iterations of the complaint: (i) the first cause of action, "failure to pay royalty on volumes of hydrocarbons, including drip condensate," FAC ¶¶ 22-30, at 10-13 (title case omitted); (ii) the second cause of action, "breach of the duty of good faith and fair dealing," FAC ¶¶ 31-42, at 14-17 (title case omitted); (iii) the fourth cause of action, "violation of the New Mexico Oil and Gas Proceeds Payment Act" N.M. Stat. Ann. §§ 70-10-1 to -6 ("NMOGPPA"), a pre-existing claim, and "interest due under Colorado law," a new claim the Plaintiffs raise for the first time in the FAC, FAC ¶¶ 56-61, at 20-21 (title case omitted); (iv) the fifth cause of action, "bad faith breach of contract," FAC ¶¶ 62-66, at 21-22 (title case omitted); (v) the sixth cause of action, a claim for declaratory relief, which is new and unique to the FAC, see FAC ¶¶ 67-70(b), at 22-23; (vi) the ninth cause of action, "fraudulent concealment," a new claim unique to the FAC, FAC ¶¶ 84-92, at 26-28 (title case omitted); (vii) the tenth cause of

action, "estoppel and continuing wrong," a new claim unique to the FAC, FAC ¶¶ 93-97, at 28-29 (title case omitted); (viii) the eleventh cause of action, "breach of the duty to market hydrocarbons -- Colorado," a new claim unique to the FAC, FAC ¶¶ 98-101, at 30-31 (title case omitted); and (ix) the twelfth cause of action, "implied covenant to market -- unreasonable expenses," a new claim unique to the FAC, FAC ¶¶ 102-104, at 32-33 (title case omitted).

1.      **The Defendants File the MTD.**

The Defendants filed their MTD pursuant to rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss, in part, the "Plaintiffs' first, second, fourth, fifth, eleventh, and twelfth causes of action" based upon the applicable statutes of limitations. See MTD at 1 (title case omitted). The MTD also seeks the dismissal of the Plaintiffs' twelfth cause of action in its entirety for failure to state any claim upon which relief can be granted, contending that under the Tenth Circuit's interpretation of New Mexico law in Elliott Industries LP v. BP America Production Co., the Defendants have not breached the implied duty to market hydrocarbons. See MTD at 1, 21-24 (citing Elliott Indus. LP v. BP Am. Prod. Co., 407 F.3d at 1091).

The Defendants argue that the statutes of limitations bar: (i) all of the Plaintiffs' claims founded upon breach of written contracts -- to the extent that the claims seek relief for any such breach occurring on or before October 20, 2005, i.e., more than six years before the Plaintiffs filed their initial complaint on October 20, 2011 -- because New Mexico has a six-year statute of limitations on actions based on a written contract, see MTD at 2 (citing N.M. Stat. Ann. § 37-1-3); and (ii) all of the Plaintiffs' claims founded upon violation of the NMOGPPA, breach of the duty to market under Colorado law, breach of the implied covenant to market under New Mexico law, the claim for "interest due under Colorado law," and breach of the implied covenant of good faith and fair dealing -- to the extent that the claims seek relief for any such violation

occurring on or before October 20, 2007, i.e., more than four years before the Plaintiffs filed their initial complaint -- because New Mexico has a four-year statute of limitations for actions on unwritten contracts and actions whose limitation period is not otherwise specified by statute, MTD at 2 (citing N.M. Stat. Ann. § 37-1-4).   The Defendants contend that New Mexico law supplies the controlling statutes of limitations even for the "interest due under Colorado law" component of the fourth cause of action and the eleventh and twelfth causes of action, which the Defendants assert all arise under Colorado law, see MTD at 4, because "'[a] federal court hearing a diversity action applies the statute of limitations which would be applied by a court of the forum state,'" and "'[u]nder New Mexico choice of law principles, a statute of limitations is procedural,' . . . [and] applies 'even where the applicable substantive law is that of another state.'"   MTD at 3, 3-4 (first and second alterations in original)(quoting Porcell v. Lincoln Wood Prods., Inc., 713 F. Supp. 2d 1305, 1316 (D.N.M. 2010)(Armijo, J.)[4]).

The Defendants contend that all of the claims that arise under Colorado law are subject to the shorter four-year limitation period set out by N.M. Stat. Ann. § 37-1-4, see MTD at 4, because the eleventh and twelfth causes of action allege breach of the implied covenant to market, and "the New Mexico Supreme Court made explicitly clear that it has 'held that the implied covenant to market is an implied covenant at law' . . . [, with] 'origins not in the parties' agreement, but rather in law.'"[5]   MTD at 4 (quoting ConocoPhillips Co. v. Lyons,

---

[4] The Honorable M. Christina Armijo, Chief United States District Judge, was elevated to Chief Judge of the United States District Court for the District of New Mexico in 2012.   See Biographical Directory of Federal Judges: Armijo, M. Christina, Federal Judicial Center, http://www.fjc.gov/servlet/nGetInfo?jid=2898&cid=999&ctype=na&instate=na.

[5] The Defendants do not specifically address the claim for "interest due under Colorado law," except to assert that it is substantively similar to the claim -- also in the fourth cause of action -- for a violation of the NMOGPPA.   See MTD at 3 (citing N.M. Stat. Ann. §§ 70-10-1

2013-NMSC-009, ¶¶ 63, 62, 299 P.3d 844, 860).  The Defendants likewise argue that the four-year statute of limitations governs the second cause of action, breach of the implied duty of good faith and fair dealing: "[F]or the six-year statute of limitations in Section 37-1-3 to apply, 'the nature of the right sued upon must be based on the breach or nonperformance of a term in a written contract."  MTD at 5 (quoting Martinez v. Cornejo, 2009-NMCA-011, ¶ 29, 146 N.M. 223, 208 P.3d 443 (N.M. Ct. App. 2009)).

The Defendants next argue that, "[u]nder New Mexico law, the statute of limitations in a breach of contract action . . . 'begins to run from the time of the breach.'"  MTD at 7 (quoting Welty v. W. Bank of Las Cruces, 1987-NMSC-066, ¶ 8, 740 P.2d 120, 122).  They contend that "[t]he Tenth Circuit has recognized that 'New Mexico has refined this rule by holding the cause of action accrues at the time of injury.'"  MTD at 7 (quoting Zamora v. Prematic Serv. Corp., 936 F.2d 1121, 1123 (10th Cir. 1991)).  The Defendants assert that the FAC "avoid[s] alleging the specific dates on which [the Plaintiffs] contend they first suffered injury in fact," but that their "artful pleading is insufficient to avoid dismissal of the claims barred by the applicable statutes of limitations," because, "despite the absence of specific dates, it is indisputably clear . . . that Plaintiffs seek to recover for injury or loss allegedly incurred more than four years, and more than six years, before the filing of their initial complaint."  MTD at 7-8.

The Defendants assert that "New Mexico applies the 'discovery rule,' which means that the statute of limitations 'commences when an injury manifests itself and is ascertainable.'"  Great Am. Ins. Co. v. Crabtree, No. CIV 11-1129, 2012 WL 3656500, at *13 (D.N.M. Aug. 23, 2012)(Browning, J.).  They argue:

---

to -6)("Plaintiffs' Fourth Cause of Action alleged violation of the New Mexico Proceeds Payment Act, and purportedly similar unspecified Colorado law."  (citation omitted)).

> Under the discovery rule, when a defendant "makes a prima facie showing that a claim is time barred," . . . "a plaintiff attempting to invoke the discovery rule has the burden of 'demonstrat[ing] that if [he or] she had diligently investigated the problem [he or] she would have been unable to discover' the facts underlying the claim."

MTD at 9 (alterations in original)(quoting Butler v. Deutsche Morgan Grenfell, Inc., 2006-NMCA-084, ¶ 28, 140 P.3d 532, 539). They further contend that "this burden applies 'at the motion to dismiss stage.'" MTD at 9 (quoting Butler v. Deutsche Morgan Grenfell, Inc., 2006-NMCA-084, ¶ 28, 140 P.3d at 539). The Defendants argue that the FAC "contains no factual allegations to satisfy the discovery rule." MTD at 9. They argue that no Plaintiff has shown that he or she made a diligent investigation, and "each of them would have been able to discover the facts underlying each claim alleged." MTD at 9.

The Defendants then argue that the Plaintiffs, "[h]aving ignored the discovery rule entirely, . . . have resorted instead . . . to allegations of fraudulent concealment, equitable estoppel, and continuing wrong in an effort to avoid the bar of limitations." MTD at 9. The Defendants attempt to rebut the three tolling theories asserted by the Plaintiffs. To rebut the fraudulent concealment argument, the Defendants argue that the Plaintiffs must demonstrate either that the Defendants "engaged in affirmative acts of misrepresentation intended to conceal . . . a potential cause of action," or that "the Defendants had an affirmative obligation," arising from a special relationship, "to make any disclosure or share information outside of that required by the terms of the underlying contracts." MTD at 10. The Defendants contend that, "because a claim of fraudulent concealment is grounded in fraud, the facts giving rise to such a claim must satisfy the heightened pleading requirements of Fed. R. Civ. P. 9(b)." MTD at 10. They assert that the FAC "fails to meet these standards." MTD at 11.

The Defendants argue that they had no special duty to disclose, and attempt to rebut what they maintain is the FAC's contention that such a duty "arose 'by virtue of the superior knowledge available to Williams [sic] all material times,'" MTD at 11 (alteration in original)(quoting FAC ¶ 85, at 26), and because the Plaintiffs' "'placed trust and reliance in Williams,'" MTD at 11 (quoting FAC ¶ 85, at 26).  The Defendants contend that, "[u]nder New Mexico law, 'absent a fiduciary duty to speak on the part of the defendants . . . silence, nondisclosure, or denial of alleged fraudulent concealment so as to toll a statute of limitations.'" MTD at 11 (quoting Cont'l Potash, Inc. v. Freeport-McMoran, Inc., 1993-NMSC-039, 115 N.M. 690, 701, 858 P.2d 66, 77 (N.M. 1993)).  The Defendants argue that "this Court has already recognized that no such duty exists."  MTD at 12 (referring to the Memo. Opinion).

The Defendants argue that the allegation that they misrepresented deducted expenses in check stubs sent to the Plaintiffs is not pled with the specificity that rule 9(b) requires.  See MTD at 14 (citing FAC ¶ 87, at 27).  They contend that the Plaintiffs must allege "'who, what, when, where and how'" the fraud occurred, MTD at 14 (quoting United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah, 472 F.3d 702, 727 (10th Cir. 2006)), and assert that the Plaintiffs did not "plead how any 'volume' or 'price' or 'expense' information is inaccurate or misleading," MTD at 14 (quotations unattributed).  The Defendants additionally argue that the FAC fails to allege that the causes of action were not discoverable through due diligence, see MTD at 15, arguing that "'[i]t [is] incumbent upon Plaintiff[s] to demonstrate that if she diligently investigated the problem, she would have been unable to discover the cause of her injury.'"  MTD at 15 (first and second alterations in original)(quoting Martinez v. Showa Denko, K.K., 1998-NMCA-111, ¶ 22, 964 P.2d 176, 181).

The Defendants also argue that the Plaintiffs have failed to adequately allege equitable estoppel.  See MTD at 17.  The Defendants contend that

> equitable estoppel "assumes that the plaintiff is aware of the facts underlying his or her cause of action, but is persuaded to forego filing suit by virtue of the defendant's actions."   Accordingly, equitable estoppel applies in the situation where the plaintiff is induced [by the defendant] not to file the complaint sooner.

MTD at 17 (quoting Skyberg v. United Food & Commercial Workers Int'l Union, 5 F.3d 297, 302 (8th Cir. 1993), relied upon by Tiberi v. Cigna Corp., 89 F.3d 1423, 1430 (10th Cir. 1996)). The Defendants contend that, "[b]ecause Defendants' monthly statements were submitted to Plaintiffs every month for many many years, long before the Plaintiffs filed their complaint, these monthly statements could not have caused any Plaintiff, aware of his cause [of] action, to refrain from filing suit."  MTD at 18.

The Defendants further argue that the continuing wrong doctrine does not apply, primarily because it applies only "'in the context of tort liability,' and not in breach of contract cases."   MTD at 18-19 (quoting Jeffers v. Butler, 762 F. Supp. 308, 309 (D.N.M. 1990)(Mechem, J.))(citing NcNeill v. Rice Eng'g & Operating, Inc., 2006-NMCA-015, ¶ 25, 128 P.3d 476, 482-83).  They also argue that the Plaintiffs' claims "allege no more than a breach which begins at a single point in time and then has continuing effects."  MTD at 21.

Last, the Defendants contend that the Plaintiffs failed to state a proper claim in their twelfth cause of action.  See MTD at 21.  The contend that the Memo. Opinion and Elliott Industries LP v. BP America Production Co. foreclose relief.  See Memo. Opinion; Elliott Indus. LP v. BP Am. Prod. Co., 407 F.3d 1091, 1113-14 (10th Cir. 2005).  They argue that, although the restyling of the Plaintiff's

> previous allegations concerning "unreasonable expenses" were not "specifically addressed" in the Memorandum Opinion . . . , the allegations on which Plaintiffs' Twelfth Cause of Action depends were *specifically addressed* by the Tenth

> Circuit in *Elliott Indus. LP v. BP America Prod. Co.*, on which this Court
> *specifically relied* when it dismissed Plaintiffs' claim for breach of the implied
> covenant to market, and which *specifically requires* dismissal of Plaintiffs'
> repetitious implied covenant to market claim in the" FAC.

MTD at 22 (emphasis in original)(citation omitted).  They assert that the Court "expressly held

that oil and gas lessees who, like WPX in this case, 'were and are actively producing gas,

processing the gas, and selling the refined natural gas and NGLs,' are in *compliance* 'with the

implied duty to market as articulated by the New Mexico courts.'"  MTD at 24 (emphasis ni

original)(quotation unattributed).

### 2.      The Plaintiffs File Their Response and Supplemental Brief.

The Plaintiffs responded to the MTD twenty days later.  See Plaintiffs' Response to

Defendants' Motion to Dismiss Claims in Plaintiffs' Fourth Amended Complaint, filed

November 8, 2013 (Doc. 156)("Response").  They first argue that the MTD is more aptly styled

as a motion for summary judgment under rule 56, because it "request[s] the Court to consider

and evaluate evidentiary materials that were not made a part of, or incorporated into," the FAC.

Response at 2.  They contend that the Court should deny the MTD.  See Response at 3.  They

assert that "[t]he inclusion of the check stub in Defendants' motion may affect the Court's

determination of the merits of the motion."  Response at 4.  Although they acknowledge that "the

Court may consider on a motion to dismiss 'undisputed documents central to the allegations in

Plaintiffs' complaint," they contend that, because "there are potentially thousands of check stubs

that will be examined at trial and that no one, single check stub is 'central' to the case," what is

really happening is that the Court is being asked to consider extrinsic evidence.  Response at 5.

They argue that, if the Court chooses to convert the motion into one for summary judgment, it

should also consider the five documents they attach to their Response: (i) the Affidavit of

Bradley Brickell Pursuant to *Fed. R. Civ. P.* 56(d) in Support of Plaintiffs' Response to

- 13 -

Defendants' Motion to Dismiss Claims in Plaintiffs' Fourth Amended Complaint, filed November 8, 2013 (Doc. 156-1); (ii) five pages of the transcript of a Deposition of Sheryl Ward, taken March 1, 2013, filed November 8, 2013 (Doc. 156-2); (iii) an additional five pages from the second portion of the same Deposition of Sheryl Ward, filed November 8, 2013 (Doc. 156-3); (iv) what appears to be a check stub, the first page of a rule 30(b)(6) deposition notice, and three pages of a document entitled "Exhibit B," Fourth Attachment to Response, filed November 8, 2013 (Doc. 156-4); and (v) what appear to be the fourth through eighth pages of the same document, "Exhibit B," Fifth Attachment to Response, filed November 8, 2013 (Doc. 156-5).

The Plaintiffs also argue that they have pled sufficient facts for a jury to reasonably conclude that the statutes of limitations have been tolled and attempt to justify all three tolling doctrines.  See Response at 7.  In this brief, they do not dispute that New Mexico law supplies all the relevant statutes of limitations.  See Response at 7 n.2.  They assert that the FAC alleges fraudulent concealment by alleging that the Plaintiffs "placed trust and reliance on Defendants as lessees of the oil and gas leases," and that the Defendants' "'superior knowledge' regarding their production of hydrocarbons from Plaintiffs' wells" imparts an obligation of "a 'full and fair disclosure of the true and complete facts of all hydrocarbons produced from the subject wells.'" Response at 7 (quoting FAC ¶ 85, at 26).  They further assert that the Defendants affirmatively concealed facts underlying the causes of action in their monthly statements, which: (i) "contain 'erroneous and misinformation about the volumes, values, prices, and types of hydrocarbons produced, used or sold from [the] subject wells,'" Response at 7-8 (alteration in original)(quoting FAC ¶ 86, at 26); (ii) do not represent "'the values of hydrocarbons based on arms' length transfers/contracts,'" Response at 8; and (iii) "misrepresent[] and omit[] that 'certain types and

amounts of expenses were deducted for certain services,'" Response at 8 (quoting FAC ¶ 87, at 27).

The Plaintiffs also argue that they have properly pled equitable estoppel.  See Response at 8.  They support this contention by pointing to allegations in the FAC and by characterizing the delivery of false monthly statements as a "'continuing wrong.'"  Response at 8-9 (quoting FAC ¶ 94, at 28).  They point to the contention in the FAC that "the class members 'did not discovery [sic] and could not have reasonably discovered their claims as alleged herein of underpayments,'" as a properly pled allegation of due diligence.  Response at 9.

The Plaintiffs additionally rely upon the discovery rule, which they contend "is raised more in the context of tort cases, [but] can certainly be used in cases of fraudulent concealment and in other cases involving fraudulent concealment, as pled herein."  Response at 9-10.  They assert that they properly "allege that they did not discover Defendants' wrongful conduct until they filed suit as a result of Defendants' fraudulent concealment and principles of equitable estoppel, which toll the statute of limitations."  Response at 10.  The Plaintiffs argue that they have also pled fraudulent concealment under the similar Colorado law.  See Response at 10-11.

The Plaintiffs argue that the question whether they exercised reasonable diligence to ascertain the facts that underlie their claims is fundamentally a question for the jury, is inappropriate on summary judgment, and certainly not appropriate on a rule 12(b)(6) motion.  See Response at 12 (citing Maestas v. Zager, 2007-NMSC-003, ¶ 25, 141 N.M. 154, 152 P.3d 141).  They argue, contrary to the Defendants' contention, that there was a special relationship between the parties "by virtue of the leases," and that a fiduciary relationship, per se, is not required.  Response at 12.

Last, the Plaintiffs argue that they have stated a proper claim for breach of the implied covenant of marketability.  See Response at 13.  They contend that,

> contrary to the Defendants' assertion in the moving papers, *Elliott Indus. LP v. BP America Prod. Co.*, 407 F.3d 1091 (10th Cir. 2005), does not support dismissal. *Elliott* does not hold that a producer can charge unreasonable expenses.  Nothing in the *Elliott* decision precludes a party from claiming breach of the implied duty to market when the royalties paid the mineral owners are based on unreasonable or phantom expenses and deductions.  The *Elliott* court did not reach the issue of reasonableness of the defendant's expenses because the *Elliott* plaintiff *dismissed* its claim for breach of contract.  The court found that the plaintiff' [sic] failure to assert a cause of action for breach of contract rejects "the very foundation" of its relationship with the lessee.

Response at 14 (emphasis in original).  They further assert that "the New Mexico Supreme Court in *ConocoPhillips Co. v. Lyons*, 2013-NMSC-009, 299 P.3d 844, held that the *deductions* used in calculating Lessees' royalty obligations *must be reasonable* even though . . . [they] need not be 'actual.'"  Response at 14-15 (emphasis in original).

### 3.      **The Defendants File Their Reply.**

The Defendants replied to the Plaintiffs' Response before the Plaintiffs filed the supplement to their Response.  See Defendants' Reply in Support of Motion to Dismiss Claims in Plaintiffs' Fourth Amended Complaint, filed December 4, 2013 (Doc. 172)("Reply").  The Defendants argue that the Court may consider the exhibit they attached to their MTD, "as it is central to Plaintiffs' claims," but that the Court should disregard the extrinsic materials submitted by the Plaintiffs "in a transparent effort to convert this motion into one for summary judgment." Reply at 1-2.  They contend that, under Tenth Circuit law, "if a document 'is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss.'"  Reply at 3 (quoting GFF Corp. v. Associated Wholesale Grocers, Inc., 130 F.3d 1381 (10th Cir. 1997)).  They assert that the "Defendants' monthly statements, which include Exhibit A, repeatedly are referred to,

- 16 -

directly and indirectly," in the FAC.   Reply at 3.   They further contend that the monthly statements are "central," because "a document attached to a motion to dismiss is 'central' to the plaintiffs' claims if the claims, 'at least in part,' are based on the document."   Reply at 4 (quoting Jornigan v. N.M. Mut. Cas. Co., No. CIV 03-0813, 2004 WL 3426437, at *6 (D.N.M. April 19, 2004)(Browning, J.)).   They also argue that, although the FAC "does not allege the specific date that Defendants or their predecessors 'first initiated delivery of monthly statements,' that omission does not *per force* establish that Plaintiffs' claims, *as alleged*, are not time-barred." Reply at 2 (emphasis in original)(quoting FAC ¶ 94, at 28).

The Defendants then argue that the Court should not convert the MTD into one for summary judgment.   Reply at 6.   They address what they characterize as an attempt by the Plaintiffs to convert the motion by way of documents attached to their Response:

> Plaintiffs further argue that they may effect conversion of Defendants' motion into one for summary judgment simply by their submission of materials outside the pleadings. . . .   "[B]ecause the Court is asked to consider extrinsic evidence (*including deposition testimony and interrogatory answers Plaintiffs attach in opposition to the motion*), the motion *must* be converted into one for summary judgment."

Reply at 6 (emphasis in original)(quoting Response at 5).   They assert that this attempt is "in clear conflict with the Tenth Circuit's decision in *Geras v. IBM Corp.*, 638 F.3d 1311 (10th Cir. 2011)."   Reply at 6.   The Defendants acknowledge that "a motion to dismiss under Rule 12(b)(6) must, *in general*, be treated as a motion for summary judgment under Rule 56 if 'matters outside the pleadings are presented to and not excluded by the court.'"   Reply at 6 (emphasis in original)(quoting Fed. R. Civ. P. 12(d)).   They contend, however, "that the district court is *not* required to accept evidence proffered by the plaintiff in response to a motion to dismiss."   Reply at 7 (emphasis in original).

The Defendants next address the equitable tolling doctrines that the Plaintiffs allege apply in the case.  See Reply at 8.  They state that, "[a]lthough Plaintiffs label these allegations as 'causes of action,' in this case they are not."  Reply at 8-9.  See Reply at 9 & n.1.  The Defendants contend that equitable estoppel is inapposite, because "a central element to any assertion of equitable estoppel is the plaintiff's awareness of his cause of action," and the FAC not only fails to allege this knowledge, but "it does exactly the opposite."  Reply at 10 (citing FAC ¶ 96, at 29).  They repeat their contention from the MTD that the continuing wrong doctrine applies only in tort cases.  See Reply at 10-11.  They oppose the Plaintiffs' allegations of fraudulent concealment on the ground that the allegations are not plead with particularity as rule 9(b) requires, see Reply at 15, and on four substantive grounds: (i) that they fail to allege a fiduciary relationship between the Plaintiffs and the Defendants, see Reply at 11-13; (ii) that the Plaintiffs have not alleged an affirmative act of concealment, which the Defendants contend is necessary to make out a claim of fraudulent concealment in the absence of a fiduciary relationship, see Reply at 13-14; (iii) that the Plaintiffs have not alleged how they exercised the due diligence that the Defendants contend is an essential element of a fraudulent concealment claim, see Reply at 14; and (iv) that BP America Production Co. v. Patterson is inapposite, because the procedural posture of that case "was an appeal of a class certification decision under the Colorado rule corresponding to Rule 23," and has "no relevance to the question whether Plaintiffs have properly pled fraudulent concealment in this case," Reply at 15-16 (citing BP Am. Prod. Co. v. Patterson, 263 P.3d 103 (Colo. 2011)).

The Defendants address the viability of the Plaintiffs' twelfth cause of action by arguing that the "'conception of the implied duty to market'" upon which the Plaintiffs rely "'finds no support within New Mexico case law.'"  Reply at 17 (quoting Elliott Indus. LP v. BP Am. Prod.

Co., 407 F.3d at 1114).  They contend that, "[i]n *Elliott*, plaintiff asserted that the implied duty to market under New Mexico law *not only* does not permit lessees 'to deduct costs incurred before a gas is in a marketable condition,' *but also* does not permit them 'to deduct costs that are not actually incurred or are unreasonable.'"  Reply at 18 (emphasis in original)(quoting Elliott Indus. LP v. BP Am. Prod. Co., 407 F.3d at 1111).  They assert that "the Tenth Circuit rejected this claim, holding, as this Court recognized, that oil and gas lessees who 'are actively producing gas, processing the gas, and selling the refined natural gas and NGLs . . . have complied with [the] implied duty to market as articulated by the New Mexico courts.'"  Reply at 18 (omission in original)(quoting Elliott Indus. LP v. BP Am. Prod. Co., 407 F.3d at 1113).  They assert that the Plaintiffs falsely allege that "'the *Elliot*[*t*] court did not reach the issue of reasonableness of the defendant's expenses because the *Elliot*[*t*] plaintiff dismissed its claim for breach of contract,'" Reply at 18 (alterations in original)(quoting Response at 14), and that "this argument is simply a rehash of the same argument Plaintiffs made when this Court dismissed this same claim in the Memorandum Opinion," Reply at 18.  They quote the Court: "'That the Plaintiffs have put their leases at issue in this case does not provide them a safety-hatch from the Tenth Circuit's explanations of New Mexico law in *Elliott Indus.*'"  Reply at 18 (quoting Memo. Opinion at 132).

The Defendants also counter Plaintiffs' "seeming reliance" on ConocoPhillips Co. v. Lyons, 2013-NMSC-009, 299 P.3d 844, noting that the Supreme Court of New Mexico's holding "with respect to the lessees' right to deduct 'reasonable' costs of post-production services in paying royalty was based *not* on the implied covenant to market, but rather on the express royalty terms in state leases."  Reply at 19 (emphasis in original)(quoting ConocoPhillips Co. v. Lyons, 2013-NMSC-009, ¶¶ 20, 24, 68, 299 P.3d at 851, 852-53, 861).

Last, the Defendants contend that the "Plaintiffs' submission of a Rule 56(d) affidavit and their assertion that the determination of Defendants' motion to dismiss would be 'premature' is improper and should be disregarded," because the MTD "'tests the sufficiency of the allegations within the four corners of the complaint.'"  Reply at 20 (quoting Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994)).

### 4.    The Court Holds a Hearing on the MTD.

The Court held a hearing on the MTD a week before the Plaintiffs submitted their Response Supp.  See Transcript of Hearing at 12-80, taken February 21, 2014 ("Tr.").[6]  The Defendants first attempted to clarify that the FAC referred to the check stubs which they attached to their MTD, and stated that they believed that these check stubs were attached to the monthly statements referenced in ¶ 96 on page 29 of the FAC.  See Tr. at 12:15-14:2 (Court, Sheridan). The Court stated that it was inclined to consider the check stubs that the Defendants attached, but not the documents that the Plaintiffs attached to their Response, and that it would not convert the MTD into a motion for summary judgment.  See Tr. at 16:8-14 (Court).

The Court first clarified with the Defendants that what they mean when they refer to dismissing claims "in part" is "just cutting off damages" past four-to-six years before the filing of the case; the Defendants confirmed this characterization.  Tr. at 17:8-14 (Court, Sheridan).  As the Defendants outlined their analysis, starting with what they contend are the applicable six-year and four-year statutes of limitations, the Plaintiffs for the first time -- as this hearing was before the Response Supp. was filed -- asserted that Colorado law might supply the statutes of

---

[6] The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

limitations for the claims under Colorado law.  See Tr. at 19:9-20:22 (Court, Brickell).  The Plaintiffs acknowledged that, "in general, [statutes of] limitations [are] viewed as procedural," Tr. at 20:21-22 (Brickell), but contended that Phillips Petroleum v. Shutts directs the Court "to look at the issue of whether each state's law should apply or not," Tr. at 19:24-25 (Brickell)(citing 472 U.S. 797 (1985)).  The Defendants opposed this contention, citing Porcell v. Lincoln Wood Products, Inc., 713 F. Supp. 2d at 1305, from the District of New Mexico and Elm Ridge Exploration Co., LLC v. Giant Exploration & Production Co., 721 F.3d 1199 (10th Cir. 2013), from the Tenth Circuit for the proposition that the Court should apply New Mexico's statutes of limitations to all claims.  See Tr. at 21:18-22:22 (Sheridan, Brickell).  The Defendants also characterized Phillips Petroleum v. Shutts as inapposite, stating that the Supreme Court of the United States had found that a Kansas court's application of Kansas substantive law -- not a Kansas statute of limitations -- to royalty interests and wells almost entirely outside Kansas violated the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States of America.  See Tr. at 22:25-25:5 (Sheridan).  They concluded by asserting that "[t]he U.S. Supreme Court did not impose a choice of law rule on that matter."  Tr. at 24:19-20 (Sheridan).

The discussion then turned to the tolling doctrines, see Tr. at 25:6-7 (Court), and the Defendants first addressed equitable estoppel, arguing again that the doctrine "assumes that the plaintiff is aware of the facts underlying his or her cause of action, but is persuaded to forego filing suit by virtue of the defendant's actions."  Tr. at 26:4-7 (Sheridan)(purporting to quote Tiberi v. Cigna Corp., 89 F.3d 1423 (10th Cir. 1996), but the Court can find no such quote). They assert that in the Plaintiffs' Response "at page 10 . . . they say [that] . . . they did not

discover defendant's wrongful conduct until they filed suit.  So if that is to be accepted as true, . . . then they do not have an equitable estop[pel] claim."  Tr. at 26:20-27:3 (Sheridan).

The Plaintiffs stated that they "have a totally different read of the [Tiberi v. Cigna Corp.] case."  Tr. at 28:1-2 (Brickell).  They assert that, in "paragraph 31,"[7] Tr. at 28:8 (Brickell), the case sets out the elements of equitable estoppel: (i) "[c]onduct which amounts to a false representation [or] a concealment of material facts . . . which is calculated to convey the impression that [f]acts are . . . inconsistent with [those that] the party subsequently attempts to assert," Tr. at 28:10-15 (Brickell); (ii) "intention that the conduct be acted upon by the other party," Tr. at 28:15-16 (Brickell); (iii) "knowledge, actual or construc[tive,] of the real facts," Tr. at 28:16-17 (Brickell); (iv) "lack of knowledge or means of knowledge of the truth" on the part of the party asserting estoppel, Tr. at 28:18-19 (Brickell); (v) "reliance" on the part of that party, Tr. at 28: 20 (Brickell); and (vi) "action based there[]upon" by that party, Tr. at 28:20 (Brickell).  The Plaintiffs assert that they "have set those forth in spades in [their] complaint." Tr. at 28:22-23 (Brickell).

The Defendants responded first by voicing their displeasure at the Plaintiffs raising an issue that they seemingly forfeited in their Response, noting that, although they "know that this Court . . . places great importance on making the right answer, . . . it seems to [them] that it's not appropriate to be making arguments . . . in oral argument here based on cases that [the Defendants] briefed in [their MTD, but that] they never responded to in their response."  Tr. at 29:17-23 (Sheridan).  The Defendants argued the issue on the merits, however, asserting that, "[u]nder New Mexico law, fraudulent concealment is a species of equitable estoppel."  Tr. at

---

[7] Tiberi v. Cigna Corp. is a Tenth Circuit case, and is not organized by paragraphs.  See 89 F.3d 1423.

- 22 -

29:25-30:2 (Sheridan).   They argue that, for all equitable estoppel that is not fraudulent concealment, actual knowledge of the party asserting estoppel must be alleged; they cite Village of Angel Fire v. Board of County Commissioners of Colfax County, 2010-NMCA-038, 242 P.3d 371, in support of this contention.   See Tr. at 30:13-31:25 (Sheridan).

The Defendants then moved to the doctrine of continuing wrong, which they asserted "is not a tolling doctrine as such, [but rather] relates to when a statute of limitations actually begins to run as opposed to being tolled, and it is a tort law doctrine."   Tr. at 33:2-6 (Sheridan).   They assert that Tiberi v. Cigna Corp. "[s]pecifically mentions that where a tort involves a continuing or repeated injury," the continuing wrong doctrine applies.   Tr. at 33:9-10 (Sheridan).   They noted that in McNeil v. Rice Engineering & Operating, Inc., 2003-NMCA-078, 70 P.3d 794, the Court of Appeals of New Mexico "rejected the continuing wrong doctrine in the context of a trespass and nuisance action."   Tr. at 33:16-17 (Sheridan).   They also cited a case, Bishop v. Evangelical Lutheran Good Samaritan Society, 2010 WL 3998030, at *8 (N.M. Ct. App. Feb. 9, 2010), in which the Defendants assert that the Court of Appeals of New Mexico ruled that, in

> situation[s] in which the defendant has a repeating obligation of performance of one type or another, [such as to] make contribution[s] to[] a pension plan . . . [or a] health care benefits [fund], . . . the cause of action accrues with the first time, with the decision when the defendant failed to make the payment.

Tr. at 34:18-35:4 (Sheridan).

The Plaintiffs half-heartedly defended the FAC's assertion of the continuing wrong doctrine:

> We have pled the continuing wrong doctrine in order to . . .   make sure that we have completely pled the issues that concern fraudulent concealment.   In some instances it has been referred to as a continuing wrong doctrine, and therefore I feel like it falls under fraudulent concealment in this particular case. Such as announced in [C]ontinental [P]ot [A]sh.   As this Court analyzed in the Great American case and those issues.   I just did not want to leave that stone unturned as some courts refer to that as a continuing wrong if it occurs on

> numerous occasions which we've alleged it occurs every month, and so that's
> why we characterize that cause of action [as a] continuing wrong.  I don't know if
> per se that is, maybe the correct nomenclature for it or not, but if it calls under a
> number of fraudulent concealment then I'm prepared to address that right now.

Tr. at 36:17-37:10 (Brickell).  When asked if they "kn[e]w of any Supreme Court case in New

Mexico that applies the continuing wrong to a contract case," the Plaintiffs answered that they

"do not."  Tr. at 37:23-38:1 (Court, Brickell).  The Plaintiffs asserted, however, that Oklahoma

has applied the continuing wrong doctrine to contract cases, see Tr. at 39:2-3 (Brickell), and

cited without discussing a case called Tull v. City of Albuquerque, 1995-NMCA-123, 907 P.2d

1010, see Tr. at 39:19 (Brickell).  The Court concluded the discussion of the continuing wrong

doctrine by noting that it was "inclined to think that this is more of a kind of accrual. . . .  It

doesn't sound like it's a primary doctrine the plaintiffs are relying upon anyway."  Tr. at 40:21-

22 (Court); id. at 41:5-6 (Court).

Turning to the fraudulent concealment issue, the Defendants first argued that the FAC "is

wholly lacking in the who, what, when, where, how, and why allegations necessary to properly

alleged fraudulent concealment to equitably toll a statute of limitations," but "[b]eyond the

pleading failures, . . . there are some substantive problems as well."   Tr. at 41:19-41:24

(Sheridan).  They contend that, "to the extent that it is based upon a nondisclosure, . . . [i]n the

absence of a duty to disclose, there cannot be fraudulent concealment."  Tr. at 41:25-42:3

(Sheridan).  They assert that the Plaintiffs rely upon this theory in ¶ 85 of the FAC, which they

characterize as stating that the "class members have placed trust and reliance in Williams by

virtue of the superior knowledge available to Williams[;] at all material times plaintiffs [and]

class members are owed a full and fair disclosure."  Tr. at 42:6-10 (Sheridan).  The Defendants

contend that a duty to disclose arises only from a fiduciary relationship and that "there are two

types of fiduciary duties": "there are duties which are fiduciary as a matter of law, [such as] a

situation involving a lawyer and a client, a doctor and a patient, priest and penitent, [or a] principal and agent"; and "[t]here are other situations where a relationship between parties can rise to the level of being a fiduciary duty in fact" -- "those are relationships that are typically the subject of special trust and confidence," with the "classic example [being] the widow and the housekeeper where the housekeeper attend[s] to all of the widow's needs[,] living with her 24 hours a day[,] tak[ing] care of her[,] and then the widow changes her will and leaves everything to the housekeeper[,] disinheriting the children." Tr. at 42:18-43:8 (Sheridan). The Defendants assert that there is no legally recognized fiduciary duty between an oil lessee and lessor, and that "[t]here are no facts alleged . . . that in any way establish any kind of relationship of special trust or confidence." Tr. at 43:12-14 (Sheridan). They asserted that "[a]ll of the plaintiffs have received their interest subsequently" -- i.e., none of them were the original signatories to their leases -- and "almost every case through inheritance." Tr. at 46:16-22 (Sheridan). They concluded their nondisclosure argument by noting that "there is simply nothing that's alleged . . . that creates any sort of special trust or confidence between somebody who gets a check once a month 45[] years after the contract was entered into and the parties sending the check." Tr. at 46:23-47:2 (Sheridan).

The Defendants then argued that the FAC alleges no affirmative act of concealment. See Tr. at 47:8-9 (Sheridan). They contended that "[w]hat has to be concealed is the cause of action," Tr. at 47:13-14 (Sheridan), "[a]nd there aren't any allegations in the complaint to show that the cause of action could not have been discovered by the exercise of due diligence," Tr. at 48:14-16 (Sheridan). The Defendants last contended that, under Tenth Circuit law, "the absence of an allegation regarding how and when [the plaintiff] learned of the alleged misconduct forecloses a claim that defendants['] fraudulent concealment prevented [the plaintiff] from

discovering defendant's involvement."  Tr. at 49: 13-17 (Sheridan)(citing Dumar v. Lummis, 543

F.3d 614, 622 (10th Cir. 2008)(Hartz, J.)).

The Plaintiffs contended that the Defendants took on a special duty to disclose when they

started sending monthly statements to the Plaintiffs.   See Tr. at 51:11-20 (Brickell).   They

acknowledged that "[t]here may not have been a duty to send them at all," Tr. at 51:19-20

(Brickell), but that, once they sent the statements, "those statements [must] be truthful and

accurate," Tr. at 51:19 (Brickell)(citing FAC ¶ 39, at 16).  They asserted that "[t]hese statements

failed to disclose what the gross volume, and value and character/type of all hydrocarbons

produced, processed, used, traded, and sold from plaintiff's wells."  Tr. at 52:1-4 (Brickell).  The

Plaintiffs then illustrated how they contend the fraudulent concealment was executed:

> And what I'd like to do, Your Honor[,] is direct your attention to the check stub
> that Your Honor recognized as part of their motion to dismiss the complaint,
> which is the very last page or denoted as Exhibit A.  All right, now if I can direct
> the Court's attention to the . . .  middle of the page there are certain letter initials
> that are used to describe certain things within the check stub itself.  You'll notice,
> Your Honor, that the second definition is called G gas.  C, condensate.  Tax,
> taxes, TRN, field transportation.  Now, Your Honor if I can walk you across one
> of the check stub lines here, let's just take, now, this is a very small check stub, so
> a lot of the numbers are very small on this thick one, but believe me there are a lot
> bigger ones than this.   But let's look at this one here on the . . . [G]ubenator
> Number 1 MV, and it shows for first of all the date of sale, it says is September of
> 2003.  And then, Your Honor, as you come across, you see the next thing which
> says PC at the top column and you come down it's a G for gas.  Your Honor,
> we're alleging that that is not all gas.  That initial that month they . . . sold natural
> gas liquids but failed to inform Mr. Anderson about that.  Let's go over to the
> price.  4 dollars 63 [cents].  Your Honor, we are alleging that that is not the value
> that was received in that sale by the defendants Williams [P]roduction Coley
> which by the way Your Honor is a name change into WPX the current defendant
> name.  We allege that that is some initial index or posted price, not reflective of
> what they received for the gas, much less the natural gas liquids that were
> processed out of that gas.  Your Honor, the reason why we know that there were
> natural gas liquids that month is because we see after the word [G]ubenator
> Number 1, we see an MV.  The MV stands for Mesa Verde.  Your Honor, that's a
> conventional gas zone and that area is productive of . . . gas that will contain inert
> quantities of large amounts of natural gas liquids.  We come on across and we see
> that they've combined the price and the quantity of 366.00 to come up with a

value of 1693.42.   Your Honor, we're alleging that that 366 is not the true quantity of gas that was produced at the wellhead.   In fact, that it was larger than that; that they are not informing Mr. Anderson of what . . . the volume of gas that was produced from his well was.   And that is not the quantity of gas that was actually sold or used by the defendant.  Next, we come on across and we see that there is a TRN deduction of 6 cents.   Now, 6 cents doesn't seem like much.   But when you look at it in the context of the total value on this very small interest on this particular check stub of 59 cents, you can see that's 10 percent.   We are alleging that in fact that 6 cents was not a transportation charge but that is a number made up by the Williams companies that they have just decided that that's the amount they're going to charge, and including things like home office overhead, including things like return on investment is the way that is calculated.   As we then state in paragraph number 40 [and] 39 on page 16, Williams intended for the plaintiffs to rely upon its written statements sent to plaintiffs.   These statements knowingly failed to disclose excessive and impermissible charges.   That's what I'm talking about, Judge, depreciation, profit, return on investment.   And reductions imposed by Williams payment methods as well as the gross volume, value and type of all hydrocarbons produced, used, sold or traded indirect violation of Williams' statutory and common law duties to properly report the same and to act in good faith and fair dealing.   The same constitutes fraudulent concealment.   Your Honor, in this particular instance, this is their own attachment is a good illustration of what we are saying constitutes fraudulent concealment and it shows the specific nature of our allegations, and how exactly specific we are.

Tr. at 53:7-56:7 (Brickell).   The Plaintiffs also argued that, even though none of the Plaintiffs were the original signatories to their leases, they are parties by succession and should be treated the same as if they had signed the leases themselves.   See Tr. at 60:23-61:4 (Brickell).

The Defendants, after providing a brief summary of what they considered "this case is about," Tr. at 65:7-66:20 (Sheridan), argued that "fraudulent breach of a contract does not give rise to an action for fraud," Tr. at 67:3-4 (Sheridan).   They further argued: "There is a difference between fraud in the inducement and fraud in the performance of a contract, okay.  There is no cause of action for fraud in the performance of a contract.   You have a claim for breach of contract."   Tr. at 67:12-16 (Sheridan)(citing Brick v. Cohn-Hall-Marx Co., 11 N.E.2d 902 (N.Y. 1937)).

The Court interjected to opine that, as far as it could tell, "this isn't really a nondisclos[ure] case. . . . [T]he duty is sort of a red herring here.  Once you start sending out the statements you've got to be accurate.   That's what the case is about, isn't it, it's not a nondisclosure, it's not a duty."  Tr. at 71:24-25 (Court); id. at 72:8-12 (Court).  The Defendants responded that "[i]t has to rise to the level of being fraudulent."  Tr. at 72:12-15 (Sheridan). They last argued that, because the Court had previously dismissed the standalone claim for fraud, the same facts could not suffice to toll the statute by way of fraudulent concealment.  See Tr. at 72:17-73:2 (Sheridan).  The Court stated that it would take the matter under advisement.  See Tr. at 79:12-14 (Court).

     **5.**       **The Plaintiffs File a Supplement to Their Response.**

The Plaintiffs filed a supplemental brief to their Response a week after the hearing and almost three months after the Defendant filed their Reply.  See Supplemental Brief in Response to Defendants' Motion to Dismiss -- Application of Forum State's Statute of Limitations, filed February 28, 2014 (Doc. 215)("Response Supp.").   The Response Supp. first argues that the Court "should determine whether it would be fundamentally unfair to apply the New Mexico statute of limitations to the Plaintiffs' and Class Members' claims under wells in Colorado," Response Supp. at 2 (citing Lujan v. Regents of the Univ. of Cal., 69 F.3d 1511, 1515-16 (10th Cir. 1995), and, if so, apply the relevant Colorado statute of limitations -- which the Plaintiffs assert is six years, see Response Supp. at 4 -- to the claims arising under Colorado law, see Response Supp. at 2.  They argue that the fraudulent concealment and equitable tolling doctrines of both states are similar, citing Continental Potash, Inc. v. Freeport-McMoran, Inc., 1993-NMSC-039, 858 P.2d 66, from New Mexico, and BP America Production Co. v. Patterson, 263 P.3d 103 (Colo. 2011), from Colorado.

## LAW REGARDING RULE 12(b)(6)

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true."  Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994).  The sufficiency of a complaint is a question of law, and when considering a rule 12(b)(6) motion, a court must accept as true all well-pled factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss."); Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pled factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff."  (citing Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006))).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)(citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Ashcroft v. Iqbal, 556 U.S. at 678.  "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  Bell Atl. Corp v. Twombly, 550 U.S. at 555 (citation omitted).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that,

if assumed to be true, state a claim to relief that is plausible on its face.  See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010).  "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556).  "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(emphasis omitted).  The Tenth Circuit stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible."  The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570)(internal citations omitted).

Although affirmative defenses must generally be pled in the defendant's answer, not argued on a motion to dismiss, see Fed. R. Civ. P. 8(c), there are exceptions where: (i) the defendant asserts an immunity defense -- the courts handle these cases differently than other motions to dismiss, see Glover v. Gartman, 899 F. Supp. 2d 1115, 1137-39, 1141 (D.N.M. 2012)(Browning, J.)(citing Pearson v. Callahan, 555 U.S. 223 (2009); Robbins v. Oklahoma, 519 F.3d 1242 (10th Cir. 2008)); and (ii) where the facts establishing the affirmative defense are apparent on the face of the complaint, see Miller v. Shell Oil Co., 345 F.2d 891, 893 (10th Cir. 1965)("Under Rule 12(b), a defendant may raise an affirmative defense by a motion to dismiss for the failure to state a claim.  If the defense appears plainly on the face of the complaint itself,

the motion may be disposed of under this rule.").  The defense of limitations is the affirmative

defense most likely to be established by the uncontroverted facts in the complaint.  See 5 Charles

Alan Wright, Arthur R. Miller, Mary Kay Kane, Richard L. Marcus & Adam N. Steinman,

Federal Practice & Procedure: Civil § 1277 (3d ed. 2014).  If the complaint sets forth dates that

appear, in the first instance, to fall outside of the statutory limitations period, then the defendant

may move for dismissal under rule 12(b)(6).  See Rohner v. Union Pac. R.R. Co., 225 F.2d 272,

273-75 (10th Cir. 1955); Gossard v. Gossard, 149 F.2d 111, 113 (10th Cir. 1945); Andrew v.

Schlumberger Tech. Co., 808 F. Supp. 2d 1288, 1292 (D.N.M. 2011)(Browning, J.).  The plaintiff

may counter this motion with an assertion that a different statute of limitations or an equitable

tolling doctrine applies to bring the suit within the statute; the Tenth Circuit has not clarified

whether this assertion must be pled with supporting facts in the complaint or may be merely

argued in response to the motion.  Cf. Kincheloe v. Farmer, 214 F.2d 604 (7th Cir. 1954)(holding

that, once a plaintiff has pled facts in the complaint indicating that the statute of limitations is a

complete or partial bar to an action, it is incumbent upon the plaintiff to plead, either in the

complaint or in amendments to it, facts establishing an exception to the affirmative defense).  It

appears, from case law in several circuits, that the plaintiff may avoid this problem

altogether -- at least at the motion-to-dismiss stage -- by simply refraining from pleading specific

or identifiable dates, see Goodman v. Praxair, Inc., 494 F.3d 458, 465-66 (4th Cir. 2007);

Hollander v. Brown, 457 F.3d 688, 691 n.1 (7th Cir. 2006); Harris v. New York, 186 F.3d 243,

251 (2d Cir. 1999); Honeycutt v. Mitchell, 2008 WL 3833472 (W.D. Okla. Aug. 15,

2008)(West, J.), although the Tenth Circuit has not squarely addressed this practice.

**LAW REGARDING THE USE OF DOCUMENTS OUTSIDE THE PLEADINGS IN A
RULE 12(b)(6) MOTION**

Generally, the sufficiency of a complaint must rest on its contents alone.  See Casanova v.
Ulibarri, 595 F.3d 1120, 1125 (10th Cir. 2010); Gossett v. Barnhart, 139 F. App'x 24, 24 (10th
Cir. 2005)(unpublished)[8]("In ruling on a motion to dismiss, the district court is limited to the
facts pled in the complaint.").  Emphasizing this point, the Tenth Circuit, in Carter v. Daniels, 91
F. App'x 83, 85 (10th Cir. 2004)(unpublished), stated: "When ruling on a Rule 12(b)(6) motion,
the district court must examine only the plaintiff's complaint.  The district court must determine
if the complaint alone is sufficient to state a claim; the district court cannot review matters
outside of the complaint."   There are three limited exceptions to this general principle:
(i) documents that the complaint incorporates by reference, see Tellabs, Inc. v. Makor Issues &
Rights, Ltd., 551 U.S. 308, 322 (2007); (ii) "documents referred to in the complaint if the
documents are central to the plaintiff's claim and the parties do not dispute the documents'
authenticity," Jacobsen v. Deseret Book Co., 287 F.3d 936, 941 (10th Cir. 2002); and
(iii) "matters of which a court may take judicial notice," Tellabs, Inc. v. Makor Issues & Rights,

---

[8] Gossett v. Barnhart is an unpublished opinion, but the Court can rely on an unpublished
opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R.
32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited for their
persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have
> generally determined that citation to unpublished opinions is not favored.
> However, if an unpublished opinion or order and judgment has persuasive value
> with respect to a material issue in a case and would assist the court in its
> disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court finds that Gossett v.
Barnhart, Carter v. Daniels, 91 F. App'x 83 (10th Cir. 2004), Nard v. City of Oklahoma City,
153 F. App'x 529 (10th Cir. 2005), and Douglas v. Norton, 167 F. App'x 698 (10th Cir. 2006),
all have persuasive value with respect to a material issue, and will assist the Court in its
disposition of this Memorandum Opinion and Order.

Ltd., 551 U.S. at 322.   In Gee v. Pacheco, 627 F.3d 1178 (10th Cir. 2010), the defendants "supported their motion with numerous documents, and the district court cited portions of those motions in granting the [motion to dismiss]."   627 F.3d at 1186.   The Tenth Circuit held that "[s]uch reliance was improper" and that, even if "the district court did not err initially in reviewing the materials, the court improperly relied on them to refute Mr. Gee's factual assertions and effectively convert the motion to one for summary judgment."   Gee v. Pacheco, 627 F.3d at 1186-87.   In other cases, the Tenth Circuit has emphasized that, "[b]ecause the district court considered facts outside of the complaint, however, it is clear that the district court dismissed the claim under Rule 56(c) and not Rule 12(b)(6)."   Nard v. City of Okla. City, 153 F. App'x 529, 534 n.4 (10th Cir. 2005)(unpublished).   In Douglas v. Norton, 167 F. App'x 698 (10th Cir. 2006)(unpublished), the Tenth Circuit addressed an untimely filed charge with the Equal Employment Opportunity Commission, and the Tenth Circuit analogized the deadline to a statute of limitations.   The Tenth Circuit found that, because the requirement was not jurisdictional, the district court should have analyzed the question under rule 12(b)(6), and "because the district court considered evidentiary materials outside of Douglas' complaint, it should have treated Norton's motion as a motion for summary judgment."   167 F. App'x at 704-05.

The Court has previously ruled that, when a plaintiff references and summarizes statements from defendants in a complaint for the purpose of refuting the statements in the complaint, the Court cannot rely on documents the defendants attach to a motion to dismiss which contain their un-redacted statements.   See Mocek v. City of Albuquerque, No. CIV 11-1009 JB/KBM, 2013 WL 312881, at *50-51 (D.N.M. Jan. 14, 2013)(Browning, J.).   The Court in Mocek v. City of Albuquerque reasoned that the statements were neither incorporated by

reference nor central to the plaintiff's allegations in the complaint, because the plaintiff only cited the statements to attack their reliability and truthfulness. See 2013 WL 312881, at *50-51. Additionally, the Court has ruled that, when determining whether a statute of limitations has run in an action alleging fraud and seeking subrogation from a defendant, it may not use interviews and letters attached to a motion to dismiss which evidence that a plaintiff was aware of the defendant's alleged fraud before the statutory period expired. See Great Am. Ins. Co. v. Crabtree, No. CIV 11-1129 JB/KBM, 2012 WL 3656500, at *3, *22-23 (D.N.M. Aug. 23, 2012)(Browning, J.). The Court in Great American Insurance Co. v. Crabtree determined that the documents did not fall within any of the Tenth Circuit's exceptions to the general rule that a complaint must rest on the sufficiency of its contents alone, as the complaint did not incorporate the documents by reference or refer to the documents. See 2012 WL 3656500, at *22-23. On the other hand, in a securities class-action, the Court has found that a defendant's operating certification, to which plaintiffs refer in their complaint, and which was central to whether the plaintiffs adequately alleged a loss, falls within an exception to the general rule, and the Court may consider the certification when ruling on the defendant's motion to dismiss without converting the motion into one for summary judgment. See Genesee Cnty. Emps.' Retirement Sys. v. Thornburg Mortg. Sec. Trust, 825 F. Supp. 2d 1082, 1150-51 (D.N.M. 2011)(Browning, J.).

## LAW REGARDING CHOICE-OF-LAW AND STATUTES OF LIMITATIONS

The Supreme Court has held that a federal court sitting in diversity should apply the same statute of limitations that a state court of the forum state would apply. See Guaranty Trust Co. v. York, 326 U.S. 99 (1945). The district court must, therefore, look to the forum state's choice-of-law rules to determine which state's law to apply -- both to control the substance of the dispute

and the limitations period in which the suit can be brought.  See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941); Pepsi-Cola Bottling Co. v. PepsiCo, Inc., 431 F.3d 1241, 1255 (10th Cir. 2005).

New Mexico courts have held that "'the law of the forum governs matters of procedure.'" Estate of Gilmore, 1997-NMCA-103, ¶ 10, 946 P.2d 1130, 1133 (quoting Sierra Life Ins. Co. v. First Nat'l Life Ins. Co., 1973-NMSC-079, ¶ 14, 512 P.2d 1245, 1249).  See Restatement of Conflict of Laws § 585 (1934)("First Restatement")("All matters of procedure are governed by the law of the forum.").  "The line between substance and procedure, [however], is not always clear, and the judgment where to draw the line in a particular case may depend on the reasons for drawing the line."  Estate of Gilmore, 124 N.M. at 122-23, 946 P.2d at 1133-34 (citing Ammerman v. Hubbard Broad., Inc., 89 N.M. 307, 310, 551 P.2d 1354, 1357 (1976)).  See Sun Oil Co. v. Wortman, 486 U.S. 717, 726 (1988)(stating that, "[e]xcept at the extremes, the terms 'substance' and 'procedure' precisely describe very little except a dichotomy, and what they mean in a particular context is largely determined by the purposes for which the dichotomy is drawn.").  "'A court usually applies its own local law rules prescribing how litigation shall be conducted even when it applies the local law rules of another state to resolve other issues in the case.'"  Estate of Gilmore, 124 N.M. at 123, 946 P.2d at 1134 (citing Restatement (Second) of Conflict of Laws § 122 (1971)("Second Restatement")).  Similarly, "procedure [is] the judicial process for enforcing rights and duties recognized by substantive law and for justly administering remedy and redress for disregard or infraction of them."  Sibbach v. Wilson & Co., 312 U.S. 1, 14 (1941).  The Court of Appeals of New Mexico has acknowledged that, when determining whether something is "procedural or substantive," it is important to "keep in mind

the rationale for applying the forum's 'procedural' rules." Estate of Gilmore, 1997-NMCA-103,

¶ 13, 946 P.2d at 1134. The Court of Appeals of New Mexico stated:

> Each state has local law rules prescribing the procedure by which controversies are brought into its courts and by which the trial of these controversies is conducted. These rules for conducting lawsuits and administering the courts' processes vary from state to state. The forum has compelling reasons for applying its own rules to decide such issues even if the case has foreign contacts and even if many issues in the case will be decided by reference to the local law of another state. The forum is more concerned with how its judicial machinery functions and how its court processes are administered than is any other state. Also, in matters of judicial administration, it would often be disruptive or difficult for the forum to apply the local law rules of another state. The difficulties involved in doing so would not be repaid by a furtherance of the values that the application of another state's local law is designed to promote.

Estate of Gilmore, 1997-NMCA-103, ¶ 13, 946 P.2d at 1134 (citing Second Restatement § 122

cmt. a). Furthermore, the Court of Appeals of New Mexico stated that, because parties to a

lawsuit do not usually think about matters of judicial administration before entering into legal

transactions, they do not usually place reliance on the applicability of specific state rules. See

Estate of Gilmore, 124 N.M. at 124, 996 P.2d at 1133 (citing Second Restatement § 122 cmt. a.).

For these reasons, there is no danger in applying the forum state's rules in such procedural

matters. See Estate of Gilmore, 124 N.M. at 124, 996 P.2d at 1134. Furthermore, "'[e]normous

burdens are avoided when a court applies its own rules, rather than the rules of another state, to

issues relating to judicial administration, such as the proper form of action, service of process,

pleading, rules of discovery, mode of trial and execution and costs.'" Estate of Gilmore, 124

N.M. at 123, 996 P.2d at 1134 (quoting Second Restatement § 122 cmt. a).

The Supreme Court of New Mexico has adopted the First Restatement approach to

choice-of-law analyses, see United Wholesale Liquor Co. v. Brown-Forman Distillers Corp., 108

N.M. 467, 469, 775 P.2d 233, 235 ("New Mexico adheres to a traditional conflicts of law

analysis contained in Restatement (First) of Conflicts of Law (1934)."), but for the purposes of

determining the applicable statute of limitation, the <u>First</u> and <u>Second Restatement</u> come out the same way: in the absence of a "borrowing statute" enacted by the forum state that adopts foreign states' statutes of limitations when applying their substantive law, the statute of limitations of the forum state governs all disputes even when another state supplies the substantive law. <u>Compare</u> <u>First Restatement</u> §§ 603-604 ("If action is barred by the statute of limitations of the forum, no action can be maintained though action is not barred in the state where the cause of action arose. . . . If action is not barred by the statute of limitations of the forum, an action can be maintained, though action is barred in the state where the cause of action arose.") <u>with</u> <u>Second Restatement</u> § 142 ("(1) An action will not be maintained if it is barred by the statute of limitations of the forum, including a provision borrowing the statute of limitations of another state. (2) An action will be maintained if it is not barred by the statute of limitations of the forum, even though it would be barred by the statute of limitations of another state, except as stated in § 143."). The only exception is if the statute of limitations of the foreign state "bars the right and not merely the remedy," in which case the action is barred regardless of the forum chosen. <u>Second</u> <u>Restatement</u> § 143 ("An action will not be entertained in another state if it is barred in the state of the otherwise applicable law by a statute of limitations which bars the right and not merely the remedy."). <u>Accord</u> <u>First Restatement</u> § 605 ("If by the law of the state which has created a right of action, it is made a condition of the right that it shall expire after a certain period of limitation has elapsed, no action begun after the period has elapsed can be maintained in any state.").

## LAW REGARDING NEW MEXICO STATUTES OF LIMITATIONS AND THE DISCOVERY RULE

"Although a statute of limitations bar is an affirmative defense, it may be resolved on a Rule 12(b)(6) motion to dismiss 'when the dates given in the complaint make clear that the right sued upon has been extinguished.'" <u>Torrez v. Eley</u>, No. CIV 09-1464, 2010 WL 1948679 (10th

Cir. May 17, 2010)(quoting Aldrich v. McCulloch Props., Inc., 627 F.2d 1036, 1041 n.4 (10th Cir. 1980)).  Accord Lee v. Rocky Mountain UFCW Unions & Emp's Trust Pension Plan, No. 92-1308, 1993 WL 482951 (10th Cir. Nov. 23, 1993)("Because the critical dates appeared plainly on the face of [plaintiff's] complaint, we conclude that the statute of limitations defense was properly raised and resolved in the Rule 12(b) context.").  When a party has asserted a statute of limitations issue in a rule 12(b)(6) motion, a court accepts all well-pled factual allegations in the complaint as true and views them in the light most favorable to the plaintiff to determine whether the statute of limitations has run.  See Sunrise Valley, LLC v. Kempthorne, 528 F.3d 1251, 1254 (10th Cir. 2008).  The statute of limitations for a breach-of-contract claim on a written contract, under New Mexico law, is six years.  See N.M. Stat. Ann. § 37-1-3 ("Those founded upon any bond, promissory note, bill of exchange, or other contract in writing, or upon any judgment of any court not of record, within six years.").  The statute of limitations for fraud, under New Mexico law, is four years.  See N.M. Stat. Ann. § 37-1-4 ("Those founded upon accounts and unwritten contracts; those brought . . . for relief upon the ground of fraud, and all other actions not herein otherwise provided for and specified within four years.").

New Mexico applies the "discovery rule," which means that the statute of limitations period "begins to run when the claimant has knowledge of sufficient facts to constitute a cause of action."  Gerke v. Romero, 2010-NMCA-060, ¶ 10, 237 P.3d 111, 115 (citing Martinez-Sandoval v. Kirsch, 1994-NMCA-115, ¶ 26, 884 P.2d 507, 513).  "The discovery rule provides that 'the cause of action accrues when the plaintiff discovers or with reasonable diligence should have discovered that a claim exists.'"  Williams v. Stewart, 2005-NMCA-061, ¶ 12, 112 P.3d 281, 285 (quoting Roberts v. Sw. Comm. Health Servs., 1992-NMSC-042, ¶ 24, 837 P.2d 442, 449).  Accord Eoff v. N.M. Corr. Dep't, Nos. CIV 10-0598, 10-0599, 10-0600, 2010 WL

5477679, at *18 (D.N.M. Dec. 20, 2010)(Browning, J.)("The Court believes that, in breach-of-contract actions involving an employee's termination, the statute of limitations should not begin to run until the employee is aware of the allegedly wrongful decision, because an employee would not be aware of the possible need to file suit until that time."); Gose v. Bd. of Cnty. Comm'rs of Cnty. of McKinley, 727 F. Supp. 2d 1256, 1264 (D.N.M. 2010)(Browning, J.)("Specifically, [the] statute of limitations commences when an 'injury manifests itself and is ascertainable, rather than when the wrongful or negligent act occurs."); Gerke v. Romero, 2010-NMCA-060, ¶ 12, 237 P.3d at 115 ("Under the discovery rule, the statute of limitations begins to run when the plaintiff knows or, with reasonable diligence should know, of his injury and its cause." (citing Roberts v. Sw. Cmty. Health Servs., 1992-NMSC-042, ¶ 24, 114 N.M. 248, 255-56, 837 P.2d 442, 449-50)).

## LAW REGARDING THE CONTINUING WRONG DOCTRINE

"Under the continuing wrong doctrine . . . , 'where a tort involves a continuing or repeated injury, the cause of action accrues at, and the limitations begin to run from, the date of the last injury.'" Tiberi v. Cigna Corp., 89 F.3d at 1430 (quoting 54 C.J.S. Limitation of Actions § 177 (1987)(applying New Mexico law)).  "In other words, the 'the statute of limitations does not begin to run until the wrong is over and done with." Tiberi v. Cigna Corp., 89 F.3d at 1431 (quoting Taylor v. Meirick, 712 F.2d 1112, 1118 (7th Cir. 1983)).  The treatise cited by the Tenth Circuit explicates the doctrine further:

> The common-law continuing tort doctrine may be applied, for statute of limitations purposes, when no single incident in a chain of tortuous activity can fairly or realistically be identified as the cause of significant harm.  A continuing violation or tort is occasioned by continuing unlawful acts and conduct, not by continual ill effects from an initial violation.  Thus, where there is a single overt act from which subsequent damages may flow, the statute begins to run on the date the defendant invaded the plaintiff's interest and inflicted injury, and this is so despite the continuing nature of the injury.

- 39 -

54 C.J.S. Limitations of Actions § 223 (2014)(footnotes omitted).

Although the doctrine has its origins in tort law, the New Mexico courts have never explicitly held that the doctrine is inapplicable to breach-of-contract actions. The Court of Appeals of New Mexico has, however, declined to apply the continuing wrong doctrine to contract cases in each of the few cases in which the argument was made. See Bishop v. Evangelical Lutheran Good Samaritan Soc'y, No. 25,510, 2010 WL 3998030 (N.M. Ct. App. 2010); Tull v. City of Albuquerque, 1995-NMCA-123, ¶¶ 4-11, 907 P.2d 1010, 1010-13. See also Village of Angel Fire v. Bd. of Cnty. Comm'rs of Colfax Cnty., 2010-NMCA-038, ¶¶ 14, 18, 242 P.3d 371, 374, 375-76 (declining to consider the application of the continuing wrong doctrine on the ground that the issue had not been properly preserved). Notably, it rejected a plaintiff's contention that, after an allegedly wrongful refusal by an employer to promote the plaintiff to a higher-paying position, the reduced paychecks the plaintiff received in the ensuing years constituted a continuing wrong. See Tull v. City of Albuquerque, 1995-NMCA-123, ¶¶ 4-11, 907 P.2d at 1010-13. It held that the wrongful promotion was a discrete act -- a "single wrong with continuing effects" -- and dismissed the plaintiff's claim. Tull v. City of Albuquerque, 1995-NMCA-123, ¶ 7, 907 P.2d at 1011.

Tull v. City of Albuquerque is the seminal case on continuing wrong doctrine in the contract context in New Mexico. See, e.g., Village of Angel Fire v. Bd. of Cnty. Comm'rs of Colfax Cnty., 2010-NMCA-038, ¶ 18, 242 P.3d 371, 375 ("The distinction between a continuing wrong and a single wrong with continuing effects[ is] explained in Tull . . . ."). That case contains language which suggests that the continuing wrong doctrine might be viable in breach-of-contract suits:

The Plaintiffs' continuing-wrong theory has been applied in a number of cases involving contracts that require periodic payments, including some cases arising in the employment context. Those cases are distinguishable. For example, in Miller v. Beneficial Management Corp., 977 F.2d 834 (3d Cir. 1992), an employee claimed her employer discriminated against her by putting off her request for promotion and eventually denying the request. The court ruled the alleged conduct constituted a continuing wrong. 977 F.2d at 844. In Hart v. International Telephone & Telegraph Corp., 546 S.W.2d 660 (Tex. Ct. App. 1977), an employee sued for commissions allegedly earned under an oral contract that called for quarterly payments of commissions. The court held the plaintiff had a separate cause of action for each quarter of the year in which commissions were earned but not paid. 546 S.W.2d at 662.

Tull v. City of Albuquerque, 1995-NMCA-123, ¶ 6, 907 P.2d at 1011.

The Court of Appeals of New Mexico appears to define the doctrine's tolling effects -- at least in the contract context -- differently than the Tenth Circuit and Corpus Juris Secundum do in the tort context. As traditionally employed, the continuing wrong doctrine provides that the statute of limitations on an entire tortious course of action does not commence until the course of action is complete. For example, if a statute of limitations for a tort is five years, and a defendant engages in a continuing wrong for fifteen years, the plaintiff would be able to seek damages for the entire fifteen-year period, not merely the most-recent five years. The Court of Appeals of New Mexico appears to be using an alternative definition -- one that would allow the plaintiff to collect on the damages incurred in the most-recent five years, but not in the preceding ten. When conceived this way, the doctrine only does work if the wrongful course of action would otherwise be analyzed as a single, discrete wrong that occurred at the beginning of the fifteen-year period, out of reach of the statute of limitations.

Plaintiffs contend that a new breach of contract occurs with each paycheck that does not include the raise to which they were entitled. Consequently, Plaintiffs maintain that they can recover damages for all paychecks not including such a raise during the three-year period preceding the filing of their complaint and for all paychecks issued since the complaint was filed. Plaintiffs concede, however, that the statute of limitations has run on any paycheck issued prior to

June 30, 1991, which was three years before the complaint was filed.  We shall
term this argument the "continuing-wrong" theory.

The City, on the other hand, maintains there is only one breach of contract
alleged, the initial failure, in 1987, to give Plaintiffs a raise in conjunction with
their assumption of expanded job duties.  For purposes of this appeal, the City
accepts the allegation that the initial breach of contract has continuing effects in
that each paycheck issued to Plaintiffs is lower than it might otherwise have been
if Plaintiffs had received the raise they expected.  The City argues, however, that
these continuing consequences have no effect on the statute of limitations and
that, for limitations purposes, the only triggering event is the initial breach of
contract.  We refer to this argument as the "single-wrong with continuing effects"
theory.

Tull v. City of Albuquerque, 1995-NMCA-123, ¶¶ 4-5, 907 P.2d at 1010-11.  Ultimately, the

Court of Appeals of New Mexico would not even permit the plaintiff to seek damages incurred

in the most-recent three years, holding that the defendant's allegedly wrongful failure to promote

the plaintiff was a one-time wrong, not a continuing one, and that the plaintiff's reduced

paychecks thereafter were merely continuing effects of the one-time wrong.  Because the statute

of limitations barred the true cause of action, the failure to promote, the plaintiff could not sue on

damages stemming from a cause of action not included in the suit.

Thus, it appears that the Court of Appeals of New Mexico may be talking about

something different when it refers to the continuing wrong doctrine in the contract

context -- defining it as a doctrine that allows for cut-off damages rather than no damages at all,

not as a doctrine that allows for complete damages rather than cut-off damages.[9]

---

[9]  The two (out-of-state) cases referenced in the quoted passage in Tull v. City of
Albuquerque provide varying levels of support for the Court of Appeals of New Mexico's
interpretation of the continuing wrong doctrine.   Hart v. International Telephone & Telegraph
Corp. contains a similar analysis to the one contemplated, but ultimately rejected, by the Court of
Appeals of New Mexico in Tull v. City of Albuquerque: the Court of Civil Appeals of Texas
allowed a plaintiff to pursue cut-off damages relating to a contract that was to be paid out in
installments, where the plaintiff alleged that it had been shorted on each of the installments; the
Texas court permitted the plaintiff to sue on the installments paid inside the limitations period,

## NEW MEXICO LAW REGARDING EQUITABLE TOLLING OF NEW MEXICO STATUTES OF LIMITATIONS

Equitable tolling applies before a complaint was filed when the litigant was prevented from filing suit because of "extraordinary events beyond his or her control." Ocana v. Am. Furniture Co., 2004-NMSC-018, ¶ 15, 91 P.3d 58, 66. "Equitable tolling is a nonstatutory tolling theory which suspends a limitations period." Ocana v. Am. Furniture Co., 2004-NMSC-018, ¶ 15, 91 P.3d at 66. "Such extraordinary event[s] include conduct by a defendant that caused the plaintiff to refrain from filing an action during the applicable period." Roberts v. Barreras, 484 F.3d 1236, 1241 (10th Cir. 2007)(internal quotation marks omitted)(citing In re Drummond, 1997-NMCA-094, ¶ 13, 945 P.2d 457, 462 ("[A] party may be estopped from asserting a statute-of-limitations defense if that party's conduct has caused the plaintiff to refrain from filing an action until after the limitations period has expired."). See also Bell v. Bd. of the Albuquerque Pub. Schs., No. CIV 06-1137 JB/ACT, 2008 WL 4104070, at *16 (D.N.M. Mar. 26, 2008)(Browning, J.).

---

but not outside of it. See 546 S.W.2d at 662. That case however, made no mention of the term "continuing wrong" or any variant, and, from all appearances, was not applying the doctrine. 546 S.W.2d at 660-62.

The other case referenced in Tull v. City of Albuquerque, Miller v. Beneficial Management Corp., applied the "continuing violation" doctrine, but it did so in the manner traditionally contemplated, allowing for the recovery of full, versus merely cut-off, damages where an employee had faced a pattern of long-term discrimination in the workplace. See 977 F.2d at 848. Furthermore, that case was an employment discrimination case, and the federal courts have a well-defined and unique body of case law relating to the application of statutes of limitation to Title VII claims. See, e.g., Bell v. Bd. of Educ. of the Albuquerque Pub. Schs., No. CIV 06-1137 JB/ACT, 2008 WL 4104070 (D.N.M. Mar. 26, 2008)(Browning, J.)("The Tenth Circuit has yet to apply the continuing-violation doctrine outside of the context of Title VII employment cases." (citing Dean v. Boeing Co., 260 F. App'x 124 (10th Cir. 2008)(unpublished)(Kelly, J.))).

- 43 -

**NEW MEXICO LAW REGARDING FRAUDULENT CONCEALMENT**

New Mexico law, under principles of equitable estoppel, recognizes the doctrine of fraudulent concealment as a means of tolling a statute of limitations.  See Garcia ex rel. Garcia v. La Farge, 119 N.M. 532, 893 P.2d 428, 432 (1995).  See also Ballen v. Prudential Bache Sec., Inc., 23 F.3d 335, 337 (10th Cir. 1994)(Brorby, J.).   A party seeking to toll a statute of limitations through this doctrine must prove that: (i) the other party engaged in conduct amounting to intentional false representation or concealment of material facts; (ii) the injured party reasonably relied on the other party and the concealment was successful; and (iii) the injured party did not know, and through the exercise of reasonable diligence, could or should not have known the true facts giving rise to a cause of action.  See Cont'l Potash, Inc. v. Freeport-McMoran, Inc., 1993-NMSC-039, ¶ 28, 858 P.2d 66, 74; Kern ex rel. Kern v. St. Joseph Hosp., Inc., 1985-NMSC-031, ¶¶ 11-12, 697 P.2d 135, 139.  Because equity tolls the statute, it does so only as long as the party is not guilty of failing to exercise ordinary diligence in pursuit of a cause of action.  See Great Am. Ins. Co. v. Crabtree, No. CIV 11-1129 JB/KBM, 2012 WL 3656500, at *13 (D.N.M. Aug. 23, 2012)(Browning, J.).

**LAW REGARDING RULE 9(b)'S HEIGHTENED PLEADING REQUIREMENT**

Normally, a plaintiff need plead only "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Fraud claims, however, must meet more stringent standards.  "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  See Two Old Hippies, LLC v. Catch the Bus, LLC, 784 F. Supp. 2d 1200, 1207 (D.N.M. 2011)(Browning, J.).

With respect to rule 9(b)'s scope, a court should require parties to plead a cause of action with particularity when that cause of action contains allegations grounded in fraud.  See 2 James Wm. Moore, Jeffrey A. Parness, & Jerry Smith, Moore's Federal Practice § 9.03(1)(d), at 9-20 (3d ed. 2008).  On the other hand, claims based on negligent or innocent misrepresentation, to the extent those claims do not require proof of fraud, may be pled in accordance with the more relaxed standards of rule 8(a).  See Moore, supra § 9.03(1)(d), at 9-21; Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1104-05 (9th Cir. 2003)("Allegations of non-fraudulent conduct need satisfy only the ordinary notice pleading standards of Rule 8(a).").

The primary motives that animate rule 9(b) help illuminate the reason for limiting the rule's reach to claims grounded in fraud.  First, the requirement of pleading with particularity protects defendants' reputations from the harm attendant to accusations of fraud or dishonest conduct.  See Guidry v. Banks of LaPlace, 954 F.2d 278, 288 (5th Cir. 1992)("[The particularity requirement] stems from the obvious concerns that general, unsubstantiated charges of fraud can do damage to defendant's reputations."); United States ex rel. Harrison v. Westinghouse Savannah River Co., 353 F.3d 908, 921 (4th Cir. 2003)("Rule 9(b) protects defendants from harm to their goodwill and reputation.")(citations omitted)(internal quotation marks omitted). Second, the requirement to plead with particularity puts defendants on notice of the allegedly fraudulent conduct so that they can formulate a defense.  See United States ex rel. Harrison v. Westinghouse Savannah River Co., 353 F.3d at 921.  A related goal of 9(b) is to prevent plaintiffs from tagging on specious fraud claims to their pleadings in an attempt "to induce advantageous settlements or for other ulterior purposes."  Banker's Trust Co., v. Old Republic Insurance Co., 959 F.2d 677, 683 (7th Cir. 1992).

The Tenth Circuit has fleshed out the components necessary to a successful rule 9(b) pleading.  In Sheldon v. Vermonty, 246 F.3d 682 (Table), 2000 WL 1774038 (10th Cir. Dec. 4, 2000), the Tenth Circuit held that the plaintiff alleged with specific particularity a violation of the Securities Exchange Act of 1934, 15 U.S.C. § 78a-pp.  See 2000 WL 1774038 at *4.  The Tenth Circuit concluded that the complaint

> adequately met Rule 9(b) requirements.  First, as the district court acknowledged, the Complaint alleged misrepresentations with background information as to date, speaker, and the medium of communication. . . .  Second, certain of the alleged misrepresentations involved profitable expectations arising from an unowned and inoperable meat-packing plant, a nonexistent lumber company, and fabricated contracts.  Accepting Sheldon's allegations as true, these are patently false statements of present fact.  The district court erred in determining they were mere conclusory allegations of falsity and in characterizing them as fraud by hindsight. . . .  Third, the allegations of scienter were sufficient.  In securities fraud cases, although speculation and conclusory allegations will not suffice, great specificity is not required if the plaintiff alleges enough facts to support a strong inference of fraudulent intent.

2000 WL 1774038, at *5 (citations omitted)(internal quotation marks omitted).  "At a minimum, Rule 9(b) requires that a plaintiff set forth the who, what, when, where and how of the alleged fraud."  United States ex rel. Schwartz v. Coastal Healthcare Group, Inc., 232 F.3d 902 (Table), 2000 WL 1595976 at *3 (10th Cir. 2000)(unpublished opinion).  "To survive a motion to dismiss, an allegation of fraud must 'set forth the time, place, and contents of the false representation, the identity of the party making the false statements and the consequences thereof.'"  Midgley v. Rayrock Mines, Inc., 374 F. Supp. 2d 1039, 1047 (D.N.M. 2005)(Browning, J.)(quoting Schwartz v. Celestial Seasonings, Inc., 124 F.3d 1246, 1252 (10th Cir. 1997)).  "On the other hand, rule 9(b) does not require specific knowledge regarding the defendant's state of mind."  Midgley v. Rayrock Mines, Inc., 374 F. Supp. 2d at 1047.  See Two Old Hippies, LLC v. Catch the Bus, LLC, 784 F. Supp. 2d at 1207.

- 46 -

## NEW MEXICO LAW REGARDING THE IMPLIED COVENANT TO MARKET OIL
## AND GAS

Oil and gas leases are construed "like any other contracts."  Elliott Indus. LP v. BP Am. Prod. Co., 407 F.3d at 1108.  Additionally, New Mexico implies in law a duty -- "'to make diligent efforts to market the production in order that the lessor may realize on his royalty interest'" -- on oil-and-gas producers, "in equity, without looking to the language of the agreements or other evidence of the parties' intentions."  Davis v. Devon Energy Corp., 2009-NMSC-048, ¶ 35, 147 N.M. 157, 218 P.3d 75 (quoting Darr v. Eldridge, 6 N.M. at 263, 346 P.2d at 1044).  This obligation is called the "duty to market."  Davis v. Devon Energy Corp., 2009-NMSC-048, ¶ 35, 147 N.M. 157, 218 P.3d 75.  One possible corollary -- "possible," because many New Mexico courts have recognized it, but the Tenth Circuit has not -- of the duty to market is the "marketable condition rule."  Compare Elliott Indus. LP v. BP Am. Prod. Co., 407 F.3d at 1113-14, with Davis v. Devon Energy Corp., 2009-NMSC-048, ¶ 6, 218 P.3d at 78. The rule provides that the working interest owner must bear the full cost of any expenses incurred in drilling, removing the hydrocarbons from the ground, and rendering them into marketable condition, and may not assess those costs against the royalty it owes the lessee.  See Davis v. Devon Energy Corp., 2009-NMSC-048, ¶ 6, 218 P.3d at 78.

In 2005, in Elliott Industries LP v. BP American Production Co., the Tenth Circuit addressed various obligations that oil-and-gas lessors owe the royalty interest owners on their leases under New Mexico law.  The plaintiffs in Elliott Industries LP v. BP American Production Co. were royalty owners who sued ConocoPhillips, the working interest owner, to collect additional royalties.  The production subject to the plaintiffs' claim in Elliott Industries LP v. BP American Production Co. was conventional gas.  The gas contained NGLs that are removed through processing before the residue is generally acceptable for transportation on interstate

- 47 -

pipeline transmission systems.  See 407 F.3d at 1110-11.  The plaintiffs alleged that ConocoPhillips was underpaying its royalty interests by reducing their royalties with illegitimate post-production costs, including "processing, marketing, transportation, and fractionation costs, from the value of the refined natural gas products."  407 F.3d at 1100.  The plaintiffs alleged that ConocoPhillips violated the NMOGPPA, breached the implied duty of good faith and fair dealing, breached the implied duty to market, and constituted conversion, constructive fraud, fraud, and unjust enrichment, among other alleged wrongs.  See 407 F.3d at 1101.  The plaintiffs expressly declined to assert any contract claims under the governing lease.  See 407 F.3d at 1107.  ConocoPhillips contended that it was performing its contractual obligations within the terms of the plaintiffs' leases.  See 407 F.3d at 1101.

The Tenth Circuit, in an opinion authored by the Honorable Michael R. Murphy, United States Circuit Judge, determined that the district court properly granted ConocoPhillips summary judgment on the plaintiffs' allegation that ConocoPhillips' royalty payment practices violated the implied duty to market.  The plaintiffs alleged that ConocoPhillips was obligated under the implied duty to market to pay royalties based upon the best price reasonably available for the gas-and-oil products, and not the actual price minus reasonable or actual cost deductions.  407 F.3d at 1113-14.  The Tenth Circuit noted that New Mexico recognizes an "'implied covenant on the part of the lessee . . . that after production of oil and gas in paying quantities is obtained, he will thereafter continue the work of development . . . with reasonable diligence . . . .  having in mind his own interest as well as that of the lessor, to market the product.'"  407 F.3d at 1113 (quoting Libby v. DeBaca, 51 N.M. at 95, 179 P.2d at 265).  Perhaps because the Tenth Circuit construed Elliott Industries LP v. BP American Production Co. before the Supreme Court of New Mexico's pronouncement in Davis v. Devon Energy Corp., 2009-NMSC-048, ¶ 35, 218

P.3d at 85-86, that the duty to market is implied "in equity, without looking to the language of the agreements or other evidence of the parties' intentions," the Tenth Circuit interpreted New Mexico law to imply the duty to market only in fact, based upon "whether any implied duty to market was intended by the parties or would contradict the express provisions of that agreement," Elliott Indus. LP v. BP Am. Prod. Co., 407 F.3d at 1113.  On that basis, the Tenth Circuit stated that it could not "speculate . . . how to construe the scope of any implied covenant to market that may exist," because the plaintiffs' divorced their implied duty to market claim from their contractual relationship with ConocoPhillips, and disclaimed any "reliance on the express provisions of the royalty agreements."  407 F.3d at 1113.

        The Tenth Circuit also noted that there was no implied-in-fact marketable condition rule term in the royalty provisions in the plaintiffs' leases, because the royalty provisions expressly covered how ConocoPhillips was to calculate the plaintiffs' royalty payments.  See 407 F.3d at 1113-14 ("[U]nder New Mexico law, covenants are not implied for subjects that are treated in express provisions. . . .  [T]he express terms of the royalty obligations direct the royalty to be paid on the value of gas 'at the well.'").  Moreover, the Tenth Circuit stated that the plaintiffs failed to show how ConocoPhillips' conduct violated any implied duty to market under New Mexico law.  The Tenth Circuit stated that, because ConocoPhillips was and is "actively producing gas, processing the gas, and selling the refined natural gas and NGLs," ConocoPhillips' conduct "complied with the implied duty to market as articulated by the New Mexico courts."  407 F.3d at 1113 (citing Darr v. Eldridge, 346 P.2d at 1044).  The Tenth Circuit expressly held that the plaintiffs' "conception of the implied duty to market" as requiring ConocoPhillips' to "bear the burden of all costs incurred to put the gas in a marketable condition

including the cost of removing the NGLs from the gas . . .  finds no support within New Mexico law."  407 F.3d at 1113-14.

From the time of the Tenth Circuit's decision in <u>Elliott Industries LP v. BP American Production Co.</u>, the Supreme Court of New Mexico has, twice, expressly declined to decide whether a marketable condition rule is implied as a matter of law in oil and gas leases.  In <u>Davis v. Devon Energy Corp.</u>, 2009-NMSC-048, ¶ 1, 218 P.3d at 77 (Chavez, J.), the issue before the Supreme Court of New Mexico was whether a state district court properly denied certification of a class alleging that defendant gas producers underpaid the plaintiffs' royalties by improperly deducting the cost of rendering the gas marketable.  The state district court concluded that the plaintiffs failed to establish the commonality requirement to proceed as a class action, because determining whether the defendants' royalty payments violated the terms of the plaintiffs' leases would require interpreting each plaintiff's individual lease -- totaling as many as thirty-four lease agreements -- and, therefore, the plaintiffs failed to demonstrate that common questions of law or fact predominated the class' allegations.  <u>See</u> 2009-NMSC-048, ¶ 26, 218 P.3d at 83.  The Supreme Court of New Mexico concluded, however, in an opinion written by the Honorable Edward L. Chavez, Chief Justice of the Supreme Court of New Mexico,[10] that the state district court's construction of the marketable condition rule would not require the court to determine whether that duty is implied in fact in each individual lease.  The Supreme Court of New Mexico first explained that the implied duty to market is implied "in equity, without looking to the

_____

[10] The Supreme Court of New Mexico elects its Chief Justice -- from among the Justices elected to the Supreme Court of New Mexico, not appointed -- every two years.  <u>See</u> N.M. Stat. Ann. § 34-2-1(C).  Justice Chavez has served on the Supreme Court of New Mexico from 2003 to present, and served as Chief Justice from 2008 to 2010.  <u>See</u> Kathy Woods, <u>New Mexico Supreme Court Has New Chief Justice</u>, Legal Newsline Legal J. (Apr. 8, 2010, 2:31 PM), http://legalnewsline.com/news/226546-new-mexico-supreme-court-has-new-chief-justice.

language of the agreements or other evidence of the parties' intentions." 2009-NMSC-048, ¶ 35, 218 P.3d at 85-85. The state district court had ruled that, "under the implied duty to market, the marketable condition rule applies in New Mexico." 2009-NMSC-048, ¶ 35, 218 P.3d at 85-86 (secondary quotation marks omitted). The Supreme Court of New Mexico concluded that, because the state district court concluded that the marketable condition rule is incorporated into the implied duty to market, the state district court would not be required to determine whether the marketable condition rule is implied, in fact, in each individual lease to adjudicate the class' allegations. See 2009-NMSC-048, ¶ 35, 218 P.3d at 85-86. The Supreme Court of New Mexico expressly disclaimed, however, that it was addressing the state district court's conclusion that the implied duty to market incorporates the marketable condition rule in New Mexico. See 2009-NMSC-048, ¶ 14, 218 P.3d at 80 ("For the purposes of our review . . . we do not address the existence of the marketable condition rule in New Mexico or its applicability in any of these cases."); 2009-NMSC-048, ¶ 35, 218 P.3d at 85-86 ("[T]he district court[] conclu[ded] that the duty to market, which applies in equity irrespective of the parties' intentions, incorporates the duty to put CBM gas in a marketable condition (a conclusion we do not review in this opinion).").

In ConocoPhillips v. Lyons, the issue before the Supreme Court of New Mexico was whether ConocoPhillips properly calculated the State of New Mexico's royalty payments as required under the statutes creating New Mexico's leases. See 2013-NMSC-009, ¶¶ 1-3, 299 P.3d 844. New Mexico contended that ConocoPhillips was not allowed, under the terms of New Mexico's statutory lease forms, to deduct the post-production costs necessary to render gas marketable from New Mexico's royalty payments. See 2013-NMSC-009, ¶¶ 2-6, 19-21, 299 P.3d 844. The Supreme Court of New Mexico, in an opinion written by the Honorable Petra J.

Maes, Chief Justice of the Supreme Court of New Mexico,[11] first explained that, when royalty

provisions specify that a lessee is to calculate its net proceeds "at the well," the lessee is,

generally,

> entitled to deduct all costs that are incurred subsequent to production, including
> those necessary to transport the gas to a downstream market and those costs, such
> as dehydrating, treating, and processing the gas, that are necessary to make the
> gas saleable in that market or that increase the value of the gas.

2013-NMSC-009, ¶ 17, 299 P.3d 844 (citing Creson v. Amoco Prod. Co., 2000-NMCA-081,

¶¶ 11-12, 129 N.M. 529, 10 P.3d 835).   New Mexico's statutorily created royalty interests,

however, did not specify that net proceeds should be calculated at the well, but rather stated that

net proceeds should be calculated "from the sale of such gas in the field."   2013-NMSC-009,

¶ 19, 299 P.3d 844 (secondary quotation marks omitted).   The "key question" before the

Supreme Court of New Mexico, therefore, was "whether a lease which provides for royalty

payable upon 'net proceeds . . . in the field' or 'from the sale of gas from each gas well' compels

a different royalty calculation than a lease which provides for 'net proceeds . . . at the well.'"

2013-NMSC-009, ¶ 19, 299 P.3d 844.   The Supreme Court of New Mexico stated that, although

lessees must bear the costs incurred in producing oil and gas product, "absent an express

contractual provision to the contrary . . . .  costs incurred subsequent to production are considered

post-production costs and are generally deducted from the sale of the product regardless of where

the sale takes place."   2013-NMSC-009, ¶ 24, 299 P.3d 844 (citing Bice v. Petro-Hung LLC,

2009 ND 124, ¶ 19, 768 N.W. 2d 496, 502 (N.D. 2009)).   The Supreme Court of New Mexico

therefore affirmed the state district court's ruling that the net proceeds term unambiguously

---

[11] Justice Maes has served on the Supreme Court of New Mexico from 1998 to present,
and served as Chief Justice from 2003 to 2005, and again from 2012 to 2014.  See Biographical
Profile:   Honorable   Petra   Jimenez   Maes,   New   Mexico   Supreme   Court,
https://nmsupremecourt.nmcourts.gov/bios/maes.php.

allowed ConocoPhillips to deduct "from their gross sales price any post-production costs they reasonably and necessarily incur in selling the gas," regardless of where the sale gas occurred. 2013-NMSC-009, ¶¶ 21, 69, 299 P.3d 844.

New Mexico also alleged that ConocoPhillips' calculation of royalty payments breached the implied covenant to market. New Mexico asserted that the implied covenant to market required ConocoPhillips to "place the gas in a marketable condition and requires that the expenses incurred in obtaining a marketable product . . . be borne by Lessees." 2012 WL 3711550, at *16. The Supreme Court of New Mexico determined, however, that it need not reach the issue whether the marketable condition rule is incorporated into the implied covenant to market. The Supreme Court of New Mexico explained that whether the marketable condition rule applies in New Mexico was not ripe for review, because legislative policy decisions inform the extent of post-production costs that ConocoPhillips may deduct from New Mexico's royalty payments, but the lower court had not yet reached a decision of the merits on that issue. See 2012 WL 3711550, at *17.[12]

---

[12] Although the Court is bound by the Tenth Circuit's interpretation of New Mexico law, the Court is not convinced that the Elliott Industries LP v. BP American Production Co.'s plaintiffs' "conception of the implied duty to market finds no support within New Mexico case law." 407 F.3d at 1114. From the time that the Tenth Circuit made this statement in Elliott Industries LP v. BP American Production Co., at least three New Mexico district courts have found that, "under the implied duty to market, the marketable condition rule applies in New Mexico." Davis v. Devon Energy Corp., 2009-NMSC-048, ¶ 14, 147 N.M. 157, 218 P.3d 75 (citing Davis v. Devon Energy Corp., 2008-NMCERT-003, 143 N.M. 682, 180 P.3d 1181; Ideal v. BP Am. Prod. Co., 2008-NMCERT-003, 143 N.M. 683, 180 P.3d 1182; Smith Family, L.L.C. v. ConocoPhillips Co., 2008-NMCERT-003, 143 N.M. 683, 180 P.3d 1182). In Davis v. Devon Energy Corp., 2009-NMSC-048, 147 N.M. 157, 218 P.3d 75, the Supreme Court of New Mexico did not address the existence of the marketable condition rule, because it found that the matter was "not ripe for review at this time," as the New Mexico state district courts had left open questions regarding the scope of the rule. 2009-NMSC-048, ¶ 15, 147 N.M. 157, 218 P.3d 75. The Supreme Court of New Mexico made a similar statement in ConocoPhillips Co. v. Lyons. See 2013-NMSC-009, ¶ 64, 299 P.3d 844 ("As we indicated in Davis, whether the marketable

condition rule applies in New Mexico is not yet ripe for review."). These pronouncements from the Supreme Court of New Mexico indicate, far from precluding the existence of the marketable condition rule as a matter of law within the state, that the Supreme Court of New Mexico considers the issue undetermined and, moreover, intends to address its existence when the record before the Supreme Court of New Mexico fully presents the issue.

The Court believes that, if and when the Supreme Court of New Mexico determines that the existence of the marketable condition rule is ripe for review, it will find that the rule is included in oil-and-gas contracts as part of the implied duty to market. Colorado, Wyoming, Kansas, and Oklahoma have all adopted a version of the marketable condition rule. The Supreme Court of Colorado announced its adoption of the marketable condition rule in Garman v. Conoco, Inc., P.2d 652 (Colo. 1994). The Supreme Court of Colorado held that, "absent an assignment provision to the contrary, overriding royalty interest owners are not obligated to bear any share of the post-production expenses . . . undertaken to transform raw gas produced at the surface into a marketable product." 886 P.2d at 661. The Supreme Court of Colorado noted that, although an oil-and-gas lease is "entered into for the mutual benefit of the parties, not all parties participate equally in lease development decisions." 886 P.2d at 657. Interest owners, whether of royalty or overriding royalty interests, must defer to the lessees "where and when to drill, the formations to be tested and ultimately whether to complete a well and establish production." 886 P.2d at 675. The Supreme Court of Colorado was also persuaded by its neighboring states' -- Wyoming, Kansas, and Oklahoma -- and the federal government's requirement that lessees place gas in a marketable condition at no cost to the lessor. See 886 P.2d at 658 (citing 30 C.F.R. § 206.153(i); Wyo. Stat. § 30-5-304(a)(vi) (1994 Supp.); Wood v. TXO Prod. Corp., 854 P.2d 880, 882 (Okla. 1992); Gilmore v. Superior Oil Co., 388 P.2d 602, 606 (1964)). The Supreme Court of Colorado explained that the marketable condition rule logically followed from a lessee's duty to effectuate the terms of a lease; the Supreme Court of Colorado reasoned that, just as the "purpose of an oil and gas lease could hardly be effected if the implied covenant to drill obligated the lessor to pay for his proportionate share of drilling costs," the purpose of a lease would be thwarted if lessors bore the cost of making a product marketable. 886 P.2d at 659. The Supreme Court of Colorado rejected an argument from oil-and-gas producers that industry practice dictates that lessees and lessors bear proportionately post-production costs necessary to render gas marketable. The Supreme Court of Colorado explained that, while other oil-and-gas producers may be aware of industry custom and factor that custom into oil-and-gas agreements, "[o]ften, however, executing an oil and gas lease, or assigning a federal lease won under the previously existing federal lottery system is the extent of a party's contact with the oil industry." 886 P.2d at 660. The Supreme Court of Colorado further emphasized that the marketable condition rule is consistent with the bargaining power of lessees and lessors: "The payment of royalties is controlled by lessees, and lessors have no ready means of ascertaining current market value other than to take lessees' word for it." 886 P.2d at 660.

The Supreme Court of Kansas based its formulation of the marketable condition rule on Colorado's. In Kansas, the rule currently requires a lessee of an oil-and-gas lease to "bear the entire expense of producing the gas at the wellhead pursuant to the terms of the oil and gas lease. Additionally, the lessee must bear 'the entire cost of putting the gas in condition to be sold pursuant to the court-made 'marketable condition rule.'"" Coulter v. Anadarko Petroleum Corp.,

296 P.3d 289, 306 (Kan. 2013)(citing <u>Sternberger v. Marathon Oil Co.</u>, 894 P.2d 788 (Kan. 1995)).   The Supreme Court of Kansas adopted a version of the marketable condition rule in <u>Sternberger v. Marathon Oil Co.</u> that allowed a lessee to share with a royalty owner the costs of transporting a marketable product to a point of sale and "to enhance the value of the gas stream, <u>e.g.</u>, the processing costs to extract a saleable component such as helium." 292 P.3d at 306.   The Supreme Court of Kansas explained that, in Kansas, ambiguities in oil-and-gas leases must be construed against the lessee, but found that the oil-and-gas leases at issue were not ambiguous.   <u>See</u> 894 P.2d at 794.   Rather, the Supreme Court of Kansas' adoption of the marketable condition rule was based upon the lessee's duty to "produce a marketable product," which requires "the lessee alone [to] bear[] the expense in making the product marketable." 894 P.2d at 799.

Kansas' interpretation of the marketable condition rule, which allows lessees to share the cost of transportation to the market with lessors may be vulnerable to attack.   The Supreme Court of Kansas recognized, in <u>Coulter v. Anadarko Petroleum Corp.</u>, that the Supreme Court of Colorado's decision in <u>Rogers v. Waterman Farm Co.</u>, 29 P.3d 887, 896-902 (Colo. 2001), "clarified that . . . . 'marketability' includes both the physical condition of the gas and the location of the gas, i.e., the commercial marketplace," and, therefore, whether oil-and-gas lessees in Kansas may share with lessors the cost of transporting marketable products to a market "may be questionable."   <u>Coulter v. Anadarko Petroleum Corp.</u>, 296 P.3d at 306 (quoting <u>Rogers v. Westerman Farm Co.</u>, 29 P.3d at 902, 903).   In <u>Rogers v. Westerman Farm Co.</u>, the Supreme Court of Colorado held that, under the marketable condition rule, "the expense of getting the product to a marketable condition and location are born by the lessee." 29 P.3d at 906.   The Supreme Court of Colorado explained that, whether gas is marketable is a question of fact, and requires, first, evidence that gas is "in the physical condition where it is acceptable to be bought and sold in a commercial marketplace," and, second, that the gas must be in a location "that is, the commercial marketplace, to determine whether the gas is commercially saleable in the oil-and-gas marketplace." 29 P.3d at 905.   The Supreme Court of Colorado noted that "'a royalty clause should be construed in its entirety and against the party who offered it, and in light of the fact that the royalty clause is the means by which the lessor receives the primary consideration for a productive lease.'" 29 P.3d at 898 (quoting Owen L. Anderson, <u>Royalty Valuation: Should Royalty Obligations be Determined Intrinsically, Theoretically, or Realistically, Part 2 (Should Courts Contemplates the Forest or Dissect Each Tree?)</u>, 37 Nat. Resources J. 611, 636 (1997)). The Supreme Court of Colorado reasoned that gas is not marketable until it is ready to be bought in a marketplace by a willing purchaser, and, accordingly, a lessee has not met its implied duty to market until a gas is transported to a marketplace, if transportation is necessary to reach purchasers.   <u>See</u> 29 P.3d at 904-06.

Similarly, the Supreme Court of Oklahoma's adoption of the marketable condition rule is based upon the bargaining power of oil-and-gas lessees and lessors.   In <u>Wood v. TXO Prod. Corp.</u>, the Supreme Court of Oklahoma explained that "[p]art of the mineral owner's decision whether to lease or to become a working interest owner is based upon the costs involved," and, when an interest owner agrees to relinquish operating rights and lease a well in exchange for a royalty interest, as a lessor, the interest owner has no power to control post-production costs. 854 P.2d at 882-83.   The Supreme Court of Oklahoma reasoned that, if lessees, oil-and-gas producers, were allowed to share production and marketing costs with royalty owners, "royalty

- 55 -

owners would be sharing the burdens of working interest ownership without the attendant rights," including the greater share of proceeds which oil-and-gas producing lessees enjoy.  854 P.2d at 883.  Accordingly, the Supreme Court of Oklahoma held that "in Oklahoma the lessee's duty to market involves obtaining a marketable product."  854 P.2d at 883.

Texas, on the other hand, has not adopted the marketable condition rule, but, rather, interprets oil-and-gas leases more strictly in accordance with their terms.  The first case in Texas to discuss a marketable condition rule was Danciger Oil & Refineries v. Hamill Drilling Co., in which the Supreme Court of Texas interpreted a royalty clause which stated that payments were to be made out of "all the oil, gas, casinghead gas, and other minerals produced, saved and marketed at the prevailing market price paid by major companies in the Gulf Coastal area from the properties."  171 S.W. 2d at 322.  The Supreme Court of Texas interpreted the lease as requiring the lessee to pay royalties for oil-and-gas "produced, saved and marketed," but not to "provide a market for all the products produced."  171 S.W. 2d at 323.  The Supreme Court of Texas concluded that the language did not indicate that the gas produced from the subject wells would be "so mixed with other products as not to be 'gas' of the kind contemplated" and also concluded that the lessee's operating expenses, which lease required the lessees to bear, did not include expenses "of processing the named product into some other product after it has been produced."  171 S.W. 2d at 323.  That there was no market for the gas in its unprocessed form in the vicinity of the wells did not sway the Supreme Court of Texas' ruling.  "The mere fact that there was then no market in that vicinity for the product then being produced from the lease, is not alone sufficient to justify us in overturning the plain, certain, and unambiguous terms of the contract."  171 S.W. 2d at 323.  The Supreme Court of Texas concluded that the lessor was "bound to accept payments out of the gas as it was then being produced from the wells, and is not entitled to have the gas refined into some other commodity."  171 S.W. 2d at 323.  The Supreme Court's decision in Danciger Oil & Refineries v. Hamill Drilling Co. has evolved into a rule in Texas courts: "Since the early history of oil and gas litigation, the courts have held that covenants are implied when an oil and gas lease fails to express the lessee's obligation to develop and protect the lease."  Amoco Prod. Co. v. Alexander, 622 S.W. 2d 563, 567 (Tex. 1981).  Accordingly, although Texas recognizes an implied duty to reasonably market oil and gas as part of an implied covenant of management and administration, which may be included in an oil-and-gas lease, the implied duty to market does not override language which specifies a particular payment method.  For example, the Supreme Court of Texas has held that a gas lease which provides for payments to be made based upon the gas' "market price" is not breached when a lessee contracts to sell the gas at a price above the prevailing market cost, reaping profits beyond that which it could obtain in an open market, but calculates and pays royalties based upon the lower, prevailing, market price for the gas, because the language of the lease provides for royalty payments in accordance with "market price."  Yzaguirre v. KCS Resources, Inc., 53 S.W. 368, 370, 373-75 (Tex. 2001)("Depending on future market behavior, this may be financially beneficial to the lessor . . . or it may be less advantageous, as here.  In either event, the parties have received the benefit of their bargain.").

The Court believes that, when the Supreme Court of New Mexico determines the existence of the marketable condition rule is ripe for review, it will find the reasoning of Colorado, Kansas, Oklahoma, and Wyoming more persuasive than that of Texas.  Like Kansas and Colorado, which construe oil-and-gas leases against the lessees, the Supreme Court of New

Mexico has established a "rule that an oil and gas lease is to be construed most strongly against the lessee." Greer v. Salmon, 82 N.M. 245, 250, 479 P.2d 294, 299 (1970).  This canon of construction is consistent with the duties a lease imposes on a lessee, such as the duty of "achiev[ing] the primary purpose of the lease, to explore, develop and produce."  82 N.M. at 250, 479 P.2d at 299.  Colorado and Kansas have recognized that, once a lessor assigns its working and operating interests to a lessee, the lessee possesses the ability to evaluate and choose which post-production measures are necessary to render a gas marketable.  Based upon the lessee's ability to assess post-production measures, Kansas and Colorado have determined that the lessee, and not the lessor, should bear the cost of those measures, as lessors generally will have "'no ready means of ascertaining'" the cost-benefit of a post-production measure "'other than to take lessees' word for it.'"  Garman v. Conoco, 886 P.2d at 660 (quoting Piney Woods Cnty. Life Sch. v. Shell Oil Co., 726 F.2d 225, 240 (5th Cir. 1984)).

    A critique of the marketable condition rule is that it necessarily turns on questions of fact, which the Supreme Court of Colorado recognized in Rogers v. Westerman Farm Co., because, whether a buyer is willing to purchase a product, and at what point, will vary from case to case.  See Rogers v. Westerman Farm Co., 29 P.3d at 903-06; Scott Lansdown, The Marketable Condition Rule 44 S. Tex. L. Rev. 667, 702-04 (Summer 2003)("The strongest argument against the marketable condition rule is that . . . if the rule is adopted, oil and gas lessees will be faced with an endless wave of expensive, burdensome and wasteful litigation . . . . [because of] [t]he failure of . . . any real criteria for marketability.").  The Court does not believe that the factual questions necessary to determining marketability are fatal to the marketable condition rule.  The cases discussed herein indicate that, in certain locations and with certain products, no willing buyer may be found until an oil or gas product is either transformed into a different condition, or transported to a different location.  At a minimum, the burden which the marketable condition rule imposes is that a market-ready product is able to reach the hands of a willing buyer, which is a burden New Mexico has already determined lessees should bear.  Cf. Libby v. DeBaca, 51 N.M. at 99, 179 P.2d at 265 (holding that the implied covenant to market requires a lessee to construct a plant for converting gas into dry ice at  his own cost, because the gas could be marketed only in dry ice form).  The Court believes that the Supreme Court of New Mexico would find that, consistent with its holding that "pronouncement without disposition of the product is futile," the implied covenant to market includes a duty to render products marketable at the lessee's, and not lessor's, expense.  Darr v. Eldridge, 66 N.M. at 263, 346 P.2d at 1044.  While the situation which allows a buyer to purchase an oil or gas product will vary from case to case, the requirement that a royalty interest owner does not pay for the meeting of product and buyer is not onerous, and will, logically, be satisfied whenever a lessee realizes the goal of a lease: receiving a profit on oil-and-gas products.  This finding leads to the second critique of the marketable condition rule: requiring a lessee to bear the burden of post-production costs is pointless, because the marketable condition rule will incentivize lessees to find purchasers that will purchase unrefined products.  Unrefined or unprocessed oil and gas will necessarily sell at a lower cost, because purchasers of the unprocessed products will factor into the price their costs to process the oil or gas.  This critique of the marketable condition rule concludes, therefore, that payments will be calculated on oil-and-gas profits less production costs, regardless whether the lessee bears those costs.  In theory, therefore, the marketable condition rule may not increase royalty owners' profits beyond their present state, as the cost of production will be taken from

## ANALYSIS

The Court will not dismiss any of the claims on limitations grounds, because the Plaintiffs have alleged facts that might reasonably establish that the discovery rule delayed the accrual of the statutes of limitations: it is plausible that the Plaintiffs' reasonable diligence either was or would have been inadequate to uncover the Defendants' alleged misconduct; and the Plaintiffs did not actually discover the misconduct until recently enough to put their suit within the statute. The Court will, however, dismiss the ninth cause of action without prejudice for failure to plead with particularity pursuant to rule 9(b)'s heightened pleading requirement. The Court will also dismiss the tenth cause of action with prejudice, because it is not an independent claim upon which relief can be granted, but rather an attempt to recite facts to establish two tolling doctrines. Last, the Court will dismiss the twelfth cause of action, because the Tenth Circuit has held that it has no basis in New Mexico law.

---

royalty payments in either transaction. The only change is in the entity deducting post-production costs. See Lansdown, supra, at 705-07. The Court does not believe that the Supreme Court of New Mexico will find this critique persuasive. The Court believes that the Supreme Court of New Mexico will conclude that, while it is true, in either situation, that post-production costs must be borne somewhere, the marketable condition rule, nonetheless, avoids an inefficient result. If oil-and-gas lessees may pass the cost onto lessors, the lessees lose the motivation for purchasing the most cost-efficient post-production measures. Oil-and-gas producers, as lessees, may attempt to pass those costs downstream to purchasers, but, in that instance, the purchaser will be assessing its own costs, and will, again, be incentivized to take on only cost-efficient post-production measures. See Libby v. DeBaca, 51 N.M. at 99, 179 P.2d at 265. In sum, the marketable condition rule incentivizes the entities with the most knowledge and ability to produce oil-and-gas in the most cost-effective manner. Without the marketable condition rule, oil-and-gas producers, as lessees, may pass post-production costs onto lessor-royalty-owners, who lack the knowledge and ability to evaluate and choose the best option. For these reasons, the Court believes that the Supreme Court of New Mexico will find that, included within the implied duty to market in New Mexico, is the marketable condition rule.

I.     **THE COURT WILL NOT CONVERT THE MTD INTO A MOTION FOR
SUMMARY JUDGMENT, BUT WILL CONSIDER THE CHECK STUBS.**

Before ruling on the substantive issues that the MTD presents, the Court must decide
whether to convert the MTD into a motion for summary judgment, and, at the same time,
whether to consider any or all of the various documents, extrinsic to the FAC, offered by each
side.  The Defendants request that the Court analyze their motion under rule 12(b)(6), but that the
Court consider the check stubs it attached to its MTD; the Plaintiffs ask that the Court convert
the MTD into a motion for summary judgment under rule 56, and that it consider various
affidavits and deposition excerpts in ruling on the motion.  The Court will let the Defendants be
masters of their own motion and thus will not convert their rule 12(b)(6) motion into one for
summary judgment.  The Court will, however, consider the check stubs that the Defendants
attached to the MTD, as it agrees with the Defendants that the check stubs satisfy the three-prong
inquiry fashioned by the Tenth Circuit in Jacobsen v. Deseret Book Co., because they: (i) are
"documents referred to in the complaint," see FAC ¶¶ 86, 87, at 26-27; id. ¶ 95, at 28-29; (ii) "are
central to the plaintiff's claim[s]," because the check stubs are a primary artifice through which
the   Defendants   communicated   their   allegedly   fraudulent,   contract   breach-concealing
representations; and (iii) "the parties do not dispute the documents' authenticity."[13]   Jacobsen v.

---

[13] The Plaintiffs dispute -- not in argument, but in an affidavit that one of their lawyers,
Bradley Brickell, wrote -- the truthfulness of the check stubs, but not their authenticity: "[I]t is
clear that several entries on the Plaintiffs' check stubs are false and constitute
misrepresentations."  Affidavit of Bradley Brickell Pursuant to *Fed. R. Civ. P.* 56(d) in Support
of Plaintiffs' Response to Defendants' Motion to Dismiss Claims in Plaintiffs' Fourth Amended
Complaint ¶ 6, at 3.  As this assertion repeats the core factual allegation underlying the Plaintiffs'
claims, and does not challenge whether the check stubs provided are original or exact copies of
the check stubs to which the FAC refers -- the ones that the Defendants mailed to the
Plaintiffs -- the Court concludes that the Plaintiffs do not challenge the authenticity of the check
stubs.

Deseret Book Co., 287 F.3d 936, 941 (10th Cir. 2002)(holding that district courts may consider documents that satisfy those three prongs in ruling on a motion to dismiss, even though the usual rule is that court must only use, and assume the truth of, the allegations in the pleadings).   The Court will not consider the affidavits attached to the Plaintiffs' Response, because -- to the extent that the Court can ascertain what the documents even are -- they are not documents to which the FAC refers, and were, in fact, produced during litigation, after the filing of the FAC.

## II.   THE COURT WILL NOT DISMISS ANY OF THE CLAIMS ON LIMITATIONS GROUNDS, BUT IT WILL DISMISS THE TWO CLAIMS -- THE NINTH AND TENTH CAUSES OF ACTION -- THAT THE PLAINTIFFS BRING IN AN ATTEMPT TO TOLL THE STATUTE.

The Court will not dismiss any of the claims on limitations grounds, because, assuming the truth of the factual allegations in the FAC, a jury could reasonably conclude that the statutes of limitations did not accrue until October 20, 2007,[14] or later, thus putting all claims fully within the limitations periods. Specifically, it is plausible that: (i) the Plaintiffs did not discover the causes of action until after that date; and (ii) reasonably diligent investigation would have failed, or did fail, to discover the causes of action earlier -- whether the Plaintiffs actually conducted any investigation or not is immaterial.   The Defendants argue that the Plaintiffs have avoided pleading the facts -- such as specific dates of unlawful conduct and the extent of the Plaintiffs' actual diligence in keeping abreast of their financial interests in the leases -- necessary for either them or the Court to conduct a full and proper statute of limitations analysis, but the Plaintiffs are under no obligation to plead such facts.   As long as the FAC plausibly alleges the prima facie elements of the causes of action it brings, and does not, on its face, definitively establish a

---

[14] This date represents the earliest date upon which the statute could accrue without barring any of the Plaintiffs' claims.  It is exactly four years prior to the day, October 20, 2011, that the Plaintiffs filed their suit in First Judicial District Court of New Mexico.

limitations defense, the Court should not dismiss the claims under rule 12(b)(6).  The two claims added to the FAC in an attempt to toll the statute of limitations, however, are unsustainable as independent claims: the ninth cause of action, for fraudulent concealment, is not pled with particularity as rule 9(b) requires, and the Court will dismiss it, see Fed. R. Civ. P. 9(b); and the tenth cause of action is not an independent claim for relief at all, but rather amounts to the Plaintiffs' presentation of two alternative arguments for equitable tolling.

> **A.    NEW MEXICO LAW SUPPLIES ALL STATUTES OF LIMITATIONS: SIX YEARS FOR THE FIRST, FIFTH AND SIXTH CAUSES OF ACTION; FOUR YEARS FOR THE SECOND, FOURTH, ELEVENTH, AND TWELFTH CAUSES OF ACTION.**

New Mexico's six-year statute of limitations for claims founded upon written contracts, see N.M. Stat. Ann. § 37-1-3, controls the Plaintiffs' first, fifth, and sixth causes of actions; their second, fourth, eleventh, and twelfth causes of action are subject to New Mexico's four-year statute of limitations for actions upon unwritten contracts and miscellaneous actions,[15] see N.M. Stat. Ann. § 37-1-4.  No claim -- including the eleventh cause of action, which arises under substantive Colorado law -- is subject to Colorado statutes of limitations.

> **1.    New Mexico Law, Not Colorado Law, Supplies All Statutes of Limitations.**

New Mexico law supplies the controlling statutes of limitations for all claims, including the eleventh cause of action, which arises under Colorado substantive law, because of the following reasons.  First, a federal court sitting in diversity jurisdiction must apply the same statutes of limitations that a state court of the forum state would apply to the case.  See Guaranty Trust Co. v. York, 326 U.S. at 109.  Second, New Mexico uses the First Restatement approach to

---

[15] Because the Court will dismiss the ninth and tenth causes of action later in this Memorandum Opinion and Order, it will not analyze what the applicable statutes of limitations for those claims would be.

choice-of-law analyses in most circumstances.  See United Wholesale Liquor Co. v. Brown-Forman Distillers Corp., 1989-NMSC-030, ¶ 9, 775 P.2d at 235 ("New Mexico adheres to a traditional conflicts of law analysis contained in Restatement (First) of Conflicts of Law (1934).").  Third, the First Restatement[16] provides that, in the absence of a "borrowing statute" -- a forum-state statute that adopts the statute of limitations of foreign states when applying their substantive law -- the statute of limitations of the forum state controls all claims, even when the claims are brought under the substantive law of a foreign state.  See First Restatement § 603-604.  Last, New Mexico has no borrowing statute.

> **a.    The Colorado Statute of Limitations Applicable to Breach of the Duty to Market Hydrocarbons Bars Merely the Remedy, Not the Right.**

The Plaintiffs half-heartedly argue that, if "it would be fundamentally unfair to apply the New Mexico statute of limitations to the Plaintiffs' and Class Members' claims under wells in Colorado," the Court should apply the Colorado statutes of limitations.  Response Supp. at 2 (citing Lujan v. Regents of the Univ. of Cal., 69 F.3d at 1515-16).  The case they cite does not rely on the "fundamentally unfair" distinction to come to the conclusion it does, but rather highlights another point of analysis.  In Lujan v. Regents of the University of California, the Tenth Circuit held that New Mexico's wrongful death statute of limitations must be "treated as" substantive -- i.e., the foreign state that supplies the substantive law also supplies the statute of limitations -- because wrongful death limitations "do[] not merely bar the remedy for the violation of a right but limit[] or condition[] the right itself."  69 F.3d at 1516-17 (citing Wall v. Gillett, 1956-NMSC-060, ¶ 4, 298 P.2d 939, 940).  This analysis is consistent with both the First

---

[16]   The Second Restatement comes out the same way on this question: the statute of limitations, as a procedural device, is supplied by the forum state.  See Second Restatement § 142.

and Second Restatement approach to choice-of-law analysis.  See First Restatement § 605 ("If by

the law of the state which has created a right of action, it is made a condition of the right that it

shall expire after a certain period of limitation has elapsed, no action begun after the period has

elapsed can be maintained in any state."); Second Restatement § 143 ("An action will not be

entertained in another state if it is barred in the state of the otherwise applicable law by a statute

of limitations which bars the right and not merely the remedy.").

The Second Restatement offers the following guidance to determine whether a statute of

limitations bars the right or merely the remedy:

> [I]t is for the forum courts to determine whether a foreign statute of limitations
> bars the right and not merely the remedy.  The almost invariable prerequisite is
> that the liability sought to be enforced must have been created by statute.  Once
> this requirement has been met, the usual test is whether, in the opinion of the
> forum, the limitation provision was directed to the right "so specifically as to
> warrant saying that it qualified the right."  Davis v. Mills, 194 U.S. 451, 454
> (1904).  Other tests have at times been employed, such as whether the statute of
> limitations has attributes in the state of its enactment which the forum would
> characterize as substantive, as that the defense need not be pleaded or that the
> obligation cannot be revived after the statutory period has elapsed.
>
> The most common illustration of a situation where a statute of limitations
> will usually be held to bar the right is when a statute creates but a single right of
> action and also contains a provision limiting the time in which actions under the
> statute may be brought.  Wrongful death statutes are typical examples of statutes
> of this sort.

Second Restatement § 143 cmt. c.

The Court must next identify which statutes of limitations to analyze.  The Plaintiffs

appear to ask, not merely that the Court apply the Colorado statute of limitations, class-wide, to

the one claim arising under Colorado state law, but rather that the Court should apply Colorado

statutes of limitations to all claims -- including the eight claims arising under New Mexico

law -- as to all wells located in Colorado.[17]  See Response Supp. at 1-5.  The Court can find no support for the application of a foreign state's statute of limitations to a claim brought under the forum state's substantive law.  Such a result would be unsound: if the factors informing a choice-of-law analysis were to weigh so strongly in favor of the foreign state that the forum court concluded it was necessary to apply even a principally procedural provision, such as a statute of limitations, then it would likely find it inappropriate to continue to apply the forum state's substantive law to the dispute.  If a Colorado statute of limitations is to apply in this case, it will be to the eleventh cause of action, a claim for breach of the implied duty to market hydrocarbons under Colorado law.[18]

The Plaintiffs contend that the applicable statute is the "six year statute of limitations that exists for breach of contracts in Colorado," Response Supp. at 4, apparently referring to Colo. Rev. Stat. Ann. § 13-80-103.5 (providing a six-year limitations period for "actions to recover a liquidated debt," "actions for arrears of rent," "actions by the public employees' retirement association to collect unpaid contributions from employers," and actions to recover damages arising from the passing of bad checks  (citing Colo. Rev. Stat. Ann. § 13-21-109 (providing for

---

[17] The Court is surprised at this request.  Variations in applicable state law within a putative class can have serious negative implications on the rule 23(b)(3) predominance and superiority analyses, and weigh heavily against certification.  See Castano v. Am. Tobacco Co., 84 F.3d 734, 741-44 (5th Cir. 1996)(Smith, J.).

[18] Even if the Court applied Colorado statutes of limitations to the claims arising under New Mexico law, Colorado -- unlike New Mexico -- has a borrowing statute, which would point the Court back to the New Mexico statutes of limitations.  See Colo. Rev. Stat. Ann. § 13-80-110 ("If a cause of action arises in another state or territory or in a foreign country and, by the laws thereof, an action thereon cannot be maintained in that state, territory, or foreign country by reason of lapse of time, the cause of action shall not be maintained in this state."), repealing by implication Colo. Rev. Stat. Ann. § 13-82-104 (adopting the Uniform Conflict of Law -- Limitations Act, and providing that Colorado uses its own statutes of limitations even when applying foreign substantive law), as recognized by Jenkins v. Panama Canal Ry. Co., 208 P.3d 238, 244-45 (Colo. 2009).

the "[r]ecovery of damages for checks, drafts, or orders not paid upon presentment"))).   The

Court concludes that the applicable statute of limitations for the implied-duty-to-market claim is

the two-year statute of limitations provided in Colo. Rev. Stat. Ann. § 13-80-102.   That section

provides the limitations period for "[a]ll other actions of every kind for which no other period of

limitation is provided"; after examining Article 80 of Title 13 of the Colorado Statutes, the Court

concludes that no other statute of limitations specifically applies to breach of the implied duty to

market hydrocarbons.   Colo. Rev. Stat. Ann. § 13-80-102(1)(i).   Even if the claim sounds in

contract, however, the Plaintiffs misidentify the appropriate statute -- Colorado has a three-year

limitation on breach-of-contract actions.   See Colo. Rev. Stat. Ann. § 13-80-101(1)(a) (providing

a three-year limitations period for "[a]ll contract actions").

      Regardless whether the two-year statute in section 102 or the three-year statute in section

101 applies, the Court concludes that both statutes merely cut off remedies, vice extinguishing

rights.   "The almost invariable prerequisite [for concluding that a statute of limitation bars a

right] is that the liability sought to be enforced must have been created by statute."   Second

Restatement § 143 cmt. c.   Here, the right sued upon is a creature of the common law, attributed

by the Plaintiffs to Rogers v. Westerman Farm Co., 29 P.3d 887 (Colo. 2001).   See FAC ¶ 100,

at 30.   The Court will also assess

> whether . . . the limitation provision was directed to the right so specifically as to
> warrant saying that it qualified the right. . . .   The most common illustration . . . is
> when a statute creates but a single right of action and also contains a provision
> limiting the time in which actions under the statute may be brought.

Second Restatement § 143 cmt. c.   The statute here presents the opposite scenario: it applies to

the eleventh cause of action only by way of a catch-all provision; or, if § 13-80-101 applies, by

an ambiguous reference to "contract actions," read to encompass all implied-in-law covenants

and judicially crafted duties.   Colo. Rev. Stat. Ann. § 13-80-101(1)(a).   The Colorado statute of

limitations applicable to breach of the implied duty to market hydrocarbons, therefore, bars merely the remedy, not the right, and thus cannot be properly applied over the countervailing forum-state statute.

> **b.**      **Application of the New Mexico Statutes of Limitations Is Not Fundamentally Unfair, Because Statutes of Limitations Are Procedural, and, Thus, New Mexico's Statutes of Limitations Would Control the Suit Even if It Were Not a Class Action.**

The "fundamentally unfair" language used by the Plaintiffs harks back to Phillips Petroleum Co. v. Shutts, in which the Supreme Court reversed a Kansas state court's decision to apply Kansas substantive law to all the claims in an oil and gas lease class action, even though over ninety-nine percent of the leases and ninety-seven percent of the class members had no connection with the state of Kansas.  472 U.S. at 815.  The Supreme Court recognized that, for large class actions to be workable mechanisms, the usual rules -- as to notice, personal jurisdiction, plaintiff autonomy, and choice-of-law -- would have to be fudged: it held that the minimum contacts analysis that informs personal jurisdiction over defendants did not apply to absent plaintiffs (class members) and that courts need not demand that absent plaintiffs affirmatively "opt in" to being part of a class.  472 U.S. at 811-12.  It held, however, that due process places limits on the extent to which the time-tested rules governing non-complex litigation could be modified in the class action context: while a class need not be composed entirely of Kansas residents with Kansas leases to apply Kansas law to the whole class -- i.e., the application of Kansas law to a class action does not require that each class member, if he brought suit as an individual, would be subject to Kansas law -- Kansas must have "a 'significant contact or significant aggregation of contacts' to the claims asserted . . . , contacts 'creating state interests,' in order to ensure that the choice of Kansas law is not arbitrary or unfair."  472 U.S. at 821-22 (quoting Allstate Ins. Co. v. Hague, 449 U.S. 302, 312-13 (1981)).

- 66 -

Here, the New Mexico statute of limitations would be appropriately applied even if this case were not complex, and the Phillips Petroleum Co. v. Shutts inquiry is thus inapposite.  If the Plaintiffs may validly sue under New Mexico substantive law, and if a New Mexico court is a valid forum in which to hear the case -- and no party has objected to either condition -- then New Mexico statutes of limitations would govern all claims based on the analysis the Court has already conducted.

**2.      The Causes of Action Founded upon Breach of Express, Written Contractual Obligations Are Subject to a Six-Year Limitations Period; Those Founded upon Statutory Rights or Implied-in-Law Covenants Are Subject to a Four-Year Limitations Period.**

The Court concludes that the Plaintiffs' first, fifth, and sixth causes of action are founded upon breach of written contract, and are thus subject to the six-year limitations period outlined in N.M. Stat. Ann. § 37-1-3.  The fourth cause of action, violation of the NMOGPPA, is subject to the four-year limitations period that N.M. Stat. Ann. § 37-1-4 provides for "all other actions not herein otherwise provided for," because the NMOGPPA has no internal provision or specified external provision setting forth a limitations period.  See N.M. Stat. Ann. §§ 70-10-1 to -6. Section 37-1-4's four-year statute of limitations also controls the second, eleventh, and twelfth causes of action, which each allege breach of an implied duty attendant to a contract, because the Court concludes that those claims fall under either the section's provision for actions "founded upon accounts and unwritten contracts," or its provision covering "all other actions not herein otherwise provided for."  N.M. Stat. Ann. § 37-1-4.

The Court's conclusions align with the Defendants' contentions.  See MTD at 3-6.  In their initial response, the Plaintiffs wrote that, "[f]or the purposes of this response, Plaintiffs do not dispute the limitation periods assigned to these claims but assert . . . that any applicable statute has been tolled."  Response at 7 n.2.  The Plaintiffs now argue that Colorado law might,

possibly, supply the limitations periods, see Response Supp. at 1-4, but do not argue that New Mexico's longer, six-year statute, for actions on written contracts, should apply to their claims for breach of good faith and the implied duty to market, see Response at 7-13; Response Supp. at 1-5. The Court could view this argument as waived, but, even upon independent examination of the statute and case law, the Court concludes that breaches of the implied duty of good faith and the implied duty to market come under the four-year statute.

Although judicially implied-in-law duties are said to be part of a contract, and do not exist in the absence of a contractual relationship, they do not require the existence of a written contract, and are themselves, of course, always unwritten. From an evidentiary perspective, implied covenants are more similar to statutory obligations and unwritten contractual terms -- an implied duty could be said to be a blend of both -- both of which § 37-1-4 governs, than they are to written contractual terms. While the Court can see some utility in applying a single limitations period to all claims surrounding a written instrument, it is not overly difficult to administer a situation where, as would happen here if the Court were to cut off damages, the Plaintiffs are entitled to six years' worth of damages on breach of the written terms, and four years' worth of damages on breach of the implied terms.

There is a dearth of case law from the New Mexico courts on this issue,[19] with the clearest explication of the scope of the six-year statute coming from the Court of Appeals of New Mexico:

---

[19] The bulk of the Defendants' case law, which, for the most part, simply repeats the proposition that the duty to market and to exercise good faith are implied in law, not in fact, is not persuasive on the issue of which statute of limitations should apply. The Court also thinks the treatise to which the Defendants cite -- for the "general rule" that implied covenants are subject to the statutes of limitations applicable to unwritten contracts -- is referring to implied-in-fact contracts and restitution claims. MTD at 4. See 66 Am. Jur. 2d, Restitution and Implied

> We look to "[t]he nature of the right sued upon, and not the form of action or relief demanded, [to] determine[] the applicability of the statute of limitations" to a cause of action.   Rito Cebolla Invs., Ltd. v. Golden W. Land Corp., 1980-NMCA-028, ¶ 28, 607 P.2d 659, 664-65 (citation omitted).  In order for a cause of action "[t]o come within the six year limitation period 'founded upon any . . . contract in writing,'" which Gallegos argues should apply to the TPFA [the Trade Practices and Frauds Act], "[the] action must be brought for breach of contract, one which requires a policy to do the things for the non[-]performance of which the action is brought."   1980-NMCA-028, ¶ 29, 607 P.2d at 665 (second alteration in original)(citations omitted).  Thus, in order for us to apply the six-year statute of limitations to the third-party right of action under the TPFA, the nature of the right sued upon must be based on the breach or nonperformance of a term in a written contract.

Martinez v. Cornejo, 2009-NMCA-011, ¶ 29, 208 P.3d 443, 452 (alterations, except the TPFA clarification, in original).  While not conclusive, the statement that, for "the six-year statute [to apply,] . . . the right sued upon must be based on the breach or nonperformance of a term in a written contract," militates against applying the six-year statute of limitations to breaches of implied covenants.  The Court will, therefore, apply the four-year statute of limitations in N.M. Stat. Ann. § 37-1-4 to the second, eleventh, and twelfth causes of action.

**B.  THE DISCOVERY RULE PREVENTS THE DEFENDANTS FROM PREVAILING ON THEIR LIMITATIONS DEFENSE AT THE MOTION-TO-DISMISS STAGE; THUS, THE COURT WILL NOT DISMISS ANY PART OF ANY OF THE CLAIMS ON LIMITATIONS GROUNDS.**

Accepting all factual allegations in the FAC as true and drawing all reasonable inferences in the Plaintiffs' favor,[20] the Court concludes that it is plausible that: (i) the Plaintiffs did not

─────────────

Contracts § 154 (2011)("It is the general rule that a statute, prescribing the time to sue upon contracts, obligations, or liabilities not founded upon instruments in writing, governs an action upon an implied or quasi-contract.").

[20] The Court has, additionally, considered the check stubs attached to the MTD and found that they contribute little to its analysis.  It is clear from the face of the FAC that the Plaintiffs allege a course of (not necessarily continuous) conduct extending back a number of years -- potentially as long ago as the mid- to late- 1940's, when the leases were executed.  See FAC ¶¶ 26-29, at 10-13 (describing the leases, including their execution dates); id. ¶ 94, at 28 (alleging that "the same failure ha[s] occurred each and every month, from the date that

discover the causes of action until October 20, 2007,[21] or later; and (ii) reasonable diligence and investigation -- whether or not it was actually carried out -- would not have uncovered the causes of action sooner than that date.  See Elm Ridge Exploration Co., LLC v. Engle, 721 F.3d 1199, 1210-11 (10th Cir. 2013)(interpreting the New Mexico discovery rule's "reasonable diligence" standard as a "reasonable-person standard . . . as to whether [the plaintiff] should have known of the [cause of action]").  As a result, it is plausible that the statutes of limitations did not accrue until after that date, and none of the Plaintiffs' claims is time-barred, either in full or in part.  The facts alleged in the FAC make out a plausible prima facie case for the claims asserted;[22] they do not definitively establish the affirmative defense of limitations, as is required to prevail on a motion to dismiss under rule 12(b)(6).  See Fed. R. Civ. P. 12(b)(6).

New Mexico uses the discovery rule, meaning that statutes of limitation accrue -- i.e., begin to run -- only when the "the plaintiff discovers, or should have discovered in the exercise

---

Williams . . . first initiated delivery of monthly statements").  A fair reading of the claims -- let alone the broad reading the Court is required to give pleadings -- is that the Defendants' unlawful course of conduct extends back at least beyond October 20, 2005, the last date the statute of limitations could accrue without barring at least some of the claims.  See FAC ¶¶ 26-29, at 10-13.

    If the Court were not to construct the claims in this self-evident manner, then the Plaintiffs would be unable to pursue damages they incurred before whatever arbitrary date the Court chose as being the cut-off point in its interpretation of the claims.  The MTD would be irrelevant, because the remedy it seeks -- cut-off damages -- would already have been provided.

    [21] This date refers to the latest date upon which the statute could accrue and all of the Plaintiffs' claims be viable in their entirety.  October 20, 2007, is the date specifically applicable to the second, fourth, eleventh, and twelfth causes of action.  October 20, 2005, is the date specifically applicable to the first, fifth, and sixth causes of action.  This opinion will refer to the later date, as, if the accrual of the statutes of limitations post-dates it, none of the claims are time barred.

    [22] This statement refers to the claims' being filed before the expiration of the limitations period.  The Court will, however, dismiss the ninth, tenth, and twelfth claims for failure to state a substative claim upon which relief can be granted.

of reasonable diligence, the facts that underlie his or her claim." Butler v. Deutsche Morgan Grenfell, Inc., 2006-NMCA-084, ¶ 26, 140 P.3d 532, 539 (citing Martinez v. Showa Denko, K.K., 1998-NMCA-111, ¶¶ 18-19, 964 P.2d 176, 180-81).  The substantive elements of the rule are, thus: (i) that before the date of accrual, the plaintiffs lacked actual knowledge of at least some of the facts necessary to establish the cause of action, see Gerke v. Romero, 2010-NMCA-060, ¶¶ 8-10, 237 P.3d at 114-15; and (ii) that reasonable diligence -- the level of investigation and inquiry that a reasonable person would pursue -- at any point in the period between the cause of action's occurrence and discovery, would not have unearthed the cause of action.  There is no requirement that the plaintiff have actually exercised reasonable diligence.  The Defendants do not contest that the Plaintiffs lacked actual knowledge of the causes of action, but rather that the reasonable diligence element is not properly pled.  See MTD at 9.

The mechanics of the discovery rule -- namely, which party carries the burden of proof at various stages of the case -- are not well defined.  The rule is an exception to an affirmative defense, and, when overlaid with procedural standards of rule 12(b)(6), is susceptible to numerous different implementations.  It is not even clear whether, under Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938), the Court should look to federal or state law in determining how to allocate or shift the burden of production.  See Fed. R. Evid. 301 (providing that federal courts are to allocate the burden of production, but not the burden of persuasion, in response to presumptions that controlling substantive law supplies); 21B Charles Alan Wright, Kenneth W. Graham, Jr., Victor James Gold & Michael H. Graham, Federal Practice & Procedure: Evidence §§ 5122, 5132 (2d ed. 2014)(equivocating on the issue whether to apply state or federal burdens of production in a diversity case); Second Restatement § 134 (stating that, in a horizontal choice-of-law analysis, the forum state's allocation of the burden of production applies).  What is clear

is that the Court must apply the substance of the discovery rule as the Supreme Court of New Mexico would interpret it,[23] but must apply it in a manner consistent with the Federal Rules of Civil Procedure.  See Hanna v. Plumer, 380 U.S. 460 (1965)(holding that the Federal Rules of Civil Procedure are presumptively procedural and apply in all cases in federal court).

### 1.   The Plaintiffs Are Not Obligated to Plead with Particularity Facts Activating the Discovery Rule.

The Defendants' argument misapprehends the requirements of notice pleading, and the scrutiny and burden-allocation of the rule 12(b)(6) inquiry.  The crux of their argument is buried deep within the MTD:

> In the[ FAC], although Plaintiffs avoid alleging the specific dates on which they contend they first suffered injury in fact by reason of any breach of the express royalty terms, breach of any implied in law covenants, or any statutory violation by Defendants, their artful pleading is insufficient to avoid dismissal of the claims barred by the applicable statutes of limitations.

MTD at 7 (emphasis added).  The Defendants extend this logic -- that, because limitations defenses can sometimes be adjudicated at the motion-to-dismiss stage, the burden is on the Plaintiffs to plead facts that permit a full adjudication of the limitations issue -- to the discovery rule as well, arguing that, because the Plaintiffs do not plead the reasonable diligence issue to the Defendants' satisfaction, the Defendants are entitled to a win by default.

While there are obvious efficiencies to disposing of clearly time-barred claims at the motion-to-dismiss stage, not all limitations defenses are open-and-shut cases; genuine factual disputes can exist, and a rule 12(b)(6) motion is not the place to decide them.  Unless it is

---

[23] In choice-of-law analysis, tolling doctrines and doctrines such as the discovery rule follow the statutes of limitations to which they apply; e.g., a court would never apply the tolling doctrines of one jurisdiction to the statute of limitations of another.  See State Farm Mut. Auto. Ins. Co. v. Boellstorff, 540 F.3d 1223, 1228 (10th Cir. 2008)(Ebel, J.)("[W]e must follow Colorado's tolling rules, as they are 'an integral part of the several policies served by the statute of limitation.'"  (quoting Cook v. G.D. Searle & Co., 759 F.2d 800, 802 (10th Cir. 1985))).

essential to the establishment of the prima facie elements of a claim or the claim is for fraud or

mistake, see Fed. R. Civ. P. 9(b), a plaintiff is under no obligation to plead specific or

identifiable dates at all.  Another court in the Tenth Circuit has concluded, applying Supreme

Court precedent, that

> the Court is confined to "the four corners" of the amended complaint.  Thus, when
> a defendant seeks dismissal based on the statute of limitations, the time-bar must
> be apparent on the face of the complaint.[24]  The Supreme Court has explained:
>
>> A complaint is subject to dismissal for failure to state a claim if the
>> allegations, taken as true, show the plaintiff is not entitled to relief.
>> If the allegations, for example, show that relief is barred by the
>> applicable statute of limitations, the complaint is subject to
>> dismissal for failure to state a claim; that does not make the statute
>> of limitations any less an affirmative defense.  Whether a particular
>> ground for opposing a claim may be the basis for dismissal for
>> failure to state a claim depends on whether the allegations in the
>> complaint suffice to establish that ground, not on the nature of the
>> ground in the abstract.
>
> Jones v. Bock, 549 U.S. 199, 215 (2007)(citations omitted).
>
> [The] Defendant . . . appears to assume that even when he relies on an
> affirmative defense,[25] the Plaintiff must identify the relevant dates in the

---

[24] See Miller v. Shell Oil Co., 345 F.2d 891, 893 (10th Cir. 1965).  See
also Benak v. Alliance Capital Management LP, 435 F.3d 396, 400 n.14 (3d Cir.
2006)("A statute of limitations defense is an affirmative one, and in order to
undergird a dismissal, must appear on the face of the complaint."); La Grasta v.
First Union Secs., Inc., 358 F.3d 840, 845 (11th Cir. 2004)("[A] Rule 12(b)(6)
dismissal on statute of limitations grounds is appropriate only if it is 'apparent
from the face of the complaint' that the claim is time-barred[.]"  (citations
omitted)); Doe v. U.S. Dep't of Justice, 753 F.2d 1092, 1115 (D.C. Cir.
1985)("[A] motion to dismiss may be granted on the basis that the action is time-
barred only when it appears from the face of the complaint that the relevant
statute of limitations bars the action[.]"  (footnote omitted)(citations omitted)).
See also 5A Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, Richard L.
Marcus & Adam N. Steinman, Federal Practice and Procedure: Civil § 1357, at
348-49 (1990)(stating that under Rule 12(b)(6), a complaint is subject to dismissal
only if the affirmative defense clearly appears on the face of the pleading).

> complaint and that his silence requires dismissal.  [He] presents no authority for
> this remarkable proposition, and none exists.  If [he] did not include the date of
> his arrest, the Court cannot dismiss the action based on the statute of limitations.[26]

Honeycutt v. Mitchell, No. CIV 08-140 W, 2008 WL 3833472, at *4 (W.D. Okla. Aug. 15,

2008)(footnotes renumbered from original to maintain continuity)(citation omitted).   This

analysis applies even to a strictly enforced statute of limitations that does not incorporate the

discovery rule.

The introduction of the discovery rule into the calculus only tilts the scales further in the

plaintiff's favor.  The Court can conceive of several possible ways to allocate the burden of

production at the motion-to-dismiss stage, which will be listed in descending order of

favorability to the plaintiff.   First, the Court could require that the defendant definitively

establish,[27] based only on the facts alleged in the complaint, that the limitations

---

[25] [T]he statute of limitations is an affirmative defense . . . ."  Aldrich v.
McCulloch Props., Inc., 627 F.2d 1036, 1041 n.4 (10th Cir. 1980)(citations
omitted).  See also John R. Sand & Gravel Co. v. United States, 552 U.S. 130,
133 (2008)("[T]he law typically treats a limitations defense as an affirmative
defense that the defendant must raise at the pleadings stage[.]"   (citations
omitted)).

[26] See Harris v. New York, 186 F.3d 243, 251 (2d Cir. 1999)(stating that
the plaintiff had no obligation in the amended complaint to "identify any time
element" because "the statute of limitations is an affirmative defense" and the
plaintiff had no obligation to anticipate this issue in his pleading); Goodman v.
Praxair, Inc., 494 F.3d 458, 465-66 (4th Cir. 2007)(concluding that the plaintiff
had no obligation to state in the complaint when the alleged contractual breach
had taken place); Hollander v. Brown, 457 F.3d 688, 691 n.1 (7th Cir. 2006)("[A]
federal complaint does not fail to state a claim simply because it omits facts that
would defeat a statute of limitations defense[.]").

[27] The Court uses the term "definitively establish" to refer to meeting the so-called "third
burden of proof," the quantum of evidence at which a court will rule in favor of the party with
the burden of persuasion.  See Wright et al., supra § 5122 (stating that, in the trial context, the
"third burden of proof" is the quantum of evidence required to entitle the plaintiff to a directed
verdict or judgment as a matter of law).  At the motion-to-dismiss stage, a court will accept a
defendant's affirmative defense only if: (i) the facts in the complaint establish the elements of the

period -- including any delay in accrual as a result of the discovery rule -- expired before filing. This interpretation would result in courts essentially never dismissing claims, unless: (i) the plaintiff goes out of his way to plead actual knowledge or the probable effectiveness of reasonable diligence; or (ii) the plaintiff pleads the specific date on which the operative events occurred, and circumstances are such that it is implausible that the plaintiff did not and could not discover the cause of action when it occurred; e.g., a car accident in which the defendant-driver gives his full contact information at the scene.  Second, the Court could shift the burden of production to the plaintiff upon a showing by the defendant that, but for the discovery rule, the facts alleged in the complaint would definitively establish a limitations defense.  Once that showing is made, the Court could require the plaintiff to: (i) allege facts that could give rise to a reasonable inference that the elements of the discovery rule might plausibly be met;[28] (ii) allege facts that, if proven at trial, could establish the elements of the discovery rule to the satisfaction of a reasonable jury; or (iii) plead with particularity -- alleging the who, what, when, where, and how -- facts that, if proven at trial, could establish the elements of the discovery rule to the satisfaction of a reasonable jury.  Such facts might include: when and how the plaintiff discovered the cause of action -- to pin down the exact time of accrual; detailed descriptions of the plaintiff's diligence; descriptions of the investigatory resources available to the plaintiff of

---

affirmative defense; or (ii) even though the facts in the complaint do not establish the affirmative defense, there is no plausible scenario, based on the facts in the complaint, in which the elements of the affirmative defense will not be established.

    [28] This burden allocation is logically equivalent to the first option -- putting the full burden on the defendant to definitively establish, based only on the facts in the complaint, that the limitations period lapsed prior to filing.  It is listed here because it contains the usual language that plaintiffs must surmount to state their claims for rule 12(b)(6) purposes.

which the plaintiff did not take advantage; and detailed allegations of any acts that the defendant

carried out to conceal or to avoid disclosing the cause of action to the defendant.

For better or worse, the Tenth Circuit has borrowed from New Mexico state court

procedure to require some form of burden-shifting whenever the discovery rule comes into play

at the pleading stage:

> A plaintiff invoking the discovery rule must "demonstrate that if she had diligently investigated the problem she would have been unable to discover the cause of her injury." Martinez v. Showa Denko, K.K., 1998-NMCA-111, ¶ 22, 964 P.2d 176, 181 (1998).  See also Blea v. Fields, 2005-NMSC-029, ¶ 28, 120 P.3d 430, 440 (2005)(holding that to toll statute of limitations for fraudulent concealment, plaintiff must prove that she "lacked knowledge of her cause of action and could not have discovered it by exercising reasonable diligence during the statutory period").  A plaintiff has this burden to defeat either a motion for summary judgment or a motion to dismiss.  Butler v. Deutsche Morgan Grenfell, Inc., 2006-NMCA-084, ¶ 28, 140 P.3d 532, 539.

Elm Ridge Exploration Co., LLC v. Engle, 721 F.3d at 1211.  The case that the Tenth Circuit

cites for the proposition that the "plaintiff has the burden" expounds further:

> The general rule is that "[t]he defense of the statute of limitations may be raised by motion to dismiss where it is clearly apparent on the face of the pleading that the action is barred."  Apodaca v. Unknown Heirs of the Tome Land Grant, 1982-NMSC-100, ¶ 14, 651 P.2d 1264, 1267-68.  However, where there are disputed facts, it is generally the province of a jury to determine the date on which a plaintiff became aware or should have become aware of the facts underlying his or her claim.  If such factual disputes exist, granting a motion to dismiss on statute of limitations grounds would be improper.
>
> The issue we confront here is what a plaintiff must plead in order to invoke the discovery rule, thereby precluding the district court from granting a motion to dismiss on statute of limitations grounds.  When a defendant makes a prima facie showing that a claim is time barred, a plaintiff attempting to invoke the discovery rule has the burden of "demonstrat[ing] that if [he or] she had diligently investigated the problem [he or] she would have been unable to discover" the facts underlying the claim.  Martinez v. Showa Denko, K.K., 1998-NMCA-111, ¶ 22, 964 P.2d at 181-82.  We acknowledge that *Martinez* involved a motion for summary judgment rather than a motion to dismiss.  However, we hold that even at the motion to dismiss stage, a plaintiff must have alleged in the complaint, or must respond to the motion to dismiss with, factual allegations that,

- 76 -

if proved, would support application of the discovery rule.  All such well-pleaded allegations are to be taken as true, and great specificity is not required.

Butler v. Deutsche Morgan Grenfell, Inc., 2006-NMCA-084, ¶¶ 27-28, 140 P.3d at 539 (alterations in original)(citations omitted)(internal quotation marks omitted).

The Court concludes that option (ii) -- requiring the plaintiff to bolster what would, without the activation of the discovery rule, be a facially time-barred claim with allegations that, if proven at trial, could convince a reasonable jury to reject the limitations defense -- is the most faithful to precedent.  The Court arrives at this conclusion by separately examining the dictates of Butler v. Deutsche Morgan Grenfell, Inc.: (i) the burden-shifting is triggered "[w]hen a defendant makes a prima facie showing that a claim is time barred"; the Court interprets "prima facie" to mean that the defendant need establish only that the facts giving rise to the cause of action occurred outside the limitations period, not that its discovery did; the Court interprets "showing" to mean that the defendant can definitively establish this fact using only the facts in the complaint and any other documents the Court may properly consider in a rule 12(b)(6) motion; (ii) when the burden shifts to the plaintiff to argue or present evidence for the application of the discovery rule, the statement that "great specificity is not required" strongly indicates that the heightened pleading standard of rule 9(b) does not control the form of the plaintiff's rebuttal; (iii) the statement that the plaintiff "must have alleged in the complaint, or must respond to the motion to dismiss with, factual allegations" indicates that while the complaint need not be amended -- assertions in the response may suffice -- the limitations defense must be rebutted with facts, and not with mere argument; (iv) the requirement that the plaintiff allege facts that "would support" application of the discovery rule implies that the plaintiff need not definitely establish that the discovery rule applies, but, at most, need only allege facts upon which a reasonable jury could find that the discovery rule applies; and (v) the Court of Appeals of New

Mexico's equation of the motion-to-dismiss and summary-judgment standards implies that, although courts are to accept all factual assertions as true, the facts must establish the elements of the discovery rule, not merely render their establishment plausible.

For the foregoing reasons, the Court will require the Plaintiffs to assert facts that, if proven at trial, could lead a reasonable jury to conclude that reasonable diligence would most likely have been futile in discovering the causes of action.

### 2.   The Plaintiffs Have Adequately Pled The Reasonable Diligence Element of the Discovery Rule.

"Reasonable diligence" is defined, in the first instance, by the New Mexico courts, and any uncertainty that remains in the definition is reserved for the jury room.  The courts have done almost nothing to pare down jury discretion by providing a more concrete definition,[29] and they apply "a reasonable-person standard . . . as to whether [a plaintiff] should have known of the [cause of action]."  Wilde v. Westland Dev. Co., 2010-NMCA-085, ¶ 18, 241 P.3d 628, 635. "Historically, the courts of [New Mexico] have characterized the application of the discovery rule as a jury question, particularly when conflicting inferences may be drawn."  Genesee Cnty.

---

[29] There is a substantial body of case law and literature interpreting Texas' discovery rule, including its reasonable diligence prong.  See HECI Exploration Co. v. Neel, 982 S.W.2d 881 (Tex. 1998); Jennifer N. Cooper, Comment, The Discovery Rule: Should Oil and Gas Leases Be Different?, 38 Hous. L. Rev. 1283 (2001); L. Melaine Martin, HECI v. Neel: Application of the Discovery Rule to Damages Arising out of Oil and Gas Leases, 33 St. Mary's L.J. 199 (2001); Andrew J. Cloutier & Megan M. Norris, The First and Last Defenses in Private Royalty Litigation: Statute of Limitations and Constitutional Defenses 5 Rocky Mountain Mineral Law Found. 14 (2008).  The Court will not look to Texas law to refine the New Mexico definition of reasonable diligence, for two reasons: (i) the commentators suggest that Texas law is itself in a state of flux presently, and imply that Texas may be an outlier in the way it interprets the discovery rule; and (ii) the Court is of the opinion that when the application of a broad standard, like the reasonable-person standard, is left to the jury without further judicial refinement, that should be construed as a conscious choice by the state courts to incorporate jury fact-finding into the substance of the standard, and should not be viewed by the federal courts as a gap to be filled with persuasive authority.

Emps'. Ret. Sys. v. Thornburg Mortg. Sec. Trust 2006-3, 825 F. Supp. 2d 1082, 1227 (D.N.M.

2011)(Browning, J.)(alterations in original)(internal quotation marks omitted)(quoting Williams

v. Stewart, 2005-NMCA-061, ¶ 16, 112 P.3d 281, 285).

The Plaintiffs have alleged facts in their FAC that, if proven at trial, could convince a

reasonable jury that reasonable diligence would not have uncovered the causes of action:

(i)    "Plaintiffs and class members have placed trust and reliance in Williams"
       on the basis of the "superior knowledge available to Williams all material
       times." FAC ¶ 85, at 26. This allegation suggests that scrutinizing the
       materials from the Defendants was itself reasonable diligence, because the
       Defendants' superior knowledge and involvement in the production,
       transport, sale, and accounting functions rendered it the objectively best
       source of information from which the Plaintiffs could obtain information
       about their leases.

(ii)   "Williams has issued monthly statements to the Plaintiffs and Class
       Members which contain erroneous and mis-information." FAC ¶ 86, at
       26. Far from ignoring their leases, which would not constitute reasonable
       diligence, the Plaintiffs kept track of their profitability by way of the
       mechanism the Defendants provided -- the only economically-feasible
       mechanism.

(iii)  "Williams has a duty to disclose completely and truthfully all material
       facts pertaining to transactions reflected on its monthly statements, i.e.,
       check stubs." FAC ¶ 86, at 26. Although a plaintiff's conclusory legal
       assertion carries no weight, if the allegation is restyled as a statement of
       the Plaintiffs' then-existing belief, then their reliance on Williams seems
       all the more reasonable.

(iv)   "Williams has represented in said check stubs, that certain type[s] and
       amounts of expenses were deducted for certain services. These
       representations were false, misleading, or omitted by Williams." FAC
       ¶ 87, at 27. Although many of these facts were intended to support the
       fraudulent concealment claim, to the extent that they speak to the
       "reasonable reliance" prong or the requirement that "the concealment was
       successful," they support a discovery rule argument, as well.

(v)    "Plaintiffs and Class Members relied upon the misrepresentations and
       omissions of Williams to their detriment." FAC ¶ 88, at 27.

(vi)   "If such facts and circumstances had been revealed accurately and
       truthfully by Williams, the Plaintiffs and Class Members would have

known of Williams intentional, continual, and repeated underpayment."
FAC ¶ 89, at 27.

(vii)    The Plaintiffs had a "lack of knowledge . . . and . . . lack of ability to
reasonably discover" the causes of action.  FAC ¶ 90, at 27-28.  This
allegation highlights that the Plaintiffs are ordinary people, who often do
not live near their leased land, have little or no experience in the oil and
gas industry, and are, in every case, uninvolved in all but one
aspect -- receiving the royalty -- of the process of drilling, transporting,
producing, and selling the oil removed from their land.

(viii)   "Williams[] failed to accurately report and pay the Plaintiffs and Class
Members for their share of revenues . . . and the same failure . . . occurred
each and every month, from the date that Williams . . . first initiated
delivery of the monthly statements to the Plaintiffs and Class Members, up
to the present."  FAC ¶ 94, at 28.  As the Plaintiffs became accustomed to
receiving what they thought to be reliable feedback from the Defendants,
their reliance on the Defendants became more reasonable over time.  Even
if it was not reasonable initially -- if, at some point in the life of the lease,
this reliance went from being unreasonable to reasonable -- then damages
would be cut-off before that point; a jury would be needed to make the
determination of when that point in time was.

(ix)     "Each month, these statements/check stubs have been relied upon by the
Plaintiffs and . . . Williams intended that the monthly statements . . . would
be relied upon to fully, accurately and truthfully state the true volumes,
types, values, and amounts of hydrocarbons produced, used and sold."
FAC ¶¶ 95-96, at 29.

(x)      "The Plaintiffs and Class Members did not discover and could not have
reasonably discovered their claims as alleged herein . . . due to the
omissions and misreporting of Williams as herein alleged."  FAC ¶ 96, at
29.

In sum, the Plaintiffs argue: (i) that they exercised reasonable diligence, because there

was nothing more, within reason, they could do to verify the information reported to them by the

Defendants, who were in a much better position to collect knowledge about the financial

circumstances of each well; and (ii) that their exercise of reasonable diligence, and their

subsequent inability regardless to discover the causes of action, proves the futility of reasonable

diligence, and satisfies that element of the discovery rule.  The injury to any given Plaintiff in

this case is very low -- thus why this case is being brought as a class action -- and expensive methods of auditing or independently verifying the information reported by the Defendants would almost certainly have been costlier than they were worth. Even now, when the Plaintiffs know for certain that potential causes of action exist -- something that is not known when considering whether to invest money in investigating the performance and disclosures of a lessor -- the suit might not be economically viable if the Court does not certify a class action.

It is not clear what more the Defendants want. They offer no concrete examples of the behavior necessary to practice reasonable diligence, but are unsatisfied with the Plaintiffs' reliance on the Defendants -- the only financially feasible source of information of which the Court can conceive. The Plaintiffs are additionally in the difficult position of having to prove a negative -- that no reasonable amount of diligent investigation would have uncovered the causes of action -- and they also fail to articulate a satisfactory definition of what conduct constitutes reasonable diligence. The Plaintiffs need only plead facts, however, not law, and the Plaintiffs have pled sufficient facts to lead a reasonable jury to the conclusion that reasonable diligence would be, or was, futile, and the limitations defense thus fails.

The Defendants largely contend that the check stub was enough to put the Plaintiffs on notice. In the end, the check stub tells an investor little. Royalty owners are terribly dependent on their working interest owners. If the Defendants were not accurate and truthful, there was little an investor could do to know whether it had a cause of action. In the Court's view, the merits of the cause of action are intertwined with the statute of limitations defense. In sum, it is for a jury to decide whether the Plaintiffs should have discovered that they were being wronged.

### C.   THE PLAINTIFFS HAVE NOT PLED FRAUDULENT CONCEALMENT WITH PARTICULARITY, AND THE COURT WILL THEREFORE DISMISS THE NINTH CAUSE OF ACTION WITHOUT PREJUDICE.

Although the Plaintiffs pled fraudulent concealment in an attempt to toll the statute of limitations, not to seek additional damages, and the Defendants have not moved for the dismissal of this claim, the Court will dismiss the ninth cause of action for failure to plead with particularity pursuant to rule 9(b).  Fed. R. Civ. P. 9(b).  To satisfy the rule 9(b) standard, "[a]t a minimum, . . . a plaintiff [must] set forth the who, what, when, where and how of the alleged fraud."  United States ex rel. Schwartz v. Coastal Healthcare Group, Inc., 232 F.3d 902 (Table), 2000 WL 1595976 at *3 (10th Cir. 2000)(unpublished opinion).  The FAC does no such thing, and falls short of the heightened pleading standard.  If the Plaintiffs want to assert a claim for fraud, they must plead: (i) exactly how the Defendants perpetrated their fraud, contrasting dollar amounts on check stubs and statements with the amounts the Plaintiffs contend that they are owed, divulging how they arrived upon the latter figure as well as, most likely, the investigative techniques they used to uncover the fraud in the first place; (ii) how the Defendants executed their concealment; and (iii) the basis and extent of the Plaintiffs' reliance upon the Defendants' representations, and facts supporting that the reliance was reasonable -- although this substantive element of fraudulent concealment overlaps significantly with the reasonable diligence element of the discovery rule, the facts in the FAC that establish reasonable diligence must be re-pled with much greater particularity.

The Plaintiffs gain nothing from a limitations perspective by including a fraudulent concealment claim, as fraudulent concealment contains all the elements of the discovery rule, plus other substantive elements, and additionally requires heightened pleading.  The Court will dismiss the ninth cause of action without prejudice, so the Plaintiffs may re-file if they please,

but the Court recommends that they do not, unless they are prepared to satisfy the rigorous pleading requirements the Court has set forth.  The Court will not strike the factual allegations enumerated underneath the claim, however, as those go to establishing the discovery rule.

> **D.   THE FACTS ALLEGED IN THE FAC DO NOT ESTABLISH EQUITABLE ESTOPPEL OR A CONTINUING WRONG, AND -- AS THOSE DOCTRINES ARE NOT INDEPENDENT CLAIMS -- THE COURT WILL DISMISS THE TENTH CAUSE OF ACTION WITH PREJUDICE.**

Neither equitable estoppel nor continuing wrong is a claim upon which relief can be granted; they are merely tolling doctrines.  See 28 Am. Jur. 2d Estoppel and Waiver § 30 (2011)(stating  that estoppel acts "always as a shield, never as a sword" and "does not . . . give a cause of action").  As such, the Court will dismiss the tenth cause of action with prejudice.

The Court will not strike the factual allegations supporting the cause of action, but, even as tolling doctrines, equitable estoppel and continuing wrong are inapplicable in the case. Equitable estoppel requires that the Plaintiffs were aware of their cause of action, but the Defendants persuaded them not to file suit.  See Tiberi v. Cigna Corp., 89 F.3d at 1430.  Not only are there no facts in the FAC to support this theory, but, if the theory were properly alleged, it would destroy the Plaintiffs' ability to toll the statute on discovery rule or fraudulent concealment grounds, and those theories both require that the plaintiff was unaware of the cause of action.

The continuing wrong doctrine -- as it is traditionally conceived, and as the Plaintiffs assert it -- strongly appears to only apply in tort cases.  Although New Mexico courts have purported to consider the doctrine's application in the breach-of-contract context, they appear to be talking about something different: allowing a plaintiff to sue on the portion of a long-term, contract-breaching course of conduct that falls within the six years immediately preceding the

lawsuit -- the portion within the limitations period -- but not before.   See Tull v. City of Albuquerque, 1995-NMCA-123, ¶¶ 4-11, 907 P.2d at 1010-13.   In every case in which a New Mexico court has considered applying the doctrine to a contract dispute, the choice has been between cut-off damages (partial dismissal) and no damages at all (outright dismissal), but the Plaintiffs argue that they are entitled to full damages, and no party disputes that the Plaintiffs are entitled to seek, at the very least, cut-off damages.

III.   **THE COURT WILL DISMISS THE TWELFTH CAUSE OF ACTION, BECAUSE THE TENTH CIRCUIT HAS HELD THAT NEW MEXICO DOES NOT RECOGNIZE THE MARKETABLE CONDITION RULE.**

The Plaintiffs assert that the Defendants, in rendering the hydrocarbons marketable, deducted costs that were unreasonably high and sometimes deducted costs that they did not actually incur from the royalties that they owed the Plaintiffs.   Although these facts may -- and do -- make out other causes of action, they do not establish a breach of the implied duty to market hydrocarbons as the Supreme Court of New Mexico has articulated, and as the Tenth Circuit interpreted in Elliott Industries LP v. BP American Production Co., 407 F.3d 1091.

The Court already dismissed a similar claim for breach of the implied duty to market, the Plaintiffs' original third cause of action.   See Memo. Opinion at 128-36; FAC ¶¶ 43-55, at 17-19. That claim alleged, not that unreasonably or fraudulently deducting expenses was a breach of the implied duty to market, but that by deducting these expenses at all, the Defendants violated their duty under New Mexico law to take the hydrocarbons out of the ground and render them into a marketable condition without passing any of those costs onto the Plaintiffs.   See FAC ¶ 48, at 18 ("Williams, as a lessee and working interest owner in the Class wells, has a duty to render the natural gas and other hydrocarbons marketable at its own expense . . . .").   Their interpretation of New Mexico law was not and is not unreasonable: (i) the Defendants have a general duty to

market -- "'to make diligent efforts to market the production in order that the lessor may realize on his royalty interest,'" <u>Davis v. Devon Energy Corp.</u>, 2009-NMSC-048, ¶ 35, 218 P.3d 75 (quoting <u>Darr v. Eldridge</u>, 346 P.2d at 1044), which, as a conceptual matter, could be extended to a duty to not to charge the lessor for bringing the hydrocarbons into a marketable condition; and (ii) as the Court has already stated in both this Memorandum Opinion and Order and its earlier Memo. Opinion, it has serious doubts whether the Tenth Circuit was correct in proclaiming that New Mexico law does not recognize a marketable condition rule, <u>see</u> Memo. Opinion at 88 n.7 (discussing <u>Elliott Indus. LP v. BP Am. Prod. Co.</u>, 407 F.3d 1091).   The Court, however, was -- and, even after <u>Davis v. Devon Energy Corp.</u>, and <u>ConocoPhillips v. Lyons</u>, 2013-NMSC-009, 299 P.3d 844, still is -- bound to abide by the Tenth Circuit's holding, and, therefore, cannot properly recognize a marketable condition rule under New Mexico law.   The Court will not rehash this analysis.[30]

---

[30] In determining the proper weight to accord Tenth Circuit precedent interpreting New Mexico law, the Court must balance the need for uniformity between federal court and state court interpretations of state law with the need for uniformity among federal judges.  If the Court adheres too rigidly to Tenth Circuit case law, ignoring changes undergone by a state's law in the ensuing years, then parties litigating state law claims will be subject to a different body of substantive law, depending on whether they litigate in state court or federal court.  This result frustrates the purpose of <u>Erie Railroad Co. v. Tompkins</u>, 304 U.S. 64 (1938)("<u>Erie</u>"), which held that federal courts must apply state court interpretations of state law, rather than their own, in part so that parties achieve a consistent result regardless of the forum.  This consideration pulls the Court in the direction of according Tenth Circuit precedent less weight, and according state court decisions issued in the ensuing years more weight.  On the other hand, when the state law is unclear, it is desirable for there to at least be uniformity among federal judges as to its proper interpretation.  Otherwise, different federal judges within the same circuit -- or even the same district, as district courts' decisions are not binding, even upon themselves -- would be free to adopt differing interpretations of a state's law.  This consideration pulls the Court towards a stronger respect for vertical stare decisis, because a Tenth Circuit decision on point -- regardless whether it accurately reflects state law -- at least provides consistency at the federal level, so long federal district judges are required to follow it.
    The Court must decide how to weigh Tenth Circuit case law against more-recent state court decisions, choosing a point on the spectrum between the two extremes: rigidly adhering to

---

Tenth Circuit precedent unless there is intervening case law directly on point from the state's highest court, on one end; and independently interpreting the state law, regarding the Tenth Circuit precedent as persuasive authority, on the other.  In striking this balance, the Court notes that it is generally more concerned about systemic inconsistency between the federal courts and the state courts than it is about inconsistency among federal judges.  Judges, even those within a jurisdiction with ostensibly identical governing law, sometimes interpret and apply the law differently from one another; this inconsistency is part and parcel of a common-law judicial system.  More importantly, litigants seeking to use forum selection to gain a substantive legal advantage cannot easily manipulate such inconsistency: cases are assigned randomly to district judges in this and many federal districts; and, regardless, litigants cannot know for certain how a given judge will interpret the state law, even if they could determine the identity of the judge pre-filing or pre-removal.  All litigants know in advance is that whomever federal district judge they are assigned will look to the entirety of the state's common law in making his or her determination -- the same as a state judge would.  Systemic inconsistency between the federal courts and state courts, on the other hand, not only threatens the principles of federalism, but litigants may more easily manipulate the inconsistency.  When the Tenth Circuit issues an opinion interpreting state law, like Elliott Industries LP v. BP American Production Co., and the state courts subsequently shift away from that interpretation, litigants -- if the district courts strictly adhere to the Tenth Circuit opinion -- have a definite substantive advantage in choosing the federal forum over the state forum, or vice versa.

The Court further notes that district courts may be in better position than the Tenth Circuit to be responsive to changes in state law.  Tenth Circuit decisions interpreting a particular state's law on a specific issue are further apart in time than the collective district courts' are.  More importantly, the Tenth Circuit does not typically address such issues with the frequency that the state's courts themselves do.  As such, Tenth Circuit precedent can lag behind developments in state law -- developments that the district courts may be nimble enough to perceive and adopt.  Additionally, much of the benefit of having a consistent Tenth Circuit-wide interpretation of a particular state's law is wasted.  Other than Oklahoma, every state encompassed by the Tenth Circuit contains only one federal judicial district, and there is relatively little need for federal judges in Wyoming and Kansas to have a uniform body of New Mexico law to which to look.  Last, the Court notes, respectfully, that district courts may be in a better position than the Tenth Circuit to develop expertise on the state law of the state in which they sit.  Every federal judicial district in the nation, except the District of Wyoming, covers at most one state.  It is perhaps a more workable design for each district court to keep track of legal developments in the state law of its own state(s) than it is for the Tenth Circuit to monitor separate legal developments in eight states.

Having outlined the relevant considerations, the Court thinks the proper stance on vertical stare decisis in the context of federal court interpretations of state law is as follows: the Tenth Circuit's cases are binding as to their precise holding -- what the state law was on the day the opinion was published -- but lack the positive precedential force that its cases interpreting a federal statute or the Constitution of the United States of America possess.  A district court considering a state law issue after the publication of a Tenth Circuit opinion on point may not come to a contrary conclusion based only on state court cases available to and considered by the Tenth Circuit, but it may come to such a conclusion based on intervening state court cases.  The

Supreme Court of the United States has addressed what the federal courts may use when there is not a decision on point from the state's highest court:

> The highest state court is the final authority on state law, but it is still the duty of the federal courts, where the state law supplies the rule of decision, to ascertain and apply that law even though it has not been expounded by the highest court of the State.  An intermediate state court in declaring and applying the state law is acting as an organ of the State and its determination, in the absence of more convincing evidence of what the state law is, should be followed by a federal court in deciding a state question.  We have declared that principle in *West v. American Telephone and Telegraph Co.*, 311 U.S. 223 (1940), decided this day. It is true that in that case an intermediate appellate court of the State had determined the immediate question as between the same parties in a prior suit, and the highest state court had refused to review the lower court's decision, but we set forth the broader principle as applicable to the decision of an intermediate court, in the absence of a decision by the highest court, whether the question is one of statute or common law.
>
> . . . We have held that the decision of the Supreme Court upon the construction of a state statute should be followed in the absence of an expression of a countervailing view by the State's highest court, and we think that the decisions of the Court of Chancery [the New Jersey trial court] are entitled to like respect as announcing the law of the State.
>
> . . . .
>
> The question has practical aspects of great importance in the proper administration of justice in the federal courts.  It is inadmissible that there should be one rule of state law for litigants in the state courts and another rule for litigants who bring the same question before the federal courts owing to the circumstance of diversity of citizenship.  In the absence of any contrary showing, the rule [set forth by two New Jersey trial courts, but no appellate courts] appears to be the one which would be applied in litigation in the state court, and whether believed to be sound or unsound, it should have been followed by the Circuit Court of Appeals.

Fid. Union Trust Co. v. Field, 311 U.S. 169, 177-80 (1940)(footnotes omitted)(citations omitted). The Supreme Court has softened this position over the years; federal courts are no longer bound by state trial or intermediate court opinions, but "should attribute [them] some weight . . . where the highest court of the State has not spoken on the point." Comm'r v. Estate of Bosch, 387 U.S. 456, 465 (1967)(citing King v. Order of United Commercial Travelers, 333 U.S. 153, 159 (1948).  See 17A James Wm. Moore et al., Moore's Federal Practice § 124.20 (3d ed. 1999)("Moore's")("Decisions of intermediate state appellate courts usually must be

followed . . . [and] federal courts should give some weight to state trial courts decisions." (emphasis omitted)(title case omitted)).

When interpreting state law, the Tenth Circuit does not and cannot issue a case holding that *x* is the law in New Mexico; it holds that the proper interpretation of New Mexico law, at the time the opinion is released, is *x*. Its holdings are descriptive, not prescriptive -- interpretive, not normative.  Because federal judicial opinions lack independent substantive force on state law issues, but possess such force regarding federal law issues, the Court thinks the following is not an unfair summary of the judicial interpretive process: (i) when interpreting federal law, the federal appellate courts consider the existing body of law, and then issue a holding that both reflects and influences the body of law; that holding subsequently becomes a part of the body of law; but (ii) when interpreting state law, the federal appellate courts consider the existing body of law, and then issue a holding that only reflects the body of law; that holding does not subsequently become a part of the body of law.  The federal district courts are bound to conclude that the Tenth Circuit's reflection of the then-existing body of law was accurate.  The question is whether they should build a doctrine atop the case and use the existence of the Tenth Circuit's case to avoid any responsibility to independently consider the whole body of state law that exists when the time comes that diversity litigants raise the issue in their courtrooms.  Giving such effect to the Tenth Circuit's interpretations of state law is at tension with Erie, giving independent substantive effect to federal judicial decisions -- i.e., applying federal law -- in a case brought in diversity.

The purpose of Erie is well-known and simple, and the Court should not complicate it beyond recognition: it is that the same substantive law governs litigants' cases regardless whether they are brought in a federal or state forum.  For simplicity's sake, most courts have settled on the formulation that "the federal court must attempt to predict how the states' highest court would rule if confronted with the issue." Moore's § 124.22[3] (citing Comm'r v. Estate of Bosch, 387 U.S. 456, 465 (1967)("[A]n intermediate appellate state court [decision] is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise."  (citation omitted)(internal quotation marks omitted))).  This may not be the most precise formulation if the goal is to ensure identical outcomes in state and federal court -- the Honorable Milton I. Shadur, United States District Judge, looks to state procedural rules to determine in which state appellate circuit the suit would have been filed were it not in federal court, and then applies the state law as that circuit court interprets it, see Abbott Laboratories v. Granite State Ins. Co., 573 F. Supp. 193, 196-200 (N.D. Ill. 1983)(noting that the approach of predicting the state supreme court's holdings will often lead to litigants obtaining a different result in federal court than they would in state court, where only the law of the circuit in which they filed -- and certainly not nonexistent, speculative state supreme court law -- governs) -- but it is a workable solution that has achieved consensus.  See Allstate Ins. Co. v. Menards, Inc., 285 F.3d 630, 637 (7th Cir. 2002)("[W]e adhere today to the general rule, articulated and applied throughout the United States, that, in determining the content of state law, the federal courts must assume the perspective of the highest court in that state and attempt to ascertain the governing substantive law on the point in question.").  This formulation, built out of ease-of-use, does not relieve courts of their Supreme Court-mandated obligation to consider state appellate and trial court decisions.  To the contrary, even non-judicial writings by influential authors, statements by state supreme

court justices, the closeness of the vote on a prior case addressing the issue, and personnel changes on the court -- considerations that would never inform a federal court's analysis of federal law -- may validly come into play. The question is whether the district courts must abdicate, across-the-board, the "would decide" aspect of the Erie analysis to their parent appellate courts when the Court of Appeals has declared an interpretation of state law.

The Erie doctrine results in federal cases that interpret state law withering with time. While cases interpreting federal law become more powerful over time -- forming the groundwork for doctrines, growing upward from one application (Congress may create a national bank) to many (Congress may set quotas on wheat-growing for personal consumption), expanding outward from the general (states must grant criminal jury trials) to the specific (the jury need not be twelve people, nor must it be unanimous) -- federal cases interpreting state law often become stale. New state court cases -- even when not directly rebuking the federal court's statement of law -- alter the common-law legal landscape with their dicta, their insinuations, and their tone. The Supreme Court of the United States, which picks cases its cases sparingly and for maximum effect, almost never grants certiorari to resolve issues of state law.

The question is whether the Court should look, not to Elliott Industries LP v. BP American Production Co., but to its own interpretation of New Mexico law, and conclude that New Mexico recognizes the marketable condition rule. The issue is whether, by so doing, the Court would be jettisoning and ignoring Tenth Circuit precedent, or would be rather recognizing, after conducting the Erie-mandated inquiry, that New Mexico law has changed since its 2005 publication. The Tenth Circuit's snapshot of New Mexico law may have been correct at the time, but it has decayed in the ensuing years. It does not appear to have shaped New Mexico law to any discernable degree or to have been ratified as a proper interpretation: no New Mexico court has cited it, although the state courts must be aware of it; the oil companies are certain to have cited it in their briefs opposing the state courts' adoption of the marketable condition rule. When called upon to interpret New Mexico law in 2014, the Northern District of California -- unbound by Tenth Circuit precedent -- agreed with the Court's assessment that Elliott Industries LP v. BP American Production Co. no longer accurately reflects New Mexico law. See Ellsworth v. U.S. Bank, N.A., No. C 12-02506 LB, 2014 WL 1218833, at *22 n.10 (N.D. Cal. March 21, 2014)(forthcoming in F. Supp. 2d)(citing Elliott Indus. LP v. BP Am. Prod. Co., 407 F.3d at 1117; Anderson Living Trust v. ConocoPhillips Co., 952 F. Supp. 2d 979, 1033 (D.N.M. 2013)(Browning, J.)).

The Court's views on Erie, of course, mean little if the Tenth Circuit does not agree. In Wankier v. Crown Equipment Corp., the Tenth Circuit said that,

> [w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do. In performing this ventriloquial function, however, the federal court is bound by ordinary principles of *stare decisis*. Thus, when a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, and on subsequent panels of this Court, unless an intervening decision of the state's highest court has resolved the issue.

- 89 -

*Wankier v. Crown Equip. Corp.*, 353 F.3d 862, 866 (10th Cir. 2003)(McConnell, J.).  From this passage, it seems clear the Tenth Circuit only permits a district court to deviate from its view of state law on the basis of a subsequent case "of the state's highest court."  See The American Heritage Dictionary of the English Language 1402 (William Morris ed., New College ed. 1976)(defining "unless" as "[e]xcept on the condition that; except under the circumstances that").  A more aggressive reading of the passage -- namely the requirement that the intervening case "resolv[e] the issue" -- might additionally compel the determination that any intervening case law must definitively and directly contradict the Tenth Circuit interpretation in order to be considered "intervening."

It is difficult to know whether Judge McConnell's limitation of "intervening decision" to cases from the highest state court was an oversight or intentional.  Most of the Tenth Circuit's previous formulations of this rule have defined intervening decisions inclusively as all subsequent decisions of "that state's courts," a term which seems to include trial and intermediate appellate courts.  Even Koch v. Koch Industries, Inc., 203 F.3d 1202, 1231 (10th Cir. 2000), the primary authority upon which Wankier v. Crown Equipment Corp. relies, uses the more inclusive definition.  In fact, Wankier v. Crown Equipment Corp. quotes its relevant passage:

> In the absence of intervening Utah authority indicating that a plaintiff is not required to prove a safer, feasible alternative design, we are bound to follow the rule of *Allen* [*v. Minnstar, Inc.*, 8 F.3d 1470 (10th Cir. 1993), a Tenth Circuit case interpreting an issue of Utah law], as was the district court. "Following the doctrine of stare decisis, one panel of this court must follow a prior panel's interpretation of state law, absent a supervening declaration to the contrary by that state's courts or an intervening change in the state's law." Koch v. Koch Indus., Inc., 203 F.3d at 1231.

*Wankier v. Crown Equip. Corp.*, 353 F.3d at 867.

Whether the decision to limit the intervening authority a district court can consider was intentional or not, the Tenth Circuit has picked it up and run with it.  In Kokins v. Teleflex, Inc., the Tenth Circuit, quoting Wankier v. Crown Equipment Corp., refused to consider an opinion from the Colorado Court of Appeals holding directly the opposite of an earlier Tenth Circuit interpretation of Colorado law.  See Kokins v. Teleflex, Inc., 621 F.3d 1290, 1297 (10th Cir. 2010)(Holmes, J.)("[T]he Colorado Court of Appeals decided *Biosera*[*, Inc. v. Forma Scientific, Inc.*, 941 P.2d 284 (Colo. Ct. App. 1998)], so it is not an 'intervening decision of the state's *highest court.*'"  (emphasis in original)(quoting Wankier v. Crown Equip. Corp., 353 F.3d at 866)).

The Tenth Circuit has set forth a stringent restriction on its district courts' ability to independently administer the Erie doctrine.  More importantly, the Tenth Circuit's view may be at tension with the above-quoted Supreme Court precedent, as well as its own prior case law.  Moore's lists the Tenth Circuit as having been, at one time, a "court[ that] hold[s] that a prior federal appellate decision [interpreting state law] is persuasive."  Moore's § 124.22[4] (citing State Farm Mut. Auto. Ins. Co. v. Travelers Indem. Co., 433 F.2d 311, 312 (10th Cir. 1970)).  Still, the Court is bound to abide by the Tenth Circuit's interpretation of Erie.  This scheme may

_____

be inefficient, because the plaintiffs may appeal, after trial, the Court's ruling on the marketable condition rule.  The Tenth Circuit may certify the question to the Supreme Court of New Mexico, and the Tenth Circuit may then have to reverse the Court after a full trial on the merits.

Even knowing the high bar the Tenth Circuit now sets for what constitutes intervening case law, the Court is tempted to conclude that <u>Davis v. Devon Energy Corp.</u> directly and unequivocally overrules <u>Elliott Industries LP v. BP American Production Co.</u>, for three broad reasons.  First, the Tenth Circuit analyzed the implied duty to market as a term implied in fact, not one implied in law.  An implied-in-fact term is a "real" contractual term, put there by the parties' agreement -- albeit their unwritten and unspoken agreement.  Because its origins are in the parties' agreement, direct conflict with a written term of the contract destroys the implied term.  Other than having the word "implied" in them, implied-in-fact terms have little in common with implied-in-law terms, like the covenant of good faith and fair dealing, which the courts "imply" onto all contracts -- without the pretense that the parties silently agreed to the term, and, in fact, often in spite of the parties' agreement.  When <u>Davis v. Devon Energy Corp.</u> held that the marketable condition rule was an implied-in-law term, reversing the district judge who styled it as an implied-in-fact term, it undermined the logic of <u>Elliott Industries LP v. BP American Production Co.</u>.  To the extent that the Tenth Circuit's case can still be read for its narrow conclusion -- now supported only by damaged logic -- that there is no marketable condition rule in New Mexico, the Court will decline to ignore <u>Elliott Industries LP v. BP American Production Co.</u> on this ground.

Second, the Court notes that <u>Davis v. Devon Energy Corp.</u> may have held that there is a marketable condition rule, and its unambiguous disclaimer to the contrary, literally in all-caps and boldface type, that it "do[es] not address the marketable condition rule," may have been mere dicta (albeit clear, and loud, dicta).  2009-NMSC-048, ¶ 14, 218 P.3d at 80 (emphasis omitted).  In that case, the district court had concluded that there was a marketable condition rule governing primary conduct in New Mexico, but declined to certify a class action for its breach because the district court thought that the rule was an implied-in-fact term.  New Mexico procedure entitles parties to a contract to a parol evidence hearing on all disputed contractual terms, and the district court thought that these hearings -- which would need to be individualized -- would render the class action unmanageable.  The Supreme Court of New Mexico reversed on an abuse-of-discretion standard, holding that the marketable condition rule is an implied-in-law term -- for which no parol evidence hearings would need to occur -- and certified the class action.  <u>See</u> 2009-NMSC-048, ¶¶ 37, 40, 218 P.3d at 86, 87.  The Supreme Court of New Mexico did not purport to hold that the marketable condition rule actually exists, but rather that, if it does exist, it is an implied-in-law duty.  If that were the case's holding, however, the Court cannot see how the district court's error would not be harmless: the district court misconstrued the nature of a cause of action, but the cause of action does not exist -- at least not according to the Supreme Court of New Mexico -- at all, so no legally cognizable harm was done to the plaintiffs.  The Court, however, is reticent to defy the express declaration of a state's highest court in implementing the <u>Erie</u> doctrine, so it will not adopt this view.  Moreover, the Supreme Court of New Mexico declined from deciding whether the marketable condition rule exists, no doubt knowing about the Tenth Circuit's opinion in <u>Elliott Industries LP v. BP American Production Co.</u>, and did not take the opportunity to make it clear to the federal courts what the law is.

The Plaintiffs argue that their claim is narrower this time, and that, although the Defendants may pass on the expenses of rendering the hydrocarbons marketable, they may only do so if those expenses are both real and reasonable.  See FAC ¶¶ 102-05, at 32-33; Response at 13-15.  This contention misses the thrust of what the implied duty to market -- at least as the Tenth Circuit has defined the doctrine -- is designed to prevent.  It is an affirmative duty, designed to prevent the lessee's <u>inaction</u> from locking the lessor into a potentially long-term contract, earning no royalty on land that could be quite valuable, and, worse, causing society to lose out on resources locked away under the lessor's land, untouchable -- by virtue of the lease's exclusivity -- by anyone except the lessee.  See <u>Elliott Indus. LP v. BP Am. Prod. Co.</u>, 407 F.3d at 1113-14.  When the Plaintiffs asserted their now-dismissed third cause of action, they argued that their asserted right to be free from expense deductions stemmed from the Defendants' "obligation to make diligent efforts to market the production . . . to allow the royalty owner to realize fully in his royalty interest(s)."  FAC ¶ 47, at 18.  See also FAC ¶ 45, at 17 ("Williams has a duty to market . . . to obtain the highest possible price . . . .").  Such a conception of the

---

Third, and perhaps most obvious, whatever else can be said about <u>Davis v. Devon Energy Corp.</u>'s holding, one thing is clear: the Supreme Court of New Mexico permits, even if it does not direct, its subordinate courts to recognize and apply the marketable condition rule.  The Court can, additionally, find no case holding that a district court may decline to recognize the marketable condition rule.  The Court, however, is not confident this holding applies in federal court.  Even if the Supreme Court of New Mexico intended to extend its invitation to adopt the marketable condition rule to the federal courts -- and there is no indication that it did -- New Mexico trial courts have some freedom to be a part of shaping New Mexico law, and recognizing novel or uncertain causes of action may be appropriate for them to do.  The Court, on the other hand, is bound to interpret and apply the state law of New Mexico, without injecting its own policy preferences.  Were it not for its opinion that the marketable condition rule already exists in New Mexico, the Court would likely not consider adopting a state cause of action that was merely permissive as to the state's district courts, and that being so, the Court will not allow its disagreement with the Tenth Circuit to cloud its judgment here.  The Court will apply the Tenth Circuit's holding from <u>Elliott Industries LP v. BP American Production Co.</u>, and conclude that it is not free to decide that the marketable condition rule exists under New Mexico law.

implied duty to market might support the Plaintiffs' claims that the duty implicitly regulates all activity and expenses incurred before the product is put into marketable condition, but the Tenth Circuit has roundly rejected this approach.

The Court need not rely on abstract principles, however, to dismiss the Plaintiffs' claim. The claim that the Tenth Circuit dismissed in Elliott Industries LP v. BP American Production Co. did not, like the Plaintiffs' third cause of action, allege that working interest owners could not assess expenses against the royalty at all.  See 407 F.3d at 1109.  It was a near carbon copy of this claim, the twelfth cause of action, alleging that "only those 'actually incurred and reasonable costs' can be deducted in calculating the royalty owed."   407 F.3d at 1109 (quoting the complaint).  The Plaintiffs attempt to counter this observation by arguing that the Tenth Circuit's holding in Elliott Industries LP v. BP American Production Co. hinged upon the plaintiffs in that case failing to assert a claim for breach of contract.  See Response at 14 ("The Elliott court did not reach the issue of reasonableness of the defendant's expenses because the Elliott plaintiff dismissed its claim for breach of contract.").  This interpretation misreads Elliott Industries LP v. BP American Production Co.; the Tenth Circuit specifically indicated in that case: "Even if we were to ignore Elliott's strategic choice to avoid reliance on the express contractual language, Elliott's implied duty to market claim would still fail."  407 F.3d at 1113.  Regardless, the Court has already rejected this distinction:

> [T]hat the Plaintiffs have put their leases at issue in this case does not provide them a safety-hatch from the Tenth Circuit's explanations of New Mexico law in Elliott Indus[tries LP v. BP American Production Co.].  The Tenth Circuit stated in Elliott Indus[tries LP v. BP American Production Co.], that a construction of the implied duty to market that would require lessees to bear all post-production costs "finds no support within New Mexico case law."

Memo. Opinion at 132 (quoting 407 F.3d at 1114).

Last, the Court notes that it has already dismissed at least part of the claim that the Plaintiffs now style as the twelfth cause of action.  See Memo. Opinion at 128-36.  In their ill-fated third cause of action, the Plaintiffs alleged -- likely as a fallback in case the Court did not adopt the expansive reading of the marketable condition rule they pushed for -- that "[a]t all material times, Williams has deducted revenues . . . greater than the actual or original cost of transforming [hydrocarbons] into a marketable product(s)."  FAC ¶ 51, at 18.  When the Court dismissed the third cause of action in its entirety, it recognized that, even if the Court accepted as true the allegation that the Defendants passed on nonexistent charges to the Plaintiffs, that set of facts does not state a proper claim for breach of the implied duty to market.  The Plaintiffs' twelfth cause of action contains an additional allegation -- that the Defendants passed on expenses that, although actually incurred, were unreasonable.  The Court cannot see how a claim for unreasonable expenses can be viable if a claim for phantom expenses is not.  It is much more invidious to assess fabricated claims against a royalty owner than it is to assess unreasonable ones, because the unreasonableness of expenses is kept naturally in check by the simple fact that the Defendants must actually incur them.

For the foregoing reasons, the Court will dismiss the Plaintiffs' twelfth cause of action with prejudice.  On the other hand, while the Court does not believe it can, under Elliott Industries LP v. BP American Production Co., find that unreasonable expenses violate the implied duty to market, it is not convinced that there is no claim for unreasonable or fabricated expenses.  There may be an implied condition that expenses and deductions must be reasonable, and so a breach-of-contract claim may protect the royalty owner from unreasonable royalty reductions.  Also, the implied covenant of good faith and fair dealing may protect royalty owners

from unreasonable expenses.  Thus, it may be unnecessary for the Court to adopt the marketable condition rule to protect the rights of royalty owners to be free from unreasonable expenses.

**IT IS ORDERED** that the Defendants' Motion to Dismiss Claims in Plaintiffs' Fourth Amended Complaint, filed October 18, 2013 (Doc. 145)("MTD"), is granted in part and denied in part.  The Court will dismiss the ninth cause of action without prejudice, and the tenth and twelfth causes of action with prejudice.  The Court will otherwise deny the MTD.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Stan Koop
Stan Koop, PLLC
Norman, Oklahoma

--and--

Stephen R. McNamara
Brian Inbody
McNamara, Inbody & Parrish, PLLC
Tulsa, Oklahoma

--and--

Karen Aubrey
Law Office of Karen Aubrey
Santa Fe, New Mexico

--and--

Brian K. Branch
The Law Office of Brian K. Branch
Albuquerque, New Mexico

--and--

Turner W. Branch
Cynthia Zedalis
Branch Law Firm
Albuquerque, New Mexico

--and--

Bradley D. Brickell
Brickell & Associates, P.C.
Norman, Oklahoma

      *Attorneys for the Plaintiffs*

Sarah Gillett
Dustin L. Perry
Hall Estill Hardwick P.C.
Tulsa, Oklahoma

--and--

Christopher A. Chrisman
Holland & Hart LLP
Denver, Colorado

--and--

Mark F. Sheridan
Bradford C. Berge
Robert J. Sutphin
John C. Anderson
Holland & Hart LLP
Santa Fe, New Mexico

      *Attorneys for the Defendants*