# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

THE ANDERSON LIVING TRUST f/k/a THE
JAMES H. ANDERSON LIVING TRUST;
THE PRITCHETT LIVING TRUST;
CYNTHIA W. SADLER; ROBERT
WESTFALL; LEE WILEY MONCRIEF 1988
TRUST; KELLY COX TESTAMENTARY
TRUST 7/1238401; MINNIE PATTON
SCHOLARSHIP FOUNDATION TRUST; and
SWMF PROPERTIES, INC.,

        Plaintiffs,

vs.                                                                    No. CIV 12-0040 JB/LFG

WPX ENERGY PRODUCTION, LLC f/k/a
WPX ENERGY SAN JUAN, LLC; WILLIAMS
PRODUCTION COMPANY, LLC; and WPX
ENERGY ROCKY MOUNTAIN, LLC, f/k/a
WILLIAMS PRODUCTION RMT
COMPANY, LLC,

        Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Plaintiffs' Motion and Supporting Brief

to Determine That This Matter Proceed as a Class Action, filed January 6, 2014

(Doc. 194)("Motion").  The Court held a two-part class certification hearing with its first portion

on March 10, 11, and 12, 2014, and its second portion on April 3 and 4, 2014.  See Transcript of

Hearing, taken March 10, 2014, filed June 26, 2014 (Doc. 254); Transcript of Hearing, taken

March 11, 2014, filed June 26, 2014 (Doc. 255); Transcript of Hearing, taken March 12, 2014,

filed June 26, 2014 (Doc. 256); Transcript of Hearing, taken April 3, 2014, filed June 26, 2014

(Doc. 257); Transcript of Hearing, taken April 4, 2014, filed June 26, 2014

(Doc. 258)(collectively, "Tr.").[1]   The primary issues are: (i) whether and to what extent textual variations among the leases within the proposed class defeat the commonality requirements of rule 23(a), or the predominance or superiority requirements of rule 23(b), of the Federal Rules of Civil Procedure; (ii) whether and to what extent ambiguity -- and the need for parol evidence to resolve it -- in the class leases defeats rule 23(a)'s commonality, or rule 23(b)(3)'s predominance or superiority requirements; (iii) whether and to what extent the class members' potentially varying levels of actual knowledge and reasonable diligence in uncovering their claims -- which, under the discovery rule, are determinative when the statutes of limitations accrue on these claims -- defeats rule 23(b)(3)'s predominance or superiority requirements; (iv) whether and to what extent any difficulty in properly assigning damages among the class members defeats the predominance or superiority requirements; (v) whether rule 23(a)'s requirements -- numerosity, commonality, typicality, and adequacy -- and rule 23(b)(3)'s requirements -- predominance and superiority -- are otherwise met with regard to the proposed class; and (vi) whom to appoint as class counsel rule 23(g).   Textual variations among the leases both destroy commonality and predominance, because the central issue in this case -- what royalty-payment methodology the Defendants owe the Plaintiffs -- varies from lease to lease.   Lease ambiguity does not destroy commonality, but it weighs against finding predominance.   The class members' potentially varying levels of knowledge likewise presents individual issues that cut against predominance.

---

[1]Although the transcripts of each day of the class certification hearing are filed as separate documents on CM/ECF, the transcripts' internal pagination is consecutive across all five documents, and the Court will thus cite them as a single transcript.   All pincites refer to the transcripts' internal pagination -- the black numbers in the top right corner, partially cut off by the page border -- and not CM/ECF's pagination -- the blue numbers slightly higher and to the left.   For reference, Document 254 contains Tr. 1-261, Document 255 contains Tr. 262-529, Document 256 contains Tr. 530-766, Document 257 contains Tr. 767-956, and Document 258 contains Tr. 967-1034.

Problems in assigning damages can be overcome, and damages can be determined on a classwide basis. Therefore, the Court concludes that this proposed class action satisfies the rule 23(a) prerequisites of numerosity, typicality, and adequacy, and the rule 23(b)(3) requirement of superiority, but that it fails the rule 23(a)(2) commonality prerequisite and the rule 23(b)(3) predominance requirement. The Court, thus, denies the Motion.

## FINDINGS OF FACT

Both the Plaintiffs and the Defendants have submitted proposed findings of fact. See Plaintiffs' Proposed Findings of Fact and Conclusions of Law, filed May 6, 2014 (Doc 240)("Plaintiffs' PF"); Defendants' Findings of Fact and Conclusions of Law Relating to Class Certification, filed May 6, 2014 (Doc. 241)("Defendants' PF"). The parties have also stipulated to several facts for the purposes of the class certification determination. See Stipulation for the Purposes of Class Certification, filed March 10, 2014 (Doc. 223)("Stipulation"). The Court has carefully considered all proposed facts, and accepts some of them, rejects others, and finds some facts that no party brought to its attention.[2] The Court also liberally judicially notices background facts. See Fed. R. Evid. 201. All of these findings of fact are authoritative only on the question of class certification, and the parties may relitigate any of them at the merits stage. See Abbott v. Lockheed Martin Corp., 725 F.3d 803, 810 (7th Cir. 2013); In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 313 (3d Cir. 2008);

---

[2]The Court is not required to make formal findings of fact in ruling on a class certification motion. See Fed. R. Civ. P. 54(a)(3) ("The court is not required to state findings or conclusions when ruling on a motion under Rule 12 or 56 or, unless these rules provide otherwise, on any other motion."); id. advisory committee's notes to 2007 amendments ("Amended Rule 52(a)(3) says that findings are unnecessary 'unless these rules provide otherwise.' This change reflects provisions in other rules that require Rule 52 findings on deciding motions. Rules 23(e), 23(h), and 54(d)(2)(C) [but not rule 23(a), (b), or (g)] are examples."). The Court has elected to do so for the parties' benefit.

Gariety v. Grant Thornton, LLP, 368 F.3d 356, 366 (4th Cir. 2004).  The Court applied the Federal Rules of Evidence at the class certification hearing, ruled on several evidentiary objections, and considered only admissible evidence in finding these facts.  See note 39, infra, and accompanying text.

The Court organizes this portion of its Memorandum Opinion and Order into eight parts.  First, it will define some of the more esoteric terms applicable in this case.  Second, it will introduce the important players in this action: the Defendants and their corporate affiliates, the named Plaintiffs, the absent class members, and a few important independent entities.  Third, the Court will explain the process of producing, gathering, and processing or treating natural gas, including the transfer-of-title process in this case.  Fourth, the Court will describe the breakdown of the different textual royalty provisions in the class leases.  Fifth, it will describe the different textual overriding royalty provisions among the class.  Sixth, the Court will describe how the Defendants have paid royalties and overriding royalties to the class, including the costs that they have deducted and their timeliness.  Seventh, it will describe the evidence that the Defendants have put forward regarding various class members' actual knowledge of or due diligence toward learning of their claims, which is relevant to the delaying of the accrual of the statutes of limitations.  Eighth, and last, the Court will summarize a few key pieces of evidence relating to the parties' and the Court's ability to construct a classwide damages-distribution model.

1.     **Definitions: The Terminology Applicable in This Case.**

1.     The Court will first define the operative terms used throughout this Memorandum Opinion and Order.  The Court divides the definitions into three sections: one on lease terminology, which defines the terms that relate to the legal relationship between the Plaintiff-lessors and Defendant-lessees; a second on oil and gas production, gathering, and processing,

which defines the terms that relate to the working relationship between the Plaintiff-landowners and Defendant-oil companies; and a third on royalty accounting, which defines the terms that relate to the financial relationship between the Plaintiff-royalty owners and the Defendant-working interest owners.  The Court will, in subsequent sections, explain how these concepts relate to this case, but includes this section as both a preface and a reference.

### a.    **Lease Terminology.**

2.    A "mineral lease," is "[a] lease in which the lessee has the right to explore for and extract oil, gas, or other minerals"; it splits land into a working interest and a royalty interest. Black's Law Dictionary 971 (9th ed. 2009).

3.    A "mineral deed" is "[a] conveyance of an interest in the minerals in or under the land." Black's Law Dictionary 477 (9th ed. 2009).

4.    A "working interest" includes "[t]he rights to the mineral interest granted by an oil-and-gas lease, so called because the lessee acquires the right to work on the leased property to search, develop, and produce oil and gas, as well as the obligation to pay all costs"; a working interest in land entails the right to drill and remove oil and gas from the land, subject to burdening royalty interests.  Black's Law Dictionary 1745 (9th ed. 2009).

5.    A "royalty interest" is "[a] share of production -- or the value or proceeds of production free of the costs of production -- when and if there is production."  Black's Law Dictionary 1466 (9th ed. 2009).

6.    The word "production," generally, in the oil-and-gas industry, has numerous meanings, but they typically revolve around the well, and not around subsequent processing: a "production" can refer to the well itself, to the fresh-out-of-the-ground product that the well produces, or to the act of drawing said product out of the ground.  8 Howard R. Williams,

Charles J. Meyers, Patrick H. Martin & Bruce M. Kramer, Williams & Meyers Oil and Gas Law 816-18 (2013)("Williams & Meyers").

7.      "Authorities are split over what costs are the costs of production," Black's Law Dictionary 1466 (9th ed. 2009), and, under Colorado law, production "end[s] when a first-marketable product has in fact been obtained," which often only occurs after processing, Rogers v. Westerman Farm Co., 29 P.3d 887, 904 (Colo. 2001)(en banc).

8.      An "overriding royalty" is "[a] share of either production or revenue from production (free of the costs of production) carved out of a lessee's interest under an oil-and-gas lease. . . .   An overriding royalty interest ends when the underlying lease terminates."  Black's Law Dictionary 1446 (9th ed. 2009).

9.      An overriding royalty interest is considered a subcategory of royalty interest.  See Garman v. Conoco, Inc., 886 P.2d 652, 657 (Colo. 1994)(en banc)("An overriding royalty is, first and foremost, a royalty interest."  (quoting 2 Williams & Meyers § 418.1)).

10.     A "division order" is "[a] contract for the sale of oil or gas, specifying how the payments are to be distributed."  Black's Law Dictionary 549 (9th ed. 2009).

11.     "Royalty owners enter into division orders to sell minerals and to instruct how payments are to be made under a mineral lease."  Black's Law Dictionary 549 (9th ed. 2009).

12.     "Working-interest owners also commonly sign division orders to instruct purchasers how payments are to be divided."  Black's Law Dictionary 549 (9th ed. 2009).

13.     A division order cannot modify the terms of the underlying mineral lease.  See Tr. at 922:10-20 (McNamara, Terry).

14.     A "division order is typically terminable at the will of either party."  8 Williams & Meyers at 272.

15.     A "transfer order" is an instrument conveying a royalty interest to another person. Tr. at 46:20-23 (Brickell); id. at 304:24-305:2 (Westfall).

      **b.**     **Natural-Gas Terminology.**

16.     "Hydrocarbons" are a class of chemical compounds composed exclusively of hydrogen and carbon; it is also a generic term for petroleum products such as oil and natural gas.[3]

17.     "Natural gas" is a gaseous mixture of hydrocarbons, the primary one being methane ($CH_4$), commonly used as fuel in homes and businesses. Glossary, United States Energy Information Administration, http://www.eia.gov/tools/glossary/index.cfm?id=N ("EIA Glossary").

18.     Natural gas must generally be treated or processed -- to remove waste products such as water vapor, sulfides, carbon dioxide, nitrogen, and other impurities, as well as valuable, heavier hydrocarbons such as ethane, butane, propane, and pentane -- before it can be put into a pipeline system or marketed as a fungible commodity. See 30 C.F.R. § 1206.171.

19.     Natural gas can be obtained as a byproduct of oil drilling, retrieved using standard drilling techniques in natural gas fields or coalbeds, or obtained through hydraulic fracturing -- also known as fracking -- in shale deposits. See EIA Glossary.

---

[3]A "hydrocarbon" is just what it sounds like: a molecular compound that contains only hydrogen and carbon. Hydrocarbon, Wikipedia.org, http://en.wikipedia.org/wiki/Hydrocarbon. Both natural gas, which is composed primarily of methane ($CH_4$), and commercial gasoline, which is composed primarily of a mix of alkanes ranging from butane ($C_4H_{10}$) to dodecane ($C_{12}H_{26}$) -- including, importantly, octane ($C_8H_{18}$) -- are composed entirely of hydrocarbons. See Natural Gas, Wikipedia.org, http://en.wikipedia.org/wiki/Natural_gas; Gasoline, Wikipedia.org, http://en.wikipedia.org/wiki/Gasoline. Propane ($C_3H_8$) is also a hydrocarbon that serves as a commercial fuel. See Propane, Wikipedia.org, http://en.wikipedia.org/wiki/Propane. For the purposes of this Memorandum Opinion and Order, "hydrocarbons" is a generic term that includes all oil, natural gas, and related petroleum products.

20.     "Conventional gas" is natural gas obtained from natural-gas fields, which are typically sandstone depositions.  Tr. at 79:14-19 (Reineke).

21.     Conventional gas typically undergoes processing to remove impurities, separate out valuable NGLs, and render the gas into marketable condition.  See Expert Witness Report of Randy Kaplin at 2 (Plaintiffs' Ex. 194).

22.     "Coalbed methane" or "CBM" is natural gas obtained from coal seams.  EIA Glossary.

23.     Coalbed methane is typically just methane and carbon dioxide, and is generally only treated for carbon dioxide removal and possibly water-vapor removal -- rather than being processed -- before it is placed in a pipeline.  See Tr. at 83:1-21 (Reineke, Brickell).

24.     "Shale gas" is natural gas obtained -- almost always by the process of hydraulic fracturing -- from shale.  EIA Glossary.

25.     "Casinghead gas," also known as "oil well gas" or "associated gas," is natural gas obtained from an oil well.  EIA Glossary.

26.     The term "natural gas liquids" ("NGLs") refers to hydrocarbons heavier than methane that can -- either on their own via condensation or through processing -- be drawn from natural gas, converted into the liquid state, and sold as fuel.  30 C.F.R. § 1206.171.

27.     The constituent "liquefiable hydrocarbons" in NGLs include propane, butane, pentane, and hexane.  EIA Glossary.

28.     Among NGL compounds, heavier compounds are typically more valuable than lighter ones.  See Tr. at 559:1-10 (Sutphin, Emory).

29.     "Heavier," in this context, refers to the compound's molecular weight, which, for alkane hydrocarbons, equates to the magnitude of the $n$ term in the generic chemical formula $C_nH_{(2n+2)}$.  Cf. Tr. at 559:5-10 (Emory).

30.     For example, pentane ($C_5H_{12}$) is heavier than butane ($C_4H_{10}$), which is, in turn, heavier than propane ($C_3H_8$).  Cf. Tr. at 559:5-10 (Emory).

31.     All of the constituent compounds of NGLs are heavier than methane ($CH_4$), which is the primary component of natural gas.  Cf. Tr. at 559:5-10 (Emory).

32.     NGLs are commonly entrained in -- or entrapped and carried along with -- natural gas.  See Tr. at 104:2-4 (Brickell, Reineke).

33.     "Natural gasoline" refers to a mixture of natural gas liquid products manufactured from natural gas.  Tr. at 407:10-20 (Sheridan, Anderson); id. at 795:9-796:1 (Sheridan, Terry).

34.     Natural gasoline is not the same substance as automotive gasoline.[4]  See Tr. at 795:9-796:1 (Sheridan, Terry).

35.     "Wet gas" is natural gas entrained with a significant amount of NGLs.  EIA Glossary.

36.     "Dry gas" is natural gas that is mostly devoid of NGLs.  EIA Glossary.

---

[4]Natural gasoline can be used to power an automobile, but the low octane content -- natural gasoline has an octane rating of 30 to 50, as opposed to the 85 to 94 seen in automotive gasoline in the United States -- reduces the amount of compression it can withstand before combusting, and causes premature detonation in the engine cylinder -- called pre-ignition -- which leads to engine knocking.  See Tr. at 795:9-796:1 (Sheridan, Terry); Natural Gasoline, Wikipedia.org, http://en.wikipedia.org/wiki/Natural_gasoline; Natural-Gas Condensate, Wikipedia.org, http://en.wikipedia.org/wiki/Natural-gas_condensate; Octane Rating, Wikipedia.org, http://en.wikipedia.org/wiki/Octane_rating; Engine Knocking, Wikipedia.org, http://en.wikipedia.org/wiki/Engine_knocking.  Natural gas is, thus, a non-ideal fuel for standard petrol engines.

37.     Almost all coalbed methane is dry gas.  <u>See</u> Expert Report of Randy Kaplin at 2 (Plaintiffs' Ex. 194).

38.     Gas must be in a dry state before it can be placed into an interstate pipeline; when gas is dry after being processed, it is referred to as "residue gas."  EIA Glossary.

39.      "Natural gas condensate," or just "condensate," refers to natural gas liquids recovered at the surface without resorting to processing.  30 C.F.R. § 1206.171.

40.     "Condensation," generically, is the physical phase change where a gas is converted to a liquid.  <u>The American Heritage Dictionary of the English Language</u> 277 (William Morris ed., New College ed. 1976).

41.     "Well condensate" or "wellhead condensate" is condensate recovered at the wellhead.  Tr. at 37:2-9 (Sheridan).

42.     A "wellhead" is the point where hydrocarbons are taken out of the ground, but the term is sometimes used to refer to anywhere hydrocarbons go while on the lease plot.  EIA Glossary.

43.     A "separator" or "production unit" is a device at the wellhead that separates liquids -- namely water and well condensate -- from the gas.  Tr. at 96:12-16 (Reineke).

44.     A "facility measurement point" is the point where a "measurement device is located for determining the volume of gas removed from the lease."  30 C.F.R. § 1206.171.

45.     "The facility measurement point may be on the lease or off-lease," but is intended to measure the natural gas attributable to a specific lease before it is comingled with gas from other leases in a gathering system.  30 C.F.R. § 1206.171.

46.     A "'completion' refers to a well that has been completed," i.e., perforated and isolated in the well bore, such that gas is capable of being produced from the well.   Emory Expert Report ¶ 23, at 13.

47.     "Lease use" gas is gas that the working interest owner uses -- to power machinery, fuel heaters, et cetera -- on the lease.  Tr. at 443:3-7 (Brickell, Emory).

48.     A "gathering system" is the system of low-pressure lines that transport natural gas from the lease site, i.e., the wellhead, to a processing plant or other central point.  EIA Glossary. See 30 C.F.R. § 1206.171.

49.      "Drip condensate" is any natural gas condensate "recovered downstream of the facility measurement point [the wellhead] without resorting to processing."   30 C.F.R. § 1206.171.

50.     "Drip condensate includes condensate recovered as a result of its becoming a liquid during the transportation of the gas removed from the lease or recovered at the inlet of a gas processing plant by mechanical means, often referred to as scrubber condensate."  30 C.F.R. § 1206.171.

51.     Drip condensate, put simply, is NGLs that condense into liquid form in the gathering system, i.e., after the gas has left the wellhead, but before it gets processed.  See 30 C.F.R. § 1206.171.

52.     A "pig" is a term for a mechanical device that pushes drip condensate sitting in a gathering system's lines out into a receptacle for eventual sale.  Tr. at 39:2-6 (Sheridan).

53.     A "fractionator" is a machine that separates NGLs into their constituent parts -- such as propane, butane, and pentane -- after they are removed during processing.  EIA Glossary

54.     A "processing plant" is a facility that takes impure, unmarketable natural gas from a gathering system, and converts it -- by removing impurities and NGLs -- into pipeline-quality natural gas, which can then be compressed and sent into the interstate pipeline system.  Tr. at 39:7-13 (Sheridan).

55.     A processing plant is typically connected to a gathering system on the input end and a pipeline system on the output end.  See Tr. at 99:16-100:11 (Reineke).

56.     A "treatment plant" is a facility that is fundamentally similar to a processing plant -- i.e., it takes impure gas from a gathering system and renders it into marketable condition -- but it does not remove NGLs from the gas.  See Tr. at 619:15-20 (Emory, Brickell).

57.     Treatment removes carbon dioxide and often dehydrates the gas -- i.e., it removes the water vapor -- but, unlike processing, it does not extract NGLs.  See Tr. at 619:15-20 (Emory, Brickell).

58.     Gas that is relatively clean -- i.e., free from impurities -- and dry -- i.e., free from NGLs -- may need only to be treated, rather than processed.  See Tr. at 619:15-20 (Emory, Brickell).

59.     Coalbed methane typically requires only treatment to remove carbon dioxide, which it tends to contain in higher quantities than conventional gas.  See Tr. at 83:1-21 (Reineke, Brickell).

60.     "Bypassing" is when raw gas is delivered by a gathering system to a processing plant but is not processed, and instead is mixed with processed gas in such proportions that the resultant product is still of pipeline quality.  Tr. at 554:15-555:4 (Emory, Sutphin).

61.     In New Mexico, "the term 'post-production costs' refers to costs associated with making the natural gas marketable after the gas is severed or removed from the ground."

Schroeder v. Terra Energy, Ltd., 565 N.W.2d 887, 890 (Mich. Ct. App. 1997); 8 Williams &

Meyers at 787.  See CononoPhillips Co. v. Lyons, 2013-NMSC-009, ¶ 11, 299 P.3d 844, 850

(N.M. 2012)(endorsing this definition).

62.    "Marketable condition means a condition in which lease products are sufficiently

free from impurities and otherwise so conditioned that a purchaser will accept them under a sales

contract typical for the field or area."  30 C.F.R. § 1206.171.

63.    For the class wells, natural gas generally comes into marketable condition when it

is of sufficient quality to be accepted into the interstate pipeline system.[5]  See Foster v. Merit

---

[5]The Defendants' expert, Dr. James Griffin, disagrees.

> To Plaintiffs' expert, Daniel Reineke, the obligation to treat royalty
> owners' gas similar to its own gas and make it "marketable" also involves in his
> mind an obligation to do so at zero cost.  He opines that "the raw gas that arrives
> at the gathering line inlet is not in marketable condition."  To Reineke, the gas
> only becomes a "marketable product" when it can be injected into an interstate
> pipeline.  Reineke's logic, which has no basis in economics, reflects that of a
> petroleum engineer, not an economist.  An economist would ask whether it
> follows that if raw gas at the lease is not marketable, does it have no value?
> Obviously, not.  There do exist markets for gas at the lease level and, in principle,
> can exist along the path from the lease to the interstate pipeline. The market value
> at different stages could be computed by using long term arms-length contracts at
> each stage to show how the value of the gas increases as it flows along through
> these various downstream stages.

Expert Report of James Griffin ¶ 22c, at 11 (Defendants' Ex. 135)(footnotes omitted).  There is
nothing wrong with Griffin's analysis, in itself, and, indeed, after reading his entire report, the
Court concludes that the oil-and-gas industry uses some odd conventions that likely exist as
vestiges of history more than as model economic practices.  The Court, however, must view the
issue as neither a petroleum engineer nor an economist, but as a legal analyst, and concludes that
"marketable condition" -- for the gaseous component of natural gas in a market where gas is sold
almost exclusively by way of the interstate pipeline -- refers to pipeline-quality residue gas.
Griffin's basic argument is correct: natural gas, no matter how impure and unusable, has
economic value the second it comes out of the ground -- and even before -- to the extent that it
can be profitably turned into pure, usable natural gas.  To consider such gas "marketable,"
however, would undercut the entire concept behind the marketable-condition rule.
For example, if a rubber and metal wholesaler were to sell raw materials to a bicycle
manufacturer in exchange for a set fraction of the proceeds of the ultimate bicycle sales, one

- 13 -

might assume that "proceeds" refers to profits, i.e., the wholesaler's royalty would be reduced to account for the manufacturer's production costs.  If, however, bicycle-production-royalty case law indicated that, if the contract is silent, the manufacturer bears all costs associated with putting the bicycle into marketable condition, then the manufacturer would not simply be able to continue passing the same portion of all its costs onto the wholesaler, under the argument that the product is a marketable bicycle -- i.e., it has value as a potential bicycle, and could be sold as such to another bicycle manufacturer -- even when it comes in the door as raw rubber and metal. The term "marketable condition" might include some vagueness, as contractual terms typically do.  For instance, if the manufacturer took 1,000 of its finished bicycles -- already in a condition suitable for retail sale -- and added additional, optional, value-adding features to them, some question could be raised about whether the cost of installing those optional features are "costs of rendering marketable" or not.  A marketable-condition rule would likely not work well in an industry like bicycles, as it would misalign incentives for the manufacturer, in some way, regardless of how the rule were interpreted.  Namely, the rule would incentivize lowering the costs of producing a bottom-of-the-line marketable bicycle more than it would incentivize creating a top-of-the-line bicycle, even if the better bicycle could be sold for greater profit.

For example, imagine a bicycle manufacturer who owes a twenty-percent royalty on all his bicycles.  He can either spend $100.00 producing a bicycle that sells for $1,000.00 retail, or spend $1,000.00 producing a bicycle that sells for $2,000.00 retail.  The second option is the economically desirable one, as it yields a profit of $1,000.00, while the first option yields a profit of only $900.00.  If the royalty is paid on profits, then the manufacturer is properly incentivized to build the second bicycle: he pays $180.00 in royalty and retains $720.00 building the first bicycle; and he pays $200.00 in royalty and retains $800.00 building the second bicycle. Because $800.00 is more than $720.00, the manufacturer will build the second bicycle.  Under the marketable-condition rule, however, the manufacturer will make the opposite choice.  He would owe $200.00 in royalty making the first bicycle and would retain $700.00.  He would owe $400.00 in royalty making the second bicycle and would retain only $600.00.  Because $700.00 is more than $600.00, the manufacturer will elect to manufacture the first bicycle -- which is not the socially ideal choice.  In this way, the marketable-condition rule incentivizes working interest owners to minimize the costs of production more than it incentivizes them to maximize product-sale profitability, because the royalty owner effectively gets to keep the full value of any additional expenses the working interest owner puts into rendering the product marketable.

Natural gas, however, is a relatively homogenous, undifferentiated, fungible product, i.e., a commodity.  While the marketable-condition rule may chill innovation to produce a "better" natural gas, the assumption is likely that society cannot use, does not want, or does not need a "better" natural gas product.  As discussed above, the rule does incentivize better -- i.e., cheaper -- production, transportation, and treating methods, which is likely the only innovation that consumers are seeking in natural gas.  Regardless whether the marketable-condition rule is good policy, the Court must interpret the concept of marketability in light of its existence.  The Court concludes that pipeline-quality gas -- the fungible commodity that is bought and sold by consumers nationwide, who consider it to be of undifferentiated quality -- is what is meant by gas in marketable condition.  See 8 Williams & Meyers at 585; 30 C.F.R. §§ 206.101.

The Court must also largely disregard Dr. Griffin's lengthy, interesting comparison of vertical integration, long-term contracts, and spot contracts.  See, e.g., Tr. at 656:10-659:9 (Berge, Griffin).  The Court's task in a breach-of-contract case -- which is mostly what this case

- 14 -

Energy Co., 282 F.R.D. 541, 546 (W.D. Okla. 2012)(Friot, J.)(referring to "commercially marketable (essentially interstate pipeline quality) gas"); Rogers v. Westerman Farm Co., 29 P.3d 887, 905 (Colo. 2001)(en banc)("It may be, for all intents and purposes, that gas has reached the first-marketable product status when it is in the physical condition and location to enter the pipeline." (citing TXO Prod. Corp. v. State ex rel. Comm'rs of Land Office, 903 P.2d 259, 262-63 (Okla. 1994))); Savage v. Williams Prod. RMT Co., 140 P.3d 67, 71 (Colo. Ct. App. 2005)(holding that "the trial court applied the correct legal standard" regarding "the condition of the gas at the wellhead" when it "found that 'the gas was marketable only after processing and transportation to the interstate pipeline connection in a condition that made it acceptable for delivery into said pipelines"); Amoco Prod. Co. v. N.M. Taxation & Revenue Dep't, 2003-NMCA-092, ¶¶ 11-12, 74 P.3d 96, 99 (N.M. Ct. App. 2003)("'[P]rocessing' is that which takes place in order for the gas to be marketable or acceptable to interstate pipelines."); Parry v. Amoco Prod. Co., No. CIV 94-0105, 2003 WL 23306663, at *1 (Colo. Dist. Ct. Oct. 6, 2003)("[T]he Court concludes that the gas in question is marketable only at the inlet to the interstate transmission pipeline . . . ."). But see Creson v. Amoco Prod. Co., 2000-NMCA-081, ¶ 24, 10 P.3d 853, 859 (N.M. Ct. App. 2000)(repeating the parties' undisputed agreement that gas is marketable at the wellhead where it is "actually marketed at the wellhead," circumstances which do not apply in this case).

64.     "Residue gas" refers to post-processing, pipeline-quality natural gas.  30 C.F.R. § 1206.171.

---

boils down to -- is to interpret the parties' agreement and enforce the terms to which they agreed -- not to design an ideal model for the oil-and-gas industry, and then impose the model's terms on the litigants and their dispute.

- 15 -

65.     An "MCF" is a unit of volume used to measure natural gas; it stands for 1,000 cubic feet, which is equivalent to a cube that is 10-feet high, 10-feet wide, and 10-feet deep. Frequently Asked Questions, United States Energy Information Administration, http://www.eia.gov/tools/faqs/faq.cfm?id=45&t=8 ("EIA FAQs").

66.     A "Btu" is a unit of energy equal to approximately 1,055 joules;[6] it is the amount of energy needed to heat -- or the amount of energy released by cooling -- one pound of water by one degree Fahrenheit.  EIA Glossary; EIA FAQs.

67.     An "MBtu" or "MMBtu" is 1,000,000 Btus.[7]  EIA FAQs.

68.     A "Btu factor" is a ratio describing the energy per volume of natural gas.  EIA Glossary; EIA FAQs.

69.     In this case, Btu factors are quoted in units of MMBtus per MCFs.

70.     The Btu factor of pure methane -- perfectly dry natural gas -- is 1.01.  See Emory Expert Report ¶ 31, at 16.

71.     Gas' Btu factor rises as the amount of entrained NGLs increases, and drops as the number of entrained, inert impurities -- such as carbon dioxide and gaseous nitrogen -- rises.  See Emory Expert Report ¶¶ 30-31, at 16.

---

[6]The SI -- or International System of Units -- measurement of energy is the joule (J), which is the amount of energy necessary to exert one Newton (N) of force -- a Newton is the force required to accelerate one kilogram of mass by one meter per second-squared -- over a distance of one meter: $1 \text{ J} = 1 \text{ N} \bullet \text{m} = 1 \text{ kg} \bullet \text{m}^2/\text{s}^2$.  The joule is the scientific standard unit, but, as the oil-and-gas industry uses Btus, the Court's references to quantities of energy will be in Btus.

[7]An MBtu and an MMBtu are, oddly, the same thing.  In "MBtu," the "M" stands for the English-language "million"; in "MMBtu," the "Ms" refer to the Roman numeral that represents one thousand.  The "MM" in "MMBtu" refers to 1,000 • 1,000, or one million.  The Court notes, purely in passing, that Roman numerals do not actually work this way, and "MM" in true Roman numeral notation would refer to the sum of the two numerals -- 1,000 + 1,000, or 2,000 -- rather than to their multiplication product.

72.     The average Btu factor of processed natural gas in the United States is 1.025.  See EIA FAQs.

73.     The Btu factors of the gas produced from the class wells in this case vary from .69 to 1.4.  See Emory Expert Report ¶ 32, at 16-17.

74.     As natural gas is valuable, ultimately, for its energetic potential -- i.e., the amount of heat it produces when burned -- its price is based not only on the volume of natural gas being sold, but also that natural gas' Btu factor.  See EIA FAQs.

75.     "GPM" stands for "gallons [of NGLs] per MCF [of gas]," and is a characteristic that reveals the quantity of entrained NGLs that can theoretically be extracted from the gas via condensation and processing.  Natural Gas Liquids at 5, Brookings Energy Security Initiative Natural Gas Task Force (Mar. 2013), available at http://www.brookings.edu/~/media/research/files/reports/2013/04/01-natural-gas-ebinger-avasarala/natural-gas-briefing-1-pdf.pdf. See Emory Expert Report ¶ 28, at 15.

76.     When NGLs are removed from natural gas, it causes a "shrink" in the energy content -- the number of MMBtus in -- the resultant natural gas.  Tr. at 194:4-7 (Ley).

### c.     Royalty Distribution and Accounting Terminology.

77.     The "netback" or "workback" method is a method of determining the wellhead price of gas by starting with the downstream (processed) sale price of the ultimate product, and deducting the costs -- such as those for transportation, processing, and manufacturing -- of converting the gas from the condition at the wellhead to the condition at final sale.  See 8 Williams & Meyers at 643-644; 30 C.F.R. §§ 1206.151, 1206.171.

78.     The netback method "is widely accepted as the best means for estimating the market value of gas at the well where no such market exists."  Abraham v. BP Am. Prod. Co., 685 F.3d 1196, 1199-1200 (10th Cir. 2012)(Kelly, J.)(joined by Murphy & Hartz, JJ.).

79.     This case involves a somewhat ambiguous term: "weighted average sales price" ("WASP").

80.     A "weighted average method" is a method of paying royalties in which each royalty owner is paid based on a predetermined portion -- usually determined by lease acreage -- of the sales revenue from several pooled leases' productions.  8 Williams & Meyers at 1139.

81.     For example, if a pool of leases totaling 1,000 acres produced $1,000,000.00 in natural gas, a 250-acre lease would receive $250,000.00, regardless whether that lease actually produced $250,000.00 in natural gas.

82.     "WASP," as used in this case, however, might refer, not to a pooling of royalties, but to a pooling of arm's length sales revenue on the front end -- e.g., if the Defendants sold two MMBtus of residue gas to one buyer at $1.00/MMBtu and on MMBtu of residue gas to another buyer at $2.00/MMBtu, then they would pay royalties to all wells based on a WASP of $1.33/MMBtu, without attempting to break down which wells produced the gas sold for $2.00/MMBtu and which wells produced the gas sold for $1.00/MMBtu.  See, e.g., Tr. at 138:15-20 (Berge, Reineke)("Q:  [Y]ou know what an index is. . . .  [I]t's average -- weighted average compiled by a service that reflects the prevailing -- the weighted average prevailing price in a particular market, right?   A:   Of residue gas, correct."); id. at 947:21-24 (Terry)(describing an index price as "representing a weighted average price").

83.     An "index price" or "posted price" is a price for natural gas that a major industry publication publishes; royalties paid on the basis of index prices are not, themselves, based on

the actual sale price of the gas, but, rather, on an average of arm's length transactions within a particular geographic area.  See 8 Williams & Meyers at 496.

84.     A "keep whole" contract is one that requires the processor to compensate the royalty owner for any loss in thermal potential (energy) that natural gas undergoes from processing -- namely, the Btu factor of gas decreases when NGLs are removed.  See 8 Williams & Meyers at 533.

85.     What the Defendants call their "keep whole basis" of paying royalties is tantamount to basing royalty payments on the natural gas' energy -- measured in MMBtus -- at the wellhead.  Tr. at 91:25-92:5 (Reineke); 199:12-200:2 (Berge, Ley)("I've heard people use the term 'keep whole.'  So I think it means different things to different people.").

86.     "Whole stream valuation" is a manner of paying royalties in which the working interest owner compensates the lessor for entrained NGLs by paying them a fraction of the sale proceeds of the NGLs, rather than simply compensating the lessors on an MMBtu basis at the wellhead, when NGLs are still entrained.[8]  Tr. at 659:22-668:12 (Griffin, Berge).

---

[8]The Defendants' expert, Dr. James Griffin, appears to have invented the whole stream value approach in response to not knowing what valuation technique the Plaintiffs argue they are entitled to receive:

> The plaintiffs' experts have not provided us with an alternative valuation mechanism.  I'm disappointed that they didn't.  But what I've tried to do is tried to create one that I think makes sense.  And this is -- what I'm going to call it, a whole stream valuation approach.  And the idea being that if you want to value the NGL content of the gas, then the whole stream approach is an alternative way to go about valuing the production from a given well.

Tr. at 659:22-660:2 (Griffin).  The term is also absent from Williams & Meyers' glossary of terms and the EIA Glossary.  A Google search for "'whole stream'" turned up biochemical information on "whole-stream metabolism" and "whole-stream respiration"; a Google search for "'whole stream' value natural gas" turned up nothing particularly relevant.  The term is also never used more than once in any Tenth Circuit or Supreme Court case, and never in the way that Dr. Griffin uses it.

87.     An "arm's length" transaction is a transaction between entities that are not corporate affiliates of one another.  Tr. at 87:15-23 (Reineke).

### 2.     The Principals: The Parties and Other Important Entities.

88.     The Defendants and their relationships to both one another and certain non-Defendant corporate affiliates are important in this case, because one of the Plaintiffs' contentions is that the Defendants paid their royalties on the basis of affiliate sales prices rather than on arm's length sales.  See, e.g., Complaint ¶ 33, at 14.

89.     The named Plaintiffs -- i.e., the proposed representatives of the proposed class -- are important, because they must adequately represent the entire class, and their claims must be common to and typical of those of the entire class.  See Fed. R. Civ. P. 23(a).

90.     The Court notes at the outset that, although it has tried to be meticulous throughout this Memorandum Opinion and Order in specifying which Defendant or corporate

---

The Court is concerned that the whole stream value approach may be a straw man, i.e., a proposed alternative valuation mechanism that the Defendants designed to make the keep-whole mechanism that the Defendants actually used look relatively good in comparison: the class still benefits, overall, from the whole stream value approach over the keep-whole approach, but not by much; perhaps more importantly, some wells benefit from the keep-whole approach over the whole-stream approach, thus creating what the Defendants say is a conflict within the class. Some aspects of the whole stream approach do not seem logical.  For example, Dr. Griffin defines the whole-stream approach such that it does not pay at all on drip condensate, a feature that he must clearly have known the Plaintiffs would want in their valuation mechanism, and a feature that, it seems to the Court, would be easy enough to add.  Additionally, the only thing keeping the whole-stream valuation technique from being greatly more profitable for the royalty owners than the keep-whole methodology is Dr. Griffin's assessment of post-production costs; if such costs -- transportation, processing, fractionation, and distribution -- are not assessed, then every class well would profit from using the whole stream methodology over the keep whole methodology.  New Mexico law is unsettled on what post-production costs can be lawfully deducted from a royalty, but, in Colorado, the marketable-condition rule is well established. Dr. Griffin surely must have known that this rule places some restrictions -- or maybe not, see note 5, supra -- on the costs that can be assessed, and yet he treated Colorado wells identically to New Mexico wells.

- 20 -

affiliate of a Defendant handled which functions, the precise identity of each actor is not extraordinarily important.

91.     Every entity with "Williams," "WPX," or "WFS" in its name was, until 2012, a corporate affiliate of every other similarly named entity -- almost always a "full-blooded" affiliate, i.e., a successor or predecessor, a wholly-owned subsidiary or parent, or a sibling subsidiary with 100% overlap in ownership.

92.     Although there was a corporate spinoff in January, 2012, that broke these entities into two camps with separate public ownership, this break is not especially important to this case, both because of how late it came in the class time period and because the contracts between the now non-affiliates that cover this case were executed at a time when the parties to the contracts were corporate affiliates, and, thus, transaction under these contracts are still considered affiliate transactions even after the spinoff.  See Tr. at 474:19-24 (Brickell, Ward).

       a.       **The Defendants.**

93.     There are two Defendants in this case: WPX Energy Production, LLC ("WPX Production") and WPX Energy Rocky Mountain, LLC ("WPX Rocky Mountain").   See Corporate Disclosure Statement ¶¶ 1-2, at 1, filed January 27, 2012 (Doc. 8).

94.     The other names listed in the caption are former names.  See Complaint ¶¶ 5-6, at 3.

95.     WPX Production was formerly named WPX San Juan, LLC ("WPX San Juan"), until it changed its name on January 13, 2012.  See Corporate Disclosure Statement ¶ 1, at 1; Certificate of Amendment of WPX Energy San Juan, LLC at 2 (Plaintiffs' Ex. 77).

96.     The former WPX San Juan was previously named Williams Production Company, LLC ("Williams Production LLC"), until it changed its name on December 31, 2011.   See Corporate Disclosure Statement ¶ 1, at 1.

97.     Williams Production LLC was previously named Williams Production Company ("Williams Production Co."), until it changed its name and was re-chartered as a limited-liability company in 1998.

98.     WPX Production is a wholly owned subsidiary of WPX Energy, Inc. ("WPX Energy").   See Corporate Disclosure Statement ¶ 1, at 1.

99.     WPX Rocky Mountain was formerly named Williams Production RMT Company, LLC ("Williams RMT"), until it changed its name on December 31, 2011.   See Corporate Disclosure Statement ¶ 2, at 1.

100.    WPX Rocky Mountain is a wholly owned subsidiary of WPX Energy Holdings, LLC ("WPX Holdings").   See Corporate Disclosure Statement ¶ 2, at 1.

101.    WPX Holdings is a wholly owned subsidiary of WPX Energy.   See Corporate Disclosure Statement ¶ 2, at 1.

102.    WPX Energy ultimately wholly owns both Defendants, and has throughout the time period applicable to this case.

103.    WPX Energy is a publicly held corporation.   See Corporate Disclosure Statement ¶¶ 1-2, at 1.

104.    WPX Production is the lessee on the class leases in New Mexico, and WPX Rocky Mountain is the lessee on the class leases in Colorado.[9]   See Tr. at 6:12-17 (Brickell).

---

[9]The Plaintiffs' lead attorney made this assertion in his opening statement and then repeated it in his closing argument:

105.    The Court will refer to WPX Production and WPX Rocky Mountain, collectively, as "the Defendants."

---

The defendants have two affiliated companies, one that owns their leases in New Mexico, which is known as -- currently known as WPX Energy Production, LLC. The company that owns the leases in Colorado is WPX Rocky Mountain. . . .

. . . .

When I use the term 'WPX' in the motion, I include both the WPX entity here in New Mexico and the WPX entity which is part of the same company in Colorado, and they call that WPX Rocky Mountain.  That's the only difference.

Tr. at 6:12-17 (Brickell); id. at 977:8-12 (Brickell).  The Defendants seemed to counter this proposition in a brief line of questioning of Sheryl Ward, a revenue accountant for WPX Energy:

Q. . . . There was a statement made by one of the plaintiffs' witnesses as to the identity of the lessee for the Colorado leases.  Which company -- which WPX company actually holds the San Juan Basin Colorado leases?

A.    It's WPX Energy Production.

Q.    And before WPX Energy Production, who was it?

A.    It was Williams Production.

Tr. at 458:14-22 (Sutphin, Ward).  This basic fact -- the identity of the lessee on the Colorado class leases -- is surprisingly hard to discern; the parties have not called the Court's attention to any non-testimonial evidence establishing the truth either way, and the Court's examination of the exhibits, while extensive, has also failed to turn up anything.  Although the Court normally holds fast to the rule that statements made in openings and closings are not evidence, the Court thinks that the unadorned words of a corporate representative -- which is what Ward is -- are more or less equivalent to representations of counsel, particularly given that the Plaintiffs' lead attorney repeated his assertion even after Ward's quoted statement.  Having no way to resolve this (literal) he-said-she-said dispute, the Court will defer to the Plaintiffs, as the issue bears exclusively on the case's merits -- i.e., which Defendants owe damages on which claims -- and not on class certification.  Also, if the Defendants are correct, WPX Rocky Mountain probably does not need to be a Defendant in this case.

As a practical matter, the fact matters little.  The same corporate parent, WPX Energy, owned both Defendants throughout the entire class time period.  The two Defendants' identities are indistinct for the purposes of this litigation, and, if damages are one day awarded, the money will all come from the same pocket: that of WPX Energy and its shareholders.

- 23 -

b.      **The Defendants' Corporate Affiliates.**

106.    Until a January, 2012, spinoff, Williams Companies, Inc. ("Williams Companies") owned all the companies that WPX Energy currently owns.  See Deposition of Morris Miller at 25:1-6 (taken December 4, 2013)(Plaintiffs' Ex. 48)(Brickell, Miller); id. at 55:8-25 (Brickell, Miller).

107.    Williams Companies also owns the general partner interest and the majority of the limited partner interest in Williams Partners LP ("Williams Partners").  Form 8-K for Williams Companies, Inc., Securities and Exchange Commission (Oct. 27, 2014), available at http://biz.yahoo.com/e/141027/wmb8-k.html.

108.    Williams Four Corners, LLC ("Williams Four Corners") is a wholly owned subsidiary of Williams Partners.  Form 8-K for Williams Companies, Inc., Securities and Exchange Commission (Oct. 27, 2014), available at http://biz.yahoo.com/e/141027/wmb8-k.html.

109.    Williams Four Corners owns all the assets that Williams Field Services Co. ("Williams Field Services") formerly owned; Williams Field Services assigned all its interest to the newly created Williams Four Corners on June 20, 2006.  See Notification of Assignment (Plaintiffs' Ex. 136).

110.    Williams Field Services was formerly named Northwest Pipeline Corp. ("Northwest Pipeline"), until it changed its name in 1992.  See Tr. at 85:17-19 (Reineke).

111.    Williams Companies acquired Northwest Pipeline in 1983.  See Emory Expert Report ¶ 19, at 12.

112.    WPX Gas Resources Company ("WPX Gas Resources") is a wholly owned subsidiary of WPX Energy.  List of Subsidiaries of WPX Energy, Inc., Securities and Exchange

Commission, <u>available at</u> http://www.sec.gov/Archives/edgar/data/1518832/00011931251308 4857/d448908dex211.htm.

113.    WPX Gas Resources was formerly named WFS Gas Resources Company ("WFS Gas Resources"), until it changed its name on December 1, 1998.  See Certificate of Amendment of Certificate of Incorporation at 2 (Plaintiffs' Ex. 60).

114.    WPX Energy Marketing, LLC ("WPX Energy Marketing") is a wholly owned subsidiary of WPX Energy.  List of Subsidiaries of WPX Energy, Inc., Securities and Exchange Commission, <u>available at</u> http://www.sec.gov/Archives/edgar/data/1518832/00011931251308 4857/d448908dex211.htm.

115.    WPX Energy Marketing was formerly named Williams Gas Marketing, Inc. ("Williams Gas Marketing"), until it changed its name on June 20, 2011.  See State of Delaware Certificate of Conversion from a Corporation to a Limited Liability Company Pursuant to Section 18-214 of the Limited Liability Act at 3 (Plaintiffs' Ex. 65).

116.    Williams Gas Marketing was formerly named Williams Power Company, Inc. ("Williams Power"), until it changed its name on November 16, 2007.  See Certificate of Amendment of Certificate of Incorporation at 3 (Plaintiffs' Ex. 66).

117.    Williams Power was formerly named Williams Energy Marketing & Trading Company ("Williams EMT"), until it changed its name on August 6, 2003.  See Certificate of Amendment of Certificate of Incorporation at 3 (Plaintiffs' Ex. 63).

118.    Williams EMT was formerly named Williams Energy Services Company ("Williams Energy Services"), until it changed its name on October 26, 1998.  See Certificate of Amendment of Certificate of Incorporation at 2 (Plaintiffs' Ex. 64).

119.    Williams Energy Services was formerly named Williams Energy Derivatives and Trading Company ("Williams EDT"), until it changed its name on September 26, 1995.  <u>See</u> Certificate of Amendment of Certificate of Incorporation at 2 (Plaintiffs' Ex. 62).

120.    Any transactions between the two of the following list of entities is considered an affiliate transaction[10] and not an arm's length sale: WPX Production, WPX Rocky Mountain, WPX San Juan, Williams Production LLC, Williams Production Co., WPX Energy, Williams RMT, WPX Holdings, Williams Companies, Williams Partners, Williams Four Corners, Williams Field Services, Northwest Pipeline, WPX Gas Resources, WFS Gas Resources, WPX Energy Marketing, Williams Gas Marketing, Williams Power, Williams EMT, Williams Energy Services, and Williams EDT.  <u>See</u> Miller Depo. at 55:8-25 (Brickell, Miller).

121.    The Court will refer to these entities, generically, as "WPX affiliates."

        **c.    <u>The Named Plaintiffs, i.e., the Proposed Class Representatives</u>.**

122.    Plaintiff Anderson Living Trust ("Anderson Trust") owns royalty and overriding royalty interests that burden WPX Production's and WPX Rocky Mountain's working interests in natural gas production from the New Mexico and Colorado portions of the San Juan Basin. <u>See</u> Tr. at 359:7-360:23 (Anderson, Branch).

123.    James Anderson is a trustee of the Anderson Trust.  <u>See</u> Tr. at 359:7-360:22 (Anderson, Branch); Anderson Trust Creation Document at 1 (Plaintiffs' Ex. 3).

124.    Anderson is willing to serve as class representative in this case and represent the class' interests as well as his own.  <u>See</u> Tr. at 373:4-13 (Anderson).

---

[10]Technically, several of the listed entities are former or later names of other listed entities, and several of the listed entities never temporally coexisted, as a result of the many name changes that virtually every listed entity underwent during the course of events giving rise to this litigation.  Regardless, any transaction between the listed entities is not an arm's length transaction.

125.    Anderson has some knowledge of the oil-and-gas industry; he receives royalty payments from seven different oil-and-gas companies, has been a class member in another royalty class action, and was formerly a member of the National Association of Royalty Owners. See Tr. at 409:15-410:21 (Anderson, Sheridan).

126.    Anderson's father, John Russell Anderson, who originally acquired the mineral interests that Anderson Trust currently holds, owned a company that built oil-and-gas gathering systems for large corporations such as El Pas Natural Gas Company and Pacific Northwest Pipeline.  See Tr. at 400:12-402:25 (Anderson, Sheridan).

127.    Based on the Court's in-person evaluation of Anderson during his testimony, Anderson appears competent and well-informed regarding the facts and the law governing this case.

128.    Plaintiff Pritchett Living Trust ("Pritchett Trust") owns royalty interests burdening WPX Production's working interests in oil and natural gas production on leases in the New Mexico portion of the San Juan Basin.   See Pritchett Trust Division Orders at 3-4 (Plaintiffs' Ex. 6); Pritchett Trust Check Stubs (Plaintiffs' Ex. 5).

129.    Plaintiff Cynthia Sadler owns overriding royalty interests burdening WPX Production's working interests in natural gas production on leases in the New Mexico portion of the San Juan Basin, having received said interests from the Zela D. Wood Living Trust in 1993. See Title Chain for Cynthia W. Sadler Overriding Royalty Interest at 1 (Plaintiffs' Ex. 8).

130.    Plaintiff Robert Westfall owns a royalty interest burdening WPX Production's working interests in natural gas production on leases in the New Mexico portion of the San Juan Basin, by virtue of mineral deeds that his father, Archie Westfall, acquired in 1952.  See Tr. at 321:8-325:19 (Westfall, Aubrey); Robert Westfall WPX Check Stubs (Plaintiffs' Ex. 9).

131.    Westfall is willing to serve as class representative and represent the interests of the class, as well as his own interests.  See Tr. at 315:21-316:11 (Aubrey, Westfall).

132.    Based on the Court's in-person evaluation of Westfall during his testimony, Westfall appears competent and well-informed regarding the facts and the law governing this case.

133.    Plaintiff Lee Wiley Moncrief 1998 Trust ("Moncrief Trust") owns royalty interests burdening WPX Rocky Mountain's working interests in the Colorado portion of the San Juan Basin.  See Moncrief Trust Check Stubs (Plaintiffs' Ex. 22).

134.    Plaintiff Kelly Cox Testamentary Trust 7/1238401 ("Cox Trust") owns royalty interests burdening WPX Rocky Mountain's working interests in the Colorado portion of the San Juan Basin.  See Cox Trust Check Stubbs (Plaintiffs' Ex. 14); Cox Trust Transfer Orders (Plaintiffs' Ex. 16).

135.    Plaintiff Minnie Patton Scholarship Foundation Trust ("Patton Trust") owns royalty interests burdening WPX Rocky Mountain's working interests in the Colorado portion of the San Juan Basin.  See Patton Trust Check Stubs (Plaintiffs' Ex. 25).

136.    Bank of America, NA, is the Patton Trust's trustee.   See Tr. at 184:16-17 (Brickell).

137.    Rolando Munoz is the Bank of American representative in charge of managing the Patton Trust's oil-and-gas interests.  See Munoz Depo. *passim*.

138.    Munoz has fifteen years of experience in the oil-and-gas industry.  See Oral Deposition of Rolando Munoz at 4:10:3-11:18 (taken January 23, 2014)(Plaintiffs' Ex. 276) (Munoz, Sheridan).[11]

139.    Plaintiff SWMF Properties, Inc. ("SWMF Properties") owns royalty interests burdening WPX Rocky Mountain's working interests in the Colorado portion of the San Juan Basin.  See SWMF Properties Check Stubs (Plaintiffs' Ex. 25).

140.    All named Plaintiffs are within the proposed class definition, i.e., even if they were not named Plaintiffs, they would still qualify as class members.  Cf. Stipulation ¶ 7, at 2.

141.    The named Plaintiffs own a total of ninety-six wells, thirty-eight of which are in New Mexico and fifty-eight of which are in Colorado.  See Emory Expert Report ¶ 22, at 13.

142.    Nineteen of the ninety-six named-Plaintiff wells are coalbed methane, with fourteen located in New Mexico and five in Colorado.  See Emory Expert Report ¶ 22, at 13.

143.    Seventy-seven of the ninety-six named-Plaintiff wells are conventional wells, with twenty-four of them located in New Mexico and fifty-three in Colorado.  See Emory Expert Report ¶ 22, at 13.

### d.      The Proposed Class Members.

144.    Per the class definition, the proposed class members -- a/k/a the absent Plaintiffs -- are those individuals and entities, not otherwise excluded, who own wells operated by WPX Production and/or WPX Rocky Mountain in the San Juan Basin.  See Motion at 3.

145.    In addition to its interests in the approximately 500 private leases in which class members own royalty and overriding royalty interests, the Defendants also own working

---

[11]This exhibit is formatted such that four pages of deposition transcript appear on each page of the exhibit.  The Court will thus pincite to this exhibit, and other others like it, using the three-digit format x:y:z, where x is the exhibit page number, y is the deposition transcript page number, and z is the line in the transcript.

interests in 229 federal oil and gas leases and eighty-six state leases in the San Juan Basin.  See Tr. at 836:17-837:9 (Terry, Sheridan).

146.    The proposed class definition excludes federal leases and Indian-owned leases. See Motion at 3.

147.    The proposed class definition also excludes interests encompassed by a pending class action in Colorado state court, Lindauer v. Williams Production RMT Co., No. 2006 CV 317 (Garfield Cnty., Colo.).  See Motion at 3.

148.    The exclusions result in 299 WPX Production-owned wells in the San Juan Basin being excluded from the class.  Compare Emory Expert Report ¶ 22, at 13, and Stipulation ¶ 2, at 1, with Emory Expert Report ¶ 42, at 22.

149.    The San Juan Basin covers the northwest corner of New Mexico and the southwest corner of Colorado.  See Tr. at 78:19-79:3 (Reineke).

150.    The proposed class definition covers approximately 3,157 wells, about 268 of which are in Colorado and roughly 2,889 of which are in New Mexico.  See Emory Expert Report ¶ 22, at 13; Stipulation ¶ 2, at 1.

151.    There is often more than one well on a lease.  See Stipulation ¶ 2, at 1; id. ¶ 4, at 2.

152.    The class definition covers 507 leases.  See Stipulation ¶ 4, at 2.

153.    A lease can have more than one royalty owner; there can be co-royalty owners and overriding royalty owners.  See Stipulation ¶¶ 4, 6, at 2.

154.    The class definition covers approximately 1,466 royalty interests and 909 overriding royalty interests.  See Stipulation ¶ 6, at 2.

155.    There are, thus, over 2,300 members of the class.  See Stipulation ¶ 6, at 2.

156.    Of the 3,157 class wells, 1,481 of them are coalbed methane wells, and 1,676 of them are conventional wells.[12]  See Emory Expert Report ¶ 22, at 13; Tr. at 79:21-23 (Reineke).

157.    Of the 1,481 class coalbed methane wells, ninety-three of them are in Colorado and 1,388 of them are in New Mexico.  See Emory Expert Report ¶ 22, at 13; Tr. at 79:21-23 (Reineke).

158.    Of the ninety-three class coalbed methane wells in Colorado, 32 of them deliver their gas to the Williams Four Corners gathering system, and sixty-one of them deliver their gas to an independent, third-party gathering system.  See Tr. at 79:24-80:2 (Reineke).

159.    Of the 1,388 class coalbed methane wells in New Mexico, 816 of them deliver their gas to the Williams Four Corners gathering system, and 572 of them deliver their gas to an independent, third-party gathering system.  See Tr. at 80:3-7 (Reineke).  See also Expert Report of Barbara Ley at 10 (Plaintiffs' Ex. 195).

160.    Of the 1,676 conventional class wells, 1,501 of them are in New Mexico, and 175 of them are in Colorado.  See Emory Expert Report ¶ 22, at 13.

---

[12]There is a slight discrepancy between the Plaintiffs' numbers and the Defendants' numbers: the Defendants report 3,157 class wells, of which 1,481 are coalbed methane and 1,676 are conventional; the Plaintiffs report 3,100 class wells, 1,482 of which are coalbed methane and 1,618 of which are conventional.  The Court relies on the Defendants' numbers in well reporting, because: (i) the Defendants generally have superior access to inventories of their own properties than the class members have to each other's; (ii) the Defendants have no motive to falsely overstate the number of wells involved -- if anything, their incentive would be to understate the numbers; and (iii) the Defendants communicated their representations regarding the well numbers in an expert report, while the Plaintiffs representations were made at the hearing, where live testimony admits of more potential errors.  The Defendants have also provided more complete information, and the Court would prefer for its findings to at least be internally consistent, even if the numbers are slightly off.  Similar factual discrepancies permeate this case; they generally follow the same pattern that the Court just described, and the Court has generally handled them similarly.

161.    Of all 3,456 wells in which the Defendants own the working interest,[13] 2,582 of them, or 74.7%, are gathered by Williams Four Corners.  See Emory Expert Report ¶ 42, at 22.

e.    **Independent Entities.**

162.    Enterprise San Juan Gathering ("Enterprise") is an independent, third-party gathering company, unrelated to the WPX affiliates.  See Emory Expert Report ¶ 42, at 22.

163.    Independent entities operate the gathering systems that control a number of class well gathering contracts, including Burlington 3816, Red Cedar 2584, BP 100274-A6, BP 1002474, Red Cedar 07-300, Cedar Hill 183085, Decker 148473, Burlington 3854, and Elm Ridge.  See Emory Expert Report ¶ 42, at 22.

3.    **The Process: Natural Gas Extraction, Gathering, Processing, Transfer, and Sale.**

164.    Raw natural gas exiting the wellhead contains substances such as NGLs, water, carbon dioxide, nitrogen, and other contaminants, some of which must be separated before the gas is suitable for insertion into a pipeline.  See Expert Report of Daniel Reineke at 2 (Plaintiffs' Ex. 196).

165.    Raw natural gas is typically not of sufficient quality to be placed into an interstate pipeline; it must first be treated for removal of at least carbon dioxide, and usually water vapor and NGLs.  See Tr. at 101:11-13 (Reineke).

166.    All gas produced from class wells is either coalbed methane or conventional gas; none of the class wells are oil wells, and thus none of the gas is casinghead gas.  See Tr. at 249:13-250:1 (Brickell, Kaplin); Stipulation ¶ 1, at 1.

---

[13]This figure represents both the class wells and the 299 wells subject to exclusion from the class despite being owned by the Defendants.

167.   As working-interest owner on the class leases, WPX Production and WPX Rocky Mountain -- in New Mexico and Colorado, respectively -- and their predecessors own title to all natural gas and NGLs as they come out of the ground.  See Tr. at 95:2-25 (Reineke, Brickell). But see note 9, supra.

168.   The gas is run through a separator, which removes the liquid water and NGLs. See Tr. at 96:12-20 (Reineke).

169.   No gaseous-phase natural gas from the class wells -- during any time period -- was sold at arm's length from the wellhead; all of it goes into a gathering system.  See Tr. at 86:6-10 (Brickell, Reineke).

170.   Some NGLs condense at the wellhead; these are known as well condensate.  See Tr. at 440:25-441:4 (Sutphin, Ward).

171.   Not all of the class wells produce well condensate; coalbed methane wells, for example, never do.  See Stipulation at 3 n.4.

172.   For "several years," the Defendants have sold their well condensate to an independent party -- currently Western Refining, and, before that, a company called "Gavalon."[14] Tr. at 441:5-442:7 (Sutphin, Ward).  See WPX Party Transaction Report (Defendants' Ex. 139).

173.   After liquids are separated from the gas, the gas is transmitted from the wellhead to a gathering system -- which, as explained earlier, is an affiliate company for some leases and an independent, third-party gatherer for others, depending purely upon location -- and is metered before it leaves the lease.  See Reineke Expert Report at 3.

---

[14]The Plaintiffs assert that no NGLs are sold at arm's length from the wellhead.  See, e.g., Reineke Expert Report at 2.  In addition to Sheryl Ward's testimony, however, the Defendants have presented documentary evidence of both their third-party sales of, and payment of royalties on, well condensate.  See WPX Party Transaction Report (Defendants' Ex. 139).

174.    No liquid -- meaning free liquid, not entrained NGLs or water vapor -- flows through the meter.  See Tr. at 96:21-97:12 (Brickell, Reineke).

175.    Metering establishes the volume of gas that the lease produces -- measured in MCFs -- its thermo-energetic potential -- measured in MMBtus -- and its NGL content -- measured in GPM -- as well as the carbon-dioxide content.  See Emory Expert Report ¶ 28, at 15; id. ¶¶ 34-35, at 18-19; id. ¶¶ 36-37, at 19-20.

176.    The meter uses ordinary mechanical mechanisms -- not fundamentally unlike water meters outside a home -- to measure the natural gas' volume, and gas chromatography to measure its energetic content.  See generally Gas Meter, Wikipedia.org, en.wikipedia.org/wiki/Gas_meter.

177.    Gas chromatography is an analytical chemical technique whereby the natural gas mixture is placed into a column filled with an inert carrier gas, and a liquid or polymer "stationary phase" coating the column's walls; the different chemical compounds in the natural gas elute -- i.e., travel from one end of the column to the other -- at different speeds, which correspond to their level of interaction with the stationary phase, and the various "retention times" of the different chemicals in the gas indicate the chemical identity of each compound in the gas.  See, e.g., Gas Chromatography, Wake Forest University Department of Chemistry, available at http://www.wfu.edu/chemistry/courses/organic/GC/index.html.   See generally Gas Chromatography, Wikipedia.org, available at en.wikipedia.org/wiki/Gas_chromatography.

178.    Once each compound -- and its proportion in the gas by weight and volume -- is determined, the known energetic properties of each compound are multiplied by that compound's proportional presence in the gas, and the overall thermo-energetic potential of the

gas is determined.  See Gas Chromatography, Wake Forest University Department of Chemistry;

Gas Chromatography, Wikipedia.org.

179.    This metering thus makes it possible to determine the potential production value

attributable to each individual lease.

180.    On leases that contain free-use clauses, the working interest owner siphons off

lease-use gas before metering the gas and uses it to power pumping units, heaters, and other

machinery on the lease.  See Tr. at 148:14-20 (Reineke).

181.    The amount of gas used on a lease is typically not metered.  See Tr. at 148:20-21

(Reineke).

182.    In the gathering system, the natural gas -- which, at this point, is still impure and

not in marketable condition -- is comingled with gas from other leases.  See Reineke Expert

Report at 4.

183.    Gas is then transmitted through the gathering system -- which is a network of

relatively low-pressure pipes -- to one of several processing or treatment plants.  See Tr. at

97:19-98:2 (Reineke); See Reineke Expert Report at 4.

184.    The gas is compressed in the gathering system by compressors that use a small

portion of the natural gas in the lines as fuel.  See Tr. at 100:12-23 (Brickell, Reineke).

185.    On the way into the processing or treatment plant, the gas is first dehydrated --

i.e., the water vapor is removed -- and compressed to a higher pressure.  See Tr. at 99:21-100:4

(Reineke).

186.    Coalbed methane wells -- for the most part, but not entirely -- flow to the Milagro

treatment plant, not to one of the processing plants, because coalbed methane lacks NGLs to

extract but it does need to have carbon dioxide removed from it before being placed into the interstate pipeline system.  See Tr. at 105:6-106:6 (Brickell, Reineke).

187.    Conventional gas wells -- for the most part, but not entirely -- flow to processing plants, because conventional gas has NGLs that can be removed and sold for a greater value than the value they add to the gas as entrained NGLs, which increase the gas' Btu factor.  See Tr. at 105:6-106:6 (Brickell, Reineke).

188.    At a processing plant, the gas is cleaned of impurities, and any NGLs that are still entrained in the gas -- i.e., those NGLs that did not condense naturally at the wellhead as well condensate or in the gathering system as drip condensate -- are removed.  Cf. Tr. at 619:15-20 (Emory, Brickell).

189.    Processing does not create new NGLs, nor does it change their constituency -- i.e., the proportion of the NGLs that are propane, butane, pentane, et cetera; it merely extracts them from the gas in which they were entrained.  See note 34, infra.

190.    NGLs removed during processing are sent to a fractionator and separated -- or "fractionated" -- into their constituent compounds.  See Tr. at 104:6-21 (Reineke, Brickell).

191.    The fractionated NGLs are then sold -- at arm's length during some time periods and to a corporate affiliate during others.  See Tr. at 104:6-21 (Reineke, Brickell).

192.    At a treatment plant, the gas is cleaned and impurities are removed, and the resultant, marketable gas is pressurized and put into the interstate pipeline system.  See Tr. at 619:15-20 (Emory, Brickell).

193.    The only process always undergone at a treatment plant is the removal of carbon dioxide, which can cause freezing issues in piping; water vapor may or may not be removed in treatment.  See Emory Expert Report ¶ 39, at 21.

194.    The residue gas is then pressurized and placed into the interstate pipeline system. See Tr. at 100:5-9 (Reineke).

195.    The point at which residue gas is placed into the interstate pipeline system is the point of the first arm's-length sale.  See Tr. at 101:9-102:1 (Reineke).

196.    When the title holder of residue gas contracts to sell a quantity of natural gas to a consumer across the country, the title holder does not place a quantity of gas into the pipeline and have the consumer wait for those specific molecules to make their way across the country; rather, the title holder places a certain number of MMBtus of residue gas into the pipeline, and the consumer takes an equivalent number of MMBtus out of it, and that is considered a transfer of natural gas, even though the actual molecules put in the pipeline are not the same ones removed.  See Tr. at 101:9-102:1 (Reineke).

197.    Pipeline-quality residue gas is, thus, fungible -- only its volume, in MCFs, and energy content, in MMBtus, determines its value; it is not otherwise qualitatively different from other pipeline-quality residue gas.  See Tr. at 101:9-102:1 (Reineke).

198.    Williams Four Corners owns four plants to which class wells flow: the Lybrook processing plant, the Kutz processing plant, the Ignacio processing plant, and the Milagro treatment plant.  See Tr. at 98:10-11 (Reineke); id. at 98:20-24 (Brickell, Reineke).

199.    Williams Four Corners also owns the gathering lines connecting the class wells to those four plants.  See Tr. at 98:25-99:1 (Brickell, Reineke).

200.    Some class wells also flow to the Cedar Hill plant and the Florida River plant -- both of which BP owns -- and the Chaco plant and the Val Verde plant -- both of which Enterprise owns.  See PWM Master Well Completion Data (Defendants' Ex. 168).

201.   The NGL recovery rate of each plant is different.   See Emory Expert Report ¶¶ 39-40, at 21-22.

202.   The operational costs and efficiency of each plant is different, and changes over time.   See Tr. at 566:11-567:8 (Sutphin, Emory).

203.   Not all gas that goes to a processing or treatment plant is processed or treated; some can be "bypassed" around processing or treatment and then blended with processed or treated gas in proportions that ensure that the final mixture is of pipeline quality.   Emory Expert Report ¶ 41, at 22.

204.   Some NGLs condense in the gathering system; these are known as drip condensate.   See Tr. at 123:4-19 (Reineke).

205.   The drip condensate is collected from the gathering system periodically and sold. See Tr. at 123:4-19 (Reineke).

206.   Drip condensate is sold at oil prices.   See Tr. at 123:4-9 (Reineke).

207.   Only conventional gas, not coalbed methane, yields drip condensate, as coalbed methane is dry gas, i.e., it does not contain NGLs.   See Tr. at 128:1-6 (Brickell, Reineke).

208.   When the natural gas changes hands among WPX affiliates, no money changes hands; the transactions are essentially treated the same as an intra-company, inter-division transfer would be.   See Tr. at 164:25-165:20 (Ley, Brickell).

209.   Royalty owners have no decision-making authority with regard to what happens to hydrocarbons once they are removed from the wellhead; the working interest owner has sole authority to transport, process, and dispose of them.   See Tr. at 95:16-96:3 (Brickell, Reineke).

210.   The Court will now outline the process by which the title to the class' gas changed hands among WPX affiliates at various stages of the class time period for wells in the New Mexico on the Williams Four Corners gathering system.[15]

      **a.**    **The Process from 1988 to 1995, i.e., Who Held Title on the Natural Gas at Each Stage.**

211.   From 1988 to 1995, Williams Production Co. was the lessee on the class leases, meaning that it held title to all natural gas produced at the wellhead.   See Tr. at 85:11-86:1 (Brickell, Reineke)(referring to Plaintiffs' Demonstrative Ex. 5).

212.   Williams Production Co. would transfer title to the natural gas to Williams Gas Marketing as it transferred physical possession of the gas to an affiliate gathering company, known as Northwest Pipeline until 1992, and Williams Field Services thereafter.   See Tr. at 85:11-86:1 (Brickell, Reineke)(referring to Plaintiffs' Demonstrative Ex. 5).

213.   During this time period, the class wells were each subject to one of six gathering contracts: J38, J99, U99, 114, 129, and K82.   See Tr. at 86:17-24 (Brickell, Reineke).

214.   The J99 contract covered wells connected to the Williams Four Corners gathering system.   See Ley Expert Report at 10.

215.   Williams Gas Marketing would then sell the gas at arm's length after the gathering affiliate finished processing it.   See Tr. at 85:11-86:1 (Brickell, Reineke)(referring to Plaintiffs' Demonstrative Ex. 5).

---

[15]The Court cannot tell whether, or to the extent that, these processes reflect the title-transfer procedures in Colorado.  The Court has found that, today, WPX Production owns the New Mexico leases and WPX Rocky Mountain owns the Colorado leases -- a finding that is itself in some doubt, see note 9, supra, and accompanying text, but it does not know if there was a similar split among predecessor companies.  It might be the case that the title-transfer processes outlined in Findings of Fact 211-227, §§ 4a-c, infra, describe the title-transfer processes for the entire class, and not just the New Mexico wells.  Regardless, these processes suffice to illustrate how WPX affiliates transferred title to one another at different points in the class period.

   b.      **The Process from 1995 to August, 2010.**

216.    From 1995 to 2010, Williams Production Co. and its post-1998 successor, Williams Production LLC, were the lessees on the class leases, meaning that they held title to all natural gas produced at the wellhead.   See Tr. at 87:2-14 (Reineke)(referring to Plaintiffs' Demonstrative Ex. 6).

217.    The lessee would transfer title to the natural gas to WFS Gas Resources as it transferred physical possession of the gas to an affiliate gathering company, Williams Field Services.  See Tr. at 87:2-14 (Reineke).

218.    The same five gathering contracts that existed from 1988 to 1995 continued to govern the class wells during this period, and J99 continued to govern all wells on the Williams Four Corners gathering system.  See Tr. at 87:2-88:5 (Reineke, Brickell)(referring to Plaintiffs' Demonstrative Ex. 6).

219.    After Williams Field Services finished processing the gas, WFS Gas Resources would then transfer title to the residue gas to Williams Gas Marketing and title to the processed NGLs to Williams Power.   See Tr. at 87:2-88:5 (Brickell, Reineke)(referring to Plaintiffs' Demonstrative Ex. 6).

220.    Williams Gas Marketing and Williams Power would then sell their respective products to arm's-length buyers.  See Tr. at 87:2-88:5 (Brickell, Reineke)(referring to Plaintiffs' Demonstrative Ex. 6).

   c.      **The Process from August, 2010, to July, 2011.**

221.    From August, 2010, to July, 2011, Williams Production LLC was the lessee on the class leases, meaning that it held title to all natural gas produced at the wellhead.  See Tr. at 88:6-12 (Brickell, Reineke)(referring to Plaintiffs' Demonstrative Ex. 7).

222.    The lessee would transfer title to the natural gas to WPX Gas Resources as it transferred physical possession of the gas to an affiliate gathering company.  See Tr. at 88:6-20 (Brickell, Reineke)(referring to Plaintiffs' Demonstrative Ex. 7).

223.    In 2011, in preparation for the upcoming spinoff of various WPX affiliates, a new set of gathering contracts were executed.  See Tr. at 88:6-20 (Brickell, Reineke)(referring to Plaintiffs' Demonstrative Ex. 7).

224.    Gathering agreement J99M replaced J99 and U99, and gathering agreement 170 replaced agreements 114, 129, and K82.  See Tr. at 88:9-89:4 (Brickell, Reineke)(referring to Plaintiffs' Demonstrative Ex. 7).

225.    These new gathering agreements run for a term of eleven-and-a-half years -- from July, 2011, to December, 2022 -- and, despite being executed before the spinoff, continue to bind the spunoff companies.  See Tr. at 88:6-89:4 (Brickell, Reineke).

226.    Transactions under the new gathering agreements are, thus, affiliate, non-arm's length transactions, because at the time they were executed, all parties to them were corporate affiliates.  See Tr. at 91:16-92:19 (Brickell, Reineke).

227.    After processing, WPX Gas Resources would transfer title to the gas and NGLs to Williams Gas Marketing, which would then sell the gas at arm's length.  See Tr. at 88:6-20 (Brickell, Reineke)(referring to Plaintiffs' Demonstrative Ex. 7).

**4.     The Language in the Class Leases: The Breakdown of Textual Royalty Formulations.**

228.    The class leases were executed in the 1940s and early 1950s, and, in all known instances, the original lessors and the original lessee representatives -- the original lessees on these leases was not WPX Production -- are unavailable.  See Expert Report of James Griffin ¶ 6, at 3-4 (Defendants' Ex. 135).

229.    The leases were executed under competitive conditions.   See Griffin Expert Report ¶ 6, at 3-4.

230.    The class leases typically distribute either one-eighth or, less commonly, three-sixteenths of the value of the gas -- and the terminology used to convey the concept of the "value of the gas" is spelled out in different ways in different leases -- to the royalty owner, leaving either seven-eighths or thirteen-sixteenths to the Defendant-lessee.   See Tr. at 94:17-95:10 (Reineke); Tr. at 238:1-5 (Kaplin).

231.    Every lease has a paragraph devoted to how royalty is to be computed and paid. See Tr. at 241:12-16 (McNamara, Kaplin).

232.    The class leases provide that royalty is to be valued based on the following language: (i) "gross proceeds," without reference to being "at the well," "at the wellhead," or "at the mouth of the well"; (ii) "proceeds at the mouth of the well"; (iii) "proceeds on the sale of gas, as such"; (iv) "price" or "market price" "at the well"; (v) "net proceeds at the well"; (vi) "gross proceeds received when sold at the mouth of the well, market value if not sold at the mouth of the well"; (vii) "gross proceeds received for gas sold, used off the premises or in the manufacture of products therefrom, but in no event more than the actual amount received"; (viii) "proceeds if sold at the well, or if marketed off the premises, market value at the well"; (ix) "market value at the well of the gas sold or used, provided that on gas sold the market value shall not exceed the amount received for such gas computed at the mouth of the well"; (x) "market value at the well if sold or used to manufacture products; on gas sold at the well, net proceeds realized; each after deduction of post-production costs"; and (xi) "market value at the well of the gas sold or used,

provided that on gas sold the market value shall not exceed the amount received for such gas computed at the mouth of the well."[16]  Lease Language Chart (Defendants' Ex. 191).

233.   Textual formulations (i), (ii), (iii), (iv), and (v) are "single-prong" royalty provisions, meaning that they pay the same regardless whether the gas is sold at the wellhead or off-site.  Lease Language Chart (Defendants' Ex. 191).

234.   Textual formulations (vi) through (xi) are "two-pronged" royalty provisions, meaning that they describe the value upon which royalty is to be paid in different terms, depending upon whether the gas is sold at the wellhead or off-site.  Tr. at 793:6-794:8 (Sheridan, Terry); id. at 799:15-800:5 (Sheridan, Terry).

235.   Fifty-five of the leases containing textual formulation (iii) -- thirty-one of which are in Colorado and twenty-four of which are in New Mexico -- contain specific, separate royalty provisions relating to casinghead gas, which the class wells, being gas wells, do not produce. See Lease Language Chart (Defendants' Ex. 191).

---

[16]The categories, and the numbers that the Court uses in its Findings of Facts Part 4.a and 5.b, come from the Defendants' Lease Language Chart (Defendants' Ex. 191).  The Plaintiffs presented their own breakdown, which lumps the language into a smaller number of broader categories, but it is generally consistent with the Defendants' numbers.  See Spreadsheet of Lease Language (Plaintiffs' Ex. 428); Summary of Lease Language by Form (Plaintiffs' Demonstrative Ex. 27).  For example, while the Plaintiffs state that 97 leases are based on "market value" or "market price," the Defendants break this down into New Mexico leases and Colorado leases, and into "market value at the well of the gas sold or used, provided that on gas sold the market value shall not exceed the amount received for such gas computed at the mouth of the well" versus "market value at the well if sold or used to manufacture products; on gas sold at the well, net proceeds realized; each after deduction of post-production costs" versus "market value at the well of the gas sold or used, provided that on gas sold the market value shall not exceed the amount received for such gas computed at the mouth of the well."  Lease Language Chart (Defendants' Ex. 191).  The Court, additionally, has concerns about the accuracy and reliability of the Plaintiffs' exhibit.  See note 17, infra.  The Court ultimately examined the leases itself and categorized them into eight categories -- A through H -- for case-management purposes.

236.    Some of the leases that refer to royalty being paid on the basis of "market value" also refer to paying on the "amount realized from such sales," but the Court cannot determine how many.[17]

237.    The majority of the leases are form contracts -- with Form 88-42 from the Kansas Blueprint Company being among the most common -- altered only to include the relevant individual information -- the parties' names, the location of the lease, et cetera -- and are therefore textually identical within their respective textual-formulation categories.  See Tr. at 239:8-18 (McNamara, Kaplin).   See generally Spreadsheet of Lease Language (Plaintiffs' Ex. 428)(categorizing each lease by its form number).

238.    The form contracts are identifiable -- i.e., they are identifiable as being form contracts, and their corporate author and model number are identifiable -- by numbers stamped on the leases, typically in the top corners.  See Tr. at 241:18-242:2 (McNamara, Kaplin).

---

[17]The Plaintiffs' expert, Randy Kaplin, analyzed the leases and divided them into a smaller number of textual categories than the Defendants' expert, Kris Terry, did.  See note 16, supra.  Compare Spreadsheet of Lease Language (Plaintiffs' Ex. 428), and Summary of Lease Language by Form (Plaintiffs' Demonstrative Ex. 27), with Lease Language Chart (Defendants' Ex. 191).  The Court is concerned at the discrepancy between the Summary of Lease Language by Form, which says that there are eight leases that pay on the "amount realized from sale," and the ostensibly more thorough Spreadsheet of Lease Language upon which it is based, which lists over seventy-five such leases.   This discrepancy, combined with Kaplin's statement at the hearing that he "reviewed 600-some [leases], but [he] found out that [he] actually reviewed some of them twice," and the fact that the initial version of the Spreadsheet of Lease Language contained 622 leases -- despite there only being 507 class leases in existence -- makes the Court reticent to rely on Kaplin's work over Terry's.  See Tr. at 231:12-14 (Kaplin)("I think the agreed to or stipulated number at this point may be 507 leases.").   See also Tr. at 266:15-19 (McNamara, Kaplin)(stating that Plaintiffs' Exs. 426 and 486 are identical, except that the latter "eliminate[d] the duplications" in the former).   The Court has ultimately decided to rely on Kaplin's categorization of the leases by their form-contract identifier, but then conduct its own analysis and categorization of each lease's text.

239.    None of the leases expressly provide for payment on the basis of a WASP or an index price.  <u>See</u> Tr. at 112:13-15 (Brickell, Reineke); <u>id.</u> at 259:9-18 (McNamara, Kaplin); Lease Language Chart (Defendants' Ex. 191).

240.    The class leases contain "free use clauses" that allow the working interest owner to use gas on the lease free of charge, <u>i.e.</u>, without paying a royalty on the gas used.[18]  Tr. at 148:7-149:1 (Sheridan, Reineke).  <u>See</u> Tr. at 326:1-327:24 (Westfall, Sutphin); Selected Lease (Defendants' Ex. 7).

241.    Some of the leases use two different royalty terms -- <u>e.g.</u>, "proceeds" versus "market value" -- to described royalties owed on gas sold from the well and those owed on gas sold off the leased premises; these leases are referred to as "double-pronged" or "two-pronged" leases, while leases that use a single royalty term for gas are "single-pronged" or "one-pronged" leases.[19]  Lease Language Chart (Defendants' Ex. 191).

242.    Of the 507 total class leases, 224 are single-pronged, and 256 are double-pronged; twenty-seven are illegible as to their royalty provisions.  <u>See</u> Lease Language Chart (Defendants' Ex. 191).

---

[18]The Court does not know the exact proportion of the class leases that contain a free use clause, but concludes that it is the vast majority, if not all of them.  <u>See</u> Tr. at 148:22-24 (Reineke)(stating that free use clauses exist "on nearly every lease I've seen").  Even if a lease does not contain a free use clause, it is a default term that the Court implies into the leases as a matter of law, unless the lease specifies otherwise.  <u>See</u> <u>ConocoPhillips Co. v. Lyons</u>, 2013-NMSC-009, ¶ 38, 299 P.3d at 856.  None of the class leases explicitly disclaim the Defendants' right to use gas on the leased premises.

[19]The Plaintiffs use -- or misapprehend the Defendants' use of -- the single-pronged versus double-pronged distinction to refer to leases that pay different royalties on casing head gas versus gas-well gas.  <u>See</u> note 92, <u>infra</u>.  As that distinction does not make any difference in this case -- the class wells are all gas wells and thus do not produce any cashing head gas -- the Court will follow the Defendants' usage.  <u>See</u> <u>id.</u>

243.     Of the 480 leases with legible royalty provisions, 381 are in Colorado, and ninety-nine are in New Mexico.  See Lease Language Chart (Defendants' Ex. 191).

### a.      The Royalty-Provision Breakdown of the New Mexico Leases.

244.     Sixty-eight of the ninety-nine total New Mexico leases are single-pronged, and thirty-one are double-pronged.  See Lease Language Chart (Defendants' Ex. 191).

245.     Sixty-seven of the sixty-eight double-pronged New Mexico leases pay based on "proceeds on the sale of gas, as such" and the other lease pays on the basis of "net proceeds at the well."  Lease Language Chart (Defendants' Ex. 191).

246.     Twenty-four of the thirty-one double-pronged New Mexico leases pay on the basis of "proceeds if sold at the well, or if marketed off the premises, market value at the well."  Lease Language Chart (Defendants' Ex. 191).

247.     Six of the thirty-one double-pronged New Mexico leases pay on the basis of "gross proceeds for gas used off the premises" and, "if used in the manufacture of gasoline, prevailing market rate."  Lease Language Chart (Defendants' Ex. 191).

248.     One of the thirty-one double-pronged New Mexico leases pays on the basis of "market value at the well of the gas sold or used, provided that on gas sold the market value shall not exceed the amount received for such gas computed as the mouth of the well."   Lease Language Chart (Defendants' Ex. 191).

### b.      The Royalty-Provision Breakdown of the Colorado Leases.

249.     One-hundred fifty-six of the 381 total Colorado leases are single-pronged and 225 are double-pronged.  See Lease Language Chart (Defendants' Ex. 191).

250.    One-hundred forty-three of the 156 total single-pronged Colorado leases pay on the basis of "proceeds on the sale of gas, as such."   Lease Language Chart (Defendants' Ex. 191).

251.    Eight of the 156 total single-pronged Colorado leases pay on the basis of "proceeds at the mouth of the well."  Lease Language Chart (Defendants' Ex. 191).

252.    Four of the 156 total single-pronged Colorado leases pay on the basis of "price [or market price] at the well."  Lease Language Chart (Defendants' Ex. 191).

253.    One of the 156 total single-pronged Colorado leases pays on the basis of "gross proceeds," without reference to the mouth of the well.  Lease Language Chart (Defendants' Ex. 191).

254.    Eighty-five of the 156 total double-pronged Colorado leases pay on the basis of "proceeds if sold at the well, or if marketed off the premises, market value at the well."  Lease Language Chart (Defendants' Ex. 191).

255.    Seventy-five of the 156 total double-pronged Colorado leases pay on the basis of "market value at the well of the gas sold or used, provided that on gas sold the market value shall not exceed the amount received for such gas computed at the mouth of the well."   Lease Language Chart (Defendants' Ex. 191).

256.    Thirty-four of the 156 total double-pronged Colorado leases pay on the basis of "gross proceeds received for gas sold, used off the premises or in the manufacture of products therefrom, but in no event more than the actual amount received."   Lease Language Chart (Defendants' Ex. 191).

257.    Twenty-three of the 156 total double-pronged Colorado leases pay on the basis of "market value at the well if sold or used to manufacture products; on gas sold at the well, net

proceeds realized; each after deduction of post-production costs."  <u>See</u> Lease Language Chart (Defendants' Ex. 191).

258.    These 23 leases are the only leases to disclaim or negate Colorado's marketable-condition rule.  <u>See</u> Lease Language Chart (Defendants' Ex. 191).

259.    Five of the 156 total double-pronged Colorado leases pay on the basis of "gross proceeds for gas used off the premises.  If used in the manufacture of gasoline, prevailing market rate."  Lease Language Chart (Defendants' Ex. 191).

260.    Three of the 156 total double-pronged Colorado leases pay on the basis of "gross proceeds received when sold at the mouth of the well, market value if not sold at the mouth of the well."  Lease Language Chart (Defendants' Ex. 191).

### c.    The Named Plaintiffs' Royalty Provisions.

261.    Anderson Trust is the royalty owner of a lease that pays royalty on "gross proceeds . . . for the gas from each well where gas only is found . . . and if used in the manufacture of gasoline," royalties are to be paid "at the prevailing market rate for gas." Selected Lease at 1 (Defendants' Ex. 4).

262.    The Anderson Trust also has overriding royalty interests paid on the "value [of gas] on the leased premises or, if marketed, of the proceeds derived from the sale, at the well or wells."  Selected Assignment (Defendants' Ex. 25).

263.    Westfall is a royalty owner in a lease that pays royalty on the basis of "proceeds from the sale of the gas, as such, for gas from wells where gas only is found."  For "gas produced from any oil well and used by the lessee for the manufacture of gasoline or any other product," royalties are to be paid on "the market value of such gas at the mouth of the well."  If the gas

used to manufacture gasoline is sold by the lessee, royalties are to be paid on "the proceeds of the sale contract."  Selected Lease at 2 (Defendants' Ex. 7).

264.    The Patton Trust is a royalty owner in a lease that pays royalty on "the market value at the well . . . of the gas sold or used, provided that on gas sold at the wells the royalty shall be one-eighth of the amount realized."  Selected Lease at 1 (Defendants' Ex. 13).

   **d.**  **The Meanings of the Varying Language in the Leases.**

265.    As a matter of oil-and-gas industry custom and usage, "proceeds" and "gross proceeds" mean the same thing.  Tr. at 247:7-248:16 (McNamara, Kaplin).

266.    In the oil-and-gas industry, "proceeds" and "amount realized" mean the same thing.  Tr. at 816:9-14 (Sheridan, Terry).

267.    In the oil-and-gas industry, the term "gas used in the manufacture of gasoline or other product therefrom" refers to the volume of gas that is converted from the gaseous state into a liquid state through plant processing.  Tr. at 787:4-20 (Terry, Sheridan); id. at 795:9-796:22 (Terry, Sheridan).

268.    In the oil-and-gas industry, the terms "proceeds" and "market value" do not necessarily mean the same thing.  See Tr. at 794:9-795:8 (Terry, Sheridan); id. at 816:3-817:12 (Terry, Sheridan).

269.    In the oil-and-gas industry, "proceeds" refers to the amount of money realized by the lessee from the sale of gas.  Tr. at 794:9-795:8 (Terry, Sheridan); id. at 816:3-817:12 (Terry, Sheridan).

270.    In the oil-and-gas industry, "market value" or "prevailing market rate" refers to the price received, not by any one lessee, but by other lessees from the sale of gas of similar

quality, in the same location, taking into account pressure, marketing outlets and other market factors.  See Tr. at 794:9-795:8 (Terry, Sheridan); id. at 816:3-817:12 (Terry, Sheridan).

271.    The market value of gas may be calculated independently of proceeds, and may be greater or less than the proceeds from sale of gas depending upon particular contract prices and changes in the market for the sale and purchase of gas.  See Tr. at 794:9-795:8 (Terry, Sheridan); id. at 816:3-817:12 (Terry, Sheridan).

272.    In some quarters of the oil-and-gas industry, royalty has been paid differently depending on whether it is payable on market value or proceeds.  See Tr. at 817:13-16 (Terry, Sheridan).

273.    The Defendants, however, used a uniform methodology to pay royalty to lessors with varying lease languages.  See Stipulation ¶ 9, at 2-3; Deposition of Julie Mathis at 32:21-33:12 (taken December 6, 2013)(Plaintiffs' Ex. 52)(Brickell, Mathis); Kaplin Expert Report at 4-5.

274.    In some quarters of the oil-and-gas industry, when used in a royalty clause, the term "at the well" or "at the mouth of the well," refers to the location and the condition of gas for purposes of royalty valuation, that is, at the well or on the lease, and not at a downstream sales point.  See Tr. at 788:2-20 (Terry, Sheridan).

275.    In some quarters of the oil-and-gas industry, the term "as such," when used with reference to royalty based on "proceeds derived from the sale of gas, as such," means from the sale of the gas in the condition that it is as it emerges from the well.  See Tr. at 780:11-23 (Terry, Sheridan).

276.    As most oil-and-gas leases were executed many decades ago, the industry's usage of these terms has largely developed after the leases in this case were executed.  See Griffin

Expert Report ¶ 6, at 3-4.  Cf. Tr. at 114:24-115:10 (Brickell, Reineke)(noting that the federal government used to set gas prices).

277.   The oil-and-gas industry has a self-evident incentive to develop trade usages for lease terms that are more favorable to the lessee than the lessor.

278.   Often, including in this case, the lessor of an oil-and-gas lease is not someone within -- or someone familiar with the trade usage of -- the oil-and-gas industry.  See Owen L. Anderson, Royalty Valuation: Should Royalty Obligations Be Determined Intrinsically, Theoretically, or Realistically?, 37 Nat. Resources J. 611, 611-12 (1997)("[S]eldom [could a] lessor engaged in the oil and gas business . . . be regarded as a 'merchant' knowledgeable about oil and gas production and marketing practices.  Typically, the lessor is a farmer or a laborer, someone engaged in an unrelated business or profession, or a retired person.").  Cf. Tr. at 298:25-299:5 (Aubrey, Westfall)(describing himself as a retired owner of a small business that sells school and office supplies); Tr. at 358:19-359:1 (Branch, Anderson)(describing himself as a self-employed architectural designer).

279.   The leases are, in virtually all, if not all, cases, form contracts, and are not the product of meaningful negotiation of any term except the magnitude of the fractional royalty share.  See Tr. at 239:8-18 (McNamara, Kaplin); Anderson, supra, at 612 ("Regarding the lease royalty clause, about the only item negotiated may be the fraction or percentage of royalty.").

280.   The magnitude of the royalty -- e.g., one-eighth versus three-sixteenths -- is sometimes negotiated between the parties.  See Tr. at 802:24-806:1 (Terry, Sheridan)(discussing Selected Leases at 313 (Plaintiffs' Ex. 427)); Tr. at 806:2-25 (Terry, Sheridan)(discussing Selected Leases at 451 (Plaintiffs' Ex. 427D)); Tr. at 807:7-809:11 (Terry, Sheridan)(discussing Selected Leases at 211 (Plaintiffs' Ex. 427E)); Tr. at 809:12-810:22 (Terry, Sheridan)(discussing

Selected Leases at 80 (Plaintiffs' Ex. 427E)); Tr. at 810:23-812:17 (Terry, Sheridan)(discussing

Selected Leases at 293 (Plaintiffs' Ex. 427D)); Tr. at 812:18-813:16 (Terry, Sheridan)(discussing

Selected Leases at 72 (Plaintiffs' Ex. 427D)).

281.    Approximately forty of the class leases show signs of alteration from the standard

form, i.e., were subject to individualized negotiation.  See Tr. at 814:17-20 (Terry).

282.    The federal government provides detailed instructions about how working interest

owners must pay royalty interests -- i.e., what costs can be deducted, how value must be

calculated, et cetera -- on land it owns and that Indian tribes own.  See generally 30 C.F.R.

§ 1206 (titled "product valuation," and containing subparts on "Indian oil," "federal oil," "federal

gas," and "Indian gas").

283.    Some private leases have effectively adopted the federal regulations by including

"same as fed" clauses in their leases.  Tr. at 207:5-18 (Sheridan, Ley).

284.    There do not appear to be any "same as fed" royalty provisions among the class,

although there are some "same as fed" overriding royalties.  See Tr. at 207:19-21 (Sheridan,

Ley).

285.    The Defendants operate many wells on federally owned land, and, when paying

those royalties, they typically pay on the sale value of the NGLs rather than on a keep-whole

basis.  See Miller Depo. at 42:12-43:4 (Brickell, Miller).

286.    For federal leases on the J99M gathering contract, however, the Defendants have,

since 2011, begun paying federal royalty on the same keep-whole basis that they have paid the

private lessors -- i.e., the class -- throughout the class time period.  See Tr. at 520:13-521:10

(Sutphin, Miller).

287.    The Defendants used to pay their federal government royalties in the same manner they pay the class -- the keep-whole methodology -- but a federal audit in the mid-1990s forced the Defendants to change.   See Tr. at 215:5-219:14 (Brickell, Ley)(reviewing Miller Depo. at 42:12-45:20 (Brickell, Miller)).

**5.    The Overriding Royalty Interests.**

288.    Overriding royalty interests are common in New Mexico where there are numerous federal and state oil-and-gas leases.  See Tr. at 830:14-24 (Terry, Sheridan).

289.    Overriding royalty interests typically are created by reservations or grants contained in assignments of oil-and-gas leases.  See Tr. at 830:6-13 (Terry, Sheridan).

290.    Overriding royalty interests can be created a number of ways, many of which are situation-specific.  See Tr. at 230:9-12 (Kaplin).

291.    One common way overriding royalty interests are created is that a non-landowner will aggregate plots of land from numerous landowners and lease them to an oil company, and cut an overriding interest for itself as, effectively, payment for the aggregation.  See Tr. at 229:21-230:1 (Kaplin).

292.    Another common way overriding royalty interests are created is that a working interest owner on a lease will want to drill another well on a lease, but, lacking the resources to do so itself, will "farm it out to a third party and tack an override on it."  Tr. at 230:3-8 (Kaplin).

293.    A third common way an override can be created is that a royalty owner will assign their lease to a new lessor -- or sell their land -- and reserve an overriding royalty in the lease.  See Tr. at 230:13-20 (McNamara, Kaplin).

294.    Overriding interests can also be conveyed to, e.g., consulting geologists who assist a prospective producer, as a form of payment.   See Tr. at 230:21-231:4 (McNamara, Kaplin).

295.    Overriding royalty interests generally are not created through the use of form contracts.  See Tr. at 830:25-831:7 (Terry, Sheridan).

296.    Overriding royalty interests often are created in individualized circumstances and business transactions, and the agreements contain unique royalty valuation terms.  See Tr. at 832:7-16 (Terry, Sheridan).

297.    There are a wide variety of express terms among the class members' overriding royalty agreements, and there is no standardization in the overriding royalty interest terms.  See Defendants' Exhibit 196; Tr. at 835:5-836:6 (Terry, Sheridan).

298.    Overriding royalty instruments are "not generic like leases are," and the terms of each individual overriding royalty instrument are "unique."   Tr. at 230:21-230:4 (Kaplin, McNamara)("The terms on [overriding royalties are] kind of unique.").

299.    Overriding royalty instruments are "individualized agreements," and all of them are "a little bit different" from one another.  Tr. at 257:10-18 (Kaplin, McNamara).

300.    The Court has a list of some of the textual provisions found in the class overriding royalties, see Overriding Royalty Language Used in Various Assignments at 1-12 (Defendants' Ex. 196), the list contains far more textual permutations than the eleven that exist for royalty interests, and even that list is illustrative, not exhaustive, of all the overriding royalty provisions among the class, see Tr. at 832:3-16 (Sheridan, Terry)("I simply was trying to come up with what I believed were some examples of the type of instruments that are going to be at issue in

this matter."); id. at 832:23-833:7 (Sheridan, Terry)("Did we pull every one? . . . [W]e didn't begin to get through all the files.").

301.    The parties have been unable to locate many of the overriding royalty interests that the class definition would cover.  See Tr. at 254:9-255:3 (McNamara, Kaplin).

302.    Among the leases in Colorado in which class members own royalty and overriding royalty interests, there are leases that permit the deduction of post-production expenses *in haec verba*.  See Tr. at 855:12-856:18 (Terry, Sheridan).

303.    Overriding interests appear to entitle their owners to a smaller portion of the value of production than standard royalties do; overriding royalties exist for 0.25 percent and 2.5 percent.  See Tr. at 267:12-18 (McNamara, Kaplin); id. at 268:10-15 (McNamara, Kaplin).

304.    Like the royalty provisions, no overriding royalty instruments explicitly provide that the working interest owner is not required to pay royalty on NGLs.  See Tr. at 268:16-21 (McNamara, Kaplin).

305.    Assignments of overriding royalty interests in which class members acquired their interest subsequent to creation of the override offer contain assignment language that is inconsistent with the express terms of the instrument that created the override.  See Tr. at 839:2-844:5 (Terry, Sheridan).

306.    In addition to its interests in the approximately 500 private leases in which class members own royalty and overriding royalty interests, the Defendants also own working interests in 229 federal oil-and-gas leases and eighty-six state leases in the San Juan Basin.  See Tr. at 836:17-837:9 (Terry, Sheridan); Database of WPX State and Federal Leases (Defendants' Ex. 200).

307.    There are some "same as fed" overriding royalty interests in the class, but the Court does not know how many.  See Tr. at 255:24-256:3 (McNamara, Kaplin).

308.    There are also some overriding royalty interests that provide that payments be made on the same formula that the State of New Mexico uses -- effectively making them "same as state" clauses.  See Tr. at 255:17-23 (McNamara, Kaplin).

309.    Overriding royalty interests that burden the Defendants' working interests in federal and state leases, do not necessarily provide for royalty on the same terms payable in the same manner as the royalty due the federal and state governments under such leases -- except, of course, for the "same as fed" overriding royalties.  See Tr. at 837:10-14 (Terry, Sheridan).

**6.      The Defendants' Royalty-Distribution System.**

310.    The Defendants use a different royalty-payment system for wells on their own gathering system, i.e., the Williams Four Corners gathering system, than the one they used for wells on an independent, third-party gathering system.  See Tr. at 80:14-18 (Reineke).

311.    The Defendants did not base royalties on -- i.e., they did not vary their payouts to the class on the basis of -- the individual leases' language.  See Stipulation ¶ 9, at 2-3; Mathis Depo. at 32:21-33:12 (Brickell, Mathis); Kaplin Expert Report at 4-5.

312.    The Defendants had a policy of reviewing leases only when the royalty owner for that lease makes a direct inquiry concerning his or her royalty payment.  See Kaplin Expert Report at 5.

313.    Even when royalty owners contacted the Defendants about their royalty, the Defendants did not ultimately adjust or individualize that royalty owner's payouts on the basis of his or her lease's language.  See Tr. at 163:9-13 (Brickell, Ley); Kaplin Expert Report at 5.

314.    The generally applicable master equation that the Defendants uses to determine royalty payouts is: Price • Quantity - Applicable Post-Production Deductions = Royalty Value. See Stipulation ¶ 10, at 3.

315.    Before 2000, the "price" term was determined using a WASP; since 2000, it has been determined using an index price.  See Tr. at 108:6-13 (Reineke);

316.    The "quantity" term is determined using an MMBtu measurement at the wellhead as described above.  Stipulation ¶ 13, at 3.

317.    For Colorado wells, the "applicable post-production deductions" includes only taxes.  See Stipulation ¶ 14, at 3.

318.    For New Mexico wells, the "applicable post-production deductions" are described below.  See Findings of Fact 366-384, Part 6d (Cost Deductions) supra.

### a.    **Payments on NGLs, Including Drip Condensate.**

319.    The Defendants pay the class members' royalties on the basis of MMBtus at the wellhead, known as a keep-whole basis.  See Stipulation ¶ 18, at 4; Tr. at 440:7-17 (Sutphin, Ward); Kaplin Expert Report at 6.

320.    This practice of paying a per-MMBtu-at-the-wellhead royalty compensates the class members partially, but not fully, for the value of entrained NGLs.  See Kaplin Expert Report at 6.

321.    Gas with a higher NGL content has a higher MMBtu factor than gas with a low NGL content; thus, paying on the basis of MMBtus at the wellhead results in higher payments for wet gas -- which will ultimately yield NGLs -- than for the same volume of dry gas.  See Aggregate Royalty Payments: Whole Stream Value Minus Keep Whole Value (Defendants' Ex. 149); Kaplin Expert Report at 6.

322.    NGLs, however, are more valuable than a thermally equivalent quantity -- i.e., an equal MMBtu amount -- of natural gas, so this payment mechanism results in the class members being paid less than they would be if they were paid their royalty share of the sold NGLs and the residue natural gas separately.  See Comparison of NGL and Residue Natural Gas Prices (Left Scale) and Relative Prices (Right Scale) (Defendants' Ex. 146)(graphing, over the time period 1994 to 2013, the price of NGLs, the price of San Juan Basin residue gas -- i.e., the index price -- and the difference between the two, in dollars per MMBtu);[20] Aggregate Royalty Payments: Whole Stream Value Minus Keep Whole Value (Defendants' Ex. 149); Kaplin Expert Report at 6.

323.    For example, consider a volume of gas A, which is dry gas and has 90 MMBtus of energy at the wellhead, and an identical volume of gas B, which is wet gas and has 120 MMBtus of energy at the wellhead.  Gas B will, downstream of the wellhead, yield NGLs whose market value, when added to the market value of the residue -- i.e., dry, post-processing -- gas B, be worth greater than one-third more than gas A, despite that the gas B only had one-third more energy at the wellhead.  The Defendants, however, only pay one-third more royalty for gas B than for gas A, effectively treating an MMBtu of natural gas as financially equivalent to an

---

[20]Despite the usefulness of this exhibit, it does not contain -- nor can the Court find in Dr. Griffin's hearing testimony -- any indication of what the average price difference, over time, is between NGLs and residue gas.  This average would be easy enough for the Court to calculate for itself if it had the underlying data that the graph portrays, but the Court does not believe that the Defendants have provided it with that data.  Moreover, the Court is most interested in learning the average difference over the entire class time period -- 1985 to present -- which would require an additional nine years of data not reflected on Dr. Griffin's graph.

MMBtu of NGLs -- even though the Defendants sell an MMBtu of NGLs for a higher price than they sell an MMBtu of natural gas.[21]

324.    Unlike the Plaintiffs' issues with the WASP method -- which, by definition, will pay out the appropriate total amount among all wells, even if it shorts some wells some months and overpays others -- the Defendants' keep-whole methodology pays the class less overall than the whole stream methodology.  See Aggregate Royalty Payments: Whole Stream Value Minus Keep Whole Value (Defendants' Ex. 149); Difference Between Whole Stream Value and Keep Whole Value (Defendants' Ex. 147).

325.    If costs of NGL extraction are not passed on to the royalty owner, or if NGL extraction were costless, then the whole stream valuation method would always benefit royalty owners over the keep-whole method that the Defendants used.  See Tr. at 705:8-23 (Brickell, Griffin); Difference Between Whole Stream Value and Keep Whole Value (Defendants' Ex. 147).

---

[21]The Defendants' keep-whole methodology effectively compensates the class members for the value that NGL-rich gas would have if it were sold, as gas, from the wellhead, even though the Defendants often do not sell it that way, but rather process it and sell the removed NGLs at higher value.  If 1 MCF of gas contains $(c + d)$ MMBtus at the wellhead, where $c$ MMBtus come from the entrained NGLs and $d$ MMBtus come from the methane, the Defendants only pay the lessee $x$ $(c + d)$ dollars, where $x$ is the price, in \$/MMBtu, of gas, rather than $(y \bullet c) + (x \bullet d)$ dollars, where $y$ is the price, in \$/MMBtu, of NGLs.

The Court concludes that this payment methodology is inappropriate for those leases that provide that royalties are to be paid on the basis of "proceeds."  Both the plain meaning and the legal precedential meaning of "proceeds" require that the Defendants cut the class members in on the amount they received from the arm's length sale.  To the extent that the Defendants removed NGLs through processing and sold them at a higher price, they must compensate the Plaintiffs, accordingly.  There are, however, costs associated with marketing NGLs -- namely the cost of collecting drip condensate and the cost of removing entrained NGLs via processing -- that are not involved in marketing dry gas, and it might be proper to pass those costs on to the royalty owner.

326.     When NGL extractions -- <u>i.e.</u>, processing -- costs are passed on to the royalty owner, however, a great number of the class wells -- but not the majority -- would get a higher royalty from the keep-whole methodology.  <u>See</u> Aggregate Royalty Payments: Whole Stream Value Minus Keep Whole Value (Defendants' Ex. 149)(presenting data, that the Defendants' expert compiled, indicating that over the period from 1985 to present, fifty-two wells of a 100-well sample[22] would have benefitted from whole stream methodology, while forty-eight wells of the sample benefitted from the use of keep-whole methodology).

327.     That being said, the whole-stream approach -- as the Defendants' expert, Dr. James Griffin defines it -- does not pay royalty on drip condensate, <u>see</u> Tr. at 685:6-12 (Sutphin, Griffin), and it is not, in fact, the royalty-calculation methodology to which the Plaintiffs contend they are entitled, <u>see</u> Tr. at 705:25-706:6 (Brickell)("[W]e're not asking for a whole stream approach.").   <u>See also</u> note 8, <u>supra</u> (describing how Dr. Griffin apparently invented the whole stream valuation method, and suggesting that it may be a strawman methodology).

328.     The Defendants do not pay royalties on drip condensate -- except to the extent that, when what will become drip condensate is entrained in the gas at the wellhead, it causes the gas to have a higher MMBtu factor.  <u>See</u> Deposition of Sheryl Ward at 201:14-202:2 (taken March 1, 2013)(Plaintiffs' Ex. 29)(Brickell, Ward)("I'm not aware of any payments for drip condensate.").

---

[22]This sample includes coalbed methane wells, however, which, under Dr. Griffin's calculation, uniformly benefit from the keep-whole method over the whole-stream method, because coalbed methane wells yield no NGLs -- and thus reap no added benefits from the whole stream method -- but would be exposed to some additional deductions under the whole stream method.  <u>See</u> Tr. at 707:18-708:4 (Brickell, Griffin).

329.    The Defendants do not pay royalties on processed NGLs -- except to the extent that, when what will become drip condensate is entrained in the gas at the wellhead, it causes the gas to have a higher MMBtu factor.  See Stipulation ¶ 18, at 4; Tr. at 440:7-17 (Sutphin, Ward); Kaplin Expert Report at 6.

330.    The industry practice regarding paying lessors for the value of drip condensate is in a state of flux.  See Tr. at 195:1-10 (Brickell, Ley); id. at 858:15-24 (Sheridan, Terry); id. at 858:24-859:11 (Sheridan, Terry); Kaplin Expert Report at 3.

331.    ConocoPhillips also has working interests in the San Juan Basin, and pays its burdening royalty owners for both gas proceeds and NGL proceeds.  See Kaplin Expert Report at 3.

332.    For example, Westfall, who owns royalties burdening ConocoPhillips as well as WPX Production, receives over fifty percent more per MMBtu from ConocoPhillips than he does from WPX Production.  See Tr. at 195:1-10 (Brickell, Ley).

333.    Enterprise has gathering contracts that provide that it -- Enterprise, rather than the well-lessors -- gets to keep the full value of all drip condensate recovered.  See Tr. at 858:15-24 (Sheridan, Terry).

334.    Arrangements such as Enterprise's "ha[ve] become more common over time." Tr. at 858:24-859:11 (Sheridan, Terry).

335.    Williams Four Corners has "keep whole" contracts with producers in addition to WPX Production and WPX Rocky Mountain, including large unaffiliated producers like ConocoPhillips, BP, XTO, and Devon, as well as, with smaller independent producers.  See Tr. at 580:3-16 (Emory, Sutphin); Chart of Williams Four Corners Keep Whole Agreements (Defendants' Ex. 201)(listing thirty-eight keep-whole agreements).

336.     There are technical challenges associated with paying exact well-by-well royalties on drip condensate.

337.     Not all class wells produce drip condensate, because coalbed methane does not produce NGLs of any kind.  <u>See</u> Tr. at 568:3-575:25 (Emory, Sutphin).  <u>See also</u> Tr. at 136:2-137:1 (Reineke, Berge).

338.     Gas' chemical composition is also relevant to drip condensate production: only class wells that produce pentanes and heavier hydrocarbons have the potential to produce drip condensate.  <u>See</u> Tr. at 568:3-575:25 (Emory, Sutphin).  <u>See also</u> Tr. at 137:8-138:6 (Reineke, Berge).

339.     Drip condensate production also largely depends on gas pressure and temperature in the gathering system.  <u>See</u> Tr. at 568:3-575:25 (Emory, Sutphin).

340.     Gas composition, pressure, and temperature vary over time, including during the class time period in this case.  <u>See</u> Tr. at 568:3-575:25 (Emory, Sutphin).

341.     A well's gas composition, however, does not vary by much over time.  <u>See</u> Tr. at 210:16-211:22 (Sheridan, Ley).

342.     While the total amount of drip condensate produced in a gathering system is ascertainable, a detailed engineering analysis, on a well-by-well basis, is required to accurately allocate the drip condensate quantities among the various wells involved.  <u>See</u> Tr. at 568:3-575:25 (Emory, Sutphin).

343.     Such an engineering analysis must take into account gas composition, temperature and pressure.  <u>See</u> Tr. at 568:3-575:25 (Emory, Sutphin).  <u>See also</u> Tr. at 642:10-643:25 Emory, Sutphin).

344.    There is an exception to the general rule that the Defendants pay the class on a keep-whole basis: for "at least two wells committed to the 372K gathering contract" -- which, between royalty and overriding royalty interests, affects 99 class members -- the Defendants pay royalty on the basis of NGLs.  See Stipulation at 4 n.6; Tr. at 452:8-18 (Sutphin, Ward).

### b.    Compensation for Gas Used Off the Lease.

345.    Production from all wells must be compressed to enter a gathering system and/or plant.  See Tr. at 577:7-580:2 (Emory, Sutphin).

346.    As the raw gas travels along the gathering system, it typically passes through one or more compressor stations, which increases the pressure of the gas to levels necessary to keep it moving along the gathering system and delivers it to a treating or processing plant.  See Tr. at 100:12-23 (Brickell, Reineke).

347.    These compressor stations are powered by gas within the lines, i.e., gas on which the class members are owed royalty.  See Tr. at 100:18-23 (Brickell, Reineke).

348.    Gas is also used on the lease itself; this gas is known as "lease use" gas.  Tr. at 443:3-7 (Brickell, Emory).

349.    WPX Production does not pay royalty on lease use gas, nor is it required to pay anything if the lease involved has a free use clause.  See Tr. at 442:8-443:15 (Ward, Sutphin).

350.    The monthly check stubs issued that the Defendants issue to the class members do not report volumes of gas that the Defendant-lessees used.  See Ley Expert Report at 8, 12.

351.    The check stubs reflect only the quantity of gas that the Defendants actually royalty on, which has -- silently built into it -- a reduction from the gross production quantity to account for "used" gas.  COGIS -- Monthly Well Production at 1 (Plaintiffs' Ex. 231).  See Tr. at 124:6-125:24 (Brickell, Reineke).

352.   The result of this fact is that the royalty owners never know about the portion of gas that the Defendants use; they are only informed of, and paid on, an amount that has already had used gas deducted.  See Tr. at 486:23-487:9 (Brickell, Ward).

353.   The amount of produced gas deducted as being "used" is typically in the eight-and-one-half percent range.  See Tr. at 126:8-17 (Reineke, Brickell).

354.   There are technical challenges associated with paying exact well-by-well compensation on used gas.

355.   The amount of compression required depends upon the individual well's producing pressure.  See Tr. at 577:7-580:2 (Emory, Sutphin).

356.   The more compression required, the more compression fuel used, and thus more compressor fuel costs.  See Tr. at 577:7-580:2 (Emory, Sutphin).

357.   The pressure of class wells varies significantly from well to well.  See Tr. at 577:7-580:2 (Emory, Sutphin).

358.   For example, some wells produce at 5 psi[23] and others at 200 psi.  See Tr. at 577:7-580:2 (Emory, Sutphin).

359.   Compressor fuel costs cannot be determined on a class-wide basis, and such costs must be determined on a well-by-well basis, taking into account the actual volume and pressure from any given well.[24]  See Tr. at 577:7-580:2 (Emory, Sutphin).

---

[23]A psi is a unit of pressure that stands for "pounds per square inch," which reflects the amount of force the measured fluid exerts on the walls of its container.  Pounds Per Square Inch, Wikipedia.org, http://en.wikipedia.org/wiki/Pounds_per_square_inch.  The SI unit of pressure is the Pascal (Pa), which is equal to one Newton of force applied across one square meter.  See note 6, supra.  A psi is equivalent to approximately 6,894.8 Pa.  See Pounds Per Square Inch, Wikipedia.org.

c.    **Timeliness of Payments**.

360.    WPX Production has, at times, made late payments -- i.e., payments outside of the NMPPA's forty-five day window -- and declined to pay interest on the overdue amounts.  See Tr. at 465:6-466:6.

361.    Every month, WPX Production makes numerous adjustments to prior royalty and overriding royalty payments in the form of "prior-period adjustments."  See Tr. at 454:9-458:12 (Ward, Sutphin).

362.    Many circumstances can prompt prior-period adjustments, some of which are beyond WPX Production's control, including volume changes from the gathering systems, suspense payments, and unit expansions.  See Tr. at 454:9-458:12 (Ward, Sutphin).

363.    Some prior-period adjustments are occasioned by accounting errors that WPX Production makes.  See Tr. at 454:9-458:12 (Ward, Sutphin).

364.    WPX Production evaluates whether to pay interest on prior-period adjustments on a case-by-case basis and has, on at least some occasions, paid interest on prior-period adjustments.  See Tr. at 454:9-458:12 (Ward, Sutphin); id. at 454:9-458:121 (Ward, Sutphin); id. at 463:2-21 (Ward, Brickell).

365.    It is more probable than not that WPX Production has withheld interest payments on grounds other than those that justify withholding interest under the NMPPA.[25]  See Tr. at 465:6-14 (Ward).

---

[24]The Court is somewhat skeptical that this Finding of Fact is accurate, and might make a different finding in another case, but the Plaintiffs have offered nothing to rebut the Defendants' evidence on this point.

[25]A leading WPX Energy revenue accountant tasked with handling prior-period adjustments, Sheryl Ward, did not even know that the NMPPA mandates interest payments on royalties outside the 45-day window.  See Tr. at 465:6-14 (Ward).

### d.  **Cost Deductions**.

366.    For royalties paid on New Mexico production committed to a gathering contract with parties other than Williams Four Corners, WPX Production deducts a proportionate share of actual charges assessed by the service provider for all post-production services, the amount for which is determined by contract, plus applicable state production taxes, and state and federal income tax, when required to be withheld.  See Stipulation ¶ 19, at 4-5.

367.    On independently gathered wells, if the gas is processed for the removal of NGLs, WPX Production deducts a proportionate share of any applicable processing fees, plant fuel, processing taxes, and costs associated with transportation and fractionation of NGLs from any royalty payment associated with said NGLs.  See Stipulation ¶ 19, at 5.

368.    For royalties paid on New Mexico production committed to a gathering contract with Williams Four Corners and its predecessors, WPX Production deducts a uniform cost of service ("COS") charge per MCF from each New Mexico class member on the Williams Four Corners gathering system, regardless of the actual costs attributable to each well/lease of rendering the gas into marketable condition.  See Mathis Depo. at 104:1-16 (Brickell, Mathis); Kaplin Expert Report at 5.

369.    The Defendants assessed a COS charge throughout the entire class period -- 1985 to present -- although its magnitude fluctuated throughout the period.  See Mathis Depo. at 107:13-20 (Brickell, Mathis).

370.    Williams Four Corners computes the COS charge and relays it to WPX Production, who assesses it against the royalty.  See Tr. at 511:9-23 (Sutphin, Miller).

371.    The Defendants assess the same COS charge against the federal government that they do against private lessors; the class COS charge is calculated pursuant to 30 C.F.R.

§ 1206.157(b), which regulates the expenses that working interests owners of federal land may deduct when the gas is sent to an affiliate.  See Tr. at 504:17-22 (Sutphin, Miller).

372.     Williams Four Corners recomputes the COS charge annually, and it is based on an even breakdown of: (i) the "hard" costs of gathering, compressing, treating and processing gas; and (ii) the "soft" costs of office overhead and depreciation on plant; and (iii) costs not actually sustained, i.e., profit.  See Tr. at 182:23-183:14 (Brickell, Ley); id. at 476:12-15 (Brickell, Ward); Kaplin Expert Report at 5.

373.     The components of the COS charge are all permissible for federal royalties, but the class members are not the federal government, and the class members' royalties are governed by their leases, and not by federal regulations.  See 30 C.F.R. § 1206.157.

374.     The COS charge is enumerated on the check stubs as a "gathering" charge, even though it is not limited to the costs of gathering.  See Tr. at 122:14-20 (Brickell, Reineke).

375.     The COS charge does not include a component for any marketing expenses that WPX Production incurs; WPX Production does not pass on marketing expenses to the royalty owners.  See Tr. at 453:22-454:8 (Ward, Sutphin)("To my knowledge, we have never deducted marketing charges to San Juan royalty owners."); id. at 466:10-18 (Ward, Sutphin).

376.     WPX Production deducts federal and state taxes from their royalty payouts, in keeping with the law.  See Stipulation ¶ 14, at 3.

377.     The Defendants calculate the profit or "rate of return" component of the COS by multiplying the undepreciated balance of gathering assets times the Triple B bond rate, by a 1.3 percent inflation factor.  Tr. at 181:17-182:3 (Brickell, Ley).  See Tr. at 509:17-511:8 (Miller, Sutphin).  See also C.F.R. § 1206.157.

378.     The COS charge's profit component comes out to around four-and-a-half percent of the total of the real-expense components.  See Tr. at 510:11-20 (Sutphin, Miller).

379.     The Defendants do not assess a COS charge on the Colorado wells.  See Stipulation ¶ 14, at 3.

380.     WPX Production does not assess a COS charge on the non-Williams Four Corners wells; rather, it passes on a proportional share of the charge that the independent gatherer invoice to it.  See Tr. at 153:23-154:2 (Reineke, Brickell).

381.     As a part of WPX Production's affiliate gathering contract with Williams Four Corners, WPX Production pays Williams Four Corners a gathering rate that is typically higher than the COS charge it assesses against royalty owners.  See Tr. at 449:7-19 (Ward, Sutphin).

382.     In one month analyzed, the contract rate for gathering was $1.39 and the COS rate was $.85, approximately sixty-one percent of the contract rate.  See Tr. at 449:20-451:25 (Ward, Sutphin); Electronic Mail Transmission from Sheryl Ward to Robert Sutphin at 1 (Defendants' Ex. 131).

383.     The WPX Production-Williams Four Corners contract is, however, an affiliate contract, as, even the contract now in place was executed at a time when both parties were owned by the same entity.

384.     Moreover, contracts between WPX Production and a gathering company -- whether Williams Four Corners or a third-party company -- do not alter the royalty that WPX Production owes the class members under their leases.

       e.     **Averaging of Payments Across Leases.**

385.     Before some point in 2001, the Defendants paid all royalty owners on the basis of a WASP.  See Tr. at 170:10-171:2 (Brickell, Ley); Responses and Objections of WPX to

Plaintiffs' "Non-Prioritized" Interrogatories at 14 (Plaintiffs' Ex. 221)(response to interrogatory no. 8); Mathis Depo. at 40:24-41:14 (Brickell, Mathis).

386.    The WASP for the natural gas was based on the arm's length sales at the pipeline, and not on any preceding affiliate transaction.  See Tr. at 108:6-109:13 (Reineke, Brickell); Mathis Depo. at 40:24-41:14 (Brickell, Mathis).

**f.      Payments of the Basis of Index Price.**

387.    In 2000, the Defendants switched from using a WASP to using an index price to pay royalties on both well condensate and natural gas.  See Responses and Objections of WPX to Plaintiffs' "Non-Prioritized" Interrogatories at 14 (Plaintiffs' Ex. 221)(response to interrogatory no. 8).

388.    The Defendants use the OPIS Mt. Belvieu index price -- an oil index -- for well condensate.  See Stipulation ¶ 11, at 3.

389.    For natural gas, the Defendants use the index price in the first-of-the-month Platt's Inside FERC San Juan Gas Market Report for El Paso Natural Gas Company.  See Stipulation ¶ 11, at 3.  See also Tr. at 102:6-11 (Reineke).

390.    An independent company, Platt's, calculates the index and publishes it in Inside FERC Natural Gas Report.  See Tr. at 817:17-823:20 (Terry, Sheridan).  See also Tr. at 114:19-23 (Reineke, Brickell).

391.    This index price is based upon actual reported sales and purchases of gas to be delivered by the seller at the El Paso pipeline location in the San Juan Basin in the particular month for which the index price is published.  See Tr. at 817:17-823:20 (Terry, Sheridan).  See also Tr. at 114:19-23 (Reineke, Brickell).

392.    This price reflects the average arm's length sale price of pipeline-quality gas, rather than wellhead-quality gas.  See Tr. at 296:9-16 (McNamara, Kaplin).

393.    Natural gas is regularly sold and purchased by unrelated sellers and buyers at the index price.  See Tr. at 821:4-13 (Terry, Sheridan).

394.    Within the oil-and-gas industry, it is generally believed that the index price reflects the market value of the gas delivered at the designated location in the month of publication.  See Tr. at 823:21-824:2 (Terry, Sheridan); id. at 138:15-20 (Reineke, Berge); id. at 287:1-288:4 (Kaplin, Berge); id. at 289:3-11 (Kaplin, Berge).

395.    To the extent that there is a "going rate" for natural gas, the indices reflect it; the federal government used to set the price of natural gas by fiat, but those days ended before the beginning of the class period.  See Tr. at 114:24-10 (Brickell, Reineke).

396.    In one comparison of the index price to the WASP, the index price was approximately $0.01 higher, and in another comparison, the WASP was slightly higher or the same.  See Tr. at 523:20-526:6 (Miller, Sutphin).

397.    The Defendants pay their federal lease royalties on the basis of an index price. See Tr. at 525:24-526:2 (Sutphin, Miller).

### g.    Affiliate Versus Arms-Length Transactions.

398.    The Plaintiffs' affiliate-transactions claim is not an independent claim, but rather a rephrasing of the index-price claim and the claim that the Defendants fail to pay royalty on NGLs; those claims and the evidence relating to them are summarized above.  See Findings of Fact 319-344, Part 6a, supra; id. 387-396, Part 6f, supra.

399.    When the Defendant-lessee -- either WPX Production or WPX Rocky Mountain -- transfers title to the gas to a gathering and/or processing affiliate -- presently

Williams Four Corners, see Findings of Fact 211-227, Part 3a-c, supra, the gathering affiliate "pays" the Defendant-lessee the index price, but no money actually changes hands, see Finding of Fact 208.

400.    The Defendants never paid royalty on an affiliate sale value that is less than the value of the index price.

401.    Additionally, when the Defendant-lessee transfers title to the gas to its gathering affiliate, it is transferring the unprocessed gas, which is effectively the gas on which it pays royalty when it pays via the keep-whole methodology.

402.    The affiliate-transaction claim is, thus, a re-packaging of their other claims.[26]

**7.    The Named Plaintiffs' and Absent Class Members' Knowledge of, and Diligence in Discovering, Their Causes of Action.**

403.    The only regular correspondence between the Defendants and the class members are the check stubs that the Defendants send to the class members conveying monthly royalty payments.

404.    The format of check stubs sent to each royalty and overriding royalty owner is uniform among the class, but has changed over time.  See Stipulation ¶ 9, at 2-3.

405.    Royalty and overriding royalty owners contact the Defendants on occasion with questions regarding their payments.  See Tr. at 727:25-728:9 (Mathis, Sutphin).

406.    The Defendants maintain a full-time position -- currently filled by Karen Furland, a WPX Energy employee -- for the purpose of receiving and resolving royalty-related questions,

---

[26]The claim could be considered a preemptive response to a very weak argument that the Defendants could potentially raise -- but have not raised -- in defense of their royalty payment practices: that they are obligated to pay the royalty owners a fraction of the sale price, but that the affiliate transactions, themselves, count as a "sale" upon which royalty can be paid.  This argument would be doomed to fail -- after all, if an affiliate sale counted as a sale for royalty-payment purposes, every producer would ensure that its first sale was to an affiliate for either no money or a token amount of money -- and the Defendants have not raised it.

and maintains records detailing royalty owner inquiries regarding royalties.  See Tr. at 725:3-727:8 (Mathis, Sutphin); id. at 726:4-6 (Sutphin, Mathis).

407.   Class members have, at times, inquired about issues relating to their royalty payments long before the Plaintiffs filed this lawsuit, including inquiries about information on check statements, see Customer Service Hotline Inter Office Call Sheet (Defendants' Ex. 80), post-production deductions, see Customer Service Hotline Inter Office Call Sheet (Defendants' Ex. 82), transportation charges and the COS charge, see Customer Service Hotline Inter Office Call Sheet (Defendants' Ex. 85), whether condensate payments are made, whether payments are made for natural gas liquids, and the parties to whom WPX Production sells its natural gas production, see Tr. at 728:10-16 (Mathis, Sutphin); 728:17-736:19 (Mathis, Sutphin).

408.   Anderson Trust never contacted WPX Production to ask about its payments, and never made an inquiry into whether it had a claim.[27]   See Tr. at 419:1-420:9 (Anderson, Sheridan).

409.   WPX Production did not dissuade Anderson from filing an action or from filing it before October, 2011.  See Tr. at 421:11-422:5 (Anderson, Sheridan).

410.   Various persons from Bank of America, SWMF Properties, and Moncrief Trust called WPX Rocky Mountain seeking information, including with respect to adjustments to royalty payments, and the information contained in the check detail.  See, e.g., Tr. at 729:24-730:16 (Mathis, Sutphin); Customer Service Hotline Inter Office Call Sheet (Defendants' Ex. 80).

---

[27]Anderson refused to testify as to when, where, how, and why he determined he had a claim in this case, on the basis of attorney-client privilege.  See Tr. at 420:20-421:10 (Sheridan, Anderson).  Accordingly, the Court can assume that his attorney told him that he had a claim.

411.    Munoz -- the Bank of America representative in charge of managing the Patton Trust's royalty interests -- annually reviews the Patton Trust's oil-and-gas properties and provides written comments and recommendations as a part of his job.  See Munoz Depo. at 13:49:8-14:50:18 (Munoz, Sheridan).

412.    Bank of America also employs division order analysts, title analysts and accountants in its oil and gas group; all of whom play a role in receiving checks, reviewing check stub detail, entering the information into the Bank of America system, and ensuring that its clients are paid properly.  See Munoz Depo. at 16:60:7-61:10 (Munoz, Sheridan); id. at 24:92:18-93:7.

413.    Bank of America reviewed royalty payments to the trust, but did not question or object to WPX Rocky Mountain's royalty calculation methods.  See Munoz Depo. at 5:15:14-17:14 (Munoz, Sheridan); id. at 25:97:7-26:98:21 (Munoz, Sheridan).

414.    Over the years, Westfall communicated by telephone and by letter with WPX Production and its predecessor, Williams Production Company, and never inquired about gas pricing, post-production deductions, or any other issues which are the subject of his claims in this case.  See Tr. at 307:12-308:10 (Westfall, Aubrey); id. at 312:20-24 (Westfall, Aubrey).

415.    Westfall did not discover his claims until 2010, when he began working with class counsel.  See Tr. at 337:15-338:10 (Westfall, Sutphin).

416.    From 1999 to 2000, a Colorado royalty owner and class member, Marshal Diggs, insisted that WPX Rocky Mountain[28] was prohibited from deducting post-production costs from

_____

[28]It may have been WPX Production.  The Court knows that Diggs is a Colorado royalty owner, and is, again, assuming that WPX Rocky Mountain is the lessee on Colorado leases. See note 9, supra.  The Court believes that the class members' conversations were actually with WPX Energy, which appears to handle administrative support for both Defendants.

his royalty payments.  See Royalty Owner Data Sheet and Correspondence with Marshal Diggs, filed February 21, 2014 (Doc. 212-8).

417.    After multiple exchanges of letters, WPX Rocky Mountain advised on September 13, 2000, that the royalty owner was paid on the value of gas at the wellhead, and that the sales price on his check stub "is with costs included."   See Royalty Owner Data Sheet and Correspondence with Marshal Diggs.

### 8.    Potential Damage-Calculation Models.

418.    Computerized database records are still in existence for most, if not all, of Defendants' accounting periods herein described for potential damages calculations.  See Emory Expert Report *passim*.

419.    Metering at the wellhead enables the Court to determine the actual (i) quantity/volume of gas produced by each well, in MCFs; (ii) energy content of gas produced by each well, in MMBtus; and (iii) quantity/volume of NGLs entrained in the gas produced by each well, in GPM.  See Emory Expert Report *passim* .

420.    It is possible to determine to which plant most gas from a given well flows, but practically impossible to determine where all of the gas flows, as the gathering systems are interconnected with one another.  See Emory Expert Report ¶¶ 44-49, at 23-26 .

421.    There is already in existence a database that, among other things, matches each class well to the gathering system and plant to which the well's gas flows; this database also contains the proportion of gas processed at each plant.  See PWM Master Well Completion Database (Defendants' Ex. 168).

422.    Because not all NGLs entrained in gas at the wellhead are ultimately extracted from the gas -- i.e., some of it fails to condense into drip condensate and also gets bypassed from

processing, thus remaining in the residue gas when it is put in the pipeline -- it would require a well-by-well flow analysis to precisely attribute NGLs, including drip condensate, to the well from which they came.  See Tr. at 137:8-138:6 (Sheridan, Reineke).

423.    Late payments -- i.e., payments made outside of the NMPPA's forty-five day window -- can be easily identified, and those late payments that might potentially be justified -- i.e., those payments that are in suspense because of a title dispute -- can also be identified through the use of a class-wide query.  See Tr. at 178:18-179:8 (Brickell, Ley).

424.    Barbara Ley -- one of the Plaintiffs' experts -- has performed such a class-wide late-payments query in other oil-and-gas class actions.  See Tr. at 179:1-8 (Ley, Brickell).

## PROCEDURAL BACKGROUND

To frame the factual determinations and legal discussion, the Court will outline -- briefly and in broad strokes -- the basic factual allegations and legal arguments underlying the Plaintiffs' case, as well as the Defendants' responses thereto.  The Court will also briefly describe the -- mostly expert -- witnesses whom each side presented at the hearing, and their general topic of testimony.  The Court will later make conclusions of law to rule on the Motion.

### 1.    The Pleadings.

1.    In ruling on a class certification motion, the Court does not accept the facts alleged in the pleadings as true, but must find all facts bearing on the question of certification, even if those facts also bear on the merits of the substantive claims.  The Court is cognizant that it must not decide the merits at this stage of the case and expressly does not decide the merits of the case.  The above findings of fact are tentative and made solely to allow the Court to decide whether class certification is appropriate.

a.      **The Complaint.**

2.      The Plaintiffs filed a proposed class action in state court on December 5, 2011, and the Defendants removed the case to federal court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) ("CAFA"), just over a month later.   Notice of Removal ¶ 1, at 1, filed January 12, 2012 (Doc. 1).   See id. ¶ 5, at 2.   The Plaintiffs did not move to remand the case to state court, and -- after several rounds of amended pleadings and motions to dismiss -- they filed the current iteration of their Complaint in August, 2013.   See Complaint ¶ 8, at 3 (conceding that the Court has subject-matter jurisdiction over the case pursuant to CAFA).   The Plaintiffs allege that they are non-cost bearing owners of oil and gas leases -- landowners who leased their land to oil companies in exchange for a cut of any proceeds from hydrocarbons drilled out of the land -- and that the Defendants are working interest owners -- oil companies that drill on the Plaintiffs' land, and pay the Plaintiffs an amount based on the profitability of the land.   See Complaint ¶¶ 9-12.   They seek to obtain class status under rule 23 to represent "themselves and . . . all other owners of 'non-cost bearing interests in the [class] wells.'"   Complaint ¶ 13, at 6.

3.      The Plaintiffs allege that the proposed class members, or their predecessors, acquired their interests in the hydrocarbon revenues from the subject wells through executing oil-and-gas mining leases or permits with the Defendants.   See Complaint ¶ 11, at 4.   The Plaintiffs assert that, under the leases, the Defendants owe the Plaintiffs a "duty to pay royalties on all hydrocarbons" for the value or price which the Defendants do or should receive from the "arm's length" sale of the hydrocarbons.   Complaint ¶ 12, at 5.   The Plaintiffs argue that the leases give them a right to royalties in the "drip condensate," a liquid product which is recovered during the Defendants' oil and gas mining processes.   Complaint ¶ 28, at 12-13.   The Plaintiffs assert that the leases do not provide that the Defendants may calculate the Plaintiffs' royalty payments

using the average sale price of a mixture of hydrocarbons from wells in which the Plaintiffs own a royalty interest and other wells in which the Plaintiffs do not own royalty interests.  See Complaint ¶ 12, at 5-6.

4.     The Plaintiffs initially alleged numerous claims, but, after two partially successful motions to dismiss, see MO, 952 F. Supp. 2d 979; MOO, 27 F. Supp. 3d 1188, only six causes of action remain: (i) the first cause of action, "failure to pay royalty on volumes of hydrocarbons, including drip condensate," Complaint ¶¶ 22-30, at 10-13 (capitalization altered for readability); (ii) the second cause of action, "breach of the duty of good faith and fair dealing," Complaint ¶¶ 31-42, at 14-17 (capitalization altered for readability); (iii) the fourth cause of action, violation of the NMPPA and "interest due under Colorado law," Complaint ¶¶ 56-61, at 20-21 (capitalization altered for readability); (iv) the fifth cause of action, "bad faith breach of contract," Complaint ¶¶ 62-66, at 21-22 (capitalization altered for readability); (v) the sixth cause of action, a claim for declaratory relief, see Complaint ¶¶ 67-70(b), at 22-23; (vi) the eleventh cause of action, "breach of the duty to market hydrocarbons -- Colorado," Complaint ¶¶ 98-101, at 30-31 (capitalization altered for readability).

> ### b.     The Answer.

5.     The Defendants answered the Complaint after all briefing on the Motion was completed and the Court had already held the class certification hearing.  See WPX Energy's Answer to Plaintiffs' Fourth Amended Complaint, filed June 16, 2014 (Doc. 249)("Answer"). The Defendants deny almost all of the Plaintiffs' allegations, see Answer ¶¶ 1-105, at 1-11, with the exception of a few background facts such as "that the named Plaintiffs own royalty and/or overriding royalty interests in leases on which WPX has drilled, operated and/or produced

wells," Answer ¶ 23, at 5.   The Defendants admit "that the putative class, as defined by Plaintiffs, contains more than 1,000 members."  Answer ¶ 14, at 4.

6.       The Defendants also assert thirty-five affirmative defenses.  See Answer ¶¶ 1-35, at 11-13.  First among them are two defenses, "failure to state a claim upon which relief can be granted," Answer ¶ 1, at 11, and "statute of limitations or the corresponding equitable doctrine of laches," Answer ¶ 2, at 11, on which the Court has already ruled in some fashion.  The Court has ruled on all arguments for failure to state a claim in two prior motions under rule 12(b)(6), resulting in the dismissal of several claims not listed here.  See MO at 154-55; MOO at 95.  The Court also declined to dismiss any claim, in whole or in part,[29] on limitations grounds, because the Plaintiffs present a plausible claim that the discovery rule delayed the accrual of the statute. See MOO at 60-61; id. at 69-81.  The Court made clear, however, that the Plaintiffs carry the burden of establishing the applicability of the discovery rule at trial, and, thus, the Defendants' time bar defenses remain viable.  See MOO at 78.

7.       The other defenses that the Defendants plead are: (i) that "[a]ll or part of Plaintiffs' claims are barred by Plaintiffs' own breach of contract or breach of their corresponding duty of good faith and fair dealing," Answer ¶ 3, at 11; (ii) waiver doctrine, see Answer ¶ 4, at 11; (iii) estoppel, see Answer ¶ 5, at 11; (iv) that the express terms of the contract control and bar all claims, see Answer ¶ 6, at 11; (v) that the Plaintiffs "acquiesce[d] in a continuous course of dealing, industry custom and practice and/or usage of trade," Answer ¶ 7, at 12; (vi) that Plaintiffs were unjustly enriched by royalty overpayments, see Answer ¶ 8, at 12;

---

[29]The Court uses the term "dismiss in part" to refer to cutting off damages for conduct that occurred more than four-to-six years before the commencement of this action in state court. Four years is the statute of limitations applicable to the second, fourth, and eleventh causes of action, and six years is the limitations period applicable to the first, fifth, and sixth causes of action.  See MOO at 61.

(vii) that the Defendants are entitled to recoup royalty overpayments, see Answer ¶ 9, at 12; (viii) that the Defendants are entitled to a set-off against future payments, and presumably against any damages awarded against them, on the basis of past royalty overpayments, see Answer ¶ 10, at 12; (ix) accord and satisfaction, see Answer ¶ 11, at 12; (x) collateral estoppel and/or res judicata, see Answer ¶ 12, at 12; (xi) that the Plaintiffs failed to meet conditions precedent of their leases, see Answer ¶ 13, at 12; (xii) election of remedies, see Answer ¶ 14, at 12; (xiii) that the Plaintiffs failed to fully perform under the leases, see Answer ¶ 15, at 12; (xiv) the impossibility doctrine, see Answer ¶ 16, at 12; (xv) that the Plaintiffs "are improper party plaintiffs," Answer ¶ 17, at 12; (xvi) that the Plaintiffs lacked authority, see Answer ¶ 18, at 12; (xvii) that the Plaintiffs lacked capacity, see Answer ¶ 19, at 12; (xviii) failure of consideration, see Answer ¶ 20, at 12; (xix) lack of standing, see Answer ¶ 21, at 12; (xx) misrepresentation and/or fraud, see Answer ¶ 22, at 13; (xxi) lack of mutual consent, see Answer ¶ 23, at 13; (xxii) mistake, see Answer ¶ 24, at 13; (xxiii) "failure to name and/or join necessary and/or dispensable parties," Answer ¶ 25, at 13; (xxiv) novation, see Answer ¶ 26, at 13; (xxv) payment, see Answer ¶ 27, at 13; (xxvi) "prior breach and/or abandonment," Answer ¶ 28, at 13; (xxvii) ratification, see Answer ¶ 29, at 13; (xxviii) release, see Answer ¶ 30, at 13; (xxix) statute of frauds, see Answer ¶ 31, at 13; (xxx) unclean hands doctrine, see Answer ¶ 32, at 13; (xxxi) unconscionability, see Answer ¶ 33, at 13; (xxxii) that the request for punitive damages, specifically, is unconscionable, see Answer ¶ 34, at 13; and (xxxiii) arbitration and award, see Answer ¶ 35, at 13.

**2.      The Pre-Hearing Briefing on the Motion.**

8.      The Plaintiffs filed their Motion on January 6, 2014, and the Defendants responded a little over a month later by filing the Defendants' Response in Opposition to

Plaintiffs' Motion for Class Certification, filed February 17, 2014 (Doc. 205)("Response").  The

Plaintiffs replied roughly two weeks after with the Plaintiffs' Reply to Defendants' Response in

Opposition to Motion for Class Certification, filed March 3, 2014 (Doc. 216)("Reply").   The

Court held the class certification hearing a week after the Plaintiffs filed their Reply.

> ### a.     **The Plaintiffs' Motion.**

9.     The Plaintiffs propose the following class definition:

> All persons or entities who own non-cost bearing interests, which are subject to oil and gas leases productive of natural gas and other hydrocarbons, now owned or previously owned in whole or in part by WPX and its predecessors by name change, conveyance or acquisition in the States of New Mexico and Colorado.
>
>> a.     All gas and other hydrocarbons shall include, but not be limited to natural gas, oil, condensate, casinghead gas, natural gas liquids, and all hydrocarbons entrained with natural gas, regardless of where such hydrocarbons are captured or obtained, inclusive of coalbed methane, shale gas, shale oil, drip condensate, or any other substance or material which consist of or is commonly accepted as a hydrocarbon;
>>
>> b.     Non-cost bearing interests shall include owners of royalty, overriding royalty and other forms of non-participating mineral rights; and
>>
>> c.     The Class time period encompasses claims accruing from January 1, 1985 through the present and the period for which relief is granted in the future.
>
> EXCLUSIONS:       The following persons or entities are excluded from the proposed Class: (i) Defendants and any of their wholly owned affiliates, parents or commonly owned subsidiaries through a common parent; (ii) all state or federally owned interests; (iii) Indian Tribe interests held in federal trust; and (iv) all interests encompassed by the settlement and/or ongoing litigation in Lindauer v. Williams Production RMT Co., No. 2006 CV 317, Garfield County, Colorado.
>
> The proposed Class is geographically designated and limited to the State of New Mexico and La Plata County, Colorado, and WPX's oil and gas leasehold located therein, owned by WPX, as to Plaintiffs' claims and causes of action.

Plaintiffs also propose the following subclasses:

Subclass 1:    Subclasses as between the members who own under WPX's oil and gas leases located in the State of New Mexico versus the State of Colorado;

Subclass 2:    Subclasses as between putative class members whose wells are productive of hydrocarbons from the Fruitland Coal formation, also known as coalbed methane, versus conventional gas, inclusive of all other productive formations;

Subclass 3:    Subclasses as between putative class members' hydrocarbons which are gathered on systems and equipment owned by Williams Four Corners, a wholly owned affiliate of the Defendants at all critical times and its corporate predecessors by name change or conveyance, versus those putative class members hydrocarbons which are gathered and/or processed by true third party entities such as Enterprise San Juan Gathering.

Plaintiffs' PF ¶¶ 20-22, at 10-11 (numbering omitted). See Motion at 3-4.

10.    The Plaintiffs assert twelve common questions of fact and fourteen common issues of law. See Motion at 4-7. The common questions of fact that the Plaintiffs assert are:

1.    Whether underpayments result from transactions with affiliate entities? . . . .

2.    Whether proper payment for natural gas hydrocarbons can be based upon an index or "posted" price, rather than the amounts actually received by WPX and its affiliates for the natural gas produced from the putative class members' wells?

3.    On all wells gathered on the affiliate Williams Four Corners gathering systems, whether the Plaintiffs and putative class members payments should be based upon the BTU equivalent of the natural gas production only, when WPX affiliates enjoy the higher values of the natural gas liquids, which are separated by processing and sold in a commercial marketplace? . . . .

4.    Whether payment is required to the Plaintiffs and putative class members on the value and proceeds received for the sale of oil and drip condensate and the value of natural gas consumed "in kind" by WPX and it affiliates used as fuel in various field operations, such as well site compression, gathering system compression and plant fuel?

> 5.    Whether the deductions subtracted from all putative class members' interests whose hydrocarbons are gathered on systems owned by affiliate Williams Four Corners are lawful? . . . .
>
> 6.    Whether all putative class members' interests in Colorado oil and gas production were properly charged for expenses related to obtaining a marketable product for the natural gas and other hydrocarbons produced in the State of Colorado, at least up to the year 2000? . . . .
>
> 7.    Whether Damages were caused by the breach of good faith and fair dealing by and through the misrepresentations of WPX in their communications to the Plaintiffs and putative class members? . . . .
>
> 8.    Whether the imposition of marketing charges, at certain times, was lawful?
>
> 9.    Whether the putative class members' pre-2001 payments can be based on a "weighted" average price, rather than the value received from the sale of hydrocarbons from the various Plaintiffs' and putative class members' wells?
>
> 10.   Whether any Class Claims are barred by the Defendants' allegations that a statute of limitations applies?
>
> 11.   Whether the interest is due the putative class members on payments made late, after the statutory period, in New Mexico and Colorado[?]
>
> 12.   An additional Class 'question of law" is whether the "Marketable Condition Rule" applies as "a matter of law" to the Plaintiffs and putative class members.

Motion at 4-6.  The Court notes that most of these alleged "common questions of fact" are, on their face, legal questions -- most obviously number 12, but also numbers 2-5 and 8-11, as interpreting the content of a contract is a legal function of the Court, and not a fact-finding function.  These questions might, however, be common questions of law.

> 11.   The Plaintiffs assert the following common issues of law:
>
> 1.    Do the check stubs issued by WPX violate any legal duties owed to the putative class members under New Mexico statutes or common law?
>
> 2.    Whether WPX owe a duty of good faith and fair dealing to the putative class members?

3.      Must the putative class members bear a share of actual and reasonable costs associated with placing the hydrocarbons, including natural gas, into marketable condition? . . . .

4.      At what point in the process of treatment, separation, transportation, processing and compression do the various hydrocarbons produced from the Plaintiffs and putative class members wells become marketable, i.e. at the well head, in the gathering system, at the tailgate of the processing facility, at the fractionator, or at the interstate pipeline, etc?

5.      Are the Plaintiffs entitled to receive the price WPX and its affiliates received in the first arm's length sale transaction for their share of revenues from the hydrocarbons produced and sold from their wells?

6.      Which, if any, of the putative class members' claims are barred by the affirmative defense of the statute of limitations?

7.      Can the putative class members' share of revenues be based upon an index value when WPX and its affiliates receive a higher value for said hydrocarbons?

8.      Whether WPX has a duty to obtain the highest price and best terms for the hydrocarbon products on behalf of putative class members?

9.      Are the putative class members entitled to receive interest and at what rate on revenue payments made after the statutory time period has expired?

10.     Do any communications from WPX constitute notice of a claim for statute of limitations purposes?

11.     Do "discovery" rules apply for statutes of limitations purposes to the claims of the putative class members against WPX?

12.     Do the actions of WPX constitute a tortious breach of their contractual obligations under state(s) law?

13.     Does WPX owe an implied duty to market and do (did) WPX' actions constitute a breach of said duty?

14.     Do uniform misrepresentations or omissions satisfy the element of reliance and/or scienter in the putative class members' fraud or constructive fraud claims?

Motion at 6-7.

12.     The Plaintiffs assert that the Defendants' dealings with numerous affiliates in transporting, processing, and marketing the natural gas and other hydrocarbons from Plaintiffs' and proposed class members' wells has resulted in the systemic failure to calculate either appropriate revenues from sales or any unlawful deductions from Plaintiffs' and proposed class members' royalties.  See Motion at 8.  The Plaintiffs contend that lessees must make diligent efforts to market production so the lessor may realize the full value of his royalty interest.  See Motion at 11 (citing Darr v. Eldridge, 66 N.M. 260, 364 P.2d 1041 (1959); Libby v. DeBaca, 51 N.M. 95, 179 P.2d 263, 265 (1947)).  They argue that "[n]one of the Plaintiffs' or putative class members' leases and overriding royalty assignments authorizes payment based on an 'index' price[, but that] all of WPX'[s] payments since approximately 2001 have been based upon an index price[], rather than the proceeds of arm's length sales."  Motion at 11.  They assert that "[t]he lessee must have the interest of the lessor in mind when marketing the product," Motion at 11 (citing Elliott Indus. LP v. BP Am. Prod. Co., 407 F.3d 1091, 1113 (10th Cir. 2005)("Elliott")), but that "WPX decided that none of its sales of hydrocarbons concerned the putative class members' interests," Motion at 11 (citing Mathis Depo. at 69:13-23; id. at 71:23-24; id. at 72:1-3; id. at 72:17-22; id. at 183:15-25).

13.     The Plaintiffs assert that the Defendants use a "standardized approach to payment of all putative class members."  Motion at 13.  They contend that this standardization renders the case comparable to two Supreme Court of New Mexico cases, Davis v. Devon Energy Corp., 2009-NMSC-048, ¶ 9, 147 N.M. 157, 161, 218 P.3d 75, 79, and Phillis Ideal v. Burlington Resources Oil & Gas Co. LP, 2010-NMSC-022, 148 N.M. 228, 233 P.3d 362, 364, in which class certifications were granted.  See Motion at 13 (citing those cases).  They assert that "WPX does not even review the Plaintiffs' or putative class members' lease terms prior to payment of

royalty and has never made any differences in payment methodology to any of the putative class members."  Motion at 13-14 (citing Mathis Depo. at 33:5-12; id. at 36:9-24; id. at 39:15-17). The Plaintiffs assert that the Defendants used a WASP method to pay all Plaintiffs and proposed class members, and that none of those leases authorize this method of payment.  See Motion at 15-16.  They argue that "[w]hether this methodology is appropriate and results in proper payment of royalty, is a common, predominate Class question."  Motion at 16.

14.      The Plaintiffs argue that every contract in New Mexico imposes a duty of good faith and fair dealing in the performance and enforcement of a contract.  See Motion at 16 (citing Watson Truck and Supply, Co. v. Males, 111 N.M. 57, 801 P.2d 639, 642 (1990); Continental Potash, Inc. v. Freeport-McMoran, 1993-NMSC-039, ¶ 64, 115 NM 690, 706-07, 858 P.2d 66, 82-83.  They assert that this duty applies to oil-and-gas leases, as well as to assignments of overriding royalty interests.  See Motion at 16.  They concede that a breach of this covenant requires evidence of bad faith or that one party intentionally used the agreements to the detriment of the other party.  See Motion at 16.  The Plaintiffs assert that, as between the Defendants and the proposed class members, the Defendants have failed to pay all proposed class members on what they received for the hydrocarbons, which they could only produce by obtaining these leases from the class member in the first place.  See Motion at 16.  They state that, after the Defendants obtained the benefit of valuable hydrocarbons under the putative class members' leases, they refused to pay the value it received to the very person who allowed it to produce these hydrocarbons from their mineral interests.  See Motion at 16.  They characterize the Defendants' testimony as not "allow[ing] the putative class members the benefit of the sales process it (and WPX affiliates) enjoys."  Motion at 16 (citing Mathis Depo. at 72:22-25; id. at 73:1-7; id. at 73:17-20; id. at 183:15-25).

15.    The Plaintiffs also assert that the charges shown as "'gathering'" on the Plaintiffs'

and proposed class members check stubs "have nothing to do with the cost of gathering."

Motion at 18 (citing Miller Depo. at 77:3-16).  They quote a WPX Energy representative for the

proposition that "[t]he COS charges made to the putative class members under the term

'gathering' include a 'profit' or rate of return and office overheard."  Motion at 19 (citing Miller

Depo. at 69:13-25).  They also assert that the Defendants wrongfully withheld all payment for

drip condensate.  See Motion at 20 (citing Ward Depo. at 201:1-14; id. at 202:1-2).  Last, the

Plaintiffs outline the legal argument for their claims regarding the Colorado wells:

> While WPX claims its actions in Colorado to eliminate all "post production"
> charges were in "good faith", the law was clear by 1994, that in Colorado it was
> the lessees' duty to pay all costs necessary to place the hydrocarbons in
> marketable condition, was at the sole expense of the lessee, including the owners
> of an overriding royalty interest.  See Garman v. Conoco, Inc., 886 P.2d 652, 659
> (Colo. 1994).  Further, the types of cost to be born solely by the lessee were made
> clear in Garman, including, but not limited to gathering, compressing,
> dehydrating, and separating or transporting the gas into the market pipeline.  See
> Garman, 658.  Garman states the relationship between the parties specifically
> provides for a "free ride" to the lessors on costs incurred to establish marketable
> production.  Garman further states, "An overriding royalty interest is, first and
> foremost, a royalty interest. . . .  [I]t is an interest in oil and gas produced at the
> surface, free of the expense of production."  Later, Rogers v. Westerman Farm
> Co., 29 P.3d 887 (Colo. 2001), also held that under the implied covenant to
> market, the lessee has a duty to make the gas marketable and costs incurred to
> make the gas marketable must be born solely by the lessee.

Motion at 21 (omission in original).

16.    The Plaintiffs attach three exhibits to their Motion: a set of interrogatory

responses, see Responses and Objections of WPX to Plaintiffs' "Non-Prioritized"

Interrogatories, filed January 6, 2014 (Doc. 194-1)("Selected Interrogatories");[30] a table of

affiliate transactions between various WPX affiliates, see WPX Gas Title Transfer Table, filed

---

[30]The Court will cite to CM/ECF's pagination -- at the top right in blue -- rather than the
exhibit's internal pagination, because the latter is not internally consecutive.

- 86 -

January 6, 2014 (Doc. 194-2); and a contract between Williams Four Corners and WPX Gas

Resources, see Gas Gathering, Processing, Dehydrating and Treating Agreement Between

Williams Four Corners and WPX Gas Resources Company, filed January 6, 2014

(Doc. 194-3)("WFC-WPX Contract").   The Selected Interrogatories contain two responses that

the Plaintiffs underline for emphasis.   First, in "Interrogatory No. 5," the Plaintiffs ask the

Defendants:

> Do you contend that any part of the payments made by you to the Plaintiffs constitutes a payment or partial payment for statutory interest due on late payments; or for unpaid, underpaid or incorrect royalty and/or overriding royalty, which payment would encompass the Plaintiffs' claims of underpayment herein?  Have any such payments been paid to any putative class members?  If any have been paid, please identify by date, amount and payee.

Selected Interrogatories at 2 (emphasis omitted).

17.     After a series of objections, the Defendants respond:

> Without waiving these objections, WPX states that it has not paid interest to the named Plaintiffs.  WPX further states that for periods of time which may be applicable to Plaintiffs' claims in this matter, it has paid interest to certain putative class members.  Because of the number of putative class members, the time period at issue, the nature of WPX's royalty accounting system, and the legacy systems that have been utilized for royalty accounting in the past (some of which are not reasonably available today), the burden of the requested discovery outweighs its likely benefit, considering the needs of the case and the importance of the discovery in resolving the issues.  Fed. R. Civ. P. 26(b)(2)(C)(iii).
>
> Further, without waiving the foregoing objections and by means of compromise, WPX agrees to identify any such payments to putative class members to the extent WPX intends to rely on those payments as part of its class certification defense.   WPX will respond to the interrogatory (either by supplementation required by Fed. R. Civ. P. 26(e) or by providing responsive documents pursuant to Fed. R. Civ. P. 33(d)) to the extent it, as part of its class certification defense, "contends that any part of the payments constitute . . . statutory interest due on late payments or . . . royalty, which payment would encompass the [putative class members] claims of underpayment herein."

Selected Interrogatories at 3 (emphasis in original)(omissions in original).   The Selected

Interrogatories include a second question and answer, "Interrogatory No. 8," which asks:

- 87 -

> State all methods, formulas, procedures and or systems you have used in calculating the price of natural gas shown on the check stubs of the putative class of royalty and overriding royalty interest?  If those methods/systems have changed since January 1, 1990, describe the changes, and how and when each occurred.

Selected Interrogatories at 4 (emphasis omitted).

18.    After again objecting to the question, the Defendants responded:

> WPX further states that, <u>since approximately 2000, it has calculated royalties and overriding royalties for natural gas on the basis of the San Juan index</u> as described in response to Interrogatory No. 1.  WPX also states that, <u>prior to that time, it calculated royalties</u> and overriding royalties for natural gas on the basis of a <u>weighted average price structure</u>.

Selected Interrogatories at 4 (emphasis in original).

19.    The Plaintiffs also call the Court's attention to the following language in the WFC-WPX Contract:

> **1.    COMMITMENTS**
>
> **1.1    Shipper's Dedication.** Shipper dedicates to Williams for Gathering, Processing, Dehydrating and Treating all of Shipper's present and future right, title, and interest in the Gas produced from or attributable to the Area of Interest more particularly described in Exhibit "B" "Shipper's Gas. This dedication and commitment is a covenant running with the land.  To give the public notice of the existence of this Agreement and the aforementioned dedication hereunder, Shipper shall execute, acknowledge and deliver to Williams, at Williams' request, a fully recordable memorandum of this Agreement.  Shipper <u>also dedicates to Williams for Gathering, Processing, Dehydrating and Treating all of Shipper's present</u> and future right, title, and interest in <u>the Gas produced from any well upstream from and connected to the Receipt Points</u> on or after the date of this Agreement.  Shipper warrants that it has the authority to make such dedications.
>
> . . . .
>
> **1.6    Gathering Fuel and Plant Fuel In-Kind and Compression Fuel Reimbursement.**

a.      Gathering and Plant Fuel In-Kind.  Shipper
shall provide to Williams Shipper's share of
Gathering Fuel and Plant Fuel.  Williams
shall give Shipper written notice of the San
Juan conventional system Gathering Fuel
and Plant Fuel percentages that will be in
effect during the upcoming year.  These fuel
percentages shall be based on actual usage
during periods of normal operation of the
Gathering System and/or Plant during the
previous calendar year, but may be adjusted
by Williams when necessary to improve
accuracy.    Williams  may  utilize  fuel
percentages based on estimated use for any
new Gathering System and/or Plant that has
not been in operation for a full calendar
year, which may be adjusted when necessary
to improve accuracy.  Williams shall have
the right, with sixty (60) days prior written
notice, to shorten the fuel calculation and
notification period from a calendar year to a
calendar quarter, after which the calculation
shall remain on a calendar quarter basis
through  the  term  of  the  Agreement.    If
Shipper's Gas hereunder flows in multiple
Gathering Systems and/or is processed by
multiple Plants, Williams may calculate a
fuel percentage based on an average of the
applicable Gathering Systems and/or Plants.
In  no  event,  however,  shall  combined
Gathering Fuel and Plant Fuel exceed six
and one-half percent (6.5%).

In the event Williams utilizes electric power
in lieu of gas fuel for operation of any of the
Williams Facilities, Shipper's Fuel for such
facility shall then be Shipper's pro rata share
of such power required, and shall be billed
in addition to other fuel requirements or fees
hereunder, provided that the amount charged
for such electric power when combined with
Gathering Fuel and Plant Fuel taken in kind
pursuant  to  the  foregoing  paragraph,  shall
not exceed an amount equivalent to six and

one-half percent (6.5%) of Shipper's Receipt Point MMbtu.

    b.    <u>Compression Fuel Reimbursement</u>.  In <u>addition to Gathering and Plant Fuel</u> as provided in Section 1.7(a) <u>Shipper shall pay Williams for compression fuel</u> consumed at each of the Compression Facilities provided in Table I of Exhibit "G''.  In no event shall Williams provide compression fuel for Shipper pursuant to this Section 1.7(b) in excess of 4,500 MMbtu/day.  In the event that Shipper's compression fuel needs exceed 4,500 MMbtu/day, Shipper and Williams shall negotiate in good faith the commercial terms for Williams' provision of this additional fuel.  If the parties are unable to reach such commercial terms within thirty (30) days following commencement of negotiations, Williams will take in-kind compression fuel Gas in excess of 4,500 MMbtu/day from Shipper.   Compression fuel is not included in Gathering Fuel and Plant Fuel as provided in 1.7(a).  Shipper's payment for compression fuel shall be calculated by multiplying the Shipper's Allocation of O&M percentages for each Compression Site as provided in Table IV of Exhibit "G", as they may be adjusted pursuant to Section 1.9(c), by the total gas in MMbtu consumed at each of these Compression Sites with the product of this calculation multiplied by one hundred percent (100%) of Platt's Inside FERC Gas Market Report El Paso Natural Gas Company San Juan Basin Index for the applicable month.

**1.7**     **Processing Services.** <u>Williams shall retain the gross Plaint Products Processed from Shipper's Gas</u> and will deliver one hundred percent <u>(100%) of Shipper's Receipt Point Dth</u> at the Delivery Point(s) <u>less Gathering Fuel and Plant Fuel as set forth in Section 1</u>.

4.    **TERM**

This Agreement shall become effective July 1, 2011 ("Effective Date") and <u>continue for a primary term through December 31, 2022</u>, and Contract <u>Year to Contract Year thereafter</u>, subject to termination upon the expiration of the primary term, or any anniversary thereafter, by either party giving the other party at least sixty (60) Days prior written notice of termination.

WFC-WPX Contract at 2-5 (emphases in original).

b.    **The Defendants' Response.**

20.    The Defendants open by arguing that "[t]he proposed class does not 'justify a departure' from the 'usual rule' against class actions."  Response at 1 (citing <u>Wal-Mart Stores, Inc. v. Dukes</u>, 131 S. Ct. 2541, 2550 (2011)("<u>Wal-Mart</u>")).  They argue that the proposed class lacks all of the rule 23(a) requirements of commonality, typicality, and adequacy, and also lacks the rule 23(b) requirements of predominance and superiority.  <u>See</u> Response at 1-2.  In keeping with their opening citation to <u>Wal-Mart</u>, the Defendants argue:

Plaintiffs have failed to prove *commonality* because their contract and implied covenant claims depend on individualized interpretations of royalty and overriding royalty instruments.  Under controlling Tenth Circuit precedent, in order to determine whether WPX has a duty to pay cost-free royalties on drip condensate and extracted NGLs, the Court would have to review each class lease and assignment. Under New Mexico law, the court would also have to consider extrinsic evidence in determining whether lease terms are ambiguous.  These inquiries defy a common, class-wide answer under <u>Wal-Mart</u>.

Response at 2.  The Defendants also contend that the proposed class lacks predominance of common issues over individual ones, asserting that the various doctrines that the Plaintiffs assert to toll or delay the accrual of the statute of limitations involve highly individualized inquiries. <u>See</u> Response at 2.

21.    They go on, in their statement of facts, to identify several purported differences among proposed class members: (i) that different proposed class members' -- and even different named Plaintiffs' -- leases contain different language governing royalty obligations, <u>see</u>

Response at 4-6; (ii) that different wells have different gas composition and might not be connect to NGL processing plants, see Response at 6-7; (iii) that the Defendants' gathering and processing arrangements are different because "some wells *cannot* be processed to extract NGLs because they are on a dedicated gathering system that leads only to a plant that does not extract NGLs," Response at 7-8; (iv) that the Defendants' methods for calculating royalties vary depending upon the location of the well and the terms of the lease in question, see Response at 8-9; (v) that "[t]he entrained NGL content of the gas varies greatly from well to well," Response at 10 (citing Emory Report ¶ 32-35), and that "[d]ifferences in gas composition and processing arrangements have a direct bearing on Plaintiffs' claims," Response at 10 (citing Deposition of Dan Reineke at 46:16-24 (taken January 16, 2014)(Plaintiffs' Ex. 209)); (vi) that "[t]he only way to estimate drip condensate produced from any well or group of wells would be to prepare a detailed engineering analysis for each well," Response at 11 (citing Emory Report ¶ 52); and (vii) that the proposed class members' knowledge of, due diligence in discovering, and ability to discover the Defendants' alleged conduct varies, see Response at 11-13.  The Defendants then move to their argument, first addressing the breach-of-contract claims, see Response at 15-34, and then addressing the other claims, see Response at 34-39.

22.    The Defendants first argue that the breach-of-contract claims lack commonality under rule 23(a)(1), because, although there may be common questions, no single question is capable of a common answer.  See Response at 15-17.  They assert that the Plaintiffs "list 26 allegedly common questions -- 14 questions of fact and 12 questions of law -- without attempting to explain how any of them has a common *answer* that would resolve an issue central to all putative class members' claims."  Response at 16 (citing Motion at 4-7).  The Defendants argue that "evaluating whether WPX has a duty to pay royalty on extracted NGLs and condensate, or

on a downstream sales price, requires a lease-by-lease evaluation of lease terms."  Response at
17 (citing Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc., 725 F.3d 1213,
1219 (10th Cir. 2013)("Roderick")).  They assert that the Plaintiffs' expert admitted that all class
leases would have to be analyzed, although, they assert, he erroneously believed this evaluation
could be deferred until a trial on the merits.  See Response at 17 (citing Deposition of Randy
Kaplin at 64:17-22 (taken January 9, 2014)(Plaintiffs' Ex. 241)).

> Various leases require different valuation measures with or without a specific
> valuation point.  For example, some provide for payment of royalty on "gross
> proceeds"; some on "proceeds" or "net proceeds" "at the well" or at the "mouth of
> the well"; and some on the "price" or "market price" at the well.  See Terry
> Report ¶ 29.  Other the royalty obligations differ depending on whether a well
> produces both oil and natural gas or only natural gas.  Still others turn on how gas
> is used, for example, off the premises or in manufacturing gasoline or other
> products.  See id.  See also Carter v. Exxon Corp., 842 S.W.2d 393, 396-97 (Tex.
> Ct. App. 1992).
>
> Given the panoply of lease language, there can be no single answer to the
> questions of contractual breach that Plaintiffs pose.

Response at 17-18 (citations omitted).  The Defendants contend that the Court would have to
hold hearings to determine the content of each individual lease using extrinsic evidence, and thus
no common issue is present.  See Response at 18-19.

23.    The Defendants also contend that post-production expenses will vary from well to
well, and thus the question how much each well was harmed can have no common answer.  See
Response at 19.  They argue that the use of a single methodology -- WASP -- does not mean that
the methodology was applied to the same effect for all wells.  See Response at 20-21.  Their final
argument on commonality grounds is that the "Plaintiffs' tolling issues raise highly
individualized questions as to whether putative class members' claims extend beyond the statute
of limitations period," because "many putative class members contacted WPX over the years and
questioned the very royalty calculations and deductions of post-production expenses at issue,"

and whether and when each class member did so bears on the applicability of the tolling doctrines and the discovery rule.  Response at 22 (emphasis omitted).

24.     The Defendants then attack the Plaintiffs' attempt to show predominance under rule 23(b).  See Response at 22-27.  They argue that predominance is "'far more demanding' than the commonality standard," Response at 22 (quoting Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623-24), and "requires, among other things, that the common questions 'predominate over any questions affecting only individual members,'" Response at 22 (quoting Fed. R. Civ. P. 23(b)(3)).  The Defendants argue that predominance is lacking for several reasons, which mostly overlap with their commonality arguments.  First, they argue that "[d]iffering lease language defeats predominance."   Response at 23 (emphasis omitted).   Second, they contend that "[d]iffering knowledge [on the part of different putative class members] defeats predominance." Response at 24 (emphasis omitted).  Third, they argue that differing damages and the need for individualized damage determinations make class certification impossible.  See Response at 25-27.

25.     The Defendants next address typicality and adequacy of representation, noting that those inquiries tend to merge, because "all concern whether 'the named plaintiff's claim and the class claims are so interrelated that the interests of the putative class members will be fairly and adequately protected in their absence.'"   Accordingly, the Defendants mount no new arguments as to typicality, instead arguing generically -- in a half-page section that references their commonality and predominance arguments -- that the named Plaintiffs' claims are not typical of the class.  See Response at 28.  As to adequacy, the Defendants argue that the class is unavoidably conflicted, because some putative class members have benefitted from the WASP calculation method.  See Response at 29.  The Defendants contend that "[c]ourts consistently

refuse to certify class actions where the named plaintiffs seek relief that benefits some putative class members but harms others."  Response at 29 (citing <u>Gonzales v. City of Albuquerque</u>, 2010 WL 4053947, at *9 (D.N.M. Aug. 21, 2010)(Browning, J.)).

26.   The Defendants last argue that the class-action mechanism fails the superiority requirement.  <u>See</u> Response at 32-34.  First, it argues that "[t]he plethora of individualized issues discussed above destroys superiority," just as they contend it destroys predominance.  Response at 32.  Second, they assert that the putative class is unmanageable because "it would require dozens if not hundreds of subclasses."  Response at 32.  They assert that there would have to be at least four times as many subclasses as the Plaintiffs propose -- representing those wells which do and do not produce condensate, and representing those members who do and do not own interests in wells having gas that is processed for NGLs -- and that there would have to be a class representative for each subclass, which is presently lacking.  Third, the Defendants assert that, because "WPX's 'keepwhole' contracts *benefit* many potential putative class members," those members "have no interest in joining Plaintiff's crusade."   Response at 33-34 (emphasis in original).

27.   The Defendants then address the claims that are not breach-of-contract claims.  <u>See</u> Response at 34-39.  They argue that the claim for breach of the implied duty of good faith and fair dealing must fail, because, "[u]nder New Mexico law, the implied duty of good faith and fair dealing 'protects the reasonable expectations of the parties arising from an agreement.'"  Response at 34 (quoting <u>Sanders v. FedEx Ground Package Sys., Inc.</u>, 2008-NMSC-040, ¶ 27, 144 N.M. 449, 188 P.3d 1200).   They contend that a good-faith-and-fair-dealing claim is uncertifiable for two reasons.  First, they assert that "determining the parties' 'reasonable expectations' would require an individualized inquiry into what each royalty and overriding

royalty interest owner expected when entering into a particular royalty instrument, and whether their expectations were reasonable."  Response at 35.  Second, the Defendants contend that they would have the right to submit individualized extrinsic evidence to prove these expectations and their reasonableness.  See Response at 35.  The Defendants assert that "[c]ourts in jurisdictions recognizing similar duties of good faith and fair dealing have consistently refused to certify class actions for alleged breaches of the duty."  Response at 35 (citing Avritt v. Reliastar Life Ins. Co., 615 F.3d 1023, 1032 (8th Cir. 2010); Stratton v. Am. Med. Sec., Inc., 266 F.R.D. 340, 353 (D. Ariz. 2009)).  They assert that "'[e]vidence of the parties' justified expectations would be required to establish a breach of the duty of good faith and fair dealing,' and such 'expectations are likely to vary among members of the putative class.'"  Response at 36 (quoting Avritt v. Reliastar Life Ins. Co., 615 F.3d at 1032).  They argue -- presumably for the purpose of distinguishing cases under California law that hold that a class can be certified for breach of good faith and fair dealing -- that California, unlike New Mexico, uses an objective test of good faith and fair dealing.  See Response at 36 n.8 (citing Vaccarino v. Midland Life Ins. Co., 2013 WL 3200500, at *19 (C.D. Cal. June 17, 2013)).

28.     The Defendants argue that the Court cannot certify the claims under Colorado law, because, although Colorado recognizes the implied covenant of good faith and fair dealing in some instances, "'the doctrine is applied *only* when one party has discretionary authority to determine certain terms of the contract, such as quantity, price, or time.'"  Response at 36 (emphasis added by Response)(quoting City of Boulder v. Pub. Serv. Co. of Colo., 996 P.2d 198, 204 (Colo. App. Ct. 1999)).  They contend that, here, even the Plaintiffs agree that the Defendants lack discretion to define terms of the contract, and, thus, the Court cannot certify the claim, because no duty of good faith and fair dealing applies.  See Response at 37.  The

Defendants last argue that claims under the NMPPA require an underlying breach of contract, and, thus, the same non-common facts that defeat certification with regard to the breach-of-contract claims also defeat certification of the NMPPA claim.  See Response at 37-38.

>           c.           **The Plaintiffs' Reply**.

29.           The Plaintiffs' Reply first points out the following regarding the Defendants' statement of facts:

1.           Sales of hydrocarbons from all class wells are made to affiliates;

2.           Costs are imposed on most class wells (Williams Four Corners gathering) as a result of affiliate transactions;

3.           Payments made to all putative class members start with an "index" price, rather than the proceeds received by WPX and its affiliates for sales of Plaintiffs' and putative class members' hydrocarbons;

4.           Misrepresentations have been made on the Plaintiffs' and putative class members' check stubs as to the type and amount of hydrocarbons sold by WPX and its affiliates, and the proceeds derived from said sales;

5.           Expenses charged to the Plaintiffs and all putative class members are misrepresented on most putative class members' check stubs;

6.           WPX has failed to pay all Plaintiffs and putative class members for interest owed on payments made late, beyond the production time periods designated in the statutes of Colorado and New Mexico;

7.           On all gas producing from conventional formations, WPX uniformly refuses to pay all Plaintiffs and putative class members for the value WPX and its affiliates receive for natural gas liquids;

8.           For all Plaintiffs and putative class members whose wells produce from conventional gas formations, WPX has failed to pay or account for the value derived from the production and sale of drip condensate;

9.           Pre-2001, WPX and its predecessors paid all the Plaintiffs and putative class members on the basis of a weighted average price, unauthorized by any of the Plaintiffs' or putative class members' oil and gas leases;

10.           All Plaintiffs' and putative class members' gas which flows on affiliate Williams Four Comer's gathering systems have been charged a

"marketing charge" and other costs not allowed by any of the Plaintiffs' or putative class members' oil and gas leases;

11. Prior to 2001, all Plaintiffs' and putative class members' interest under oil and gas leases located in the State of Colorado, were charged for the expense of placing the gas in marketable condition, contrary to Colorado law.

Reply at 1-2.[31]

30.     They next assert that "the [named] Plaintiffs have an interest in 96 of the 3,200 WPX wells at issue in the class definition." Reply at 3. They assert that the Defendants have conceded this fact to be true. See Reply at 3. The Plaintiffs contend that "[t]he types of wells include Fruitland Coal production, Conventional Gas production, wells in Colorado, wells in New Mexico, wells gathered on WFC affiliate systems and wells not gathered on affiliate systems," and, thus, "[t]he entire range of all proposed subclasses is covered by the [named] Plaintiffs' interests." Reply at 3. The Plaintiffs assert the following three points of uniformity:

1. None of the putative class members' leases provide that they may be paid based upon a value established in an affiliate transfer, or charged with a cost derived from an affiliate transaction;

2. None of the leases provide that the lessor may be paid, based upon an index price for natural gas (methane), especially when their gas consists of more valuable hydrocarbons than methane;

3. None of the oil and gas leases provide that the Plaintiffs may be charged for costs of depreciation of the home office, a return on undepreciated assets, i.e., profit, or marketing.

Reply at 3 (emphasis omitted).

31.     The Plaintiffs attempt to distinguish Roderick, arguing that "Roderick directs the district court to review all of the leases forms [sic] to determine the above issues, as well as

---

[31]The Reply's internal pagination is one page off from CM/ECF's. The Court will use the Reply's internal pagination -- the black number at the bottom center of the page.

'whether the issues we have identified have any effect on its typicality or adequacy findings.'" Reply at 4 (quotation unattributed).  The Plaintiffs concede that damages will differ from well to well, but contend that the question of liability -- common to all putative class members -- predominates.  See Reply at 5.  They further contend that there is no conflict among the class, because Dr. Griffin's analysis -- which the Plaintiffs assert is the only evidence suggesting that some putative class members would be better off under the WASP calculation -- used hypothetical, rather than actual, sales and costs.  See Reply at 5-6.

32.    The Plaintiffs next defend their fraudulent concealment claim, see Reply at 7-9, which the Court will not summarize here, because it subsequently dismissed that claim, see MOO at 82-83.  The Plaintiffs then expound upon their earlier contention that differing damages among the proposed class do not defeat predominance.  See Reply at 9-12.  They first quote the Tenth Circuit for the proposition that "'there are ways to preserve the class action model in the face of individualized damages.'"  Reply at 9 (quoting Roderick, 725 F.3d at 1220).  They also contend that there are some "single stroke remedies," including "that the royalties paid to all putative class members must, in the first instance, be based upon the value received in an arm's length transaction by WPX."[32]  Reply at 10.  They discuss two cases, Chieftain Royalty Co. v. XTO Energy, Inc., 213 U.S. App. LEXIS 13837 (2013), and Butler v. Sears, Roebuck & Co., 702 F.3d 359 (7th Cir. 2012), in which classes were certified despite individualized damages. See Reply at 10-12.  The test, the Plaintiffs contend, is whether the individuals damages stem from a common injury.  See Reply at 10-12 (characterizing Wal-Mart).

---

[32]It is not clear whether the Plaintiffs are referring to equitable/declaratory relief -- an instruction from the Court to the Defendants to pay the putative class members appropriately in the future -- or if the Plaintiffs are simply highlighting what they view to be a common issue in constructing a unified damages formula.

3.    **The Class Certification Hearing**.

33.    The Court held a class certification hearing, the bulk of which was held on March 10-12, 2014, and the remainder of which was finished up on April 3-4, 2014.[33]  The parties first gave brief opening statements.  See Tr. at 4:22-69:5 (Brickell, Court, Sheridan).  The Plaintiffs called expert witness Dan Reineke, a former petroleum engineer and oil company consultant, see Tr. at 76:9-155:3 (Brickell, Reinke, Berge, Court), expert witness Ley, an accounting and auditing professional, see Tr. at 155:20-222:16 (Brickell, Ley, Berge, Court), expert witness Randy Kaplin, a former reservoir engineer for Texaco, Inc., vice president of operations for Dyco Petroleum, Inc., and petroleum consultant, see Tr. at 223:15-297:11 (McNamara, Kaplin, Berge, Court), Westfall -- a putative class representative -- a retired Albuquerque, New Mexico, resident who inherited mineral interests in some of the subject wells from his father, see Tr. at 298:13-357:22 (Aubrey, Westfall, Sutphin, Court), and Anderson -- the beneficiary of Anderson Trust, also a proposed class representative -- a self-employed architectural designer and Bluffdale, Utah resident, whose personal trust owns mineral interests in some of the subject wells, see Tr. at 358:10-434:23 (Branch, Anderson, Sheridan, Court).

34.    The Defendants called Sheryl Ward, WPX Energy's "manager of revenue for the Tulsa region," Tr. at 438:22-23 (Ward); see Tr. at 438:6-498:14 (Sutphin, Ward, Brickell, Court),

---

[33]The Court broke the class certification hearing into two settings because one of the Defendants' expert witnesses, Kris Terry, was unable to be present for the March 10-12, 2014, setting, because her father died a few days before the hearing was set to begin.  The Plaintiffs moved to vacate and postpone the hearing it its entirety, see Emergency Motion to Vacate Class Certification Hearing, filed March 7, 2014 (Doc. 220), and the Court denied their motion, see Memorandum Opinion and Order, filed June 20, 2014 (Doc. 250), but set aside an additional date, April 3, 2014, in which the Plaintiffs could put Terry on the stand, see generally Transcript of Hearing, taken April 3, 2014, filed June 26, 2014 (Doc. 257).  April 4, 2014, was devoted to closing arguments.  See generally Transcript of Hearing, taken April 4, 2014, filed June 26, 2014 (Doc. 258).

Morris Miller, a retired WPX Energy employee formerly responsible for "mak[ing] sure that the federal royalty payments were paid correctly, in accordance with federal regulations," Tr. at 503:24-504:2 (Miller); see Tr. at 499:5-527:18 (Sutphin, Miller, Koop, Court), expert witness John Emory, a former engineer for British Petroleum, PLC, and a consultant, see Tr. at 532:13-650:11 (Sutphin, Emory, Brickell, Court), expert witness Dr. Griffin, an economics professor at Texas A&M University, see Tr. at 650:23-722:10 (Berge, Griffin, Brickell, Court), Julie Mathis, WPX Energy's "Director of Revenue and Regulatory Accounting," Tr. at 724:9-10 (Mathis); see Tr. at 723:22-755:23 (Sutphin, Mathis, Brickell, Court), and expert witness Kris Terry, an accountant, lawyer, and gas and oil consultant, see Tr. at 770:13-952:16 (Sheridan, Terry, McNamara, Court).  The Plaintiffs presented no rebuttal, and evidence closed on April 3, 2014. See Tr. at 952:21-953:2 (Court, Sheridan, Brickell).  The parties gave closing arguments the next day.  See generally Tr. at 967-1034.  As the Court bases its findings of facts off of the hearing -- and cites to the hearing transcript and the parties' exhibits for each finding -- the Court will not describe the hearing in detail, but, rather, will summarize each witness' credentials and the highlights of their testimony.

a.      <b>Opening Statements.</b>

35.     The parties agreed to an hour apiece for opening statements, with the Plaintiffs presenting first and the Defendants second.  See Tr. at 4:13-15 (Court).  On the factual front, the Plaintiffs emphasized that the Defendants' payment methodology is and always has been the same across all class wells, and that the payouts are based on index prices rather than actual proceeds.  See Tr. at 8:4-13:7 (Brickell).  The Plaintiffs used Westfall as an example, and demonstrated how, if Westfall had been paid by proceeds from arms-length sales, rather than index prices, Westfall would have received a $0.40/MMBtu higher rate than he did.  See Tr. at

14:12-16:13 (Brickell).  The Plaintiffs asserted that the United States had its own leases with the

Defendants, that it audited the Defendants, and that, after the audit, the Defendants began paying

the United States on natural gas liquids.  See Tr. at 21:15-21 (Brickell).  On the legal front, the

Plaintiffs minimized the significance of Roderick, arguing that the case chastised the district

court for not considering lease variations, but did not hold that lease variations necessarily

destroy commonality or predominance.  See Tr. at 17:4-19:8 (Brickell).  They also discussed BP

America Production Co. v. Patterson, 263 P.3d 103 (Colo. 2011)(en banc)("Patterson"), arguing

that it permits courts to consider fraudulent concealment, ignorance, and reliance to be common

issues for class-certification purposes.  See Tr. at 22:6-27:7 (Brickell).

        36.     The Defendants presented their opening second.  See Tr. at 30:10-69:7 (Court,

Sheridan).  They summarized how the natural gas production and gathering processes work, as

well as the Plaintiffs' case against them.  See Tr. at 30:10-40:25 (Sheridan, Court).  They stated

that they pay royalties based on an index price -- which itself is based on what the gas would sell

for in an arms-length transaction, rather than in an affiliate transaction -- at the well head.  See

Tr. at 30:10-40:25 (Court, Sheridan).  They characterized the Plaintiffs' claim that they have

been shorted the value of their drip condensate as follows:

        What this case is about is essentially the following: WPX pays royalty
        based upon the MMBTU, the adjusted MMBTU content of the gas as produced at
        the wellhead, all of it, at the market price established by the index.

        And what the plaintiffs are saying is that their royalty should be
        determined instead based upon the price per gallon of the NGLs extracted through
        processing at a processing plant, plus the price of the residue gas per MMBTU.
        And in their view, the combination of those two prices will be greater than the
        adjusted BTU content price of the gas at the wellhead. That is what the case is
        about.

        In addition, they want some additional royalty, apparently, for drip
        condensate.  As I said, WPX pays on the adjusted BTU content of the gas as
        produced at the wellhead.  And because wet gas -- gas that has a heavier or larger

content of entrained liquefiable hydrocarbons -- will have a higher BTU content than the price for the gas at the wellhead, any gas that contains entrained liquefiable hydrocarbons will be proportionately higher, based on its BTU content than dry gas.

So the plaintiffs are -- receive royalty based upon the BTU content of the gas, which compensates for the value of the entrained liquefiable hydrocarbons that are part and parcel of the gas stream as produced.

Tr. at 39:23-40:25 (Sheridan).

37.     The Defendants acknowledged that the Plaintiffs' basic claim has some basis in law, citing Jicarilla v. Supron Energy Corp., 782 F.2d 855 (10th Cir. 1986), but said that this claim is inapplicable here.  See Tr. at 41:1-42:7 (Sheridan).  They said that this claim arises from the unique fiduciary relationship between the federal government and federally recognized Indian tribes -- a relationship that is absent here -- and that the Plaintiffs' royalty payouts should properly be based exclusively on their lease provisions.  See Tr. at 41:1-42:7 (Sheridan).  The Defendants contend that the "plethora of different terms" that exist among the proposed class' leases obliterate commonality.   Tr. at 46:1 (Sheridan).   Last, the Defendants raised their contention that they would need to introduce extrinsic parol evidence on each of the contracts, that this parol evidence could vary from lease to lease, and that this variance defeats commonality.  See Tr. at 49:12-53:10 (Sheridan, Court).  The Court pressed the Defendants hard in their opening to answer whether they would or could actually present parol evidence -- which would be from the 1940s -- and the Defendants conceded that they lacked any such evidence. See Tr. at 49:12-53:10 (Sheridan, Court).   The Defendants contended, however, that they possessed, and intended to present, parol evidence regarding the formation of various division orders.  See Tr. at 53:3-20 (Sheridan, Court).  At the Court's pressing, the Defendants further conceded that division orders are not often negotiated in any meaningful way, but they argued

that they constitute valuable evidence of the course of conduct between the parties.  See Tr. at 53:11-55:6 (Sheridan, Court).

>    b.    **The Plaintiffs' First Witness, Reineke.**

38.    Reinke has a bachelor's degree in petroleum engineering from the Colorado School of Mines, worked at major oil companies like ConocoPhillips and Kansas-Nebraska Natural Gas, and later worked for Sam Dean Oil Corporation in Oklahoma City, Oklahoma.  See Tr. at 76:17-25 (Brickell, Reineke).  Around 1980, he started his own independent consulting company doing engineering work for various independent well operators; he later became an independent well operator himself.  See Tr. at 77:1-7 (Reineke).  Since the mid-1990s, he has worked as an expert witness in oil-and-gas cases, and has testified in that capacity in federal cases in Oklahoma, Kansas, and Washington, D.C., and in state court in Arkansas, Wyoming, and West Virginia.  See Tr. at 77:8-15 (Brickell, Reineke).  He has previously testified in twelve to fifteen class certification hearings.  See Tr. at 77:22-78:1 (Brickell, Reineke).

39.    Reineke testified that all putative class members are paid under the same methodology.  See Tr. at 76:9-155:3 (Brickell, Reinke, Berge, Court).  See also Plaintiffs' Exhibit 211 at 4-6.  He testified that all royalty owners are alike in that they have no active role in the operations taking place upon their mineral estate, and, therefore, they are not responsible for, nor have any control over, any of the costs, expenses or decisions associated with the production and marketing of the products from their mineral estate.  He asserted that, similarly, the owners of overriding royalty interests have no active role, and typically do not bear the costs of production and marketing.  Reineke also opined that the Defendants did not pay based on the price of an arm's length sale of gas at the wellhead:

>    Q.    Did you hear in opening statement counsel for the defendant referring to a wellhead sale and a price of gas at the wellhead?

A.      Yes.

Q.      In all the documents that you reviewed in this case, did you ever come across any documents that indicated a sale by these defendants of the gas in an arm's length transaction at the wellhead?

A.      No.

Q.      And again, during this time period, '95 [85 sic] to 2010, are you aware of anytime in all of the documents you've reviewed where any gas or other entrained liquids, anything in the gas itself was sold in an arm's length transaction over here at the wellhead by these defendants?

A.      No.

Q.      Let's take a look, if we can, now at Demonstrative Number 24. When we were talking earlier on our gas contracts chart that you were identifying we got from Ms. Mathis' deposition --

A.      Yes.

Q.      -- can you identify on this diagram kind of on the ground, so to speak, where those arm's length sales take place?

A.      They take place basically at the tailgate of the plant.  After you have pipeline quality residue gas, that's where the sale of the residue gas goes.  And after you extract the natural gas liquids, that's where the sale happens. So you have -- first arm's length sales are actually at the tailgate of the plant for both the natural gas liquids and the residue gas.

Q.      Now, I notice this says "conventional gas."  Do we have another slide about where the arm's length sale is on the coal-bed methane?

A.      Yes.  And the first arm's length sale[] is once again at the interstate pipeline.

Tr. at 86:2-10 (Brickell, Reineke); id. at 87:24-88:5 (Brickell, Reineke); id. at 106:22-107:17 (Brickell, Reineke).

### c.      The Plaintiffs' Second Witness, Ley.

40.      Ley testified that she has an accounting degree from Oklahoma State University.

See Tr. at 156:8-9 (Ley).  After graduation, she worked at "one of the Big Four firms" as an

auditor, leaving after six-and-a-half years to start her own firm with one of her partners.  Tr. at 156:8-19 (Ley).  She has run her firm, which has fifteen employees, for almost twenty-five years; in that time she has served as president of the Oklahoma Society of Certified Public Accountants and chairperson of the Oklahoma Accountancy Board.  See Tr. at 157:2-11 (Ley).  She has worked on "at least 30 class actions" before this case.  Tr. at 157:18-19 (Ley).

41.     Ley is a damages expert, and stated that she has calculated damages in class actions "that have many times th[is case's] number of royalty owners and may times th[is case's] number of leases."  Tr. at 160:11-13 (Ley).  See Tr. at 160:3-5 (Brickell)(estimating that the class contains 2,300 members and approximately 500 leases).  Ley spoke in general terms about damage calculations on all of the Plaintiffs' claims, but testified with the most specificity on the late-payments claim.  She said that royalty payments were, in some instances, made outside of the PPA's 45-day window.  See Tr. at 178:3-14 (Ley, Brickell).  She acknowledged that not every payment was made late, but that late payments were especially amenable to class-action treatment, because "[t]he calculation can be done based upon a formula or a program, or a query . . . so that th[e late] payments are identified very quickly."  Tr. at 178:18-23 (Brickell, Ley).

### d.     The Plaintiffs' Third Witness, Kaplin.

42.     Kaplin testified that he graduated from Wichita State University in 1974 with a degree in mechanical engineering, and worked for Texaco, Inc., as a production engineer in Great Bend, Kansas, where he "basically oversaw Texaco's operations in the field on oil and gas wells."  Tr. at 224:1-8 (Kaplin).  After working for four years in that capacity, Texaco promoted him to "reservoir engineer" and reassigned him to Tulsa, Oklahoma, where he stayed for two more years.  Tr. at 224:9-16 (Kaplin).  In 1980, he went to work for a company called Dyco Petroleum, Inc., where he worked as a production engineer, then as a production manager, and,

later, as vice president of operations.  See Tr. at 224:17-225:8 (Kaplin).  In 1991, he started his

own petroleum consulting company, assisting investors and providing expert testimony.  See Tr.

at 225:9-15 (Kaplin).  He stated that he has testified as an expert in over fifty cases, primarily

testifying on behalf of royalty owners, and against major oil-and-gas companies.  See Tr. at

225:15-18 (Kaplin).  He stated that, over the years, he has been the subject of "more than one

Daubert challenge," but that he has never been disqualified or had his testimony disallowed for

any reason.  Tr. at 227:11-15 (Kaplin, McNamara).  He also stated that he served as a consultant

to the Oklahoma Tax Commission.  See Tr. at 226:6-13 (McNamara, Kaplin).

43.     Kaplin stated that he reviewed the class leases, but did not review the actual lease

assignments or overriding lease instruments at issue in this case -- instead relying on a summary

of those documents that the Defendants' expert, Terry, prepared.  See Tr. at 231:9-233:1

(McNamara, Kaplin); id. at 253:23-254:5 (McNamara, Kaplin); id. at 848:7-11 (Sheridan,

Terry).  He talked at length about the various textual provisions in the leases, noting that most of

the leases are form contracts.  See Tr. at 239:8-18 (McNamara, Kaplin).  He presented a

spreadsheet that he created which compiles the royalty provisions and categorizes them

according to their text; the spreadsheet that he initially presented had numerous erroneous

duplications on it, but he replaced that spreadsheet with a corrected spreadsheet with the

duplications removed the next day.  See Tr. at 266:15-19 (McNamara, Kaplin)(stating that

Spreadsheet of Lease Language (Plaintiffs' Ex. 426), and Spreadsheet of Lease Language

(Plaintiffs' Ex. 428), are identical, except that the latter "eliminate[d] the duplications" in the

former).  Kaplin also talked, in considerably less detail, about the overriding royalty provisions,

noting that, while they tend to be more unique and less boilerplate than the royalty provisions, a

few commonalities -- such as the "same as fed" and "same as state" provisions -- appear frequently.  Tr. at 255:24-256:3 (McNamara, Kaplin).

> ### e.    The Plaintiffs' Fourth Witness, Westfall.

44.    Westfall, a named Plaintiff and proposed class representative, testified next.  See Tr. at 298:13-357:22 (Westfall, Aubrey, Court, Sutphin).  Westfall testified that he is retired, but that, before retiring, he worked "in a family business selling school and office products."  Tr. at 298:25-299:5 (Aubrey, Westfall).  He stated that his father, the late Archie Westfall, purchased a tract of land in Rio Arriba County, New Mexico, in 1952, and passed it on to his son when he died in 2004.  See Tr. at 299:12-300:1 (Aubrey, Westfall).  Westfall stated that neither he nor his father possessed any particular expertise with regard to the oil-and-gas industry, and that he did not know anything about the history of the mineral lease.  See Tr. at 300:2-4 (Aubrey, Westfall).  Westfall stated that the lease already encumbered the land when his father bought it, and, thus, neither he nor his father negotiated the lease's terms.  See Tr. at 300:5-10 (Aubrey, Westfall).

> ### f.    The Plaintiffs' Fifth Witness, Anderson.

45.    Anderson, a named Plaintiff and proposed class representative, testified next.  See Tr. at 358:12-434:23 (Anderson, Branch, Court, Sheridan).  Anderson testified that he lives in Bluffdale and that he is a self-employed architectural designer.  See Tr. at 358:19-359:1 (Branch, Anderson).  He stated that the Anderson Trust is his personal trust, and its trustees are he and his wife.  See Tr. at 359:15-18 (Anderson).  He said that he obtained his royalty interests from his mother -- or, more precisely, his mother's trust, the Georgia Fay Anderson Living Trust -- in 2000 when she died.  See Tr. at 360:3-5 (Anderson); id. at 362:10-13 (Anderson, Branch).

46.    On cross-examination, the Defendants questioned Anderson regarding when he discovered his causes of action and what diligence he had taken to uncover them.  Anderson

stated that he did not discover them until his attorneys contacted him about becoming a class representative, and he refused to testify as to when, where, how, and why the Anderson Trust determined that it had a claim in this case, on the basis of attorney-client privilege.  See Tr. at 420:20-421:10.

### g.      The Defendants' First Witness, Ward.

47.      Ward, a revenue accountant for WPX Energy, testified first for the Defendants. See Tr. at 438:8-498:14 (Ward, Sutphin, Court, Brickell).  Ward clarified that she worked for Julie Mathis, the WPX Energy executive who served as one of the Defendants' primary representatives in this litigation -- and another of the Defendants' witnesses.  See Tr. at 468:20-22 (Brickell, Ward).  Ward testified on a variety of topics, not really going into anything in depth.  She rebutted, however, the Plaintiffs' assertion that the Defendants do not pay royalty on well condensate, see Tr. at 441:5-442:7 (Sutphin, Ward), talked about how the Defendants apply prior period adjustments, see Tr. at 454:14-457:17 (Sutphin, Ward), and cast doubt on the Plaintiffs' representations that WPX Rocky Mountain, not WPX Production, owns the Colorado leases, see Tr. at 458:14-22 (Sutphin, Ward); note 9, supra, and accompanying text.

### h.      The Defendants' Second Witness, Miller.

48.      Miller, a recently retired WPX Energy employee, testified next.  See Tr. at 499:7-527:18 (Sutphin, Miller, Koop, Court).  He stated that, before retiring, he was in charge of handling the Defendants' royalty payments on federally owned leases.  See Tr. at 500:22-501:3 (Sutphin, Miller).  Miller stated that he performed this function for WPX Energy during his eight-year career with them, see Tr. at 500:1-6 (Sutphin, Miller), and had done this job for BP, as well, before working for WPX Energy, see Tr. at 500:13-501:3 (Sutphin, Miller).

i.    **The Defendants' Third Witness, Emory.**

49.    Emory, a petroleum engineer, testified next.  See Tr. at 532:15-650:11 (Emory, Sutphin, Court, Brickell).  He stated that he has a bachelor's degree in mechanical engineering from Michigan State University and a master's in business administration from Cleveland State University.  See Tr. at 533:1-3 (Emory); id. at 534:12-16 (Sutphin, Emory).  He said that, after getting his education, he worked for BP for several years before moving to a large gas utility in Michigan, working as a project engineer on pipeline projects.  See Tr. at 533:3-14 (Emory).  He then worked for a power generation company developing natural gas-fueled power plants, before beginning his consulting career.  See Tr. at 533:15-22 (Emory).  He first worked at the consulting firm Baker & O'Brien in Texas, and then moved to his current job at Pearson Watson Millican Company in Dallas.  See Tr. at 53323-534:7 (Sutphin, Emory).  Emory stated that he has qualified as an expert in state-court proceedings, in the Queen's Court in Canada, and in a number of ICC and Triple-A arbitration cases, but has never, before this case, testified in federal court.  See Tr. at 537:6-17 (Sutphin, Emory).

50.    Emory's testimony focused on defending his opinion that this case is not amenable to a common damages model.  See Tr. at 542:4-18 (Sutphin, Emory).  Emory divided this main opinion into five "sub-opinions."  Tr. at 541:25 (Sutphin).  First, Emory stated that not all gas is processed for NGL removal, and that some gas, including all coalbed methane and some conventional gas, is merely treated for carbon dioxide removal.  See Tr. at 543:1-11 (Emory).  He focused on the interconnectivity of the various gathering systems, asserting that it would be impossible to identify with certainty which NGLs originated at which wells.  See Tr. at 544:23-548:18 (Sutphin, Emory)(referring to WPX Pipeline Map (Defendants' Ex. 197))("You'd have to do a hydraulic simulation to determine which way these wells want to flow on the

gathering systems."). Emory's second sub-opinion is that the varying production conditions -- pressure, temperature, and gas composition -- prevent classwide resolution of the Plaintiffs' claims. See Tr. at 557:18- (Sutphin, Emory). Emory stated that, even to the extent that the wells produce NGLs, those NGLs differ in their composition, with some containing a higher proportion of heavier, more valuable hydrocarbons than others. See Tr. at 559:1-10 (Sutphin, Emory). Emory opined that these differences go, not only to the varying production value among the class wells, but also to the varying downstream operational costs attributable to each -- i.e., when the NGL content of a well rises, its production is more valuable and, at the same time, more costly to process. See Tr. at 563:4-565:11 (Sutphin, Emory). Emory's third sub-opinion is that the varying operational aspects of each plant create variances among the class in the reasonable post-production costs that can be deducted. See Tr. at 565:12-566:10 (Sutphin, Emory). Emory used, as an illustrative example, the varying fuel consumption of the different plants, and further noted that a plant's consumption changes over time. See Tr. at 566:11-567:8 (Sutphin, Emory). Emory's fourth sub-opinion was simply that the class is, under the keep-whole method, compensated for the value of drip condensate. See Tr. at 568:3-18 (Sutphin, Emory). This sub-opinion essentially just pointed out that, when drip condensate is still entrained in the gas at the wellhead, it raises the MMBtu factor of the gas, as measured at the wellhead; because the Defendants pay on the basis of MMBtus, Emory said, they effectively are paying for drip condensate. See Tr. at 568:22-23 (Sutphin, Emory). Emory's fifth and final sub-opinion is that post-production costs vary from well to well, thus making a classwide damages determination on that issue impractical. See Tr. at 576:1-13 (Sutphin, Emory).

j.      **The Defendants' Fourth Witness, Griffin.**

51.     Dr. Griffin, an endowed professor of economics at the George Bush School at Texas A&M University, testified next.   See Tr. at 650:25-722:10 (Griffin, Berge, Court, Brickell).   Dr. Griffin received his bachelor's degree in economics and mathematics from Southern Methodist University, and his Ph.D. in economics from the University of Pennsylvania. See Tr. at 652:11-24 (Berge, Griffin).   He stated that he has written eight books in the field of economics, including a textbook on energy economics and a book on smart energy policy.   See Tr. at 653:14-21 (Berge, Griffin).   He has testified as an expert witness "a number of times," although never in New Mexico.   Tr. at 653:22-654:9 (Berge, Griffin).

52.     Dr. Griffin described the results of an economic analysis he conducted of Plaintiffs' claims.   See Tr. at 660:19-662:16 (Berge, Griffin).   Dr. Griffin stated that he compared, well-by-well, the royalty amounts that the Defendants actually paid on production during the proposed class period to the amounts that they would have paid under the whole stream value methodology.   See Tr. at 660:19-662:16 (Berge, Griffin).   Dr. Griffin's analysis began with production data from 846 wells, representing a cross-sampling of wells by formation, location, and MMBtu content.   See Tr. at 660:19-662:16 (Berge, Griffin).   Dr. Griffin then divided the 846 wells into ten groups of 84 or 85 wells each, based upon Btu content of the production from each well.  From each group, Dr. Griffin randomly selected ten wells.   See Tr. at 663:24-664:16 (Berge, Griffin).   To determine the value of the production from each well, for each relevant month, under Plaintiffs' theories, Dr. Griffin first aggregated the market values of the constituent parts of the production stream, including the entrained liquefiable hydrocarbons and the residue gas.   From this monthly, well-by-well aggregate value, Dr. Griffin then deducted the appropriate expenses that would have been incurred in connection with gathering, processing,

and treatment of the production, applicable taxes, and transportation expenses.  See Summary Count for Whole Value Vs. Keep Whole Value (Defendants' Ex. 148); Aggregate Royalty Payments: Whole Stream Value Minus Keep Whole Value (Defendants' Ex. 149).  Dr. Griffin's study compared the royalty amounts that the Defendants paid under the keep-whole methodology, well-by-well and month-by-month, to the amounts that would have been owed under a whole-stream value methodology.  He found that, while the royalty owners generally benefit from the whole-stream methodology, when processing costs are deducted, the difference between the two methodologies is inconsistent and relatively minor.[34]

---

[34]One comment that Dr. Griffin made at the hearing gives the Court serious pause about his testimony.  It does not rise to level of causing the Court to question Dr. Griffin's work -- which the Court believes is technically sound, honest, and interesting, notwithstanding some of the odd premises with which Dr. Griffin started his analysis, see note 8, supra -- but the Court will note it, because it indicates, at the least, that Dr. Griffin has no usable opinion regarding why his analysis came out the way it did.  When the Plaintiffs cross-examined Dr. Griffin, they asked him "[w]hat caused . . . the pretty significant difference" across the wells in the extent to which the keep whole versus whole stream distinction affected them.  Tr. at 698:3-5 (Brickell).  Dr. Griffin answered:

> I think there w[ere] at least two things that led to it.  One factor, probably the CO2 content.  And the other factor is that you can -- I heard John Emory say this -- that you can have wells that -- actually, after you've stripped out all the CO2s, you can have a different cocktail, if you will, of NGLs, even though they may have the same BTU value.  But the different combinations of the C2s, C3s, C4s, C5s.  So the liquids themselves can be in a different mixture.

Tr. at 698:6-15 (Griffin).  This second "factor" is an unfortunate misstatement of basic chemistry; carbon dioxide removal and fractionation are both physical processes, and not chemical processes.  To be fair to Dr. Griffin, he within seconds followed his statements up by disclaiming: "[R]emember I'm an economist.  I'm certainly not a chemical engineer."  Tr. at 698:17-19 (Griffin).  The Plaintiffs did not respond to Dr. Griffin's misstatement at the time, leading the Court to consider that it had perhaps misapprehended Dr. Griffin's point.  At closing arguments, however, the Plaintiffs' pounced on Dr. Griffin's misstatement as their very first scripted point, although without naming Dr. Griffin specifically:

> Your Honor, the first thing I want to address in my opening is an issue that came up yesterday.  And that is somewhat key from a physical standpoint of the gas to our case. . . .

**k.      The Defendants' Fifth Witness, Mathis.**

53.      Mathis, WPX Energy's director of revenue and regulatory accounting, testified next.  See Tr. at 723:22-755:23 (Sutphin, Mathis, Court, Brickell).  Mathis stated that she ran a division of fifty-five to sixty people, and that she was Ward's current boss and Miller's former boss.  See Tr. at 724:11-725:2 (Sutphin, Mathis).  Mathis testified on two issues: primarily, she testified about the "royalty hotline" that WPX Energy maintained to field questions from royalty owners, see Tr. at 725:3-11 (Sutphin, Mathis); secondarily, she briefly attempted to justify the keep-whole methodology, see Tr. at 736:22-727:17 (Sutphin, Mathis).  On the first issue, Mathis stated that a full-time employee staffed the royalty hotline and that this employee fielded royalty inquiries near-daily, including from several class members.  See Tr. at 725:3-736:19 (Sutphin,

---

Now, the questions yesterday intimated, if not directly stated, that the natural gas liquids, which consist of -- and I believe propanes and butanes were mentioned most prominently yesterday.  But the other -- ethane and the other types of natural gas liquids are not present here; they're only created over here at the plant.

I think yesterday it was presented that these hydrocarbons, these valuable heavier hydrocarbons, are not here; they're just created out of the gas by some chemical catalytic process, and then they only exist over here at the plant where then they're pipelined out to Mt. Bellview, or fractionated somewhere else.

Absolutely wrong, Judge.  Let's look at their own expert report here, John Emory.  And Mr. Emory has been an engineer for a long time . . . .

Tr. at 969:21-971:5 (Brickell).  The Plaintiffs then proceeded to establish that removing carbon dioxide from natural gas does not alter the chemical composition of any entrained NGLs and that any NGLs are present, in chemically identical form, in the gas at the wellhead.  See Tr. at 971:9-975:9 (Brickell).

Last, the Court notes that the Plaintiffs referred to the misstatement being made "yesterday," which would refer to Terry's testimony, and not Dr. Griffin's -- it seems unlikely that the Plaintiffs would confuse this point, given that there was a multi-week gap in between every other witness and Terry.  See note 33, supra.  The Court did not notice any such misrepresentations in Terry's testimony, but, if there were, the Court assumed they were accidental.

Mathis).  Mathis discussed a small sample of these telephone calls, of which WPX Energy

records and catalogues the gist.  See Tr. at 725:3-736:19 (Sutphin, Mathis).  On the second issue,

Mathis presented a less-than-sophisticated attack on potential alternatives to the keep-whole

methodology:

> Q.     Now, plaintiffs, based on this common question, appear to be arguing that
> they should be paid on the value of gas sold from the wells in which they own an
> interest, and no other.  That's what I understand their position to be. From an
> accounting perspective, can that be done?  In other words, can we pay these
> private royalty owners based on the sales proceeds received from the gas -- just
> from their wells?
>
> A.     We absolutely cannot.
>
> Q.     And why not?
>
> A.     Because once that gas enters into a gathering system, it loses every
> molecule, loses its identity.  We can no longer track that particular molecule from
> a well -- cannot be tracked through the gathering system, through a plant, and then
> to a specific third party settle.

Tr. at 739:6-22 (Sutphin, Mathis).[35]

### *l.*     **The Defendants' Sixth Witness, Terry.**

54.     Terry, an expert witness who focused her expert testimony on the language in the

class leases, testified next.  See Tr. at 770:15-952:16 (Terry, Sheridan, Court, McNamara).  Terry

is an attorney and a member of the Oklahoma and Texas bars, and graduated from the University

of Oklahoma for both undergraduate and law school.  See Tr. at 771:17-772:7 (Sheridan, Terry).

After graduating from law school in 1979, Terry worked for Fina Oil and Chemical Company,

see Tr. at 771:11-16 (Sheridan, Terry), where she worked in the legal department for four years

---

[35]That the Defendants' own expert, Dr. Griffin, constructed a model that calculates well-by-well royalties on an alternative methodology -- the whole stream value method -- undermines Mathis' statement, unless, of course, Mathis was responding to a hyper-literal, patently unworkable interpretation of the Plaintiffs' requested valuation methodology.

before moving into the exploration and production department, where she became manager of their natural gas contracts, see Tr. at 772:15-25 (Terry).  She worked in that capacity for two years, see Tr. at 773:11-17 (Sheridan, Terry), before becoming a consultant, see Tr. at 774:15-18 (Sheridan, Terry).  Terry stated that she has testified as an expert in numerous oil-and-gas class actions, where she typically focuses on "analyzing the companies' contractual instruments with the various royalty owners and overriding royalty interest owners.  So that would involve analyzing leases, assignments, [and] grants."  Tr. at 774:25-775:15 (Sheridan, Terry).  See Tr. at 776:10-777:12 (Sheridan, Terry).  She stated that she had also provided expert testimony on "industry custom and usage" -- essentially, the way that words in an oil-and-gas contract should be interpreted.  Tr. at 775:22-776:4 (Sheridan, Terry).  The Plaintiffs then "stipulate[d] to Ms. Terry's qualifications" to testify as an expect.  Tr. at 777:13-16 (McNamara).

55.    Terry testified about overseeing a review of historical lease and division order files to locate instruments creating overriding royalty interests that burden the Defendants' working interests in leases in this case.  See Tr. at 831:8-832:2 (Sheridan, Terry).  The review that Terry conducted took more than 100 hours, and involved a review of at least sixty file boxes. See Tr. at 832:17-22 (Sheridan, Terry); id. at 847:11-8548:6 (Sheridan, Terry).  Terry selected a sample of overriding royalty instruments from the proposed class and prepared a summary of those instruments.   See Overriding Royalty Language Used in Various Assignments (Defendants' Ex. 196); Tr. at 828:25-829:10 (Sheridan, Terry); id. at 832:3-16 (Sheridan, Terry); id. at 833:8-835:4 (Sheridan, Terry).  Of the 507 leases that are the subject of Plaintiffs' royalty claims, Terry reviewed and classified the leases into fifteen different categories.   See Lease Language Chart (Defendants' Ex. 191) Tr. at 813:17-20 (Sheridan, Terry); id. at 797:3-798:2 (Sheridan, Terry); id. at 800:25-802:12 (Sheridan, Terry); id. at 813:21-23 (Sheridan, Terry).

m.      **Oral Closing Arguments**.

56.     The Plaintiffs presented their closing argument first, immediately fielding the
Court's questions about how the Plaintiffs felt they could distinguish their case from <u>Roderick</u>.
<u>See</u> Tr. at 958:1-21 (Court).  The Plaintiffs responded that the district court in <u>Roderick</u> had not
considered the potentially individualized issues that the varying language in the class leases
presents.  <u>See</u> Tr. at 960:16-962:14 (Brickell)("[The Tenth Circuit] is saying that, yes, there is a
standard, but you [district judge] never looked at those leases.  And you go back and you
look at the leases.").  The Court inquired about the different textual provisions among the class,
asking if the Plaintiffs' were "hanging [their] hat on [the fact] that they're not materially
different language?"  Tr. at 963:1-2 (Court).  The Plaintiffs responded that, no, "they're not
materially different.  They are the same."  Tr. at 963:17-18 (Brickell).  The Court also inquired
about <u>Mark V</u>, asking how it could "manage a situation" where the Defendants "com[e] in and
demand[] a <u>Mark V</u> on every one of these leases?"  Tr. at 966:20-22 (Court).  The Plaintiffs'
response was to essentially point the Court to and describe the holding of <u>Davis v. Devon Energy
Corp.</u>, noting that, in that case, the Supreme Court of New Mexico reversed a state district court
that denied class certification on <u>Mark V</u> grounds.  <u>See</u> Tr. at 967:5-22 (Brickell).

57.     The Plaintiffs then shifted to delivering their prepared remarks, first establishing
that processing does not create any NGLs, but rather, NGLs that were always present in the gas
are removed during processing.  <u>See</u> note 34, <u>supra</u>.  The Plaintiffs emphasized both their case's
negative value nature and its manageability:

> Your Honor, I think it's very clear to the Court that there is not a single
> one of these plaintiffs, nor a single class member, that if these claims that we are
> presenting to the Court as our common issues are real, and they have been, and
> these damages are real, there is not a single one of these people that are ever
> going to recover unless it's a class action.  That's just a simple fact.  That's the
> only way.  Because, as you can see, just from the litigation cost that has been

generated to date, the expense of going after these types of issues, and just getting the discovery and calculations, it cannot be done any other way.

The great thing about the class action and these types of cases is -- on this difficulty issue up here, D -- is the defendants have been doing this for many years.  They have the database already set up.  They have the information on computer, all the payments, the decimal interest, and the volumes.  That's what makes it doable in terms of the difficulty issue.

Tr. at 976:10-977:5 (Brickell).   The Plaintiffs also walked the Court through its purported

common issues, summarized earlier, before yielding the floor to the Defendants.  See Tr. at

985:19-988:11 (Brickell).

58.   The Defendants presented next.  See Tr. at 994:12-1029:25 (Sheridan, Court).

The Court asked the Defendants whether their primary argument against certification was still

Mark V, and the Defendants stated that it was.  See Tr. at 994:13-25 (Court, Sheridan).  The

Defendants stated that "[t]he royalty class actions that you see brought in these other states,

particularly Kansas and Oklahoma, which have been the source of the opinion[s] in the Tenth

Circuit, all arise out of claims for breach of an implied covenant" rather than for breach of

contract.  Tr. at 995:12-17 (Sheridan).  The Defendants characterized Roderick as holding that,

"because no determination had been made that the implied duty to market claim . . . would not

negate express royalty terms," class certification was inappropriate.  Tr. at 996:5-9 (Sheridan).

The Defendants discussed ConocoPhillips Co. v. Lyons, asserting that the case's takeaway point

is that "[c]ourts are not free to go around implying covenants in contracts," but, rather, must look

to the express lease terms when they conflict with any implied-in-law terms the court may wish

to apply.  Tr. at 1002:7-1003:8 (Sheridan).  Last, the Defendants discussed the relevance of

division orders, conceding that division orders cannot alter the terms of the lease, but arguing

that they can be introduced, under Mark V, as evidence to illuminate the meaning of a lease that

the Court has found to be ambiguous:

> [T]he division order can be used to explain or to shed light on the meaning of an ambiguous instrument.  And under New Mexico law, it can be used to assist the court in making the threshold determination whether the lease term is unambiguous or ambiguous.  And that is the purpose for the use of that evidence.

Tr. at 1009:9-15 (Sheridan).

### 4.      The Post-Hearing Briefing.

59.      After the hearing, the parties filed several other documents.  The Plaintiffs filed closing arguments, and the Defendants responded.  Both parties filed post-hearing memoranda and supplemental case law in support of their positions.  Every argument contained in these documents has already been made repeatedly, so the Court will summarize these documents succinctly.

### a.      Written Closing Argument and Response.

60.      The Plaintiffs filed their closing argument roughly three weeks after the conclusion of the hearing.  See Plaintiffs' Closing Argument in Support of Class Certification, filed April 25, 2014 (Doc. 234)("Plaintiffs' Closing").  They argue that Mark V does not defeat certification, for three reasons.  See Plaintiffs' Closing at 1-9.  First, they assert that the Defendants have not produced a significant amount of extrinsic evidence and that such evidence is generally not available in this case, even if it could theoretically be admitted.  See Plaintiffs' Closing at 1-5.  Second, they argue that the Colorado claims are exempt from Mark V altogether, as Colorado uses a traditional four-corners approach to contract interpretation.  See Plaintiffs' Closing at 5-6.  Third, they contend that, under Davis v. Devon Energy Corp., the case can be certified under an implied-covenant theory, rather than a pure breach-of-contract theory, thus circumventing Mark V.  See Plaintiffs' Closing at 6-9.  The Plaintiffs focus the rest of their brief on more generic rule 23 arguments, doubling down on their contention that "the implied duty to

market applies to all class members."  Plaintiffs' Closing at 13 (capitalization altered for readability).  See id. at 9-18.

61.   The Defendants responded to the Plaintiffs' Closing Argument.  See Defendants' Response to Plaintiffs' Closing Argument in Support of Class Certification, filed May 6, 2014 (Doc. 238)("Defendants' Closing").  The Defendants' Closing brought up one meaningful point, which is that the Court has already dismissed the Defendants implied-duty-to-market claim -- truthfully, twice.  See Defendants' Closing at 1-3.  They reiterated their contention that covenants can be implied only "'in the absence of any express[ term] on the subject.'" Defendants' Closing at 3 (quoting Libby v. DeBaca, 1947-NMSC-007, ¶ 6, 179 P.2d 263).

**b.   Supplemental Case Law.**

62.   The Defendants points the Court to Arkalon Grazing Association v. Chesapeake Operating, Inc., No. CIV 09-1394 CM, 2014 WL 3089556 (D. Kan. July 7, 2014)(Murguia, J.), asserting that the district court in that case, "[a]fter considering variations in the express language of the more than fifty lease forms covering the 1044 leases at issue, and questions relating to the marketability of gas produced from the more than 400 wells at issue," held that individual issue predominated and refused to certify the class.  See Notice of Supplemental Authority in Support of Defendants' Post-Hearing Memorandum in Opposition to Plaintiffs' Motion for Class Certification, filed July 25, 2014 (Doc. 264).  The Plaintiffs respond that that case was inapposite in two ways:

  1.   The marketable condition rule, which is the sole class claim in Arkalon, is not currently pending before this Court with respect to the New Mexico wells, pursuant to the Court's dismissal by order of June 13, 2013;

  2.   The "gas quality at the well" is not an issue with regard to the Plaintiffs' chief common complaints which are: (a) that the Plaintiffs' and class members' payments were based on an affiliate sale; and (b) whether price paid was an index price, for natural gas only, not the price realized by the arm's length

sale by WPX and its affiliates for both gas and the more valuable natural gas liquids.

Plaintiffs' Corrected Response to Notice of Supplemental Authority, filed September 23, 2014 (Doc. 272)(replacing the initially filed Plaintiffs' Response to Notice of Supplemental Authority, filed July 30, 2014 (Doc. 265)).

63.   The Defendants also point the Court to EQT Prod. Co. v. Adair, 764 F.3d 347 (4th Cir. 2014)(Diaz, J., joined by Wilkinson & Keenan, JJ.).[36]   See Defendants' Notice of Supplemental Authority in Support of Defendants' Response to Plaintiffs' Motion for Class Certification (Doc. No. 205) and Defendants' Post Hearing Memorandum in Opposition to Plaintiffs' Motion for Class Certification (Doc. No. 233), filed September 25, 2014 (Doc. 273)("EQT Supp.").   The Defendants argue:

> First, the court made clear that when commonality is based upon classwide ownership of a property interest -- such as here, where Plaintiffs claim a royalty interest in drip condensate or in natural gas liquids extracted from natural gas through plant processing -- and resolution of the ownership question requires reference to specific language in the instruments granting or reserving the class members' property interests, "[s]uch individualized review precludes a finding of commonality."

EQT Supp. at 1-2 (citations omitted).   They argue that, "[s]econd, the court made clear that the plaintiff in a putative royalty class action is required to demonstrate how variations in the royalty language among differing class members do not defeat commonality," and, "[t]hird, the court

---

[36]The Court has examined this case carefully, having great respect for the Honorable J. Harvie Wilkinson III, United States Circuit Judge for the Fourth Circuit, who was on the undivided panel.  The bulk of the opinion, however, has little to do with this case.  The majority of EQT Production Co. v. Adair's analysis is devoted to disputes over the ownership of coalbed methane drilling rights -- namely, whether owners of coal-mining rights also owned the rights to the methane.  See 764 F.3d at 359-64.  Here, of course, there is no dispute over who owns the leases in question.  The ownership disputes in EQT Production Co. v. Adair, however, were so great as to not only undermine commonality, but to cause the class action to fail the "implicit threshold requirement that the members of a proposed class be 'readily identifiable.'"  764 F.3d at 358.

made clear that 'the need for individualized proof' on certain issues also present in this case, 'strongly affects the predominance analysis of Rule 23(b).'" EQT Supp. at 2 (citations omitted).

### CONCLUSIONS OF LAW

Having made its findings of fact, the Court issues the following legal conclusions, first outlining the law and then analyzing the facts at hand. Part I outlines the law regarding class certification, Part II outlines the law regarding New Mexico's statutes of limitations and the discovery rule, and Part III outlines the law regarding the implied covenant to market in New Mexico. Part IV is the analysis.

### I.     LAW REGARDING CERTIFYING CLASS ACTIONS UNDER RULE 23(b)(3).

1.     Rule 23 sets forth the requirements for certifying a class action under the federal rules. See Fed. R. Civ. P. 23. All classes must satisfy: (i) all the requirements of rule 23(a); and (ii) one of the three sets of requirements under rule 23(b), where the three sets of requirements correspond to the three categories of classes that a court may certify. See Fed. R. Civ. P. 23(a)-(b). The plaintiff[37] bears the burden of showing that the requirements are met, see Rex v. Owens ex rel. Okla., 585 F.2d 432, 435 (10th Cir. 1978); Pueblo of Zuni v. United States, 243 F.R.D. 436, 444 (D.N.M. 2007)(Johnson, J.), but, in doubtful cases, class certification is favored, see Esplin v. Hirschi, 402 F.2d 94, 101 (10th Cir. 1968)("[T]he interests of justice require that in a doubtful case, . . . any error, if there is to be one, should be committed in favor of allowing the class action."); Eisen v. Carlisle & Jacquelin, 391 F.2d 555, 563 (2d Cir. 1968)("[W]e hold that . . . rule [23] should be given a liberal rather than a restrictive interpretation, and that [denying

---

[37]Technically, it is the party seeking certification, i.e., the movant, who bears the burden of proof, and defendants may also move for class certification. See William B. Rubenstein, Newberg on Class Actions § 7:20 (5th ed.). As a practical matter, however, motions for class certification are made almost exclusively by plaintiffs.

certification] is justified only by a clear showing to that effect . . . .").  In ruling on a class certification motion, the Court need not accept the representations of either party, but must independently find the relevant facts to a preponderance of the evidence.[38]  See Rutstein v. Avis Rent-A-Car Sys., Inc., 211 F.3d 1228, 1234 (11th Cir. 2000)("Going beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues.").  "In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met."  Anderson v. City of Albuquerque, 690 F.2d 796, 799 (10th Cir. 1982).  See Vallario v. Vandehey, 554 F.3d 1259, 1267 (10th Cir. 2009)("We, of course, adhere to the principle that class certification does not depend on the merits of a suit").  Still, the Court must

---

[38]As the Court has previously noted, Tenth Circuit precedent suggests that the Court must show some level of deference to the Complaint's factual allegations when ruling on a rule 23 motion: "The Court must accept a plaintiff's substantive allegations as true, but it "need not blindly rely on conclusory allegations which parrot Rule 23," and "may consider the legal and factual issues presented by plaintiff's complaints."  In re Thornburg Mortg., Inc. Sec. Litig., 912 F. Supp. 2d 1178, 1120 (D.N.M. 2012)(Browning, J.)(citing Shook v. El Paso Cnty., 386 F.3d 963, 968 (10th Cir. 2004); J.B. v. Valdez, 186 F.3d 1280, 1290 n.7 (10th Cir. 1999); Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 178 (1974)).  Since the Court's statement in In re Thornburg Mortgage, Inc. Securities Litigation, however, the Tenth Circuit issued a case stating that district courts should apply a "strict burden of proof" to class certification issues.  Roderick, 725 F.3d 1213, 1218 (10th Cir. 2013).  This request is consistent with the general trend in the federal judiciary towards using an ordinary preponderance standard to find facts at the class certification stage.  See, e.g., Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc., 546 F.3d 196, 202 (2d Cir. 2008); In re Hydrogen Peroxide Litig., 552 F.3d 305, 318-20 (3d Cir. 2008); William B. Rubenstein, Newberg on Class Actions § 7:21 (5th ed.)(tracing the shift in the case law from deferring to plaintiffs' representations to adopting an ordinary preponderance standard, and disclaiming the Court's statement from In re Thornburg Mortgage, Inc. Securities Litigation -- a statement that earlier versions of the treatise espoused).  Thus, although the Tenth Circuit has not yet explicitly adopted the preponderance standard for fact-finding in class certification analyses, it most likely will, and the Court will employ that standard here.

conduct a rigorous analysis of the rule 23 requirements, even if the facts that the Court finds in

its analysis bear on the merits of the suit:

> Rule 23 does not set forth a mere pleading standard.  A party seeking class
> certification must affirmatively demonstrate his compliance with the Rule -- that
> is, he must be prepared to prove that there are in fact sufficiently numerous
> parties, common questions of law or fact, etc.   We recognized in [General
> Telephone Co. of the Southwest v.] Falcon that "sometimes it may be necessary
> for the court to probe behind the pleadings before coming to rest on the
> certification question," and that certification is proper only if "the trial court is
> satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been
> satisfied.    Actual, not presumed, conformance with Rule 23(a) remains
> indispensable."  Frequently that "rigorous analysis" will entail some overlap with
> the merits of the plaintiff's underlying claim.  That cannot be helped.  The class
> determination generally involves considerations that are enmeshed in the factual
> and legal issues comprising the plaintiff's cause of action.  Nor is there anything
> unusual about that consequence: The necessity of touching aspects of the merits in
> order to resolve preliminary matters, e.g., jurisdiction and venue, is a familiar
> feature of litigation.

Wal-Mart, 131 S. Ct. 2541, 2551-52 (2011)(Scalia, J.).  In a subsequent, seemingly contradictory

admonition, however, the Supreme Court cautioned district courts not to decide the merits of the

case at the class certification stage:

> Although we have cautioned that a court's class-certification analysis must be
> "rigorous" and may "entail some overlap with the merits of the plaintiff's
> underlying claim," Rule 23 grants courts no license to engage in free-ranging
> merits inquiries at the certification stage.  Merits questions may be considered to
> the extent -- but only to the extent -- that they are relevant to determining whether
> the Rule 23 prerequisites for class certification are satisfied.

Amgen Inc. v. Conn. Ret. Plans & Trust Funds, 133 S. Ct. 1184, 1194-95 (2013)(Ginsburg, J.).

To reconcile these two directives, the Court will find facts for the purposes of class certification

by the preponderance of the evidence, but will allow the parties to challenge these findings

during the subsequent merits stage of this case.  This approach is analogous to preliminary

injunction practice, and, although the Tenth Circuit has not endorsed it, other circuits have.  See

Abbott v. Lockheed Martin Corp., 725 F.3d 803, 810 (7th Cir. 2013); In re Hydrogen Peroxide

Antitrust Litig., 552 F.3d 305, 313 (3d Cir. 2008); Gariety v. Grant Thornton, LLP, 368 F.3d 356, 366 (4th Cir. 2004).  Because of the res judicata effect a class judgment has on absent parties, a court may not simply accept the named parties' stipulation that class certification is appropriate, but must conduct its own independent rule 23 analysis.  See Amchem Prods., Inc. v. Windsor, 521 U.S. at 620-22.  In taking evidence on the question of class certification, the Federal Rules of Evidence apply, albeit in a relaxed fashion.[39]

---

[39]Rule 1101 of the Federal Rules of Evidence provides:

    **(a)**    **To Courts and Judges.**  These rules apply to proceedings before:

        • United States district courts;

        • United States bankruptcy and magistrate judges;

        • United States courts of appeals;

        • the United States Court of Federal Claims; and

        • the district courts of Guam, the Virgin Islands, and the Northern Mariana Islands.

    **(b)**    **To Cases and Proceedings.**  These rules apply in:

        • civil cases and proceedings, including bankruptcy, admiralty, and maritime cases;

        • criminal cases and proceedings; and

        • contempt proceedings, except those in which the court may act summarily.

    **(c)**    **Rules on Privilege.**  The rules on privilege apply to all stages of a case or proceeding.

    **(d)**    **Exceptions.**  These rules -- except for those on privilege -- do not apply to the following:

        **(1)**    the court's determination, under Rule 104(a), on a preliminary question of fact governing admissibility;

 

    **(2)**      grand-jury proceedings; and

    **(3)**      miscellaneous proceedings such as:

          • extradition or rendition;

          • issuing an arrest warrant, criminal summons, or search warrant;

          • a preliminary examination in a criminal case;

          • sentencing;

          • granting or revoking probation or supervised release; and

          • considering whether to release on bail or otherwise.

  **(e)**    **Other Statutes and Rules.**  A federal statute or a rule prescribed by the Supreme Court may provide for admitting or excluding evidence independently from these rules.

Fed. R. Evid. 1101.  It is not immediately obvious whether a class certification hearing is a "civil case[ or] proceeding" under rule 1101(b) -- in which case the Federal Rules of Evidence apply -- or a "miscellaneous proceeding" under rule 1101(d)(3) -- in which case the Rules do not apply.  The Tenth Circuit does not appear to have addressed this question, but most courts have concluded that the Federal Rules of Evidence do not apply to class certification hearings.  See Paxton v. Union Nat'l Bank, 688 F.2d 552, 562 n.14 (8th Cir. 1982)(Heaney, J.)("Hearsay testimony may be admitted to demonstrate typicality."  (citing Donaldson v. Pillsbury Co., 554 F.2d 825, 830 n.3 (8th Cir. 1977)(Webster, J.))); Bell v. Addus Healthcare, Inc., No. C06-5188, 2007 WL 3012507, at *3 (W.D. Wash. Oct. 12, 2007)("[T]he Court is still not persuaded that it must apply the traditional rules . . . [to] evidence in support of class certification."); Fisher v. Ciba Specialty Chems. Corp., 238 F.R.D. 273, 279 (S.D. Ala. 2006)("[T]he Federal Rules of Evidence are not stringently applied at the class certification stage because of the preliminary nature of such proceedings.  Courts confronted with Rule 23 issues may consider evidence that may not ultimately be admissible at trial."); id. at 279 n.7 ("[D]efendants proffered . . . that the Federal Rules of Evidence should be rigorously applied . . . .  [D]efendants came forward with not a single case supporting their position that those Rules should be stringently enforced."); Rockey v. Courtesy Motors, Inc., 199 F.R.D. 578, 582 (W.D. Mich. 2001); In re Hartford Sales Practices Litig., 192 F.R.D. 592, 597 (D. Minn. 1999); Thompson v. Bd. of Educ. of Romeo Cmty. Sch., 71 F.R.D. 398, 402 n.2 (W.D. Mich. 1976), rev'd on other grounds, 709 F.2d 1200 (6th Cir. 1983).  See also Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 178 (1974)("[W]e might note that a preliminary determination of the merits [at the class certification stage] may result in substantial prejudice to a defendant, since of necessity it is not accompanied by the traditional rules and procedures applicable to civil trials.").  But see Mars Steel Corp. v. Cont'l Bank N.A., 880 F.2d 928, 937-38 (7th Cir. 1989)(Easterbrook, J.)(holding that the Federal Rules of Evidence

apply to class settlement fairness hearings); In re Fine Paper Antitrust Litig., 751 F.2d 562, 584 (3d Cir. 1984)(Gibbons, J.)("[P]lainly, the requirement of an evidentiary hearing [to resolve attorneys' claims for fees from an equitable fund] demands the application in that hearing, of the Federal Rules of Evidence."  (citing no cases)); Soutter v. Equifax Info. Servs. LLC, 299 F.R.D. 126, 129 (E.D. Va. 2014)("The Federal Rules of Evidence . . . 'apply to proceedings in United States courts,' subject to certain exceptions not applicable here.  A motion for class certification is, without doubt, such a proceeding."); Pecover v. Elec. Arts Inc., No. C08-2820 VRW, 2010 WL 8742757, at *2 (N.D. Cal. Dec. 21, 2010)(Walker, J.)("There seems to be nothing in the Federal Rules of Evidence or in the Federal Rules of Civil Procedure to suggest that class action certification proceedings present an exception to FRE 1101 or that the Federal Rules of Evidence carry different meaning in the class action certification context than elsewhere."); Lewis v. First Am. Title Ins. Co., 265 F.R.D. 536, 544 (D. Idaho 2010)("[T]he FRE and the minimal case law available support First American's position that the FRE apply generally at the class certification stage."  (citing no cases)); McLaughlin on Class Actions § 3:14 (10th ed.)("When conducting its rigorous analysis of whether a class should be certified, the Court should apply the Rules of Evidence.").

The Supreme Court, however, dropped an important clue in Wal-Mart indicating that the Federal Rules of Evidence apply in class certification hearings: "The District Court concluded that Daubert did not apply to testimony at the certification stage of class-action proceedings.  We doubt that is so . . . ."  131 S. Ct. at 2554-54 (citation to the district court opinion omitted).  The Court is reticent to read too much into this passing reference, but, considering the issue on its own, concludes that the Federal Rules of Evidence apply to class certification hearings.  First of all, under rule 1101(b), the Federal Rules of Evidence apply to "civil cases and proceedings"; a class action is a civil case, and the class certification hearing is a civil proceeding.  If there were no exceptions, the Federal Rules of Evidence would apply.  Hence, if the Federal Rules of Evidence do not apply, class certification hearings must fit within one of the exceptions.  All of the exceptions specifically listed in rule 1101(d)(2) and (d)(3) are criminal; only rule 1101(d)(1) clearly covers civil cases -- and it covers criminal cases, as well.  Rule 1101(d)(1) encompasses the common-sense rule that the court can consider inadmissible hearsay for the limited purpose of determining, under rule 104(a), "any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible."  Fed. R. Evid. 104(a).  A class certification hearing is not a hearing to decide the admissibility of evidence, but whether the case should proceed as a class under rule 23; in that sense, it is more like a hearing under rule 12(b)(6) or rule 56 than one to determine admissibility under the rules of evidence.  Similarly, a class certification hearing does not seem to be similar to the miscellaneous criminal proceedings that rule 1101(d)(3) lists.  There may be a public policy need to dispense with the formalities of the rules of evidence when making the potentially life-and-death decisions concerning: (i) whether to release a criminal defendant on bail when he or she may present a danger to the public; (ii) whether to revoke probation or grant a defendant release after he or she has allegedly violated the terms of his or her release; (iii) how long to sentence a defendant who may be a danger to the public; (iv) whether to extradite a defendant out of the court's jurisdiction, where the court may never see the defendant again, and where the defendant may not be treated fairly; and (v) whether to grant an arrest warrant, criminal summons, or search warrant -- decisions that are made ex parte and often under time constraints.  The similarity of a class certification hearing to

    **1.**    <u>**Requirements Applicable to All Classes: Rule 23(a).**</u>

    2.    All classes must satisfy the prerequisites of rule 23(a):

    **(a)**    **Prerequisites**.  One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

        **(1)**    the class is so numerous that joinder of all members is impracticable;

        **(2)**    there are questions of law or fact common to the class;

        **(3)**    the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

        **(4)**    the representative parties will fairly and adequately protect the interests of the class.

---

a trial suggests that a class certification hearing is not a "miscellaneous proceeding such as" a hearing on sentencing, extradition, preliminary examination, probation violation, or setting bail.

Class certification is an important stage of a case: a certified class action often settles, often for a large amount of money; a rejected or precertification class action is difficult to settle -- except for the often miniscule value of the claims of the individual class representatives -- because res judicata does not attach to the absent class members unless and until the class is certified.  The importance of the class certification determination led Congress, the Supreme Court, and the drafters of the Rules to avail litigants to an interlocutory appeal of the district court's determination -- a rare exception to the final-judgment rule.  <u>See</u> Fed. R. Civ. P. 23(f) ("A court of appeals may permit an appeal from an order granting or denying class-action certification under this rule if a petition for permission to appeal is filed with the circuit clerk within 14 days after the order is entered.").  Thus, given the importance of the class certification determination and the evidentiary nature of the hearing, the Court concludes that the Federal Rules of Evidence apply.  On the other hand, the sole decider in class certification hearings is a judge, and not a jury.  Judges may be better equipped to properly weigh the value of hearsay and irrelevant evidence than juries.  Moreover, there is no practical way to screen a presiding judge entirely from hearing inadmissible evidence, as it is the judge who must decide the threshold question of admissibility.  It is, thus, perhaps more realistic and more honest for the judge to consider all but the most egregiously inadmissible pieces of evidence as they are presented, and factor any evidentiary infirmity into the weight he or she gives to them.

The parties have to decide how to put on their cases; if they want to object to each others' evidence, it may make their presentations difficult.  On the other hand, if the parties decide to make objections, the Court will do its job and decide the objections under the Federal Rules of Evidence, not some other standard.

Fed. R. Civ. P. 23(a).  "A party seeking to certify a class is required to show . . . that all the requirements of [rule 23(a)] are clearly met." Reed v. Bowen, 849 F.2d 1307, 1309 (10th Cir. 1988).  "Although the party seeking to certify a class bears the burden of proving that all the requirements of Rule 23 are met, the district court must engage in its own 'rigorous analysis' of whether 'the prerequisites of Rule 23(a) have been satisfied.'" Shook v. El Paso Cnty., 386 F.3d 963, 968 (10th Cir. 2004)(quoting Gen. Tel. Co. of the S.W. v. Falcon, 457 U.S. 147, 161 (1982))(citing Reed v. Bowen, 849 F.2d at 1309).  These four requirements are often referenced as numerosity, commonality, typicality, and adequacy, respectively.

> **a.      Numerosity.**

3.      Rule 23(a)(1) requires that the putative class membership be sufficiently large to warrant a class action, because the alternative of joinder is impracticable.  Some courts have held that numerosity may be presumed at a certain number; the Tenth Circuit, however, "has never adopted such a presumption." Trevizo v. Adams, 455 F.3d 1155, 1162 (10th Cir. 2006).  "The Tenth Circuit has stated that there is 'no set formula' to determine whether the numerosity requirement is met; instead, it is a fact-specific inquiry best left to the district court's discretion." Gonzales v. City of Albuquerque, No. CIV 09-0520 JB/RLP, 2010 WL 4053947, at *7 (D.N.M. Aug. 21, 2010)(Browning, J.)(quoting Rex v. Owens, 585 F.2d 432, 436 (10th Cir. 1978)). Cf. Mullen v. Treasure Chest Casino, LLC, 186 F.3d 620, 624 (5th Cir. 1999)(finding that proposed class consisting of "100 to 150 members . . . is within the range that generally satisfies the numerosity requirement").  In determining whether a proposed Class meets the numerosity requirement, "the exact number of potential members need not be shown," and a court "may make 'common sense assumptions' to support a finding that joinder would be impracticable." Neiberger v. Hawkins, 208 F.R.D. 301, 313 (D. Colo. 2002)(citation omitted).  See Bittinger v.

Tecumseh Prods. Co., 123 F.3d 877, 884 n.1 (6th Cir. 1997)(noting that rule 23(a)(1) is not a

"'strict numerical test'"; holding, however, that where class comprises over 1,100 persons,

suggestion that joinder is not impractical is "frivolous")(citation omitted); Robidoux v. Celani,

987 F.2d 931, 936 (2nd Cir. 1993)("[T]he difficulty in joining as few as 40 putative class

members should raise a presumption that joinder is impracticable."   (citation omitted)).

"Satisfaction of the numerosity requirement does not require that joinder is impossible, but only

that plaintiff will suffer a strong litigational hardship or inconvenience if joinder is required."

Cook v. Rockwell Int'l Corp., 151 F.R.D. 378, 384 (D. Colo. 1993).  See Robidoux v. Celani,

987 F.2d 931, 935 (2d Cir. 1993)("Impracticable does not mean impossible.").  The Court has

previously found that joinder of "several hundred tenants and homeowners" would be

impracticable, and thus the proposed class met rule 23(a)(1)'s numerosity requirement.  Lowery

v. City of Albuquerque, 273 F.R.D. 668, 683 (D.N.M. 2011)(Browning, J.).  At the other end of

the spectrum, the Court found that a class of 6,100 members, in a securities action, was so

numerous that joinder was impracticable.   See Lane v. Page, 272 F.R.D. 558, 574 (D.N.M.

2011)(Browning, J.).   See also Thompson v. Jiffy Lube Intern., Inc., 250 F.R.D. 607, 620

(D. Kan. 2008)(Brown, J.)(finding that the numerosity requirement is met by a proposed class

seeking injunctive relief that constituted "at least tens of millions of members," and by a

proposed class seeking damages that constitutes at least 4,900 members).

b.   <strong><u>Commonality</u></strong>.

4.   Rule 23(a)(2) requires that "there are questions of law <u>or</u> fact common to the

class."  Fed. R. Civ. P. 23(a)(2) (emphasis added).  Even "factual differences in the claims of the

individual putative class members should not result in a denial of class certification where

common questions of law exist."   In re Intelcom Group Sec. Litig., 169 F.R.D. 142, 148

(D. Colo. 1996). <u>See</u> <u>Adamson v. Bowen</u>, 855 F.2d 668, 676 (10th Cir. 1988)("That the claims of individual putative class members may differ factually should not preclude certification under Rule 23(b)(2) of a claim seeking the application of a common policy."); <u>Lopez v. City of Santa Fe</u>, 206 F.R.D. 285, 289 (D.N.M. 2002)(Vázquez, J.)("Commonality requires only a single issue common to the class, and the fact that 'the claims of individual putative class members may differ factually should not preclude certification under Rule 23(b)(2) of a claim seeking the application of a common policy.'" (citations omitted)). A single common question will suffice to satisfy rule 23(a)(2), but the question must be one "that is central to the validity of each one of the claims." <u>Wal-Mart</u>, 131 S. Ct. at 2551.

5.   "The commonality requirement has been applied permissively in securities fraud litigation." <u>In re Initial Pub. Offering Sec. Litig.</u>, 227 F.R.D. 65, 87 (S.D.N.Y. 2004). "Securities cases often involve allegations of common courses of fraudulent conduct, which can be sufficient to satisfy the commonality requirement." 5 Jerold S. Solovy, Ronald L. Marmer, Timothy J. Chorvat & David M. Feinberg, <u>Moore's Federal Practice</u> § 23.23[4][b], at 23-77 (3d ed. 2004). "Where the facts as alleged show that Defendants' course of conduct concealed material information from an entire putative class, the commonality requirement is met." <u>In re Oxford Health Plans, Inc. Sec. Litig.</u>, 191 F.R.D. 369, 374 (S.D.N.Y. 2000). <u>Accord</u> <u>Initial Pub. Offering</u>, 227 F.R.D. at 87 ("In general, where putative class members have been injured by similar material misrepresentations and omissions, the commonality requirement is satisfied.").

6.   The commonality requirement was widely perceived to lack teeth before the Supreme Court's decision in <u>Wal-Mart</u>, which grafted the following requirements onto rule 23(a)(2): (i) that the common question is central to the validity of each claim that the proposed class brings; and (ii) that the common question is capable of a common answer. <u>See</u> <u>Wal-Mart</u>,

131 S. Ct. at 2550-52.  In that case, a proposed class of about 1.5 million current and former Wal-Mart employees sought damages under Title VII for Wal-Mart's alleged gender-based discrimination.  See 131 S. Ct. at 2547.  Wal-Mart, however, had no centralized company-wide hiring or promotion policy, instead opting to leave personnel matters to the individual store managers' discretion.  See 131 S. Ct. at 2547-48.  The plaintiffs argued that, although no discriminatory formal policy applied to all proposed class members, "a strong and uniform 'corporate culture' permits bias against women to infect, perhaps subconsciously, the discretionary decisionmaking of each one of Wal-Mart's thousands of managers -- thereby making every [proposed class member] the victim of one common discriminatory practice." 131 S. Ct. at 2548.  The Supreme Court disagreed that such a theory constitutes a common question under rule 23(a)(2).

> The crux of this case is commonality -- the rule requiring a plaintiff to show that "there are questions of law or fact common to the class."  Rule 23(a)(2). That language is easy to misread, since "[a]ny competently crafted class complaint literally raises common 'questions.'"  Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 131-132 (2009).  For example: Do all of us plaintiffs indeed work for Wal-Mart?  Do our managers have discretion over pay?  Is that an unlawful employment practice?  What remedies should we get?  Reciting these questions is not sufficient to obtain class certification.  Commonality requires the plaintiff to demonstrate that the class members "have suffered the same injury," Falcon, 102 S. Ct. at 2364.  This does not mean merely that they have all suffered a violation of the same provision of law.  Title VII, for example, can be violated in many ways -- by intentional discrimination, or by hiring and promotion criteria that result in disparate impact, and by the use of these practices on the part of many different superiors in a single company.  Quite obviously, the mere claim by employees of the same company that they have suffered a Title VII injury, or even a disparate-impact Title VII injury, gives no cause to believe that all their claims can productively be litigated at once.  Their claims must depend upon a common contention -- for example, the assertion of discriminatory bias on the part of the same supervisor.  That common contention, moreover, must be of such a nature that it is capable of classwide resolution -- which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.

> What matters to class certification . . . is not the raising of common "questions" -- even in droves -- but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation.  Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.

Wal-Mart, 131 S. Ct. at 2550-51 (emphasis in original)(quoting Nagareda, supra, at 132).  In

EQT Production Co. v. Adair, the Fourth Circuit stated:

> We first review the aspects of the district court's analysis that apply to all five royalty underpayment classes.
>
> At bottom, the district court believed that both the commonality and predominance requirements of Rule 23 were satisfied by the same basic fact: the defendants employed numerous uniform practices related to the calculation and payment of CBM royalties.  These common practices are not irrelevant to Rule 23(b)'s predominance requirement.  But we hold that the district court abused its discretion by failing to consider the significance of this common conduct to the broader litigation.
>
> The district court identified numerous common royalty payment practices.  For example, it noted that EQT sells all of the CBM it produces in Virginia to an affiliate, EQT Energy, and that "all royalty owners within the same field have been paid royalties based on the same sales price for the CBM."  With respect to CNX, it noted that CNX "has uniform policies and procedures which governed its calculation of CBM revenues," and that "it has deducted severance and license taxes when calculating royalties since January 1, 2004."
>
> That the defendants engaged in numerous common practices may be sufficient for commonality purposes.  As noted above, the plaintiffs need only demonstrate one common question of sufficient importance to satisfy Rule 23(a)(2).

764 F.3d at 366 (citations omitted).

7.   In Wal-Mart, Justice Scalia stated: "Wal-Mart is entitled to individualized

determinations of each employee's eligibility for backpay."   131 S. Ct. at 2546.   From this

observation, he then concluded:

> Because the Rules Enabling Act forbids interpreting Rule 23 to "abridge, enlarge or modify any substantive right," 28 U.S.C. § 2072(b), a class cannot be certified on the premise that Wal-Mart will not be entitled to litigate its statutory defenses

> to individual claims.  And because the necessity of that litigation will prevent
> backpay from being "incidental" to the classwide injunction, respondents' class
> could not be certified even assuming, arguendo, that "incidental" monetary relief
> can be awarded to a 23(b)(2) class.

Wal-Mart, 131 S. Ct. at 2561.  Thus, the common question or questions cannot be "incidental"

nor can the plaintiff submit a long list of "incidental" questions or issues, and say that they

predominate over the real issues to be used.

### c.   Typicality.

8.   Rule 23(a)(3) requires that the named representative's claims be typical of the

class' claims.  See Fed. R. Civ. P. 23(a)(3).  The typicality requirement ensures that absent

proposed class members are adequately represented by evaluating whether the named plaintiff's

interests are sufficiently aligned with the class' interest.  See Baby Neal ex rel. Kanter v. Casey,

43 F.3d 48, 57 (3d Cir. 1994); Nicodemus v. Union Pac. Corp., 204 F.R.D. 479, 490 (D. Wyo.

2001).  The Supreme Court of the United States has noted that "[t]he commonality and typicality

requirements of Rule 23(a) tend to merge."  Gen. Tele. Co. of the Sw. v. Falcon, 457 U.S. at 157

n.13.  "Provided the claims of Named Plaintiffs and putative class members are based on the

same legal or remedial theory, differing fact situations of the putative class members do not

defeat typicality."  DG v. Devaughn, 594 F.3d 1188, 1198 (10th Cir. 2010)(citing Adamson v.

Bowen, 855 F.2d 668, 676 (10th Cir. 1988)).   "[L]ike commonality, typicality exists

where . . . all putative class members are at risk of being subjected to the same harmful practices,

regardless of any class member's individual circumstances."  DG v. Devaughn, 594 F.3d at

1199.  Factual differences among some of the proposed class members will "not defeat typicality

under Rule 23(a)(3) so long as the claims of the class representative and putative class members

are based on the same legal or remedial theory."  Adamson v. Bowen, 855 F.2d 668, 676 (10th

Cir. 1988).  See Penn v. San Juan Hosp., Inc., 528 F.2d 1181, 1189 (10th Cir. 1975)("It is to be

recognized that there may be varying fact situations among individual members of the class and this is all right so long as the claims of Plaintiffs and the other putative class members are based on the same legal or remedial theory.").  Accordingly, differences in the amount of damages will not defeat typicality.  See Harrington v. City of Albuquerque, 222 F.R.D. 505, 511 (D.N.M. 2004)(Hansen, J.).  "The United States Court of Appeals for the Tenth Circuit has said that the typicality requirement is satisfied if there are common questions of law or fact."  Gianzero v. Wal-Mart Stores Inc., No. CIV 09-00656 REB/BNB, 2010 WL 1258071, at *3 (D. Colo. Mar. 29, 2010)(citing Milonas v. Williams, 691 F.2d 931, 938 (10th Cir. 1982))("In determining whether the typicality and commonality requirements have been fulfilled, either common questions of law or fact presented by the class will be deemed sufficient."); Adamson v. Bowen, 855 F.2d at 676 ("[D]iffering fact situations of putative class members do not defeat typicality under Rule 23(a)(3) so long as the claims of the class representative and putative class members are based on the same legal or remedial theory."  (citations omitted)).

### d.      **Adequacy.**

9.      Rule 23(a)(4) requires that "representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  This requirement protects the due-process interests of unnamed proposed class members -- who are bound by any judgment in the action.  See Matsushita Elec. Indus. Co. v. Epstein, 516 U.S. 367, 379 n.5 (1996)(characterizing adequacy of representation as a constitutional requirement); Lile v. Simmons, 143 F. Supp. 2d 1267, 1277 (D. Kan. 2001)("Due process requires that the Court 'stringently' apply the competent representation requirement because putative class members are bound by the judgment (unless they opt out), even though they may not actually be aware of the proceedings.").  "The requirement of fair and adequate representation is perhaps the most

important of the criteria for class certification set forth in Rule 23(a)."  Miller ex rel. S.M. v. Bd. of Educ., 455 F. Supp. 2d 1286, 1294 (D.N.M. 2006)(Armijo, J.).  See Cobb v. Avon Prods., Inc., 71 F.R.D. 652, 654 (W.D. Pa. 1976)("Adequacy of the representative is of monumental importance since representation demands undiluted loyalty to the class interests . . . .").  The Tenth Circuit has identified two questions relevant to the adequacy of representation inquiry: (i) whether the named plaintiffs and their counsel have any conflicts with other proposed class members; and (ii) whether the named plaintiffs and their counsel will vigorously prosecute the action on the class' behalf.  See Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d 1180, 1187-88 (10th Cir. 2002).  In considering this second question, the experience and competence of the attorney representing the class may inform the court's analysis.  See Lopez v. City of Santa Fe, 206 F.R.D. at 289-90.  Although Tenth Circuit precedent suggests that the adequacy-of-counsel analysis is conducted as a part of the rule 23(a)(4) inquiry, this analysis has likely now been moved entirely to rule 23(g).[40]  This difference matters little, except that now district courts should not refuse to certify a class on the basis of inadequacy of counsel alone.

10.    The Supreme Court "has repeatedly held [that] a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the putative class members."  E. Tex. Motor Freight Sys. Inc. v. Rodriguez, 431 U.S. 395, 403 (1977)(quoting Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 216 (1974)).  Courts have found that intra-class conflicts "may negate adequacy under Rule 23(a)(4)."  Langbecker v. Elec. Data Sys. Corp., 476 F.3d 299, 315 n.28 (5th Cir. 2007)(holding that the district court erred in certifying a class without evaluating intra-class conflicts).  See Pickett v. Iowa Beef Processors,

---

[40]The 2003 amendments to rule 23 created rule 23(g), entitled "class counsel."  Fed. R. Civ. P. 23(g).  This subsection contains its own adequacy-of-counsel analysis.  See Fed. R. Civ. P. 23(g)(1)-(2).

209 F.3d 1276, 1280 (11th Cir. 2000)(finding that representation was inadequate where the class included those "who claim harm from the very acts from which other putative class members benefitted"); Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d 331, 344 (4th Cir. 1998)(holding that the current franchisees who had an interest in the continued viability of the franchiser had an inherent conflict with former franchisees whose only interest was in the maximization of damages); Alston v. Va. High Sch. League, Inc., 184 F.R.D. 574, 579 (W.D. Va. 1999)(ruling that a class of all high school female athletes could not be certified -- even if the alleged conduct of the defendant school system was discriminatory -- when some female athletes did not share the same goals or interests as the named female plaintiffs, because those unnamed female athletes were satisfied with and/or benefitted from the alleged discriminatory treatment).

11.     On the other hand, "only a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status.   Beyond that straightforward proposition, defining the level of antagonism or conflict that should preclude class certification is a more difficult proposition."   7A Charles Alan Wright, Arthur A. Miller & Mary K. Kane, Federal Practice & Procedure § 1768, at 389-93 (3d ed. 2005).   "Though a plaintiff cannot be an adequate representative if he or she has a conflict of interest with putative class members, not every potential disagreement between a class representative and the putative class members will stand in the way of a class suit."   Lowery v. City of Albuquerque, 273 F.R.D. at 680 (citation omitted).

**2.      Different Categories of Classes: Rule 23(b).**

12.     Once the court finds that the threshold requirements have been met, "it must then examine whether the class falls within at least one of three categories of suits set forth in Rule

23(b)." Adamson v. Bowen, 855 F.2d at 675. See DG v. Devaughn, 594 F.3d at 1199 ("In addition to satisfying Rule 23(a)'s requirements, the class must also meet the requirements of one of the types of classes described in subsection (b) of Rule 23."). Rule 23(b) provides that a class action is appropriate if the threshold requirements are satisfied, and the case falls into one or more of three categories:

> **(b)** **Types of Class Actions.** A class action may be maintained if Rule 23(a) is satisfied and if:
>
> > **(1)** prosecuting separate actions by or against individual putative class members would create a risk of:
> >
> > > **(A)** inconsistent or varying adjudications with respect to individual putative class members that would establish incompatible standards of conduct for the party opposing the class; or
> > >
> > > **(B)** adjudications with respect to individual putative class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;
> >
> > **(2)** the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or
> >
> > **(3)** the court finds that the questions of law or fact common to putative class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
> >
> > > **(A)** the putative class members' interests in individually controlling the prosecution or defense of separate actions;

> **(B)**  the extent and nature of any litigation concerning the controversy already begun by or against putative class members;
>
> **(C)**  the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> **(D)**  the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b). "Only one of rule 23(b)'s subdivisions must be satisfied to meet the class-action requirements." Gonzales v. City of Albuquerque, No. CIV 09-0520 JB/RLP, 2010 WL 4053947, at *11 (D.N.M. Aug. 21, 2010)(citing Carpenter v. Boeing, Co., 456 F.3d 1183, 1187 (10th Cir. 2006)(stating that the district court must determine whether a suit "falls within one of the categories of actions maintainable as class actions")).

13.     The three categories of class actions -- really four, as rule 23(b)(1) contains two subcategories, known as (b)(1)(A) and (b)(1)(B) class actions -- are not of equal utility.  Class actions under (b)(1) can be certified only in very particular circumstances.  Class actions under (b)(2) are broadly available, but are only capable of seeking injunctive or declaratory relief, and not damages.  Far and away the most controversial class action category, (b)(3), can be brought for class-wide damages, injunctive relief, declaratory relief, or any combination thereof.  Class actions under (b)(3) always require notice to all proposed class members of certification of the class, and those individuals must be given the opportunity to opt out if they so desire.  See Fed. R. Civ. P. 23(c)(2)(B); Phillips Petrol. Co. v. Shutts, 472 U.S. at 812 ("[W]e hold that due process requires at a minimum that an absent plaintiff be provided with an opportunity to remove himself from the class by executing and returning an 'opt out' or 'request for exclusion' form to the court.").  The other class action categories, however, are ordinarily mandatory, and neither notice nor opportunity to opt out needs to be given.  See Fed. R. Civ. P. 23(c)(2)(B); Phillips

Petrol. Co. v. Shutts, 472 U.S. at 811 n.3 (limiting the constitutional requirement of an opt-out

notice "to those class actions which seek to bind known plaintiffs concerning claims wholly or

predominately for money judgments").  The Court will focus on the most important form of class

action, the (b)(3) damages class action.[41]

---

[41]The Court will briefly address the other class-action types.  Rule 23(b)(1) contains two subcategories of class action, (b)(1)(A) actions and (b)(1)(B) actions; a class need satisfy the requirements of only one to be certified.  See Fed. R. Civ. P. 23(b)(1).  Class actions under (b)(1)(A) are designed to avoid the situation in which a defendant subject to suit by multiple plaintiffs is ordered to undertake incompatible courses of conduct as a result of the non-centralized nature of the adjudication.  See Fed. R. Civ. P. 23(b)(1)(A).  "Incompatible" means more than simply inconsistent.  A situation in which, e.g., a defendant was ordered to pay $10,000.00 to a plaintiff in one case, was ordered to pay ten million dollars to another plaintiff in an identical or similar case, and was found to not be at fault at all in yet another case, may be inconsistent, but it does not create "incompatible standards of conduct for the party opposing the class."  Fed. R. Civ. P. 23(b)(1)(A).  Such alleged inconsistency is a normal and expected part of the system of individualized adjudication used by the judiciary to apply a uniform set of laws onto varied factual settings.  What (b)(1)(A) is designed to avoid is injunctive or declaratory "whipsawing," in which, e.g., one court orders a school district to close an underperforming inner-city school and bus its students to suburban schools, and another court orders the district to keep the school open and bus suburban students in to the school.

Class actions under (b)(1)(B) serve a similar role, but apply when varying adjudications would result in practically -- rather than legally -- incompatible judgments.  See Fed. R. Civ. P. 23(b)(1)(B).  Rule (b)(1)(B) applies when the defendant has possession or control of a res -- a pot of money or thing that constitutes the relief that the proposed class seeks -- and the relief sought by all the individual members of the proposed class would more than exhaust the res.  For example, if a Ponzi scheme operator took ten billion dollars of investors' money, and, upon law enforcement's discovery of the scheme, had only six billion dollars remaining, then the individual investors' claims to recover their rightful share would add up to four billion dollars more than existed in the res.  Thus, the court might certify a (b)(1)(B) class action to ensure that the custodian of the res does not pay out the entire res to the first investors to file suit, but, instead, distributes the res fairly among all investors -- most likely by paying each investor 60& of his or her lost investment.

The two subcategories of (b)(1) class action have other things in common as well.  Both exist, in a sense, for the benefit of the defendant -- at least relative to (b)(2) and (b)(3) class actions -- and are rarely brought, in part because plaintiffs have little incentive to bring them.  In the (b)(1)(B) example, each investor hopes to recover the full value of his or her investment, not a 60% value, and thus is incentivized to file as an individual.  In the (b)(1)(A) example, the plaintiff seeking to close down the school (i) does not care about the inconsistent obligations of the school district, and (ii) would rather not be joined in a class action with plaintiffs who want to keep the school open.  Last, (b)(1) class actions, along with (b)(2) class actions, are mandatory: if certified, no person covered under the class definition may opt out of it or pursue

his or her own individual claim.  As such, no notice needs to be given to the class members that they are part of ongoing litigation, although the certifying court may elect to direct notice in appropriate circumstances.  See Fed. R. Civ. P. 23(c)(2)(A).

Class actions under (b)(2) provide for injunctive or declaratory relief when a defendant has "acted or refused to act on grounds that apply generally to the class."  Fed. R. Civ. P. 23(b)(2).

> The key to the (b)(2) class is "the indivisible nature of the injunctive or declaratory remedy warranted -- the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them."  Nagareda, supra, at 132.  In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class.  It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant.  Similarly, it does not authorize class certification when each class member would be entitled to an individualized award of monetary damages.

Wal-Mart, 131 S. Ct. at 2557 (emphasis in original).  The (b)(2) class action was invented for the purpose of facilitating civil rights suits, and much of its use is in that field today.  See William B. Rubenstein, Newberg on Class Actions § 4:26 (5th ed.)("Newberg").  The (b)(2) class action allows civil rights litigants to advocate on behalf of all similarly situated individuals, such as a disenfranchised black voter representing a class of all black voters within an unconstitutionally drawn district or a jail inmate representing all inmates in an overcrowding case.  Anyone familiar with the nation's seminal civil rights cases, however, knows that many of them are not brought as class actions, which raises a question:

> [W]hy would anyone ever bring one?  . . .  Th[is] inquiry is generated because if an individual litigant pursues an individual case for injunctive relief and prevails, she can generally get all of the remedy that she needs without going through the hurdles of certifying a class.  For example, to return to Brown v. Board of Education, once Linda Brown prevailed on her race discrimination claim, her remedy -- a desegregated school -- was hers to pursue.  Although that remedy would affect many other persons not a part of her litigation, hence making class certification appropriate, there is no requirement that to secure that remedy, she had to file a class action.
>
> Nonetheless, social change advocates tend to pursue class certification under Rule 23(b)(2) for several reasons.  First, and perhaps most importantly, Linda Brown will likely graduate from school long before her case ends; if hers is simply an individual action, it will become moot and risk dismissal.  Class certification, however, constitutes an exception to the mootness doctrine in certain circumstances.  Second, the scope of the plaintiff's relief is likely augmented by certifying a class.  It is arguable that all that Linda Brown would have been able to secure as a remedy for her individual claim was a desegregated school for

14.    To satisfy rule 23(b)(3), the court must find "that the questions of law or fact common to the members of the class <u>predominate</u> over any questions affecting only individual members, and that a class action is <u>superior</u> to other available methods for the fair and efficient adjudication of the controversy."   Fed. R. Civ. P. 23(b)(3) (emphases added).   Rule 23(b)(3) provides that "[t]he matters pertinent to these findings include": (i) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (ii) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (iii) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (iv) the difficulties likely to be encountered in the management of a class action.  Fed. R. Civ. P. 23(b)(3)(A)-(D).

### i.    The Predominance Requirement.

15.    Rule 23(b)(3)'s first requirement is that questions common to the class predominate over those that are individualized.   <u>See</u> Fed. R. Civ. P. 23(b)(3).   A question is common when "the same evidence will suffice for each member to make a prima facie showing,"

---

herself, not for students throughout the entire school district; there is some relationship between the scope of the class and the scale of the remedy.  Third, it is often the case that the attorneys pursuing civil rights actions are doing so as public interest lawyers paid by an organization like the NAACP Legal Defense Fund or the American Civil Liberties Union (ACLU); they may therefore have a financial incentive to pursue a class's case rather than a series of individual cases as they have limited resources, and the economies of scale may argue for a class action suit.  Most generally, many civil rights cases are brought as class suits because the attorneys and clients pursuing them conceptualize their efforts in group, not individual, terms.  Thus, while an individual civil rights plaintiff might be able to secure the relief that she seeks without a (b)(2) class, a series of factors may encourage the pursuit of one.

<u>Newberg</u> § 4:26 (footnotes omitted).  Like (b)(1) class actions, (b)(2) class actions are mandatory -- individuals covered under the class definition may not opt out -- and do not require notice to be given to the class.  <u>See</u> Fed. R. Civ. P. 23(c)(2)(A).

Blades v. Monsanto Co., 400 F.3d 562, 566 (8th Cir. 2005)(citing In re Visa Check/MasterMoney Antitrust Litig., 208 F.3d 124, 136-40 (2d Cir. 2001)), or when the issue is "susceptible to generalized, class-wide proof," In re Nassau Cnty. Strip Search Cases, 461 F.3d 219, 227 (2d Cir. 2006).  A question is individual when "the members of a proposed class will need to present evidence that varies from member to member," Blades v. Monsanto Co., 400 F.3d at 566.  Although a case need not present only common questions to merit certification, and the presence of some individual questions does not destroy predominance, the rule 23(b)(3) predominance requirement is much stricter than the rule 23(a)(1) commonality requirement: the latter requires only that a common question or questions exist; the former requires that the common question or questions predominate over the individual ones.  See Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623-24; In re Thornburg Mortg., Inc. Sec. Litig., 912 F. Supp. 2d at 1225 ("The predominance criterion of rule 23(b)(3) is 'far more demanding' than rule 23(a)(2)'s commonality requirement.").  As the Tenth Circuit, addressing a Title VII claim, put it:

> The myriad discriminatory acts that Plaintiffs allege (e.g., failure to promote, failure to train, unequal pay, disrespectful treatment, etc.) each require independent legal analysis, and similarly challenge the predominance requirement of Rule 23(b)(3) if not also the commonality requirement of Rule 23(a).
>
> . . . .
>
> Although we do not rest our decision upon Rule 23(a), cases that interpret that the commonality requirement of Rule 23(a) illustrate the instant Plaintiffs' inability to satisfy Rule 23(b)(3)'s 'far more demanding' requirement that common issues predominate.

Monread v. Potter, 367 F.3d 1224, 1237 (10th Cir. 2004)(Ebel, J.)(footnote omitted).

16.     The predominance question applies to both macro damages -- the total class damages -- and to the micro damages -- the individual damages.  In Comcast Corp. v. Behrend, 133 S. Ct. 1426 (2013), the Supreme Court, in a five-to-four decision, in which Justice Scalia

wrote the majority opinion, held that the court could not accept as evidence that damages were susceptible of measurement across an entire class -- as rule 23(b)(3) requires for certification of a class on the theory that questions of law or fact common to class members predominate over any questions affecting only individual members -- the regression model which the plaintiffs' expert had developed.  The plaintiffs argued four theories of antitrust violations; one theory was that Comcast Corp.'s activities had an antitrust impact, because Comcast Corp.'s activities reduced the level of competition from "overbuilders," companies that build competing cable networks in areas where an incumbent cable company already operates.  The district court found, among other things, that the damages resulting from overbuilder-deterrence impact could be calculated on a classwide basis.  To establish such damages, the plaintiffs relied solely on the testimony of Dr. James McClave.  Dr. McClave designed a regression model which compared actual cable prices in the Philadelphia "Designated Market Area" with hypothetical prices that would have prevailed but for Comcast Corp.'s allegedly anticompetitive activities.  The model calculated damages of $875,576,662.00 for the entire class.  As Dr. McClave acknowledged, however, the model did not isolate damages resulting from any one theory of antitrust impact.  The district court nonetheless certified the class.

17.    The Third Circuit affirmed the district court decision.   The Third Circuit concluded that the plaintiffs "provided a method to measure and quantify damages on a classwide basis," finding it unnecessary to decide "whether the methodology was a just and reasonable inference or speculation."   133 S. Ct. at 1433 (quoting 655 F.3d 182, 206 (3d Cir. 2011)).  The Supreme Court granted certiorari on the question "[w]hether a district court may certify a class action without resolving whether the plaintiff class had introduced admissible evidence, including expert testimony, to show that the case is susceptible to awarding damages

on a class-wide basis."   133 S. Ct. at 24.   Justice Scalia criticized the Court of Appeals'

reluctance to entertain arguments against the plaintiffs' damages model "simply because those

arguments would also be pertinent to the merits determination . . . ."  133 S. Ct. at 1433.  Justice

Scalia said that

> it is clear that, under the proper standard for evaluating certification, respondents'
> model falls far short of establishing that damages are capable of measurement on
> a classwide basis.  Without presenting another methodology, respondents cannot
> show Rule 23(b)(3) predominance: Questions of individual damage calculations
> will inevitably overwhelm questions common to the class.

Comcast Corp. v. Behrend, 133 S. Ct. at 1433.   Justice Scalia stated that, under the Third

Circuit's logic, "at the class-certification stage, *any* method of measurement is acceptable so long

as it can be applied classwide, no matter how arbitrary the measurements may be.  Such a

proposition would reduce rule 23(b)(3)'s predominance requirement to a nullity."  133 S. Ct. at

1433 (emphasis in original).

18.     It is clear that Comcast Corp. v. Behrend applies to classwide damages.  It is less

clear that Comcast Corp. v. Behrend's language applies to the determination of individual

damages.  There are three ways that the Court could deal with Comcast Corp. v. Behrend and the

determination of individual damage awards.  First, the Court could decide that Comcast Corp. v.

Behrend applies only to classwide damages and is not controlling at all in the determination of

individual damages.  Second, the Court could decide that everything that Justice Scalia said

about classwide damages also applies to the determination of individual damages.  Third, the

Court could decide that Justice Scalia said some things relating to the determination of individual

damages, but not the same things that apply to classwide damages.  As to the first option, while

much could be said of limiting Justice Scalia's opinion to classwide damages -- even from the

language of the opinion and from the wording of the question presented -- the Court is reluctant

to say that it has nothing to say that might be relevant to the determination of individual damages awards. Some of Justice Scalia's concerns about admissible evidence to determine damages -- whether classwide or individual damage awards -- still seems relevant to whether damages are classwide or individual. While Justice Scalia was not addressing the determination of individual damage awards, some of what he said -- and how he said it -- should cause the Court to be cautious in determining a methodology for calculating individual damage awards. On the other hand, the Court is not convinced that it should or even can apply Comcast Corp. v. Behrend's language to the individual determination of damages as it does to classwide damages. The dissent stated that "[r]ecognition that individual damages calculations do not preclude class certification under Rule 23(b)(3) is well nigh universal." 133 S. Ct. at 1437 (Ginsburg, J., dissenting). Justice Scalia did not refute this proposition, and the Court has no reason to think the dissent's statement -- which is accurate -- does not remain good law. Accordingly, just because each plaintiff and class member may get a different amount and there has to be a separate calculation of each plaintiff's damages does not defeat class certification.

19. What the Court thinks that Comcast Corp. v. Behrend says that is relevant to the individual determination of damages is threefold. First, at the class certification stage, the Court cannot ignore how individual damages, if any are appropriate, are to be decided. In other words, the Court cannot ignore the possible complexities of the individual damages determinations in making the predominance calculation. A class can have individual damage calculations, but the Court has to look at the issues of individual damages calculations at the class certification stage. Second, the methodology for all class members needs to be common or, if there are different methodologies for some plaintiffs and class members, the Court must take these differences into account at the class certification stage in the predominance analysis. In other words, if the Court

is going to use different methodologies for different class members, it must decide: (i) whether these differences create questions affecting only individual members; and (ii) whether these individual questions predominate over the questions of law or fact common to the class.  Third, even if the methodology is common to the class, the Court must decide whether it will operate in a consistent way for each individual class member.  The law and methodology may be the same, but when applied to the class, they may create issues for one class member or group of class members that they do not create for other class members or groups.  The predominance analysis must identify precisely the common issues and uncommon issues that application of the class methodology or methodologies raise, and then determine whether, in the total issue mix, the common issues predominate over the individual ones.

20.    A defendant's desire to assert individual counterclaims -- generally speaking, counterclaims, even common ones, are not permitted against absent class members at all -- does not typically defeat predominance.  See Phillips Petrol. Co. v. Shutts, 472 U.S. 797, 810 (1985); Allapattah Servs, Inc. v. Exxon Corp., 333 F.3d 1248, 1260 (11th Cir. 2003).  A defendant's desire to assert individual affirmative defenses also often does not defeat predominance, see Smilow v. Sw. Bell Mobile Sys., Inc., 323 F.3d 32, 39 (1st Cir. 2003)("Courts traditionally have been reluctant to deny class action status under Rule 23(b)(3) simply because affirmative defenses may be available against individual members."), but this statement is less true after Wal-Mart.[42]  Other recurring individual issues present more serious challenges to predominance,

---

[42]Limitations defenses are an especially common breed of affirmative defense. Limitations defenses generally present common questions, rather than individual ones, because a limitations defense's merits rest on two facts: (i) the date on which the statute of limitations accrued; and (ii) the date on which the action was filed.  Fact (ii) is a common issue in virtually every class action, because the entire class gets credit for the filing date of the class action complaint.  Fact (i) may not be truly common, but it might be, if, for example, the discovery rule delays accrual of a statute of limitations until the cause of action is discovered, and all class

such as: (i) the prima facie element of reliance or due diligence in common-law fraud and other

cases;[43] (ii) differences in the applicable law in a multi-state, state law-based class actions,[44] see

_____

members' causes of action are discovered at the same time, or if a single act by the defendant breached contracts with all class members at once.

Even if the question is individual -- for example, if a class is defined as only encompassing preexisting filed claims, or if the discovery rule might delay the accrual of the statute for some class members but not others -- it still typically does not defeat predominance.

> Although a necessity for individualized statute-of-limitations determinations invariably weighs against class certification under Rule 23(b)(3), we reject any per se rule that treats the presence of such issues as an automatic disqualifier.  In other words, the mere fact that such concerns may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones.  As long as a sufficient constellation of common issues binds class members together, variations in the sources and application of statutes of limitations will not automatically foreclose class certification under Rule 23(b)(3).  Predominance under Rule 23(b)(3) cannot be reduced to a mechanical, single-issue test.

Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288, 296 (1st Cir. 2000)(citing 5 James Wm. Moore et al., Moore's Federal Practice ¶ 23.46[3] (3d ed. 1999)).  See Newberg § 4:57 (confirming that the above passage "reflects the law in most circuits" (footnote omitted)).

[43]The advisory committee's notes to rule 23 state that

> a fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by individuals within the class.  On the other hand, although having some common core, a fraud case may be unsuited for treatment as a class action if there was material variation in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed.

Fed. R. Civ. P. 23 advisory committee's notes (citations omitted).

> Despite the generalized concern about the individual nature of the misrepresentations and/or reliance inquiry in fraud cases, there are at least three recurring situations in which courts have found common issues predominant in fraud cases: (1) those in which reliance is common across the class; (2) those in which courts have excused a showing of individual reliance; and (3) those in which the underlying law does not require a showing of individual reliance.

Newberg § 4:58.  Reliance may be a common issue when the same misrepresentation is made to the entire class; some circuits have held that written misrepresentations may be common issues while oral misrepresentations are presumed to be individualized.   See, e.g., Moore v. PaineWebber, Inc., 306 F.3d 1247, 1253 (2d Cir. 2002)("[T]he Third, Fourth, Fifth, Sixth, and Seventh Circuits . . . have held that oral misrepresentations are presumptively individualized."); In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 319 (3d Cir. 1998)(certifying class where alleged misrepresentations were written and uniform); Spencer v. Hartford Fin. Servs. Grp., Inc., 256 F.R.D. 284, 297 (D. Conn. 2009)(certifying class where class definition was narrowed to include only those who had received written communications from defendant).   The requirement that plaintiffs show reliance is most often presumed or excused in so-called fraud-on-the-market securities cases, in which class members -- investors in the defendant company -- are presumed to be rational, fully informed actors who use all of the information available to the general public, but are also presumed to not possess insider information.

> We have found a rebuttable presumption of reliance in two different circumstances.  First, if there is an omission of a material fact by one with a duty to disclose, the investor to whom the duty was owed need not provide specific proof of reliance.  Second, under the fraud-on-the-market doctrine, reliance is presumed when the statements at issue become public.  The public information is reflected in the market price of the security.  Then it can be assumed that an investor who buys or sells stock at the market price relies upon the statement.

Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 552 U.S. 148, 159 (2008)(citing Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 153 (1972); Basic Inc. v. Levinson, 485 U.S. 224, 245 (1988)).

[44]In In re Bridgestone/Fireston, Inc., 288 F.3d 1012 (7th Cir. 2002), Judge Easterbrook, in a pre-Wal-Mart/Comcast opinion, stated:

> No class action is proper unless all litigants are governed by the same legal rules.  Otherwise the class cannot satisfy the commonality and superiority requirements of Fed. R. Civ. P. 23(a), (b)(3).  Yet state laws about theories such as those presented by our plaintiffs differ, and such differences have led us to hold that other warranty, fraud, or products-liability suits may not proceed as nationwide classes

288 F.3d at 1015.  Judge Easterbrook then discussed how variations in tires defeats class treatment:

> Because these claims must be adjudicated under the law of so many jurisdictions, a single nationwide class is not manageable.  Lest we soon see a Rule 23(f) petition to review the certification of 50 state classes, we add that this litigation is not manageable as a class action even on a statewide basis.  About 20% of the Ford Explorers were shipped without Firestone tires.  The Firestone

tires supplied with the majority of the vehicles were recalled at different times; they may well have differed in their propensity to fail, and this would require sub-subclassing among those owners of Ford Explorers with Firestone tires.  Some of the vehicles were resold and others have not been; the resales may have reflected different discounts that could require vehicle-specific litigation.   Plaintiffs contend that many of the failures occurred because Ford and Firestone advised the owners to underinflate their tires, leading them to overheat.   Other factors also affect heating; the failure rate (and hence the discount) may have been higher in Arizona than in Alaska.   Of those vehicles that have not yet been resold, some will be resold in the future (by which time the tire replacements may have alleviated or eliminated any discount) and some never will be resold.   Owners who wring the last possible mile out of their vehicles receive everything they paid for and have claims that differ from owners who sold their Explorers to the second-hand market during the height of the publicity in 2000.   Some owners drove their SUVs off the road over rugged terrain, while others never used the "sport" or "utility" features; these differences also affect resale prices.

Firestone's tires likewise exhibit variability; that's why fewer than half of those included in the tire class were recalled.   The tire class includes many buyers who used Firestone tires on vehicles other than Ford Explorers, and who therefore were not advised to underinflate their tires.

. . . .

When courts think of efficiency, they should think of market models rather than central-planning models.

Our decision in <u>Rhone-Poulenc Rorer</u> made this point, and it is worth reiterating: only "a decentralized process of multiple trials, involving different juries, and different standards of liability, in different jurisdictions" (51 F.3d at 1299) will yield the information needed for accurate evaluation of mass tort claims.

. . . .

No matter what one makes of the decentralized approach as an original matter, it is hard to adopt the central-planner model without violence not only to Rule 23 but also to principles of federalism.   Differences across states may be costly for courts and litigants alike, but they are a fundamental aspect of our federal republic and must not be overridden in a quest to clear the queue in court. <u>See</u> <u>BMW v. Gore</u>, 517 U.S. at 568-73; <u>Szabo</u> (reversing a nationwide warranty class certification); <u>Spence v. Glock, G.m.b.H.,</u> 227 F.3d 308 (5th Cir. 2000) (reversing a nationwide tort class certification); Larry Kramer, <u>Choice of Law in Complex Litigation</u>, 71 N.Y.U. L. Rev. 547, 579 (1996); Linda S. Mullenix, <u>Mass Tort Litigation and the Dilemma of Federalization</u>, 44 DePaul L. Rev. 755, 781

Castano v. Am. Tobacco Co., 84 F.3d 734, 741 (5th Cir. 1996); and (iii) the need to determine individual personal injury damages, which presents such a challenge to predominance that class certification of mass tort claims is now exceedingly rare, see Amchem Prods., Inc. v. Windsor, 521 U.S. at 625.

21.     There is little uniform guidance on how to assess when common issues predominate over individual ones, and the Court's statements to this point have, obviously, done more to disavow various tempting but fallacious rules than they have to set forth a usable standard.

22.     There is currently a split of authority between the United States Court of Appeals over the proper way to analyze predominance -- with the Seventh and Sixth Circuits on one side and the Third, Tenth and Eleventh Circuits on the other.  The Honorable Richard A. Posner,[45] United States Circuit Judge for the Seventh Circuit, concludes that the predominance inquiry boils down to "a question of efficiency."  Butler v. Sears, Roebuck & Co., 702 F.3d at 362.

_____

(1995); Robert A. Sedler, The Complex Litigation Project's Proposal for Federally-Mandated Choice of Law in Mass Torts Cases: Another Assault on State Sovereignty, 54 La. L .Rev. 1085 (1994).  Tempting as it is to alter doctrine in order to facilitate class treatment, judges must resist so that all parties' legal rights may be respected.

In re Bridgestone/Firestone, Inc., 288 F.3d at 1018-20.

[45]Judge Posner is not only the most widely referenced legal authority alive -- he is the most-cited legal scholar of all time.  See Fred R. Shapiro, The Most-Cited Legal Scholars, 29 J. Legal Stud. 409, 424 (2000).  Judge Posner has been cited more than twice as often as any other legal figure other than Ronald Dworkin:

| | |
|---|---|
| Richard A. Posner | 7, 981 |
| Ronald Dworkin | 4,488 |
| Oliver Wendell Holmes, Jr. | 3,665 |
| John Hart Ely | 3,032 |
| Roscoe Pound | 3,018 |

Shapiro, supra, at 424.

Judge Posner poses the predominance question as: "Is it more efficient, in terms both of economy of judicial resources and of the expense of litigation to the parties, to decide some issues on a class basis or all issues in separate trials?"  Butler v. Sears, Roebuck & Co., 702 F.3d at 362.  In Butler v. Sears, Roebuck & Co., the Seventh Circuit reversed a district court's denial of certification of a class of washing-machine owners who alleged that Sears' washing machines were prone to cultivate mold and affirmed the district court's certification of the same class to pursue a claim that the machines' control units were defective.  See 702 F.3d at 360-61.  The Seventh Circuit certified the class -- which spanned six states -- to pursue its mold claim under state breach-of-warranty law:

> A class action is the more efficient procedure for determining liability and damages in a case such as this, involving a defect that may have imposed costs on tens of thousands of consumers yet not a cost to any one of them large enough to justify the expense of an individual suit.  If necessary a determination of liability could be followed by individual hearings to determine the damages sustained by each class member (probably capped at the cost of replacing a defective washing machine -- there doesn't seem to be a claim that the odors caused an illness that might support a claim for products liability as distinct from one for breach of warranty).  But probably the parties would agree on a schedule of damages based on the cost of fixing or replacing class members' mold-contaminated washing machines.  The class action procedure would be efficient not only in cost, but also in efficacy, if we are right that the stakes in an individual case would be too small to justify the expense of suing, in which event denial of class certification would preclude any relief.
>
> . . . .
>
> [T]he district court will want to consider whether to create different subclasses of the control unit class for the different states.  That should depend on whether there are big enough differences among the relevant laws of those states to make it impossible to draft a single, coherent set of jury instructions should the case ever go to trial before a jury.

Butler v. Sears, Roebuck & Co., 702 F.3d at 362.  Along with numerous other class actions pending appeal before the Supreme Court, the Supreme Court vacated Butler v. Sears, Roebuck & Co., and remanded it to the Seventh Circuit "for reconsideration in light of Comcast Corp. v.

Behrend."  Butler v. Sears, Roebuck & Co., 727 F.3d at 797 (7th Cir. 2013).  On reconsideration,

the Seventh Circuit reaffirmed its prior decision, again in an opinion written by Judge Posner:

> Sears thinks that predominance is determined simply by counting noses: that is, determining whether there are more common issues or more individual issues, regardless of relative importance.  That's incorrect.  An issue "central to the validity of each one of the claims" in a class action, if it can be resolved "in one stroke," can justify class treatment.  Wal-Mart, 131 S.Ct. at 2551.  That was said in the context of Rule 23(a)(2), the rule that provides that class actions are permissible only when there are issues common to the members of the class (as of course there are in this case).  But predominance requires a qualitative assessment too; it is not bean counting.  In Amgen Inc. v. Connecticut Retirement Plans & Trust Funds, 133 S.Ct. at 1196, the Court said that the requirement of predominance is not satisfied if "individual questions . . . overwhelm questions common to the class," and in Amchem Products, Inc. v. Windsor, 521 U.S. 591, 623 (1997), it said that the "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  And in In re Inter-Op Hip Prosthesis Liability Litigation, 204 F.R.D. 330, 345 (N.D. Ohio 2001), we read that "common issues need only predominate, not outnumber individual issues." . . .
>
> As we noted in Carnegie v. Household Int'l., Inc., 376 F.3d 656, 661 (7th Cir. 2004), "the more claimants there are, the more likely a class action is to yield substantial economies in litigation.  It would hardly be an improvement to have in lieu of this single class 17 million suits each seeking damages of $15 to $30. . . . The *realistic* alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30" (emphasis in original).  The present case is less extreme: tens of thousands of class members, each seeking damages of a few hundred dollars.  But few members of such a class, considering the costs and distraction of litigation, would think so meager a prospect made suing worthwhile.
>
> There is a single, central, common issue of liability: whether the Sears washing machine was defective.  Two separate defects are alleged, but remember that this class action is really two class actions.  In one the defect alleged involves mold, in the other the control unit.  Each defect is central to liability. Complications arise from the design changes and from separate state warranty laws, but can be handled by the creation of subclasses.  See, e.g., Johnson v. Meriter Health Services Employee Retirement Plan, 702 F.3d at 365 (10 subclasses).

Butler v. Sears, Roebuck & Co., 727 F.3d at 801-02.[46]

---

[46]In addition to articulating the Seventh Circuit's construction of the predominance inquiry, Judge Posner addressed Comcast Corp. v. Behrend's impact on the Seventh Circuit's case:

> So how does the Supreme Court's Comcast decision bear on the rulings . . . in our first decision?

> Comcast holds that a damages suit cannot be certified to proceed as a class action unless the damages sought are the result of the class-wide *injury* that the suit alleges.  Comcast was an antitrust suit, and the Court said that "if [the plaintiffs] prevail on their claims, they would be entitled only to damages resulting from reduced overbuilder competition, since that is the only theory of antitrust impact accepted for class-action treatment by the District Court.  It follows that a model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory.  If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)."  "[A] methodology that identifies damages *that are not the result of the wrong*" is an impermissible basis for calculating class-wide damages. Id. at 1434 (emphasis added).  "For all we know, cable subscribers in Gloucester County may have been overcharged because of petitioners' alleged elimination of satellite competition (*a theory of liability that is not capable of classwide proof* )."  And on the next page of its opinion the Court quotes approvingly from Federal Judicial Center, Reference Manual on Scientific Evidence 432 (3d ed.2011), that "the first step in a damages study is the translation of the legal theory of the harmful event into an analysis of the economic impact *of that event*."   (emphasis the [Supreme] Court's).  None of the parties had even challenged the district court's ruling that class certification required "that the damages resulting from . . . [the antitrust violation] were measurable 'on a class-wide basis' through use of a 'common methodology.'"

> Unlike the situation in Comcast, there is no possibility in this case that damages could be attributed to acts of the defendants that are not challenged on a class-wide basis; all members of the mold class attribute their damages to mold and all members of the control-unit class to a defect in the control unit.

> Sears argues that Comcast rejects the notion that efficiency is a proper basis for class certification, and thus rejects our statement that "predominance" of issues common to the entire class, a requirement of a damages class action under Rule 23(b)(3), "is a question of efficiency."  But in support of its argument Sears cites only the statement in the dissenting opinion in Comcast that "economies of time and expense" favor class certification, -- a statement that the majority

23.     The Sixth Circuit handled essentially the same case -- a class action against Sears

for defective washing machines -- in In re Whirlpool Corp. Front-Loading Washing Products

Liability Litigation, 678 F.3d 409 (6th Cir. 2012), and also elected to certify the mold-based

claim.[47]

> [W]e have no difficulty affirming the district court's finding that common questions predominate over individual ones and that the class action mechanism is the superior method to resolve these claims fairly and efficiently.   This is especially true since class members are not likely to file individual actions because the cost of litigation would dwarf any potential recovery.  See Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 617 (1997)(finding that in drafting Rule 23(b)(3), "the Advisory Committee had dominantly in mind vindication of 'the rights of groups of people who individually would be without effective strength to bring their opponents into court at all' ").  Further, [as] the district court observed, any class member who wishes to control his or her own litigation may opt out of the class under Rule 23(b)(3)(A).

---

opinion does not contradict. Sears is wrong to think that anything a dissenting opinion approves of the majority must disapprove of.

Sears compares the design changes that may have affected the severity of the mold problem to the different antitrust liability theories in Comcast.  But it was not the existence of multiple theories in that case that precluded class certification; it was the plaintiffs' failure to base all the damages they sought on the antitrust impact -- the injury -- of which the plaintiffs were complaining. In contrast, any buyer of a Kenmore washing machine who experienced a mold problem was harmed by a breach of warranty alleged in the complaint.

Furthermore and fundamentally, the district court in our case, unlike Comcast, neither was asked to decide nor did decide whether to determine damages on a class-wide basis.  As we explained in McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 672 F.3d 482, 491-92 (7th Cir. 2012), a class action limited to determining liability on a class-wide basis, with separate hearings to determine -- if liability is established -- the damages of individual class members, or homogeneous groups of class members, is permitted by Rule 23(c)(4) and will often be the sensible way to proceed

Bulter v. Sears, Roebuck & Co., 727 F.3d at 799-800 (emphasis in Butler v. Sears, Roebuck & Co. but not Comcast Corp. v. Behrend, except as noted)(citations omitted).

[47]The Sixth Circuit's class "did not involve the other claim in [the Seventh Circuit's] case, the control unit claim."  Butler v. Sears, Roebuck & Co., 727 F.3d at 802.

In re Whirlpool Corp. Front-Loading Washing Products Liability Litigation, 678 F.3d at 421

(citation omitted).  That case was also vacated after Comcast Corp. v. Behrend, and, like the

Seventh Circuit, the Sixth Circuit reaffirmed its prior decision, fleshing out the predominance

inquiry in more detail than it had done in its prior opinion:

> Whirlpool does not point to any "fatal dissimilarity" among the members
> of the certified class that would render the class action mechanism unfair or
> inefficient for decision-making.  Instead, Whirlpool points to "a fatal similarity --
> [an alleged] failure of proof as to an element of the plaintiffs' cause of action."
> That contention, the Supreme Court instructs, "is properly addressed at trial or in
> a ruling on a summary-judgment motion.  The allegation should not be resolved in
> deciding whether to certify a proposed class."  Tracking the Supreme Court's
> reasoning, we conclude here that common questions predominate over any
> individual ones.  Simply put, this case comports with the "focus of the
> predominance inquiry" -- it is "sufficiently cohesive to warrant adjudication by
> representation."

In re Whirlpool Corp. Front-Loading Washing Products Liability Litigation, 722 F.3d 838, (7th

Cir. 2013)(citations omitted).  The Seventh Circuit and Sixth Circuit, thus, define predominance

in much the same way: if the district court can design a mechanism for trying the case that is fair

to the defendants and more efficient than individual litigation of the same dispute, then

predominance is satisfied.  See Butler v. Sears, Roebuck & Co., 727 F.3d at 802.  This styling of

the predominance inquiry is in keeping with that given, many years earlier, by a leading class-

action treatise:

> [A] court addressing predominance must determine whether the evidence about
> the putative class representative's circumstances and the opposing evidence from
> the defense will enable a jury to make across-the-board "yes" or "no" factual
> determinations that fairly resolve the claims of the entire class. Where the right to
> recover for each class member would "turn . . . on facts particular to each
> individual plaintiff," class treatment makes little sense.  If the resolution of the
> common issues devolves into an unmanageable variety of individual issues, then
> the lack of increased efficiency will prohibit certification of the class.
>
> The predominance and efficiency criteria are of course
> intertwined.  When there are predominant issues of law or fact,
> resolution of those issues in one proceeding efficiently resolves

those issues with regard to all claimants in the class.  <u>When there are no predominant issues of law or fact, however -- as in the instant case -- class treatment would be either singularly inefficient, as one court attempts to resolve diverse claims from around the country in its own courtroom, or unjust,</u> as the various factual and legal nuances of particular claims are lost in the press to clear the lone court's docket.

<u>McLaughlin on Class Actions</u> § 5:23 (11th ed.)(emphases added)(omission in original)(footnotes omitted).

24.     Although the Seventh Circuit and the Sixth Circuit may agree about the definition of predominance, the Third, Tenth, and Eleventh Circuits stake out a different test.

"Whether an issue predominates can only be determined after considering what value the resolution of the class-wide issue will have in each class member's underlying cause of action."  Common issues of fact and law predominate if they "'ha[ve] a direct impact on every class member's effort to establish liability' *that is more substantial than the impact of individualized issues* in resolving the claim or claims of each class member."  If "after adjudication of the classwide issues, plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual claims, [their] claims are not suitable for class certification under Rule 23(b)(3)."

<u>Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Serv., Inc.</u>, 601 F.3d at 1170 (11th Cir.)(emphasis in original)(citations omitted).[48]   The Eleventh Circuit, however, imposes a

---

[48]The Eleventh Circuit first adopted this test -- relying on district court decisions -- in 2004 in <u>Klay v. Humana, Inc.</u>, and gave renewed articulations of the test in 2009 in <u>Vega v. T-Mobile USA, Inc.</u>, and in 2010 in <u>Sacred Heart Health Systems, Inc. v. Humana Healthcare Services, Inc.</u>  In each case, the Eleventh Circuit made some reference to additionally adopting a Fifth Circuit rule-of-thumb test:

An alternate formulation of this test was offered in <u>Alabama v. Blue Bird Body Co.</u>, 573 F.2d 309 (5th Cir. 1978).  In that case, we observed that if common issues truly predominate over individualized issues in a lawsuit, then "the addition or subtraction of any of the plaintiffs to or from the class [should not] have a substantial effect on the substance or quantity of evidence offered."  Put simply, if the addition of more plaintiffs to a class requires the presentation of significant amounts of new evidence, that strongly suggests that individual issues (made relevant only through the inclusion of these new class members) are

different, more rigorous, second step: the district court's trial plan must spend more <u>time</u> adjudicating the common questions than it does adjudicating the individual questions.   The Eleventh Circuit's test may not be the greatest -- the Court sees little reason why negative-value cases that can be fairly and efficiently adjudicated via class action should not be certified[49] -- but

---

important.   <u>Alabama v. Blue Bird Body Co.</u>, 573 F.2d at 322 ("If such addition or subtraction of plaintiffs does affect the substance or quantity of evidence offered, then the necessary common question might not be present.").   If, on the other hand, the addition of more plaintiffs leaves the quantum of evidence introduced by the plaintiffs as a whole relatively undisturbed, then common issues are likely to predominate.

<u>Klay v. Humana, Inc.</u>, 382 F.3d at 1255.   <u>See</u> <u>Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Serv., Inc.</u>, 601 F.3d at 1170 ("In practical terms, while '[i]t is not necessary that all questions of fact or law be common,' 'the addition or subtraction of any of the plaintiffs to or from the class [should not] have a substantial effect on the substance or quantity of evidence offered.'"); <u>Vega v. T-Mobile USA, Inc.</u>, 564 F.3d at 1270 (quoting the above portion of <u>Klay v. Humana, Inc.</u>).

The Fifth Circuit, however, was not setting forth a test for when predominance is satisfied so much as a test for when an issue is common versus individualized.   The Fifth Circuit's full quote -- without the Eleventh Circuit's alterations -- is:

We only point out that in a situation wherein one seeks to represent a nationwide class in order to obtain redress for harm done from a nationwide conspiracy consideration should be given to whether the addition or subtraction of any of the plaintiffs to or from the class will have a substantial effect on the substance or quantity of evidence offered.   If such addition or subtraction of plaintiffs does affect the substance or quantity of evidence offered, <u>then the necessary common question might not be present</u>.

<u>State of Alabama v. Blue Bird Body Co., Inc.</u>, 573 F.2d at 322 (emphasis added)(footnote omitted).

[49]In fairness to the Eleventh Circuit, Judge Posner's test merges the predominance and superiority inquiries -- effectively reading out predominance -- in negative-value cases.   Thus, the Eleventh Circuit's test is truer to rule 23's text than Judge Posner's.   "Predominate," the word that rule 23 uses, means "[t]o be of greater power, importance, <u>or quantity</u>; be most important or outstanding."   <u>The American Heritage Dictionary of the English Language</u> 1032 (William Morris ed., New College ed. 1976)(emphasis added).   Rule 23's text thus arguably suggests a direct comparison of common and individual issues, and not -- as Judge Posner suggests -- an indirect comparison that decides the predominance question on the basis of a fancy economic analysis. There are, however, two other rule 23 provisions whose impact on predominance is not often

- 158 -

discussed: (i) the issue class-action clause, see Fed. R. Civ. P. 23(c)(4) ("When appropriate, an action may be brought or maintained as a class action with respect to particular issues."); and (ii) the subclassification clause, see Fed. R. Civ. P. 23(c)(5) ("When appropriate, a class may be divided into subclasses that are each treated as a class under this rule."). These provisions are indeed unfortunate for those who wish to read rule 23 as containing the seeds of its own destruction. Rule 23(c)(4) allows for adjudication of common issues, even if these issues do not add up to a common claim. Rule 23(c)(5) allows for collective adjudication, even if it falls short of being completely "classwide" adjudication. Judge Posner's test explicitly admits of subclasses and issue classes. Even if it had not, their impact in Judge Posner's analysis would be obvious: the district court uses the tools of subclassification and issue classification -- along with other management tools, such as polyfurcation -- to design a class-action management plan, and then decide whether the plan is more or less efficient than separate trials.

The impact that these provisions have on the Eleventh Circuit's approach is less clear. The Eleventh Circuit's best discussion of subclasses comes from Sacred Heart Health Systems, Inc. v. Humana Military Healthcare Services, Inc.:

> [W]e cannot accept the district court's proposal to use subclasses corresponding to the hospitals' six categories of payment clauses. We recognize the long and venerated practice of creating subclasses as a device to manage complex class actions, but the six subclasses proposed here mask a staggering contractual variety. The sixth proposed subclass -- a miscellaneous residue of numerous payment clauses that are insusceptible of ready classification -- alone is fatal to predominance. When this "potpourri" subclass, as Humana has termed it, is broken down into its disparate component parts, the illusion of uniformity gives way to nearly thirty subclasses.
>
> Common sense tells us that "[t]he necessity of a large number of subclasses may indicate that common questions do not predominate," Manual for Complex Litigation § 21.23 (4th ed. 2004); see also Harding v. Tambrands Inc., 165 F.R.D. 623, 630 (D. Kan.1996)("The potential for numerous different subclasses weighs against a finding of predominance of common issues."). Here, the necessary recourse to a "miscellaneous" subclass readily indicates the lack of a predominant question.
>
> Ultimately, after examining the many individualized payment clauses contained in the network agreements, we perceive a "distinct possibility that there was a breach of contract with some class members, but not with other class members." Subclasses are no answer to this problem, meaning that the efficiency of a class action will be lost entirely unless the hospitals are allowed "to stitch together the strongest contract case based on language from various [contracts], with no necessary connection to their own contract rights. The hospitals, however, may not lawfully "amalgamate" their disparate claims in the name of convenience. The Rules Enabling Act, 28 U.S.C. § 2072 -- and due process -- prevents the use of class actions from abridging the substantive rights of any party. Yet, from the record before us, an abridgment of the defendant's rights

> seems the most likely result of class treatment.  By glossing over the striking
> differences in the material terms of the agreements, the district court created an
> "unnecessarily high risk," of such unlawful results, and thereby abused its
> discretion.

601 F.3d at 1176 (citations omitted).  These statements imply that, but for the sixth "category" of
payment clauses -- really a catchall for all contracts that did not fit into one of the five real
categories -- the class would be certifiable.  The only "abridgement of the defendant's rights"
that the district court's plan would produce would be the "'amalgamat[ion]'" of different
contractual language into a single category -- the sixth category.  601 F.3d at 1176.  That case,
thus, leaves open the question whether subclassification and issue certification can aid in
satisfying predominance, or if these techniques are separate from the predominance inquiry.

The Fifth Circuit staked out a clear answer to this question in its much-discussed <u>Castano
v. American Tobacco Co.</u> case, deciding the issue in a way one might expect:

> Severing the defendants' conduct from reliance under rule 23(c)(4) does
> not save the class action.  A district court cannot manufacture predominance
> through the nimble use of subdivision (c)(4).  The proper interpretation of the
> interaction between subdivisions (b)(3) and (c)(4) is that a cause of action, as a
> whole, must satisfy the predominance requirement of (b)(3) and that (c)(4) is a
> housekeeping rule that allows courts to sever the common issues for a class trial.
> Reading rule 23(c)(4) as allowing a court to sever issues until the remaining
> common issue predominates over the remaining individual issues would
> eviscerate the predominance requirement of rule 23(b)(3); the result would be
> automatic certification in every case where there is a common issue, a result that
> could not have been intended.

84 F.3d at 745 n.21 (citations omitted).  This logic is hardly unassailable.  Namely, the result of
reading rules 23(c)(4) and (c)(5) as bearing on the predominance inquiry would <u>not</u> be
"automatic certification in every case where there is a common issue," because superiority must
still be satisfied.  84 F.3d at 745 n.21.  If a proposed class action is superior -- <u>e.g.</u>, if it lacks the
value to be brought on an individual basis -- and individual issues can be pared away via rules
23(c)(4) and (c)(5) then it is not clear why certification "could not have been intended" by the
rule.  84 F.3d at 745 n.21.  Moreover, it is a poor reading of the rule's text.  Presumably, even if
rules 23(c)(4) and (c)(5) are mere "housekeeping rule[s]," they would still alleviate "likely
difficulties in managing a class action."  84 F.3d at 745 n.21; Fed. R. Civ. P. 23(b)(3)(D).
Because rule 23 directs that "[t]he matters pertinent to these findings [predominance and
superiority] include: . . . the likely difficulties in managing a class action," the Court, if it were
writing on a clear slate would think that rules 23(c)(4) and (c)(5) would play a part in the
predominance determination, Fed. R. Civ. P. 23(b)(3), and that this result thus "could not have
been intended."  84 F.3d at 745 n.21.

The Fifth Circuit's approach attracted the adherence of a revered jurist on the Fourth
Circuit -- although not the Fourth Circuit itself.  The Honorable Paul V. Niemeyer, United States
Circuit Judge for the Fourth Circuit, endorsed the Fifth Circuit's view in an opinion concurring

in part and dissenting in part from an opinion in which the Fourth Circuit adopted the opposing view:

> Despite the overwhelming predominance of these individualized issues and claims over the common issue that the majority now certifies for class treatment, the majority has adopted an inventive approach to Rule 23 that allows certification of a class where the predominance requirement of Rule 23(b)(3) is admittedly unmet in the context of the case as a whole. According to the majority, to require the certified issue in this case to predominate over the individualized issues in the action as a whole ignores Rule 23(c)(4)(A), which it appears to view as a fourth avenue for class certification, on equal footing with Rules 23(b)(1), 23(b)(2), and 23(b)(3). In doing so, the majority glorifies Rule 23(c)(4)(A) -- a housekeeping rule that authorizes a court to certify for class treatment "particular issues" in a case that otherwise satisfies Rule 23(a) and 23(b) -- with the effect of materially rewriting Rule 23 such that Rule 23(b)(3)'s requirements no longer need be applied to "[a]n action," see Fed. R. Civ. P. 23(b), but rather to any single issue, no matter how small.

> Not only does the majority's approach expand Rule 23 beyond its intended reach, but it also creates a direct conflict with the Fifth Circuit which has held:

>> A district court cannot manufacture predominance through the nimble use of subdivision (c)(4). The proper interpretation of the interaction between subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) in that (c)(4) is a housekeeping rule that allows courts to sever the common issues for a class trial.

Castano v. American Tobacco Co., 84 F.3d 734, 745 n.21 (5th Cir. 1996).

Gunnells v. Healthplan Servs., Inc., 348 F.3d at 446-47. Despite Judge Niemeyer's concern with creating a Circuit split, the Second Circuit, the Ninth Circuit, and, of course, the Seventh Circuit have all held that subclasses can be used to satisfy predominance concerns since at least 2001, two years before Gunnells v. Healthplan Services, Inc. See Zinser v. Accufix Research Inst., Inc. 253 F.3d at 1189-90, 1192 n.8. See Robinson v. Metro-North Commuter R.R., 267 F.3d 147, 167-69 (2d Cir. 2001); Jefferson v. Ingersoll Int'l Inc., 195 F.3d 894, 898 (7th Cir. 1999). The Eleventh Circuit has refrained from taking a side on this question:

> Some have been critical of the piecemeal certification of class action status for claims within a case. See Gunnells v. Healthplan Servs., Inc., 348 F.3d 417, 446-47 (4th Cir. 2003)(Niemeyer, J., dissenting)(arguing that the predominance requirement in Fed. R. Civ. P. 23(b) applies to the action as a whole, not to individual subclasses or claims); Castano v. Am. Tobacco Co., 84 F.3d 734, 745 n. 21 (5th Cir. 1996)("The proper interpretation of the interaction between [Fed. R. Civ. P. 23] subdivisions (b)(3) and (c)(4) is that a cause of

it is commendable in that it is a test that district courts can use, rather than yet another meaningless recitation, see CGC Holding Co. LLC v. Broad & Cassel, 773 F.3d 1076 (10th Cir. 2014)("[T]he predominance prong 'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation defeating, individual issues." (quoting Newberg § 4:49)), circular axiom, see, e.g., Amchem Prods., Inc. v. Windsor, 521 U.S. at 623 ("The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."), obvious guidepost, see Reed v. Bowen, 849 F.2d at 1309 ("Each case must be decided on its own facts, on the basis of 'practicalities and prudential considerations.'"), self-evident comparison, see Monreal v. Potter, 367 F.3d at 1237 ("[T]he predominance criterion of Rule 23(b)(3) [i]s 'far more demanding' tha[n] the Rule 23(a) commonality requirement[.]" (quoting Amchem Prods., Inc. v. Windsor,

_____

action, as a whole, must satisfy the predominance requirement of (b)(3) and that (c)(4) is a housekeeping rule that allows courts to sever the common issues for a class trial.").    We did not directly address the propriety of such partial certification in Klay.

Borrero v. United Healthcare of N.Y., Inc., 610 F.3d 1296, 1310 n.5 (11th Cir. 2010)(alterations in original).  The Tenth Circuit also appears to have refrained from taking a side:

> Plaintiffs urge us to consider a "hybrid" certification whereby the liability stage might be certified for class treatment under Rule 23(b)(2) even if the damages stage does not qualify for such treatment.  See Robinson v. Metro-North Commuter R.R., 267 F.3d 147, 167-69 (2d Cir. 2001).  Compare Lemon v. Int'l Union of Operating Engr's, Local No. 139, AFL-CIO, 216 F.3d 577, 581 (7th Cir. 2000), and Jefferson v. Ingersoll Int'l Inc., 195 F.3d 894, 898 (7th Cir. 1999), with Allison v. Citgo Petroleum Corp., 151 F.3d 402, 420-22 (5th Cir. 1998).  We do not need to rule on a hybrid possibility because in the instant case, the liability stage does not satisfy either Rules 23(b)(2) or 23(b)(3).  The district court's ruling that plaintiffs did not allege a sufficient policy, practice or pattern of discrimination to warrant class treatment for liability determination is not an abuse of discretion.

Monreal v. Potter, 367 F.3d at 1237 n.12 (Ebel, J.).

521 U.S. at 623-24)), or worthless slogan, see Marcus v. BMW of N. Am., LLC, 687 F.3d at 600

(exhorting district courts to examine claims "'through the prism' of Rule 23(b)(3)").

25.     The Tenth Circuit followed the Eleventh Circuit's approach in CGC Holding Co.,

LLC v. Broad and Cassel.[50]

> Predominance regularly presents the greatest obstacle to class certification, especially in fraud cases. Accordingly, the issues disputed in this case are not unusual. And given our obligation to ensure that the district court did not err in conducting its rigorous analysis, we must *characterize* the issues in the case as common or not, and then *weigh* which issues predominate. Here, that task requires us to survey the elements of the class's RICO claims to consider (1) which of those elements are susceptible to generalized proof, and (2) whether those that are so susceptible predominate over those that are not. Stated another way, consideration of how the class intends to answer factual and legal questions to prove its claim -- and the extent to which the evidence needed to do so is common or individual -- will frequently entail some discussion of the claim itself.

> In this context, it is worth reiterating that our review on appeal is limited. For the purposes of class certification, our primary function is to ensure that the requirements of Rule 23 are satisfied, not to make a determination on the merits of the putative class's claims. But it is impractical to construct "an impermeable wall" that will prevent the merits from bleeding into the class certification decision to some degree. So, although class certification does not depend on the merits of the suit, "[e]valuation of many of the questions entering into determination of class action questions is intimately involved with the merits of the claims."

> With these legal principles in mind, "[c]onsidering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." For this limited purpose, we consider the proposed class's claim for a RICO conspiracy.

### 2. Civil RICO

> The Racketeer Influenced and Corrupt Organizations Act (RICO) establishes a civil cause of action for persons injured as a result of a prohibited racketeering activity. To prove a RICO violation, a plaintiff must show that the defendant violated the RICO statute, and the plaintiff was injured "by reason of" that violation. A defendant violates the act when he (1) participates in the

---

[50]The Tenth Circuit issued that opinion on December 8, 2014, well into the Court's deliberations on this Motion.

conduct (2) of an enterprise (3) through a pattern of (4) racketeering activity. Section 1961(1)(B) describes the qualifying "racketeering activities," or "predicate acts," which include wire fraud. Id. at § 1961(1)(B).   Pursuant to § 1962(d), conspiracy to commit a RICO violation also constitutes a violation of the Act when a conspirator adopts the goal of furthering the enterprise, even if the conspirator does not commit a predicate act.

Under RICO's "by reason of" requirement, "to state a claim . . . the plaintiff is required to show that a RICO predicate offense 'not only was a 'but for' cause of his injury, but was the proximate cause as well.'"   Sufficiently establishing the element of causation -- both actual and proximate -- is crucial to proving any violation of RICO.   "When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries."   Tailored to the predominance inquiry, the question is whether the link between defendants' actions and the class's injuries can be adduced through common evidence.

Although reliance is not an explicit element of a civil RICO claim, it frequently serves as a proxy for both legal and factual causation.   But despite its usefulness as a stand-in for causation, strict first-party reliance is not a prerequisite to establishing a RICO violation.   Nevertheless, in cases arising from fraud, a plaintiff's ability to show a causal connection between defendants' misrepresentation and his or her injury will be predicated on plaintiff's alleged reliance on that misrepresentation.   Put simply, causation is often lacking where plaintiffs cannot prove that they relied on defendants' alleged misconduct. Ultimately, in cases such as this one, "proving reliance is necessary [because] it is integral to Plaintiffs' theory of causation."

### 3. The Predominance Element in RICO Class Actions

Next, we must determine whether reliance in this case is susceptible to general and classwide proof.

Reliance, as a means of establishing RICO causation and beyond, takes on uncommon gravity when it arises in the context of establishing predominance under Rule 23.   In practice, efforts to certify classes based on causes of action that require an element of causation, including RICO, often turn on whether the class can demonstrate that reliance is susceptible to generalized proof.

The status of reliance as a focal point at the class certification stage is primarily a forward-looking evidentiary concern.   Since reliance is often a highly idiosyncratic issue that might require unique evidence from individual plaintiffs, it may present an impediment to the economies of time and scale that encourage class actions as an alternative to traditional litigation.   In terms of Rule 23 doctrine, individualized issues of reliance often preclude a finding of predominance.

- 164 -

But that is not always the case.  Sometimes issues of reliance can be disposed of on a classwide basis without individualized attention at trial.  For example, where circumstantial evidence of reliance can be found through generalized, classwide proof, then common questions will predominate and class treatment is valuable in order to take advantage of the efficiencies essential to class actions.  Under certain circumstances, therefore, it is beneficial to permit a commonsense inference of reliance applicable to the entire class to answer a predominating question as required by Rule 23.  In the RICO context, class certification is proper when "causation can be established through an inference of reliance where the behavior of plaintiffs and the members of the class cannot be explained in any way other than reliance upon the defendant's conduct."

Cases involving financial transactions, such as this one, are the paradigmatic examples of how the inference operates as an evidentiary matter.  On this point, the Second Circuit's recent decision in In re U.S. Foodservice Inc. Pricing Litigation is instructive.  In that case, defendants challenged the certification of a nationwide RICO class action against a food distributor for fraudulent overbilling under a "cost-plus" payment plan.  Defendants appealed the district court's class certification decision on several grounds, including that the district court ignored particularized issues of reliance that were bound to predominate.  The Second Circuit disagreed, finding circumstantial proof of classwide reliance in the fact that class members made payments pursuant to the agreements:

> In cases involving fraudulent overbilling, payment may constitute circumstantial proof of reliance based on the reasonable inference that customers who pay the amount specified in an inflated invoice would not have done so absent reliance on the invoice's implicit representation that the invoiced amount was honestly owed. Fraud claims of this type may thus be appropriate candidates for class certification because "while each plaintiff must prove reliance, he or she may do so through common evidence (that is, through legitimate inferences based on the nature of the alleged misrepresentations at issue)."

Likewise, the Eleventh Circuit in Klay v. Humana found that an inference of reliance was appropriate where "circumstantial evidence that can be used to show reliance is common to the whole class.  That is, the same considerations could lead a reasonable factfinder to conclude beyond a preponderance of the evidence that each individual plaintiff relied on the defendants' representations." Klay involved class claims brought by doctors against health maintenance organizations (HMOs), alleging a conspiracy to systematically underpay physicians on reimbursements for their services.  To rebut the HMOs' claims that this inference was inappropriate, the court commented that "[i]t does not strain credulity to conclude that each plaintiff, in entering into contracts with the

- 165 -

defendants, relied upon the defendants' representations and assumed they would be paid the amounts they were due."

In re U.S. Foodservice Inc. Pricing Litigation and Klay are persuasive and they are hardly alone in reasoning that circumstantial evidence of reliance is sufficient to allege RICO causation for purposes of Rule 23. Indeed, numerous district court decisions, in the process of certifying classes, have accentuated facts similar to those in this case -- primarily, the alleged legitimacy of the counterparty to an agreement, or the fact that all plaintiffs paid fees in exchange for a promise -- as proper grounds to infer reliance on a classwide basis. Moreover, outside the context of class certification, the inference of reliance has also been deemed appropriate in RICO and similar fraud cases.

The logic of these cases applies here. Under the facts of this case, evidence of payment for the loan commitment -- more specifically, the inference that arises from it -- is sufficient to present a predominating question related to class member reliance that can resolve a central issue of this litigation in one swoop. Resorting to this generalized inference of reliance addresses a critical classwide piece of evidence and will not require individualized consideration that would belie class treatment. More specifically the fact that a class member paid the nonrefundable up-front fee in exchange for the loan commitment constitutes circumstantial proof of reliance on the misrepresentations and omissions regarding Hutchens's past and the defendant entities' ability or intent to actually fund the promised loan.

Were we deciding the merits of an individual plaintiff's RICO fraud claim, we would surely accept the introduction of such an inference -- the factfinder's ultimate acceptance or rejection notwithstanding -- with little analysis. For the purposes of class certification, we see no reason why a putative class containing plaintiffs, who all paid substantial up-front fees in return for financial promises, should not be entitled to posit the same inference to a factfinder on a classwide basis. When plaintiffs are given the opportunity to present that inference as their theory of causation, reliance, an issue often wrought with individualized inquiries, becomes solvable with a uniform piece of circumstantial evidence. Furthermore, the circumstantial fact of payment of the up-front fee is common to the entire class: all class members paid up-front fees without receiving the promised loan. This element is subsumed in the definition of the class itself. And as a result, the putative class is not stymied, for the purposes of class certification, under Rule 23(b)'s predominance element.

The defendants point to cases from other circuits that have resisted class certification in financial transaction cases where reliance cannot be shown through generalized evidence. But those cases, rather than categorically rejecting the inference, simply do not permit its application on a classwide basis due to unique facts surrounding the class claims. In particular, those cases involve

significant individualized or idiosyncratic elements that reasonably preclude the predomination of common questions.

For example, Poulos v. Caesars World, Inc., 379 F.3d 654 (9th Cir. 2004), is unpersuasive because the court found that a given putative class member's decision to partake in slot-machine and video-poker gambling was not necessarily done in reliance on the game machine's maker's representations about the odds of winning. Unlike entering into a serious financial transaction, many people gamble without any consideration, let alone reliance, on the representations about the likelihood of striking it rich. Nor does every slot player spend any serious money expecting something (other than a good time, perhaps) in return.

A similar, albeit less direct, conclusion derives from Sandwich Chef of Texas, Inc. v. Reliance National Indemnity Insurance Co., 319 F.3d 205, 219 (5th Cir. 2003). In Sandwich Chef, the class alleged that several insurance companies defrauded policyholders in violation of RICO by charging excessive premiums on workers' compensation plans. Plaintiffs asserted that their theory of reliance was based on a simple financial transaction; namely, that each class member relied on the accuracy of an inflated invoice when it made payments in satisfaction of their debt. This act of payment, said the class, was sufficient to establish circumstantial evidence of reliance on a classwide basis. The Fifth Circuit disagreed, finding that individualized issues of reliance would take center stage at trial. According to the court, the uniquely negotiated premiums, among other bespoke elements of the insurance policies, would require personalized evidence to establish whether a given plaintiff was aware of the method for calculating premiums, whether individual policyholders were aware that their rates deviated from rates filed with regulators, and, most importantly, whether "a specific policyholder thought an invoice complied with the approved rate and paid an inflated premium in reliance on that belief." Particularly in the context of insurance negotiations, where myriad factors are considered during the fact-specific bargaining process, no set of universal facts could predominate over the comprehensive sui generis evidence that would arise at trial with respect to each putative class member. Under those circumstances, Rule 23(b)'s predominance requirement cannot be met.

At bottom, the sort of quid pro quo that is present in this case did not exist in Sandwich Chef. The putative class members in Sandwich Chef received the insurance they coveted -- even if it was a slightly watered-down or less appealing version. Moreover, the insurance coverage itself was legitimate, and the companies offering it were in the business of providing insurance. In this case, the victims of Hutchens's fraud were completely deprived of any benefit from their transaction because Hutchens allegedly did not intend to or have the ability to fund any of the loans. This fact, if proved at trial, will resolve a central, predominating issue that is common to all class members. Not so in Sandwich Chef where common proof simply would not suffice to dispose of any principal issue in that case.

Before moving on, a few observations about the limited effect of this inference on the litigation of the class claims.  As we have explained, the sole result of this inference is that the class members are exempted from demonstrating causation on a class-member-by-class-member basis.   The inference thus manifests primarily as an evidentiary matter: class members will not be required to testify as to their reliance on the lenders' misrepresentations and omissions. Instead, the putative class members are permitted to use the common fact that they all forfeited advanced fees as evidence that the class's damages were caused "by reason of" defendants' alleged RICO violations.

But this inference does not shift the burden of proof at trial on the element of RICO causation (or any other elements of the claim) -- plaintiffs will still have to prove RICO causation by a preponderance of the evidence to win on the merits. Similarly, the trier of fact is not required to accept the inference; it is merely permitted to utilize it as common evidence to establish the class's prima facie claims under RICO.  Given the significance that RICO's causation element will play at trial, combined with lenders' common misrepresentations and omissions regarding Hutchens's ability or intent to fund the promised loans (which are not challenged here), it is clear that the class's claims will "prevail or fail in unison." That is enough to satisfy the predominance prong of Rule 23.11

CGC Holding Co., LLC v. Broad & Cassel, 773 F.3d at 1087-94 (emphases in original)(footnotes omitted)(citations omitted).  It is clear given the Tenth Circuit's repeated citations to Eleventh Circuit case law, including Klay v. Humana, that the Tenth Circuit has adopted the Eleventh Circuit's test of comparing the total time the district court most likely will spend on common versus individual questions.  See CGC Holding Co., LLC v. Broad & Cassel, 773 F.3d at 1087 ("[W]e must *characterize* the issues in the case as common or not, and then *weigh* which issues predominate."  (emphases in original)).[51]

---

[51]The Tenth Circuit cites to a section of Newberg for its predominance analysis; the section, in its entirety, states:

Though courts usually do not state it quite this way, the predominance analysis logically entails two distinct steps -- the characterization step and the weighing step.  A court must first characterize the issues in the case as common or individual and then weigh which predominate.

Issues are characterized as common or individual primarily based on the nature of the evidence:

- If "the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question."

- If "the same evidence will suffice for each member to make a prima facie showing," or if the issue is "susceptible to generalized, class-wide proof," then it is a common issue.

Once the issues have been characterized, courts then loosely compare the issues subject to common proof against the issues subject solely to individualized proof to assess whether the common issues predominate. This is more of a qualitative than quantitative analysis. Common questions do not predominate if "a great deal of individualized proof" would need to be introduced or "a number of individualized legal points" would need to be established after common questions were resolved. Nor do common questions predominate if, "'as a practical matter, the resolution of . . . [an] overarching common issue breaks down into an unmanageable variety of individual legal and factual issues.'" Common issues will predominate if "individual factual determinations can be accomplished using computer records, clerical assistance, and objective criteria -- thus rendering unnecessary an evidentiary hearing on each claim." In addition, common issues predominate when adding more plaintiffs to the class would minimally or not at all affect the amount of evidence to be introduced.

Newberg § 4:50 (footnotes omitted). Newberg -- a decidedly plaintiff-friendly treatise -- does not set forth the Eleventh Circuit's test, nor really any meaningful test, at all. See Newberg § 4:50 (describing the inquiry as a "loose[] compar[ison]" which is "more of a qualitative than quantitative analysis").

The last sentence of the section -- taken from the Eleventh Circuit's characterization of the Fifth Circuit's language -- is particularly plaintiff-friendly. Adding plaintiffs to a class does not necessarily increase the amount of evidence necessary unless the questions involved are completely individualized. For example, in a class breach-of-contract case in which the class members each sue for breach of a contract that he or she signed with the defendant -- and 1,000 differently phrased versions of these contracts exist among the class -- the district court could divide the class into segments and allow each segment to proceed on its own unique contractual language. In this circumstance, the addition of more plaintiffs into the class would not increase the amount of evidence needed -- provided, of course, that the new plaintiffs' contracts fit within one of the existing 1,000 categories (and that is how the rule is intended to be applied, as even a shareholder class action would fail this test if the "new plaintiffs" did not have to be shareholders). A class with 1,000 different segments, however, should fail the predominance inquiry, and, thus, Newberg's statement that "common issues predominate when adding more plaintiffs to the class would minimally or not at all affect the amount of evidence to be introduced" must be false.

Wright & Miller, a more even-handed treatise, also downplays the time-weighing test that the Eleventh Circuit and Tenth Circuit use:

26.     The Third Circuit has adopted a similar approach.  In <u>Marcus v. BMW of North</u>

<u>America, LLC</u>, 687 F.3d 583 (3d Cir. 2012), the Third Circuit said:

> To assess predominance, a court at the certification stage must examine each
> element of a legal claim "through the prism" of Rule 23(b)(3).  <u>In re DVI, Inc.</u>
> <u>Sec. Litig.</u>, 639 F.3d 623, 630 (3d Cir. 2011).  A plaintiff must "demonstrate that
> the element of [the legal claim] is capable of proof at trial through evidence that is
> common to the class rather than individual to its members."  <u>Hydrogen Peroxide</u>,
> 552 F.3d at 311.  "Because the nature of the evidence that will suffice to resolve a
> question determines whether the question is common or individual, a district court
> must formulate some prediction as to how specific issues will play out in order to
> determine whether common or individual issues predominate in a given case."  <u>Id.</u>
> (quotation marks omitted).

---

Most courts have not attempted to measure the amount of time that will be spent
litigating each issue in the case to decide whether the common issues predominate
in the sense of how much time will be devoted to them.  Although their reluctance
at least in part is due to the purely hypothetical nature of this type of inquiry, it
also reflects the fact that clockwatching is not very helpful in ascertaining whether
class-action treatment would be desirable in a particular case.  One court, in the
course of expressly rejecting the suggestion that predominance should be decided
on the basis of the total time that will be spent on the proof of common issues as
compared with that to be spent on individual issues, reasoned as follows:

> (A)rguably it is true that as a class action more time in toto will be
> spent in proof of individual damage claims in any of the class
> actions than will be spent in proof of conspiracy. . . .  (However,) if
> there were to be but a single case for trial, the court would expect
> that the great bulk of the time of that trial would be consumed with
> proof or the attempted proof of the existence and effect of a
> conspiracy and that the fraudulent concealment and damage issues
> would be far less predominant in the sense of time consumed at the
> trial.  Were there to be 500 separate suits, this same pattern
> undoubtedly would prevail as to each.  It seems specious and
> begging the question to say that if these 500 law suits were brought
> into a class so that proof on the issues of conspiracy need be
> adduced only once and the result then becomes binding on all 500,
> that thereby the common issue of conspiracy no longer
> predominates because from a total time standpoint, cumulatively
> individual damage proof will take longer.

Wright & Miller, <u>supra</u>, § 1778 (quoting <u>In re Nassau Cnty. Strip Search Cases</u>, 461 F.3d 219,
228 (2d Cir. 2006)).

687 F.3d at 600.  The Third Circuit then set forth the claims that the plaintiffs brought:

> Marcus asserts four claims on behalf of the New Jersey class against BMW and Bridgestone: (1) violations of the NJCFA; (2) breach of the implied warranty of merchantability; (3) breach of contract; and (4) breach of the implied covenant of good faith and fair dealing. He also asserts a claim for breach of express warranty against BMW.   We consider the elements of these claims through the prism of the predominance requirement to determine whether they are capable of proof with common, class-wide evidence.

687 F.3d at 600.  The Third Circuit first addressed the common-law claims, which, like the district court, referred to the plaintiffs' breach of warranty, breach of contract, and breach of the implied covenant of good faith and fair-dealing claims.

> The essence of each of Marcus's common law claims (at least for purposes of our predominance analysis) is that he purchased a defective product that caused him damage.[52]  In his complaint, Marcus alleges that Bridgestone RFTs (and, in turn, the BMW vehicles that they equip) are defective for several reasons: (1) Bridgestone RFTs pop or sustain bubbles from use under normal driving conditions, making them more susceptible to road hazard damage than conventional tires and other brands of RFTs; (2) they cannot be repaired in the event of even a small puncture; and (3) they are extremely expensive to replace. In addition, he alleges that his BMW vehicle is defective because it cannot be reconfigured to operate with conventional tires.

> The District Court found that Marcus could prove these alleged defects at trial with common, class-wide evidence.[53]  BMW and Bridgestone contest the Court's finding with respect to the first alleged defect.  They also argue that issues of proximate causation -- i.e., determining why each class member's tires "have gone and been replaced" -- will require individualized inquiries that will predominate over any common ones.

687 F.3d at 600-01.  The Third Circuit then discussed the common proof of susceptibility to road hazard damage:

---

[52]In a lengthy footnote, the Third Circuit set forth the elements of all the common-law claims.

[53]The Third Circuit dropped a footnote and stated that, because BMW and Bridgestone did not challenge the District Court's findings that, with respect to Marcus' common claims, the other alleged defects are capable of common proof, the Third Circuit need not consider them.

According to BMW and Bridgestone, Marcus has failed to identify any particular defect that supposedly makes Bridgestone RFTs more susceptible to road hazard damage than other tires.  In addition, they claim that any defect -- should one exist at all -- will not be evident uniformly across all tires, regardless of size or other specifications, included in the class definition.  They argue that the District Court erred by accepting without question Marcus's expert testimony on these points without considering their own.

In In re Hydrogen Peroxide Antitrust Litigation, we clarified a district court's duty when confronted with competing expert testimony about a plaintiff's ability to prove a claim through evidence that is common to the class.  552 F.3d at 307, 322-24.  We held that "the court's obligation to consider all relevant evidence and arguments [on a motion for class certification] extends to expert testimony, whether offered by a party seeking class certification or by a party opposing it.  Id. at 307.  We explained that "[e]xpert opinion with respect to class certification, like any matter relevant to a Rule 23 requirement, calls for rigorous analysis."  Id. at 323.  Therefore, "[w]eighing conflicting expert testimony at the certification stage is not only permissible[, but] it may be integral to the rigorous analysis Rule 23 demands," especially when a party opposing certification offers its own competing expert opinion.  Id.  We further assured district courts that "[r]igorous analysis need not be hampered by a concern for avoiding credibility issues."  Id. at 324.  In that case, we ruled that the district court abused its discretion because it appeared to have assumed that it was barred from weighing one expert opinion against another for the purpose of determining whether the requirements of Rule 23 had been met, specifically whether the plaintiff's claims were susceptible to common proof.  Id. at 322.

Like the District Court in Hydrogen Peroxide, the District Court here was confronted with conflicting expert testimony about whether the plaintiff could prove its claim with common proof.  On the one hand, Marcus's tire expert, Charles Gold, opined on the similarity of Bridgestone RFTs.  After "a detailed analysis of the thousands of pages of specifications produced," he found that "all Bridgestone run-flat tires relevant to this action, despite variations due to size, are substantially similar in construction."  J.A. 1978-79.  He concluded that "a proven defect arising from construction would manifest itself in all relevant tires."  J.A. 1979.  In addition, Gold suggests in his expert report that not only would all Bridgestone RFTs have a similar defect, but in fact they all do have a particular defect.  He explains that the major difference between RFTs and conventional tires is the inclusion of extra components added to the sidewall and assemblies of RFTs, allowing RFTs to be operated at zero, or near zero, inflation pressure.  J.A. 1978.  "Unfortunately," he adds, these same components stiffen the tire during regular inflated use and "[t]he extra stiffness [in RFTs] can make the tire more susceptible to road hazard damages during normal use."  J.A. 1978-1979.

BMW and Bridgestone counter by highlighting that Gold recanted his "extra stiffness" opinion during his deposition.  He admitted he had no published

- 172 -

testing, studies or scientific data to support his opinion.  J.A. 2031-32.  In fact, Gold admitted that he "cannot offer an opinion, to a reasonable degree of engineering certainty, that Bridgestone RFTs are more susceptible to road-hazard damage during normal use."  J.A. 2074-75.  When Bridgestone and BMW moved to exclude Gold's opinion, Marcus too seems to have changed course with respect to the "stiffness" theory.  Rather than rely on that theory, he argued (and still argues now) that Bridgestone RFTs are more susceptible to road hazard damage because they are "low aspect ratio" tires and that proof of this "defect" is found in the defendants' own documents, not in any expert report.  Marcus Br. 27-28; J.A. 2138.[54]

Despite this apparent retreat from Gold's "stiffness" theory, the District Court found that Marcus "has offered evidence that because run-flat tires are, universally, substantially stiffer than conventional tires, they are therefore more susceptible to road hazard damage.  Such evidence makes it likely that common issues of proof will establish the class members' claims."  Marcus, 2010 WL 4853308, at *13.  Ultimately, however, whether Bridgestone RFTs are more susceptible to road hazard damage than other tires -- due to their "extra stiffness," their low aspect ratio, or anything else -- is not the issue before us.  Our inquiry is limited to whether the District Court abused its discretion when finding that, should a defect exist at all in Bridgestone RFTs that makes them more susceptible to road hazard damage, Marcus will be capable of proving that defect at trial through evidence that is common to the class rather than individual to its members.  See Hydrogen Peroxide, 552 F.3d at 311.

On this point, the Court discussed and apparently credited Gold's similarity opinion.  Marcus, 2010 WL 4853308, at *4, *5 (noting that Marcus "will also offer Gold's expert testimony that all Bridgestone run-flat tires, regardless of model, are substantially similar" and that "Gold's expert testimony opines that all of Bridgestone's run-flat tires are substantially similar, irrespective of model").  Bridgestone offered its own expert evidence (reports and deposition testimony from its experts, Brian Queiser and James Gardner) that the different tires and sizes in the class are not substantially similar given the differences in design, components and materials in different tires specified as standard and optional equipment for different BMW vehicles.  J.A. 399; 401-06; 413-15; 424-26; 452-53.  The District Court did not explicitly discuss these expert opinions, which challenge the similarity opinion of Marcus's expert.

Although we would prefer a more explicit discussion and comparison of Bridgestone's competing expert testimony from the District Court to aid our appellate review, we cannot conclude that the Court abused its discretion in violation of Hydrogen Peroxide.  Unlike the District Court's opinion in Hydrogen Peroxide, nothing in the District Court's opinion in our case suggests that it

---

[54]In a footnote, the Third Circuit noted that an aspect ratio is, roughly speaking, the relationship between height and width of a tire.

assumed it was barred from weighing the credibility of the expert opinions. Instead, it appears that the Court -- consistent with Hydrogen Peroxide -- simply found Gold's opinion about the similarity of Bridgestone RFTs to be more persuasive than the opinions put forth by Bridgestone.  This was not an abuse of discretion.

687 F.3d at 601-03.  After demonstrating what it expected district courts to do to decide the

common proof on one element of the common-law claims, the Third Circuit then turned to the

common proof of another element of the claims -- proximate causation:

> Having found that Marcus could show a common, class-wide defect, the District Court then found he could show, without resort to individual proofs, that this defect caused the class members' damages.  Considering the damages that Marcus alleges, we believe the District Court's causation finding was an abuse of discretion.

> Recall that Marcus defines the class in terms of certain owners and lessees of BMW vehicles with Bridgestone RFTs that "have gone flat and been replaced." He claims that "[a]ll class members were damaged when their tires suffered a flat and they were forced to pay for a new Tire or when they purchased road hazard coverage to insulate them from financial hardship due to cost of the Tires." Pl's Am. Br. in Support of Class Cert. (J.A. 1255).  Accordingly, he asserts that "[e]ach Class member's damages can be measured by the cost of a replacement Tire.  For Class members who purchased road hazard coverage, the damages will be the greater of either the cost of replacement Tires or the cost of road hazard coverage." Id. at 1253-54.

> But these damages allegations beg the question of what caused class members' tires to go flat and need replacement. Causation is pivotal to each of Marcus's claims.  See, e.g., N.J. Stat. Ann. § 12A:2-314 cmt. 13 (discussing how, in an action based on breach of warranty, "it is of course necessary to show . . . that the breach of warranty was the proximate cause of the loss sustained," and that "an affirmative showing by the seller that the loss resulted from some action or event following his own delivery of the goods can operate as a defense").  Here the District Court should have addressed an undisputed, fundamental point: any tire can "go flat" for myriad reasons.  See J.A. 307-308, 448.  Even "defective" tires can go flat for reasons completely unrelated to their defects.  Critically, to determine why a particular class member's Bridgestone RFT has "gone flat and been replaced" requires an individual examination of that class member's tire. See J.A. 305, 399, 1476-77.  These individual inquiries are incompatible with Rule 23(b)(3)'s predominance requirement.

> In another RFT case brought against BMW and Goodyear involving nearly identical allegations as those Marcus makes here, Judge Holwell of the

- 174 -

United States District Court for Southern District of New York denied class certification and aptly explained why individual issues of causation create irremediable predominance problems:

> Even if the plaintiffs were to show that the Goodyear RFTs suffered from a common defect, they would still need to demonstrate that this defect caused each class member's RFT to puncture.  But tires can puncture for any number of reasons, and not all of these reasons will relate to the defect.  As defendants properly note, RFTs can go flat for reasons that would also cause a standard radial tire to go flat, for example, if the driver ran over a nail, tire shredding device, or large pothole, or if a vandal slashed the tire . . . .  [P]laintiff would have to demonstrate in each individual case that the tire punctured for reasons related to the defect, rather than for a reason that would cause any tire to fail.

Oscar v. BMW of N. Am., LLC, 274 F.R.D. 498, 511 (S.D.N.Y. June 7, 2011) ("Oscar I").  Other federal courts have also recognized that suits alleging defects "involving motor vehicles often involve complicated issues of individual causation that predominate over common questions regarding the existence of a defect."  Id. at 510 (collecting cases); see also Chin v. Chrysler Corp., 182 F.R.D. 448, 455 (D.N.J. Sept. 11, 1998)(refusing to certify a class of purchasers and lessee of vehicles with allegedly defective anti-lock brake systems because, among other things, "[e]ven where the alleged defect has manifested itself, individual issues of actual cause must be adjudicated").

Marcus's own experience illustrates the problem.  Of the two tires he presented for inspection in this lawsuit, one went "flat" and was replaced because he ran over a jagged chunk of metal and the other because he ran over a sharp object that tore and gouged the tire and damaged the sidewall.  See J.A. 300, 400, 409-10.  The experts agree that the two tires could not have been repaired and that any tire (run-flat or conventional) would also have been damaged under the circumstances.  See J.A. 309-10, 400, 412, 414, 426.  In other words, it is undisputed that even if Marcus could prove that Bridgestone RFTs suffer from common, class-wide defects, those defects did not cause the damage he suffered for these two tires: the need to replace them.  In this sense, Marcus is no different than a class member who, seconds after buying his car, pulls off the dealership lot and runs over a bed of nails, as neither can claim a "defect" caused his tires to go flat and need replacement.  Because Marcus's common law claims require an individualized inquiry into why any particular consumer's Bridgestone RFTs went flat and had to be replaced, the District Court abused its discretion in finding that the claims satisfy the predominance requirement.

687 F.3d at 603-05.

27.     In light of the Tenth Circuit's analysis in <u>CGC Holding Co., LLC v. Broad &</u> <u>Cassel</u>, the Court concludes that, to determine whether predominance is satisfied, it must first "*characterize* the issues in the case as common or not, and then *weigh* which issues predominate. 773 F.3d at 1087 (emphases in original).  The Court also thinks that <u>Wal-Mart</u> and <u>Comcast</u> <u>Corp. v. Behrend</u> have changed the landscape for the predominance analysis overall.   For example, there are some old cases that state that rule 23(b)(3) "does not require that common questions be dispositive or significant; it only requires that common questions predominate."  <u>In</u> <u>re Potash Antitrust Litig.</u>, 159 F.R.D. 682, 699 (D. Minn. 1995)(Kyle, J.).  Similarly, the Second Circuit had said that the fact that the answer to a common question is not disputed -- for example, if the parties have stipulated as to the answer or the court has already ruled -- does not affect either its commonality or its ability to predominate.  <u>See</u> <u>In re Nassau Cnty. Strip Search</u> <u>Cases</u>, 461 F.3d 219, 228 (2d Cir. 2006)(Straub, J.)("That the class-wide proof comes in the form of a simple concession rather than contested evidence certainly shortens the time that the court must spend adjudicating the issue, but it does nothing to alter the fundamental cohesion of the proposed class, which is the central concern of the predominance requirement.").  The Court believes that the days of submitting a long list of allegedly common issues -- some dispositive, some not dispositive, some significant, some not significant, some upon which the Court has already ruled, some which remain unanswered, some of which are not disputed, some of which the parties have stipulated -- are over.  The common issues have to be real issues -- not phantom issues -- or else the analysis will not meaning anything.[55]

---

[55]In a post-<u>Wal-Mart</u> case, the Supreme Court wrote:

We rest . . . entirely on the text of Rule 23(b)(3), which provides for class certification if "the questions of law or fact common to class members predominate over any questions affecting only individual members."  A failure of

ii.      **The Superiority Requirement.**

28.      The second requirement for certifying a (b)(3) class is superiority, which means

that a class action would be superior to -- not merely just as good as or more convenient than --

all other available procedural mechanisms, including: (i) individual actions by class members;

(ii) ordinary joinder rules, see Fed. R. Civ. P. 18-20; (iii) multidistrict litigation,[56] see 28 U.S.C.

------

proof on the common question of materiality ends the litigation and thus will
never cause individual questions of reliance or anything else to overwhelm
questions common to the class.   Therefore, under the plain language of Rule
23(b)(3), plaintiffs are not required to prove materiality at the class-certification
stage.    In other words, they need not, at that threshold, prove that the
predominating question will be answered in their favor.

Amgen Inc. v. Conn. Retirement Plans & Trust Funds, 133 S. Ct. at 1196.   The last two
sentences could be read to imply that common questions weigh in favor of predominance even if
they are answered at the class-certification stage; saying that satisfying a certain condition is "not
required" or "need[ed]" to trigger an outcome typically implies -- at the very least -- that
satisfying the condition will not foreclose the opportunity to trigger the outcome, e.g., no one
would say that "it is not required to feed a child poison to ensure its healthy development."  The
time-balancing test, however, entails that uncontroverted issues -- for which no evidence need be
introduced at trial -- have no weight in the predominance calculus.

[56]Multidistrict litigation presents different challenges, and is perhaps subject to an
entirely different mode of analysis vis-à-vis superiority, because the decision whether to initiate a
new multidistrict litigation or to transfer a case to an existing multidistrict litigation belongs
entirely to the Judicial Panel on Multidistrict Litigation; there is no provision even permitting
district courts to formally petition the Panel for a transfer.    See 28 U.S.C. § 1407(c)
("Proceedings for the transfer of an action under this section may be initiated by -- (i) the judicial
panel on multidistrict litigation upon its own initiative, or (ii) motion filed with the panel by a
party in any action in which transfer for coordinated or consolidated pretrial proceedings under
this section may be appropriate."); David F. Herr, Multidistrict Litigation Manual § 4:3
("Proceedings before the Panel may be commenced by a party or by the Panel.").  The Court can
informally advise the Panel of its opinion that the multidistrict litigation might be appropriate for
one or more of its cases, and the Panel may then choose to take up the matter "upon its own
initiative."  28 U.S.C. § 1407(c)(i).  If, however, the Panel considers the issue -- either on the
court's advice or upon motion of one of the parties -- and elects not to transfer the case into
multidistrict litigation, the court should respect that decision and exclude the possibility of
multidistrict litigation from its superiority analysis.   In other words, if the Panel declines to
transfer a case into multidistrict litigation, the court should not then decide that the proposed
class lacks superiority because the multidistrict litigation device would be an equal or superior
means for adjudicating the case.

§ 1407; (iv) multiparty multiforum litigation, see 28 U.S.C. § 1369; and (v) the use of bellwether cases.  The superiority requirement thus sets a high bar, but there are two ways that a proposed class can get an immediate leg up on certification, both of which involve rendering the aforementioned procedural devices impractical for the task at hand.

29.    First, the suit can consist of so-called negative value claims -- claims in which the cost of litigation exceeds the likely recovery, rendering them economically non-viable without aggregation.  These claims are the heart and soul of the class action, as the Supreme Court recently reaffirmed:

> The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.  A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor.

Amchem Prods., Inc. v. Windsor, 521 U.S. at 617 (quoting Mace v. Van Ru Credit Corp., 109 F.3d 338, 344 (7th Cir. 1997)).  The class action absolves absent plaintiffs of the otherwise prohibitive obligations of having to hire their own attorneys, devote time and energy to their own discovery, and potentially testify on their own behalf.

30.    Second, the class may consist of such a large volume of similar cases that the judiciary would be overwhelmed if it had to treat each separately.  While this consideration militates against individual treatment and counsels towards aggregation, the court must carefully consider whether another mass-aggregation form -- such as multidistrict litigation -- might be better suited to the task.

31.    In addressing whether a proposed class action is superior to other available methods of adjudicating the controversy, courts start with the four factors that rule 23(b)(3)(A)-(D) enumerates, although those factors are not exhaustive.  See Fed. R. Civ. P. 23 advisory

committee's notes ("Factors (A)-(D) are listed, non-exhaustively, as pertinent to the findings.");

Amchem Prods., Inc. v. Windsor, 521 U.S. at 615-16 ("Rule 23(b)(3) includes a nonexhaustive

list of factors pertinent to a court's 'close look' at the predominance and superiority criteria.").

The first factor, "the class members' interests in individually controlling the prosecution . . . of

separate actions," closely tracks the money value of the individual cases.   Fed. R. Civ. P.

23(b)(3)(A).   When individual actions are practical, they are preferred; the United States has a

"deep-rooted historic tradition that everyone should have his own day in court," and adjudicating

individual disputes is the core activity of our judicial scheme.   Martin v. Wilks, 490 U.S. 755,

762 (1989)(quoting 18C Charles Alan Wright, Arthur R. Miller, Edward H. Cooper, Vikram

David Amar, Richard D. Freer, Helen Hershkoff, Joan E. Steinman, Catherine T. Struve, Federal

Practice  Procedure, Jurisdiction & Related Matters § 4449, at 417 (1981)).   The proposed class

members' emotional connection to the case may also be relevant: the stronger the attachment, the

more reticent the court should be to certify the case.   See Vassalle v. Midland Funding, LLC, 708

F.3d 747, 758 (6th Cir. 2013); Abby v. City of Detroit, 218 F.R.D. 544, 549-50 (E.D. Mich.

2003).   Another recurring issue that arises in relation to this factor is when the statute sued under

provides greater remedies for individual suits than for class suits, either by imposing a damage

cap for class actions which does not apply to individual actions, or by granting statutory damages

to individual plaintiffs while requiring class plaintiffs to prove actual damages.   See, e.g., Fair

Debt Collection Practices Act, 15 U.S.C. § 1692k(2)(B) (capping individual damages at $1,000

and class action damages at $500,000); Truth in Lending Act, 15 U.S.C. § 1640(a) (capping

individual damages at $5,000 and class action damages at $500,000).   Although claims under

these statutes may be more lucratively brought as individual actions, courts should assess the

real-world likelihood that class members would bring their own actions, which implicates

another factor the court should consider: the likelihood that proposed class members know they have a claim, and whether they are savvy enough to pursue it.[57]  See Hicks v. Client Servs., Inc., 257 F.R.D. 699, 701 (S.D. Fla. 2009)(finding superiority because "class members [most likely do not] understand the provisions well enough to know that it may be financially worthwhile to spend the time and effort to litigate these matters").  As the Honorable Loretta A. Preska, Chief United States District Judge for the Southern District of New York, wrote:

> [W]hile the potential for higher individual recoveries exists, realizing that potential requires assuming that each putative class member is aware of her rights, willing to subject herself to all the burdens of suing and able to find an attorney willing to take her case.  Those transaction costs are not insubstantial and have prompted other courts in this Circuit to conclude that litigating as a class is superior.

Kalish v. Karp & Kalamotousakis, LLP, 246 F.R.D. 461, 464 (S.D.N.Y. 2007).  See Jancik v. Cavalry Portfolio Servs., LLC, No. CIV 06-3104 MJD/AJB, 2007 WL 1994026, at *11 (D. Minn. July 3, 2007)("[T]he truth is that the putative plaintiffs in this case are not likely to know their rights and are therefore not likely to pursue these claims on their own.").

32.    The second enumerated (b)(3) factor, "the extent and nature of any litigation concerning the controversy already begun by . . . class members," is closely linked to the first factor.  Fed. R. Civ. P. 23(b)(3)(B).  The advisory notes to the rules state that "[t]he court is to consider the interests of individual members of the class in controlling their own litigations and

---

[57]It is often the case that a plaintiff would receive greater remuneration -- damages or settlement less attorneys' fees and other expenses of litigation -- from an individual action than he would from his proportional share of the class recovery.  If the number of proposed class members likely to file individual claims ($n$), multiplied by the likely remuneration each would receive from an individual action ($i$), exceeds the entire class' recovery less attorneys' fees and expenses ($c$), then the Court will be hesitant to find superiority.  Thus, if $n \cdot i > c$, the Court will not generally certify a (b)(3) class.  The Court should bear in mind, however, that $n$ includes only those individuals who: (i) would, in the event of certification, become class members, i.e., they would not opt out; and (ii) would, nonetheless, in the event the class was not certified, file an individual action.  Thus, $n$ is likely to be a small number in most cases.

carrying them on as they see fit.   In this connection the court should inform itself of any litigation actually pending by or against the individuals."   Fed. R. Civ. P. 23 advisory committee's notes (citations omitted).   This passage suggests that the extent to which proposed class members -- or individuals who would otherwise be proposed class members but for being specifically excluded from the definition by virtue of their individual claims -- have already filed individual claims is probative evidence of the extent to which they will continue to file individual claims in the event of certification denial, and indicates a higher "interest[] in individually controlling the prosecution."   Fed. R. Civ. P. 23(b)(3)(A).   It is also probative evidence whether the claims are truly negative value or whether the plaintiffs' counsel is merely representing that they are to enhance his argument for certification.

33.   In evaluating the (b)(3)(A) and (b)(3)(B) factors, the court must keep in mind a powerful fact that counsels strongly in favor of finding superiority: (b)(3) class actions give all proposed class members the opportunity to opt out of inclusion in the class.   See Fed. R. Civ. P. 23(c)(2)(B).   The individual actions that rule 23(b)(3)(B) directs the court to consider would not be swept under the class action's umbrella, nor would certification interfere with the litigation autonomy of any proposed class member who plans to file an individual claim but has yet to do so.   The sole group that rule 23(b)(3)(A) and (b)(3)(B) protects consists only of those individuals who (i) have not yet filed an individual action, (ii) but are identifiable by proposed class counsel as having a claim, (iii) who are sent notice of their claim, (iv) who still, upon receiving notice, fail to meet with an attorney to file an individual claim or even to opt out of the class, and (v) only later develop an interest in pursuing an individual claim, and find themselves unable to do so because of the res judicata effect that a class action has on its members.   As a practical matter, in most instances, this group contains few people, if any.   Individuals interested in

litigating their claims individually will most likely have already filed suit; at the very latest, receipt of the class notice will spur them into action, and they will opt out of the class.  For this reason, the Court believes that concerns about (b)(3) class actions' intrusions into litigant autonomy are overblown and even somewhat paternalistic.

34.     The Court does not write off the rule 23(b)(3)(B) factor entirely, however, as it does provide one piece of useful, specific guidance.  The rule speaks not only of assessing the "extent . . . of any litigation . . . already begun" -- presumably meaning the raw number of cases filed relative to the size of the proposed class -- but also of the "nature of any litigation . . . already begun."  Fed. R. Civ. P. 23(b)(3)(B).  The Court interprets this language to mean that it must look at what procedural forms the already-filed cases have taken.  For example, if a group of asbestos plaintiffs file for class certification, the court should decline to certify on the ground that asbestos cases are consolidated in multidistrict litigation in the United States District Court for the Eastern District of Pennsylvania.  See In re Asbestos Prods. Liability Litig. (No. VI), MDL No. 875 (E.D. Penn.)(Robreno, J.).  But see supra note 56.  Furthermore, the Court concludes that, if a class has already been certified to pursue certain claims, redundant classes should generally not be certified.[58]  See Newberg § 4:70 ("[I]f a *class action* case is already

---

[58]The Court makes this statement confidently as it relates to "horizontally" competing class actions: the Court should always strive to avoid having multiple overlapping or competing class actions certified in the federal court system.  It is less clear how to handle a putative class action when there are one or more class actions pending in state court(s) whose outcome would have res judicata impact on the Court's proposed class members.  Although the presence of vertically competing class actions certainly bears on the superiority determination, the Court must carefully evaluate such circumstances on a case-by-case basis.  The Court can envision a scenario in which numerous heavily overlapping class actions languished across multiple state courts without making progress, and in which the Court is capable of expeditiously certifying and resolving a nationwide class action, and, in such circumstances, superiority might be met.

Under the Anti-Injunction Act, federal courts generally may not stay or enjoin state court cases on the ground that they would interfere with a proposed class action or even a certified class action.  See 28 U.S.C. § 2283 ("A court of the United States may not grant an injunction to

stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."). There are possible exceptions, however, including that, pursuant to the All Writs Act, 28 U.S.C. § 1651, a district court may enjoin state court proceedings which would interfere with an imminent settlement agreement. See In re Diet Drugs, 282 F.3d 220, 233-39 (3d Cir. 2002)(Scirica, J.). In the seminal case of In re Diet Drugs, the Honorable Anthony J. Scirica, United States Circuit Judge for the Court of Appeals for the Third Circuit, noted that, although in personam cases may generally proceed in parallel in state and federal courts, a fully-formed and imminent settlement in a federal case constituted the equivalent of a res, thus permitting the federal court to enjoin the state court from entertaining litigation which could destroy the settlement:

> [C]ourts have analogized complex litigation cases to actions in rem. As one court reasoned, "the district court had before it a class action proceeding so far advanced that it was the virtual equivalent of a res over which the district judge required full control." In re Baldwin-United Corp. (Single Premium Deferred Annuities Ins. Litig.), 770 F.2d 328, 337 (2d Cir. 1985). See also Wesch v. Folsom, 6 F.3d 1465, 1470 (11th Cir. 1993); Battle v. Liberty Nat'l Life Ins. Co., 877 F.2d 877, 882 (11th Cir. 1989)("[I]t makes sense to consider this case, involving years of litigation and mountains of paperwork, as similar to a res to be administered."). The in rem analogy may help to bring into focus what makes these cases stand apart. In cases in rem, "the jurisdiction over the same res necessarily impairs, and may defeat, the jurisdiction of the federal court already attached." Kline v. Burke Const. Co., 260 U.S. 226, 229 (1922). Similarly, where complex cases are sufficiently developed, mere exercise of parallel jurisdiction by the state court may present enough of a threat to the jurisdiction of the federal court to justify issuance of an injunction. See In re Baldwin-United Corp. (Single Premium Deferred Annuities Ins. Litig.), 770 F.2d at 337 (noting such cases, like cases in rem, are ones in which "it is intolerable to have conflicting orders from different courts"). What is ultimately important, in any event, is that in both kinds of cases state actions over the same subject matter have the potential to "so interfer[e] with a federal court's consideration or disposition of a case as to seriously impair the federal court's flexibility and authority to decide the case." Atl. Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs, 398 U.S. 281, 295 (1970).

In re Diet Drugs, 282 F.3d at 235 n.12. See Winkler v. Eli Lilly & Co., 101 F.3d 1196, 1202 (7th Cir. 1996)(holding that a federal injunction is proper "[w]here a litigant's success in a parallel state court action would make a nullity of the district court's [discovery] ruling, and render ineffective its efforts effectively to manage the complex litigation at hand"); Carlough v. Amchem Prods., 10 F.3d 189, 203 (3d Cir. 1993)(affirming an injunction against a state-court class action where the "the stated purpose of the [state] suit [was] to challenge the propriety of the federal class action"). Cf. In re Corrugated Container Antitrust Litig., 659 F.2d 1332, 1335 (5th Cir. 1981)(affirming an injunction against a South Carolina class action where the state court enjoined the defendants -- which also were defendants in a federal multidistrict suit -- from entering any settlement that contained any release of claims under South Carolina law, thereby

pending, certification of another class suit might not be sensible or superior to the current litigation posture."   (emphasis in original)).   Subsequent proposed classes should either be defined to avoid class member-overlap with previously certified classes or else should assert different claims.[59]

---

"clearly interfer[ing] with the [federal] multidistrict court's ability to dispose of the broader action pending before it").   But see In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liability Litig., 134 F.3d 133 *passim* (3d Cir. 1998)(Becker, J.)(refusing to enjoin a Louisiana state court from approving a class settlement, even though a similar proposed class was pending certification in federal multidistrict litigation, because: (i) the federal court lacked personal jurisdiction over the absent class members, given that the federal class had not yet been certified nor notice served on the absent class members; (ii) the Full Faith and Credit Clause of the Constitution, and the Rooker-Feldman doctrine, barred review of the state court's approval of the settlement, because approval had already been finalized and final judgment entered; and (iii) the Anti-Injunction Act would have barred the federal court from enjoining the state court even if the state court's judgment were not finalized, as protecting the viability of a pre-certification class action is not "necessary in aid of [the federal court's] jurisdiction," nor is it necessary "to protect or effectuate its judgments").   In light of General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation, it is generally safe to assume that a district court may never enjoin a state court from certifying or going forward with an overlapping class when the federal court has not yet certified and noticed its own class.

As a practical matter, many of the questions raised relating to competing state and federal class actions have been obviated by the passage of CAFA, which has resulted in most if not all truly nationwide class actions being immediately removable to federal court, see 28 U.S.C. § 1332(d), which defendants do so reliably that plaintiffs have begun filing them in federal court, rather than filing them in state court and waiting for them to be removed, see Emery G. Lee III & Thomas E. Willging, The Impact of the Class Action Fairness Act of 2005 on the Federal Courts 1-2 (Federal Judicial Center ed., 2008).   Although CAFA's primary effect has been to make superiority determinations easier by placing limitations on state court class actions that could overlap with federal class actions, it also raises novel questions, such as whether and when the court -- in light of CAFA's explicit purpose to push more multistate class actions into federal court -- should conclude that the availability of a state court aggregation device destroys superiority of a proposed federal class action.

[59]If a class has already been certified relating to a matter, and a new plaintiff seeks both (i) certification of a larger class than was previously certified and (ii) to assert claims for which the previous class was not certified, then the new plaintiff could avoid overlap between the new and old class actions by splitting the new class into different classes or subclasses.   The claims contained in the already-certified class action could be asserted in the proposed class action only by individuals excluded from the already-certified class' definition.   Claims not included in the already-certified class action could be asserted by the entirety of the proposed class, including those individuals who are also members of the already-certified class.

35.     The third rule 23(b)(3) factor is "the desirability or undesirability of concentrating the litigation of the claims in the particular forum," which can be split into two prongs: (i) whether aggregation is desirable; and (ii) whether the particular court at issue is a desirable forum to adjudicate the aggregated dispute.   Fed. R. Civ. P. 23(b)(3)(C).   The first prong, whether aggregation is desirable, is considered a recitation of the general superiority inquiry; all of the aforementioned factors and considerations apply, and courts should, additionally, consider the interest of judicial economy -- from this perspective, the more cases that can be aggregated, the better.   See Newberg § 4:71.   The second prong is whether the particular court at issue is a desirable forum for the litigation.   Some issues that reliably influence the determination of this prong include: (i) the geographic convenience of the parties, witnesses, or class counsel, see Zinser v. Accufix Research Inst., Inc., 253 F.3d 1180, 1191-92 (9th Cir. 2001); (ii) the locus of the harm, as well as any other events forming the basis of the action, see Winkler v. DTE, Inc., 205 F.R.D. 235, 245 (D. Ariz. 2001); (iii) the location of the bulk of the proposed class, see Macarz v. Transworld Sys., Inc., 193 F.R.D. 46, 57 (D. Conn. 2000); and (iv) whether the defendant is located in the forum state, see In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 534 (3d Cir. 2004).   "The particular court at issue" does not refer only to the desirability of the United States District Court for the District of New Mexico, or even of the Albuquerque division, but, rather, the prong's inquiry extends all the way down to the level of the individual district judge.   For example, if a district judge has already made several pre-certification preliminary rulings, see Klay v. Humana, Inc., 382 F.3d 1241, 1271 (11th Cir. 2004); if he or she has other, similar actions consolidated in his court, see Beaulieu v. EQ Indus. Servs., Inc., No. 5:06-CV-00400-BR, 2009 WL 2208131, at *23 (E.D.N.C. July 22, 2009); In re Relafen Antitrust Litig., 218 F.R.D. 337, 347 (D. Mass. 2003); or even if he or she possesses particular expertise at

handling the claims alleged by the proposed class, the judge may weigh those facts in favor of a finding of superiority.

36.     The fourth, final, and most important[60] factor a court must consider in assessing superiority is the extent to which the court will be able to manage the class action, if certified, through pre-trial litigation and trial, accurately adjudicating the class' claims -- in particular the individual issues -- and fairly distributing relief among the class members.  See Fed. R. Civ. P. 23(b)(3)(D).  The manageability factor "encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit."  Eisen v. Carlisle & Jacquelin, 417 U.S. at 164.    The principal concern in a manageability inquiry is individualization.   The size of a proposed class, on its own, does not affect manageability; increasing the size of a proposed class only hurts manageability if it introduces new proposed class members with individual issues.  See Carnegie v. Household Int'l, Inc., 376 F.3d 656, 660-61 (7th Cir. 2004)(Posner, J.).   As such, several courts have held that, if the predominance requirement is met, then the court should not decline to certify the class on manageability grounds alone.

> The predominance analysis has a tremendous impact on the superiority analysis for the simple reason that, the more common issues predominate over individual issues, the more desirable a class action lawsuit will be as a vehicle for adjudicating the plaintiffs' claims both relative to other forms of litigation such as joinder or consolidation, and in absolute terms of manageability.

Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc., 601 F.3d 1159, 1184 (11th Cir. 2010)(internal citations and quotation marks omitted).  See Klay v. Humana, Inc., 382 F.3d 1241, 1272 (11th Cir. 2004)("[W]here a court has already made a finding that common

---

[60]Newberg writes that the "manageability factor . . . is, by the far, the most critical concern in determining whether a class action is a superior means of adjudication.  Indeed, the superiority discussion has, to this point, been playing *Hamlet* without the prince, and now, it is time to usher the prince onstage."  Newberg § 4:72.

issues predominate over individualized issues, we would be hard pressed to conclude that a class action is less manageable than individual actions.").

37.     When it comes to designing a fair management plan for trying a class action, district courts have myriad tools which can be customized to suit the needs of individual cases: "[W]hen a judge becomes convinced that a case is 'complex,' procedural innovation often replaces procedural conservatism."  Jay Tidmarsh & Roger H. Trangsrud, <u>Modern Complex Litigation</u> 34 (2d ed. 2010).  Most techniques that are truly "procedural" are fair game: cases can be bifurcated,[61] trifurcated, or polyfurcated; trials can be conducted in multiple stages or phases; and, provided that each defendant's overall monetary liability can be ascertained, the sometimes difficult question of how to distribute said damages among the class can be addressed with less formality.[62]

---

[61]"Vertical" polyfurction, which is what is typically meant when bifurcation is discussed, is so named because the separately tried elements build on top of each other, and a negative verdict in one trial obviates the need for the second trial.  For example, if the jury comes back for the defendant on a liability-only trial, then there is no need for a trial on damages.  Vertical polyfurcation also often requires that the separate trials be performed in a certain sequence.  "Horizontal" polyfurcation is so named because the trials do not build on one another, but rather sit analytically side-by-side.  "Severance" is similar to the criminal procedural maneuver in which a defendant whose case is joined to be tried with another defendant's or defendants' petitions the court for his or her own separate trial.  Fed. R. Crim. P. 14(a), 12(b)(3)(D).

[62]Defendants have a due-process right to have any damages against them proven in court.  The question of how to distribute those damages among the class, however, does not implicate the defendants' rights at all, and, thus, that process can be conducted in a non-adversary fashion, with the court supervising the class counsel's administration of an approved damages-distribution scheme.  The judicial oversight and scrutiny that should apply to this process is more analogous to a rule 23(e) settlement review than it is to a trial.  The relevant inquiry at the certification stage is one of superiority: whether the class would be better off with an imperfect damages-distribution scheme or with another available procedural device -- in negative value cases, this question often equates to asking whether something is better than nothing.
      District courts have leeway to be creative when it comes to devising processes for managing the distribution of class damages.  The Court is willing to go along with innovative and cost-effective mechanisms for distributing class damages, even if they are imperfect,

especially when the alternative is denying certification.  One device of increasing popularity that the Court is loath to use, however, is cy pres relief.

> The cy pres doctrine is an equitable doctrine under which courts "distribute unclaimed portions of a class-action judgment or settlement funds to a charity that will advance the interests of the class."  Black's Law Dictionary 444 (9th ed. 2009).  It derives from the French expression "*cy pres comme possible*," which means "as near as possible," and developed out of the law of trusts.
>
> . . . .
>
> The Court has a basic disagreement with the application of this doctrine for several reasons: (i) class actions are disputes between parties and the money damages should remain among the parties, rather than be distributed to some third party; (ii) it is unseemly for judges to engage in the selection of third[-]party beneficiaries and to distribute class action damages to third parties; (iii) judges are often not in the best position to choose a charitable organization that would best approximate the unpaid class members' interests; and (iv) the doctrine encourages charitable organizations, and plaintiffs' lawyers, to lobby the court for cy pres awards.

Lane v. Page, 862 F. Supp. 2d 1182, 1230-31 (D.N.M. 2012)(Browning, J.)(citations omitted). See In re Thornburg Mortg., Inc. Sec. Litig., 885 F. Supp. 2d 1097, 1105-12 (D.N.M. 2012)(Browning, J.)(denying a joint request by the class representatives and the defendants to distribute much of the class damages to the Center for Civic Values).  The Tenth Circuit has never discussed cy pres relief -- it has only once even uttered the term, see United States v. State of New Mexico, 536 F.2d 1324, 1326 (10th Cir. 1976)(mentioning without elaboration, in a non-class action, that the district court had "refused to apply the doctrine of cy pres") -- but many scholars, see Martin H. Redish, Peter Julian & Samantha Zyontz, Cy Pres Relief and the Pathologies of the Modern Class Action: A Normative and Empirical Analysis, 62 Fla. L. Rev. 617, 641 (2010); Myriam Gilles & Gary B. Friedman, Exploding the Class Action Agency Costs Myth: The Social Utility of Entrepreneurial Lawyers, 155 U. Pa. L. Rev. 103 (2006); Sam Yospe, Cy Pres Distribution in Class Action Settlements, 2009 Colum. Bus. L. Rev. 1014 (2009), the *Wall Street Journal*, see Krueger & Serotta, supra, and the *Washington Post*, see Editorial, supra, at A20, have raised questions about its constitutionality, its compliance with the Rules Enabling Act, 28 U.S.C. § 2072, or both.  See also Robles v. Brake Masters Sys., Inc., No. CIV 10-0135 JB/WPL, 2011 WL 9717448, at *16-17 (D.N.M. Jan. 21, 2011)(Browning, J.). The Court would be more likely to let unused or undisbursable funds escheat to the state or revert to the defendant -- although reversion undermines the deterrent value of the class action -- than it is to use cy pres relief.  If the fund is disbursed under a claim system, and the total of the claims does not exhaust the entire fund, the Court would likely first look to distributing the unclaimed funds to the claimants on a pro rata basis.

Still, the fact that cy pres relief is a commonly used method of distributing class damages underscores the point that courts need not approach the distribution of class damages with the same perfectionism with which they approach adversarial proceedings.  Even if the distribution

38.     Techniques that merely presume away substantive elements that a plaintiff normally has to prove, or that would impair a defendant's due-process rights, however, are impermissible.   But see supra note 43 (describing the fraud-on-the-market theory, which presumes satisfaction of the reliance element in securities cases).   In particular, the Supreme Court has expressly disavowed "trials by statistics" or "trials by formula," either as to liability or damages.   Wal-Mart, 131 S. Ct. at 2561.   A trial by statistics involves a small but representative sample of class members presenting evidence on individual questions in their own cases and then inviting the jury to extrapolate its conclusions from the sample to the entire class.   See, e.g., Wal-Mart, 131 S. Ct. at 2561.   For example, counsel for a class of 5,000 might present fifty class members' cases in the same way he would if he or she were trying them individually.   Counsel would additionally present expert testimony that those fifty class members were representative of the class -- generally meaning that they were selected at random -- and that both (i) the proportion of the sample to which the defendant is liable, and (ii) the damage inflicted on the average individual in the sample, could be generalized to the entire class to a certain confidence interval and level.[63]   The defendants might put on their own sample, attack the representativeness

---

is not completely fair -- if, for instance, a class member who sustained $100 in damage receives the same distribution as another class member who sustained $800 -- it is still better than cy pres relief, which gives the entire pot of damages to an interloper.

[63]A confidence interval for a proportion estimate is also known as a "margin of error."  It is the "plus or minus" figure often displayed next to the proportion estimate in, e.g., public polling data.  See, e.g., Confidence Intervals, Yale University Department of Statistics, http://www.stat.yale.edu/Courses/1997-98/101/confint.htm; Confidence Interval, Wikipedia, http://en.wikipedia.org/wiki/Confidence_interval; Margin of Error, Wikipedia, http://en.wikipedia.org/wiki/Margin_of_error (collectively, "CI/CL Websites").   A confidence level is the percent certainty that the actual proportion fall within the margin of error of the stated estimate.  See CI/CL Websites.  For example, if Gallup, Inc. says that 39% of Americans -- with a confidence interval of [+]/- 3% and a confidence level of 95% -- approve of President Barack H. Obama's job performance, then there is less than a 5% chance that the actual percentage of Americans who approve of President Obama's performance falls outside of the 36% to 42% range.

of the plaintiffs' sample, or put on non-randomly selected class members whose cases were weak; they would almost certainly also present evidence defending against the individual cases of the plaintiffs' sample.  The jury, if it bought into the plaintiff's theory, might decide that the defendant was liable to twenty members of the sample for a total of $100,000.00, extrapolate from the sample to the entire class, and award the class ten million dollars in damages.[64]

39.     The Supreme Court bars this method of trying cases, because it violates the defendant's right to have each element of each claim asserted against it by each class member specifically proven.  See Wal-Mart, 131 S. Ct. at 2561.[65]  When issues are truly common, multiple class members' claims -- or at least elements thereof -- can be specifically proven in one fell swoop; that this common determination can be done forms the basis of the class action.

---

Even with the same sampling data, a confidence interval can be improved at the expense of confidence level and vice versa.  See CI/CL Websites.  For example, Gallup, Inc. might be able -- and the Court has not conducted the actual calculations -- to display the same data as having a [+]/- 8% margin of error and a 99% confidence level, or a [+]/- 1% margin of error and a 90% confidence level.  The use of a 95% confidence level, however, is a scientific and industry standard.

[64]The class contains 100 times as many individuals as the sample, and ten million dollars is 100 times $100,000.00.  The mathematics work out the same way if one considers only the twenty meritorious class members: the twenty sample class members were determined to be owed an average of $5,000.00 apiece, which, multiplied by the expected 2,000 meritorious class members in the entire class, again comes to ten million dollars.

The class could then devise a way, subject only to judicial approval, to divide up the ten million dollars -- or whatever remained of it after deducting class counsel's expenses and fees -- among the class.  That plan might include an equal division among class members of $2,000.00 apiece, or an attempt to administratively determine the relative levels of harm suffered by each class member and distribute the damages proportionately.  See supra note 62.

[65]The Supreme Court based its holding -- or, more precisely, its dicta -- disclaiming trials by formula on the Rules Enabling Act, 28 U.S.C. § 2072(b), stating that trials by statistics effectively alter the substance of the law being applied, but there may additionally be Due Process concerns under the Fifth Amendment to the Constitution of the United States.  See Wal-Mart, 131 S. Ct. at 2561 (citing Ortiz v. Fireboard Corp., 527 U.S. 815, 845 (1999)).

Truly individual issues, on the other hand, must be adjudicated individually and not by statistical inference.[66]

40.     In formulating a workable trial plan, the Court must also ensure that it does not run afoul of the Seventh Amendment.  The Seventh Amendment contains two clauses:

> In Suits at common law, where the value in controversy shall exceed twenty dollars, [(i)] the right of trial by jury shall be preserved, and [(ii)] no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law.

U.S. Const. amend. VII.

---

[66]While the Court fully agrees with Justice Scalia that courts cannot sacrifice the defendant's rights for the economic convenience of the plaintiffs, the Court is not convinced that it, as Wal-Mart seems to suggest, should forego the advantages of class certification merely to convenience the defendant in carrying burdens which the defendant would have to carry even if the litigation was conducted individually.  If the defendant ordinarily bears the burden to produce certain evidence or prove certain allegations, that the burden might be exceptionally inconvenient for it do so on an individual basis against an enormous number of class members should not, in the Court's opinion, weigh against class certification.  For example, if a defendant is sued in a breach-of-contract class action in which 1,000 class members allege that the defendant was not properly performing a term in an identical form contract executed between the defendant and every class member, the defendant might wish to introduce individualized parol evidence -- such as oral communications contemporaneous with the signing of the written instrument explaining the disputed term -- or inject individual issues into the case by asserting affirmative defenses -- such as that certain class members waived performance of the disputed term.  In the Court's opinion -- not necessarily the Supreme Court's -- the defendant would be free to pursue these strategies, but, just as it would in 1,000 individual suits, it must discover and present proof against each individual class member to whom these theories apply.  In the Court's view, just as plaintiffs cannot conduct trials by statistics, the defendant could not put one-hundred class members on the stand to testify to waiver and then expect anything more than a ten-percent decrease in class damages as a result.  Although this burden may seem unfair to the defendant, the defendant would have to expend the same energy and resources in the 1,000 suits were brought individually.  That such suits might never be brought -- because they would not be economically viable for the plaintiffs or because the plaintiffs are not aware of their claims -- should not, in the Court's view, excuse the defendant of its ordinary litigation burdens.  In short, the issues that should most cut against a finding of predominance are those individual questions that would ordinarily be the plaintiff's burden to answer at trial: elements of the prima facie case and individualized rebuttals of any common affirmative defenses that the defendant asserts.  The Court must, however, faithfully and fully apply Supreme Court and Tenth Circuit law.  The Court concludes that Comcast Corp. v. Behrend and Wal-Mart require the Court to count time spent adjudicating individual affirmative defenses against the predominance finding.

- 191 -

41.     These clauses are known as the trial-by-jury clause and the reexamination clause, respectively, and bifurcation has been challenged under both.  Plaintiffs often dislike bifurcation, because it lowers their odds of success by excluding damages evidence from the liability phase -- evidence of the plaintiff's injuries that is often evocative -- and necessitating that they win two trials instead of one.  See infra note 105.  They have, accordingly, argued that bifurcation -- a procedural innovation which post-dates the Founding -- violates the trial-by-jury clause. Whatever the merits of this argument, the Supreme Court has rejected it:

> [W]e are not now concerned with the form of the ancient rule.  It is the Constitution which we are to interpret; and the Constitution is concerned, not with form, but with substance.  All of vital significance in trial by jury is that issues of fact be submitted for determination with such instructions and guidance by the court as will afford opportunity for that consideration by the jury which was secured by the rules governing trials at common law.  Beyond this, the Seventh Amendment does not exact the retention of old forms of procedure.  It does not prohibit the introduction of new methods for ascertaining what facts are in issue . . . .

Gas. Prods. Co. v. Champlin Refining Co., 283 U.S. 494, 498 (1931).  The only restriction that the trial-by-jury clause places on trial-separation schemes is that, when a case contains both legal and equitable issues -- the former of which must be submitted to a jury and the latter of which a judge can decide -- the judge may not rule on the equitable issues before trial in such a way as to preclude the jury from trying the legal issues.  See Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 510-11 (1959).

> The court should take care when deciding which issues may and should be severed for separate trial and the order in which to try them[, as] the right to trial by jury on legal claims may not (except under "the most imperative circumstances") be lost by a prior determination of equitable claims.

Manual for Complex Litigation § 11.632, at 122.

42.     The reexamination clause presents more formidable difficulties to polyfurcation.

Relatively few appellate judges have invalidated lower-court judgments or class-management

plans on this ground, by far the most famous being Judge Posner:

> [T]he district judge . . . exceeded his authority [at] the point at which his plan of
> action proposes to divide the trial of the issues that he has certified for class-
> action treatment from the other issues involved in the thousands of actual and
> potential claims of the representatives and members of the class.  Bifurcation and
> even finer divisions of lawsuits into separate trials are authorized in federal
> district courts.  And a decision to employ the procedure is reviewed deferentially.
> However, as we have been at pains to stress recently, the district judge must carve
> at the joint.  Of particular relevance here, the judge must not divide issues
> between separate trials in such a way that the same issue is reexamined by
> different juries.  The problem is not inherent in bifurcation.  It does not arise when
> the same jury is to try the successive phases of the litigation.  But most of the
> separate "cases" that compose this class action will be tried, after the initial trial
> in the Northern District of Illinois, in different courts, scattered throughout the
> country.  The right to a jury trial in federal civil cases, conferred by the Seventh
> Amendment, is a right to have juriable issues determined by the first jury
> impaneled to hear them (provided there are no errors warranting a new trial), and
> not reexamined by another finder of fact.  This would be obvious if the second
> finder of fact were a judge.  But it is equally true if it is another jury.  In this
> limited sense, a jury verdict can have collateral estoppel effect.

> The plan of the district judge in this case is inconsistent with the principle
> that the findings of one jury are not to be reexamined by a second, or third, or *n*th
> jury.  The first jury will not determine liability.  It will determine merely whether
> one or more of the defendants was negligent under one of the two theories.  The
> first jury may go on to decide the additional issues with regard to the named
> plaintiffs.  But it will not decide them with regard to the other class members.
> Unless the defendants settle, a second (and third, and fourth, and hundredth, and
> conceivably thousandth) jury will have to decide, in individual follow-on
> litigation by class members not named as plaintiffs in the <u>Wadleigh</u> case, such
> issues as comparative negligence -- did any class members knowingly continue to
> use unsafe blood solids after they learned or should have learned of the risk of
> contamination with HIV? -- and proximate causation.  Both issues overlap the
> issue of the defendants' negligence.  Comparative negligence entails, as the name
> implies, a comparison of the degree of negligence of plaintiff and defendant.
> Proximate causation is found by determining whether the harm to the plaintiff
> followed in some sense naturally, uninterruptedly, and with reasonable probability
> from the negligent act of the defendant.  It overlaps the issue of the defendants'
> negligence even when the state's law does not (as many states do) make the
> foreseeability of the risk to which the defendant subjected the plaintiff an explicit
> ingredient of negligence.  A second or subsequent jury might find that the

defendants' failure to take precautions against infection with Hepatitis B could not be thought the proximate cause of the plaintiffs' infection with HIV, a different and unknown blood-borne virus.   How the resulting inconsistency between juries could be prevented escapes us.

In re Rhone-Poulenc Rorer, Inc., 51 F.3d at 1302-03 (citations omitted).

43.     By and large, other courts have not picked up and run with Judge Posner's Seventh Amendment concerns with polyfurcation.   The Tenth Circuit has not addressed the Seventh Amendment's impact on polyfurcation.   The Court nonetheless concludes it can make three statements confidently on the issue.   First, Seventh Amendment concerns are sidestepped entirely when the same jury is used for both phases of the trial.   See In re Rhone-Poulenc Rorer, Inc., 51 F.3d at 1303 ("The problem is not inherent in bifurcation.   It does not arise when the same jury is to try the successive phases of the litigation."); Manual for Complex Litigation § 11.632, at 122 ("Generally, when issues are severed for separate trials, they should be tried before the same jury unless they are entirely unrelated.").   Second, the Court must be cautious that no subsequent jury disturbs any issue that a prior jury definitively decided -- and the Court will use the test from the collateral-estoppel analysis to determine whether a prior jury definitively established an issue.[67]   This requirement does not imply a need to "carve at the joint" -- whatever that means[68] -- but merely to do as the Seventh Amendment says, and prevent "reexamination."   Third, and the Court differs with Judge Posner here, most minor reexamination

---

[67]The Seventh Amendment defines collateral estoppel's contours.   See, e.g., SEC v. Monarch Funding Corp., 192 F.3d 295, 304 (2d Cir. 1999)(cited by Lab. Corp. of Am. Holdings v. Metabolite Labs., Inc., 410 F. App'x 151, 159 (10th Cir. 2011)(unpublished)).

[68]The Tenth Circuit has never used this term.   It seems to imply that every case only has certain points at which it can be bifurcated, e.g., if a claim contains elements $A$ through $E$, but the "joint" is between $C$ and $D$, then the case cannot be bifurcated into a trial on $A$ and $B$ and a separate trial on $C$ through $E$.   Maybe the Court is reading too much into the metaphor.   In the Court's view, however, separate trials for $A$ and $B$ and $C$ through $E$ would be acceptable, so long as the $C$-through-$E$ jury respects the prior jury's findings on $A$ and $B$.

issues -- i.e., issues submitted to different juries that overlap somewhat -- can be resolved by instructing the subsequent jury to adhere to the prior jury's findings and by carefully crafting the verdict form to reflect the prior jury's findings. See In re Paoli R.R. Yard PCB Litig., 113 F.3d 444, 452 n.5 (3d Cir. 1997); EEOC v. Foster Wheeler Constructors, Inc., No. 98-C-1601, 1999 WL 528200, at *3 (N.D. Ill. July 13, 1999)(Coar, J.)("[A] well-constructed bifurcation scheme, used in tandem with clear instructions to the juries can delineate the roles of the two juries in order to avoid reexamination of any factual issues . . . ."); Steven S. Gensler, Bifurcation Unbound, 75 Wash. L. Rev. 705, 735-37 (2000).

### d.   Oil-and-Gas Class Actions.

44.   Oil-and-gas wells are often drilled on land owned by entities or individuals other than the oil company that performs the drilling. The landowners execute mineral leases or deeds with the oil companies, dividing the estate up into a royalty interest, which the landowner-lessor owns, and a working interest, which the oil company-lessee owns. The lessee builds wells on the leased land and connects them to a gathering system -- a system of small pipelines that collect oil and gas from a large number of wells in a region -- which then carries it to a plant for treatment or processing. When the lessee sells the oil or gas, it then pays the lessors a fraction of the proceeds, known as a royalty, which effectively serves as "rent" for the use of the leased land. Royalty owners sometimes contend that their lessees are underpaying their royalty, either by deducting impermissible costs from the proceeds -- a lessee can typically deduct post-production costs, but not production costs, from the sale proceeds before dividing off royalties -- or by paying on an amount that does not reflect the true sale proceeds. The relationship between lessors and lessee is fundamentally a contractual one, but there is also positive law -- case law and statutes -- supplying default terms and contractual gap-fillers. Each lessor's monthly royalty

is typically small and, thus, lessors have little practical recourse for royalty underpayment in

individual litigation.  They will, instead, band together with other landowner-lessors with whom

a given oil company-lessor contracts -- often other lessors on a single gathering system or within

a region -- and sue the oil company via class action.  These class actions have a prodigious

history in the state courts, where they were traditionally brought -- because oil-and-gas royalty

law is principally state law -- before CAFA's passage.  See, e.g., Phillips Petrol. Co. v. Shutts,

472 U.S. at 799.  These actions present recurring issues, and, as certification reversals are both

more common[69] and more instructive than affirmances, the Court will focus on cases where

---

[69]Before rule 23(f)'s interlocutory-appeal provision was added, the Courts of Appeals could only rule on class certification (i) after a final judgment issued in the case, which, given the class actions' high settlement rate, was rare; or (ii) by way of a writ of mandamus, in which case the Courts of Appeals would not generally issue an opinion unless they granted the writ and ordered decertification.  See, e.g., In re Rhone-Poulenc Rorer, Inc., 51 F.3d 1293 (7th Cir. 1995).  Even now, most circuits interpret rule 23(f) in such a way that they will only hear an interlocutory appeal if it appears the certification decision was erroneous:

> We apply a five-factor test to assess the appropriateness of granting a Rule 23(f) petition.  The relevant factors are:
>
> > (1) whether the certification ruling is likely dispositive of the litigation; (2) whether the district court's certification decision contains a substantial weakness; (3) whether the appeal will permit the resolution of an unsettled legal question of general importance; (4) the nature and status of the litigation before the district court (such as the presence of outstanding dispositive motions and the status of discovery); and (5) the likelihood that future events will make appellate review more or less appropriate.
>
> We consider these factors on a holistic basis, but the court should grant the petition, notwithstanding the other factors, "[w]here a district court's certification decision is manifestly erroneous and virtually certain to be reversed on appeal."

EQT Prod. Co. v. Adair, 764 F.3d 347, 356-57 (4th Cir. 2014)(citations omitted).  These standards -- rule 23(f) and, formerly, the mandamus standard -- result in the Courts of Appeals appearing to reverse a higher proportion of class certifications that they actually do.  A district court's decision to certify a class or deny certification is reviewed for abuse of discretion.  See Vallario v. Vandehey, 554 F.3d 1259, 1264 (10th Cir. 2009).

appellate courts concluded that a proposed class failed to satisfy rule 23's requirements.  But see

Karen E. Kahle & Denielle M. Stritch, Grouping the Marcellus Payout: Use of Class Actions in

Royalty Litigation Concerning Post-Production Cost Deductions, 88 N.D. L. Rev. 699 (2012).

45.    The Tenth Circuit's only cases on rule 23(a) and (b)(3)'s application to oil-and-

gas royalty cases[70] came in two companion cases issued on July 9, 2013, Roderick and Chieftain

Royalty Co. v. XTO Energy, Inc., 528 F. App'x 938 (10th Cir. 2013)(unpublished),[71] which were

---

[70]Unsurprisingly, given that the Tenth Circuit's geographic footprint encompasses such oil-rich states as Oklahoma, New Mexico, and Colorado, the Tenth Circuit has dealt with a number of other oil-and-gas royalty class actions, but those cases addressed questions other than the front-end certification inquiry.  See, e.g., Eatinger v. BP Am. Prod. Co., 528 F. App'x 859 (10th Cir. 2013)(unpublished)(McKay, J., joined by Kelly & Matheson, JJ.)(holding that the execution of a class-action settlement mooted the appeal of royalty owners who had been excluded from the class definition); Abraham v. BP Am. Prod. Co., 685 F.3d at 1196 (Kelly, J., joined by Murphy & Hartz, JJ.)(reversing, after a class-action trial, the district court's decisions to admit evidence of the defendant's transition to a uniform same-as-fed payment methodology and to grant judgment as a matter of law on two lease forms); Pelt v. Utah, 539 F.3d 1271 (10th Cir. 2008)(Robinson, J., joined by Murphy & Lucero, JJ.)(holding that plaintiffs were not bound by conclusions in a prior class action to which they were not parties); Elliott, 407 F.3d at 1091 (Murphy, J., joined by Seymour & McKay, JJ.)(making a number of substantive holdings and ruling that an intervention was timely and proper); S. Ute Indian Tribe v. Amoco Prod. Co., 151 F.3d 1251 (10th Cir. 1998)(en banc)(Seymour, C.J.)(holding that Indian tribes that owned mineral rights in coal also owned the rights to the accompanying coalbed methane), rev'd by 526 U.S. 865; Craig v. Champlin Petrol. Co., 435 F.2d 933, 939 (10th Cir. 1971)(overturning the district court's clearly erroneous factual finding that "a market exists for . . . gas in 1965 at the contract price established in 1960").

[71]Chieftain Royalty Co. v. XTO Energy, Inc. is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court finds that Chieftain Royalty Co. v. XTO Energy, Inc., as well as Skinner v. Uphoff, 175 F. App'x 255 (10th Cir.

both written by the Honorable Paul J. Kelly, Jr.,[72] United States Circuit Judge for the Tenth Circuit, and joined by the Honorable Scott M. Matheson, Jr.,[73] United States Circuit Judge for the Tenth Circuit, and the Honorable Monroe G. McKay, Senior United States Circuit Judge for the Tenth Circuit.   In Roderick, a class of individuals owning interests in a total of roughly 650 leases and over 300 wells across ten well fields in Kansas brought a class action against XTO Energy for breach of contract, unjust enrichment, and an accounting.  See 725 F.3d at 1215.  The district court certified the class on the basis of a single common issue, "whether XTO's uniform payment methodology breached the implied duty of marketability under Kansas law," which the district court deemed to predominate over individual issues.  725 F.3d at 1217.  On appeal, the Tenth Circuit decertified the class on two grounds.  First, Judge Kelly stated that the district court had failed to consider variations in lease language at all, relying instead on the implied duty of marketability.  See 725 F.3d at 1216.  This failure constituted an abuse of discretion, because the duty of marketability obtains only "[a]bsent a contract providing to the contrary," and, thus, can be negated by express lease language.  725 F.3d at 1216 (alteration in original)(quoting Sternberger v. Marathon Oil Co., 894 P.2d 788, 800 (Kan. 1995)).  The plaintiffs had not

---

2006)(unpublished), Baldauf v. Garoutte, 137 F. App'x 137 (10th Cir. 2005)(unpublished), Laboratory Corp. of America Holdings v. Metabolite Laboratories, Inc., 410 F. App'x 151 (10th Cir. 2011)(unpublished), and In re Kahn, 133 F.3d 932 (10th Cir. 1998)(unpublished), all have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

   [72]Judge Kelly is a subject-matter expert in oil-and-gas law, having practiced for many years with one of New Mexico's oldest firms, the vaunted Hinkle Firm, now Hinkle Shanor LLP, in Roswell and Santa Fe, New Mexico, known for its representation of oil companies.

   [73]Westlaw lists the third member of the panel as being the Honorable Charles E. Matheson, then-Chief United States Bankruptcy Judge for the District of Colorado.  The Court thinks it more likely that the Judge Matheson on the panel was the Tenth Circuit judge, because: (i) the official published opinion states that the case is "[b]efore Kelly, McKay, and Matheson, Circuit Judges"; and (ii) the Court does not believe that Article I judges can, or do, sit on federal appellate panels.

reviewed any of the class leases, and XTO Energy reviewed only one-fifth of them, categorizing them by royalty type, "several of which negate[d] the IDM [implied duty of marketability] completely or in part (i.e., by providing for certain express deductions)."  725 F.3d at 1216. Second, the Tenth Circuit held that applying Kansas' implied duty to market requires determining the point at which gas from each well becomes marketable, declaring that "[o]nce gas is in marketable condition, the IDM is satisfied -- regardless of whether a market exists at that location . . . [and] gas may be marketable *at the well*."  725 F.3d at 1219 (emphasis in original).  Importantly, the Tenth Circuit did not hold that the class could not be certified, and, to the extent that the Court reads such things into judicial opinions, it implied the opposite.  Rather, it held that the district court's inquiry -- and the form in which it certified the class -- was inadequate, and gave the district court multiple leads for conducting a new rule 23 analysis on remand.  See 725 F.3d at 1219 ("On remand, the [plaintiffs] could, for example, create a chart classifying lease types, and although we express no opinion as to the merits, the district court could decide that no lease type negates the IDM."  (citing Foster v. Merit Energy Co., 282 F.R.D. 541, 551 n.12 (W.D. Okla. 2012))); id. at 1219 ("On remand, the district court should consider whether and to what extent marketability affects commonality."  (footnote omitted)).

46.     In the unpublished companion case, Chieftain Royalty v. XTO Energy, Inc., the Tenth Circuit applied Roderick's holding to a much larger class action composed of lessors for 14,300 leases and 2,300 wells in Oklahoma.  See 528 F. App'x at 940.  Again, Judge Kelly noted that "approximately 13,568 leases have yet to be examined by XTO Energy -- let alone by Chieftain or the district court," and that this omission was "particularly significant because unlike the plaintiff in Roderick, Chieftain admits that some leases expressly abrogate -- and one

even negates -- the IDM."   528 F. App'x at 942-43.   Judge Kelly added one interesting

elaboration on the Roderick holding:

> [T]he district court acknowledged the significance of lease language variations
> when it stated that "the express terms of the various leases will necessarily have to
> be evaluated . . . to determine whether the [IDM] has been abrogated."   However,
> the district court decided the issue was "capable of resolution at the summary
> judgment stage of this litigation."
>
> To be sure, the legal effect of lease language is a merits question that is
> likely "capable of resolution at the summary judgment stage."   However, it is also
> an issue that bears directly on Rule 23's criteria.   As the Supreme Court has
> emphasized, "[e]valuation of many of the questions entering into determination of
> class action questions is intimately involved with the merits of the claims."
> Therefore, the district court must address the lease language issue as it relates to
> Rule 23 *before* certifying the class.

528 F. App'x at 942 (alteration in original)(emphasis in original)(citations omitted).

47.   Other Circuits have also analyzed oil-and-gas royalty class actions, although,

interestingly given its own lack of precedent, the Tenth Circuit did not cite any of them in the

companion cases discussed above.   The Court suspects that the Tenth Circuit did not want to rely

too heavily on cases issued before Wal-Mart.   One influential court to discuss rule 23's

application to oil-and-gas royalty cases in the post-Wal-Mart era is the United States Court of

Appeals for the Fourth Circuit.   In EQT Production Co. v. Adair, the Honorable Albert Diaz,

United States Circuit Judge for the Fourth Circuit, joined by the Honorable J. Harvie Wilkinson

III and Barbara M. Keenan, United States Circuit Judges for the Fourth Circuit, vacated a district

court's certification of five closely related oil-and-gas royalty class actions and remanded them

for further analysis.   See 764 F.3d at 352.   That case was primarily about mineral-rights

ownership -- namely, whether certain coal-rights owners also held title to the coalbed methane

under the leased premises -- but it also addressed royalty underpayments.   See 764 F.3d at 347-

365 (addressing the coalbed methane ownership issue).   Judge Diaz pointed out three individual

issues that the district court failed to consider and that weighed against predominance.  First, the

case addresses the issue of intra-class variations in lease language; the Fourth Circuit's rationale

parallels the Tenth Circuit's, going into more detail in some areas:

> [T]he mere fact that the defendants engaged in uniform conduct is not, by itself, sufficient to satisfy Rule 23(b)(3)'s more demanding predominance requirement. The predominance inquiry focuses not only on the existence of common questions, but also on how those questions relate to the controversy at the heart of the litigation.  Even a plethora of identical practices will not satisfy the predominance requirement if the defendants' common conduct has little bearing on the central issue in the litigation -- in this case, whether the defendants underpaid royalties.  Absent such a relationship, there is no basis for concluding that individual issues will not predominate.
>
> We believe the district court placed an inordinate emphasis on the sheer number of uniform practices without considering whether those practices are relevant to assessing the defendants' ultimate liability.  Some of the common practices that the district court identified -- e.g., the fact that EQT sold all of its CBM into one of two interstate pipelines -- have little relevance to the validity of the defendants' royalty payment practices.
>
> The district court did identify common practices that may be pertinent to the predominance inquiry -- e.g., the fact that "EQT calculated all royalties based on the same methodology."  But the district court's analysis fell short because it never analyzed why those common practices were sufficient to ensure that the class members' common issues would predominate over individual ones.
>
> The defendants have highlighted a number of uncommon practices that might cause individual issues to predominate.  For example, EQT notes that it calculates royalties in different ways for different class members, depending on where the CBM is produced.  Its method of calculating royalties -- and the deductions it applies -- have also changed over time.  CNX submitted evidence that it takes different deductions depending on where it sells the CBM, and that its deduction calculations sometimes vary between and even within wells during different time periods.

764 F.3d at 366-67 (citations omitted).  These statements support the Court's conclusion that the

predominance inquiry is not a quantitative inquiry comparing the number of common questions

to the number of individual questions, nor is it a cursory inquiry asking whether the defendants

generally subjected the class members to the same factual treatment by the defendants or whether

their claims are subject to the same legal standard, but, rather, it is a manageability inquiry that requires the Court to determine whether common legal issues, susceptible to common evidence, exist in the right places to try the case in a way that is fair to all parties.  Second, the Fourth Circuit pointed out that the district court would "likely need to consider" course-of-performance evidence.  764 F.3d at 370-71.  Third, it stated that "the district court should reevaluate the implications of the defendants' statute of limitations defense for Rule 23's predominance requirement."  764 F.3d at 371.  The plaintiffs' claims were facially time-barred, but they pled fraudulent concealment to toll the statute, and the Fourth Circuit held that, "[a]lthough a defendant's conduct is not irrelevant, attention must also be paid to the plaintiff's knowledge and actions," and, "[i]n this context, a plaintiff's knowledge typically requires individual evidence." 764 F.3d at 370.

48.    After determining that the facts that oil-and-gas companies engaged in numerous common practices may be sufficient for commonality purposes, the Fourth Circuit in EQT Production Co. v. Adair made it clear that such common practices are not enough to satisfy the predominance requirement:

But the mere fact that the defendants engaged in uniform conduct is not, by itself, sufficient to satisfy Rule 23(b)(3)'s more demanding predominance requirement.  The predominance inquiry focuses not only on the existence of common questions, but also on how those questions relate to the controversy at the heart of the litigation.  See Amchem Prods., 521 U.S. at 623 (noting that the predominance inquiry "trains on the legal or factual questions that qualify each class member's case as a genuine controversy").  Even a plethora of identical practices will not satisfy the predominance requirement if the defendants' common conduct has little bearing on the central issue in the litigation -- in this case, whether the defendants underpaid royalties.  Absent such a relationship, there is no basis for concluding that individual issues will not predominate.

We believe the district court placed an inordinate emphasis on the sheer number of uniform practices without considering whether those practices are relevant to assessing the defendants' ultimate liability.  Some of the common practices that the district court identified -- e.g., the fact that EQT sold all of its

CBM into one of two interstate pipelines -- have little relevance to the validity of the defendants' royalty payment practices.

The district court did identify common practices that may be pertinent to the predominance inquiry -- e.g., the fact that "EQT calculated all royalties based on the same methodology." But the district court's analysis fell short because it never analyzed why those common practices were sufficient to ensure that the class members' common issues would predominate over individual ones.

The defendants have highlighted a number of uncommon practices that might cause individual issues to predominate. For example, EQT notes that it calculates royalties in different ways for different class members, depending on where the CBM is produced. Its method of calculating royalties -- and the deductions it applies -- have also changed over time. CNX submitted evidence that it takes different deductions depending on where it sells the CBM, and that its deduction calculations sometimes vary between and even within wells during different time periods.

. . . .

Although the district court recognized the problem of lease language variation, it did not see it as a barrier to class certification in any of these cases. In our view, however, these variable terms will make it difficult, if not impossible, for a court to assess the validity of the defendants' royalty payment practices on a classwide basis.

. . . .

Yet, as the defendants note, the district court failed to discuss course of performance evidence entirely.

Second, the district court should reevaluate the implications of the defendants' statute of limitations defense for Rule 23's predominance requirement.

764 F.3d at 366-68, 70 (footnote omitted)(citation omitted).

49. The Fourth Circuit, like the Tenth Circuit, never held that the five putative classes were intractably or irredeemably uncertifiable -- just that the district court did not ask all the necessary questions.[74]

_____

[74]Unlike the Tenth Circuit, however, the Fourth Circuit implied that the case might be doomed: "In our view, however, these variable [royalty] terms will make it difficult, if not

We do not decide today whether the disparate practices identified by the defendants are sufficient to defeat the predominance requirement.  On remand, the district court may well conclude that the defendants' common conduct is sufficient to ensure the predominance of common issues over individual ones.  But it was an abuse of discretion for the district court to focus only on the number of common practices without considering the significance of the defendants' disparate conduct in the broader litigation.

EQT Prod. Co. v. Adair, 764 F.3d at 367.  The case is -- moreso even than Roderick and Chieftain Royalty Co. v. XTO Energy, Inc. -- littered with instructions to the district court for improving its rule 23 analysis on remand.  See, e.g., EQT Prod. Co. v. Adair, 764 F.3d at 367 ("We also remand for the district court to . . . consider how variations in the defendants' royalty obligations to the class members implicate the commonality and predominance inquiries in [certain of the five classes]."); 764 F.3d at 371 ("Where the proper balance lies in the superiority analysis we leave to the district court on remand as part of its broader consideration of the other Rule 23(b)(3) factors.").  In its conclusion, the Fourth Circuit summed up its holding:

> We ultimately hold that the district court's analysis lacked the requisite rigor to ensure the requirements of Rule 23 were satisfied by any of the certified classes.  On remand, the district court may conclude that one or more subclasses should be certified. It may also find that class certification should be denied entirely.  At this point, we only conclude that certification was premature.
>
> We recognize that there are numerous CBM owners in Virginia who haven't received a penny of CBM royalties and others who may have gotten less than their due.  We are not unsympathetic to their plight.
>
> But sympathy alone cannot justify certification under Rule 23.  We therefore vacate the district court's grant of the plaintiffs' motions for class certification, and remand the case for further proceedings consistent with this opinion

_____

impossible, for a court to assess the validity of the defendants' royalty payment practices on a classwide basis." EQT Prod. Co. v. Adair, 764 F.3d at 367-68. The Fourth Circuit left open the possibility, however, that the classes might be certifiable: "On remand, after reviewing the leases in this case, the plaintiffs may be able to show that there are a limited number of lease forms, such that the validity of the defendants' conduct can be assessed on a subclass basis." 764 F.3d at 369.

764 F.3d at 371.

## II.   LAW REGARDING NEW MEXICO'S STATUTES OF LIMITATIONS AND THE DISCOVERY RULE.

50.     "Although a statute of limitations bar is an affirmative defense, it may be resolved on a Rule 12(b)(6) motion to dismiss 'when the dates given in the complaint make clear that the right sued upon has been extinguished.'"  Torrez v. Eley, No. CIV 09-1464, 2010 WL 1948679 (10th Cir. May 17, 2010)(quoting Aldrich v. McCulloch Props., Inc., 627 F.2d 1036, 1041 n.4 (10th Cir. 1980)).  Accord Lee v. Rocky Mountain UFCW Unions & Emp's Trust Pension Plan, No. 92-1308, 1993 WL 482951 (10th Cir. Nov. 23, 1993)("Because the critical dates appeared plainly on the face of [plaintiff's] complaint, we conclude that the statute of limitations defense was properly raised and resolved in the Rule 12(b) context.").  When a party has asserted a statute of limitations issue in a rule 12(b)(6) motion, a court accepts all well-pled factual allegations in the complaint as true and views them in the light most favorable to the plaintiff to determine whether the statute of limitations has run.  See Sunrise Valley, LLC v. Kempthorne, 528 F.3d 1251, 1254 (10th Cir. 2008).  The statute of limitations for a breach-of-contract claim on a written contract, under New Mexico law, is six years.  See N.M. Stat. Ann. § 37-1-3 ("Those founded upon any bond, promissory note, bill of exchange, or other contract in writing, or upon any judgment of any court not of record, within six years.").  The statute of limitations for fraud, under New Mexico law, is four years.  See N.M. Stat. Ann. § 37-1-4 ("Those founded upon accounts and unwritten contracts; those brought . . . for relief upon the ground of fraud, and all other actions not herein otherwise provided for and specified within four years.").

51.     New Mexico applies the "discovery rule," which means that the statute of limitations period "begins to run when the claimant has knowledge of sufficient facts to

constitute a cause of action." Gerke v. Romero, 2010-NMCA-060, ¶ 10, 237 P.3d 111, 115

(citing Martinez-Sandoval v. Kirsch, 1994-NMCA-115, ¶ 26, 884 P.2d 507, 513). "The

discovery rule provides that 'the cause of action accrues when the plaintiff discovers or with

reasonable diligence should have discovered that a claim exists.'" Williams v. Stewart, 2005-

NMCA-061, ¶ 12, 112 P.3d 281, 285 (quoting Roberts v. Sw. Comm. Health Servs., 1992-

NMSC-042, ¶ 24, 837 P.2d 442, 449). Accord Eoff v. N.M. Corr. Dep't, Nos. CIV 10-0598, 10-

0599, 10-0600, 2010 WL 5477679, at *18 (D.N.M. Dec. 20, 2010)(Browning, J.)("The Court

believes that, in breach-of-contract actions involving an employee's termination, the statute of

limitations should not begin to run until the employee is aware of the allegedly wrongful

decision, because an employee would not be aware of the possible need to file suit until that

time."); Gose v. Bd. of Cnty. Comm'rs of Cnty. of McKinley, 727 F. Supp. 2d 1256, 1264

(D.N.M. 2010)(Browning, J.)("Specifically, [the] statute of limitations commences when an

'injury manifests itself and is ascertainable, rather than when the wrongful or negligent act

occurs."); Gerke v. Romero, 2010-NMCA-060, ¶ 12, 237 P.3d at 115 ("Under the discovery rule,

the statute of limitations begins to run when the plaintiff knows or, with reasonable diligence

should know, of his injury and its cause." (citing Roberts v. Sw. Cmty. Health Servs.,

1992-NMSC-042, ¶ 24, 114 N.M. 248, 255-56, 837 P.2d 442, 449-50)).

### III. LAW REGARDING NEW MEXICO'S IMPLIED COVENANT TO MARKET OIL AND GAS, AND THE ONGOING DISPUTE REGARDING THE EXISTENCE OF THE MARKETABLE-CONDITION RULE.

52.     Oil and gas leases are construed "like any other contracts." Elliott, 407 F.3d at

1108. Additionally, New Mexico implies in law a duty -- "'to make diligent efforts to market the

production in order that the lessor may realize on his royalty interest'" -- on oil-and-gas

producers, "in equity, without looking to the language of the agreements or other evidence of the

parties' intentions." Davis v. Devon Energy Corp., 2009-NMSC-048, ¶ 35, 147 N.M. 157, 218

P.3d 75 (quoting Darr v. Eldridge, 6 N.M. at 263, 346 P.2d at 1044).  This obligation is called

the "duty to market."  Davis v. Devon Energy Corp., 2009-NMSC-048, ¶ 35, 147 N.M. 157, 218

P.3d 75.   One possible corollary -- "possible," because many New Mexico courts have

recognized it, but the Tenth Circuit has not -- of the duty to market is the "marketable condition

rule."  Compare Elliott, 407 F.3d at 1113-14, with Davis v. Devon Energy Corp., 2009-NMSC-

048, ¶ 6, 218 P.3d at 78.  The rule provides that the working interest owner must bear the full

cost of any expenses incurred in drilling, removing the hydrocarbons from the ground, and

rendering them into marketable condition, and may not assess those costs against the royalty it

owes the lessee.  See Davis v. Devon Energy Corp., 2009-NMSC-048, ¶ 6, 218 P.3d at 78.

        53.     In 2005, in Elliott, the Tenth Circuit addressed various obligations that oil-and-

gas lessors owe the royalty interest owners on their leases under New Mexico law.  The plaintiffs

in Elliott were royalty owners who sued ConocoPhillips, the working interest owner, to collect

additional royalties.  The production subject to the plaintiffs' claim in Elliott was conventional

gas.   The gas contained NGLs that are removed through processing before the residue is

generally acceptable for transportation on interstate pipeline transmission systems.  See 407 F.3d

at 1110-11.  The plaintiffs alleged that ConocoPhillips was underpaying its royalty interests by

reducing their royalties with illegitimate post-production costs, including "processing, marketing,

transportation, and fractionation costs, from the value of the refined natural gas products."  407

F.3d at 1100.  The plaintiffs alleged that ConocoPhillips violated the NMPPA, breached the

implied duty of good faith and fair dealing, breached the implied duty to market, and committed

conversion, constructive fraud, fraud, and unjust enrichment, among other alleged wrongs.  See

407 F.3d at 1101.  The plaintiffs expressly declined to assert any contract claims under the

governing lease.  See 407 F.3d at 1107.  ConocoPhillips contended that it was performing its contractual obligations within the terms of the plaintiffs' leases.  See 407 F.3d at 1101.

54.     The Tenth Circuit, in an opinion authored by the Honorable Michael R. Murphy, United States Circuit Judge, determined that the district court properly granted ConocoPhillips summary judgment on the plaintiffs' allegation that ConocoPhillips' royalty payment practices violated the implied duty to market.  The plaintiffs alleged that ConocoPhillips was obligated under the implied duty to market to pay royalties based upon the best price reasonably available for the gas-and-oil products, and not the actual price minus reasonable or actual cost deductions.  407 F.3d at 1113-14.  The Tenth Circuit noted that New Mexico recognizes an "'implied covenant on the part of the lessee . . . that after production of oil and gas in paying quantities is obtained, he will thereafter continue the work of development . . . with reasonable diligence . . . . having in mind his own interest as well as that of the lessor, to market the product.'"  407 F.3d at 1113 (quoting Libby v. DeBaca, 51 N.M. at 95, 179 P.2d at 265).  Perhaps because the Tenth Circuit construed Elliott before the Supreme Court of New Mexico's pronouncement in Davis v. Devon Energy Corp., 2009-NMSC-048, ¶ 35, 218 P.3d at 85-86, that the duty to market is implied "in equity, without looking to the language of the agreements or other evidence of the parties' intentions," the Tenth Circuit interpreted New Mexico law to imply the duty to market only in fact, based upon "whether any implied duty to market was intended by the parties or would contradict the express provisions of that agreement," Elliott, 407 F.3d at 1113.  On that basis, the Tenth Circuit stated that it could not "speculate . . . how to construe the scope of any implied covenant to market that may exist," because the plaintiffs' divorced their implied duty to market claim from their contractual relationship with ConocoPhillips, and disclaimed any "reliance on the express provisions of the royalty agreements."  407 F.3d at 1113.

55.     The Tenth Circuit also noted that there was no implied-in-fact marketable condition rule term in the royalty provisions in the plaintiffs' leases, because the royalty provisions expressly covered how ConocoPhillips was to calculate the plaintiffs' royalty payments.  See 407 F.3d at 1113-14 ("[U]nder New Mexico law, covenants are not implied for subjects that are treated in express provisions. . . .  [T]he express terms of the royalty obligations direct the royalty to be paid on the value of gas 'at the well.'").  Moreover, the Tenth Circuit stated that the plaintiffs failed to show how ConocoPhillips' conduct violated any implied duty to market under New Mexico law.  The Tenth Circuit stated that, because ConocoPhillips was and is "actively producing gas, processing the gas, and selling the refined natural gas and NGLs," ConocoPhillips' conduct "complied with the implied duty to market as articulated by the New Mexico courts."  407 F.3d at 1113 (citing Darr v. Eldridge, 346 P.2d at 1044).  The Tenth Circuit expressly held that the plaintiffs' "conception of the implied duty to market" as requiring ConocoPhillips' to "bear the burden of all costs incurred to put the gas in a marketable condition including the cost of removing the NGLs from the gas . . .  finds no support within New Mexico law."  407 F.3d at 1113-14.

56.     From the time of the Tenth Circuit's decision in Elliott, the Supreme Court of New Mexico has, twice, expressly declined to decide whether a marketable condition rule is implied as a matter of law in oil and gas leases.  In Davis v. Devon Energy Corp., 2009-NMSC-048, ¶ 1, 218 P.3d at 77 (Chavez, J.), the issue before the Supreme Court of New Mexico was whether a state district court properly denied certification of a class alleging that the defendant gas producers underpaid the plaintiffs' royalties by improperly deducting the cost of rendering the gas marketable.  The state district court concluded that the plaintiffs failed to establish the commonality requirement to proceed as a class action, because determining whether

the defendants' royalty payments violated the terms of the plaintiffs' leases would require interpreting each plaintiff's individual lease -- totaling as many as thirty-four lease agreements -- and, therefore, the plaintiffs failed to demonstrate that common questions of law or fact predominated the class' allegations.  See 2009-NMSC-048, ¶ 26, 218 P.3d at 83.  The Supreme Court of New Mexico concluded, however, in an opinion written by the Honorable Edward L. Chavez, Chief Justice of the Supreme Court of New Mexico,[75] that the state district court's construction of the marketable condition rule would not require the court to determine whether that duty is implied in fact in each individual lease.  The Supreme Court of New Mexico first explained that the implied duty to market is implied "in equity, without looking to the language of the agreements or other evidence of the parties' intentions."  2009-NMSC-048, ¶ 35, 218 P.3d at 85-85.  The state district court had ruled that, "under the implied duty to market, the marketable condition rule applies in New Mexico."  2009-NMSC-048, ¶ 35, 218 P.3d at 85-86 (secondary quotation marks omitted).  The Supreme Court of New Mexico concluded that, because the state district court concluded that the marketable condition rule is incorporated into the implied duty to market, the state district court would not be required to determine whether the marketable condition rule is implied, in fact, in each individual lease to adjudicate the class' allegations.  See 2009-NMSC-048, ¶ 35, 218 P.3d at 85-86.  The Supreme Court of New Mexico expressly disclaimed, however, that it was addressing the state district court's conclusion that the implied duty to market incorporates the marketable condition rule in New Mexico.  See 2009-NMSC-048, ¶ 14, 218 P.3d at 80 ("For the purposes of our review . . . we do not address

---

[75]The Supreme Court of New Mexico elects its Chief Justice -- from among the Justices elected to the Supreme Court of New Mexico, not appointed -- every two years.  See N.M. Stat. Ann. § 34-2-1(C).  Justice Chavez has served on the Supreme Court of New Mexico from 2003 to present, and served as Chief Justice from 2008 to 2010.  See Kathy Woods, New Mexico Supreme Court Has New Chief Justice, Legal Newsline Legal J. (Apr. 8, 2010, 2:31 PM), http://legalnewsline.com/news/226546-new-mexico-supreme-court-has-new-chief-justice.

the existence of the marketable condition rule in New Mexico or its applicability in any of these cases."); 2009-NMSC-048, ¶ 35, 218 P.3d at 85-86 ("[T]he district court[] conclu[ded] that the duty to market, which applies in equity irrespective of the parties' intentions, incorporates the duty to put CBM gas in a marketable condition (a conclusion we do not review in this opinion).").

57.     In ConocoPhillips v. Lyons, the issue before the Supreme Court of New Mexico was whether ConocoPhillips properly calculated the State of New Mexico's royalty payments as required under the statutes creating New Mexico's leases.  See 2013-NMSC-009, ¶¶ 1-3, 299 P.3d 844.  New Mexico contended that ConocoPhillips was not allowed, under the terms of New Mexico's statutory lease forms, to deduct the post-production costs necessary to render gas marketable from New Mexico's royalty payments.  See 2013-NMSC-009, ¶¶ 2-6, 19-21, 299 P.3d 844.  The Supreme Court of New Mexico, in an opinion written by the Honorable Petra J. Maes, then-Chief Justice of the Supreme Court of New Mexico,[76] first explained that, when royalty provisions specify that a lessee is to calculate its net proceeds "at the well," the lessee is, generally,

> entitled to deduct all costs that are incurred subsequent to production, including those necessary to transport the gas to a downstream market and those costs, such as dehydrating, treating, and processing the gas, that are necessary to make the gas saleable in that market or that increase the value of the gas.

2013-NMSC-009, ¶ 17, 299 P.3d 844 (citing Creson v. Amoco Prod. Co., 2000-NMCA-081, ¶¶ 11-12, 129 N.M. 529, 10 P.3d 835).  New Mexico's statutorily created royalty interests, however, did not specify that net proceeds should be calculated at the well, but rather stated that

---

[76]Justice Maes has served on the Supreme Court of New Mexico from 1998 to present, and served as Chief Justice from 2003 to 2005, and again from 2012 to 2014.  See Biographical Profile: Honorable Petra Jimenez Maes, New Mexico Supreme Court, https://nmsupremecourt. nmcourts.gov/bios/maes.php.

net proceeds should be calculated "from the sale of such gas in the field."  2013-NMSC-009, ¶ 19, 299 P.3d 844 (secondary quotation marks omitted).   The "key question" before the Supreme Court of New Mexico, therefore, was "whether a lease which provides for royalty payable upon 'net proceeds . . . in the field' or 'from the sale of gas from each gas well' compels a different royalty calculation than a lease which provides for 'net proceeds . . . at the well.'" 2013-NMSC-009, ¶ 19, 299 P.3d 844.  The Supreme Court of New Mexico stated that, although lessees must bear the costs incurred in producing oil and gas product, "absent an express contractual provision to the contrary . . . .  costs incurred subsequent to production are considered post-production costs and are generally deducted from the sale of the product regardless of where the sale takes place."  2013-NMSC-009, ¶ 24, 299 P.3d 844 (citing Bice v. Petro-Hung LLC, 2009 ND 124, ¶ 19, 768 N.W. 2d 496, 502 (N.D. 2009)).  The Supreme Court of New Mexico therefore affirmed the state district court's ruling that the net proceeds term unambiguously allowed ConocoPhillips to deduct "from their gross sales price any post-production costs they reasonably and necessarily incur in selling the gas," regardless of where the sale gas occurred. 2013-NMSC-009, ¶¶ 21, 69, 299 P.3d 844.

58.     New Mexico also alleged that ConocoPhillips' calculation of royalty payments breached the implied covenant to market.  New Mexico asserted that the implied covenant to market required ConocoPhillips to "place the gas in a marketable condition and requires that the expenses incurred in obtaining a marketable product . . . be borne by Lessees."   2012 WL 3711550, at *16.  The Supreme Court of New Mexico determined, however, that it need not reach the issue whether the marketable condition rule is incorporated into the implied covenant to market.  The Supreme Court of New Mexico explained that whether the marketable condition rule applies in New Mexico was not ripe for review, because legislative policy decisions inform

the extent of post-production costs that ConocoPhillips may deduct from New Mexico's royalty payments, but the lower court had not yet reached a decision of the merits on that issue.  <u>See</u> 2012 WL 3711550, at *17.

59.  Although the Court is bound by the Tenth Circuit's interpretation of New Mexico law, the Court is not convinced that the <u>Elliott</u> plaintiffs' "conception of the implied duty to market finds no support within New Mexico case law."  407 F.3d at 1114.  From the time that the Tenth Circuit made this statement in <u>Elliott</u>, at least three New Mexico district courts have found that, "under the implied duty to market, the marketable condition rule applies in New Mexico."  <u>Davis v. Devon Energy Corp.</u>, 2009-NMSC-048, ¶ 14, 147 N.M. 157, 218 P.3d 75 (citing <u>Davis v. Devon Energy Corp.</u>, 2008-NMCERT-003, 143 N.M. 682, 180 P.3d 1181; <u>Ideal v. BP Am. Prod. Co.</u>, 2008-NMCERT-003, 143 N.M. 683, 180 P.3d 1182; <u>Smith Family, L.L.C. v. ConocoPhillips Co.</u>, 2008-NMCERT-003, 143 N.M. 683, 180 P.3d 1182).  In <u>Davis v. Devon Energy Corp.</u>, the Supreme Court of New Mexico did not address the existence of the marketable condition rule, because it found that the matter was "not ripe for review at this time," as the New Mexico state district courts had left open questions regarding the scope of the rule. 2009-NMSC-048, ¶ 15, 147 N.M. 157, 218 P.3d 75.  The Supreme Court of New Mexico made a similar statement in <u>ConocoPhillips Co. v. Lyons.</u>  <u>See</u> 2013-NMSC-009, ¶ 64, 299 P.3d 844 ("As we indicated in <u>Davis</u>, whether the marketable condition rule applies in New Mexico is not yet ripe for review.").  These pronouncements from the Supreme Court of New Mexico indicate, far from precluding the existence of the marketable condition rule as a matter of law within the state, that the Supreme Court of New Mexico considers the issue undetermined and, moreover, intends to address its existence when the record before the Supreme Court of New Mexico fully presents the issue.

60.     The Court believes that, if and when the Supreme Court of New Mexico determines that the existence of the marketable condition rule is ripe for review, it will find that the rule is included in oil-and-gas contracts as part of the implied duty to market.  Colorado, Wyoming, Kansas, and Oklahoma have all adopted a version of the marketable condition rule. The Supreme Court of Colorado announced its adoption of the marketable condition rule in Garman v. Conoco, Inc., P.2d 652 (Colo. 1994).  There, the Supreme Court of Colorado held that, "absent an assignment provision to the contrary, overriding royalty interest owners are not obligated to bear any share of the post-production expenses . . . undertaken to transform raw gas produced at the surface into a marketable product."  886 P.2d at 661.  The Supreme Court of Colorado noted that, although an oil-and-gas lease is "entered into for the mutual benefit of the parties, not all parties participate equally in lease development decisions."  886 P.2d at 657. Interest owners, whether of royalty or overriding royalty interests, must defer to the lessees regarding "where and when to drill, the formations to be tested and ultimately whether to complete a well and establish production."  886 P.2d at 675.  The Supreme Court of Colorado was also persuaded by its neighboring states' -- Wyoming, Kansas, and Oklahoma -- and the federal government's requirement that lessees place gas in a marketable condition at no cost to the lessor.   See 886 P.2d at 658 (citing 30 C.F.R. § 206.153(i); Wyo. Stat. § 30-5-304(a)(vi) (1994 Supp.); Wood v. TXO Prod. Corp., 854 P.2d 880, 882 (Okla. 1992); Gilmore v. Superior Oil Co., 388 P.2d 602, 606 (Kan. 1964)).  The Supreme Court of Colorado explained that the marketable condition rule logically followed from a lessee's duty to effectuate the terms of a lease; the Supreme Court of Colorado reasoned that, just as the "purpose of an oil and gas lease could hardly be effected if the implied covenant to drill obligated the lessor to pay for his proportionate share of drilling costs," the purpose of a lease would be thwarted if lessors bore the

cost of making a product marketable.  886 P.2d at 659.  The Supreme Court of Colorado rejected

an argument from oil-and-gas producers that industry practice dictates that lessees and lessors

bear proportionately post-production costs necessary to render gas marketable.  The Supreme

Court of Colorado explained that, while other oil-and-gas producers may be aware of industry

custom and factor that custom into oil-and-gas agreements, "[o]ften, however, executing an oil

and gas lease, or assigning a federal lease won under the previously existing federal lottery

system is the extent of a party's contact with the oil industry."  886 P.2d at 660.  The Supreme

Court of Colorado further emphasized that the marketable condition rule is consistent with the

bargaining power of lessees and lessors: "The payment of royalties is controlled by lessees, and

lessors have no ready means of ascertaining current market value other than to take lessees' word

for it."  886 P.2d at 660.

61.     The Supreme Court of Kansas based its formulation of the marketable condition

rule on Colorado's.  In Kansas, the rule currently requires a lessee of an oil-and-gas lease to

"bear the entire expense of producing the gas at the wellhead pursuant to the terms of the oil and

gas lease.  Additionally, the lessee must bear 'the entire cost of putting the gas in condition to be

sold pursuant to the court-made 'marketable condition rule.'"  Coulter v. Anadarko Petroleum

Corp., 296 P.3d 289, 306 (Kan. 2013)(citing Sternberger v. Marathon Oil Co., 894 P.2d 788

(Kan. 1995)).  The Supreme Court of Kansas adopted a version of the marketable condition rule

in Sternberger v. Marathon Oil Co. that allowed a lessee to share with a royalty owner the costs

of transporting a marketable product to a point of sale and "to enhance the value of the gas

stream, e.g., the processing costs to extract a saleable component such as helium."  292 P.3d at

306.  The Supreme Court of Kansas explained that, in Kansas, ambiguities in oil-and-gas leases

must be construed against the lessee, but found that the oil-and-gas leases at issue were not

ambiguous.  See 894 P.2d at 794.  Rather, the Supreme Court of Kansas' adoption of the marketable condition rule was based upon the lessee's duty to "produce a marketable product," which requires "the lessee alone [to] bear[] the expense in making the product marketable."  894 P.2d at 799.

62.    Kansas' interpretation of the marketable condition rule, which allows lessees to share the cost of transportation to the market with lessors may be vulnerable to attack.  The Supreme Court of Kansas recognized, in Coulter v. Anadarko Petroleum Corp., that the Supreme Court of Colorado's decision in Rogers v. Waterman Farm Co., 29 P.3d 887, 896-902 (Colo. 2001), "clarified that . . . .  'marketability' includes both the physical condition of the gas and the location of the gas, i.e., the commercial marketplace," and, therefore, whether oil-and-gas lessees in Kansas may share with lessors the cost of transporting marketable products to a market "may be questionable."  Coulter v. Anadarko Petroleum Corp., 296 P.3d at 306 (quoting Rogers v. Westerman Farm Co., 29 P.3d at 902, 903).  In Rogers v. Westerman Farm Co., the Supreme Court of Colorado held that, under the marketable condition rule, "the expense of getting the product to a marketable condition and location are born by the lessee."  29 P.3d at 906.  The Supreme Court of Colorado explained that, whether gas is marketable is a question of fact, and requires, first, evidence that gas is "in the physical condition where it is acceptable to be bought and sold in a commercial marketplace," and, second, that the gas must be in a location "that is, the commercial marketplace, to determine whether the gas is commercially saleable in the oil-and-gas marketplace."  29 P.3d at 905.  The Supreme Court of Colorado noted that "'a royalty clause should be construed in its entirety and against the party who offered it, and in light of the fact that the royalty clause is the means by which the lessor receives the primary consideration for a productive lease.'"  29 P.3d at 898 (quoting Owen L. Anderson, Royalty Valuation: Should

Royalty Obligations be Determined Intrinsically, Theoretically, or Realistically, Part 2 (Should

Courts Contemplates the Forest or Dissect Each Tree?), 37 Nat. Resources J. 611, 636 (1997)).

The Supreme Court of Colorado reasoned that gas is not marketable until it is ready to be bought

in a marketplace by a willing purchaser, and, accordingly, a lessee has not met its implied duty to

market until a gas is transported to a marketplace, if transportation is necessary to reach

purchasers.  See 29 P.3d at 904-06.

         63.    Similarly, the Supreme Court of Oklahoma's adoption of the marketable

condition rule is based upon the bargaining power of oil-and-gas lessees and lessors.  In Wood v.

TXO Prod. Corp., the Supreme Court of Oklahoma explained that "[p]art of the mineral owner's

decision whether to lease or to become a working interest owner is based upon the costs

involved," and, when an interest owner agrees to relinquish operating rights and lease a well in

exchange for a royalty interest, as a lessor, the interest owner has no power to control post-

production costs.  854 P.2d at 882-83.  The Supreme Court of Oklahoma reasoned that, if lessees

-- oil-and-gas producers -- were allowed to share production and marketing costs with royalty

owners, "royalty owners would be sharing the burdens of working interest ownership without the

attendant rights," including the greater share of proceeds which oil-and-gas producing lessees

enjoy.  854 P.2d at 883.  Accordingly, the Supreme Court of Oklahoma held that "in Oklahoma

the lessee's duty to market involves obtaining a marketable product."  854 P.2d at 883.

         64.    Texas, on the other hand, has not adopted the marketable condition rule, but,

rather, interprets oil-and-gas leases more strictly in accordance with their terms.  The first case in

Texas to discuss a marketable condition rule was Danciger Oil & Refineries v. Hamill Drilling

Co., in which the Supreme Court of Texas interpreted a royalty clause which stated that

payments were to be made out of "all the oil, gas, casinghead gas, and other minerals produced,

saved and marketed at the prevailing market price paid by major companies in the Gulf Coastal area from the properties."  171 S.W. 2d at 322.  The Supreme Court of Texas interpreted the lease as requiring the lessee to pay royalties for oil-and-gas "produced, saved and marketed," but not to "provide a market for all the products produced."  171 S.W. 2d at 323.  The Supreme Court of Texas concluded that the language did not indicate that the gas produced from the subject wells would be "so mixed with other products as not to be 'gas' of the kind contemplated" and also concluded that the lessee's operating expenses, which the lease required the lessees to bear, did not include expenses "of processing the named product into some other product after it has been produced."  171 S.W. 2d at 323.  That there was no market for the gas in its unprocessed form in the vicinity of the wells did not sway the Supreme Court of Texas' ruling.  "The mere fact that there was then no market in that vicinity for the product then being produced from the lease, is not alone sufficient to justify us in overturning the plain, certain, and unambiguous terms of the contract."  171 S.W. 2d at 323.  The Supreme Court of Texas concluded that the lessor was "bound to accept payments out of the gas as it was then being produced from the wells, and is not entitled to have the gas refined into some other commodity." 171 S.W. 2d at 323.  The Supreme Court's decision in Danciger Oil & Refineries v. Hamill Drilling Co. has evolved into a rule in Texas courts: "Since the early history of oil and gas litigation, the courts have held that covenants are implied when an oil and gas lease fails to express the lessee's obligation to develop and protect the lease."  Amoco Prod. Co. v. Alexander, 622 S.W. 2d 563, 567 (Tex. 1981).  Accordingly, although Texas recognizes an implied duty to reasonably market oil and gas as part of an implied covenant of management and administration, which may be included in an oil-and-gas lease, the implied duty to market does not override language which specifies a particular payment method.  For example, the Supreme Court of

Texas has held that a gas lease which provides for payments to be made based upon the gas' "market price" is not breached when a lessee contracts to sell the gas at a price above the prevailing market cost, reaping profits beyond that which it could obtain in an open market, but calculates and pays royalties based upon the lower, prevailing, market price for the gas, because the language of the lease provides for royalty payments in accordance with "market price." Yzaguirre v. KCS Res., Inc., 53 S.W. 368, 370, 373-75 (Tex. 2001)("Depending on future market behavior, this may be financially beneficial to the lessor . . . or it may be less advantageous, as here.  In either event, the parties have received the benefit of their bargain.").

65.    The Court believes that, when the Supreme Court of New Mexico determines that the existence of the marketable condition rule is ripe for review, it will find the reasoning of Colorado, Kansas, Oklahoma, and Wyoming more persuasive than that of Texas.  Like Kansas and Colorado, which construe oil-and-gas leases against the lessees, the Supreme Court of New Mexico has established a "rule that an oil and gas lease is to be construed most strongly against the lessee."  Greer v. Salmon, 82 N.M. 245, 250, 479 P.2d 294, 299 (1970).  This canon of construction is consistent with the duties a lease imposes on a lessee, such as the duty of "achiev[ing] the primary purpose of the lease, to explore, develop and produce."  82 N.M. at 250, 479 P.2d at 299.  Colorado and Kansas have recognized that, once a lessor assigns its working and operating interests to a lessee, the lessee possesses the ability to evaluate and choose which post-production measures are necessary to render a gas marketable.  Based upon the lessee's ability to assess post-production measures, Kansas and Colorado have determined that the lessee, and not the lessor, should bear the cost of those measures, as lessors generally will have "'no ready means of ascertaining'" the cost-benefit of a post-production measure "'other than to take

lessees' word for it.'"   Garman v. Conoco, 886 P.2d at 660 (quoting Piney Woods Cnty. Life

Sch. v. Shell Oil Co., 726 F.2d 225, 240 (5th Cir. 1984)).

         66.     A critique of the marketable condition rule is that it necessarily turns on questions

of fact, which the Supreme Court of Colorado recognized in Rogers v. Westerman Farm Co.,

because, whether a buyer is willing to purchase a product, and at what point, will vary from case

to case.   See Rogers v. Westerman Farm Co., 29 P.3d at 903-06; Scott Lansdown, The

Marketable Condition Rule 44 S. Tex. L. Rev. 667, 702-04 (Summer 2003)("The strongest

argument against the marketable condition rule is that . . . if the rule is adopted, oil and gas

lessees will be faced with an endless wave of expensive, burdensome and wasteful litigation . . . .

[because of] [t]he failure of . . . any real criteria for marketability.").   The Court does not believe

that the factual questions necessary to determining marketability are fatal to the marketable

condition rule.   The cases discussed herein indicate that, in certain locations and with certain

products, no willing buyer may be found until an oil or gas product is either transformed into a

different condition, or transported to a different location.   At a minimum, the burden which the

marketable condition rule imposes is that a market-ready product is able to reach the hands of a

willing buyer, which is a burden New Mexico has already determined lessees should bear.   Cf.

Libby v. DeBaca, 51 N.M. at 99, 179 P.2d at 265 (holding that the implied covenant to market

requires a lessee to construct a plant for converting gas into dry ice at  his own cost, because the

gas could be marketed only in dry ice form).   The Court believes that the Supreme Court of New

Mexico would find that, consistent with its holding that "pronouncement without disposition of

the product is futile," the implied covenant to market includes a duty to render products

marketable at the lessee's, and not lessor's, expense.   Darr v. Eldridge, 66 N.M. at 263, 346 P.2d

at 1044.   While the situation which allows a buyer to purchase an oil or gas product will vary

from case to case, the requirement that a royalty interest owner does not pay for the meeting of product and buyer is not onerous, and will, logically, be satisfied whenever a lessee realizes the goal of a lease: receiving a profit on oil-and-gas products.

67.     This finding leads to the second critique of the marketable condition rule: requiring a lessee to bear the burden of post-production costs is pointless, because the marketable condition rule will incentivize lessees to find purchasers that will purchase unrefined products. Unrefined or unprocessed oil and gas will necessarily sell at a lower cost, because purchasers of the unprocessed products will factor into the price their costs to process the oil or gas. This critique of the marketable condition rule concludes, therefore, that payments will be calculated on oil-and-gas profits less production costs, regardless whether the lessee bears those costs. In theory, therefore, the marketable condition rule may not increase royalty owners' profits beyond their present state, as the cost of production will be taken from royalty payments in either transaction. The only change is in the entity deducting post-production costs. See Lansdown, supra, at 705-07. The Court does not believe that the Supreme Court of New Mexico will find this critique persuasive. The Court believes that the Supreme Court of New Mexico will conclude that, while it is true, in either situation, that post-production costs must be borne somewhere, the marketable condition rule, nonetheless, avoids an inefficient result. If oil-and-gas lessees may pass the cost onto lessors, the lessees lose the motivation for purchasing the most cost-efficient post-production measures. Oil-and-gas producers, as lessees, may attempt to pass those costs downstream to purchasers, but, in that instance, the purchaser will be assessing its own costs, and will, again, be incentivized to take on only cost-efficient post-production measures. See Libby v. DeBaca, 51 N.M. at 99, 179 P.2d at 265. In sum, the marketable condition rule incentivizes the entities with the most knowledge and ability to produce oil-and-

gas in the most cost-effective manner.  Without the marketable condition rule, oil-and-gas

producers, as lessees, may pass post-production costs onto lessor-royalty-owners, who lack the

knowledge and ability to evaluate and choose the best option.  For these reasons, the Court

believes that the Supreme Court of New Mexico will find that, included within the implied duty

to market in New Mexico, is the marketable condition rule.  As a district court, however, the

Court is bound by the Tenth Circuit's decision in Elliott.[77]

---

[77]In determining the proper weight to accord Tenth Circuit precedent interpreting New Mexico law, the Court must balance the need for uniformity between federal court and state court interpretations of state law with the need for uniformity among federal judges.  If the Court adheres too rigidly to Tenth Circuit case law, ignoring changes undergone by a state's law in the ensuing years, then parties litigating state law claims will be subject to a different body of substantive law, depending on whether they litigate in state court or federal court.  This result frustrates the purpose of Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1938)("Erie"), which held that federal courts must apply state court interpretations of state law, rather than their own, in part so that parties achieve a consistent result regardless of the forum.  This consideration pulls the Court in the direction of according Tenth Circuit precedent less weight, and according state court decisions issued in the ensuing years more weight.  On the other hand, when the state law is unclear, it is desirable for there to at least be uniformity among federal judges as to its proper interpretation.  Otherwise, different federal judges within the same circuit -- or even the same district, as district courts' decisions are not binding, even upon themselves -- would be free to adopt differing interpretations of a state's law.  This consideration pulls the Court towards a stronger respect for vertical stare decisis, because a Tenth Circuit decision on point -- regardless whether it accurately reflects state law -- at least provides consistency at the federal level, so long as federal district judges are required to follow it.

The Court must decide how to weigh Tenth Circuit case law against more-recent state court decisions, choosing a point on the spectrum between the two extremes: rigidly adhering to Tenth Circuit precedent unless there is intervening case law directly on point from the state's highest court, on one end; and independently interpreting the state law, regarding the Tenth Circuit precedent as persuasive authority, on the other.  In striking this balance, the Court notes that it is generally more concerned about systemic inconsistency between the federal courts and the state courts than it is about inconsistency among federal judges.  Judges, even those within a jurisdiction with ostensibly identical governing law, sometimes interpret and apply the law differently from one another; this inconsistency is part and parcel of a common-law judicial system.  More importantly, litigants seeking to use forum selection to gain a substantive legal advantage cannot easily manipulate such inconsistency: cases are assigned randomly to district judges in this and many federal districts; and, regardless, litigants cannot know for certain how a given judge will interpret the state law, even if they could determine the identity of the judge pre-filing or pre-removal.  All litigants know in advance is that whichever federal district judge they are assigned will look to the entirety of the state's common law in making his or her

- 222 -

determination -- the same as a state judge would.  Systemic inconsistency between the federal courts and state courts, on the other hand, not only threatens the principles of federalism, but litigants may more easily manipulate the inconsistency.  When the Tenth Circuit issues an opinion interpreting state law, like Elliott, and the state courts subsequently shift away from that interpretation, litigants -- if the district courts strictly adhere to the Tenth Circuit opinion -- have a definite substantive advantage in choosing the federal forum over the state forum, or vice versa.

The Court further notes that district courts may be in better position than the Tenth Circuit to be responsive to changes in state law.  Tenth Circuit decisions interpreting a particular state's law on a specific issue are further apart in time than the collective district courts' are.  More importantly, the Tenth Circuit does not typically address such issues with the frequency that the state's courts themselves do.  As such, Tenth Circuit precedent can lag behind developments in state law -- developments that the district courts may be nimble enough to perceive and adopt.  Additionally, much of the benefit of having a consistent Tenth Circuit-wide interpretation of a particular state's law is wasted.  Other than Oklahoma, every state encompassed by the Tenth Circuit contains only one federal judicial district, and there is relatively little need for federal judges in Wyoming and Kansas to have a uniform body of New Mexico law to which to look.  Last, the Court notes, respectfully, that district courts may be in a better position than the Tenth Circuit to develop expertise on the state law of the state in which they sit.  Every federal judicial district in the nation, except the District of Wyoming, covers at most one state.  District judges are members of the legal community of the state in which they sit, often having practiced in it before taking the bench, and typically keep tabs with developments in state law as a matter of course.  On the other hand, with the exception of the D.C. Circuit, every Court of Appeals spans three states or more; the Tenth Circuit, for example, spans six full states -- and portions of two others -- and only three of its twenty-one judges sit in New Mexico.  It is perhaps a more workable design for each district court to keep track of legal developments in the state law of its own state(s) than it is for the Tenth Circuit to monitor separate legal developments in eight states.  It is generally presumed that the Courts of Appeals are experts on the law -- this presumption either arises from or gives rise to the fact that their legal rulings are authoritative on the district courts -- and district courts are presumed to be experts on the facts -- this presumption either arises from or gives rise to the fact that their factual rulings are afforded deference by the Courts of Appeals.  Erie predictions, however, while legal in nature, bear some resemblance to fact-finding, in that the district court is seeking to identify something external, objective, and pre-existing, rather than using normative values to creatively interpret and apply the law.   Normative values may be relevant to an Erie prediction -- insofar as the federal courts predict that certain values would sway the state supreme court more than others -- but they do not in and of themselves drive the outcome of a diversity suit under Erie.

Having outlined the relevant considerations, the Court thinks the proper stance on vertical stare decisis in the context of federal court interpretations of state law is as follows: the Tenth Circuit's cases are binding as to their precise holding -- what the state law was on the day the opinion was published -- but lack the positive precedential force that its cases interpreting a federal statute or the Constitution of the United States of America possess.  A district court considering a state law issue after the publication of a Tenth Circuit opinion on point may not come to a contrary conclusion based only on state court cases available to and considered by the

- 223 -

_____

Tenth Circuit, but it may come to such a conclusion based on intervening state court cases.  The Supreme Court of the United States has addressed what the federal courts may use when there is not a decision on point from the state's highest court:

> The highest state court is the final authority on state law, but it is still the duty of the federal courts, where the state law supplies the rule of decision, to ascertain and apply that law even though it has not been expounded by the highest court of the State.  An intermediate state court in declaring and applying the state law is acting as an organ of the State and its determination, in the absence of more convincing evidence of what the state law is, should be followed by a federal court in deciding a state question.  We have declared that principle in West v. American Telephone and Telegraph Co., 311 U.S. 223 (1940), decided this day.  It is true that in that case an intermediate appellate court of the State had determined the immediate question as between the same parties in a prior suit, and the highest state court had refused to review the lower court's decision, but we set forth the broader principle as applicable to the decision of an intermediate court, in the absence of a decision by the highest court, whether the question is one of statute or common law.
>
> . . . We have held that the decision of the Supreme Court upon the construction of a state statute should be followed in the absence of an expression of a countervailing view by the State's highest court, and we think that the decisions of the Court of Chancery [the New Jersey trial court] are entitled to like respect as announcing the law of the State.
>
> . . . .
>
> The question has practical aspects of great importance in the proper administration of justice in the federal courts.  It is inadmissible that there should be one rule of state law for litigants in the state courts and another rule for litigants who bring the same question before the federal courts owing to the circumstance of diversity of citizenship.  In the absence of any contrary showing, the rule [set forth by two New Jersey trial courts, but no appellate courts] appears to be the one which would be applied in litigation in the state court, and whether believed to be sound or unsound, it should have been followed by the Circuit Court of Appeals.

Fid. Union Trust Co. v. Field, 311 U.S. 169, 177-80 (1940)(footnotes omitted)(citations omitted). The Supreme Court has softened this position over the years; federal courts are no longer bound by state trial or intermediate court opinions, but "should attribute [them] some weight . . . where the highest court of the State has not spoken on the point."  Comm'r v. Estate of Bosch, 387 U.S. 456, 465 (1967)(citing King v. Order of United Commercial Travelers, 333 U.S. 153, 159 (1948)).  See 17A James Wm. Moore et al., Moore's Federal Practice § 124.20 (3d ed. 1999)("Moore's")("Decisions of intermediate state appellate courts usually must be

followed . . . [and] federal courts should give some weight to state trial courts decisions." (emphasis omitted)(title case omitted)).

When interpreting state law, the Tenth Circuit does not and cannot issue a case holding that *x* is the law in New Mexico; it holds that the <u>proper interpretation</u> of New Mexico law, at the time the opinion is released, is *x*. Its holdings are descriptive, not prescriptive -- interpretive, not normative. Because federal judicial opinions lack independent substantive force on state law issues, but possess such force regarding federal law issues, the Court thinks the following is not an unfair summary of the judicial interpretive process: (i) when interpreting federal law, the federal appellate courts consider the existing body of law, and then issue a holding that both reflects and influences the body of law; that holding subsequently becomes a part of the body of law; but (ii) when interpreting state law, the federal appellate courts consider the existing body of law, and then issue a holding that only reflects the body of law; that holding does not subsequently become a part of the body of law. The federal district courts are bound to conclude that the Tenth Circuit's reflection of the then-existing body of law was accurate. The question is whether they should build a doctrine atop the case and use the existence of the Tenth Circuit's case to avoid any responsibility to independently consider the whole body of state law that exists when the time comes that diversity litigants raise the issue in their courtrooms. Giving such effect to the Tenth Circuit's interpretations of state law is at tension with <u>Erie</u>, giving independent substantive effect to federal judicial decisions -- <u>i.e.</u>, applying federal law -- in a case brought in diversity.

The purpose of <u>Erie</u> is well-known and simple, and the Court should not complicate it beyond recognition: it is that the same substantive law governs litigants' cases regardless whether they are brought in a federal or state forum. For simplicity's sake, most courts have settled on the formulation that "the federal court must attempt to predict how the states' highest court would rule if confronted with the issue." <u>Moore's</u> § 124.22[3] (citing <u>Comm'r v. Estate of Bosch</u>, 387 U.S. 456, 465 (1967)("[A]n intermediate appellate state court [decision] is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." (citation omitted)(internal quotation marks omitted))). This may not be the most precise formulation if the goal is to ensure identical outcomes in state and federal court -- the Honorable Milton I. Shadur, United States District Judge for the Northern District of Illinois, looks to state procedural rules to determine in which state appellate circuit the suit would have been filed were it not in federal court, and then applies the state law as that circuit court interprets it, <u>see</u> <u>Abbott Laboratories v. Granite State Ins. Co.</u>, 573 F. Supp. 193, 196-200 (N.D. Ill. 1983)(noting that the approach of predicting the state supreme court's holdings will often lead to litigants obtaining a different result in federal court than they would in state court, where only the law of the circuit in which they filed -- and certainly not nonexistent, speculative state supreme court law -- governs) -- but it is a workable solution that has achieved consensus. <u>See</u> <u>Allstate Ins. Co. v. Menards, Inc.</u>, 285 F.3d 630, 637 (7th Cir. 2002)("[W]e adhere today to the general rule, articulated and applied throughout the United States, that, in determining the content of state law, the federal courts must assume the perspective of the highest court in that state and attempt to ascertain the governing substantive law on the point in question."). This formulation, built out of ease-of-use, does not relieve courts of their Supreme Court-mandated obligation to consider state appellate and trial court decisions. To the contrary, even non-judicial writings by influential authors, statements by state supreme court justices, the closeness of the vote on a prior case

- 225 -

addressing the issue, and personnel changes on the court -- considerations that would never inform a federal court's analysis of federal law -- may validly come into play in determined how a state supreme court "would decide" an issue.  The question is whether the district courts must abdicate, across-the-board, the "would decide" aspect of the Erie analysis to their parent appellate courts when the Court of Appeals has declared an interpretation of state law.

The Erie doctrine results in federal cases that interpret state law withering with time. While cases interpreting federal law become more powerful over time -- forming the groundwork for doctrines, growing upward from one application (Congress may create a national bank) to many (Congress may set quotas on wheat-growing for personal consumption), expanding outward from the general (states must grant criminal jury trials) to the specific (the jury need not be twelve people, nor must it be unanimous) -- federal cases interpreting state law often become stale.  New state court cases -- even when not directly rebuking the federal court's statement of law -- alter the common-law legal landscape with their dicta, their insinuations, and their tone.  The Supreme Court of the United States, which picks cases its cases sparingly and for maximum effect, almost never grants certiorari to resolve issues of state law.

The question is whether the Court should look, not to Elliott, but to its own interpretation of New Mexico law, and conclude that New Mexico recognizes the marketable condition rule. The issue is whether, by so doing, the Court would be jettisoning and ignoring Tenth Circuit precedent, or would be rather recognizing, after conducting the Erie-mandated inquiry, that New Mexico law has changed since its 2005 publication.  The Tenth Circuit's snapshot of New Mexico law may have been correct at the time, but it has decayed in the ensuing years.  It does not appear to have shaped New Mexico law to any discernable degree or to have been ratified as a proper interpretation: no New Mexico court has cited it, although the state courts must be aware of it; the oil companies are certain to have cited it in their briefs opposing the state courts' adoption of the marketable condition rule.  When called upon to interpret New Mexico law in 2014, the Northern District of California -- unbound by Tenth Circuit precedent -- agreed with the Court's assessment that Elliott no longer accurately reflects New Mexico law.  See Ellsworth v. U.S. Bank, N.A., No. C 12-02506 LB, 2014 WL 1218833, at *22 n.10 (N.D. Cal. Mar. 21, 2014)(forthcoming in F. Supp. 2d)(citing Elliott, 407 F.3d at 1117; Anderson Living Trust v. ConocoPhillips Co., 952 F. Supp. 2d 979, 1033 (D.N.M. 2013)(Browning, J.)).

The Court's views on Erie, of course, mean little if the Tenth Circuit does not agree, and, at present, the Tenth Circuit does not agree -- although it used to.  Over a period of three cases spanning ten years, the Tenth Circuit has, perhaps by accident, gone from espousing an approach consistent with the Court's to being, as far as the Court can tell, the only Court of Appeals in the nation to bar its district courts absolutely from considering state intermediate appellate- and trial-court opinions issued subsequent to a Tenth Circuit ruling on the state's law.  In the first opinion, Koch v. Koch Industries, Inc., the Tenth Circuit outlined the usual formulation of "intervening decision," which is that it can include cases from all levels of the state's judiciary:

> Following the doctrine of stare decisis, one panel of this court must follow a prior panel's interpretation of state law, absent a supervening declaration to the contrary by that state's courts or an intervening change in the state's law. Because the Plaintiffs have failed to alert us to any supervening Kansas decisions contrary to [the Tenth Circuit's prior decision interpreting Kansas state law], this court is bound by [the prior Tenth Circuit decision] . . . .

Koch v. Koch Indus., Inc., 203 F.3d 1202, 1231 (10th Cir. 2000)(Murphy, J.)(emphases added)(citation omitted).  The Tenth Circuit's use of the generic terms underlined in the above quote suggest that it intended for any subsequent state-court decision to count as a potentially "intervening decision."  A state's intermediate appellate courts and trial courts are, after all, one of "that state's courts," and their opinions are "any . . . decisions."

In the second opinion in the three-opinion string, however, the Honorable Michael W. McConnell, then-United States Circuit Judge for the Tenth Circuit, quoted the inclusive Koch v. Koch Industries, Inc. definition but, in an earlier part of the opinion, phrased the standard in more restrictive terms:

> Where no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do.  In performing this ventriloquial function, however, the federal court is bound by ordinary principles of *stare decisis*.  Thus, when a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, and on subsequent panels of this Court, unless an intervening decision of the state's highest court has resolved the issue.  Blackhawk-Cent. City Sanitation Dist. v. Am. Guar., 214 F.3d 1183, 1194 n.4 (10th Cir. 2000); Koch v. Koch Indus., Inc., 203 F.3d 1202, 1231 (10th Cir. 2000).
>
> . . . .
>
> In the absence of intervening Utah authority indicating that a plaintiff is not required to prove a safer, feasible alternative design, we are bound to follow the rule of Allen [v. Minnstar, Inc., 8 F.3d 1470 (10th Cir. 1993), a Tenth Circuit case interpreting an issue of Utah law], as was the district court. "Following the doctrine of stare decisis, one panel of this court must follow a prior panel's interpretation of state law, absent a supervening declaration to the contrary by that state's courts or an intervening change in the state's law." Koch v. Koch Indus., Inc., 203 F.3d at 1231.

Wankier v. Crown Equip. Corp., 353 F.3d 862, 866 (10th Cir. 2003)(McConnell, J.)(emphasis added).  In the first quoted paragraph, Judge McConnell defines "intervening decision" to include only decisions from the state supreme court.  See The American Heritage Dictionary of the English Language 1402 (William Morris ed., New College ed. 1976)(defining "unless" as "[e]xcept on the condition that; except under the circumstances that").  It seems likely that this limitation was accidental.  Wankier v. Crown Equipment Corp., itself, involved a situation where no intervening state authority of any kind existed; it was not a case where Judge McConnell chose to ignore an intervening state intermediate appellate-court decision because it did not come from the state supreme court.  Moreover, the fundamental Erie inquiry does ask what the state's highest court, specifically, would do -- it would be easy to conflate limitations on the core inquiry with limitations on the indicia to which a court may look in answering that core inquiry.

If Wankier v. Crown Equipment Corp. were the Tenth Circuit's final word on the subject, the Court would be inclined to continue using the inclusive Koch v. Koch Industries, Inc.

definition -- which, after all, Judge McConnell quoted without alteration later on in his opinion -- rather than Judge McConnell's apparent one-time slip-up.  For better or for worse, however, the Tenth Circuit picked up Judge McConnell's restrictive definition and ran with it in the third and final case in the three-case string, Kokins v. Teleflex, Inc., 621 F.3d 1290 (10th Cir. 2010)(Holmes, J.).  In that case, the Honorable Jerome A. Holmes, United States Circuit Judge for the Tenth Circuit, applied a Tenth Circuit interpretation of Colorado law even though there was a more-recent interpretation from the Colorado Court of Appeals that came to the opposite conclusion.  See Kokins v. Teleflex, Inc., 621 F.3d at 1297.  Judge Holmes zoomed straight in on Judge McConnell's restrictive language, even adding italics for emphasis: "[T]he Colorado Court of Appeals decided Biosera[, Inc. v. Forma Scientific, Inc.], 941 P.2d 284 (Colo. Ct. App. 1998)], so it is not an 'intervening decision of the state's *highest court*.'"  Kokins v. Teleflex, Inc., 621 F.3d at 1297 (emphasis in original).  The Court cannot ignore that statement.  While the Court would feel comfortable taking a loose reading of Wankier v. Crown Equipment Corp., it cannot defy the Tenth Circuit's express holding in Kokins v. Teleflex, Inc., which is that federal district courts may only consider cases from a state supreme courts to be "intervening authority" when balancing Erie and vertical stare decisis.

The Tenth Circuit has set forth a stringent restriction on its district courts' ability to independently administer the Erie doctrine.  More importantly, the Tenth Circuit's view may be at tension with the above-quoted Supreme Court precedent, as well as its own prior case law. Moore's lists the Tenth Circuit as having been, at one time, a "court[ that] hold[s] that a prior federal appellate decision [interpreting state law] is persuasive."  Moore's § 124.22[4] (citing State Farm Mut. Auto. Ins. Co. v. Travelers Indem. Co., 433 F.2d 311, 312 (10th Cir. 1970)). Still, the Court is bound to abide by the Tenth Circuit's interpretation of Erie.  This scheme may be inefficient, because the Plaintiffs may appeal, after trial, the Court's ruling on the marketable condition rule.  The Tenth Circuit may certify the question to the Supreme Court of New Mexico, and the Tenth Circuit may then have to reverse the Court after a full trial on the merits.

Even knowing the high bar the Tenth Circuit now sets for what constitutes intervening case law, the Court is tempted to conclude that the Supreme Court of New Mexico, in Davis v. Devon Energy Corp., directly and unequivocally overruled Elliott, for three broad reasons.  First, the Tenth Circuit analyzed the implied duty to market essentially as a term implied in fact, not one implied in law.  An implied-in-fact term is a "real" contractual term, put there by the parties' agreement -- albeit their unwritten and unspoken agreement.  Because its origins are in the parties' agreement, direct conflict with a written term of the contract destroys the implied term. Other than having the word "implied" in them, implied-in-fact terms have little in common with implied-in-law terms, like the covenant of good faith and fair dealing, which the courts "imply" onto all contracts -- without the pretense that the parties silently agreed to the term, and, in fact, often in spite of the parties' agreement.  When Davis v. Devon Energy Corp. held that the marketable condition rule was an implied-in-law term, reversing the district judge who styled it as an implied-in-fact term, it undermined the logic of Elliott.  To the extent that the Tenth Circuit's case can still be read for its narrow conclusion -- now supported only by damaged logic -- that there is no marketable condition rule in New Mexico, the Court will decline to ignore Elliott on this ground.

Second, the Court notes that Davis v. Devon Energy Corp. may have held that there is a marketable condition rule, and its unambiguous disclaimer to the contrary, literally in all-caps and boldface type, that it "do[es] not address the marketable condition rule," may have been

## IV.   <u>LAW REGARDING THE NMPPA</u>.

68.    The NMPPA sets forth a derivative remedy that the New Mexico Legislature

provides to oil-and-gas royalty owners.  It will not lie absent a demonstration of a lessee's breach

of an underlying agreement with, or duty to, an interest owner.  See <u>Elliott</u>, 407 F.3d at 1120

---

mere dicta (albeit clear, and loud, dicta).  2009-NMSC-048, ¶ 14, 218 P.3d at 80 (emphasis
omitted).  In that case, the district court had concluded that there was a marketable condition rule
governing primary conduct in New Mexico, but declined to certify a class action for its breach
because the district court thought that the rule was an implied-in-fact term.  New Mexico
procedure entitles parties to a contract to a parol evidence hearing on all disputed contractual
terms, and the district court thought that these hearings -- which would need to be
individualized -- would render the class action unmanageable.  The Supreme Court of New
Mexico reversed on an abuse-of-discretion standard, holding that the marketable condition rule is
an implied-in-law term -- for which no parol evidence hearings would need to occur -- and
certified the class action.  See 2009-NMSC-048, ¶¶ 37, 40, 218 P.3d at 86, 87.  The Supreme
Court of New Mexico did not purport to hold that the marketable condition rule actually exists,
but rather that, if it does exist, it is an implied-in-law duty.  If that were the case's holding,
however, the Court cannot see how the district court's error would not be harmless: the district
court misconstrued the nature of a cause of action, but the cause of action does not exist -- at
least not according to the Supreme Court of New Mexico -- at all, so no legally cognizable harm
was done to the plaintiffs.  The Court, however, is reticent to defy the express declaration of a
state's highest court in implementing the <u>Erie</u> doctrine, so it will not adopt this view.  Moreover,
the Supreme Court of New Mexico declined from deciding whether the marketable condition
rule exists, no doubt knowing about the Tenth Circuit's opinion in <u>Elliott</u>, and did not take the
opportunity to make it clear to the federal courts what the law is.

Third, and perhaps most obvious, whatever else can be said about <u>Davis v. Devon Energy
Corp.</u>'s holding, one thing is clear: the Supreme Court of New Mexico permits, even if it does
not direct, its subordinate courts to recognize and apply the marketable condition rule.  The
Court can, additionally, find no case affirming a district court that declined to recognize the
marketable condition rule.  The Court, however, is not confident this permissive quasi-holding
applies in federal court.  Even if the Supreme Court of New Mexico intended to extend its
invitation to adopt the marketable condition rule to the federal courts -- and there is no indication
that it did -- New Mexico trial courts have some freedom to be a part of shaping New Mexico
law, and recognizing novel or uncertain causes of action may be appropriate for them to do.  The
Court, on the other hand, is bound to interpret and apply the state law of New Mexico, without
injecting its own policy preferences.  Were it not for its opinion that the marketable condition
rule already exists in New Mexico, the Court would likely not consider adopting a state cause of
action that was merely permissive as to the state's district courts, and that being so, the Court
will not allow its disagreement with the Tenth Circuit to cloud its judgment here.  The Court will
apply the Tenth Circuit's holding from <u>Elliott</u>, and conclude that it is not free to decide that the
marketable condition rule exists under New Mexico law.

("[I]n order to maintain a Payment Act claim, Elliott must allege a potentially successful claim for underpayment of royalties or theory of liability showing that it is 'legally entitled to such payments.'" (quoting N.M. Stat. Ann. § 70-10-3)).

69.     The NMPPA provides a specific time frame in which lessees on oil-and-gas lessees must pay royalty interest owners for proceeds they receive:

> The oil and gas proceeds derived from the sale of production from any well producing oil, gas or related hydrocarbons in New Mexico shall be paid to all persons legally entitled to such payments, commencing not later than six months after the first day of the month following the date of first sale and thereafter not later than forty-five days after the end of the calendar month within which payment is received by payor for production unless other periods or arrangements are provided for in a valid contract with the person entitled to such proceeds.

N.M. Stat. Ann. § 70-10-3.   Working interest owners who fail to make payments within § 70-10-3's timeframe incur eighteen-percent interest on the "unpaid balance due," unless one of the four exceptions in § 70-10-5 applies:

> A.      the payor fails to make payment in good-faith reliance upon a title opinion by a licensed New Mexico attorney making objection to the lack of good and marketable title of record in the party claiming entitlement to payment and furnishes a copy thereof to such party for curative action required thereby;

> B.      the payor receives information that in his good-faith judgment brings into question the entitlement of the person claiming the right to the payment to receive the payment or that has rendered the marketable title of record unmarketable or that may expose the payor to the risk of multiple liability or liability to third parties if the payment is made;

> C.      the total amount of oil and gas proceeds in the possession of the payor owed to the owner of the oil and gas proceeds making claim to payment is less than one hundred dollars ($100) at the end of any month; or

> D.      the party entitled to payment has failed or refused to execute a reasonable division or transfer order acknowledging the proper interest to which he claims to be entitled and setting forth a mailing address to which payment may be directed.

N.M. Stat. Ann. § 70-10-5.  Additionally, the lessee need not pay interest on unpaid balances if

the lessee, has not received from the operator or lessee arranging for the sale of oil and gas "the

name, the address, and the percentage of interest of each person to whom payment is to be made,

as well as proof of marketable title" to the oil and gas to be sold.  N.M. Stat. Ann. §§ 70-10-3.1

and -5 (providing that a lessor does not incur the eighteen-percent penalty on unpaid balances if

payments are made in accordance with § 70-10-3's time period and the lessor "has been

furnished with the information required by Section 70-10-3.1").

**V.** **ANALYSIS.**

70.     The Court will deny the Motion.  To be certified under rule 23(b)(3), a class must

meet all four of rule 23(a)'s requirements -- numerosity, commonality, typicality, and adequacy -

- and both of rule 23(b)(3)'s requirements -- predominance and superiority.  Because the

NMPPA claim is separable from the other claims -- while the other claims revolve around

underpayment, the NMPPA claims revolve around late payments -- the Court will analyze it

separately.  The Court thus divides its analysis into three parts.  First, the Court will conclude

that, although the underpayment claims satisfy rule 23(a)'s other requirements, they lack

commonality under rule 23(a)(2).  Second, the Court concludes that the underpayment claims fail

to satisfy rule 23(b)(3)'s predominance requirement, although they would satisfy the superiority

requirement.  Last, the Court concludes that the NMPPA claims fail both rule 23(a)'s and

23(b)(3)'s requirements.  Because the Defendants have contested virtually every component of

this analysis -- including both rule 23(b)(3) factors and three of the four rule 23(a) factors[78] -- the

Court will go into some detail in discussing each portion.

---

[78] The Defendants do not contest that the class complied with rule 23(a)(1)'s numerosity
prerequisite.

**A.    THE UNDERPAYMENT CLAIMS DO NOT SATISFY RULE 23(a)(2)'S COMMONALITY REQUIREMENT, BUT THEY WOULD OTHERWISE SATISFY RULE 23(a).**

71.    Rule 23(a) sets forth the requirements that apply to all class actions in the federal courts: numerosity, commonality, typicality, and adequacy.   The underpayment claims satisfy all but commonality.

**1.    At Over 1,367 Class Members, the Class Is Sufficiently Numerous to Warrant Class Treatment, Thus Satisfying Rule 23(a)(1)'s Numerosity Prerequisite.**

72.    Although it is said that there is "no set formula," Rex v. Owens, 585 F.2d at 436, nor "strict numerical test," Bittinger v. Tecumseh Prods. Co., 123 F.3d at 884 n.1, for determining when a class is sufficiently numerous for joinder to be impracticable, the reality is that a per se numerosity threshold seems to exist somewhere south of 150 proposed class members, see, e.g., Mullen v. Treasure Chest Casino, LLC, 186 F.3d at 624 (holding that "100 to 150 members . . . is within the range that generally satisfies the numerosity requirement").  This class contains over 1,367 members, which easily clears rule 23(a)(1)'s bar.  The Court arrives at this number by starting with the 1,466 "persons or entities [who] are owners of royalty interests" and subtracting the up to 99[79] proposed class members under the two excluded 372K wells, resulting in a final figure of 1,367.[80]  The actual total will likely be higher than this one, but it will not be lower.  See supra notes 79, 80.

---

[79]It is likely that some of these well owners additionally own wells committed to other gathering contracts and will thus remain class members.

[80]There are 909 proposed class members who own overriding royalty interests.  See Stipulation ¶ 6, at 2.  The Court excludes all overriding royalties except for "same as fed" and "same as state" overriding royalties, and, because it does not know how many of the 909 overriding royalty interests fall into those categories, it does not count any of them, so that it ends up with a reliable lowest-possible number.

73.     To elucidate the numerosity requirement's substantive content, the Court will look to its purposes, which the Court believes are two-fold.  First, rule 23(a)(1) is concerned with manageability, i.e., the Court's ability to handle the case as a non-class action; this purpose is obvious from the rules text, which calls for "joinder . . . [being] impracticable."  Fed. R. Civ. P. 23(a)(1).  Here, the Court could not manage a non-class lawsuit where over 2,000 plaintiffs are expected to move and respond to motions on an individual basis; it certainly could not conduct hearings in such a manner.[81]

74.     Second, the Court concludes that the numerosity requirement -- like much if not most of rule 23 -- is concerned with protecting absent plaintiffs from the dangers that inhere in class litigation's foregoing of meaningful, face-to-face attorney-client representation.[82]  In individual litigation, each party has, if not his or her own attorney, then at least an attorney who pledges, on pain of professional sanctions, to represent the party's interests to the fullest, and to make diligent efforts to communicate with the party fully about the case.  This attorney is, in most cases, obligated to share all pertinent information and strategy relating to the case, and the client retains a great deal of control over the large-scale direction of the suit.  In class litigation, however, the class counsel makes the big decisions that are, in individual litigation, reserved for the client, such as whether to settle for a given amount or to go to trial.  Compare Model R. Prof'l Conduct 1.2(a) ("[A] lawyer shall abide by a client's decisions concerning the objectives

---

[81]The Court's practice is to conduct hearings on all opposed civil motions.

[82]It is also true that the more class members there are in a class, the greater the efficiency of class litigation.  See Carnegie v. Household Int'l, Inc., 376 F.3d 656, 661 (7th Cir. 2004)(Posner, J.)("The more claimants there are, the more likely a class action is to yield substantial economies in litigation.").  The Court, however, does not believe that efficiency is a major underpinning of rule 23(a)(1)'s numerosity requirement -- and Judge Posner does not suggest that it is.  Numerosity applies to all class actions, but efficiency is mostly a rule 23(b)(3) concern.  In particular, numerosity's role in rule 23(b)(1)(A) and (b)(1)(B) class actions seems to have very little to do with efficiency.

of representation and . . . shall consult with the client . . . .  A lawyer shall abide by a client's decision whether to settle a matter."), with Fed. R. Civ. P. 23(e)(5) (providing for settlement over the objection of some class members), and id. 23(c)(2)(B), (e)(1) (contemplating that "notice" be sent to class members in specific circumstances).  Moreover, class counsel typically cannot share information or strategy with the class if he or she wants to keep that information secret from the defense.  Given that keeping information and strategy secret from the opposition is often sound litigation strategy in itself, even a well-meaning class counsel advocating vigorously on behalf of the entire class might find himself or herself in the position of being unable to speak candidly with inquiring class members.  Class litigation, in short, puts class counsel in a similar position in regard to his or her clients as a board of directors of a publicly traded corporation is to its shareholders: he or she must act on their behalf, but may do so without their knowledge and even over their objections.  Class litigation attempts to bridge the gap between the absent plaintiffs and their attorneys by using class representatives -- a somewhat weak response, as the Court will discuss later -- as well as by having the judge appoint counsel, monitor class counsel's advocacy, set attorneys' fees, and scrutinize all settlements independently for fairness -- a better response, but one that does not utilize the time-tested incentives of the adversarial process.  See Fed. R. Civ. P. 23(e), (g), (h).  For these reasons, individual litigation is preferable to class litigation -- if it is a realistic option.  See, e.g., Califano v. Yamasaki, 442 U.S. 682, 700-01 (1979)(describing class litigation as "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only").

75.     Here, however, individual litigation is not realistic, as joinder is impracticable.  If, hypothetically, the Court were to force the Plaintiffs to join each class member as a full-fledged,

jointly represented[83] party under rule 20, counsel's communication with his clients would, of necessity, still resemble that of class counsel and class member, and not that of attorney and client.  This observation is not to say that a class counsel cannot effectively communicate with his class outside of rule 23's notice requirements; he can.  The internet has made it feasible to correspond regularly with class members -- or at least those class members who care enough to keep informed -- and keep them informed of the litigation's progress.  What the Court means is that, in a case where plaintiffs' counsel represents 1,367 clients -- whether as joined parties or a certified class -- he cannot share secret information with its clients, he cannot obtain their unanimous permission to settle, and, to act in their best interests, he must represent the class' whole rather than its parts.  Even if the Court could manage this number of plaintiffs under rule 20, which it cannot, all it would be doing is eschewing rule 23's built-in protections for absent plaintiffs.  The class clears rule 23(a)(1)'s numerosity hurdle.

> ### 2.    Incidental Common Questions of Law and Fact Exist, Most Notably Regarding the Defendants' Uniform Payment Methodology, but They Are Not Sufficient to Satisfy Rule 23(a)(2)'s Commonality Prerequisite.

76.    Incidental common questions of law and fact exist in this case, but none satisfy Wal-Mart.  For better or for worse, the commonality inquiry now focuses on quality rather than quantity.  While, in the old days, a single common question might have cleared the rule 23(a)(2) bar, and in the right case might still do so, Wal-Mart has beefed up the requirements to be considered a common question in the first place.  Post-Wal-Mart, a common question must be "capable of classwide resolution -- which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke," or, to use

---

[83]It is extremely unlikely that many -- if any -- class members would retain their own, separate counsel to prosecute their individual claims.

the more popular phraseology, it must be prone "to generate [a] common *answer*[] apt to drive the resolution of the litigation."[84]   131 S. Ct. at 2551 (emphasis in original).   In this case, common questions do not abound.   The Court will analyze commonality for the underpayment claims and the NMPPA claim separately.

77.      Regarding the underpayment claims, the Defendants paid all class royalties and overriding royalties under a uniform policy, with the exception of two of the wells committed to the 372K gathering contract, which the Court excludes from the class.   See Stipulation ¶¶ 9, at 2 ("There are no differences in WPX's royalty accounting methodology based on the royalty provisions contained in the [class] leases and the [class] assignments."); id. at 4 n.6.   This policy valued production from all wells committed to Williams Four Corners under a keep-whole method and production from all wells committed to independent gatherers under the sale price that the Defendants received from the independent gatherer.   In terms of deducting post-production expenses from the royalty, the Defendants (i) do not deduct them at all for Colorado wells; (ii) deduct them at a proportionate rate to what the gatherer charges the Defendants for New Mexico wells committed to independent gatherers; and (iii) deduct them using a COS charge identical to the one that the federal government demands for non-arm's length transactions for New Mexico wells committed to the Williams Four Corners gathering systems.

---

[84]The Court thinks that Wal-Mart casts doubt on Judge Kyle's statement in In re Potash Antitrust Litigation that rule 23 "does not require that common issues be dispositive or significant."  159 F.R.D. at 699.  The Court believes that Justice Scalia's opinion has put a rigorous analysis into rule 23(a)(2).  If the common issue is not disputed, it may not really be a common question.  If it is not disputed, it is a phantom issue, and the Court should not rely upon it as a common question.  The Court thinks that some of the Second Circuit's opinion in In re Nassau County Strip Search Cases, which stated that the fact that the answer to a common issue is not disputed -- for example, if the parties have stipulated as to the answer or the court has already ruled -- probably now, after Wal-Mart, does not affect its commonality, and is likely no longer good law.

This uniform policy, which calculates and pays the class' royalties without regard to variations in lease language, is a common issue[85] of fact, and it forms one half of the Plaintiffs' underpayment claims.  The underpayment claims, at base, consist of two input inquiries and one output result: (i) "how were the class members entitled to be paid by the Defendants," which is a mixed legal and factual question that requires looking to the language in the leases and any implied-in-law terms; (ii) "how did the Defendants actually pay the class members," which is a factual question that requires looking to the evidence; and (iii) "what is the numerical difference, if any, between (ii) and (i)," which determines damages.  Issue (ii) is common, but it is undisputed, and, thus, incidental.  It is not merely "capable of" a producing a common answer, Wal-Mart, 131 S. Ct. at 2545, it has already been given one.  The Court thus does not believe, after Wal-Mart, that the Defendants' uniform payment policy is the common question that satisfies rule 23(a)(2).  See EQT Prod. Co. v. Adair, 764 F.3d at 366 ("That the defendants engaged in numerous common practices may be sufficient for commonality purposes."  (emphasis added)).  Issue (i) -- how were the class members entitled to be paid by the Defendants -- is the important one in this case, and it is an individualized inquiry.

---

[85]The Court uses "issue" rather than "question," because the parties have stipulated to what the answer is to the question "whether the Defendants paid royalties differently depending on variations in the lease language" -- no.  A common question needs to be unresolved or actually disputed going into the merits phase to count as a common question and satisfy the commonality requirement.  Such a rule may have the perverse impact of favoring certification of cases with more open, unresolved cases over otherwise identical cases with more agreed-upon facts;  at the very least, class-action plaintiffs may seek to delay all merits adjudications until after the class-certification stage, and may not agree to factual stipulations -- even favorable ones -- on questions common to the class.  The Court is convinced that Justice Scalia wanted to end the old practice of a plaintiff listing a host of "common questions" -- issues that were largely undisputed to convince the court that, one, there were a lot of common issues, and, two, overlook the real "questions" that the court had to decide.

78.   Arguably, the aforementioned "uniform policy" is at least two policies -- one that valued Williams Four Corners-gathered wells on a keep-whole basis, and another that valued independently gathered wells on sale-receipt basis -- and thus is not common to the class.[86]   Of course, there are other common questions in this case, and, for the most part, they are "common to the class," but less clearly "central to the validity of each one of the claims."   These questions include: (i) whether a marketable-condition rule exists, requiring the Defendants to absorb all costs of rendering the gas marketable; (ii) whether a WASP is a permissible basis for paying royalty; (iii) whether an index is a permissible basis for paying royalty; (iv) whether reasonable diligence by a hypothetical person in a class member's shoes would have uncovered the causes of action before the critical date for the statute of limitations;[87] (v) whether the check stubs that the Defendants sent out to the class, which were uniform in nature, contained material misrepresentations; and (vi) whether the check stubs were misleading such that they violated the covenant of good faith and fair dealing.   These questions do not resemble questions that have been held -- pre-Wal-Mart and at the Court of Appeals-level -- to be common questions in other

---

[86]The Defendants' method of valuing production uses one method for Williams Four Corners-gathered wells and another for independently gathered wells.   They are two separate policies.   In pre-Wal-Mart case law, the United States Court of Appeals for the Fifth Circuit has, on several occasions, held that a common question of law or fact need not apply to every class member, so long as it applies to "a substantial number," Jenkins v. Raymark Indus., Inc., 782 F.2d 468, 472 (5th Cir. 1986), or "a significant number," James v. City of Dallas, Tex., 254 F.3d 551, 570 (5th Cir. 2001), of class members.   District courts outside of the Fifth Circuit also adopted this interpretation before Wal-Mart.   See Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd., 246 F.R.D. 293, 300 (D.D.C. 2007)(Kollar-Kotelly, J.); Holmes v. Pension Plan of Bethlehem Steel Corp., No. Civ.A.98-CV-1241, 1999 WL 554591, at *6 (E.D. Pa. June 30, 1999)(Van Antwerpen, J.).   While the Fifth Circuit is not known to be a particularly liberal, plaintiff-friendly, or class action-loving Court of Appeals, the Court sees no reason to doubt its holdings on this subject.   After Wal-Mart, however, they are no longer valid.

[87]Although it appears to satisfy a literal interpretation of Justice Scalia's dictate that a common issue must be "central to the validity of . . . the claims," the Court has some doubt that a common question of fact that goes only to establishing or refuting an affirmative defense would be sufficient, on its own, to establish commonality.   Wal-Mart, 131 S. Ct. at 2551.

cases, including: (i) whether an employer engaged in a pattern of racketeering activity that depressed the wages of all employees, see Williams v. Mohawk Indus., Inc., 568 F.3d 1350 (11th Cir. 2009); (ii) whether an employer engaged in racial discrimination in the setting of wages, see Parra v. Bashas', Inc., 536 F.3d 975, 980 (9th Cir. 2009); (iii) whether a health-care plan created a backlog of unprocessed claims, see Gunnells v. Healthplan Servs., Inc., 348 F.3d 417, 425 (4th Cir. 2003); and (iv) whether a product produced by the defendant was defective, see Butler v. Sears, Roebuck & Co., 727 F.3d 796, 801 (7th Cir. 2013).  See also Newberg § 3:24.

79.    The primary question in this case is not sufficiently similar to the common questions in those cases to give the Court comfort that the primary question in the case is a common question.  In those cases, the common questions answered the main issues in the case. Here, the primary issue is how much the Plaintiffs should have been paid, and the Defendants' practices do not answer that question in a common way.  Moreover, most of these common questions, in the pre-Wal-Mart era, could theoretically be broken down into more specific questions that no longer encompassed the entire class.  None of them, on its own, definitively establishes a claim, even if answered in the affirmative.  It is questions like these that Justice Scalia had in his crosshairs when he wrote Wal-Mart.

80.    Even if the Court were to certify any part of this case, the Court would still exclude from the class the two 372K wells on which the Defendants pay royalty under a separate methodology.  The Plaintiffs' premier common issue -- that the Defendants calculate and pay all royalties under a uniform policy -- does not apply to these wells.  While other common questions may apply to the two 372K wells, the uniform-payment issue is ultimately the issue that has the best chance to render this case manageable, as the Court will describe in its predominance analysis.  The bigger problem is that no evidence was presented to the Court regarding how

royalty is paid on these wells.  Other than the vague statements in the Stipulation that these two wells "are exceptions to th[e otherwise common] methodology" and that the interest owners on those wells "are paid . . . for NGLs," the Court has heard little about them.  Stipulation at 4 n.6. They came up only briefly at the hearing, during Ward's direct examination, and Ward did nothing but repeat the assertions in the Stipulation footnote.  See Tr. at 452:3-21 (Sutphin, Ward).  The Plaintiffs seem to have essentially written those wells off, and, accordingly, they have failed to carry their burden under rule 23 to include them in the class.

> ### 3.   The Class Representatives' Claims Are, in All Important Respects, Identical to the Absent Class Members', Thus Satisfying Rule 23(a)(3)'s Typicality Prerequisite.

81.   Typicality is satisfied in this case, because the class representatives bring the same causes of action, and present comparable factual circumstances, as the absent class members.  The Court notes that it is not clear whether typicality requires independent inquiry at all in the Tenth Circuit.  At least one district court in the Tenth Circuit has concluded that the "Tenth Circuit has said that the typicality requirement is satisfied if there are common questions of law or fact."  Gianzero v. Wal-Mart Stores Inc., 2010 WL 1258071, at *3 (citing Milonas v. Williams, 691 F.2d at 938).  That is not quite what the Tenth Circuit said in the cited case, but nor is it an absurd characterization:

> In determining whether the typicality and commonality requirements have been fulfilled, either common questions of law or fact presented by the class will be deemed sufficient.  Factual differences in the claims of the class members should not result in a denial of class certification where common questions of law exist.  As we have stated previously, every member of the class need not be in a situation identical to that of the named plaintiff.
>
> Milonas and Rice, together with the class which they were certified to represent, have common claims against the defendants, i.e., that the disciplinary practices carried on at the school violated various constitutional and statutory rights of the individual plaintiffs and of the class.  Regardless of their source of funding or, indeed, their individual disability or behavioral problems, all of the

> boys at the school were in danger of being subjected to the four enjoined
> "behavior-modification" practices.  In our view, the typicality and commonality
> requirements of Fed. R. Civ. P. 23(a)(3) have been met

Milonas v. Williams, 691 F.2d at 938 (citations omitted)(footnote omitted). The first sentence of

the quoted excerpt, read literally, seems to suggest that the commonality and typicality inquiries

are coextensive.   Although Milonas v. Williams is a pre-Wal-Mart case, Wal-Mart only

heightened the commonality inquiry, so, if commonality and typicality were coextensive before

Wal-Mart, then the Court can conceive of only two possible effects that Wal-Mart could have on

typicality: (i) the typicality inquiry is heightened alongside the commonality inquiry, so that the

two remain coextensive; or (ii) the typicality inquiry remains where it was, meaning that

typicality now represents a lower threshold, fully inscribed within the commonality inquiry.

Either way, the typicality inquiry would not bar any cases that passed the commonality inquiry.

82.    Although typicality certainly seems to be the forgotten rule 23(a) prerequisite

after Wal-Mart, the Court thinks that it still has some utility.  In the post-Wal-Mart era, class

representatives probably have to allege all of the same claims that the absent class members do to

even satisfy commonality.  Class representatives, however, can still have factual circumstances

that differ from those of the bulk of the absent portion of the class, or their claims could be

subject to defenses that do not apply to many absent class members, and, in extreme cases, this

dissimilarity might make the proposed class representatives unsuitable under rule 23(a)(3).  This

inquiry is necessarily an imprecise, "eye-test" standard, in which the Court tries to discern

whether the putative class counsel has made a reasonable effort to collect class representatives

who fairly reflect the absent class members' posture in the litigation.[88]  Here, no absent class

---

[88]A major part of the reason the Court would oppose abolishing the typicality inquiry
entirely is that the Court would not want to effectively give a green light to class counsel to
deliberately select class representatives whose factual circumstances are materially different

member asserts any cause of action that is not also asserted by at least one of the class representatives, and the class representatives appear to be spread fairly well across the various segments the Court would use to manage this case.  There are Colorado representatives and New Mexico representatives; there are representatives with Williams Four Corners-gathered wells and representatives with independently gathered wells; and there are representatives with conventional wells and representatives with coalbed methane wells.  <u>See</u> Typicality and Adequacy of Class Reps (Plaintiffs' Demonstrative Exs. 9-11).  The Court thus concludes that the class representatives have claims that are typical of the class.

### 4.      The Class Representatives Will Vigorously Prosecute the Action, Thus Satisfying Rule 23(a)(4)'s Adequacy Prerequisite.

83.      The class representatives will vigorously prosecute this action on behalf of the absent class members.  The representatives' claims are not only typical but essentially identical to those of the absent class, and the representatives appear competent, informed, and savvy regarding the law and the facts of this case.  The Patton Trust has Bank of America as its trustee, represented by Munoz, who has over fifteen years of experience in the oil-and-gas industry.  Anderson received royalties from seven different oil-and-gas companies, and has served as a class representative in other oil-and-gas class actions -- meaning that at least one other judge has already deemed him an adequate representative in a case very similar to this one.  This part of the commonality analysis overlaps heavily with the typicality analysis.  To the extent that there is any noticeable difference in factual circumstances between the representatives and the bulk of the class, it is that the representatives appear to own unusually large or valuable interests relative

from -- <u>i.e.</u>, superior to -- the vast majority of the class.  While the typicality inquiry in its present form may be a paper tiger, it at least keeps plaintiffs' attorneys from openly selecting egregiously atypical representatives.  No attorney wants to risk losing a class certification motion by cutting corners on potentially defective class representatives -- their role in the case simply is not important enough to justify that risk.

to the rest of the class.  This difference however, increases the representatives' adequacy rather than decreasing it.[89]  Last, the Defendants also contend that the representatives are inadequate, because they do not possess leases and assignments that contain every category of textual royalty/overriding royalty provision.  The Defendants, however, offer no reason for why that level of detailed representativeness is necessary, and the Court cannot conceive of any strong ones.[90]

_____

[89]The Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737 ("PSLRA"), mandates an "empowered-plaintiff" approach in securities cases, in which the class member with the largest financial interest in the case -- almost always a mutual fund or other institutional investor -- is designated the "lead plaintiff," and given authority to select and retain class counsel.  15 U.S.C. § 77z-1(a)(3)(B).  It is generally thought that this approach cuts down on agency costs.  See generally Elliott J. Weiss & John S. Berkerman, Let the Money Do the Monitoring: How Institutional Investors Can Reduce Agency Costs in Securities Class Actions, 104 Yale L.J. 2053 (1995).  Although this case is not a securities case, the Federal Judicial Center encourages district courts to borrow from the empowered-plaintiff model in many circumstances, including selecting class counsel when there is more than one credible applicant.  See Manual for Complex Litigation § 21.272, at 281 ("[The PSLRA] provides a useful analogy for similar class actions brought by sophisticated plaintiffs with large losses or sizeable claims.").  It is, in short, a good thing -- likely to increase the class representatives' "vigor" in prosecuting the case -- that the representatives have a great amount at stake personally in this action.

[90]The Court notes that, while it has held the Plaintiffs to the "strict burden of proof" that rule 23 requires in evaluating the typicality and adequacy of the class representatives, it does not believe that these inquiries are among the more important ones in a class certification analysis.  Tabor v. Hilti, Inc., 703 F.3d 1206, 1228 (10th Cir. 2013).  The Court has always thought that class representatives are important -- in some ways.  They provide class counsel with a real, live client for which to work, and prevent representative litigation from becoming faceless litigation.  That being said, the modern reality is that class counsel run the show on the plaintiffs' side, and the class representatives are relegated to a largely symbolic role on the sidelines of the litigation.  The lawyers pick the class representatives, and, while it behooves them to pick representatives who are generally knowledgeable of the oil-and-gas industry and capable of fully understanding and participating in the case -- and the Court would demand those showings regardless of if they benefited counsel -- attorneys also likely try to pick representatives who will not "rock the boat," i.e., who will not put forth strenuous objections to anything the lawyers are likely to want to do.  Class counsel may not consider active participation in the case by class representatives, in itself, to be a bad thing -- although some attorneys undoubtedly find even supportive participation annoying -- but the class' attorneys likely never want class representatives to try to impose independent limitations on class counsel's freedom to manage or settle the case.  Many class

attorneys likely view "active" class representatives to be potentially meddling class representatives.  Such attorneys are likely willing to sacrifice any wisdom or representative democratic input from the class that active class representatives might bring, if it eliminates the possibility of an active set of class representatives threatening to object to a settlement, or injecting additional considerations into a settlement-negotiation milieu already fraught with more uncertainty and more variables than usual.  Such meddling -- from class counsel's perspective -- or independence -- from the rule's perspective -- risks handcuffing class counsel as they try to settle the case, and the attorneys have every incentive to avoid that result.

Moreover, even if class representatives are independent, active participants at the certification stage of a case, class counsel can relatively easily buy their complicity at the settlement stage.  The Court does not make this statement in an accusatory manner.  Rule 23's protections are, in large part, designed to protect against class counsel selling out the absent, and presumably inattentive, class members.  When a single law firm aggregates a million $100 claims against a single defendant, both the law firm and the defendant have an incentive to collude to come up with a settlement figure that pays high attorneys' fees while reducing the defendant's overall settlement amount.  This collusion can be most easily illustrated with the example of pre-CAFA coupon settlements.  When a defendant pays a class settlement by giving out $100 million in coupons for the defendant's product, the settlement does not cost the defendant anywhere near $100 million, nor does it impart anywhere near $100 million in benefit on the class members.  If, however, the coupons' aggregate face value is used to calculate class counsel's fee, then the attorneys get the same benefit from a $100 million coupon settlement as they would from a $100 million cash settlement.

Even outside of the coupon-settlement context, the concept of diminishing marginal utility suggests that class counsel has an incentive, which the class members do not share, towards strong risk aversion.  For example, if class counsel for a one million-member class can reasonably expect to keep twenty percent of any settlement brokered, counsel likely has an incentive to accept a $250 million settlement, rather than try a case where there is two-thirds chance of winning a $750 million verdict and a one-third chance of losing a defense verdict.  The class benefits from trying the case in these circumstances: settlement has a $250 million expected value, while trial has a $500 million expected value -- twice as high -- which corresponds, for each individual class member to a $250.00 expected value from settlement versus a $500.00 expected value from trial -- still, obviously, worth twice as much.  For class counsel, however, the expected value of the settlement is $50 million -- twenty percent of $250 million -- and the expected value of trial is $100 million -- twenty percent of $500 million.  While, at first glance, it seems like class counsel's interests are aligned with the class, if class counsel is an individual -- or a small number of individuals -- who is not already very, very wealthy, he or she would likely be willing to sacrifice $50 million in expected value in exchange for the increased certainty of settlement.  Basically, while a $100 million is nominally worth twice what $50 million is, from an attorney's perspective, they both mean almost exactly the same thing: he or she can pay off the mortgage, buy a vacation home, stop working or cut down on work, put the kids in the very best schools, make his or her former salary on investment returns, and never worry about money again.  What would really animate the attorney's decision between settling and going to trial is the one-third chance of losing.  The class members do not share this nonalignment between nominal expected value and real expected value, however, because their returns from the class action are small enough to be nondiminishing: to most people, $500.00 is worth more-or-less

---

twice what $250.00 is.  In circumstances like these, class counsel should consider the class' best interests, which, in the above hypothetical, would be best served by going to trial.  The Court doubts that class counsel always follows this rule, however, and the Court suspects that such silent, seemingly innocuous collusion between defendants and class counsel is common in modern class litigation.  See generally John C. Coffee, Jr., Understanding the Plaintiff's Attorney: The Implications of Economic Theory for Private Enforcement of Law Through Class and Derivative Actions, 86 Colum. L. Rev. 669, 677-79 (1986).

Class representatives emerged as one response to check the misaligned incentives between class counsel and class, but they have, unfortunately, been largely ineffectual.  In addition to the problems, which the Court has already described, that arise from the fact that the class counsel usually gets to hand pick the class representatives, class counsel often attempt to cut the class representative in on any collusion that the class counsel arranges with the defendant.  Class-action attorneys often structure settlements to pay class representatives awards that go well beyond what an absent class member with the same case facts would receive.  "Service" fees, "incentive" payments, and class representative "enhancements" are routine, often going into the five-figure range and sometimes swallowing up a sizable chunk of the class damages.  Laura L. Ho, Class Representative Enhancements and Attorneys Fees in Wage and Hour Class Action Settlement Agreements on the West Coast, Am. Bar Assoc. Labor & Emp't Section  Annual Meeting (Nov.  3,  2011),  available at  http://www.americanbar.org/content/dam/aba/ administrative/labor_law/meetings/2011/ac2011/177.pdf.  Many courts allow these awards, with the idea being that, otherwise, there would be no incentive for anyone to agree to be a class representative.  Being a class representative is not the most arduous job in the world, but it usually involves preparing for, traveling to, and participating in depositions or the class certification hearing.  Class counsel justify these awards on this basis, but the awards make it easy for an unscrupulous class counsel to buy out any independence that the class representatives might otherwise bring to the table.

As a practical matter, the absent class members' due-process rights must, as in individual litigation, be protected first and foremost by their lawyer -- the class counsel.  To the extent that class litigation knocks the normally well-aligned interests of a plaintiff and his or her lawyer out of kilter, the Court -- more than the class representatives -- steps in to fill the gap: undertaking an independent rule 23(a) and (b) inquiry; appointing competent class counsel, see Fed. R. Civ. P. 23(g); commencing notice and opportunity for opt-out, see Fed. R. Civ. P. 23(c)(2)(B); independently scrutinizing proposed settlements by way of a fairness hearing, see Fed. R. Civ. P. 23(e)(2); and policing the attorneys' fees on the back end, see Fed. R. Civ. P. 23(h).  The adequacy prerequisite -- and, indeed, the entire concept of class representatives -- has been a part of rule 23 since it was first created in 1937.  See Fed. R. Civ. P. 23(a) (1937)("If persons constituting a class are so numerous as to make it impracticable to bring them all before the court, such a number of them as will fairly insure the adequate representation of all may, on behalf of all, join as plaintiffs or be joined as defendants, when the character of the right.").  In modern practice, however, the role of class representatives has become largely obsolete.

- 245 -

**B.      THE UNDERPAYMENT CLAIMS DO NOT SATISFY RULE 23(b)(3).**

84.     The Court concludes that the proposed class fails to satisfy the rule 23(b)(3) requirement of predominance of common issues over individual ones, although it satisfies the superiority requirement.

**1.      The Underpayment Claims Fail Predominance, Because the Court Would Spend More Time Adjudicating Individual Questions Than Common Questions.**

85.     "Predominance regularly presents the greatest obstacle to class certification." CGC Holding Co. v. Broad and Cassel, 773 F.3d at 1087.  This axiom holds true in this case.  As the Tenth Circuit has instructed, to determine predominance, the Court must "*characterize* the issues in the case as common or not, and then *weigh* which issues predominate."  CGC Holding Co., LLC v. Broad & Cassel, 773 F.3d at 1087.

86.     The proposed class fails the Tenth Circuit's predominance test.  The common evidence in this case includes: (i) evidence about the Defendants' payment methodology, which is uncontroverted and thus likely to be minimal; (ii) industry-custom-and-usage evidence shedding light on the meaning of all of the class leases; (iii) course-of-performance evidence, which is essentially the same as (i); (iv) evidence regarding the level of diligence that a reasonable lessor would exercise to learn of his or her claims -- relevant to the Defendants' limitations defense; and (v) the Plaintiffs' requested damages methodology -- they request a netback payment, and, thus, their total damages evidence involves only the Defendants' total (common) final proceeds, and their total (common) transportation and processing expenses.  The individualized evidence in this case includes: (i) industry-custom-and-usage evidence regarding what specific royalty provisions -- e.g., "proceeds," "market value," "gross proceeds," "net proceeds" -- which are not shared by all class members, mean; (ii) the differing language

between the various leases; (iii) parol evidence concerning negotiations and oral agreements contemporaneous to the execution of certain class leases -- the Court doubts that much of this evidence exists, however, and assigns a low weight to it in the predominance calculus; (iv) evidence of certain class members' calls to WPX Energy inquiring about their royalty payments -- relevant to individual affirmative defenses against certain members; and (v) the individual damages evidence -- which includes analyses of which wells' gas tends to travel to which plants, various plants' efficiency levels and bypass rates over time, and what costs, including used gas, are attributable to which individual wells. Weighing the individualized evidence against the common evidence, the Court concludes that it will spend the majority of its time hearing individualized evidence and adjudicating individual questions.

87. The Court has identified five common issues in this case, two of which are essentially identical. Evidence of the Defendants' payment methodology and of the parties' course-of-performance would take up a small part of the trial and the Court's management of the case. First, the parties do not dispute the methodology that the Defendants' used to pay the Plaintiffs -- i.e. the parties' course of performance. Little, if any, evidence would be introduced at trial to show the Defendants' payment methodology. In all likelihood, there would be no evidence entered at trial, because the Defendants have stipulated to what methodology they used to pay the Plaintiffs. Second, even if the Defendants refused to stipulate to their payment methodology, this evidence could easily be proven at trial, and it would not consume a large portion of the case. Absent fraud in the form of altering or destroying accounting records, the Defendants likely have records of the methodology they used to determine each lessee's payments. During discovery, the Plaintiffs would likely uncover this information, and they could easily prove the methodology through a single witness and the introduction of several

documents.  In any case, because the Defendants stipulate to the methodology, these common issues would take up only a miniscule portion of the case.

88.    In the same way that the Defendants' payment methodology and the parties' course of performance would not play a large role in the case, neither would calculating the Plaintiffs' requested payment methodology.  The netback payment method requires knowledge of two figures: (i) the Defendants' total (common) final proceeds; and (ii) their total (common) transportation and processing expenses.  The Defendants likely keep accounting documents from which these figures can easily be derived.  There is no indication that either party would dispute the accuracy of the numbers; rather, the main objections lie in what methodology to use and how to determine individualized damages after total, class-wide damages have been calculated.  Therefore, the jury's only job -- if the Court adopted the Plaintiffs' requested payment methodology -- would be to make one simple calculation: the Defendants' total final proceeds minus total transportation and processing expenses.  This common issue would, thus, take up little time at trial.

89.    As for industry-custom evidence, while this evidence may be common for leases with the same language, this issue's significance is undercut by the fact that all of the leases do not have identical language.  Some of the leases -- perhaps even a vast majority of them -- have similar wording, which can be defined through common industry-custom evidence.  Yet, because all of the leases do not have identical language, they will still require individualized determinations -- thus cutting against a finding of predominance.

90.    Finally, there may be common evidence concerning the amount of diligence a reasonable lessee would exercise in discovering whether he or she was being paid adequate royalties.  This evidence is common across the class, because if a common lessee would have

discovered his or her cause of action before a certain point in time, the statute of limitations may bar all of the Plaintiffs' claims. Similarly, if a reasonable plaintiff would not have discovered his or her cause of action, then the statute of limitations would not present a per se bar to the Plaintiffs' claims. This factor is undercut, however, by the fact that the Defendants are focusing less on when a reasonable lessee would have discovered his or her cause of action, and more on when specific individuals would have discovered their causes of action. The Defendants' statute of limitations defense, thus, focuses on individualized and not common issues.

91. While there are several common issues in this case, they will not predominate over the individualized ones. The majority of the trial, and the Court's time preparing for trial and managing this case, will be spent on the individual issues.

92. The parties would likely spend the bulk of the trial presenting testimony regarding the meaning of the various textual royalty provisions; these issues are not truly individual, because multiple class members share the same royalty provisions -- perhaps a better term would be "categorical" or "quasi-common" -- but they are not common, and, given that subclassification cannot substitute for the entire class' satisfaction of the rule 23(b)(3) requirements, they weigh against predominance. But see EQT Prod. Co. v. Adair, 764 F.3d at 363 ("[T]he plaintiffs may be able to identify a finite number of variations in deed language, such that the ownership question is answerable on a subclass basis.").[91] The main fight in this case is what payment methodology the Defendants should have used. This issue is resolved by examining the language of the individual leases. Every lease does not, however, contain identical language; the Court must, therefore, apply a different legal standard to each lease

---

[91]As the Court has previously discussed, the Fourth Circuit allows predominance to be achieved through the use of subclasses.

variety.  Variation in lease language was the main problem that the Fourth Circuit identified in EQT Production Co. v. Adair.  See 764 F.3d at 367.  There, the Fourth Circuit instructed the district court to "consider how variations in the defendants' royalty obligations to the class members implicate the commonality and predominance inquiries," and even noted that these lease variations would "make it difficult, if not impossible, for a court to assess the validity of the defendants' royalty payment practices on a classwide basis."  764 F.3d at 367-68.  These same concerns are prevalent in this case because of the leases' varying language and the different industry-custom-and-usage evidence that will be needed to interpret the different lease variations.

93.    The management plan that the Court crafted underscores that individual issues would predominate over common ones.  Under its plan, the Court would divide the class into segments on the basis of either the potential of a different legal standard applying or different factual circumstances existing: (i) between Colorado wells and New Mexico wells; (ii) between Williams Four Corners-gathered wells and independently gathered wells; and (iii) among the eight textual formulations the Court has identified among the class leases' royalty provisions.  If there is one thing that the case law has repeatedly made clear, it is that the Court cannot ignore variations in contractual language.  See, e.g., EQT Prod. v. Adair, 764 F.3d at 363; Roderick, 725 F.3d at 1218-19; Chieftain Royalty Co. v. XTO Energy, Inc., 528 F. App'x at 942-44. Each segmentation creates an individual issue, because the Court has to determine in which segment each lease belongs.

94.     The Court has produced a spreadsheet -- attached hereto -- based on the Spreadsheet of Lease Language (Plaintiffs' Ex. 428),[92] that divides the leases into eight

---

[92]The Court has relied on the Plaintiffs' and Kaplin's representations in the spreadsheet only as it relates to his designations of the form-contract identifier on each lease. The Court examined at least three leases at random within each form-contract category -- both to ensure that all leases-within each form-contract category shared the same language and to spot-check Kaplin's work -- and reproduced all relevant language from the lease royalty provisions. The Court had to do this work because, despite multiple attempts to clarify the issue at the hearing, the parties did not make it clear whether the oft-referenced one-pronged-versus-two-pronged classification scheme referred to: (i) a bifurcated royalty for casing head gas versus other gas -- in which case the Court can look to only the second prong and completely ignore the first prong, because the class wells, as gas wells, produce no casing head gas; or (ii) a bifurcated royalty for gas sold at the well versus gas sold away from the well -- in which case the Court is still unsure whether it can disregard the first prong. Of course, both distinctions exist among the leases, and that fact was obvious from both the hearing and the exhibits -- and proved true upon examining the leases, as well. What was not at all clear, in Kaplin's Spreadsheet of Lease Language (Plaintiffs' Ex. 428), is whether the language he omitted and replaced with ellipses is, for any given lease, whether the variation in royalty buzzwords -- e.g., "amount realized" versus "market value," et cetera -- was triggered by (i) whether the gas was casing head gas or gas from a gas well; or (ii) whether the gas was sold at the well or away from the well. The Court would be inclined to use Terry's lease chart over Kaplin's, but, from what the Court can tell, the Defendants did not provide the Court with a comprehensive lease-language spreadsheet from Terry, but, rather, only the summarized Lease Language Chart (Defendants' Ex. 191).

The Court concludes that Terry was relatively consistent in using the "prong" terminology to describe royalty bifurcations on the basis whether the gas was sold at the well, although her usage was, at times, unclear. See, e.g., Tr. at 869:8-16 (McNamara, Terry). Kaplin, on the other hand, and the Plaintiffs generally, appear to use the "prong" terminology to refer to royalty provisions that discriminate on the basis whether gas is casing head gas or comes from a gas well:

Q.      . . . [W]here the leases have a two-prong royalty clause, your understanding is that all of these, all of the second prongs relate exclusively to casing head gas; is that correct?

A.      The ones I looked at that had two prongs, and to look to [sic] gasoline products and casing head gas.

Q.      My question, sir, is the second prong -- in all of those two-pronged leases, the second prong relates exclusively to casing head gas, was that your testimony?

A.      I think that's what I said, yes.

categories, A through H, where each lease within any given category contains a materially[93] textually identical royalty provision.  Cf. Roderick, 725 F.3d at 1219 ("On remand, the Trust could, for example, create a chart classifying lease types . . . .").[94]  See EQT Prod. Co. v. Adair, 764 F.3d at 369 ("[A]fter reviewing the leases in this case, the plaintiffs may be able to show that there are a limited number of lease forms, such that the validity of the defendants' conduct can be assessed on a subclass basis.").  Leases in which the royalty provision is illegible but the

---

Tr. at 277:18-278:5 (McNamara, Kaplin).  See also Tr. at 249:3-19 (McNamara, Kaplin).  This confusion in usage necessitated the Court using a magnifying glass and examining each lease type individually.  The Court's spreadsheet disregards casing head-gas-versus-standard-gas royalty distinctions while noting and separating out wellhead-sale-versus-offsite-sale distinctions, and, when the Court refers to a two-pronged royalty, it is referring to a lease with the latter distinction, which may or may not contain the former.

[93]Although the Court tried to note where a casing head gas clause exists, it did not record what the clause actually was, because any textual differences in that clause have no bearing on this case.  The Court fully separated, however, leases with different two-pronged provisions.  For example, if a lease provides for payment on the basis of "proceeds" if sold at the well and payment on "market value" if sold away from the well, the lease was grouped in a category only with other leases that provide exactly the same thing, and not with one-pronged leases that pay on either proceeds or market value.

[94]Taking heed of Roderick's clear command -- and borrowing its chart idea -- the Court will treat all textual formulations separately until they are shown to be substantively identical.

> [F]rom what we are told, there are roughly 430 leases which have yet to be examined by the Trust or the district court. . . .
>
> . . . .
>
> [T]he district court concluded that individual testimony regarding parties' intent or the circumstances of lease formation would be unnecessary.  The district court did not, however, consider whether language within the four corners of each lease would need to be examined individually.  And while Farrar [a Kansas state-court case] appears to have disclaimed the "need for individualized examination of lease . . . language," Farrar is not dispositive.  First, Farrar did not involve Fed. R. Civ. P. 23.  Second, Farrar's conclusion must be evaluated in light of Wal-Mart and Comcast, particularly given the fact that Farrar upheld certification despite finding some leases "expressly abrogate[d] the implied covenant."

Roderick, 725 F.3d at 1218-19 & n.4 (citations omitted).

form-contract identifier is legible were assumed to have the same textual royalty provision as the other leases with the same form-contract identifier, and were placed into the appropriate category, accordingly.  Leases that are illegible -- i.e., they are not themselves readable, nor do they have a legible form-contract number -- were placed in category X.[95]  The Court designates a lone lease with an entirely unique textual royalty provision with a Y.  This spreadsheet has columns specifying whether each lease is from Colorado or New Mexico, and whether wells on the lease are gathered by Williams Four Corners or an independent gatherer -- although the latter column is currently empty, as the Plaintiffs have not provided the Court with the necessary information.  Once again, each of these designations required individual determinations.

95.      As for the difference between one-pronged and two-pronged leases, the Court has fully separated them into their own categories -- no two-pronged lease is in the same category as any one-pronged lease or any two-pronged lease that differs on either of the two prongs.  The Defendants contend that the two prongs -- and the Court uses "prongs" to refer to variations in royalty language triggered by whether the gas is sold at the wellhead or away from the wellhead, and not variations based on whether gas is casinghead gas -- are important, and the Plaintiffs have not yet shown that they are not important.  No gas is sold at arm's length at the wellhead, unless that clause is intended to refer to gas transmitted to independent gatherers.  If transfer to a gatherer counts as a "sale" under these provisions -- although, at the present time, the Court is inclined to think that it does not -- then the Court would be required to keep all eight lease-language categories, unless the Plaintiffs can establish that the language used in some of

---

[95]The Court examined the illegible leases individually and generally agrees with Kaplin's assessments of which leases are illegible.  In examining the leases, however, the Court came across a lease -- Bates No. 18345 -- that the Court deems illegible, despite Kaplin's conclusion to the contrary.

the categories is identical in its meaning.  If, however, independent gathering does not count as a wellhead sale, the Court could ignore the "sold at the well" prong of the two-prong leases, and collapse the eight categories into four or five categories.  These determinations are individual ones that the Court would need to make if it were to certify this class.

96.     Category A consists of leases that pay royalty on the basis of "proceeds, as such," and contains 222 of the 507 class leases.  Category B consists of leases that pay royalty on the basis of "proceeds if sold at the well" and "market value at the well" "if marketed by Lessee off the leased premises," and contains 113 class leases.  Category C consists of leases that pay royalty on the basis of "the amount realized from . . . sale" on gas "sold at the well[]" and "market value at the well" on gas "sold or used off the premises or in the manufacture of gasoline or other product therefrom," and contains seventy-eight class leases.  Category D consists of leases that pay royalty on the basis of "gross proceeds" and contains thirty-four class leases.  Category E consists of leases that pay royalty on the basis of "net proceeds realized from . . . sale" on gas "sold at the well," and "market value at the well," on gas "sold or used off the premises or in the manufacture of products therefrom," and contains twenty-four class leases.  Category F is an unusual textual formulation.  Its leases provide that royalty is to be paid on the basis of "gross proceeds" on gas "used off the premises," and "if used in the manufacture of gasoline a royalty [paid on the basis of] the prevailing market rate for gas."  It contains ten class leases.  Category G consists of leases that pay royalty on the basis of "market price at the well" and contains four class leases.  Category H consists of leases that pay royalty on the basis of "gross proceeds" on gas "sold at the mouth of the well" and "market value . . . at the mouth of the well" on gas "not sold at the mouth of the well," and contains three class leases.  The oddball

Y lease provides that royalty is to be paid on the basis of "gross proceeds" "and if such gas be used in the manufacture of gasoline . . . the prevailing market rate."

97.     Even if not all -- or even no -- textual variations take on a different meaning in New Mexico than they do in Colorado, the Court would still need to segment the class by the state in which the well is situated, because (i) Colorado recognizes the marketable-condition rule, while New Mexico does not, meaning that a different legal standard applies between the two segments; and, correspondingly, (ii) the Defendants assess a COS charge on Williams Four Corners-gathered wells in New Mexico, but not in Colorado, meaning that the two segments are in different factual circumstances.  The Court would also have to segment the class based on whether the well is gathered by Williams Four Corners or an independent gatherer, because (i) the Defendants assess a COS charge, or no charge at all, on Williams Four Corners-gathered wells in New Mexico and Colorado, respectively, but merely pass on a proportionate chunk of the independent gatherer's fee on independently gathered wells, meaning that the two segments are in different factual circumstances; and (ii) if a transfer of gas to an independent gatherer is considered a "sale at the well," under the two-pronged leases, then the independently gathered wells with two-pronged leases will also each be subject to a different legal standard than wells in the same lease category, but that Williams Four Corners gathers.  The Court, and the parties, would be required to make individual determinations of each and every lease to place them in the correct segment.

98.     The illegible (X) leases and the unique (Y) lease are outside of this management framework, but the Court might be able to include them in the class, if it were to certify the class under this management plan.  The unique (Y) lease would probably be folded into one of the

existing lease categories once the Court established its meaning.[96]  As for the eighteen illegible leases, three things could happen with them.  First, the parties might be able to produce legible copies of them.  The Court has the same copies that Kaplin had, and it is possible that legible copies exist out there somewhere.  Second, the parties might come forward with evidence of individual leases' likely text, e.g., if a lessor executed an illegible lease at the same time as the lessor executed two other class leases, both of which have the same textual royalty provision, then the Court could find that the illegible lease says the same thing as the two contemporaneously executed leases.  At any rate, unless the illegible leases turned out to be unique, the leases could then be placed, on an individual basis, into the category in which they belong.  Third, even if the parties presented the Court with no individualized evidence on the illegible leases' meanings, the Court would still have to interpret them to mean something -- that the leases are illegible does not give the Defendants free reign to pay however they want, any more than it permits them to stop paying royalty altogether on gas they extract from the class members' land.  Determining these leases' meaning, and how to make that determination, are individualized issues.

99.    Working from front-to-back -- i.e., starting with the lease-language obligations, the variations in state law, and the situational differences between affiliate-gathered and independently gathered wells -- as the Court has thus far, this class action could involve up to forty different legal standards for the jury to apply.  Peeking at the back end of this case, however, the Court doubts that forty different standards -- i.e., forty different ways of paying royalty on natural gas -- exist, let alone that the class leases contain all forty of them.  The

---

[96]If the Y lease's meaning cannot be established, or if it turned out to be unique from all the other class leases, then the Court would have to exclude it from the class.

problem for the Court is that the Plaintiffs have not, by a preponderance of the evidence, established that the Court's doubts are well-founded.  The same seven payment terms appear in every lease: (i) "proceeds, as such"; (ii) "proceeds"; (iii) "gross proceeds"; (iv) "net proceeds"; (v) "market value at the well"; (vi) "market price at the well"; and (vii) "amount realized." Many of these terms may mean the same thing as one other, and all of the terms may mean the same thing in New Mexico as they do in Colorado -- with regard to the basic payment methodology, at least; permissible deductions will differ between the two states.  The problem for the Court is that the Plaintiffs have not, by a preponderance of the evidence, established that the terms are the same.  The Court, if it certified the class action, would have to keep these categories separate for the time being for four reasons: (i) class certification is not the time to decide the case's merits, and the royalty provisions' meanings are merits issues; (ii) even if the Court wanted to determine the provisions' meanings at the point of certification, the parties have presented the Court with little evidence on this topic;[97] (iii) as a practical matter, it would be easier to start with greater number of segments and winnow them down later in the case than it is to separate out differences after certification that the Court had glossed over before certification; and, most importantly, (iv) for any given lease provision, if the Court cannot pin down the terms' meanings as a matter of law, then the jury must decide them as a matter of fact -- this last point

---

[97]The Court will, however, for the parties' benefit, give its inclinations about what some of the royalty terms mean, based on existing case law and the terms' plain meanings. "Proceeds," generically, refers to the amount the Defendants receive from selling the hydrocarbons, and not any index or market price.  ConocoPhillips Co. v. Lyons, 2013-NMSC-009, ¶¶ 16, 24, 299 P.3d at 850, 852-53.  This term forbids paying NGL royalty on a keep-whole basis.  "Net proceeds" permits post-production cost deductions -- but not production-cost deductions -- in New Mexico, ConocoPhillips Co. v. Lyons, 2013-NMSC-009, ¶¶ 16, 24, 299 P.3d at 850, 852-53.  "Gross proceeds" forbids the deduction of costs.  Rogers v. Westerman Farm Co., 29 P.3d at 897.  Last, "[l]essees are only obligated to pay royalties on the use of drip condensate to the extent that they receive proceeds from such use."  ConocoPhillips Co. v. Lyons, 2013-NMSC-009, ¶ 48, 299 P.3d at 857.

prevents the Court from just taking its best crack at interpreting the leases based on the little bits of evidence the parties have presented to date.  Point (iv) does not necessarily mean that the jury would have to find and apply forty different standards.  It means that, if the Court ends up being unable to collapse any of the current segments together before trial as a matter of law, the jury would have to, first, find all forty legal standards and, second, apply however many remained after, undoubtedly, some of them may turn out to be identical to one another[98] -- effectively collapsing the segments and then applying the smaller number of legal standards.  The Court would likely, however, be able to discern some of the leases' meanings during the parties' pre-trial motion practice.

100.    That the Court may be able to winnow the forty different standards down a bit does not, however, weigh in favor of predominance.  As of now -- the class certification stage -- the Court must determine predominance.  The Court should not certify the class on the basis that perhaps at some point down the road common issues will predominate, or at least will be closer to predominating, individual ones.  The Court must determine predominance now, and, the potential forty different legal standards governing the various claims creates too many individualized standards for the Court to find that common issues predominate.

101.    In re Bridgestone/Firestone, Inc., Judge Easterbrook addressed the question whether a district court properly certified a nationwide class action involving fifty different legal standards -- i.e., one from each state.  See 288 F.3d at 1018.  Judge Easterbrook explained that such a class would not be manageable and would not be efficient.  See 288 F.3d at 1018-20.  Judge Easterbrook commended the district judge's resolve to apply fifty different legal

_____

[98]The Court would predict that some, if not most, of the legal standards would be identical to one another, but, at the present time, the Plaintiffs have not established, by a preponderance of the evidence, that this will be the case.

- 258 -

standards, rather than refusing the certify the class and requiring each class member to file individual suits:

> The district judge did not doubt that differences within the class would lead to difficulties in managing the litigation.  But the judge thought it better to cope with these differences than to scatter the suits to the winds and require hundreds of judges to resolve thousands of claims under 50 or more bodies of law.

288 F.3d at 1019-20.  Judge Easterbrook concluded, however, that the case was not appropriate for certification.  See 288 F.3d at 1018-20.

102.    While the forty potential legal standards in this case is less than the fifty with which Judge Easterbrook was presented in In re Bridgestone/Firestone, Inc., forty is just a stone's throw away from fifty, and Judge Easterbrook's predominance concerns resonate here. That the Court and jury will have to spend a substantial amount of time interpreting the differing lease provisions that are not common to the entire class shows that common issues do not predominate over individualized ones.

103.    That the Defendants may introduce parol evidence to interpret the meaning of individual leases further cuts against predominance.  The Court doubts that such evidence exists, given the age of the leases, but the possibility of such evidence weighs against predominance.  If the Defendants presented parol evidence, the Court would have to make individual determinations as to the meaning of each lease on a lease-by-lease basis.  While the variations in the leases' language already defeats predominance, parol evidence that would cause even more lease variations and standards counsels further against certification.  The Court may have to consider parol evidence to determine if the meaning of individual leases is ambiguous.  If the Court found ambiguity, it would permit the parties to present evidence at trial to determine the meaning of these individual leases.  The jury would be required not only to apply forty different

legal standards to the different lease segments, but also determine the individual leases'
meanings.

104.    As the Court has discussed, state courts are more amiable to oil-and-gas royalty
class actions, but, even in New Mexico state court, the possibility of parol evidence, which
would require to Court to make individualized lease-by-lease determinations, may defeat
certification.  The district court in Davis v. Devon Energy Corp. concluded that the possibility of
parol evidence, which may cause individual leases to be ambiguous, could overwhelm the case,
such that common issues would no longer predominate over individualized ones.  See 2009-
NMSC-048, at ¶ 10.  The Supreme Court of New Mexico reversed the district court, but on
different grounds, holding that, under the marketable condition rule, the district court should
have considered an implied covenant that did not require consideration of the individual leases'
provisions.  See 2009-NMSC-048, at ¶ 36.  The Supreme Court of New Mexico did not,
however, consider whether the district court erred in concluding that the possibility of parol
evidence may defeat predominance when the plaintiffs' claims rely on interpretation of the
leases' provisions.  The Court agrees with the state district court.  The possibility of parol
evidence counsels against finding predominance and against certification.

105.    The Defendants' statue-of-limitations defense also cuts against certification.
While "[u]nique affirmative defenses that require some individualized inquiry do not present a
per se bar to certification," Pace v. PetSmart Inc., No. CIV 13-0500 DOC/RBNx, 2014 WL
2511297, at *9 (C.D. Cal. June 3, 2014)(Carter, J.)(quoting Kelly v. City and County of San
Francisco, No CIV 05-1287, 2005 WL 3113065, at *3 (N.D. Cal. Nov. 21, 2005)(Illston, J.)),
affirmative defenses that will require individualized evidence and determinations cut against
finding predominance, see Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288, 295 (1st Cir.

2000)("[W]e regard the law as settled that affirmative defenses should be considered in making class certification decisions."); Kaye v. Amicus Mediation & Arbitration Grp., Inc., 300 F.R.D. 67, 79 (D. Conn. 2014)(Hall, J.)("This court is bound by Dukes, and in the wake of Dukes, this Circuit has likewise treated affirmative defenses on which defendants' ultimate liability will depend as proper subjects of the inquiries into commonality and typicality, as well as predominance."); Donaca v. Dish Network, LLC., 303 F.R.D. 390, 399-400 (D. Colo. 2014)(Jackson, J.)("However, 'an affirmative defense is not *per se* irrelevant to the predominance inquiry.'" (quoting Gene & Gene LLC v. Biopay LLC, 541 F.3d 318, 327 (5th Cir. 2008)); Robert Elliott Trucking, Inc. v. Caterpillar, Inc., No. CIV 11-0753 RMG, 2012 WL 2918700, at *8 (D.S.C. Mar. 21, 2012)(Gergel, J.)("Additionally, the Court finds that the commonality and predominance requirements are not satisfied because Defendant's affirmative defenses would require individual determinations.").  The Defendants may prove their statute-of-limitations defense by showing that a reasonable lessee would have discovered his or her cause of action sooner; however, they may also prove their defense on an individualized basis -- the time when individual lessees discovered their causes of action.  Several lessees made inquiries with concerning their royalty payments.  There is a question whether these inquiries should have alerted the lessees to whether they had a cause of action.  The jury might hear evidence on what each lessee, or a significant number of lessees learned during those conversations and will have to determine whether these individual lessees should have discovered that they had a cause of action at that time.  It is unclear how much of this evidence the Defendants will present, but the fact that they will present some individualized affirmative defense evidence counsels against finding predominance.

106.    Finally, there are a number of individualized issues that must be resolved to determine individual class-member's damages.  As the Court has already concluded, Comcast v. Behrend requires the Court to consider individual damages calculations at the certification stage. Here, the jury will have to consider a number of individualized issues, including which wells traveled to which plants, the various plants' efficiency levels, the bypass rates over time, and from which wells drip condensate was collected.  While the overall damages may be calculated through a simple mathematic formula -- the Defendants' total (common) final proceeds minus their total (common) transportation and processing expenses -- the individual damages must be calculated through consideration of a significant amount of individualized evidence.  It would take more time and resources to make these individualized damages calculations than to make the fairly straightforward class-wide damages calculation.

107.    The leases' variations, by themselves, create too many individualized issues so that the common issues do not predominate the individualized ones.  Because of the lease variations, the state-law issues, the affirmative defenses, and potential challenges with calculating damages, the Plaintiffs fail to satisfy the predominance requirement.  The large number of individualized issues that are central to this case prevent the Court from finding that common issues predominate.  For this reason, the Court concludes that the Plaintiffs cannot satisfy the predominance requirement, and certification is inappropriate.

**2.    The Class Action Device Is Superior to Other Available Procedural Forms, Largely Because the Class Members' Individual Suits Have Negative Value.**

108.    The class action device is superior to other available procedural forms.  The only form available to adjudicate this dispute is individual litigation, and the class members' individual suits have negative value, and thus cannot be pragmatically pursued in the absence of

certification.  Addressing the four rule 23(b)(3) factors in turn, the Court concludes first that "the class members' interests in individually controlling the prosecution or defense of separate actions" would not be served by denying class certification, because the class members cannot economically maintain their own suits.  Fed. R. Civ. P. 23(b)(3)(A).  This factor thus cuts in favor of certification.  Second, considering "the extent and nature of any litigation concerning the controversy already begun by or against class members" also cuts in favor of certification, because the Court is unaware that any class members have commenced individual litigation. Fed. R. Civ. P. 23(b)(3)(B).  Third, it is "desirab[le] . . . [to] concentrat[e] the litigation of the claims in th[is] particular forum," because (i) it is geographically convenient for the parties, witnesses, and lawyers, and near to the locus of the action, which is largely within the District of New Mexico; and (ii) the Court has worked on this case extensively and become familiar with the factual and legal issues involved.  Fed. R. Civ. P. 23(b)(3)(C).  Fourth, the proposed class does not present insurmountable manageability issues.  See Fed. R. Civ. P. 23(b)(3)(D). Accordingly, the Court concludes that the proposed class satisfies the superiority requirement.

> **a.    The Class Action Device Would Be Superior to Individual Suits, Because the Class Members' Individual Suits Have Negative Value.**

109.    The class-action device would be superior to the use of individual actions to adjudicate this case, because the individual actions that could arise from this case have negative value.  Because the class-action device is, itself, unavailable -- lacking commonality and predominance -- the superiority requirement is not satisfied.  Interestingly, while virtually everything that has ever been written on class actions states -- and every legal and political perspective on class actions espouses -- that negative-value class actions are favored over positive-value ones, no one has (i) outlined a workable test for determining if a class action has

negative value; or (ii) crisply defined what negative value means.  What is clear is that a case has

negative value when it would be uneconomical for the class members to bring individual claims.

110.    The Court concludes that negative value does not correspond to a particular

claimed dollar amount that applies in every case, e.g., every case in which the plaintiff requests

more than $10,000.00 has positive value or every case in which the plaintiff requests less than

$3,000.00 has negative value.  Two additional factors must be considered in addition to the

dollar figure that the plaintiff may write in the complaint.  First, the Court must multiply the

case's potential damages by the plaintiff's likelihood of success, thus calculating the case's

expected value.  Second, the Court must subtract any disparity in litigation costs between the

plaintiff and defendant, i.e., any expected litigation costs that the plaintiff will incur but the

defendant will not.[99]  This calculation is how a rational plaintiff decides whether an individual

---

[99]Here, the math gets a little complicated.  It is not true that the plaintiff can simply calculate the case's expected damages, add the defendant's litigation costs to take the case through trial, subtract the plaintiff's litigation costs to take the case through trial, and use that figure as the case's expected profitability.  If the case went to trial, the plaintiff would save no money on account of the defendant's litigation costs; subtracting the defendant's litigation costs presumes settlement, and the plaintiff only recoups any favorable disparity in the parties' litigation costs to the extent that such costs have not yet been incurred, i.e., the earlier the case settles, the better the deal should be.  The case would have to progress a little bit, however, for the defendants to verify that the plaintiff's substantive case has value, i.e., that the merits are as strong as the plaintiffs say they are.  If the parties had complete information at the point of filing, then the case's settlement value would be at its very highest at filing and would only go downhill from there.  Settlements include the value of avoided litigation costs, which are highest at the point of filing, when no litigation costs have yet been incurred.  In the real world, however, information is not complete, and acquiring it is not costless, and thus cases have to mature for settlement.  See generally Warren F. Schwartz & Abraham L. Wickelgen, Credible Discovery, Settlement, and Negative Expected Value Suits, 40 RAND J. Econ. 636 (2009).
    Often, the plaintiff has to put more money into the case at earlier stages than the defendant does.  This fact reduces the case's value from the plaintiff's perspective, as the parties are less likely to avoid spending any given dollar in litigation costs if that dollar must be spent earlier in the case rather than later.  Thus, when a plaintiff's attorney values a prospective lawsuit, he or she must consider the timing of each side's litigation expenses, as well as the total amount.

case is worth pursuing, and that is what the Court is trying to discern.  If a case is for a half-million dollars, but has only a one-in-three chance of success, then a plaintiff will not pursue the claim if it will cost over $166,666.67 to litigate.[100]  The plaintiff might not pursue the case even if it were cheaper to do so, if the plaintiff could get a better return on his or her investment elsewhere.

111.   The Court can try to conduct this calculation directly, i.e., by looking at the claim amounts, and gauging the likelihood of success and the probable litigation costs.  Here, all the check stubs that the Court have seen have been for monthly payments in the two-figure to low three-figure range, and the stubs at which the Court has looked are those of the class representatives -- who have larger claims than the average class member.   The Court conservatively assumes that a typical class member received a royalty of $100.00 per month, which would come to roughly $35,000.00 in royalty payments over the class period.  Even if the Plaintiffs contend that they have been underpaid by twenty-five percent -- and the underpayment is not that great -- the class member's case would be for $17,500.00.  Even if the Plaintiffs had a one-hundred percent chance of prevailing at trial, their litigation costs would be high enough to make individual litigation uneconomical.  The discovery in this case has been voluminous and extensive.  Although a class member's individual case could be brought cheaper than this class action was -- for example, all leases other than the class member's own could be disregarded, and all discovery and argument related to class certification could be foregone -- it would still be

---

[100]Again, when the Court refers to the cost of litigation, it is referring to the actual expected cost of litigating the case to disposition -- not necessarily trial.  If there is a twenty-percent chance the case will settle after $50,000.00 in litigation costs are incurred, a sixty-percent chance that it will settle after $100,000.00 in litigation costs are incurred, and a twenty-percent chance that the case will go to verdict for a total of $200,000.00 in litigation costs, then the relevant figure for the case's expected litigation costs is $110,000.00.

expensive to pursue such a case.   All the discovery and argument that the Plaintiffs have presented that relates to the Defendants' gathering and processing operations, deductions, and payment policies would still be required in individual litigation -- and such evidence constitutes the bulk of this class action.   This controversy's merits are irreducibly expensive to litigate, whether in individual litigation or class litigation.   It could not be done profitably in individual litigation.

112.   Another method -- other than attempting to conduct a direct value approximation -- is looking to indirect evidence, namely: (i) how many individuals who would otherwise be class members or who resemble class members in material respects have filed individual cases; and (ii) what have those cases earned in settlements or verdicts.[101]   This method produces evidence that convinces the Court.   No individual royalty owners in the San Juan Basin have filed individual suits against their working-interest owners.   If these cases were viable to bring on an individual basis, one would expect to see it.

113.   In some ways, this class action resembles a shareholder class action.   In a shareholder action, a small number of shareholders may have sufficient interests in their cases to justify individual actions, i.e., while a single share of stock is almost never sufficiently harmed enough to make litigation worthwhile, a single investor -- often a mutual fund or other institutional investor -- may own enough shares for litigation to be profitable.   Here, a single well will not have sustained losses large enough to warrant litigation.   Some royalty owners own

---

[101]The Court refers to this value-calculation method as "indirect," but it could be considered direct.   For one thing, the whole point of conducting a valuation of the claims is to determine whether individual suits are a superior method of adjudicating the controversy, and being superior requires that they be viable.   Looking to the extent to which individual cases have been filed is barely removed from that inquiry.   Moreover, rule 23(b)(3)'s text specifically demands this inquiry.   See Fed. R. Civ. P. 23(b)(3) (directing courts to consider "the extent and nature of any litigation concerning the controversy already begun by or against class members").

enough wells to where they have incentive to conduct their own lawsuits.  The most obvious examples, however -- the federal government and the Indian tribes -- have been excluded from this class.  There are no class members with inordinately large stakes relative to the rest of the class; if there were, the Court might be inclined to take another cue from the shareholder-litigation context and appoint them as class representatives.  See Manual for Complex Litigation § 21.272, at 281.  This class appears be composed of ordinary individuals, not institutional investors or oil companies.  The class representatives are, appropriately, class members with a little more at stake than the average class member, and the Court has determined that even they cannot pursue their claims on an individual basis.  The class members' claims have negative value, and, thus, the class-action procedural form -- if it were available -- would be superior to individual litigation.

### b.    Other Complex Procedural Forms Are Unavailable in This Case, Thus Taking Them Out of the Superiority Calculus.

114.    No other complex-litigation form is available in this case.  The Court has already determined that rule 20 "joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  Multiparty, multiforum jurisdiction does not exist, because "at least 75 natural persons have [not] died in [an] accident at a discrete location."  28 U.S.C. § 1369(a).  No multidistrict litigation presently exists for oil-and-gas royalty-underpayment cases, and the Court has no power to conjure one into existence.  See supra note 56.  The possibility for multidistrict litigation thus does not cut against finding superiority, even if the Court speculated that it might be a viable procedural form to manage the case.

115.    Last, the Court has already stated that rule 23(b)(3)(B)'s dictate to consider the "nature of any litigation concerning the controversy already begun by . . . class members" requires the Court consider any other class actions that have already been certified.  See

Conclusion of Law 22 & n.59.  Two other class actions have been filed that relate to this case: Lindauer v. Williams Production RMT Co., in Colorado state court; and Abraham v. WPX Energy Production, LLC, No. CIV 12-0917 JB (D.N.M. 2012)(Browning, J.)("Abraham"), which was filed with the Court after this case, and for which the class certification hearing has been completed but the Court has not yet ruled whether to certify.  The Court concludes that neither of these cases cut against finding superiority.  The class members in Lindauer v. Williams Production RMT Co. have been excluded from the class definition in this case, there is no overlap in the class definition, and there is thus no question of which class action will be superior for those individuals in both classes.  As for Abraham, that it is not yet certified takes it out of the superiority calculus.  Given the judicial resources required to conduct a rule 23 analysis on a factually complex case like this one and Abraham, it is unrealistic for the Court to conduct both analyses at once before determining which class action is superior.

116.  Moreover, the superiority inquiry asks whether "a class action is superior to other available methods" and not whether this particular class action is superior.  Fed. R. Civ. P. 23(b)(3) (emphasis added).  While the existence of an already certified class action may defeat the superiority of any subsequent putative class action, thus rendering the class-action device, generally, inappropriate, the Court does not read rule 23's text to require that the Court compare the putative class action in question with every other pre-certification class action out there. Taken to its logical endpoint, this reading would require the Court to compare the putative class action in front of it with every putative class action that could exist, even if it has not been filed -- the same analysis the Court must perform when evaluating superiority vis-à-vis individual suits.  This interpretation would then result in the Court certifying a class action only if it deemed the class action to be superior to all other theoretical class actions -- in essence,

perfect.  The Court does not believe that the superiority inquiry is that demanding, and, although excluding other pre-certification class actions from the superiority consideration greatly incentivizes being the first attorney to file a class action and pursuing that case diligently, the Court concludes that these incentives are generally positive.

> **c.    The Desirability of Concentrating the Litigation of the Plaintiffs' Claims in the District of New Mexico Weighs in <u>Favor of Certification.</u>**

117.    Rule 23(b)(3)'s third factor, "the desirability or undesirability of concentrating the litigation of the claims in the particular forum," cuts in favor of certification.  Fed. R. Civ. P. 23(b)(3).  Specifically, both prongs for this factor -- (i) the desirability of aggregation; and (ii) the desirability of the Court adjudicating the dispute -- cut in favor of certification.  First, because this is a negative value case, the first prong is satisfied.  Without aggregation, there would be no mechanism -- or at least no economical mechanism -- for the Plaintiffs to have their grievances heard.  For essentially the same reasons that the Court finds that a class action is superior to any other form of litigation, the Court finds that aggregation of the Plaintiffs' claims is desirable.

118.    Second, the Court is a desirable forum for the case.  Several factors are considered in making this determination: (i) the geographic convenience of the parties, witnesses, or class counsel, <u>see</u> <u>Zinser v. Accufix Research Inst., Inc.</u>, 253 F.3d at 1191-92; (ii) the locus of the harm, as well as any other events forming the basis of the action, <u>see</u> <u>Winkler v. DTE, Inc.</u>, 205 F.R.D. at 245; (iii) the location of the bulk of the proposed class, <u>see</u> <u>Macarz v. Transworld Sys., Inc.</u>, 193 F.R.D. at 57; and (iv) whether the defendant is located in the forum state, <u>see</u> <u>In re Warfarin Sodium Antitrust Litig.</u>, 391 F.3d at 534.  Each factor cuts in favor of concluding that the Court is a desirable forum.  At least one of Plaintiffs' lead counsel is located in Albuquerque,

New Mexico, while the Defendants' counsel is located in Santa Fe, New Mexico, which is about an hour drive North of Albuquerque.  All of the events leading to this case occurred in New Mexico or its northern neighbor, Colorado.  It is unclear where the bulk of the proposed class members reside, but, because the leases are all located in New Mexico or Colorado, at least some members likely reside in one of those two states.  Finally, while the Defendants are incorporated in Delaware, with their principal places of business in Oklahoma, they each own oil-and-gas leases in New Mexico.  See Complaint ¶¶ 5-6 (noting that WPX Production and WPX Rocky Mountain are incorporated in Delaware with their principal places of business in Oklahoma). Three of the factors cut in favor of the Court being a desirable forum while one -- the location of the Defendants -- cuts against. Even the fourth factor, however, does not weigh heavily against desirability, because the Defendants conduct business in New Mexico -- i.e. the business leading to this case.  Because all, or a substantial number, of the factors weigh in favor of finding that the Court is a desirable forum, the Court concludes that it is desirable to litigate this case in this forum.

> **d.      This Class Action Does Not Present Insurmountable Manageability Issues.**

119.    The fourth and final factor a court must consider in assessing superiority is the extent to which it will be able to manage the class action, if certified, through pre-trial litigation and trial, accurately adjudicating the class' claims -- in particular the individual issues -- and fairly distributing relief among the class members.  See Fed. R. Civ. P. 23(b)(3)(D).  The manageability factor "encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit."  Eisen v. Carlisle & Jacquelin, 417 U.S. at 164.  This case does not present insurmountable manageability issues.

120.    The Court would divide the class into segments on the basis of either the potential of a different legal standard applying or different factual circumstances existing: (i) between Colorado wells and New Mexico wells; (ii) between Williams Four Corners-gathered wells and independently gathered wells; and (iii) among the eight textual formulations the Court has identified among the class leases' royalty provisions.  The Court would thus segment the class as follows:

| New Mexico Wells | | | | | | | | | | | | | | | | | | | | Colorado Wells | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Affiliate-Gathered Wells | | | | | | | | | | Independently Gathered Wells | | | | | | | | | | Affiliate-Gathered Wells | | | | | | | | | | Independently Gathered Wells | | | | | | | | | |
| A | B | C | D | E | F | G | H | OF | OS | A | B | C | D | E | F | G | H | OF | OS | A | B | C | D | E | F | G | H | OF | OS | A | B | C | D | E | F | G | H | OF | OS |
| 01 | 02 | 03 | 04 | 05 | 06 | 07 | 08 | 09 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 | 36 | 37 | 38 | 39 | 40 |

In this chart, "OF" refers to the "same as fed" overriding royalties and "OS" refers to the "same as state" overriding royalties.  For the Plaintiffs' primary claim/theory of liability -- which is that the keep-whole methodology and index-based pricing constitute a contract-breaching method of paying royalty -- potentially all forty segments would need to be analyzed separately.  For the Plaintiffs' claim/theory that the magnitude of the COS charge was a breach of contract,[102] only

---

[102]If there were no other problems with class certification, this claim might be particularly amenable to class treatment.  The COS charge is an aggregated deduction, meaning that the Defendants added up their total expenses and divided them evenly among all class members -- meaning proportionately by MCF, not literally evenly.  If the jury or the Court decides that some component(s) of the COS charge are inappropriate -- such as the profit or the home-office component -- then it can, with a single finding, resolve the claim classwide.  There are no individualized facets to this claim/theory; even apportionment of damages among the class requires only a process of dividing the total damages attributable to the claim/theory by each well's productivity by volume.

This analysis assumes, however, that the Plaintiffs are seeking damages only for excessive deductions that result from the COS charge.  The Plaintiffs may also be seeking damages that correspond to the independently gathered New Mexico wells.  The Defendants' deductions on those wells were a proportionate share -- presumably also by volume, as that seems to be what puts wear and tear on the gathering system and processing plants, but it could also be by MMBtu -- of whatever fees the independent gatherer charged the Defendants.  The Court cannot tell whether the Plaintiffs are alleging that these charges were wrongful.  While the

segments 1 through 10 would need be analyzed at all -- the COS charge was not applied to Colorado wells or independently gathered wells.  For the Plaintiffs' theory that gas was used off the lease, no segmentation is necessary,[103] as no lease permits the lessee to use gas off the leased premises free of charge, but all leases permit the lessee to use gas on the lease free of charge.[104]  These three claims/theories constitute the whole of the Plaintiffs' case -- except for the NMPPA claim, which the Court will analyze separately -- because the Court has declined to certify any WASP-based claim/theory of liability, and the Court believes that the affiliate-transaction claim/theory is a rephrasing of the primary improper-value-calculation claim/theory.

121.    As for the trial, if the Court were to certify the class, the Court would prefer a single trial to multiple trials, but the Court would take its cues from the parties and would consider splitting the case up into parts pursuant to rule 42(b).  The most obvious point of

_____

Court ordinarily liberally construes the claims in the Complaint, this case is now at the certification stage, and if the Plaintiffs have not made it clear that they are seeking damages for something, then the Court cannot certify a class on that basis.  Even if the Court were to certify this class to seek relief for excessive deductions, those deductions must arise from the COS charge.  The Court, however, is fairly confident that the COS charge is the only cost deduction with which the Plaintiffs ever really had a problem.

[103]It is possible that this claim applies only to segments 1 through 10 and 21 through 30, i.e., the affiliate-gathered wells.  The Plaintiffs did not prove, by a preponderance of the evidence, whether the lessee -- the Defendants -- or the independent gatherer is responsible for compensating lessors for gas used, off the lease, within an independent gathering system.  Even if the claim applies to only half of the segments, no segmentation would be needed within this chunk of the class, i.e., only the difference between affiliate-gathered wells and independently gathered wells would matter, and not the variations in lease language.

[104]The default rule is that the lessee can use gas on the lease without having to compensate the lessor for the gas' value, see ConocoPhillips Co. v. Lyons, 2013-NMSC-009, ¶ 38, 299 P.3d at 856, and this default rule is reinforced by free use clauses in most, if not all, of the class leases.  The default rule is also, however, that the lessee must compensate the lessee for all gas used off the lease as if it were sold, see ConocoPhillips Co. v. Lyons, 2013-NMSC-009, ¶ 38, 299 P.3d at 856 ("[A] lessee's right to use gas in the operations of the leased premises is not without limits and generally interpreted as being limited to the leased premises unless the clause expressly states otherwise."  (citation omitted)), and this default rule is reinforced by explicit language in many of the class leases, especially the two-pronged leases.

bifurcation in this case -- the one mirrored in the organization of this Analysis -- is separation of the NMPPA claims.  Separating the NMPPA claims involves both severance -- as only the New Mexico wells can bring NMPPA claims -- and horizontal bifurcation.  The issue overlap between the NMPPA claims and the other claims is minimal, and the NMPPA claims could be tried separately without the trials presenting duplicative evidence.  After the NMPPA claims, the next most attractive points of separation are (i) between the Colorado wells and the New Mexico wells; and (ii) between the affiliate-gathered wells and the independently gathered wells. Severance might also be desirable to cut out the class members against whom the Defendants have substantial individualized evidence, but those class members are not likely numerous, and thus severing them might make for judicial waste.

122.    If the Court were to certify the class, the Court's preference would be to try all the underpayment claims together.  Multiple trials on the underpayment claims would require that much of the same evidence be presented at each trial, thus reducing judicial economy.  Having already sat through two largely duplicative class certification hearings in this case and in Abraham, the Court would rather not spend its time and society's resources sitting through similarly duplicative trials.[105]

---

[105]Vertical bifurcation -- separation of a trial into liability and damages phases -- generally benefits defendants.  There are three reasons for this effect.  First, it effectively sets up two opportunities for the plaintiffs to lose; a plaintiff must go 2-0 to garner a large verdict, while, for the defendant, a win at either trial -- either winning on liability or convincing the damages jury to award a low figure -- constitutes a win overall.  Second, evidence may be excluded from each trial that would be admissible in a unified trial, for the reason that it is relevant only to the issue not being tried.  While this impact is, in theory, neutral between the plaintiff and defendant, in practice it generally works to the plaintiff's detriment.  At the liability trial, the plaintiff cannot pile on extensive evidence of the harsh effects that the defendant's alleged conduct had on the plaintiff's life -- the bread and butter of a damages argument -- which could potentially reduce jurors' sympathy for the plaintiff or their understanding why the defendant's conduct was wrongful.  At the damages trial, the plaintiffs, likewise, often cannot introduce extensive evidence of the defendant's wrongdoing, thus making it unlikely that the jury

123.    The Court will next discuss two potential management issues that the Defendants raise with regard to this plan: (i) their right to introduce individualized evidence establishing a limitations defense; and (ii) the difficulty in determining individual damages.   Neither of these issues presents intractable management difficulties.

---

will come back with a large verdict out of indignation.   Third -- and this reasons stems from the first reason and is the flip side of the second -- the defendant can refrain from arguing damages in the liability trial and focus on them in the damages trial.   In a unified trial, defendants are often leery about arguing damages, worrying that, if the jury sees them spending too much time arguing damages, they might interpret that as an implicit concession on liability.   They are perhaps equally reticent, however, to refrain from arguing damages entirely; the defendant's counsel in Texaco, Inc. v. Pennzoil Co., No. 01-86-0216-CV (Tex. Dist. Ct.), took this approach, and ended up being on the wrong end of the largest jury verdict in American history.   See Texaco, Inc. v. Pennzoil Co., 729 S.W.2d 768, (Tex. Ct. App. 1987)("Pennzoil suffered damages of $7.53 billion . . . [and] was entitled to punitive damages of $3 billion.").   A bifurcated trial resolves this issue in best-of-both-worlds fashion for the defendants: at the liability trial, they can ignore damages entirely and proclaim their absolute innocence; and at the damages trial, they can focus on damages.

Vertical bifurcation's benefits to defendants are not speculative; they have been established empirically.   Numerous studies have been conducted in which the same case is tried, to multiple juries, in both unitary and bifurcated form: one study observed a drop from 66% to 44% in the plaintiff's victory rate as a result of bifurcation, see Hans Zeisel & Thomas Callahan, Split Trials and Time Saving: A Statistical Analysis, 76 Harv. L. Rev. 1606, 1612 tbl. 2 (1963); another observed a drop from 100% to 74.3%, see Irwin A. Horowitz & Kenneth S. Bordens, An Experimental Investigation of Procedural Issues in Complex Tort Trials, 14 Law & Hum. Behav. 269, 278 (1990); a third observed a drop from 87.5% to 25%, see Horowitz & Bordens, supra, at 278; a fourth observed a drop from 100% to 62.5%, see Horowitz & Bordens, supra, at 278; a fifth observed a drop from 55.2% to 42.8%, see Stephan Landsman, Shari Diamond, Linda Dimitropoulos & Michael J. Saks, Be Careful What You Wish for: The Paradoxical Effects of Bifurcating Claims for Punitive Damages, 1998 Wis. L. Rev. 297, 316-17 (1998).   Basically, the liability phase of a bifurcated trial tends to go poorly for plaintiffs.   About the only bright spot for plaintiffs is that there is some evidence that, if they can prevail in the liability trial, damages trials may yield larger verdicts than unitary trials with the same facts.   See Horowitz & Bordens, supra, at 278.

For this reason, the Court is more inclined to give serious weight to the Plaintiffs' request for vertical bifurcation than the Defendants'; the Defendants could be asking for it because it benefits them, whereas the Plaintiffs would likely only ask if they had a legitimate fear of jury confusion or were unable to put on a vertically unified case in a reasonable amount of time.   If either side wanted to use rule 42(b) in any way other than the ways the Court has described, the Court would likely demand: (i) a showing of necessity or efficiency; (ii) a detailed proposed trial plan; and (iii) voluntary adherence to more restrictive timeframes for presenting their case.

i.      **The Defendants' Limitations Defense Does Not Render the Case Unmanageable.**

124.    The Defendants' limitations defense does not render the case unmanageable, because (i) the Defendants' have mostly common evidence, although they have also adduced some individualized evidence; and (ii) even if the Defendants had a large amount of individualized evidence to present, so long as the trial remained manageable, it would remain the Defendants' burden to either present this evidence or forfeit the argument.  The Court discussed the Defendants' burden in proving a limitations defense under New Mexico's discovery rule -- which governs all claims for all class members, including Colorado-well owners -- in detail in the MOO.  There are two ways for the Defendants to prevail: (i) prove that certain -- or all -- class members had actual knowledge of their causes of action before October 20, 2007; or (ii) prove that reasonable diligence by a royalty owner would have resulted in the class members discovering their causes of action before October 20, 2007.  Both defenses could be either individualized or common -- although in this case, the first is individualized while the second is common.

125.    While the Defendants have some individual evidence to present against some class members, they would have to argue their limitations defense, for the most part, on ground (ii), and present evidence and argument that the check stubs put the class members on notice and that the class members' inherent responsibilities as lessors reasonably necessitated inquiry.  This evidence is largely common and thus has a minimal impact on manageability.  The Defendants also presented evidence at the hearing that certain class members called them with questions about their royalty payments.  The Defendants can use this evidence either as individualized evidence -- arguing that those class members who called were given actual knowledge of their claims or put on notice to do reasonable research into them -- or as common evidence -- arguing

that, if some class members saw fit to call about their royalty checks, then all of them should reasonably have.  Either way, the amount of evidence that the Defendants have is manageable.  The Defendants wrote a short memorandum each time a royalty owner called them, and these documents might be admissible under the business-records exception to the hearsay rule.  See Fed. R. Evid. 803(6).  Similarly, the Defendants would be able to call witnesses to testify to this information.  Regardless, the Court would not have a difficult time organizing and managing the requisite evidence and testimony for the limitations defense.

### ii.   Damages Determinations Do Not Render the Case Unmanageable.

126.   The Defendants last argue that damages calculations pose intractable management problems in this case.  The Court disagrees.  As the Court mentioned earlier, the payment methodology to which the Plaintiffs argue that they are entitled is simple enough to compute: (i) for NGLs, start with the Defendants' arm's length sale proceeds, allocate the proceeds attributable to each well by dividing the total proceeds by each well's wellhead GPM, and then divide each well's attributable proceeds by the royalty fraction specified in its lease; and (ii) for residue gas, start with the Defendants' arm's length sale proceeds, allocate the proceeds attributable to each well by dividing the total proceeds by each well's wellhead MMBtu -- reduced to compensate for the separate payment on NGLs[106] -- and then divide each well's attributable proceeds by the royalty fraction specified in its lease.  This calculation is simple

---

[106]Residue gas royalties might be payable on a purely volumetric (MCF) basis.  Whether this approach is fair and practical depends upon whether all natural gas has the same Btu factor -- MMBtus per MCF -- once all NGLs are removed.  The only factors that cause natural gas to vary in its Btu factor are: (i) the gas' entrained NGL content -- which is negated when royalties are paid separately on NGLs; and (ii) the amount of impurities, particularly carbon dioxide, in the gas.  The Court gets the impression that (ii) does not have a great impact on the gas' Btu factor, i.e., although it may be important to remove carbon dioxide and water from the gas for safety and transportation reasons, and to produce a burnable fuel, these impurities are not present in large enough quantities to substantially affect the gas' Btu factor.

enough, despite the Defendants' attempts to obfuscate the process with their references to intermingling and their suggestions that virtually every damages component must be calculated on a well-by-well basis.

127.    It appears that the wellhead meter's GPM readout reports only the total NGLs in the gas, rather than giving separate readouts for butane, propane, pentane, et cetera.  It is true that some NGL constituents are more valuable than others, and, if the more detailed information is available, it should be used in allocating any damages among the class.  If a wellhead NGL-constituent breakdown is not available, however, the case is still manageable.  First, this issue goes only to damages distribution and not to the Defendants' overall damages,[107] and thus looser proof should be required.  Second, if certain information is not kept, or the calculations involved are too confusing to be submitted to a jury or examined in court, then: (i) the Defendants are probably not expected to pay royalties under that fine of a methodology; and (ii) even if they are, the resultant uncertainties in damages would persist even in individual litigation, and, thus, do not militate against the use of the class-action form.  For example, the Defendants argue that: (i) gas from multiple wells is intermingled, and one cannot assume that all the gas from any given well goes to any given plant; (ii) a large portion of gas that goes to some processing plants

---

[107]This statement is not entirely complete.  For simplicity's sake, the Court has written this section as if the class wells produced every molecule of gas and NGLs that the four plants involved ultimately sold.  The hydrocarbons that the four plants sold, however, also includes gas and NGLs from federal and Indian-owned wells that are excluded from the class.  Additionally, some would-be class members will opt out of the class.  The Defendants' total sale proceeds will have to be reduced at the front end of the royalty calculation to account for hydrocarbons that originated from the excluded and opt-out wells.  This calculation is fairly easy to conduct.

It is theoretically possible, however, that NGLs from excluded wells have a higher proportion of higher value NGL constituents, like pentane, than the class wells do, and, if that were the case, paying a flat rate for NGLs would overcompensate the class.  There is no evidence to suggest that the class members' NGL production is not constitutionally identical to that of the Indian tribes and the federal government.  Any such variation will almost certainly be negligible, and the Defendants are welcome to introduce evidence showing otherwise.

get bypassed, and it is impossible to know which class members to pay for NGLs, because, if wellhead GPM is used, it cannot be known whether those exact NGLs were ultimately bypassed or processed and sold; and (iii) operating costs and fuel consumption varies among the plants, and even a single plant's costs vary over time.   None of these issues makes this class unmanageable.

128.   No royalty-payment methodology takes into account intermingling and pays well owners separately for gas that ends up at separate wells.   No methodology tracks which molecules of gas are bypassed and from what well that molecule hails.   Even if the Plaintiffs were asking for a royalty methodology that does those things -- and by arguing for a netback methodology, they are expressly not arguing as much -- the calculations would be just as impractical or impossible in individual litigation as they are in class litigation.   They are red herrings, inserted into the case to sow confusion and conjure up individual issues.   Hydrocarbons are measured for volume, MMBtu content, and NGL content, at the point when they pass through the wellhead meter; they are measured again at the point of sale.   Those two measurements -- and the lump sum of any legally deductible post-production costs that the Defendants incur in between -- are all that is needed to construct a workable damages model. Thus, damages calculations do not render the case unmanageable.

## C.   THE NMPPA CLAIMS ARE ALSO NOT CERTIFIABLE UNDER RULE 23(b)(3).

129.   Having addressed the underpayment claims, the Court now turns to the NMPPA claims and concludes that they, too, do not meet rule 23(b)(3)'s demands.   Substantively, the NMPPA provides that royalty owners are entitled to be paid "not later than forty-five days after the end of the calendar month within which payment is received by payor for production."   N.M. Stat. Ann. § 70-10-3.   If the payor cannot determine to whom to pay royalty, it must create a

suspense account and keep the funds in suspense until the identity of the proper payee is ascertained; in-suspense funds accrue at an interest rate that is one-and-one-half percent higher than that set by the federal reserve bank of Dallas.  See N.M. Stat. Ann. § 70-10-4.  If the payor fails to pay in a timely fashion and that failure cannot be attributed to an excusable failure to ascertain the identity of the proper payee, then the payor owes eighteen-percent annual interest on the late payments.  See N.M. Stat. Ann. § 70-10-5.  Whether a failure to pay is excusable -- and thus triggers § 70-10-4B's lower interest rate rather than § 70-10-5's higher, punitive interest rate -- is determined by whether "the payor has been furnished with the information required by Section 70-10-3.1."  N.M. Stat. Ann. § 70-10-5.  Section 70-10-3.1 is entitled "duty to locate" and  provides:

> A.     The operator or lessee arranging for the sale of oil and gas shall furnish the payor with the name, the address and the percentage of interest of each person to whom payment is to be made, as well as proof of marketable title to all of the oil and gas to be sold.
>
> B.     The payor shall make a diligent effort to furnish each interest owner with a reasonable division or transfer order that will set forth the proper interest to which the interest owner is entitled, as well as the mailing address to which payment may be directed.
>
> C.     If the purchaser or payor is unable to locate any person listed by the operator or lessee then the purchaser or payor shall notify the operator or lessee that he has been unable to locate or obtain the address of the person entitled to payment.

N.M. Stat. Ann. 70-10-3.  The NMPPA trumps contravening lease language, thus obviating any need for the Court to individually examine the leases to determine whether they provide for different payment periods.  See First Baptist Church of Roswell v. Yates Petrol. Corp., 2014-NMSC-004, ¶¶ 9-20 (N.M. 2014)(Vigil, C.J.).

130.     Little is established about the mechanics of an NMPPA claim beyond the fact that, in federal court, at least, no NMPPA claim may lie absent some underlying claim --

typically an underpayment claim.  See Elliott, 407 F.3d at 1120 ("[I]n order to maintain a Payment Act claim, Elliott must allege a potentially successful claim for underpayment of royalties or theory of liability showing that it is 'legally entitled to such payments.'"  (quoting N.M. Stat. Ann. § 70-10-3)).  The Plaintiffs have not satisfied that requirement.  Moreover, the allocation of the burden of proof for triggering the various statutory elements is unclear, and so the Court must interpret the statute as best it can.  The Court concludes that the initial burden of showing that a payment was made outside the forty-five-day window rests with the Plaintiffs, as this showing seems to be a prima facie element of an NMPPA claim.  After that, late payments are presumed to be inexcusable and thus subject to § 70-10-5's punitive eighteen-percent interest rate, unless the Defendants prove that they lacked the information outlined in § 70-10-3.1.  Section § 70-10-3.1 divides the "duty to locate" -- i.e., the obligation to ascertain the proper payee's identity -- between the payor and "[t]he operator or lessee," who, in this case, are the same entities: the Defendants.  N.M. Stat. Ann. § 70-10-3.1.  In addition to being sound statutory interpretation, allocating the burden in this fashion also places the burden of proof on the party that has the information; if the Defendants lacked § 70-10-3.1 information and kept funds in suspense as a result, then they will have records proving as much.

131.    The Court concludes that the NMPPA claims are substantively separate from the underpayment claims.  The Court also thinks that it could manage them more easily.  They do not satisfy predominance, however, and, thus, the Court also declines to certify them.

### 1.    Neither Commonality Nor Predominance Is Satisfied.

132.    The Plaintiffs state that they have records showing when payments were made outside the NMPPA's forty-five-day window, and the Defendants do not dispute this assertion. This case could be managed by having the Plaintiffs present each instance in which they believe

a payment was made late; the Defendants could dispute that any given payment was made late, and the Plaintiffs would bear the burden of proving lateness.  Next, the Defendants could argue that all or a certain number of the late payments were properly in suspense, and thus subject to § 70-10-4B's interest rate.  The Plaintiffs could dispute that any given in-suspense payment was properly in suspense under § 70-10-3.1, and the burden would rest with the Defendants to prove that the payment was properly in suspense.  Last, to calculate damages, whatever the Defendants actually paid could be subtracted from the amount to which the Plaintiffs were legally entitled. The Plaintiffs' expert, Ley, testified at the hearing that she has calculated NMPPA damages many times before and that it tends to be fairly easy.  See Tr. at 178:18-179:8 (Brickell, Ley). Unfortunately for the Plaintiffs, manageability is not the same as predominance.  While this management plan is easy enough, it presents effectively no common issues.  Although there is a common legal standard under the NMPPA, these claims are really about the Defendants' late payments -- which will vary from class member to class member, as will the reasons for the Defendants' tardiness.  Thus, neither commonality nor predominance is satisfied.

### 2.        The NMPPA Claims Satisfy Superiority.

133.    It is even less likely that the NMPPA claims could be pursued as individual actions than the underpayment claims.  They are not valuable enough to render individual litigation financially worthwhile.[108]  Furthermore, the NMPPA claims could not even be brought separately in their own class action; under Elliott, NMPPA claims may exist only as tagalong

---

[108]The parties have presented no evidence regarding the magnitude of these claims, i.e., how many dollar-years of late payments there are that are subject to each of § 70-10-4 and -5.  The damages for the NMPPA claims reflect only improperly withheld interest on late payments, and it appears that only a small portion of royalty payments were made outside the 45-day window.  Ward, the WPX Energy employee responsible for handling late payments and prior-period adjustments, could not recall any specific instances of late payments.  See Tr. at 465:15-466:6 (Brickell, Ward).  One of the Plaintiffs' witnesses stated that royalties go into suspense only "[o]n occasion."  Tr. at 176:23 (Ley).

claims to one or more underpayment claims.  See Elliott, 407 F.3d at 1120.  Thus, the Court believes that trying the Plaintiffs' NMPPA claims as a class action would be superior to other alternatives and is likely the only way those claims would be heard.

134.    Having reached the end of this analytical journey, the Court has a few parting concerns regarding its ruling in particular and the state of class-action law in general.  The Court well understands that refusing to certify this class likely closes the courthouse doors to the Plaintiffs' claims forever.  It may be true that each Plaintiff has suffered a cognizable wrong. Yet, the costs of proving such wrongs are so large and the reward for prevailing so small that the prospect of thousands of individual actions is unfeasible.  In a negative-value case, such as this, denying certification leaves the Plaintiffs out in the cold, thus violating the deeply rooted principle in American jurisprudence that "every wrong shall have a remedy."  Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 552 U.S. 148, 176-77 (2008)(Stevens, J., dissenting).

135.    That this case is manageable, would be a superior method of trying the Plaintiffs' claims than individual actions, and is likely the only avenue of relief for the Plaintiffs, are all factors that weigh heavily in favor of certifying this class.  Supreme Court and Tenth Circuit precedent, however, ties the Court's hands.  Those courts have repeatedly instructed that, when faced with class certification, district courts must rigorously enforce rule 23's commonality and predominance requirements -- separate and apart from the more plaintiff-friendly superiority test. The Court has done its best to faithfully apply that law.  The Court is concerned, however, that appellate courts' increasing hostility towards class actions is a result of their largely unfounded belief that district courts cannot handle them.  As the foregoing analysis demonstrates, trying class actions like this one takes some elbow grease and some creativity, but it is not impossible. District courts can, and often do, try cases that are at least as difficult as this one.

- 282 -

136.     At the end of the day, district court judges know whether they can try a case.  If they determine that a class action is manageable and more efficient than other alternatives, appellate courts should give some deference to their judgment.  Under this approach, efficiency, manageability, and superiority would drive the class-certification analysis, rather than commonality and predominance.[109]  Such an approach would be a more equitable and pragmatic way to determine class certification than the existing framework.  The Court must follow binding precedent, however, and therefore has no choice but to deny certification.

**IT IS ORDERED** that the Plaintiffs' Motion and Supporting Brief to Determine That This Matter Proceed as a Class Action, filed January 6, 2014 (Doc. 194), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Stan Koop
Stan Koop, PLLC
Norman, Oklahoma

--and--

Stephen R. McNamara
Brian Inbody
McNamara, Inbody & Parrish, PLLC
Tulsa, Oklahoma

--and--

---

[109]The problem with the existing class-certification jurisprudence is underscored by the fact that, if the class members had, at the beginning of the class time period, each sold their interests in the 507 leases to a single individual or entity, that entity's or individual's identical claims -- with all of their manageability issues -- could proceed as a case.

Brian K. Branch
The Law Office of Brian K. Branch
Albuquerque, New Mexico

--and--

Turner W. Branch
Cynthia Zedalis
Branch Law Firm
Albuquerque, New Mexico

--and--

Bradley D. Brickell
Brickell & Associates, PC
Norman, Oklahoma

    *Attorneys for the Plaintiffs*

Sarah Gillett
Dustin L. Perry
Hall Estill Hardwick PC
Tulsa, Oklahoma

--and--

Christopher A. Chrisman
Holland & Hart LLP
Denver, Colorado

--and--

Mark F. Sheridan
Bradford C. Berge
Robert J. Sutphin
John C. Anderson
Holland & Hart LLP
Santa Fe, New Mexico

    *Attorneys for the Defendants*