## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

THE ANDERSON LIVING TRUST f/k/a THE
JAMES H. ANDERSON LIVING TRUST;
THE PRICHETT LIVING TRUST; CYNTHIA
W. SADLER and ROBERT WESTFALL,

        Plaintiffs,

vs.                                                         No. CIV 12-0040 JB/KBM

WPX ENERGY PRODUCTION, LLC f/k/a
WPX ENERGY SAN JUAN, LLC; WILLIAMS
PRODUCTION COMPANY, LLC and WPX
ENERGY ROCKY MOUNTAIN, LLC f/k/a
WILLIAMS PRODUCTION RMT
COMPANY, LLC,

        Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

      **THIS MATTER** comes before the Court on the Plaintiffs' Motion for a Scheduling Conference, filed March 31, 2015 (Doc. 279)("Motion"). The Court held a hearing on May 12, 2015. The primary issues are: (i) whether the Court should reopen discovery on issues relevant only to class certification; and (ii) whether the Court should set a scheduling conference to establish deadlines applicable to the remainder of this case. As to the first issue, the Court will not reopen class certification discovery, because the Plaintiffs had a full and fair opportunity to develop evidence supporting their class certification evidence in the first round of discovery, and because reopening discovery at this stage would prejudice the Defendants and needlessly delay the case's progress. As to the second issue, the Court will set a status conference for June 2, 2015 at 9:00 a.m., for the purpose of planning the merits discovery, pre-trial, and trial stages of

the named Plaintiffs' case.  The Court will, however, vacate that hearing if the Plaintiffs file a motion to reconsider before that date.

## FACTUAL BACKGROUND

The Court has summarized the Plaintiffs' factual allegations on numerous occasions, see Memorandum Opinion at 5-9, filed June 28, 2013 (Doc. 108); Memorandum Opinion and Order at 2-6, filed May 16, 2014 (Doc. 246); Memorandum Opinion at 3-6, filed May 26, 2015 (Doc. 284), and has even made extensive -- albeit tentative -- factual findings for the purposes of deciding whether to certify this case as a class action, see Memorandum Opinion and Order at 3-75, filed March 19, 2015 (Doc. 278)("Class Certification MOO").  This case is a proposed class action on behalf of landowners who executed long-term leases with the Defendants.  See Fourth Amended Complaint for Underpayment of Oil and Gas Royalties ¶ 26, at 10-12, filed September 27, 2013 (Doc. 129)("Complaint").  The leases, which were executed, for the most part, in the 1940s, allow the Defendants to drill for natural gas on the Plaintiffs' land in exchange for a royalty payment -- usually one-eighth of the proceeds from sale.  See Complaint ¶ 26, at 10-12. The Plaintiffs contend that the Defendants have been underpaying the royalties in a number of ways[1] -- most notably by paying royalty on natural-gas liquids at the same price per MMBtu[2]

---

[1]In addition to underpaying on natural-gas liquids, the Plaintiffs also allege that the Defendants improperly deduct the costs of rendering the gas into marketable condition, see Complaint ¶¶ 102-105, at 32-33, that the Defendants have failed to compensate the Plaintiffs for gas that the Defendants used off the leased premises to operate machinery, see Complaint ¶ 39, at 16, that the Defendants have made late royalty payments without adding the statutorily prescribed interest, see Complaint ¶¶ 56-61, at 20-21, that the Defendants based their royalty price off of affiliate-sale prices, rather than proceeds yielded at arm's length transactions, see Complaint ¶ 33, at 14, and that the Defendants have improperly averaged royalty payments across multiple wells, thus resulting in some Plaintiffs being underpaid, see Complaint ¶ 12, at 5.

[2]An MMBtu is 1,000,000 Btus.  A Btu is a "British thermal unit," which is a unit of energy equivalent to approximately 1,055 joules.  The joule (J) is the SI -- or International

that they pay for natural gas, which is a cheaper product -- since time immemorial, and they are seeking damages for this underpayment going back to 1985.  See Complaint ¶ 33, at 14.

The named Plaintiffs are individuals and trusts owned by individuals with no in-depth knowledge of the oil-and-gas industry, although their levels of oil-and-gas sophistication, of course, vary from Plaintiff to Plaintiff.  Owing to the age of the leases, no Plaintiff personally executed the lease that now pays his or its royalty; rather, all of the named Plaintiffs inherited their royalty interests.  See Complaint ¶ 26, at 10-12.  The only consistent information[3] that the Plaintiffs receive regarding their royalties are their monthly check stubs, which contain figures -- broken down by well, for those Plaintiffs who own royalty interests in more than one well -- for the total "price," "quantity," "value," "deductions," and "net [proceeds]" of all gas recovered from the Plaintiff's well over that payment period, and the "interest," "paid int[erest]," "value," "deductions," and "net share" of the Plaintiff's royalty.  E.g., Check Stubs of James H. Anderson Living Trust (dated over numerous years), filed with the Court during the class certification proceedings as Plaintiffs' Ex. 1.  See Complaint ¶¶ 86-87, at 26-27; id. ¶ 95, at 28-29.  The Plaintiffs also receive the actual checks, which contain only the final dollar figure of the royalty

---

System of Units -- unit of energy, and it is the amount of energy required to exert one Newton (N) of force over a distance of one meter.  A Newton is the amount of force required to accelerate one kilogram of mass by one meter per second-squared.  See Class Certification MOO ¶¶ 66-67 & nn.6-7, at 16.

[3]By "consistent information," the Court means the only information that the entire class received, consistently, from 1985 to present.  According to the Complaint, the check stubs are the only affirmative representations that the Defendants made to the Plaintiffs regarding royalty calculations.

The Defendants, it turns out, have a staff member whose full-time job is to field questions from royalty owners, like the Plaintiffs.  The Defendants presented evidence at the class certification hearing showing that a small but significant number of putative class members called to inquire about their royalty payments.

payout for that payment period.  See, e.g., Check Stubs of James H. Anderson Living Trust at 1-2.

## PROCEDURAL BACKGROUND

The Plaintiffs filed their case in state court on October 20, 2011, see Anderson Living Trust v. Williams Prod. Co., D-117-CV-2011-00511 (1st Jud. Dist. Ct., Cnty. of Rio Arriba, State of N.M.)(Raphaelson, J.), and the Defendants removed the case to federal court on January 12, 2012, see Notice of Removal, filed January 12, 2012 (Doc. 1), invoking federal subject-matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d).  Upon removal, the Court bifurcated discovery in the case into a class certification phase and a merits phase, which were to be separated by a class certification hearing.  See Scheduling Order, filed August 17, 2012 (Doc. 65).  The Court set "the termination date for class certification discovery [on] April 1, 2013," and stated that "discovery shall not be reopened, nor shall case management deadlines be modified, except . . . upon a showing of good cause."  Scheduling Order at 1.  The Court later pushed this deadline back to December 5, 2013, and reaffirmed its earlier warning that "discovery shall not be reopened" after that date.  Amended Scheduling Order at 1, filed October 2, 2013 (Doc. 133).  See Order Granting Joint Motion to Modify Scheduling Order, filed January 3, 2013 (Doc. 81).

The Court held its class certification hearing in the Spring of 2014, holding the first three days on March 10, 11, and 12, and the last two days on April 3 and 4.  See Class Certification MOO at 1.  On March 19, 2015, the Court issued its Class Certification MOO denying class certification on commonality, see Fed. R. Civ. P. 23(a)(2), and predominance, see Fed. R. Civ. P. 23(b)(3), grounds, see Class Certification MOO at 283.  The Court concluded that textual variations among the class members' leases destroyed any possibility of class treatment.  See

Class Certification MOO at 2.  The Court pointed out that the Plaintiffs had particularly failed to carry their burden vis-à-vis the overriding-royalty interests, as the Plaintiffs' expert witness had testified at the hearing that they were all different from one another; additionally, the Plaintiffs did not even obtain in discovery many of the assignments giving rise to these interests.  See Class Certification MOO at ¶ 43, at 10; id. at 232 n.80.

The Plaintiffs filed the Motion on March 31, 2015.  The Motion is a relatively lean document with roughly two pages of content, and it requests that the Court set a scheduling conference to discuss "establish[ing] a discovery and hearing schedule," through which they can obtain "additional discovery related to the production characteristics of the class wells" -- in particular, the class overriding-royalty interests.  Motion ¶¶ 3, 4, at 2.  The Defendants responded seventeen days later, noting that, while they do not oppose a scheduling conference for the limited purpose of planning discovery and trial on the named Plaintiffs' claims, they do oppose reopening discovery on class certification issues, i.e., issues that relate to absent class members. See Defendants' Response to Plaintiffs' Motion for Scheduling Conference at 1 & n.1, filed April 17, 2015 (Doc. 280)("Response").  They assert that Smith v. United States, 834 F.2d 166 (10th Cir. 1987)("Smith"), sets forth the United States Court of Appeals for the Tenth Circuit's test for reopening discovery and that the Plaintiffs' request fails to satisfy that test.  See Response at 2.

The Defendants argue that Smith sets forth six factors that the Court must assess when deciding whether to reopen discovery: (i) whether trial is imminent; (ii) whether the request is opposed; (iii) whether reopening discover would prejudice the non-moving party; (iv) whether the moving party was diligent in obtaining discovery within the guidelines that the Court established; (v) the foreseeability of the need for additional discovery in light of the amount of

time that the Court allocated for discovery in the first instance; and (vi) the likelihood that the requested discovery will uncover relevant evidence. See Response at 10 (citing Smith, 834 F.2d at 169). The Defendants argue that none of these factors cuts in favor of reopening discovery. See Response at 10. As to the first factor, the Defendants substitute "class certification" for "trial," and note that "the class certification hearing is beyond imminent -- it is over." Response at 10. The Defendants win the second factor, of course, merely by virtue of opposing the Motion, and, as to the third factor, they state that they would be prejudiced both by the additional delay in the trial and by the new discovery impositions -- many of which, the Defendants assert, would be repetitive of demands with which they have already complied. See Response at 10-11. The Defendants also assert that discovery compliance "disrupt[ed]" their business the first time, as its "personnel spent weeks identifying, pulling, segregating, isolating and indexing the company's files." Response at 10. They also point out that their discovery-related legal fees are not limited to their trial counsel, Holland & Hart, LLP, but include specific discovery counsel, Hall Estill Hardwick P.C. See Response at 11. The Defendants address the fourth and fifth factors together, contending that the "Plaintiffs were well aware of the significance of the content of the leases and assignments to class certification analysis by reason of the Tenth Circuit's decision in Wallace v. Roderick Revocable Living Trust v. XTO Energy, Inc., 725 F.3d 1213 (10th Cir. 2013)[("Roderick")]."[4] Response at 11. The Defendants assert that they "informed

---

[4]Roderick was an important decision, upon which the Court relied heavily in its Class Certification MOO; the case stands for the proposition that the Court may not simply treat a class with significant intra-class lease-language variations as if all class members' leases were identical. See Class Certification MOO passim. The Court notes, however, that the Tenth Circuit issued Roderick on July 9, 2013 -- about three-and-a-half months after the initial close-of-discovery date and a little less than five months before the extended deadline. Compare Roderick (issued July 9, 2013), with Scheduling Order at 1 (setting a close-of-discovery date for the class certification phase on April 1, 2013), and Amended Scheduling Order at 1 (pushing the

Plaintiffs and the Court of the labor-intensive and time-consuming task of searching for and locating the lease assignments creating the overriding royalty interests subject to the class claims," and the Plaintiffs opted not to spend the time and money necessary to obtain the assignments. Response at 11. The Defendants also state that they made all the assignments they had in their possession available to the Plaintiffs for review, but the Plaintiffs declined the review any of the New Mexico assignments.[5] See Response at 6-9, 11. The Defendants also assert that, "[w]ith one exception early in 2012, at no point did Plaintiffs state they needed any additional time, let alone additional discovery." Response at 3. As to the sixth factor, the Defendants twist the factor slightly, interpreting "relevant evidence" as, basically, evidence likely to change the Court's mind about certification. See Response at 12. The Defendants assert that the variations in royalty-provision terminology among the class make certification impossible, and that obtaining hardcopies of the assignments will not change the Court's analysis. See Response at 12.

In addition to the Smith factors, the Defendants also analyze the Motion under the general rule 16 "good cause" standard for modifying a scheduling order. Response at 12-15. They argue, generally, that good cause is based on the Plaintiffs' diligence, and that "nothing in Plaintiffs' motion shows that anything they propose to do now could not have been done within the deadlines set in the Amended Scheduling Order through diligent efforts." Response at 13.

---

class certification close-of-discovery date back to December 5, 2013). The Plaintiffs thus formulated their discovery plan without knowledge of Roderick, and, even once the Tenth Circuit issued the opinion, it often takes parties a little time to discover a case and realize its significance.

[5]The Defendants assert that "[t]he vast majority of overriding royalty interests of the putative class are located in New Mexico." Reponse at 11 n.14.

The Court held a hearing on May 12, 2015.  <u>See</u> Transcript of Hearing (taken May 12, 2015)("Tr.").[6]  At the hearing, the Plaintiffs clarified that the primary purpose of their request to reopen discovery was to obtain proposed class members' assignments from various public sources, including the New Mexico State Land Office, the federal Bureau of Land Management, and several county clerks' offices.  <u>See</u> Tr. at 3:9-9:15 (Brickell); <u>id.</u> at 35:15-25 (Sutphin).  They stated that they had based their presentation at the class certification hearing on an implied-covenant-to-market theory, which would not require separate treatment of the different lease forms, and that "that is why [they] had not, prior to this time, done as careful a job and as good a job as we could have done to analyze the individual lease language, as well as go to" the Bureau of Land Management to obtain the assignments.  Tr. at 12:1-8 (Brickell).  The Plaintiffs stated that they did not know how long it would take to complete all the discovery they request, but that 120 days should suffice.  <u>See</u> Tr. at 12:9-15 (Brickell).

The Defendants strenuously opposed the Motion, first arguing that the Plaintiffs had blindsided them with their requests.  <u>See</u> Tr. at 12:25-13:10 (Sutphin).  The Defendants contended that they came to the hearing with no more information than was in the Motion itself, and that, before the hearing began, the Plaintiffs had provided them with a "handout" page or packet containing "extensive information" about their discovery plan,[7] leaving the Defendants flat-footed and unable to respond effectively.  Tr. at 14:10-18 (Sutphin).  The Defendants stated:

> I guess the biggest surprise to me is that -- really three things.  What plaintiffs knew going into the class certification hearing last March, what they knew about their claims and about the state of the law.  Number two, what evidence was

---

[6]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final version may contain slightly different page and/or line numbers.

[7]The parties did not provide this "handout" to the Court or make it part of the record.

available to them last -- before last March at that time.  And number 3, what they did or did not do about it before last March.

Tr. at 14:23-15:5 (Sutphin).

The Plaintiffs also argued that the Court had blindsided them in its reasoning in the Class Certification MOO and that they needed additional class certification discovery to handle the Court's unexpected approach:

> THE COURT:  Well, the thing that perked up my ears -- and I guess I'd have to go back and read what I did -- was I'll put Mr. Brickell's argument into my words, but that I did something at the motion to dismiss stage on the De Baca standard that then caught them by surprise in the class certification hearing.  Do you know what I'm referring to?

> M[R]. SUTPHIN:  I know that Mr. Brickell mentioned Libby, De Baca, and the implied duty to market, and that the Court had done something.  I'm not sure I fully understood what the Court allegedly did.  Because I think the Court was --

> THE COURT:  It was bad from Mr. Brickell's viewpoint.

> M[R]. SUTPHIN:  Well, two things I would say in response to that, Your Honor.  The Court, I believe, was quite clear on what it did with plaintiffs' implied duty to market claim and why it was doing it.  And I would pose -- number two, I would suggest to the Court that this is nothing more than Monday morning quarterbacking, hindsight on their part.  They are trying to look for any leverage to explain why they didn't do what they did -- should have done the first time around.

> THE COURT:  All right.  Let[s] -- because this [s]eems to be their best leverage.  Mr. Brickell, restate exactly how I think I sandbagged you with -- stay there Mr. Sutphin, I'm going to let you respond it, so that you and I understand it -- it seems to be one of the better leverage points for Mr. Brickell.  So why don't you kind of restate that.

> MR. BRICKELL:  Thank you, Your Honor.  What I was saying was that the plaintiffs were proceeding with this class certification hearing on the principal theory of liability of the breach of the implied duty to market, not the one that encompasses the -- where it encompasses the Marketable Condition Rule, but the one that already exists -- and those exact words came out of Davis versus Devon -- already exist in New Mexico law under Libby versus De Baca.  And my paraphrase of that is that the lessee must do as well for the lessor as he does for himself, including his affiliate companies.  So that he must market the

- 9 -

hydrocarbons for the highest and best price, and pay that over as the percentage to the royalty owners.  Now, if he's allowed under the law to make deductions, then he's allowed under law to make deductions.  But the original price, the original sale, he must do for the lessor what he does for himself.  We felt like that implied duty to market, Your Honor, falls directly under the type of certification that was authorized in Davis versus Devon, also in the Ideal versus Burlington Supreme Court of New Mexico opinion; and that is, you're trying a class action under an implied duty at law, implied to all the leases, regardless of their language, unless -- as found in Roderick -- unless you have a lease that negates the implied duty to market.  So we did our analysis, based on Roderick, to determine if any leases negated this implied duty to market.

Your Honor had ruled, when we raised this very issue, as the Court kicked out our third cause of action on the implied duty to market and Marketable Condition Rule.  And we said, ["]Well, wait a minute, Judge, this third cause of action also includes the implied duty to market under Libby-De Baca; that is, you have to do as well for the lessor as the lessee does for himself.["]

And in the order coming back, you said, ["]No, that's going to stand, the dismissals of the cause of action stands as stated; however, it's noted that your other implied duty to market falls well under your breach of contract on your first cause of action.["]  So you've still got it.  And so, Your Honor, that's how we proceeded in the certification, and why we didn't feel like that going to the individual lease language was necessary, just as the Supreme Court found in Davis versus Devon, because it was implied in law covenant to all the instruments.

Tr. at 22:21-25:25 (Court, Sutphin, Brickell).  The Defendants responded to this line of argument

as follows:

M[R]. SUTPHIN:  Yes, sir, I do.  I understand it probably just a little better now.  I'd like to first say that their implied duty -- breach of the implied covenant to market, breach of the implied duty to market claim has been dismissed not once, but twice.  It was dismissed in the Court's June 2013 memorandum opinion.  Plaintiffs subsequently filed an amended complaint and retooled it as an implied duty to market claim, breach of the implied duty to market.  We moved to dismiss that retooled claim, and it was dismissed as well.  And that order, memorandum opinion and order, was dated May 16, 2014.  So not once, but twice, this Court has dismissed the very claim that Mr. Brickell now claims is central to their second bite at the apple attempt here.

But as to the substance of the claim, even if Mr. Brickell is right; that is, they somehow have an implied duty to market claim, that will not change the Court's result.  Mr. Brickell seems to be of the view that with an implied duty to market claim, the leases don't matter.  That's not what Elliott says.  That's not

what precedent out of other New Mexico courts say. The leases still matter. The leases are not negated. To determine the existence and scope of any implied duty, we have to first look at the contractual obligation, the contractual agreement. And we also have to look at the intent of the parties, as informed by extrinsic evidence, to understand what the contractual agreement was.

So this notion that because they somehow had a claim, that survived two orders of dismissal, that is central to their case, and because that claim should be in the case, the lease analysis doesn't matter, is just wrong. It's just wrong as a matter of fact and as a matter of law.

And let me say this, too, Your Honor, if they believed that the Court erred in their implied duty to market claim, either on the first dismissal or on the second dismissal, they could have moved for reconsideration then. They could have said: Your Honor, you misunderstood what we were alleging, and you shouldn't have dismissed based on this clarification. They didn't do it. Why should . . . they [be] allowed to wait until after they get a class certification decision to come in and ask the Court to basically reconsider its dismissal of the claims, not once, but twice.

After this Court sat through five days, multiple witnesses, fact and expert, hundreds of exhibits. And the Court went to the great lengths to write a 283-page opinion, as detailed in fact and law as any I've ever seen. It was clearly a burden on this Court to do that, only to -- on the basis that the Court erred in dismissing a claim two years ago revisited, is just not right, Your Honor. It can't meet <u>Servants of the Paracletes</u> test, if the Court would treat this as a reconsideration, which it should. And it certainly can't meet the <u>Smith</u> reopening discovery test, or the 16(b) good cause diligence test.

Tr. at 26:13-28:23 (Sutphin).

The Court asked what the process was after a Court denies class certification, <u>i.e.</u>, do the Plaintiffs get another bite at the certification apple and, if so, under what circumstances. <u>See</u> Tr. at 18:20-19:10 (Court). The Defendants responded that the Plaintiffs would have to move the Court, pursuant to rule 59(e), to reconsider its denial; they argued that, in the Tenth Circuit, <u>Servants of the Paraclete v. Does</u>, 204 F.3d 1005 (10th Cir. 2000), governs such motions. <u>See</u> Tr. at 20:6-21:4 (Sheridan). The Defendants stated that the Court had been "quite clear on what it did with the plaintiffs' implied duty to market claim and why it was doing it," and that this claim "has been dismissed not once, but twice[:] . . . in the Court's June 2013 memorandum

opinion[;] . . . [and on] May 16, 2014" -- after the Plaintiffs had "retooled" their claim as one for breach of the implied covenant to market, rather than for breach of the marketable-condition rule. Tr. at 23:12-14 (Sutphin); id. at 26:17-25 (Sutphin).  The Defendants asked the Court to set up a discovery plan for going forward with the named Plaintiffs' case only and, additionally, asked the Court to set a settlement conference.  See Tr. at 33:20-34:17 (Sutphin, Court).  The Defendants did not advance a specific timeframe for the remaining discovery and pre-trial work, but stated that it "[sh]ouldn't be too extensive"; when pressed, they offered "90 to 120 days."  Tr. at 34:18-35:5 (Sutphin).

The Plaintiffs stated that they were not exactly sure what standard the Court should use in reassessing its denial of class certification, but stated that they believed it was routine for the Courts of Appeals to reverse a grant of class certification with instructions for the district court to conduct an entirely new analysis.  See Tr. at 46:14-47:1 (Court, Brickell).  The Court stated that "that's not where we are," because this case has not come down from a Tenth Circuit reversal, but, rather, is on the Court's own denial of certification.  Tr. at 47:2-15 (Court).  When pressed, the Plaintiffs conceded that they did not know what standard the Court should apply.  See Tr. at 47:16-48:9 (Brickell)("Your Honor, anything I would say right now, without doing a little more research on it, would be pure speculation.").

The Plaintiffs also stated that they could get the majority of what they wanted -- the class assignments -- without formal discovery, simply by making requests with local public authorities.  See Tr. at 43:23-44:13 (Court, Brickell).  They stated, however, that they still wanted to reopen formal discovery and to obtain "a schedule from the Court that allows [them] to do some additional class certification discovery" -- most notably, on developing parol evidence to show the meaning of some class leases.  Tr. at 44:18-46:2 (Brickell).

The Court concluded the hearing as follows:

Well, it seems to me that we need a scheduling conference, one way or another. So I'm proposing holding it on June 2 at 9:00. That will give me some time to get an opinion together for you on what I see moving forward. And it may make it a little difficult for you to come prepared. But everybody needs to -- I think the real issue I need to decide is whether I'm going to allow any future discovery, to include class certification discovery. It seems like a lot of the discovery that you're talking about is discovery that you can do on your own without it necessarily being governed by the Court's pretrial and final scheduling orders. So I need to decide that issue.

And then I guess the second issue -- I'm seeing this as sort of two issues I've got to decide over the next three weeks -- is that issue, whether I'm going to extend class certification, and then build in another motion for class certification. So I'm kind of giving myself 21 days. If anybody has anything they want to say, they can send me a letter on the questions I've asked and the issues.

Is June 2nd okay with everybody? And if I decide I'm not going to do those two things for the plaintiff, then we should be prepared to put this thing on a track for pretrial trial and trial scheduling to get the case resolved with the individual claims. And if I decide then that I'm going to extend class certification discovery and also build into the schedule the opportunity for the plaintiffs to file another class certification, then we'll need to -- I guess, we'll just set those deadlines. So it seems rather discrete to me. But that will give everybody a chance to say anything else they want to say by sending a letter or whatever to the Court, and then I'll be here on June 2 to set the schedule one way or another.

Tr. at 48:14-49:25.  The parties agreed to the Court's proposal.  See Tr. at 50:1-2 (Court, Brickell); id. at 51:1-3 (Court, Sutphin).

Thirteen days after the hearing, the Plaintiffs filed a Notice of Anticipated Filing of Motion to Reconsider, filed May 26, 2015 (Doc. 285)("Notice").  The Notice is one-page long, and it states:

At the recent motion hearing on May 12, 2015, this Court set a Scheduling Conference for June 2, 2015. The Court allowed the parties to file a Bench Memorandum addressing the standard for a District Court to alter or amend a decision under Fed. R. Civ. P. 23 on or before May 26, 2015. The Court further stated that if the Plaintiffs filed a Motion to Reconsider th[e] . . . Class Certification [MOO], prior to the Scheduling Conference, then the Scheduling Conference and associated issues would be stricken, pending a decision on the

Motion to Reconsider.  Plaintiffs will not be filing such Bench Memorandum and instead will be filing a Motion to Reconsider on or before June 1, 2015 . . . .

Notice at 1 (citations omitted).

## LAW REGARDING THE MODIFICATION OF SCHEDULING ORDERS

"The District Court has wide discretion in its regulation of pretrial matters."  Si-Flo, Inc. v. SFHC, Inc., 917 F.2d 1507, 1514 (10th Cir. 1990).  Scheduling orders, however, "may be modified only for good cause and with the judge's consent."  Fed. R. Civ. P. 16(b)(4).  Accord Street v. Curry Bd. of Cnty. Comm'rs, No. CIV 06-0776 JB/KBM, 2008 WL 2397671, at *6 (D.N.M. Jan. 30, 2008)(Browning, J.).  The advisory committee notes to rule 16 observe:

> [T]he court may modify the schedule on a showing of good cause if it cannot reasonably be met despite the diligence of the party seeking the extension.  Since the scheduling order is entered early in the litigation, this standard seems more appropriate than a "manifest injustice" or "substantial hardship" test.  Otherwise, a fear that extensions will not be granted may encourage counsel to request the longest possible periods for completing pleading, joinder, and discovery.

Fed. R. Civ. P. 16(b)(4) advisory committee's note to the 1983 amendment.

The Tenth Circuit has held that the concepts of good cause, excusable neglect, and diligence are related.  "The Tenth Circuit . . . has recognized the interrelation between 'excusable neglect' and 'good cause.'"  Pulsecard, Inc. v. Discover Card Servs. Inc., 168 F.R.D. 295, 301 (D. Kan. 1996)(citing In re Kirkland, 86 F.3d 172, 175 (10th Cir. 1996)).  "Properly construed, 'good cause' means that scheduling deadlines cannot be met despite a party's diligent efforts."  Street v. Curry Bd. of Cnty. Comm'rs, 2008 WL 2397671, at *6.  See Advanced Optics Elecs., Inc. v. Robins, 769 F. Supp. 2d 1285, 1313 (D.N.M. 2010)(Browning, J.)(noting that the "rule 16(b) good-cause inquiry focuses on the diligence of the party seeking [to] amend the scheduling

- 14 -

order.").   In <u>In re Kirkland</u>, the Tenth Circuit dealt with the definition of "good cause" in the

context of a predecessor to modern rule 4(m) of the Federal Rules of Civil Procedure[8] and noted:

> [W]ithout attempting a rigid or all-encompassing definition of 'good cause,' it
> would appear to require <u>at least as much</u> as would be required to show excusable
> neglect, as to which simple inadvertence or mistake of counsel or ignorance of the
> rules usually does not suffice, and some showing of 'good faith on the part of the
> party seeking the enlargement and some reasonable basis for noncompliance
> within the time specified' is normally required.

86 F.3d at 175 (emphasis in original)(quoting <u>Putnam v. Morris</u>, 833 F.2d 903, 905 (10th Cir.

1987))(internal quotation marks omitted).   The Tenth Circuit explained that <u>Putnam v. Morris</u>

"thus recognized that the two standards, although interrelated, are not identical and that 'good

cause' requires a greater showing than 'excusable neglect.'"   <u>In re Kirkland</u>, 86 F.3d at 175.

Where a party is diligent in its discovery efforts and nevertheless cannot comply with the

scheduling order, the Court has found good cause to modify the scheduling order if the

requesting party timely brings forward its request.   In <u>Advanced Optics Electronics, Inc. v.

Robins</u>, the Court found that, where the defendant did not conduct discovery or make any good-

faith discovery requests, and where the defendant did not make efforts "diligent or otherwise" to

conduct discovery, the defendant did not, therefore, show good cause to modify the scheduling

---

[8]Rule 4(m) provides:

> If a defendant is not served within 120 days after the complaint is filed, the
> court -- on motion or on its own after notice to the plaintiff -- must dismiss the
> action without prejudice against that defendant or order that service be made
> within a specified time.   But if the plaintiff shows good cause for the failure, the
> court must extend the time for service for an appropriate period.   This subdivision
> (m) does not apply to service in a foreign country under Rule 4(f) or 4(j)(1).

Fed. R. Civ. P. 4(m).   The Tenth Circuit in <u>In re Kirkland</u> interpreted rule 4(j), which was
substantially identical.   <u>See</u> 86 F.3d at 174 ("Rule 4(j) requires the court to dismiss a proceeding
if service has not been made upon the defendant within 120 days after filing and the party
responsible for service cannot show good cause why it was not made.").

order.   769 F. Supp. 2d at 1313 n.8.   In <u>Street v. Curry Board of County Commissioners</u>, however, the Court found that the plaintiff had "shown good cause for a delay in seeking leave to amend," because she "was diligent in pursuing discovery . . . [and] brought to the Court's attention her identification of an additional claim in a timely manner," where she discovered the claim through "documents provided in discovery."  2008 WL 2397671, at *11.  In <u>Montoya v. Sheldon</u>, No. CIV 10-0360 JB/WDS, 2012 WL 5353493 (D.N.M. Oct. 7, 2012)(Browning, J.), the Court did not find good cause to modify the scheduling order and reopen discovery, and refused to grant the plaintiffs' request do so, where the plaintiffs' excuse for not disclosing their expert before the close of discovery was that they thought that the case would settle and they would thus not require expert testimony.  <u>See</u> 2012 WL 5353493, at *14.  The Court noted:

> The [plaintiffs] filed this case on April 15, 2010.  Because [Plaintiff] D. Montoya had seen the physician before that date, the fact that the [plaintiffs] are only now bringing the physician forward as a newly identified expert witness, over two years later, and over one and a half years after the deadline to disclose expert witnesses, does not evidence circumstances in which the Court can find excusable neglect nor good cause.

2012 WL 5353493, at *14.

In <u>Scull v. Management and Training Corp.</u>, 2012 WL 1596962 (D.N.M. May 2, 2012)(Browning, J.), the Court did not grant a plaintiff's request for an extension of time to name an expert witness against a defendant, when the plaintiff asserted that he had waited to name an expert witness until a second defendant joined the case, because, before the second defendant entered the case, a scheduling order was in effect and the plaintiff should have known that he would need to name an expert witness against the defendant already in the case.  <u>See</u> 2012 WL 1596962, at *8.  The Court determined that the plaintiff was seeking "relief from his own disregard" for the deadline.  2012 WL 1596962, at *8.  "Despite his knowledge that [Defendant] PNA had yet to enter the case, [Plaintiff] Scull chose to allow the deadline to pass

without naming expert witnesses against [Defendant] MTC."  2012 WL 1596962, at *8. Regarding the defendant who entered the case at a later date, however, the Court allowed the plaintiff an extension of time to name an expert witness, because it "was not unreasonable for Scull to expect a new deadline to name expert witnesses upon PNA's entrance into the case because he had not yet had the opportunity to engage in discovery against PNA as he had against MTC."  2012 WL 1596962, at *9.  The Court also noted that not naming an expert witness "is a high price to pay for missing a deadline that was arguably unrealistic when it was set," as Scull could not have determined the need for an expert witness until after PNA entered the case.  2012 WL 1596962, at *9.

In Stark-Romero v. National Railroad Passenger Co (AMTRAK), 275 F.R.D. 544 (D.N.M. 2011)(Browning, J.), the Court found that a lawyer had shown excusable neglect when his reason for missing a scheduling deadline was that, soon after his son's wedding, his father-in-law developed a tumor in his chest and the lawyer handled arranging his father-in-law's medical care, and only after the lawyer returned to his work did he realize that a deadline passed.  See 275 F.R.D. 549-50.  The Court noted that the lawyer could have avoided missing the deadline had he not left his work until the last minute, just before his son's wedding, but found that the lawyer had demonstrated good faith and missed the deadline because of "life crises," and not because of his own inadvertence.  275 F.R.D. 549-550.  In West v. New Mexico Taxation and Revenue Department, No. CIV 09-0631 JB/CEG, 2010 WL 3834341 (D.N.M. July 29, 2010)(Browning, J.), the Court allowed a plaintiff extended time to file a response to a defendant's motion for summary judgment, in part because of the difficulty the plaintiff's counsel experienced attempting to obtain depositions with certain defense witnesses, and thus it

was not her fault, and in part because cross-motions on summary judgment are particularly

helpful for the Court:

> [C]ross-motions tend to narrow the factual issues that would proceed to trial and promote reasonable settlements.  In some cases, it allows the Court to determine that there are no genuine issues for trial and thereby avoid the expenses associated with trial.  The Court prefers to reach the merits of motions for summary judgment when possible.

2010 WL 3834341, at *4-5.  On the other hand, in <u>Liles v. Washington Tru Solutions, LLC</u>, No.

CIV 06-854 JB/CEG, 2007 WL 2298440 (D.N.M. June 13, 2007)(Browning, J.), the Court

denied a plaintiff's request for additional time to respond to a defendant's motion for summary

judgment, when the only rationale the plaintiff provided was that its counsel's "family and

medical emergencies" precluded the plaintiff from timely responding.  2007 WL 2298440, at *2.

## LAW REGARDING DISCOVERY

Rule 34 of the Federal Rules of Civil Procedure govern discovery requests for tangible

objects.  <u>See</u> Fed. R. Civ. P. 34.  Rule 34(a) states:

A party may serve on any other party a request within the scope of Rule 26(b):

> **(1)**    to produce and permit the requesting party or its representative to inspect, copy, test, or sample the following items in the responding party's possession, custody, or control:
>
> > **(A)**    any designated documents or electronically stored information -- including writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations -- stored in any medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form; or
> >
> > **(B)**    any designated tangible things; or

> **(2)**     to permit entry onto designated land or other property
> possessed or controlled by the responding party, so that the
> requesting party may inspect, measure, survey, photograph,
> test, or sample the property or any designated object or
> operation on it.

Fed. R. Civ. P. 34(a).  Rule 26(b)(1) explains that the proper scope of discovery is "any

nonprivileged matter that is relevant to any party's claim or defense."  Fed. R. Civ. P. 26(b)(1).

Information sought is relevant "if the discovery appears reasonably calculated to lead to

discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1).  Federal courts have held that the

scope of discovery under rule 26 is broad.  See Gomez v. Martin Marrietta Corp., 50 F.3d 1511,

1520 (10th Cir. 1995); Sanchez v. Matta, 229 F.R.D. 649, 654 (D.N.M. 2004)(Browning, J.)

("The federal courts have held that the scope of discovery should be broadly and liberally

construed to achieve the full disclosure of all potentially relevant information.").  The federal

discovery rules reflect the courts' and Congress' recognition that "mutual knowledge of all the

relevant facts gathered by both parties is essential to proper litigation."  Hickman v. Taylor, 329

U.S. 495, 507 (1947).  As a result of this policy, rule 26 "contemplates discovery into any matter

that bears on or that reasonably could lead to other matter that could bear on any issue that is or

may be raised in a case."  Anaya v. CBS Broad., Inc., 251 F.R.D. 645, 649-50 (D.N.M.

2007)(Browning, J.)(internal quotations marks omitted).

A district court is not, however, "required to permit plaintiff to engage in a 'fishing

expedition' in the hope of supporting his claim."  McGee v. Hayes, 43 F. App'x 214, 217 (10th

Cir. 2002)(unpublished).[9]  "'Discovery . . . is not intended to be a fishing expedition, but rather is

---

[9]McGee v. Hayes is an unpublished opinion, but the Court can rely on an unpublished
opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R.
32.1(A), 28 U.S.C. ("Unpublished opinions are not precedential, but may be cited for their
persuasive value.").  The Tenth Circuit has stated: "In this circuit, unpublished orders are not

meant to allow the parties to flesh out allegations for which they initially have at least a modicum of objective support.'" Rivera v. DJO, LLC, No. CIV 11-1119 JB/RHS, 2012 WL 3860744, at *1 (D.N.M. Aug. 27, 2012)(Browning, J.)(quoting Tottenham v. Trans World Gaming Corp., No. CIV 00-7697 WK, 2002 WL 1967023, at *2 (S.D.N.Y. June 21, 2002)(Knapp, J.)). See Hardrick v. Legal Servs. Corp., 96 F.R.D. 617, 618 (D.D.C. 1983)(noting that courts do, and should, remain concerned about "fishing expeditions, discovery abuse and inordinate expense involved in overbroad and far-ranging discovery requests")(internal quotation marks omitted). "[B]road discovery is not without limits and the trial court is given wide discretion in balancing the needs and rights of both plaintiff and defendant." Gomez v. Martin Marietta Corp., 50 F.3d at 1520 (internal quotation marks omitted).

Courts have recognized that, while it is true that relevancy in discovery is broader than that required for admissibility at trial, "the object of inquiry must have some evidentiary value before an order to compel disclosure of otherwise inadmissible material will issue." Zenith Elecs. Corp. v. Exzec, Inc., No. CIV 93-5041 BMM, 1998 WL 9181, at *2 (N.D. Ill. Jan. 5, 1998). Courts have also recognized that "[t]he legal tenet that relevancy in the discovery context is broader than in the context of admissibility should not be misapplied so as to allow fishing expeditions in discovery." Zenith Elecs. Corp. v. Exzec, Inc., 1998 WL 9181, at *2 (internal quotation marks omitted).

---

binding precedent, . . . and . . . citation to unpublished opinions is not favored. . . . However, if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision." United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court concludes that McGee v. Hayes has persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

Rule 26(b)(1) was amended in 2000.  Before the 2000 amendments, rule 26(b)(1) defined the scope of discovery as follows:

> Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending actions, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter.   The information sought need not be admissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

Fed. R. Civ. P. 26(b)(1)(1996).  The 2000 amendments made the following changes, shown here in redline form with the deleted language stricken and the added material underlined:

> Parties may obtain discovery regarding any matter, not privileged, that ~~which~~ is relevant to ~~the subject matter involved in the pending actions, whether it relates to~~ the claim or defense of ~~the party seeking discovery or to the claim or defense of~~ any ~~other~~ party, including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter.  <u>For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action.  Relevant</u> ~~The~~ information ~~sought~~ need not be admissible at the trial if <u>discovery</u> the ~~information sought~~ appears reasonably calculated to lead to the discovery of admissible evidence.

Fed. R. Civ. P. 26(b)(1).  Putting aside the changes to the last sentence -- which the advisory committee's notes make clear was a housekeeping amendment to clarify that inadmissible evidence must still be relevant to be discoverable -- the 2000 amendments have two effects: (i) they narrow the substantive scope of discovery in the first sentence; and (ii) they inject courts into the process in the entirely new second sentence.

> In 1978, the Committee published for comment a proposed amendment, suggested by the Section of Litigation of the American Bar Association, to refine the scope of discovery by deleting the "subject matter" language.  This proposal was withdrawn, and the Committee has since then made other changes in the discovery rules to address concerns about overbroad discovery.  Concerns about costs and delay of discovery have persisted nonetheless, and other bar groups have repeatedly renewed similar proposals for amendment to this subdivision to delete the "subject matter" language.  Nearly one-third of the lawyers surveyed in

1997 by the Federal Judicial Center endorsed narrowing the scope of discovery as a means of reducing litigation expense without interfering with fair case resolutions. Discovery and Disclosure Practice, supra, at 44-45 (1997). The Committee has heard that in some instances, particularly cases involving large quantities of discovery, parties seek to justify discovery requests that sweep far beyond the claims and defenses of the parties on the ground that they nevertheless have a bearing on the "subject matter" involved in the action.

The amendments proposed for subdivision (b)(1) include one element of these earlier proposals but also differ from these proposals in significant ways. The similarity is that the amendments describe the scope of party-controlled discovery in terms of matter relevant to the claim or defense of any party. The court, however, retains authority to order discovery of any matter relevant to the subject matter involved in the action for good cause. The amendment is designed to involve the court more actively in regulating the breadth of sweeping or contentious discovery. The Committee has been informed repeatedly by lawyers that involvement of the court in managing discovery is an important method of controlling problems of inappropriately broad discovery. Increasing the availability of judicial officers to resolve discovery disputes and increasing court management of discovery were both strongly endorsed by the attorneys surveyed by the Federal Judicial Center. See Discovery and Disclosure Practice, supra, at 44. Under the amended provisions, if there is an objection that discovery goes beyond material relevant to the parties' claims or defenses, the court would become involved to determine whether the discovery is relevant to the claims or defenses and, if not, whether good cause exists for authorizing it so long as it is relevant to the subject matter of the action. The good-cause standard warranting broader discovery is meant to be flexible.

**The Committee intends that the parties and the court focus on the actual claims and defenses involved in the action. The dividing line between information relevant to the claims and defenses and that relevant only to the subject matter of the action cannot be defined with precision. A variety of types of information not directly pertinent to the incident in suit could be relevant to the claims or defenses raised in a given action. For example, other incidents of the same type, or involving the same product, could be properly discoverable under the revised standard. Information about organizational arrangements or filing systems of a party could be discoverable if likely to yield or lead to the discovery of admissible information. Similarly, information that could be used to impeach a likely witness, although not otherwise relevant to the claims or defenses, might be properly discoverable. In each instance, the determination whether such information is discoverable because it is relevant to the claims or defenses depends on the circumstances of the pending action.**

The rule change signals to the court that it has the authority to confine discovery to the claims and defenses asserted in the pleadings, and signals to the

parties that they have no entitlement to discovery to develop new claims or defenses that are not already identified in the pleadings.  In general, it is hoped that reasonable lawyers can cooperate to manage discovery without the need for judicial intervention.  When judicial intervention is invoked, the actual scope of discovery should be determined according to the reasonable needs of the action.  The court may permit broader discovery in a particular case depending on the circumstances of the case, the nature of the claims and defenses, and the scope of the discovery requested.

The amendments also modify the provision regarding discovery of information not admissible in evidence.  As added in 1946, this sentence was designed to make clear that otherwise relevant material could not be withheld because it was hearsay or otherwise inadmissible.  The Committee was concerned that the "reasonably calculated to lead to the discovery of admissible evidence" standard set forth in this sentence might swallow any other limitation on the scope of discovery.  Accordingly, this sentence has been amended to clarify that information must be relevant to be discoverable, even though inadmissible, and that discovery of such material is permitted if reasonably calculated to lead to the discovery of admissible evidence.  As used here, "relevant" means within the scope of discovery as defined in this subdivision, and it would include information relevant to the subject matter involved in the action if the court has ordered discovery to that limit based on a showing of good cause.

Finally, a sentence has been added calling attention to the limitations of subdivision (b)(2)(i), (ii), and (iii).  These limitations apply to discovery that is otherwise within the scope of subdivision (b)(1).  The Committee has been told repeatedly that courts have not implemented these limitations with the vigor that was contemplated.  See 8 Federal Practice & Procedure § 2008.1 at 121.  This otherwise redundant cross-reference has been added to emphasize the need for active judicial use of subdivision (b)(2) to control excessive discovery.  Cf. Crawford-El v. Britton, 118 S. Ct. 1584, 1597 (1998)(quoting Rule 26(b)(2)(iii) and stating that "Rule 26 vests the trial judge with broad discretion to tailor discovery narrowly").

Fed. R. Civ. P. 26 advisory committee's notes (emphasis added).

One gets the impression from reading the advisory committee's notes that the amendment

was not intended to exclude a delineable swath of material so much as it is intended to send a

signal to district judges to become more hands-on in the process of regulating -- mostly

limiting -- discovery on relevance grounds alone.  The "two effects" of the 2000 amendments

might, thus, be only one effect: directing district judges to roll up their sleeves and manage

discovery, and to do so on the basis of relevance.  The change in substantive scope from "subject matter" to "claim or defense" would, therefore, seem to exist more to "add teeth" to the relevance standard than to effectuate a substantive narrowing.  It is not surprising that Congress would want to increase judicial presence: "relevance" is a wide-open concept even in the context of trial, see Fed. R. Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."), and it is often said that relevance for discovery is an even broader concept.  One might then say that the old rule 26(b)(1)'s relevant-discovery provision was toothless.  It is likewise unsurprising that the rulemakers are unable to articulate precise language narrowing the substantive scope of discovery: no single general rule can adequately take into account the infinite number of possible permutations of different claims, defenses, parties, attorneys, resources of parties and attorneys, information asymmetries, amounts in controversy, availabilities of information by other means, etc.  The determination requires the individualized judgment of someone on the scene, and that presence is what the rulemakers wanted when they: (i) encouraged district judges to take a firmer grasp on the scope of discovery; and (ii) put their thumbs on the scale in favor of narrower discovery in the rule's definition of the scope of discovery.

Of course, courts should also seek to give substantive content to amendments.  Read literally, the rule does not permit parties to discover information relevant only to the claim or defense of another party; they must use discovery only to investigate their own claims and defenses.  More problematically, however, the rule may prohibit using the Federal Rules' compulsory discovery process to obtain "background" information not specifically relevant to any one claim or defense -- e.g., a plaintiff naming a pharmaceutical company as a defendant and

- 24 -

then using discovery to educate itself generally about medicine, biochemistry, and the drug industry by using the defendant's expertise.

In In re Cooper Tire and Rubber Co., 568 F.3d 1180 (10th Cir. 2009), the Tenth Circuit clarified that the 2000 Amendments to rule 26 "implemented a two-tiered discovery process; the first tier being attorney-managed discovery of information relevant to any claim or defense of a party, and the second being court-managed discovery that can include information relevant to the subject matter of the action." 568 F.3d at 1188. The Tenth Circuit further stated that,

> when a party objects that discovery goes beyond that relevant to the claims or defenses, "the court would become involved to determine whether the discovery is relevant to the claims or defenses and, if not, whether good cause exists for authorizing it so long as it is relevant to the subject matter of the action." This good-cause standard is intended to be flexible. When the district court does intervene in discovery, it has discretion in determining what the scope of discovery should be. "[T]he actual scope of discovery should be determined according to the reasonable needs of the action. The court may permit broader discovery in a particular case depending on the circumstances of the case, the nature of the claims and defenses, and the scope of the discovery requested."

568 F.3d at 1188-89 (quoting the advisory committee's notes to the 2000 amendments to Fed. R. Civ. P. 26(b)(1))(citations omitted)(footnote omitted)(alteration in original).

## LAW REGARDING MOTIONS TO ALTER OR AMEND THE JUDGMENT UNDER RULE 59(e)

Rule 59(e) provides: "A motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment." Rule 60 provides in relevant part:

(b)   **Grounds for Relief from a Final Judgment, Order, or Proceeding.** On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:

(1)   mistake, inadvertence, surprise, or excusable neglect;

(2)   newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);

(3)     fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;

(4)     the judgment is void;

(5)     the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

(6)     any other reason that justifies relief.

(c)     **Timing and Effect of the Motion.**

(1)     **Timing.**  A motion under Rule 60(b) must be made within a reasonable time -- and for reasons (1), (2), and (3) no more than a year after the entry of the judgment or order or the date of the proceeding.

(2)     **Effect on Finality.**   The motion does not affect the judgment's finality or suspend its operation.

Fed. R. Civ. P. 60(b)-(c).  The Tenth Circuit has recognized:

Generally, a "motion for reconsideration, not recognized by the Federal Rules of Civil Procedure, Clough v. Rush, 959 F.2d 182, 186 n.4 (10th Cir. 1992), may be construed in one of two ways: if filed within 10 days of the district court's entry of judgment, it is treated as a motion to alter or amend the judgment under Rule 59(e); if filed more than 10 days after entry of judgment, it is treated as a motion for relief from judgment under Rule 60(b)."   Computerized Thermal Imaging, Inc. v. Bloomberg, LP, 312 F.3d 1292, 1296 n.3 (10th Cir. 2002).

Price v. Philpot, 420 F.3d 1158, 1167 n.9 (10th Cir. 2005).  The time limit in rule 59(e) is now twenty-eight days rather than ten days.  See Fed. R. Civ. P. 59(e).

A motion for reconsideration under rule 59(e) is an "inappropriate vehicle[] to reargue an issue previously addressed by the court when the motion merely advances new arguments, or supporting facts which were available at the time of the original motion."  Servants of Paraclete v. Does, 204 F.3d 1005, 1012 (10th Cir. 2000).  "Grounds warranting a motion to reconsider include (1) an intervening change in the controlling law, (2) new evidence previously

unavailable, and (3) the need to correct clear error or prevent manifest injustice."   Servants of

Paraclete v. Does, 204 F.3d at 1012.  "Thus, a motion for reconsideration is appropriate where

the court has misapprehended the facts, a party's position, or the controlling law."  Servants of

Paraclete v. Does, 204 F.3d at 1012.  A district court has considerable discretion in ruling on a

motion to reconsider under rule 59(e).  See Phelps v. Hamilton, 122 F.3d 1309, 1324 (10th Cir.

1997).

Rule 60 authorizes a district court to, "[o]n motion and just terms[,] . . . relieve a party or

its legal representative from a final judgment, order, or proceeding for the following reasons,"

including "any other reason that justifies relief."  Fed. R. Civ. P. 60(b).  A court cannot enlarge

the time for filing a rule 59(e) motion.  See Brock v. Citizens Bank of Clovis, 841 F.2d 344, 347

(10th Cir. 1988)(holding that district courts lack jurisdiction over untimely rule 59(e) motions);

Plant Oil Powered Diesel Fuel Sys., Inc. v. ExxonMobil Corp., No. CIV 11-0103, 2012 WL

869000, at *2 (D.N.M. Mar. 8, 2012)(Browning, J.)("The Court may not extend the time period

for timely filing motions under Rule 59(e) . . . .").  "A motion under rule 59 that is filed more

than 28 days after entry of judgment may be treated as a Rule 60(b) motion for relief from

judgment."  12 James Wm. Moore et al., Moore's Federal Practice § 59.11[4][b], at 59-32 (3d

ed. 2012)(citations omitted).  Nevertheless, a court will not generally treat an untimely rule 59(e)

motion as a rule 60(b) motion when the party is seeking "reconsideration of matters properly

encompassed in a decision on the merits' contemplated by Rule 59(e)."  Jennings v. Rivers, 394

F.3d 850, 854 (10th Cir. 2005).

Under some circumstances, a party can rely on rule 60(b)(1) to rectify a mistake by his or

her attorney, or when their attorney acted without the party's authority.  See Yapp v. Excel

Corp., 186 F.3d 1222, 1231 (10th Cir. 1999)("Rule 60(b)(1) motions premised upon mistake are

intended to provide relief to a party . . . when the party has made an excusable litigation mistake

or an attorney has acted without authority . . . .").  Mistake in this context entails either acting

without the client's consent or making a litigation mistake, such as failing to file or comply with

deadlines.  See Yapp v. Excel Corp., 186 F.3d at 1231.  If the alleged incident entails a mistake,

then it must be excusable, meaning that the party was not at fault.  See Pioneer Inv. Servs. v.

Brunswick Assocs. LP, 507 U.S. 380, 394 (1993)("This leaves, of course, the Rule's requirement

that the party's neglect be 'excusable.'"); Cashner v. Freedom Stores, Inc., 98 F.3d 572, 577

(10th Cir. 1996)("If the mistake alleged is a party's litigation mistake, we have declined to grant

relief under Rule 60(b)(1) when the mistake was the result of a deliberate and counseled decision

by the party."); Pelican Prod. Corp. v. Marino, 893 F.2d 1143, 1146 (10th Cir. 1990)(holding

attorney carelessness is not a basis for relief under Rule 60(b)(1)).

Courts will not grant relief when the mistake of which the movant complains is the result

of an attorney's deliberate litigation tactics.  See Cashner v. Freedom Stores, Inc., 98 F.3d at 577.

This rule exists because a party

> voluntarily chose [the] attorney as his representative in the action, and he cannot
> now avoid the consequences of the acts or omissions of this freely selected agent.
> Any other notion would be wholly inconsistent with our system of representative
> litigation, in which each party is deemed bound by the acts of his lawyer agent
> and is considered to have notice of all facts, notice of which can be charged upon
> the attorney.

Pioneer Inv. Servs. v. Brunswick Assocs. LP, 507 U.S. at 397 (quoting Link v. Wabash R.R. Co.,

370 U.S. 626, 633-34 (1962))(internal quotation marks omitted).  The Tenth Circuit has held that

there is nothing "novel" about "the harshness of penalizing [a client] for his attorney's conduct"

and has noted that those "who act through agents are customarily bound," even though, when "an

attorney is poorly prepared to cross-examine an expert witness, the client suffers the

consequences." Gripe v. City of Enid, Okla., 312 F.3d 1184, 1189 (10th Cir. 2002).  The Court

has previously stated:

> There is a tension between how the law treats attorney actions that are without
> authority, thus permitting relief under rule 60(b), and how the law treats those
> attorney actions which are inexcusable litigations decisions, thus failing to qualify
> for relief; although the distinction between those actions may not always be
> logical, it is well established.

Wilson v. Jara, No. 10-0797, 2012 WL 1684595, at *7 (D.N.M. May 10, 2012)(Browning, J.).[10]

---

[10]The Supreme Court has recognized that individuals must be "held accountable for the
acts and omissions of their chosen counsel," and that the "proper focus is upon whether the
neglect of respondents *and their counsel* was excusable."  Pioneer Inv. Servs. Co. v. Brunswick
Assoc. LP, 507 U.S. 380, 397 (1993)(emphasis in original).  At the same time, the Tenth Circuit
has held that, when counsel acts without authority, rule 60(b)(1) provides relief from judgment.
See Cashner v. Freedom Stores, Inc., 98 F.3d at 576 ("[A]s a general proposition, the 'mistake'
provision in Rule 60(b)(1) provides for the reconsideration of judgment only where . . . an
attorney in the litigation has acted without authority from a party . . . .").  "There is a tension
between these decisions, because, ordinarily, a client will not authorize his or her attorney to act
in a negligent manner or to make a mistake."  Wilson v. Jara, 2012 WL 1684595, at *7 n.7.
    The Court concludes that, when the client acknowledges that he or she has hired the
attorney, there is a difference between decisions which terminate the litigation, such as
settlement or a stipulation of dismissal, and other litigation decisions, because decisions to
terminate the litigation are ordinarily left to the client.  See Chavez v. Primus Auto. Fin. Servs.,
125 F.3d 861, 1997 WL 634090, at *4-5 (10th Cir. 1997)(unpublished)(citing Navajo Tribe of
Indians v. Hanosh Chevrolet-Buick, Inc., 749 P.2d 90, 92 (1988); Bolles v. Smith, 591 P.2d 278,
280 (1979)).  "Otherwise the Court has difficulty explaining attorney decisions which are made
without authority and attorney decisions for which it is acceptable that the client suffer the
consequences."  Wilson v. Jara, 2012 WL 1684595, at *7 n.7.  In Chavez v. Primus Automotive
Financial Services, the Tenth Circuit recognized that "the mere employment of an attorney does
not give him the actual, implied or apparent authority to compromise his client's case."  1997
WL 634090, at *4.  Few Tenth Circuit cases analyze whether an attorney has acted without
authority.  The cases in which the Tenth Circuit has found a lack of authority appear to fall into
two categories: (i) cases in which the attorney entered an appearance without the client's
knowledge, see, e.g., FDIC v. Oaklawn Apts., 959 F.2d at 175-76 (finding that there were factual
issues which the district court needed to resolve where "[t]here is nothing in the record indicating
when Appellants became aware of the lawsuit and of Newcombe's purported representation");
and (ii) cases in which the attorney's actions terminate the litigation, see, e.g., Thomas v. Colo.
Trust Deed Funds, Inc., 366 F.2d 136, 139-40 (10th Cir. 1966)(finding that, as to one of the
plaintiffs, "the record shows that he did not participate in the transactions and negotiations with
the S.E.C. and did not consent to the execution of the stipulation of the judgment"); Cashner v.
Freedom Stores, Inc., 98 F.3d at 577 (citing with approval Surety Ins. Co. of Cal. v. Williams,

Rule 60(b)(6) is a "grand reservoir of equitable power to do justice in a particular case."

Van Skiver v. United States, 952 F.2d 1241, 1244 (10th Cir. 1991)(internal quotation marks

omitted).  "If the reasons offered for relief from judgment could be considered under one of the

more specific clauses of Rule 60(b)(1)-(5), those reasons will not justify relief under Rule

60(b)(6)."  Moore, supra § 60.48[2], at 60-182.  Accord Liljeberg v. Health Servs. Acquisition

Corp., 486 U.S. 847, 863 n.11 (1988)("This logic, of course, extends beyond clause (1) and

---

729 F.2d 581, 582-83 (8th Cir. 1984), which held that a "judgment entered upon an agreement by
the attorney may be set aside on affirmative proof that the attorney had no right to consent to its
entry").  Because decisions that terminate the litigation are ordinarily the client's prerogative,
those decisions fit more squarely within rule 60(b)(1)'s "lack of consent" prong.  Decisions
where the purported client is unaware of the litigation, or of the attorney's attempt to act on his
or her behalf, would also fit within rule 60(b)(1)'s "lack of consent" prong, because an individual
has the right to choose his or her own attorney, or whether he or she wishes to have any attorney.
Other litigation decisions are made jointly or are within the attorney's control, see Model Code
of Prof'l Conduct R. 1.2 cmt. 1 (2011)("With respect to the means by which the client's
objectives are to be pursued, the lawyer shall consult with the client . . . and may take such action
as is impliedly authorized to carry out the representation."); Pittman ex rel. Sykes v. Franklin,
282 F. App'x 418, 427 n.6 (6th Cir. 2008)(unpublished)("[T]he decision to allege comparative
fault as an affirmative defense falls within a narrow band of circumstance in which an attorney
may act without consulting his or her client."), and, thus, to give final judgments meaning and
allow cases to terminate, it is logical that those decisions must fall within the "excusable
litigation mistake" prong, or be based on a substantive mistake of law or fact.

Although the Tenth Circuit does not appear to have expressed its views on where the line
is drawn between attorneys acting without consent and litigation mistakes, or acknowledged the
tension between these two categories, the Court concludes that the appropriate division is, when
the client is aware that the attorney is acting on his or her behalf, between decisions which
dispose of the case and ordinarily require client consent, and other routine attorney decisions
which take place over the course of the case.  The Court also notes that rules of professional
conduct require, "[i]n a criminal case," for a lawyer to "abide by the client's decision, after
consultation with the lawyer, as to the plea to be entered, whether to waive a jury trial and
whether the client will testify."  Model Rules of Prof'l Conduct R. 1.2(a).  While a decision on
the plea to be entered in a criminal case is comparable to whether to settle a civil case, the Court
has not located any decisions permitting rule 60(b) relief when a civil attorney waives his or her
client's right to a jury trial.  One unpublished decision from the United States Court of Appeals
for the Fourth Circuit discussed briefly a scenario where, without resolving the merits of the
issue, a criminal defendant raised through a rule 60(b) motion in a habeas preceding that "his
trial counsel had prevented him from testifying in his defense."  United States v. McMahan, 8
F. App'x 272, 274 (4th Cir. 2001)(unpublished).

suggests that clause (6) and clauses (1) through (5) are mutually exclusive.").   "The Rule does not particularize the factors that justify relief, but we have previously noted that it provides courts with authority 'adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice,' while also cautioning that it should only be applied in 'extraordinary circumstances.'"   Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. at 863. Generally, the situation must be one beyond the control of the party requesting relief under rule 60(b)(6) to warrant relief.   See Ackermann v. United States, 340 U.S. 193, 202 (1950)("The comparison [of prior precedent] strikingly points up the difference between no choice and choice; imprisonment and freedom of action; no trial and trial; no counsel and counsel; no chance for negligence and inexcusable negligence.   Subsection 6 of Rule 60(b) has no application to the situation of petitioner.").   Legal error that provides a basis for relief under rule 60(b)(6) must be extraordinary, as the Tenth Circuit discussed in Van Skiver v. United States:

> The kind of legal error that provides the extraordinary circumstances justifying relief under Rule 60(b)(6) is illustrated by Pierce [v. Cook & Co., 518 F.2d 720, 722 (10th Cir. 1975)(en banc)].   In that case, this court granted relief under 60(b)(6) when there had been a post-judgment change in the law "arising out of the same accident as that in which the plaintiffs . . . were injured."   Pierce v. Cook & Co., 518 F.2d at 723.   However, when the post-judgment change in the law did not arise in a related case, we have held that "[a] change in the law or in the judicial view of an established rule of law" does not justify relief under Rule 60(b)(6).   Collins v. City of Wichita, 254 F.2d 837, 839 (10th Cir. 1958).

952 F.2d at 1244-45.

## LAW REGARDING MOTIONS TO RECONSIDER AND THE APPLICATION OF LAW-OF-THE-CASE DOCTRINE TO INTERLOCUTORY ORDERS AT THE DISTRICT COURT LEVEL

Considerable confusion exists among the bar regarding the proper standard for a district court to apply when ruling on a motion to reconsider one of its prior "interlocutory" or "interim" orders, i.e., an order that a district court issues while the case is ongoing, as distinguished from a

final judgment. This confusion originates from the fact that the Federal Rules of Civil Procedure -- the normal starting point for figuring out how to use various procedural devices in the federal courts -- do not mention motions to reconsider, let alone set forth a specific procedure for filing them or a standard for analyzing them. A loose conflation in terminology in <u>Servants of the Paraclete v. Does</u>, which refers to rule 59(e) motions -- "motion[s] to alter or amend a <u>judgment</u>" -- as "motions to reconsider,"[11] compounded that baseline confusion. Fed. R. Civ. P. 59(e) (emphasis added); <u>Servants of the Paraclete v. Does</u>, 204 F.3d 1005 *passim*.

Final judgments are different from interlocutory orders. <u>See</u> Fed. R. Civ. P. 54(a) ("'Judgment' as used in these rules includes a decree and any order <u>from which an appeal lies</u>." (emphasis added)). In addition to ripening the case for appeal, <u>see</u> 28 U.S.C. § 1291 ("The courts of appeals . . . shall have jurisdiction of appeals from all final decisions of the district courts . . . ."), the entry of final judgment narrows the district court's formerly plenary

---

[11]The Honorable Paul J. Kelly, Jr., United States Circuit Judge for the Tenth Circuit, who authored <u>Servants of the Paraclete v. Does</u>, refers to rule 59(e) motions as "motions to reconsider" several times throughout the opinion. He uses the term "motion to reconsider" as an umbrella term that can encompass three distinct motions: (i) motions to reconsider an interlocutory order, which no set standard governs, save that the district court must be decide them "before the entry of . . . judgment," Fed. R. Civ. P. 54(b); (ii) motions to reconsider a judgment made within 28 days of the entry of judgment, which the <u>Servants of the Paraclete v. Does</u> standard governs; and (iii) motions to reconsider a judgment made more than 28 days after the entry of judgment, which rule 60(b) governs. There is arguably a fourth standard for motions to reconsider filed more than a year after the entry of judgment, as three of the rule 60(b) grounds for relief expire at that point.

Much confusion could be avoided by using the term "motion to reconsider" exclusively to refer to the first category, "motion to amend or alter the judgment" exclusively to refer to the second category, and "motion for relief from judgment" exclusively to refer to the third category (and arguable fourth category). These are the terms that the Federal Rules of Civil Procedure -- and other Circuits -- use to describe (ii) and (iii). The Court agrees with Judge Kelly -- and all he likely meant by using motion to reconsider as an umbrella term is -- that, if a party submits a motion captioned as a "motion to reconsider" after an entry of final judgment, the court should evaluate it under rule 59(e) or 60(b), as appropriate, rather than rejecting it as untimely or inappropriate.

jurisdiction over the case to: (i) for the first twenty-eight days after the entry of judgment, motions under rules 50(b), 52(b), 59, and 60 -- the district court's jurisdiction, while limited, trumps that of the Court of Appeals during this time period, and, even if a party files a notice of appeal, the Court of Appeals will wait until after the district court has ruled on the post-judgment motion to touch the case, see Fed. R. App. P. 4(a)(4)(B); (ii) after twenty-eight days, if a party has filed a notice of appeal, motions under rule 60 -- the Court of Appeals' jurisdiction trumps the district court's during this period, and the district court needs the Court of Appeals' permission even to grant a rule 60 motion;[12] and (iii) after twenty-eight days, if no party has filed a notice of appeal, motions under rule 60.

Final judgments implicate two important concerns militating against giving district courts free reign to reconsider their judgments.  First, when a case is not appealed, there is an interest in finality.  The parties and the lawyers expect to go home,[13] quit obsessing about the dispute, and

---

[12]Rule 60(a), which allows the district court to correct clerical errors, provides that, "after an appeal has been docketed in the appellate court and while it is pending, such a mistake may be corrected only with the appellate court's leave." Fed. R. Civ. P. 60(a).  Rule 60(b), which provides for the correction of substantive legal errors, has an interestingly one-sided application when the case is up on appeal: "[A] notice of appeal does not divest a district court of jurisdiction to consider a Rule 60(b) motion, although it prevents a district court from granting such a motion unless it notifies this court of its intention to grant the motion upon proper remand." West v. Ortiz, No. CIV 06-1192, 2007 WL 706924, at *5 n.5 (10th Cir. Mar. 9, 2007) (unpublished)(Broby, J.)(citing Allison v. Bank One-Denver, 289 F.3d 1223, 1243 (10th Cir. 2002); Aldrich Enters., Inc. v. United States, 938 F.2d 1134, 1143 (10th Cir. 1991)).  In other words, "a district court does have the authority 'to consider on the merits and deny a 60(b) motion after a notice of appeal, because the district court's action is in furtherance of the appeal,'" but the district court does not have the authority to grant a rule 60(b) motion without first asking the Court of Appeals to remand the case. United States v. Edmonson, 928 F. Supp. 1052, 1053 (D. Kan. 1996)(Crow, J.)(emphasis in original)(quoting Winchester v. U.S. Att'y for the S. Dist. of Tex., 68 F.3d 947, 949 (5th Cir. 1995)).

[13]When the Court says that the parties are free to "go home" after the final judgment, it is not just employing colorful language.  At the beginning of a case, the plaintiff is required to serve a summons on the defendant, personally, or obtain a waiver of such service.  See Fed. R.

Civ. P. 4(c)-(d).  Service of process is a jurisdictional prerequisite, without which the defendant is under no obligation to participate in the case, and without which the plaintiff cannot seek a default judgment.  See Fed. R. Civ. P. 4, 55.  Once served, however, the bar for continued service lowers substantially; papers may be served on the opposing party's attorney, rather than on the opposing party, personally, and service via CM/ECF suffices.  See Macias v. N.M. Dep't of Labor, 300 F.R.D. 529, 571 (D.N.M. 2014)(Browning, J.)("While rule 5's relatively permissive standards govern service of a motion, rule 4's more rigorous provisions govern service of a summons and complaint initiating a case."  (emphasis in original)).

The disparity between the one-time, heightened obligations of rule 4 service and the ongoing, easy-to-follow obligations of rule 5 service makes sense.  It would be unfair for a plaintiff to win a default judgment against a defendant who has no idea he or she is being sued.  On the other hand, once the defendant has been put on notice of the case, judicial efficiency dictates that the defendant should have an affirmative obligation to stay abreast of anything that pops up on CM/ECF.

That obligation, however, must end with the case.  If it did not, then anyone ever named as a party in a judicial proceeding would have to spend the rest of his or her life looking out for new motions in the long-closed case, keeping his or her former adversaries updated with current contact information, and periodically checking the old docket sheet or calling the clerk's office to verify that nothing new has happened.  The Court had such a case in 2014.  In Macias v. New Mexico Department of Labor, a group of Spanish-speaking farmworkers in the El Paso, Texas, and Sunland Park, New Mexico, area had banded together and sued the New Mexico Department of Labor ("NMDOL") in 1991.  300 F.R.D. at 533-34.  The case had settled in 1992, with the NMDOL agreeing, as a part of the settlement agreement, to keep a claim office open in Sunland Park indefinitely.  See 300 F.R.D. at 534.  In 2013, however, NMDOL -- now named the New Mexico Department of Workforce Solutions -- filed a motion to reopen the case and exercise an escape clause in the settlement agreement purporting to allow it "'to motion the Court for appropriate relief'" in the event of "'a reduction in funding to NMDOL.'"  300 F.R.D. at 534 (quoting the settlement agreement).  NMDOL was unable to locate the plaintiffs and instead served its motion on the attorney, Nancy Simmons, who had represented the plaintiff-farmworkers in 1991 and 1992 in connection with her employment with Texas Rural Legal Aid, Inc.  See 300 F.R.D. at 534-37.  Ms. Simmons had moved through several different public-interest legal jobs since 1992, and she had not had contact with the plaintiffs -- whom she represented to be itinerant -- in over a decade.  See 300 F.R.D. at 534-37.  Ms. Simmons argued that she was no longer the plaintiffs' lawyer and that service on her was inappropriate, but she nonetheless entered "'a special entry of appearance exclusively for the purpose of challenging subject-matter jurisdiction and personal jurisdiction.'"  300 F.R.D. at 536 (citation omitted).  On the personal jurisdiction issue, Ms. Simmons argued that NMDOL's motion was really a new suit, which required new service of process on the farmworkers; in the alternative, she argued that, even if the motion was properly styled as a motion in the 1991 case, she was no longer a proper recipient of even non-process service under rule 5.  See 300 F.R.D. at 536-37.  She argued that, even if it were fair -- in the context of more recent cases -- to continue to hold parties accountable for everything posted on CM/ECF, even years after final judgment, CM/ECF had not existed in the 1990s, and the plaintiffs, thus, most likely neither knew about the suit nor had any reasonable way of learning about it.  The Court ultimately denied NMDOL's motion for lack

- 34 -

put the case behind them, and the final judgment -- especially once the twenty-eight day window of robust district court review and the thirty-day window of appeal have both closed -- is the disposition upon which they are entitled to rely.  Second, when a case is appealed, there is the need for a clean jurisdictional handoff from the district court to the Court of Appeals.  "[A] federal district court and a federal court of appeals should not attempt to assert jurisdiction over a case simultaneously," as doing so produces a "danger [that] a district court and a court of appeals w[ill] be simultaneously analyzing the same judgment."  Griggs v. Provident Consumer Discount Co., 459 U.S. 56, 58-59 (1982).  The Court of Appeals needs a fixed record on which to base its decisions -- especially given the collaborative nature of appellate decisionmaking -- and working with a fixed record requires getting some elbow room from the district court's continued interference with the case.  The "touchstone document" for this jurisdictional handoff is the notice of appeal, not the final judgment, see Griggs v. Provident Consumer Discount Co., 459 U.S. at 58 ("The filing of a notice of appeal is an event of jurisdictional significance -- it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal."  (citations omitted)); Garcia v. Burlington N. R.R. Co., 818

---

of subject-matter jurisdiction and did not decide whether sending an electronic mail transmission to Ms. Simmons constituted sufficient service on the plaintiffs.  See 300 F.R.D. at 571 ("The Court will reserve judgment whether it has personal jurisdiction over UTAF."  (emphasis omitted)).

Although the Court did not decide the question because it lacked subject-matter jurisdiction, it would be patently unfair to allow former parties to ancient cases to come back, years after the cases' resolution, and effectively receive ex parte reconsideration of rulings that the opposing parties and the Court put behind them long ago.  From the parties' perspective, the initial service of summons and final judgment are the jurisdictional bookends signifying the beginning and end of their responsibility to be diligently engaged in the case.  The same due-process considerations that give rise to the service-of-process requirement also demand that the case eventually end and that the parties eventually be set free from their obligations to stay on top of it.

F.2d 713, 721 (10th Cir. 1987)("Filing a timely notice of appeal pursuant to Fed. R. App. P. 3 transfers the matter from the district court to the court of appeals.  The district court is thus divested of jurisdiction.  Any subsequent action by it is null and void."  (citations omitted)); Kirtland v. J. Ray McDermott & Co., 568 F.2d 1166, 1170 (5th Cir. 1978)("[I]t is the filing of the appeal, not the entering of a final judgment, that divests the district court of jurisdiction." (citations omitted)), but, because the final judgment starts the parties' thirty-day clock for filing a timely notice of appeal, the Federal Rules and the Tenth Circuit have chosen to curtail the district court's jurisdiction over the case in the roughly month-long period of potentially overlapping trial- and appellate-court jurisdiction that immediately follows the entry of final judgment, see Servants of the Paraclete v. Does, 204 F.3d at 1009 (noting that post-final judgment motions at the district court level are "not intended to be a substitute for direct appeal").  Basically, rather than suddenly divesting the district court of all jurisdiction over the case -- potentially resulting in the district court being unable to rectify easily fixable problems with the final judgment before the case goes to the Tenth Circuit, or even requiring appeal of a case that might otherwise not need to be appealed -- the Federal Rules set forth a jurisdiction phased de-escalation process, wherein the district court goes from pre-final judgment plenary jurisdiction, to limited review for the first twenty-eight days post-final judgment, and, finally, to solely rule 60 review after twenty-eight days.  In defining the "limited review" that rule 59(e) allows a district court to conduct in the 28-day flux period, the Tenth Circuit, in Servants of the Paraclete v. Does, incorporated traditional law-of-the-case grounds -- the same grounds that inform whether a court should depart from an appellate court's prior decision in the same case -- into rule 59(e).  See United States v. Alvarez, 142 F.3d 1243, 1247 (10th Cir. 1998)("[W]e will depart from the law of the case doctrine in three exceptionally narrow circumstances: (1) when the evidence in a subsequent

trial is substantially different; (2) when controlling authority has subsequently made a contrary decision of the law applicable to such issues; or (3) when the decision was clearly erroneous and would work a manifest injustice."  (citation omitted)); <u>Servants of the Paraclete v. Does</u>, 204 F.3d at 1012 (incorporating those grounds into rule 59(e)).

Neither of these concerns -- finality or jurisdictional overlap -- is implicated when a district court reconsiders one of its own interlocutory orders.  The Federal Rules do not specifically mention motions to reconsider interlocutory orders, but rule 54(b) makes the following open-ended proclamation about their mutability:

> When an action presents more than one claim for relief -- whether as a claim, counterclaim, crossclaim, or third-party claim -- or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay.  Otherwise, <u>any order or other decision</u>, however designated, <u>that adjudicates fewer than all the claims</u> or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and <u>may be revised at any time before the entry of a judgment</u> adjudicating all the claims and all the parties' rights and liabilities.

Fed. R. Civ. P. 54(b) (emphases added).  Rule 54(b) thus (i) provides that a district court can freely reconsider its prior rulings; and (ii) puts no limit or governing standard on the district court's ability to do so, other than that it must do so "before the entry of judgment."  Fed. R. Civ. P. 54(b).

The Tenth Circuit has not cabined district courts' discretion beyond what rule 54(b) provides: "[D]istrict courts generally remain free to reconsider their earlier interlocutory orders." <u>Been v. O.K. Indus.</u>, 495 F.3d at 1225.  In the Tenth Circuit, "law of the case doctrine has <u>no</u> bearing on the revisiting of interlocutory orders, even when a case has been reassigned from one judge to another."  <u>Rimbert v. Eli Lilly & Co.</u>, 647 F.3d 1247, 1252 (10th Cir. 2011)(emphasis added)(citing <u>Been v. O.K. Indus., Inc.</u>, 495 F.3d at 1225).  In this context, "the doctrine is

merely a 'presumption, one whose strength varies with the circumstances.'"   Been v. O.K.
Indus., Inc., 495 F.3d at 1225 (quoting Avitia v. Metro. Club of Chi., Inc., 49 F.3d 1219, 1227
(7th Cir. 1995)).  In short, a district court can use whatever standard it wants to review a motion
to reconsider an interlocutory order.  It can review the earlier ruling de novo and essentially
reanalyze the earlier motion from scratch, it can review the ruling de novo but limit its review, it
can require parties to establish one of the law-of-the-case grounds, or it can refuse to entertain
motions to reconsider altogether.

The best approach, in the Court's eyes, is to analyze motions to reconsider differently
depending on three factors.  Cf. Been v. O.K. Indus., Inc., 495 F.3d at 1225 ("[T]he doctrine is
merely a 'presumption, one whose strength varies with the circumstances.'"  (citation omitted)).
First, the Court should restrict its review of a motion to reconsider a prior ruling in proportion to
how thoroughly the earlier ruling addressed the specific findings or conclusions that the motion
to reconsider challenges.  How "thoroughly" a point was addressed depends both on the amount
of time and energy the Court spent on it, and on the amount of time and energy the parties spent
on it -- in briefing and orally arguing the issue, but especially if they developed evidence on the
issue.  A movant for reconsideration thus faces a steeper uphill challenge when the prior ruling
was on a criminal suppression motion, class certification motion, or preliminary injunction,[14]

---

[14]The Court typically makes findings of fact and conclusions of law in ruling on these
motions.  At first glance, it appears that the Federal Rules of Civil Procedure set forth additional
standards -- beyond that which applies to other interlocutory orders -- for amending findings of
fact and conclusions of law:

> **Amended or Additional Findings.**  On a party's motion filed no later than 28
> days after the entry of judgment, the court may amend its findings -- or make
> additional findings -- and may amend the judgment accordingly.  The motion may
> accompany a motion for a new trial under Rule 59.

than when the prior ruling is, e.g., a short discovery ruling.  The Court should also look, not to

the overall thoroughness of the prior ruling, but to the thoroughness with which the Court

addressed the exact point or points that the motion to reconsider challenges.  A movant for

reconsideration thus faces an easier task when he or she files a targeted, narrow-in-scope motion

asking the Court to reconsider a small, discrete portion of its prior ruling than when he or she

files a broad motion to reconsider that rehashes the same arguments from the first motion, and

essentially asks the Court to grant the movant a mulligan on its earlier failure to present

persuasive argument and evidence.

    Second, the Court should consider the case's overall progress and posture, the motion for

reconsideration's timeliness relative to the ruling it challenges, and any direct evidence the

parties may produce, and use those factors to assess the degree of reasonable reliance the

opposing party has placed in the Court's prior ruling.  See 18B Charles Alan Wright, Arthur R.

Miller, Edward H. Cooper, Vikram David Amar, Richard D. Freer, Helen Hershkoff, Joan E.

Steinman & Catherine T. Struve, Federal Practice & Procedure § 4478.1 (2d ed.)("Stability

becomes increasingly important as the proceeding nears final disposition . . . .  Reopening should

be permitted, however, only on terms that protect against reliance on the earlier ruling.").  For

example, if a defendant (i) spends tens of thousands of dollars removing legacy computer

hardware from long-term storage; then (ii) obtains a protective order in which the Court decides

---

Fed. R. Civ. P. 52(b).  This rule appears to limit motions to reconsider orders with findings of
fact and conclusions of law to twenty-eight days.  The rule's use of the term "entry of judgment,"
its reference to rule 59, and its adoption of the same time period that applies to motions to alter
or amend a judgment, all lead the Court to conclude, however, that rule 52(b) -- and its 28-day
time limit -- does not apply to interlocutory orders.  The time limit applies only to findings of
fact and conclusions of law supporting a case-ending judgment -- such as those entered after a
bench trial -- and to those giving rise to an interlocutory appeal that, if filed, divests the district
court of its jurisdiction -- such as those entered in support of a preliminary injunction.

that the defendant need not produce the hardware in discovery; then (iii) returns the hardware to long-term storage, sustaining thousands more in expenses; and (iv) several months pass, then the plaintiffs should face a higher burden in moving the Court to reconsider its prior ruling that they faced in fighting the motion for protective order the first time.

Third, the Court should consider the Servants of the Paraclete v. Does grounds.  The Court should be more inclined to grant motions for reconsideration if the movant presents (i) new controlling authority -- especially if the new authority overrules prior law or sets forth an entirely new analytical framework; (ii)  new evidence -- especially if the movant has a good reason why the evidence was not presented the first time around; or (iii) a clear indication -- one that manifests itself without the need for in-depth analysis or review of the facts -- that the Court erred.

These three factors should influence the degree to which the Court restricts its review of a prior ruling, but they do not necessarily mean that the Court should always apply a deferential standard of review.  The Court should pause before applying a standard of review to its own interlocutory orders that is more deferential than the standard that the Court of Appeals will apply to it, unless the Court concludes that the alleged error in the prior ruling was harmless, or the party moving for reconsideration waived their right to appeal the alleged error by not raising the appropriate argument.  Even in circumstances where the Court concludes that it is insulated from reversal on appeal, there are principled reasons for applying a de novo standard.  After all, if the Court was wrong in its earlier decision, then, generally speaking, it is unjust to maintain that result -- although the Court should weigh this injustice against any injustice that would result from upending the parties' reliance on the earlier ruling, which is the balancing test that the three factors above represent.

What the Court means by "restricting its review" is less about applying a deferential standard of review -- although that may be appropriate in some circumstances -- and more about reducing (i) the depth of the Court's analysis the second time around -- thus conserving judicial resources; and (ii) the impositions that relitigation of the prior ruling will impose on the party opposing the motion for reconsideration.  The Court should consider the time and expense that the party opposing reconsideration spent in winning the earlier ruling, and should try to prevent that party from having to bear the same impositions again.  Basically, even if the Court ultimately analyzes a motion to reconsider under the same standard that it analyzed the motion that produces the earlier ruling, it should analyze the motion in a different way -- one focused on reducing the litigation burdens of the party opposing reconsideration.  For example, when a party moves the Court for a preliminary injunction, standard practice is that the Court holds an evidentiary hearing as a matter of course, regardless whether it looks as if the party has a good chance of prevailing.  If the party loses and the Court denies the injunction, however, and the party moves for reconsideration, the party should not be entitled to the presumption of an evidentiary hearing merely because he or she received that presumption the first time the Court considered the motion.

In light of these statements, it is perhaps better to characterize the increased burden that a movant for reconsideration faces as one of production, and not of persuasion.  The Court analyzes motions to reconsider by picking up where it left off in the prior ruling -- not by starting anew.  Parties opposing reconsideration can do the same, and they may stand on whatever evidence and argument they used to win the earlier ruling.  Movants for reconsideration, on the other hand, carry the full burden of production: they must persuade the Court, using only the evidence and argument they put before it, that it should change its prior ruling; they must do all

of the legwork, and not rely on the Court to do any supplemental fact-finding or legal research; and they must convincingly refute both the counterarguments and evidence that the opposing party used to win the prior ruling and any new arguments and evidence that the opposing party produces while opposing the motion to reconsider.  Unlike the motion that produced the prior ruling, a motion to reconsider is not -- and is not supposed to be -- a fair fight procedurally.  The deck is stacked against a movant for reconsideration, and if such a movant hopes to prevail, he or she must have not only a winning legal position, but the work ethic and tenacity to single-handedly lead the Court to his or her way of thinking.

## ANALYSIS

The Court will grant the Motion under the same terms it proposed -- and to which the parties agreed -- at the hearing, but it will not reopen class certification discovery.  This ruling may not be as bad for the Plaintiffs as it may seem: (i) they can obtain copies of the class assignments from the Bureau of Land Management, country clerks offices, and the State Land Office without the Court's blessing; and (ii) they can use formal discovery tools to uncover parol evidence elucidating the meaning of various lease terms, provided -- but only to the extent that -- the named Plaintiffs have leases containing those terms.

Before examining the specific rules on reopening class certification discovery, the Court will first look at what hurdles the Plaintiffs will face -- even if they get all the discovery they need -- in getting the Court to certify this case as a class action, after having already denied certification.  The Defendants argue that the rule 59(e) standard applies; the Court disagrees.  An order granting or denying class certification, despite its importance -- and its immediate

appealability[15] -- is not a final judgment; rather, it is an "interlocutory" or "interim" order.  See Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment."); Coopers & Lybrand v. Livesay, 437 U.S. 463, 469 n.11 (1978)("[A] district court's order denying or granting class status is inherently tentative.").  Rule 54(b) provides that

> any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

Fed. R. Civ. P. 54(b).  The rule 59(e) standard, which pertains only to final judgments, thus does not apply.  See Fed. R. Civ. P. 59(e) (titled "Motion to Alter or Amend a Judgment").  In fact, in the Tenth Circuit, a district court is under no obligation whatsoever to abide by its prior interlocutory orders.   See Rimbert v. Eli Lilly & Co., 647 F.3d at 1252 ("[L]aw of the case doctrine has no bearing on the revisiting of interlocutory orders . . . .").

---

[15]Generally speaking, the filing of an interlocutory appeal divests the district court of jurisdiction.

> We begin with the unassailable general proposition that the filing of a notice of appeal, whether from a true final judgment or from a decision within the collateral order exception, "is an event of jurisdictional significance -- it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal."

Stewart v. Donges, 915 F.2d 572, 574 (10th Cir. 1990)(Ebel, J.)(quoting Griggs v. Provident Consumer Discount Co., 459 U.S. at 58).  Interlocutory appeals of class certification rulings, however, are an exception to this general rule.  See Fed. R. Civ. P. 23(f) ("An appeal does not stay proceedings in the district court unless the district judge or the court of appeals so orders."). Even if it were the case that an interlocutory appeal under rule 23(f) divested the district court of jurisdiction, no party appealed the Class Certification MOO, so the Court would still have jurisdiction.

Of course, the district court can stick with its prior rulings, and it can limit its reconsideration of rulings to far less thorough a review than it gave the matter in its initial consideration.   In the context of interlocutory orders, law-of-the-case doctrine is "merely a presumption, one whose strength varies with the circumstances."   Prairie Band Potawatomi Nation v. Wagnon, 476 F.3d at 823 (citation omitted)(internal quotation marks omitted).   A leading treatise offers district courts the following guidance on how "the circumstances" should affect the strength of the presumption:

> A trial court could not operate if it were to yield to every request to reconsider each of the multitude of rulings that may be made between filing and final judgment.  All too often, requests would be made for no purpose but delay and harassment.  Other requests, made in subjective good faith, would reflect only the loser's misplaced attachment to a properly rejected argument.  Even the sincere desire to urge again a strong position that perhaps deserves to prevail could generate more work than our courts can or should handle.  A presumption against reconsideration makes sense.

> All too often, however, a trial court could not operate justly if it lacked power to reconsider its own rulings as an action progresses toward judgment.  Far too many things can go wrong, particularly with rulings made while the facts are still undeveloped or with decisions made under the pressures of time and docket.

> . . . The policies that support adherence to earlier rulings without perpetual reexamination surely do apply, whatever label is used.  These policies regulate exercise of the undoubted power to reconsider.  The "law-of-the-case" label is a convenient way of invoking these policies and is often used. . . .

> The necessary power to reopen and the equally necessary reluctance to reopen must be balanced against each other whatever label is used. . . .

> . . . .

> Courts have recognized the general proposition that the decision whether to reconsider an earlier ruling is properly affected by the stage the proceeding has reached.  Stability becomes increasingly important as the proceeding nears final disposition, supporting refusal to reopen issues that could cause further delay or confusion.  Reopening has been contemplated or permitted even after lengthy and complex proceedings, supported by the desire for a proper outcome.  Reopening should be permitted, however, only on terms that protect against reliance on the earlier ruling -- it is better to provide an opportunity to argue in support of the

initial ruling, and essential to provide an opportunity to meet the issues that are
raised by a revised ruling.  Once reconsideration has been completed, however, a
court may pardonably refuse to consider a tardy law-of-the-case objection.

        The pretrial rulings that may be reconsidered in continuing pretrial
proceedings span the full range of pretrial activity.  Some pretrial rulings are
avowedly preliminary, designed to maintain order while gathering information
and resources for reconsideration.  An order granting or denying a preliminary
injunction, for example, rests on tentative findings that are subject to
reconsideration, either at trial or during later stages of pretrial proceedings.
Rulings on the sufficiency or amendment of pleadings are easily modified or
retracted, in keeping with the generally subordinate role played by pleading in
modern practice.  Denial of a motion to dismiss may be followed by an order
granting dismissal, or -- in the very nature of the difference between a ruling on
the pleadings and an examination of the record -- an order granting summary
judgment.  Summary judgment orders provide innumerable further examples.  It
is proper to refuse to reconsider a summary judgment ruling.  But denial of
summary judgment often is reconsidered and followed by an order granting
summary judgment, or by inconsistent action at trial. . . .

. . . .

. . . Denial of class-action certification may be followed by certification.

18B Charles Alan Wright, Arthur R. Miller, Edward H. Cooper, Vikram David Amar, Richard

D. Freer, Helen Hershkoff, Joan E. Steinman & Catherine T. Struve, <u>Federal Practice &</u>

<u>Procedure</u> § 4478.1 (2d ed.).

        The above passage describes the general principles for applying law-of-the-case doctrine

to interlocutory orders, but it would seem that the specific context involved here -- a motion to

reconsider a denial of class certification -- would arise commonly enough for courts to have

developed some common practice of handling these motions.  As it happens, there <u>is</u> a well-worn

path to moving to reconsider a class certification denial, and it leads directly uphill.  A prominent

class-action treatise -- one generally regarded as being plaintiff-friendly -- describes the

consensus standard that has developed at the district-court level for analyzing such motions:

Rule 23 enables a district court to alter or amend its class certification decision any time before final judgment.  A court may change its mind in either direction; it can:

  • certify a class that it initially rejected, or

  • decertify or modify a class that it initially approved.

. . . .

While both types of motions are plausible, decertification and modification are far more common than reconsideration.  The difference is easily explained: courts experience themselves as having somewhat unfettered discretion to decertify or modify as part of their oversight of the class suit, but they tend to adjudicate motions for reconsideration through the standard approach to such motions -- namely, that they are an exception to the law of the case doctrine -- and that approach makes reconsideration highly unlikely.

Yet behind this easy explanation lies a more nuanced explanation concerning the history of Rule 23, a history that suggests that courts are more open to modified certifications than to revisiting denials.  Under the pre-2003 version of Rule 23, courts were required to decide the class certification issue "as soon as practicable after commencement of an action" but were simultaneously permitted to certify a class conditionally.  Given the quick but tentative value of initial certifications, modification and, perhaps, decertification were not unusual developments in the progression of a class suit.  Under the current, post-2003, Rule, courts have more time to make the initial certification decision -- now it must be "at an early practicable time" rather than "as soon as practicable" -- but, simultaneously, they must be satisfied that the party seeking certification has met all requirements of Rule 23.  Thus, post-2003, decertification and modification should theoretically only take place after some change, unforeseen at the time of the class certification, that makes alteration of the initial certification decision necessary.  Yet because district courts retain their broad discretion over issues related to class certification, these unforeseen changes need not satisfy a heightened standard of review in order for district courts to consider them in the context of decertification or modification.  Rather, district courts rely on the discretion granted to them by Rule 23(c)(1)(C).

By contrast, a successful motion for reconsideration, then and now, requires a significant, unexpected change in the facts or the law.  Courts do not rely on their discretion under Rule 23 in adjudicating these motions but rather apply a strict standard generally requiring a change in controlling law, the availability of new evidence, or the need to correct manifest error or injustice.  These three conditions, the traditional bases for motions to reconsider any court order, are difficult to satisfy, and courts generally look on motions to reconsider with disfavor.

In short, decertification and modification have historically involved less stringent standards than reconsideration, and despite a revised Rule 23 that implies any certification should be carefully considered and not "conditionally" granted, traditional conceptions of each still determines how they are applied.

. . . .

Courts rarely grant [motions to reconsider a denial of certification].  Much of the reason is doctrinal.  As the federal rules do not literally provide for a "motion to reconsider," reconsideration is conceptualized as an exception to the common law "law of the case" doctrine.  Law of the case enforces consistency within a case, reflecting the fact that "courts are understandably reluctant to reopen a ruling once made," and hence courts "adhere to previous rulings absent a compelling reason" to revisit them.  The doctrine provides but three such compelling reasons if "(1) there has been an intervening change in controlling law; (2) new evidence has become available; or (3) there is need to prevent manifest injustice or correct a clear error of law."

Although Rule 23(c)(1)(C) itself states, "An order that grants or denies class certification may be altered or amended before final judgment," courts uniformly apply the stringent law of the case standard to motions to reconsider initial class certification decisions.  This choice stems from courts' reluctance to allow parties to have a "second bite at the apple" by relitigating issues that have already been decided, thereby incentivizing parties to put their best foot forward at the outset and avoiding costly delays to the proceedings.

Courts therefore rarely grant motions to reconsider initial certification decisions, with two recurring exceptions.  First, if a district court denied class certification because of case management concerns, but the parties then settle and propose certification for settlement purposes, the court may reconsider its earlier decision as manageability concerns are irrelevant at settlement; thus, courts will certify settlement classes although they had previously denied certification of the same class for litigation purposes.  Second, sometimes interlocutory appellate review under Rule 23(f) will result in a circuit court order directing the lower court to reconsider its initial certification decision, particularly if there has been a change in law since the initial certification decision or the circuit court finds some defect in the district court's application of Rule 23.  Nonetheless, such an order does not necessarily command reversal.

In short, motions styled as seeking reconsideration of initial class certification decisions are subjected to the strict law of the case doctrine and rarely succeed.

William B. Rubenstein, <u>Newberg on Class Actions</u> §§ 7:34-7:35 (5th ed.)(footnotes omitted).

While the Tenth Circuit has not explicitly adopted any particular standard for reassessing an initial denial of certification, the Court has noticed -- in the extensive surveying of the case law that it conducted in working on this case -- that it tends to happen almost exclusively when the case has been remanded from the Tenth Circuit, i.e., when it was the Tenth Circuit, rather than the district court, that decided the denial.  Cases in this post-remand procedural posture are uninstructive as to the standard that the Court should apply in this case, because cases on remand from the Tenth Circuit implicate the mandate rule -- a "complementary theory" to law-of-the-case doctrine, which "'generally requires [district] court conformity with the articulated appellate remand.'"   United States v. Webb, 98 F.3d 585, 587 (10th Cir. 1996)(alteration in original) (quoting United States v. Moore, 83 F.3d 1231, 1234 (10th Cir. 1996)).

The Court agrees with Professor Rubenstein and the Defendants that the common-law law-of-the-case grounds, which, incidentally, are the same as those that apply to rule 59(e) motions after Servants of the Paraclete v. Does, see supra note 11, constitute the majority -- perhaps even the consensus -- standard among courts for reconsidering class certification denials. If the Plaintiffs can establish one of the traditional law-of-the-case grounds -- new law, new evidence, or manifest injustice -- so much the better for them, but, even if they cannot, the Court will not deny their motion out of hand.[16]  In determining the appropriate standard to apply to the

---

[16]When a district court certifies a class action, it has an ongoing responsibility to modify or decertify the class as the need arises, and there is no presumption against doing so if the circumstances warrant.  This responsibility stands in contrast to the strict application of the law-of-the-case doctrine to which many district courts adhere, and creates a one-sided standard wherein class action defendants have an easier time seeking reconsideration of adverse rulings than class action plaintiffs do.

Second, Professor Rubenstein acknowledges this disparity and attributes at least some of its existence to the pre-2003 practice of conditionally certifying class actions.  Courts are no longer allowed to conditionally certify classes, and they now may only certify a class action "after a rigorous analysis" finding "[a]ctual, not presumed, conformance with" rule 23.

motion to reconsider, the Court will look to two additional factors, beyond the presence of the law-of-the-case grounds.  First, the Court will assess the thoroughness with which it decided the issue or issues that the motion to reconsider challenges.  This factor will almost certainly cut against the Plaintiffs, as they will likely challenge the Court's overall commonality and predominance rulings -- rather than specific factual findings or legal conclusions -- on which the Court spent an enormous amount of time and energy.  Second, the Court will assess the amount of reliance the Defendants have placed in the Class Certification MOO.  This factor will likely cut in the Plaintiffs' favor, as their motion to reconsider will likely be relatively timely, and this case is headed for another discovery period regardless of what happens.  Given the resources the Defendants poured into defeating class certification on the first go-round, the Court is unlikely to compel them to do much of anything in defending the Plaintiffs' motion.  The Court will start its review of the record with the factual findings it made in the Class Certification MOO, and the

---

Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2551-52 (2011).  The Court thus concludes that the 2003 amendments to rule 23 pulled some of the logical underpinnings out from under the practice of applying strict law-of-the-case doctrine to reconsideration of class certification denials.

     Third, if the class action is valuable enough, adopting a more forgiving reconsideration standard for class action denials may promote judicial economy.  Neither a denial of certification nor a merits adjudication of the named plaintiffs' cases has any res judicata effect on the absent class members.  The plaintiffs' counsel can thus refile the same class action -- with new named plaintiffs -- in a new case.  If the standard for achieving certification on reconsideration is higher than the standard for achieving certification in a new case, the plaintiffs' counsel may be incentivized to go that route, rather than riding out the first case -- where the local attorneys and the court have become familiar with the case's law and facts.

     For these reasons, the Court would pause before ruling, on a motion to reconsider a class certification denial, that a class action plaintiff had satisfied rule 23, and that his or her case would have been certified had he or she put on the same evidence in their initial class certification motion that he or she produced in the motion to reconsider, but that, because the plaintiff failed to establish one of the law-of-the-case grounds, the Court will deny the motion to reconsider.  The Court will restrict its review of the Plaintiffs' motions to a substantially less robust one than it undertook in ruling on the initial class certification motion, but restrict its review procedurally, rather than substantively.

Court will not allow duplication of any evidence it read or heard during the class certification briefing and hearing.  Furthermore, the Court will begin its analysis of the forthcoming motion to reconsider with the legal conclusions it made in the Class Certification MOO, so the Defendants can, if they wish, do nothing, and still may be able to defeat the motion to reconsider.

The Court has granted motions to reconsider in the past, including those in favor of the Defendants in this case.  See Anderson Living Trust v. WPX Energy Prod., LLC, 298 F.R.D. 514 (D.N.M. 2014)(Browning, J.).  The Court is normally somewhat liberal in its handling of motions to reconsider, but, here, the parties and the Court have already poured massive amounts of time, energy, and money into getting it right the first time.  The Court will, thus, apply the circumstantially-varying presumption of law-of-the-case doctrine more strictly to this motion -- and to reconsideration of class certification denials generally -- than it typically applies to motions to reconsider in other contexts.  The Court will not attempt to decide the merits of a motion that the Plaintiffs have not yet filed, but it has no reservations about telling the Plaintiffs that they face an uphill fight, even relative to the battle they already lost on their initial class certification motion.

Moving to the question more immediately before the Court -- whether to allow class certification discovery in the upcoming discovery phase, which was supposed to be reserved for merits discovery -- it is not completely clear what standard the Court should apply.  The Tenth Circuit uses a six-factor test to decide whether it is appropriate to reopen discovery:

> Whether to extend or reopen discovery is committed to the sound discretion of the trial court and its decision will not be overturned on appeal absent abuse of that discretion.  Appellate decisions have identified several relevant factors in reviewing decisions concerning whether discovery should be reopened, including: 1) whether trial is imminent, 2) whether the request is opposed, 3) whether the non-moving party would be prejudiced, 4) whether the moving party was diligent in obtaining discovery within the guidelines established by the court, 5) the foreseeability of the need for additional discovery in light of

the time allowed for discovery by the district court, and 6) the likelihood that the discovery will lead to relevant evidence.

Smith, 834 F.2d at 169 (citations omitted).  The Court is not certain, however, that the Smith standard really applies here.  The Court is not truly "reopening" discovery; after all, there will be another period of discovery forthcoming regardless of what the Court does with the Motion. Also, the Tenth Circuit refers to disrupting an imminent "trial" in the first Smith factor -- something which is not at stake here.

In a true motion to reopen discovery, the Court concludes that the Smith factors effectively replace rule 16's "good cause" standard -- or, perhaps more accurately, the Smith factors are dispositive as to how good cause applies in motions to reopen; either way, no separate good cause analysis is needed.[17]  With this Motion, however, the Court will stick with the generic rule 16 good-cause standard, but -- given the Motion's close kinship to a run-of-the-mill motion to reopen discovery -- it will view the Smith factors as highly instructive.  The Court will apply these factors in turn.

As to the first factor, the Court is not so sure that it should -- as the Defendants suggest -- substitute "class certification" for "trial," and conclude that the Plaintiffs fail this factor, per se, because the Court has already held its class certification hearing.  When a district court reopens discovery, in a non-class action, immediately before trial, it is disruptive to the opposing parties'

---

[17]The Defendants run this case's facts through the six Smith factors and then, apparently as a backstop, also analyze them under the rule 16 "good cause" standard for modifying scheduling orders.  Response at 12-15.  Reopening discovery is a species in the genus of scheduling-order modifications, and, so, when the Tenth Circuit outlines a number of factors specific to analyzing requests to reopen discovery, the Court assumes that those specific factors trump the general good-cause standard, i.e., Smith directs district courts how "good cause" is to be assessed in the specific context of reopening discovery, and the Court should not, thus, conduct a separate good-cause analysis on top of the Smith analysis.

attempts to "solidify" their trial plans, e.g., making witness travel arrangements, deciding how to present the evidence available, and even juggling attorney and paralegal work schedules. Here, the parties are heading into another discovery period, regardless, and the only question is the scope of the discovery to be permitted. On the other hand, the parties prepared for the class certification hearing in much the same way that they would prepare for a trial, and while reopening discovery will not disrupt the planning for or waste expenses associated with that hearing -- because it has already happened -- the Plaintiffs' request comes in the shadow of a request for a whole new class certification hearing, which threatens to duplicate the same work and expenses that the first hearing imposed. In the end, however, the Court concludes that this factor does not cut against the Plaintiffs; it would only cut in Defendants' favor if this request had come shortly before trial. After all, if the Plaintiffs prevail on their potentially forthcoming motion to reconsider, the Court will likely hold another class certification hearing, regardless. That granting a motion to reconsider will impose these additional expenses cuts against granting the motion to reconsider -- it is a valid "circumstance[]" affecting the strength that the Court should afford to the law-of-the-case "presumption" -- but that consideration is best left for the Court's analysis of the substantive motion to reconsider, and not taken into account here. Been v. O.K. Indus., Inc., 495 F.3d at 1225 (quoting Avitia v. Metro. Club of Chi., Inc., 49 F.3d 1219, 1227 (7th Cir. 1995)).

      As to the second factor, the Defendants oppose reopening discovery, and, thus, the factor cuts against the Plaintiffs. As to the third factor, the Court concludes that it cuts, mildly, against the Plaintiffs. The Defendants have an interest -- which would certainly be impaired if the Court reopened discovery -- in the speedy disposition of this case. Moreover, it costs money to comply with discovery requests, and the only items that the Plaintiffs appear to need from the Defendants

are the assignments, which the Defendants offered to the Plaintiffs during the first round of class certification discovery and which the Plaintiffs declined to review.  Forcing the Defendants to repeat a task they have already performed would be unfair to them, and it would reward the Plaintiffs' lack of diligence in the designated class certification discovery period.

As to the fourth factor, the Plaintiffs were not diligent in conducting discovery the first time: they could have easily obtained the assignments, but chose not to do so.  Worse, as the Court has already explained, the Plaintiffs declined the Defendants' invitation to review the assignments that the Defendants had on hand.  Although Roderick -- the Tenth Circuit case that sounded the death knell for class certification on the basis of undifferentiated treatment of classes with disparate lease provisions -- came out midway through the class certification discovery period, the Plaintiffs certainly should have recognized its significance before now.  If the Plaintiffs had come to the Court in July, 2013, when the Tenth Circuit issued the opinion -- or even several months afterward -- then the Plaintiffs might have prevailed on this factor, and the Court might have been inclined to extend or reopen class certification discovery so that the Plaintiffs could collect discovery on their reformed post-Roderick certification theory.  The Plaintiffs were well aware of Roderick before the hearing -- the Court asked the Plaintiffs about it at multiple motion hearings before the class certification hearing -- and at no time did the Plaintiffs request to extend or reopen discovery to obtain the additional information they needed to achieve certification in light of Roderick.  This factor, thus, cuts against the Plaintiffs.

As to the fifth factor, it also cuts against reopening discovery.  The Plaintiffs' requested discovery now has nothing to do with Court-imposed limitations on the first round of discovery.  Everything that the Plaintiffs now request could have been obtained in the first round of class certification discovery.   The one Court-imposed "limitation" that could possibility have

prevented the Plaintiffs from getting what they needed was the time limitation that the Court placed on discovery, and that limitation was both (i) fairly standard for a complex case; and (ii) subject to an eight-month extension.  Compare Scheduling Order at 1 (setting a close-of-discovery date for the class certification phase on April 1, 2013), with Amended Scheduling Order at 1 (pushing the class certification close-of-discovery out to December 5, 2013).  Even if the Court's time limitations had stifled the Plaintiffs' reasonable needs, they should have spoken up then, rather than waiting until after the hearing and after the Court denied certification.

The sixth and final factor also cuts against reopening discovery.  Here, the Court's earlier exposition of the substantive standard to which the Plaintiffs' request will be subjected is particularly relevant.  The Plaintiffs' avenue for seeking certification at this point is an ordinary motion to reconsider -- not a rule 59(e) or 60(b) motion -- but the Court will analyze it using a modified Servants of the Paraclete v. Does standard.  The Plaintiffs will need to present (i) new evidence -- not just a new presentation format; (ii) new law -- not just new argument; or (iii) a motion to reconsider that leaves the Court with the strong impression -- not just that class certification might now be appropriate, but that the Court erred in denying it the first time.  Imposing renewed discovery costs on Defendants who have already complied fully with a first round of discovery -- thus breaking the pact that the Court made with the parties in the Scheduling Order and Amended Scheduling Order -- would be more justifiable if the Plaintiffs had a better-than-even chance of capitalizing on the new information they hope to obtain.  The Plaintiffs, however, have a lower chance of success now than they have had at any point in this case.

Turning back to rule 16's master good-cause standard -- the touchstone of which is the moving party's diligence in getting what he or she needed under the original intended timeframe

-- the Court concludes that the Plaintiffs come up short.  See Street v. Curry Bd. of Cnty. Comm'rs, 2008 WL 2397671, at *6 ("Properly construed, 'good cause' means that scheduling deadlines cannot be met despite a party's diligent efforts.").  They received one rather generous extension, and never asked for another, from Defendants who were generally amenable to working with such requests.  The Tenth Circuit's issuance of Roderick, a potentially theory-of-the-case-altering opinion, provides a plausible explanation for the Plaintiffs' failure to obtain the information they needed in the time allotted, but they still had ample time.  Furthermore, the Plaintiffs, to this day, have not raised Roderick's issuance as an excuse, leading the Court to believe that it was not the cause for the discovery defects that they now seek to rectify.

As for the Plaintiffs' suggestion that the Court blindsided them by refusing to certify this case under a management plan that treats all of the proposed class leases the same -- i.e., one that ignores textual variations among leases -- the Court is, itself, caught somewhat off-guard.  The Court believes in resolving case on the merits, and it worked hard to formulate a class-management plan capable of accurately disposing of the claims of each and every proposed class member.  Ultimately, however, the Court's system -- which it concluded was the simplest and most efficient one possible, while still being sensitive to textual variations and, thus, fair to the Defendants -- failed to satisfy rule 23's commonality and predominance requirements, as the Supreme Court of the United States and the Tenth Circuit construe them.  The Plaintiffs now, apparently, argue that the Court should have ignored inter-class textual variations and treated the entire proposed class as if all members had signed a single generic lease form.  Whether the Plaintiffs call their theory the marketable-condition rule or the implied duty to market -- and the Plaintiffs have called it both, and the Court has dismissed it under both stylings -- Roderick forecloses it.  If the Court were to summarize Roderick's holding -- or at least its practical import

-- in a single sentence, it would be something along the lines of: "A district court cannot treat a proposed oil-and-gas-royalty class as a monolithic unit if the members have materially different leases from one another."  The Court largely started its class certification analysis from this point, and if doing so caused the Plaintiffs to feel as if the Court did not notice or appreciate their implied-covenant, treat-them-all-as-one arguments, then the Plaintiffs should look back to either, or both, of the two prior opinions that the Court wrote dismissing the claim on which the Plaintiffs argued for uniform class treatment.  See Memorandum Opinion and Order at 84-95, filed May 16, 2014 (Doc. 246)("MOO"); Memorandum Opinion at 128-36, filed June 28, 2013 (Doc. 108)("Memo. Opinion").  The Court has canvassed this issue thoroughly, and it does not know what else to say at this juncture.  The Court agrees with the Defendants:

> [N]ot once, but twice, this Court has dismissed the very claim that [the Plaintiffs] now [argue] is central to their second bite at the apple . . . .  [I]f they believed that the Court erred in dismissing the[] . . . claim, either on the first dismissal or the second dismissal, they could have moved for reconsideration then.

Tr. at 26:25-27:3 (Sutphin); id. at 27:24-28:3 (Sutphin).

The Court will therefore deny the Plaintiffs' request to reopen class certification discovery, and the coming discovery period will be limited to merits issues.  The Plaintiffs have, however, two openings to obtain the information they now seek.  First, as discussed at the hearing, nothing is stopping the Plaintiffs from informally obtaining information on their own -- including seeking copies of the class assignments from public offices.  The Court's ruling today means only that the Defendants are under no obligation to comply with the Plaintiffs' requests, and the Plaintiffs may not use the Court's subpoena power to compel non-parties' compliance.  Second, some -- and probably most -- of the parol evidence that the Plaintiffs seek can be obtained in the coming discovery period.  The meanings of the various terms in the named Plaintiffs' leases present a merits issue, and the Plaintiffs are thus free to seek discovery on it.  If

- 56 -

the Court had certified the class, it would have expected the parties to collect and present evidence -- both at trial and, potentially, before it -- establishing what the various lease royalty provisions mean.  Now, the Plaintiffs may not seek discovery on lease provisions that exist only in absent class members' leases, but, if one or more named Plaintiffs have a lease that says $x$, then the Plaintiffs may use the Federal Rules' discovery tools to obtain parol evidence on what $x$ means.

The Court will thus grant the Motion, and will set a scheduling conference for June 2, 2015, at 9:00 a.m.  It will vacate that scheduling conference if the Plaintiffs file a motion to reconsider before that time.  Regardless of when the Court finally holds this scheduling conference, the conference will be for the sole purpose of planning discovery, pre-trial, and trial timelines for the named Plaintiffs' case, and will not involve reopening class certification discovery.

**IT IS ORDERED** that: (i) the Plaintiffs' Motion for a Scheduling Conference, filed March 31, 2015 (Doc. 279), is granted in part and denied in part; (ii) the Court will not allow the Plaintiffs to use the forthcoming discovery period to obtain information relevant only to class certification; (iii) the Court will tentatively set a status conference for June 2, 2015, at 9:00 a.m.; and (iv) the Court will vacate that status conference if the Plaintiffs file a motion to reconsider before that date.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Stan Koop
Norman, Oklahoma

--and--

Stephen R. McNamara
Brian Inbody
McNamara, Inbody & Parrish, PLLC
Tulsa, Oklahoma

--and--

Karen Aubrey
Santa Fe, New Mexico

--and--

Brian K. Branch
Albuquerque, New Mexico

--and--

Turner W. Branch
Cynthia Zedalis
Branch Law Firm
Albuquerque, New Mexico

--and--

Bradley D. Brickell
Brickell & Associates, P.C.
Norman, Oklahoma

> *Attorneys for the Plaintiffs*

Sarah Gillett
Dustin L. Perry
Hall Estill Hardwick P.C.
Tulsa, Oklahoma

--and--

Christopher A. Chrisman
Holland & Hart LLP
Denver, Colorado

--and--

Mark F. Sheridan
Bradford C. Berge
Robert J. Sutphin
John C. Anderson
Holland & Hart LLP
Santa Fe, New Mexico

*Attorneys for the Defendants*