IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

THE ANDERSON LIVING TRUST f/k/a THE
JAMES H. ANDERSON LIVING TRUST;
THE PRICHETT LIVING TRUST; CYNTHIA
W. SADLER and ROBERT WESTFALL,

        Plaintiffs,

vs.                                                         No. CIV 12-0040 JB/KBM

WPX ENERGY PRODUCTION, LLC f/k/a
WPX ENERGY SAN JUAN, LLC; WILLIAMS
PRODUCTION COMPANY, LLC and WPX
ENERGY ROCKY MOUNTAIN, LLC f/k/a
WILLIAMS PRODUCTION RMT
COMPANY, LLC,

        Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Plaintiffs' Motion for Reconsideration of Order Denying Class Certification, filed June 1, 2015 (Doc. 288)("Motion").  The Court held a hearing on October 23, 2015.  The primary issue is whether the Court should reconsider its earlier Memorandum Opinion and Order, filed March 19, 2015, in which the Court denied the Plaintiffs' Motion and Supporting Brief to Determine That This Matter Proceed as a Class Action, filed January 6, 2014 (Doc. 194), on the ground that the Plaintiffs did not satisfy rule 23 of the Federal Rules of Civil Procedure's requirements.  The Court concluded that the Plaintiffs did not meet rule 23's commonality and predominance requirements because the Court had to examine too many different lease variations to resolve the proposed class' claims.  See Memorandum Opinion and Order at 1-3, filed March 19, 2015 (Doc. 278)("Class Certification MOO").  The Plaintiffs contend that the implied-duty-to-market claim provides a basis on which

the Court can certify a class.  Because the Court dismissed the claim on which the Plaintiffs argue that the Court should reconsider its Class Certification MOO, and because the Plaintiffs provide no other sound reasons for the Court to change its earlier ruling, the Court declines to change its ruling and will thus deny the Motion.

## FACTUAL BACKGROUND

The Court has summarized the Plaintiffs' factual allegations on numerous occasions, see Anderson Living Trust v. ConocoPhillips Co., LLC, 952 F. Supp. 2d 979 (D.N.M. 2013)(Browning, J.)("First MTD MO"); Anderson Living Trust v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1192-95 (D.N.M. 2014)(Browning, J.)("Second MTD MOO"); Anderson Living Trust v. WPX Energy Prod., LLC, 2015 WL 3543011 (D.N.M. May 26, 2015)(Browning, J.).  The Court has even made extensive factual findings for the purposes of deciding whether to certify this case as a class action.  See Class Certification MOO at 3-75.  It incorporates by reference those discussions, and sets forth additional facts pertinent to the issues raised in this Memorandum Opinion and Order.

The named Plaintiffs are: the Anderson Living Trust, formerly known as the Jams H. Anderson Living Trust; the Prichett Living Trust; Cynthia W. Sadler; and Robert Westfall.  The named Plaintiffs are individuals and trusts owned by individuals with no in-depth knowledge of the oil-and-gas industry.  Owing to the leases' ages, no Plaintiff personally executed the lease that now pays his, her, or its royalty; rather, all of the named Plaintiffs inherited their royalty interests.  See Complaint ¶ 26, at 10-12.  There are two Defendants in this case: (i) WPX Energy Production, LLC ("WPX Energy"), formerly known as WPX Energy San Juan, LLC, and Williams Production Company, LLC; and (ii) WPX Energy Rocky Mountain, LLC ("WPX

Rocky Mountain"), formerly known as Williams Production RMT Company, LLC.  The Court will refer to WPX Energy and WPX Rocky mountain as "the Defendants."

This case is a proposed class action on behalf of landowners who executed long-term leases with the Defendants.  See Fourth Amended Complaint for Underpayment of Oil and Gas Royalties ¶ 26, at 10-12, filed September 27, 2013 (Doc. 129)("FAC").  The leases, which were executed largely in the 1940s, allow the Defendants to drill for natural gas on the Plaintiffs' land in exchange for a royalty payment -- usually one-eighth of the proceeds from sale.  See Complaint ¶ 26, at 10-12.  The Plaintiffs contend that the Defendants have been underpaying the royalties in a number of ways[1] -- most notably by paying royalties on natural-gas liquids at the same price per MMBtu[2] that they pay for natural gas, which is a cheaper product.  See Complaint ¶¶ 12-105, at 5-33.  The Plaintiffs seek damages for this underpayment going back to 1985.  See Complaint ¶ 33, at 14.

---

[1]The Plaintiffs also allege, in addition to underpaying on natural-gas liquids, that: (i) the Defendants improperly deduct the costs of rendering the gas into marketable condition, see Complaint ¶¶ 102-105, at 32-33; (ii) the Defendants have failed to compensate the Plaintiffs for gas that the Defendants used off the leased premises to operate machinery, see Complaint ¶ 39, at 16; (iii) the Defendants have made late royalty payments without adding the statutorily prescribed interest, see Complaint ¶¶ 56-61, at 20-21; (iv) the Defendants based their royalty price off of affiliate-sale prices, rather than on proceeds yielded at arm's length transactions, see Complaint ¶ 33, at 14; and (v) the Defendants have improperly averaged royalty payments across multiple wells, thus resulting in some Plaintiffs being underpaid, see Complaint ¶ 12, at 5.

[2]An MMBtu is 1,000,000 Btus.  A Btu is a "British thermal unit," which is a unit of energy equivalent to approximately 1,055 joules.  The joule (J) is the SI -- or International System of Units -- unit of energy, and it is the amount of energy required to exert one Newton (N) of force over a distance of one meter.  A Newton is the amount of force required to accelerate one kilogram of mass by one meter per second-squared.  See Memorandum Opinion and Order ¶¶ 66-67 & nn.6-7, at 16, filed March 19, 2015 (Doc. 278).

The only consistent information[3] that the Plaintiffs received regarding their royalties are their monthly check stubs, which contain figures -- broken down by well, for those Plaintiffs who own royalty interests in more than one well -- for the total "price," "quantity," "value," "deductions," and "net [proceeds]" of all gas recovered from the Plaintiffs' wells over that payment period, and the "interest," "paid int[erest]," "value," "deductions," and "net share" of the Plaintiffs' royalty.   E.g., Check Stubs of James H. Anderson Living Trust (dated over numerous years), filed with the Court during the class certification proceedings as Plaintiffs' Ex. 1.   See Complaint ¶¶ 86-87, at 26-27; id. ¶ 95, at 28-29.   The Plaintiffs also receive the checks, which contain only the final dollar figure of the royalty payout for that payment period. See, e.g., Check Stubs of James H. Anderson Living Trust at 1-2.

## PROCEDURAL BACKGROUND

In the Class Certification MOO, the Court stated that the Plaintiffs must satisfy rule 23's requirements to proceed as a class action.   See Class Certification MOO at 231.   "To be certified under rule 23(b)(3), a class must meet all four of rule 23(a)'s requirements -- numerosity, commonality, typicality, and adequacy -- and both of rule 23(b)(3)'s requirements -- predominance and superiority."   Class Certification MOO at 231.   The Court concluded that, "although the underpayment claims satisfy rule 23(a)'s other requirements, they lack commonality under rule 23(a)(2)."   Class Certification MOO at 231.   Second, the Court determined that "the underpayment claims fail to satisfy rule 23(b)(3)'s predominance

---

[3]By "consistent information," the Court means the only information that the entire class received, consistently, from 1985 to the present.   According to the Complaint, the check stubs are the only affirmative representations that the Defendants made to the Plaintiffs regarding royalty calculations.

The Defendants also have a staff member whose full-time job is to field questions from royalty owners, like the Plaintiffs.   The Defendants presented evidence at the class certification hearing showing that a small but significant number of proposed class members called to inquire about their royalty payments.

requirement."  Class Certification MOO at 231.  The Court therefore denied the Plaintiffs'

motion to certify the case as a class action.  See Class Certification MOO at 283.  Before the

Court considered whether to certify a class, however, it considered whether to dismiss the

Plaintiffs' claims for breach of the implied duty to market.

### 1. The Court's Dismissal of the Plaintiffs' Third Cause of Action.

In the Plaintiffs' third cause of action, they asserted that the Defendants' practice of

deducting the cost of rendering the hydrocarbons marketable from the Plaintiffs' royalty

payments violated the implied duty to market.  See First Amended Complaint for Underpayment

for Oil and Gas Royalties ¶¶ 41-53, at 13-16, filed January 12, 2012 (Doc. 1-1); Second

Amended Complaint ¶¶ 43-55, at 13-16, filed February 16, 2012 (Doc. 10)("SAC").  The Court

construed their claim as an assertion that the Defendants violated the marketable-condition rule

sub-part of the implied duty to market.  Although each state describes the marketable-condition

rule in its own way, in general, the marketable-condition rule prohibits lessees from deducting

certain post-production costs from lessors' royalty payments.  See Garman v. Conoco, Inc., 886

P.2d 652, 661 (Colo. 1994); Wood v. TXO Prod. Corp., 854 P.2d 880, 882 (Okla. 1992);

Gilmore v. Superior Oil Co., 192 Kan. 388, 388 P.2d 602, 606 (1964).  In contrast, the implied

duty to market is broader: it requires lessees to extract the minerals subject to a lease and to

market them.  See Elliott Indus. LP v. BP Am. Prod. Co., 407 F.3d 1091, 1113 (10th Cir.

2005)("Elliott Industries").  After an extensive consideration of Tenth Circuit precedent, the

Court concluded that "the Tenth Circuit's decision in Elliott Industries bars the Plaintiffs'

allegation of a breach of the marketable condition rule and breach of the implied duty to market

hydrocarbons."  First MTD MO, 952 F. Supp. 2d at 1046-47.

The Court described the facts of Elliott Industries in detail, exploring all of the Plaintiffs' contentions that Tenth Circuit precedent did not foreclose the Court from determining that New Mexico law recognized their cause of action.  See First MTD MO, 952 F. Supp. 2d at 1022-24.  The Court described how, in Elliott Industries, the plaintiffs alleged that the lessee defendant breached the implied duty to market by taking "'excessive cost deductions" from the plaintiffs' royalty payments.  First MTD MO, 952 F. Supp. 2d at 1022.  In other words, the plaintiffs alleged that the defendants violated the marketable-condition rule sub-part of the implied duty to market.  The Court explained that the Tenth Circuit determined that: (i) New Mexico had not adopted the marketable-condition rule; and (ii) the defendants did not violate "any implied duty to market under New Mexico law" because they were actively producing, processing, and selling the refined gas, which "'complied with the implied duty to market as articulated by the New Mexico courts.'"  First MTD MO, 952 F. Supp. 2d at 1023 (quoting Elliott Industries, 407 F.3d at 1113).

The Court then exhaustively described New Mexico case law considering whether the marketable-condition rule is implied as a matter of law into oil and gas leases.  See First MTD MO, 952 F. Supp. 2d at 1023-24.  It explained how the Supreme Court of New Mexico has twice "expressly declined" to adopt the marketable condition rule.  First MTD MO, 952 F. Supp. 2d at 1023.  The Court then determined that Elliott Industries precluded the Plaintiffs' allegation that the Defendants breached the marketable-condition rule sub-part of the implied duty to market.  See First MTD MO, 952 F. Supp. 2d at 1048.  The Court therefore discussed how Elliott Industries foreclosed the Plaintiffs' assertion that the Defendants could not deduct post-production costs from their royalty payments.  It did not consider whether Elliott Industries foreclosed the argument that the implied duty to market requires lessees to secure the best price

- 6 -

reasonably obtainable.  See First MTD MO, 952 F. Supp. 2d at 1049.  The Court concluded that,

because Elliott Industries precluded the Plaintiffs' claim that the Defendants' cost deductions

violated the marketable-condition rule sub-part of the implied duty to market, the Court had to

dismiss their claim.  See First MTD MO, 952 F. Supp. 2d at 1049.  The Court wrote a detailed

footnote explaining its disagreement with the Tenth Circuit's conclusion that New Mexico's

implied duty to market did not include the marketable condition rule.  Because the Court's

reasoning is relevant to this opinion, and because it provides a thorough explanation of the

marketable-condition rule, it provides that footnote here:

> Although the Court is bound by the Tenth Circuit's interpretation of New
> Mexico law, the Court is not convinced that the *Elliott Indus.*' plaintiffs'
> "conception of the implied duty to market finds no support within New Mexico
> case law."  407 F.3d at 1114.  From the time that the Tenth Circuit made this
> statement in *Elliott Indus.*, at least three New Mexico district courts have found
> that, "under the implied duty to market, the marketable condition rule applies in
> New Mexico."  *Davis v. Devon Energy Corp.*, 2009–NMSC–048, ¶ 14, 147 N.M.
> 157, 218 P.3d 75 (citing *Davis v. Devon Energy Corp.,* 2008–NMCERT–003, 143
> N.M. 682, 180 P.3d 1181; *Ideal v. BP Am. Prod. Co.*, 2008–NMCERT–003, 143
> N.M. 683, 180 P.3d 1182; *Smith v. ConocoPhillips Co.*, 2008–NMCERT–003,
> 143 N.M. 683, 180 P.3d 1182).  In *Davis v. Devon Energy Corp.*, 2009–NMSC–
> 048, 147 N.M. 157, 218 P.3d 75, the Supreme Court of New Mexico did not
> address the existence of the marketable condition rule, because it found that the
> matter was "not ripe for review at this time," as the New Mexico state district
> courts had left open questions regarding the scope of the rule. 2009–NMSC–048,
> ¶ 15, 147 N.M. 157, 218 P.3d 75.  The Supreme Court of New Mexico made a
> similar statement in *ConocoPhillips Co. v. Lyons*.  *See* 2013–NMSC–009, ¶ 64,
> 299 P.3d 844 ("As we indicated in *Davis*, whether the marketable condition rule
> applies in New Mexico is not yet ripe for review.").  These pronouncements from
> the Supreme Court of New Mexico indicate, far from precluding the existence of
> the marketable condition rule as a matter of law within the state, that the Supreme
> Court of New Mexico considers the issue undetermined and, moreover, intends to
> address its existence when the record before the Supreme Court of New Mexico
> fully presents the issue.
>       The Court believes that, if and when the Supreme Court of New Mexico
> determines that the existence of the marketable condition rule is ripe for review, it
> will find that the rule is included in oil-and-gas contracts as part of the implied
> duty to market.  Colorado, Wyoming, Kansas, and Oklahoma have all adopted a
> version of the marketable condition rule.  The Supreme Court of Colorado
> announced its adoption of the marketable condition rule in *Garman v. Conoco,*

*Inc.*, 886 P.2d 652 (Colo. 1994).  The Supreme Court of Colorado held that, "absent an assignment provision to the contrary, overriding royalty interest owners are not obligated to bear any share of the post-production expenses . . . undertaken to transform raw gas produced at the surface into a marketable product." 886 P.2d at 661.  The Supreme Court of Colorado noted that, although an oil-and-gas lease is "entered into for the mutual benefit of the parties, not all parties participate equally in lease development decisions." 886 P.2d at 657. Interest owners, whether of royalty or overriding royalty interests, must defer to the lessees "where and when to drill, the formations to be tested and ultimately whether to complete a well and establish production." 886 P.2d at 657.  The Supreme Court of Colorado was also persuaded by its neighboring states' -- Wyoming, Kansas, and Oklahoma -- and the federal government's, requirement that lessees place gas in a marketable condition at no cost to the lessor.  *See* 886 P.2d at 658 (citing 30 C.F.R. § 206.153(i); Wyo. Stat. § 30–5–304(a)(vi) (1994 Supp.); *Wood v. TXO Prod. Corp.*, 854 P.2d 880, 882 (Okla. 1992); *Gilmore v. Superior Oil Co.*, 192 Kan. 388, 388 P.2d 602, 606 (1964)).  The Colorado Supreme Court explained that the marketable condition rule logically followed from a lessee's duty to effectuate the terms of a lease; the Supreme Court of Colorado reasoned that, just as the "purpose of an oil and gas lease could hardly be effected if the implied covenant to drill obligated the lessor to pay for his proportionate share of drilling costs," the purpose of a lease would be thwarted if lessors bore the cost of making a product marketable.  886 P.2d at 659.  The Supreme Court of Colorado rejected an argument from oil-and-gas producers that industry practice dictates that lessees and lessors bear proportionately post-production costs necessary to render gas marketable.  The Supreme Court of Colorado explained that, while other oil-and-gas producers may be aware of industry custom and factor that custom into oil-and-gas agreements, "[o]ften, however, executing an oil and gas lease, or assigning a federal lease won under the previously existing federal lottery system is the extent of a party's contact with the oil industry." 886 P.2d at 660.  The Supreme Court of Colorado further emphasized that the marketable condition rule is consistent with the bargaining power of lessees and lessors: "The payment of royalties is controlled by lessees, and lessors have no ready means of ascertaining current market value other than to take lessees' word for it." 886 P.2d at 660.

The Supreme Court of Kansas based its formulation of the marketable condition rule on Colorado's. In Kansas, the rule currently requires a lessee of an oil-and-gas lease to "bear the entire expense of producing the gas at the wellhead pursuant to the terms of the oil and gas lease.  Additionally, the lessee must bear the entire cost of putting the gas in condition to be sold pursuant to the court-made 'marketable condition rule.'" *Coulter v. Anadarko Petroleum Corp.*, 296 Kan. 336, 292 P.3d 289, 306 (2013)(citing *Sternberger v. Marathon Oil Co.*, 257 Kan. 315, 894 P.2d 788 (1995)).  The Supreme Court of Kansas adopted a version of the marketable condition rule in *Sternberger v. Marathon Oil Co.* that allowed a lessee to share with a royalty owner the costs of transporting a marketable product to a point of sale and "to enhance the value of the gas stream, *e.g.*, the processing costs to extract a saleable component such as helium." 292 P.3d at

306.  The Supreme Court of Kansas explained that, in Kansas, ambiguities in oil-and-gas leases must be construed against the lessee, but found that the oil-and-gas leases at issue were not ambiguous.  *See* 894 P.2d at 794.  Rather, the Supreme Court of Kansas' adoption of the marketable condition rule was based upon the lessee's duty to "produce a marketable product," which requires "the lessee alone [to] bear[ ] the expense in making the product marketable."  894 P.2d at 799.

Kansas' interpretation of the marketable condition rule which allows lessees to share the cost of transportation to the market with lessors may be vulnerable to attack.  The Supreme Court of Kansas recognized, in *Coulter v. Anadarko Petroleum Corp.*, that the Supreme Court of Colorado's decision in *Rogers v. Westerman Farm Co.*, 29 P.3d 887, 896–902 (Colo. 2001), "clarified that . . . . 'marketability' includes both the physical condition of the gas and the location of the gas, i.e., the commercial marketplace," and, therefore, whether oil-and-gas lessees in Kansas may share with lessors the cost of transporting marketable products to a market "may be questionable."  *Coulter v. Anadarko Petroleum Corp.*, 292 P.3d at 306 (quoting *Rogers v. Westerman Farm Co.*, 29 P.3d at 902, 903).  In *Rogers v. Westerman Farm Co.*, the Supreme Court of Colorado held that, under the marketable condition rule, "the expense of getting the product to a marketable condition and location are born by the lessee."  29 P.3d at 906.  The Supreme Court of Colorado explained that, whether gas is marketable is a question of fact, and requires evidence, first, that gas is "in the physical condition where it is acceptable to be bought and sold in a commercial marketplace," and, second, the gas must be in a location "that is, the commercial marketplace, to determine whether the gas is commercially saleable in the oil-and-gas marketplace."  29 P.3d at 905.  The Supreme Court of Colorado noted that "'a royalty clause should be construed in its entirety and against the party who offered it, and in light of the fact that the royalty clause is the means by which the lessor receives the primary consideration for a productive lease.'"  29 P.3d at 898 (quoting Owen L. Anderson, *Royalty Valuation: Should Royalty Obligations be Determined Intrinsically, Theoretically, or Realistically, Part 2 (Should Courts Contemplates the Forest or Dissect Each Tree?)*, 37 Nat. Resources J. 611, 636 (1997)).  The Supreme Court of Colorado reasoned that gas is not marketable until it is ready to be bought in a marketplace by a willing purchaser, and, accordingly, a lessee has not met its implied duty to market until a gas is transported to a marketplace, if transportation is necessary to reach purchasers.  *See* 29 P.3d at 904–06.

Similarly, the Supreme Court of Oklahoma's adoption of the marketable condition rule is based upon the bargaining power of oil-and-gas lessees and lessors.  In *Wood v. TXO Prod. Corp.*, the Supreme Court of Oklahoma explained that "[p]art of the mineral owner's decision whether to lease or to become a working interest owner is based upon the costs involved," and, when an interest owner agrees to a relinquish operating rights and lease a well in exchange for a royalty interest, as a lessor, the interest owner has no power to control post-production costs. 854 P.2d at 882–83.  The Supreme Court of Oklahoma reasoned that, if lessees, oil-and-gas producers, were allowed to share production and marketing costs with royalty owners, "royalty owners would be sharing the

burdens of working interest ownership without the attendant rights," including the greater share of proceeds which oil-and-gas producing lessees enjoy.  854 P.2d at 883.  Accordingly, the Supreme Court of Oklahoma held that "in Oklahoma the lessee's duty to market involves obtaining a marketable product."  854 P.2d at 883.

Texas, on the other hand, has not adopted the marketable condition rule, but, rather, interprets oil-and-gas leases more strictly in accordance with their terms.  The first case in Texas to discuss a marketable condition rule was *Danciger Oil & Refineries v. Hamill Drilling Co.*, in which the Supreme Court of Texas interpreted a royalty clause which stated that payments were to be made out of "all the oil, gas, casinghead gas, and other minerals produced, saved and marketed at the prevailing market price paid by major companies in the Gulf Coastal area from the properties."  141 Tex. 153, 171 S.W.2d 321, 322 (1943). The Supreme Court of Texas interpreted the lease as requiring the lessee to pay royalties for oil-and-gas "produced, saved and marketed," but not to "provide a market for all the products produced."  171 S.W.2d at 323.  The Supreme Court of Texas concluded that the language did not indicate that the gas produced from the subject wells would be "so mixed with other products as not to be 'gas' of the kind contemplated" and also concluded that the lessee's operating expenses, which lease required the lessees to bear, did not include expenses "of processing the named product into some other product after it has been produced."  171 S.W.2d at 323.  That there was no market for the gas in its unprocessed form in the vicinity of the wells did not sway the Supreme Court of Texas' ruling.  "The mere fact that there was then no market in that vicinity for the product then being produced from the lease, is not alone sufficient to justify us in overturning the plain, certain, and unambiguous terms of the contract."  171 S.W.2d at 323.  The Supreme Court of Texas concluded that the lessor was "bound to accept payments out of the gas as it was then being produced from the wells, and is not entitled to have the gas refined into some other commodity."  171 S.W.2d at 323.  The Supreme Court's decision in *Danciger Oil & Refineries v. Hamill Drilling Co.* has evolved into a rule in Texas courts: "Since the early history of oil and gas litigation, the courts have held that covenants are implied when an oil and gas lease fails to express the lessee's obligation to develop and protect the lease." *Amoco Prod. Co. v. Alexander,* 622 S.W.2d 563, 567 (Tex. 1981).  Accordingly, although Texas recognizes an implied duty to reasonably market oil and gas as part of an implied covenant of management and administration, which may be included in an oil-and-gas lease, the implied duty to market does not override language which specifies a particular payment method.  For example, the Supreme Court of Texas has held that a gas lease which provides for payments to be made based upon the gas' "market price" is not breached when a lessee contracts to sell the gas at a price above the prevailing market cost, reaping profits beyond that which it could obtain in an open market, but calculates and pays royalties based upon the lower, prevailing, market price for the gas, because the language of the lease provides for royalty payments in accordance with "market price." *Yzaguirre v. KCS Resources, Inc.*, 53 S.W.3d 368, 370, 373–75 (Tex. 2001)("Depending on future market behavior, this may be financially beneficial

- 10 -

to the lessor . . . or it may be less advantageous, as here.  In either event, the parties have received the benefit of their bargain.").

The Court believes that, when the Supreme Court of New Mexico determines the existence of the marketable condition rule is ripe for review, it will find the reasoning of Colorado, Kansas, Oklahoma, and Wyoming more persuasive than that of Texas.  Like Kansas and Colorado, which construe oil-and-gas leases against the lessees, the Supreme Court of New Mexico has established a "rule that an oil and gas lease is to be construed most strongly against the lessee."  *Greer v. Salmon*, 82 N.M. 245, 250, 479 P.2d 294, 299 (1970).  This canon of construction is consistent with the duties a lease imposes on a lessee, such as the duty of "achiev[ing] the primary purpose of the lease, to explore, develop and produce."  82 N.M. at 250, 479 P.2d at 299.  Colorado and Kansas have recognized that, once a lessor assigns its working and operating interests to a lessee, the lessee possesses the ability to evaluate and choose which post-production measures are necessary to render a gas marketable.  Based upon the lessee's ability to assess post-production measures, Kansas and Colorado have determined that the lessee, and not the lessor, should bear the cost of those measures, as lessors generally will have "'no ready means of ascertaining'" the cost-benefit of a post-production measure "'other than to take lessees' word for it.'"  *Garman v. Conoco*, 886 P.2d at 660 (quoting *Piney Woods Cnty. Life Sch. v. Shell Oil Co.*, 726 F.2d 225, 240 (5th Cir. 1984)).

A critique of the marketable condition rule is that it necessarily turns on questions of fact, which the Supreme Court of Colorado recognized in *Rogers v. Westerman Farm Co.*, because, whether a buyer is willing to purchase a product, and at what point, will vary from case to case.  *See Rogers v. Westerman Farm Co.*, 29 P.3d at 903–06; Scott Lansdown, *The Marketable Condition Rule*, 44 S. Tex. L. Rev. 667, 702–04 (Summer 2003)("The strongest argument against the marketable condition rule is that . . . if the rule is adopted, oil and gas lessees will be faced with an endless wave of expensive, burdensome and wasteful litigation . . . [because of] [t]he failure of . . . any real criteria for marketability.").  The Court does not believe that the factual questions necessary to determining marketability are fatal to the marketable condition rule.  The cases discussed herein indicate that, in certain locations and with certain products, no willing buyer may be found until an oil or gas product is either transformed into a different condition, or transported to a different location.  At a minimum, the burden which the marketable condition rule imposes is that a market-ready product is able to reach the hands of a willing buyer, which is a burden New Mexico has already determined lessees should bear. *Cf. Libby v. DeBaca*, 51 N.M. at 99, 179 P.2d at 265 (holding that the implied covenant to market requires a lessee to construct a plant for converting gas into dry ice at his own cost, because the gas could be marketed only in dry ice form).  The Court believes that the Supreme Court of New Mexico would find that, consistent with its holding that "pronouncement without disposition of the product is futile," the implied covenant to market includes a duty to render products marketable at the lessee's, and not lessor's, expense. *Darr v. Eldridge*, 66 N.M. at 263, 346 P.2d at 1044.  While the situation which allows a buyer to purchase an oil or gas product will vary from case to

case, the requirement that a royalty interest owner does not pay for the meeting of product and buyer is not onerous, and will, logically, be satisfied whenever a lessee realizes the goal of a lease: receiving a profit on oil-and-gas products. This finding leads to the second critique of the marketable condition rule: requiring a lessee to bear the burden of post-production costs is pointless, because the marketable condition rule will incentivize lessees to find purchasers that will purchase unrefined products. Unrefined or unprocessed oil and gas will necessarily sell at a lower cost, because purchasers of the unprocessed products will factor into the price their costs to process the oil or gas. This critique of the marketable condition rule concludes, therefore, that payments will be calculated on oil-and-gas profits less production costs, regardless whether the lessee bears those costs. In theory, therefore, the marketable condition rule may not increase royalty owners' profits beyond their present state, as the cost of production will be taken from royalty payments in either transaction. The only change is in the entity deducting post-production costs. *See* Lansdown, *supra*, at 705–07. The Court does not believe that the Supreme Court of New Mexico will find this critique persuasive. The Court believes that the Supreme Court of New Mexico will conclude that, while it is true, in either situation, that post-production costs must be borne somewhere, the marketable condition rule, nonetheless, avoids an inefficient result. If oil-and-gas lessees may pass the cost onto lessors, the lessees lose the motivation for purchasing the most cost-efficient post-production measures. Oil-and-gas producers, as lessees, may attempt to pass those costs downstream to purchasers, but, in that instance, the purchaser will be assessing its own costs, and will, again, be incentivized to take on only cost-efficient post-production measures. *See Libby v. DeBaca*, 51 N.M. at 99, 179 P.2d at 265. In sum, the marketable condition rule incentivizes the entities with the most knowledge and ability to produce oil-and-gas in the most cost-effective manner. Without the marketable condition rule, oil-and-gas producers, as lessees, may pass post-production costs onto lessor-royalty-owners, who lack the knowledge and ability to evaluate and choose the best option. For these reasons, the Court believes that the New Mexico Supreme Court will find that, included within the implied duty to market in New Mexico, is the marketable condition rule.

First MTD MO, 952 F. Supp. at 1025.

## 2.   The Court's Second Dismissal.

After the Court dismissed the Plaintiffs' third cause of action, the Plaintiffs filed a new complaint -- the FAC. See FAC at 1. The Plaintiffs sought leave to amend their complaint so that they could more clearly state their claim that the Defendants' cost deductions violated the implied duty to market. See Plaintiffs' Motion for Leave to File Fourth Amended Complaint at 5, filed August 28, 2013 (Doc. 114)("Motion for Leave to File FAC"). They did not ask to

amend their claim to state that the Defendants did not sell the hydrocarbons for the highest obtainable price.  Thus, under the heading "Third Cause of Action" for breach of the implied duty to market hydrocarbons under New Mexico law, the Plaintiffs stated that the Court dismissed the claim in its First MTD MO on June 28, 2013.  FAC at 17.  They asserted breach of the duty to market hydrocarbons under Colorado law as their new eleventh cause of action.  See FAC ¶¶ 98-101, at 30-31.  Additionally, they asserted in their new twelfth cause of action that the Defendants breached the implied duty to market by deducting certain post-production expenses from the Plaintiffs' royalty payments, and by selling the hydrocarbons to an affiliate company.  See FAC ¶¶ 103-04, at 32.

Once again, the Court dismissed the Plaintiffs' twelfth cause of action for breach of the implied duty to market under New Mexico law, because the claim was nearly identical to the Plaintiffs' claim for breach of the marketable-condition rule.  See Second MTD MOO, 27 F. Supp. 3d at 1242-44.  The Court stated that it "already dismissed a similar claim for breach of the implied duty to market" in the Plaintiffs' original third cause of action.  Second MTD MOO, 27 F. Supp. 3d at 1242.  The Court again cited Tenth Circuit precedent as foreclosing its ability to recognize the claim that the Plaintiffs asserted.  See Second MTD MOO, 27 F. Supp. 3d at 1243. Likewise, the Court expressed its doubts about "whether the Tenth Circuit was correct in proclaiming that New Mexico law does not recognize a marketable condition rule."  Second MTD MOO, 27 F. Supp. 3d at 1243.  In a multi-page footnote, the Court described how it was nonetheless bound by Tenth Circuit precedent.  See Second MTD MOO, 27 F. Supp. 3d at 1243-47.  As the Court stands by its reasoning, it provides the footnote in this opinion.[4]

---

[4]In determining the proper weight to accord Tenth Circuit precedent interpreting New Mexico law, the Court must balance the need for uniformity between federal court and state court interpretations of state law with the need for uniformity among federal judges.  If the Court

adheres too rigidly to Tenth Circuit case law, ignoring changes undergone by a state's law in the ensuing years, then parties litigating state law claims will be subject to a different body of substantive law, depending on whether they litigate in state court or federal court. This result frustrates the purpose of Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1938)("Erie"), which held that federal courts must apply state court interpretations of state law, rather than their own, in part so that parties achieve a consistent result regardless of the forum. This consideration pulls the Court in the direction of according Tenth Circuit precedent less weight, and according state court decisions issued in the ensuing years more weight. On the other hand, when the state law is unclear, it is desirable for there to at least be uniformity among federal judges as to its proper interpretation. Otherwise, different federal judges within the same circuit -- or even the same district, as district courts' decisions are not binding, even upon themselves -- would be free to adopt differing interpretations of a state's law. This consideration pulls the Court towards a stronger respect for vertical stare decisis, because a Tenth Circuit decision on point -- regardless whether it accurately reflects state law -- at least provides consistency at the federal level, so long federal district judges are required to follow it.

The Court must decide how to weigh Tenth Circuit case law against more-recent state court decisions, choosing a point on the spectrum between the two extremes: rigidly adhering to Tenth Circuit precedent unless there is intervening case law directly on point from the state's highest court, on one end; and independently interpreting the state law, regarding the Tenth Circuit precedent as persuasive authority, on the other. In striking this balance, the Court notes that it is generally more concerned about systemic inconsistency between the federal courts and the state courts than it is about inconsistency among federal judges. Judges, even those within a jurisdiction with ostensibly identical governing law, sometimes interpret and apply the law differently from one another; this inconsistency is part and parcel of a common-law judicial system. More importantly, litigants seeking to use forum selection to gain a substantive legal advantage cannot easily manipulate such inconsistency: cases are assigned randomly to district judges in this and many federal districts; and, regardless, litigants cannot know for certain how a given judge will interpret the state law, even if they could determine the identity of the judge pre-filing or pre-removal. All litigants know in advance is that whomever federal district judge they are assigned will look to the entirety of the state's common law in making his or her determination -- the same as a state judge would. Systemic inconsistency between the federal courts and state courts, on the other hand, not only threatens the principles of federalism, but litigants may more easily manipulate the inconsistency. When the Tenth Circuit issues an opinion interpreting state law, like Elliott Industries LP v. BP American Production Co., and the state courts subsequently shift away from that interpretation, litigants -- if the district courts strictly adhere to the Tenth Circuit opinion -- have a definite substantive advantage in choosing the federal forum over the state forum, or vice versa.

The Court further notes that district courts may be in a better position than the Tenth Circuit to be responsive to changes in state law. Tenth Circuit decisions interpreting a particular state's law on a specific issue are further apart in time than the collective district courts' are. More importantly, the Tenth Circuit does not typically address such issues with the frequency that the state's courts themselves do. As such, Tenth Circuit precedent can lag behind developments in state law -- developments that the district courts may be nimble enough to perceive and adopt. Additionally, much of the benefit of having a consistent Tenth Circuit-wide interpretation of a particular state's law is wasted. Other than Oklahoma, every state

encompassed by the Tenth Circuit contains only one federal judicial district, and there is relatively little need for federal judges in Wyoming and Kansas to have a uniform body of New Mexico law to which to look.  Last, the Court notes, respectfully, that district courts may be in a better position than the Tenth Circuit to develop expertise on the state law of the state in which they sit.  Every federal judicial district in the nation, except the District of Wyoming, covers at most one state.  It is perhaps a more workable design for each district court to keep track of legal developments in the state law of its own state(s) than it is for the Tenth Circuit to monitor separate legal developments in eight states.

Having outlined the relevant considerations, the Court thinks the proper stance on vertical stare decisis in the context of federal court interpretations of state law is as follows: the Tenth Circuit's cases are binding as to their precise holding -- what the state law was on the day the opinion was published -- but lack the positive precedential force that its cases interpreting a federal statute or the Constitution of the United States of America possess.  A district court considering a state law issue after the publication of a Tenth Circuit opinion on point may not come to a contrary conclusion based <u>only</u> on state court cases available to and considered by the Tenth Circuit, but it may come to such a conclusion based on intervening state court cases.  The Supreme Court of the United States has addressed what the federal courts may use when there is not a decision on point from the state's highest court:

> The highest state court is the final authority on state law, but it is still the duty of the federal courts, where the state law supplies the rule of decision, to ascertain and apply that law even though it has not been expounded by the highest court of the State.  An intermediate state court in declaring and applying the state law is acting as an organ of the State and its determination, in the absence of more convincing evidence of what the state law is, should be followed by a federal court in deciding a state question.  We have declared that principle in *West v. American Telephone and Telegraph Co.*, 311 U.S. 223 (1940), decided this day.  It is true that in that case an intermediate appellate court of the State had determined the immediate question as between the same parties in a prior suit, and the highest state court had refused to review the lower court's decision, but we set forth the broader principle as applicable to the decision of an intermediate court, in the absence of a decision by the highest court, whether the question is one of statute or common law.

> . . .  We have held that the decision of the Supreme Court upon the construction of a state statute should be followed in the absence of an expression of a countervailing view by the State's highest court, and we think that the decisions of the Court of Chancery [the New Jersey trial court] are entitled to like respect as announcing the law of the State.

> . . . .

> The question has practical aspects of great importance in the proper administration of justice in the federal courts.  It is inadmissible that there should be one rule of state law for litigants in the state courts and another rule for

- 15 -

litigants who bring the same question before the federal courts owing to the circumstance of diversity of citizenship. In the absence of any contrary showing, the rule [set forth by two New Jersey trial courts, but no appellate courts] appears to be the one which would be applied in litigation in the state court, and whether believed to be sound or unsound, it should have been followed by the Circuit Court of Appeals.

Fid. Union Trust Co. v. Field, 311 U.S. 169, 177-80 (1940)(footnotes omitted)(citations omitted). The Supreme Court has softened this position over the years; federal courts are no longer bound by state trial or intermediate court opinions, but "should attribute [them] some weight . . . where the highest court of the State has not spoken on the point." Comm'r v. Estate of Bosch, 387 U.S. 456, 465 (1967)(citing King v. Order of United Commercial Travelers, 333 U.S. 153, 159 (1948)). See 17A James Wm. Moore et al., Moore's Federal Practice § 124.20 (3d ed. 1999)("Moore's")("Decisions of intermediate state appellate courts usually must be followed . . . [and] federal courts should give some weight to state trial courts decisions." (emphasis omitted)(title case omitted)).

When interpreting state law, the Tenth Circuit does not and cannot issue a case holding that *x* is the law in New Mexico; it holds that the proper interpretation of New Mexico law, at the time the opinion is released, is *x*. Its holdings are descriptive, not prescriptive -- interpretive, not normative. Because federal judicial opinions lack independent substantive force on state law issues, but possess such force regarding federal law issues, the Court thinks the following is not an unfair summary of the judicial interpretive process: (i) when interpreting federal law, the federal appellate courts consider the existing body of law, and then issue a holding that both reflects and influences the body of law; that holding subsequently becomes a part of the body of law; but (ii) when interpreting state law, the federal appellate courts consider the existing body of law, and then issue a holding that only reflects the body of law; that holding does not subsequently become a part of the body of law. The federal district courts are bound to conclude that the Tenth Circuit's reflection of the then-existing body of law was accurate. The question is whether they should build a doctrine atop the case and use the existence of the Tenth Circuit's case to avoid any responsibility to independently consider the whole body of state law that exists when the time comes that diversity litigants raise the issue in their courtrooms. Giving such effect to the Tenth Circuit's interpretations of state law is at tension with Erie, giving independent substantive effect to federal judicial decisions -- i.e., applying federal law -- in a case brought in diversity.

The purpose of Erie is well-known and simple, and the Court should not complicate it beyond recognition: it is that the same substantive law governs litigants' cases regardless whether they are brought in a federal or state forum. For simplicity's sake, most courts have settled on the formulation that "the federal court must attempt to predict how the states' highest court would rule if confronted with the issue." Moore's § 124.22[3] (citing Comm'r v. Estate of Bosch, 387 U.S. 456, 465 (1967)("[A]n intermediate appellate state court [decision] is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." (citation omitted)(internal quotation marks omitted))). This may not be the most precise formulation if the goal is to ensure identical outcomes in state and federal court -- the Honorable Milton I. Shadur, United States District Judge, looks to state procedural rules to determine in which state

appellate circuit the suit would have been filed were it not in federal court, and then applies the state law as that circuit court interprets it, see Abbott Laboratories v. Granite State Ins. Co., 573 F. Supp. 193, 196-200 (N.D. Ill. 1983)(noting that the approach of predicting the state supreme court's holdings will often lead to litigants obtaining a different result in federal court than they would in state court, where only the law of the circuit in which they filed -- and certainly not nonexistent, speculative state supreme court law -- governs) -- but it is a workable solution that has achieved consensus.  See Allstate Ins. Co. v. Menards, Inc., 285 F.3d 630, 637 (7th Cir. 2002)("[W]e adhere today to the general rule, articulated and applied throughout the United States, that, in determining the content of state law, the federal courts must assume the perspective of the highest court in that state and attempt to ascertain the governing substantive law on the point in question.").  This formulation, built out of ease-of-use, does not relieve courts of their Supreme Court-mandated obligation to consider state appellate and trial court decisions. To the contrary, even non-judicial writings by influential authors, statements by state supreme court justices, the closeness of the vote on a prior case addressing the issue, and personnel changes on the court -- considerations that would never inform a federal court's analysis of federal law -- may validly come into play.  The question is whether the district courts must abdicate, across-the-board, the "would decide" aspect of the Erie analysis to their parent appellate courts when the Court of Appeals has declared an interpretation of state law.

The Erie doctrine results in federal cases that interpret state law withering with time. While cases interpreting federal law become more powerful over time -- forming the groundwork for doctrines, growing upward from one application (Congress may create a national bank) to many (Congress may set quotas on wheat-growing for personal consumption), expanding outward from the general (states must grant criminal jury trials) to the specific (the jury need not be twelve people, nor must it be unanimous) -- federal cases interpreting state law often become stale.  New state court cases -- even when not directly rebuking the federal court's statement of law -- alter the common-law legal landscape with their dicta, their insinuations, and their tone.  The Supreme Court of the United States, which picks cases its cases sparingly and for maximum effect, almost never grants certiorari to resolve issues of state law.

The question is whether the Court should look, not to Elliott Industries LP v. BP American Production Co., but to its own interpretation of New Mexico law, and conclude that New Mexico recognizes the marketable condition rule.  The issue is whether, by so doing, the Court would be jettisoning and ignoring Tenth Circuit precedent, or would be rather recognizing, after conducting the Erie-mandated inquiry, that New Mexico law has changed since its 2005 publication.  The Tenth Circuit's snapshot of New Mexico law may have been correct at the time, but it has decayed in the ensuing years.  It does not appear to have shaped New Mexico law to any discernible degree or to have been ratified as a proper interpretation: no New Mexico court has cited it, although the state courts must be aware of it; the oil companies are certain to have cited it in their briefs opposing the state courts' adoption of the marketable condition rule. When called upon to interpret New Mexico law in 2014, the Northern District of California -- unbound by Tenth Circuit precedent -- agreed with the Court's assessment that Elliott Industries LP v. BP American Production Co. no longer accurately reflects New Mexico law.  See Ellsworth v. U.S. Bank, N.A., No. C 12-02506 LB, 2014 WL 1218833, at *22 n.10 (N.D. Cal. March 21, 2014)(forthcoming in F. Supp. 2d)(citing Elliott Indus. LP v. BP Am. Prod. Co., 407 F.3d at 1117; Anderson Living Trust v. ConocoPhillips Co., 952 F. Supp. 2d 979, 1033 (D.N.M. 2013)(Browning, J.)).

---

The Court's views on Erie, of course, mean little if the Tenth Circuit does not agree. In Wankier v. Crown Equipment Corp., the Tenth Circuit said that,

> [w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do. In performing this ventriloquial function, however, the federal court is bound by ordinary principles of *stare decisis*. Thus, when a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, and on subsequent panels of this Court, unless an intervening decision of the state's highest court has resolved the issue.

Wankier v. Crown Equip. Corp., 353 F.3d 862, 866 (10th Cir. 2003)(McConnell, J.). From this passage, it seems clear the Tenth Circuit only permits a district court to deviate from its view of state law on the basis of a subsequent case "of the state's highest court." See The American Heritage Dictionary of the English Language 1402 (William Morris ed., New College ed. 1976)(defining "unless" as "[e]xcept on the condition that; except under the circumstances that"). A more aggressive reading of the passage -- namely the requirement that the intervening case "resolv[e] the issue" -- might additionally compel the determination that any intervening case law must definitively and directly contradict the Tenth Circuit interpretation in order to be considered "intervening."

It is difficult to know whether Judge McConnell's limitation of "intervening decision" to cases from the highest state court was an oversight or intentional. Most of the Tenth Circuit's previous formulations of this rule have defined intervening decisions inclusively as all subsequent decisions of "that state's courts," a term which seems to include trial and intermediate appellate courts. Even Koch v. Koch Industries, Inc., 203 F.3d 1202, 1231 (10th Cir. 2000), the primary authority upon which Wankier v. Crown Equipment Corp. relies, uses the more inclusive definition. In fact, Wankier v. Crown Equipment Corp. quotes its relevant passage:

> In the absence of intervening Utah authority indicating that a plaintiff is not required to prove a safer, feasible alternative design, we are bound to follow the rule of *Allen* [*v. Minnstar, Inc.*, 8 F.3d 1470 (10th Cir. 1993), a Tenth Circuit case interpreting an issue of Utah law], as was the district court. "Following the doctrine of stare decisis, one panel of this court must follow a prior panel's interpretation of state law, absent a supervening declaration to the contrary by that state's courts or an intervening change in the state's law." Koch v. Koch Indus., Inc., 203 F.3d at 1231.

Wankier v. Crown Equip. Corp., 353 F.3d at 867.

Whether the decision to limit the intervening authority a district court can consider was intentional or not, the Tenth Circuit has picked it up and run with it. In Kokins v. Teleflex, Inc., the Tenth Circuit, quoting Wankier v. Crown Equipment Corp., refused to consider an opinion from the Colorado Court of Appeals holding directly the opposite of an earlier Tenth Circuit interpretation of Colorado law. See Kokins v. Teleflex, Inc., 621 F.3d 1290, 1297 (10th Cir. 2010)(Holmes, J.)("[T]he Colorado Court of Appeals decided *Biosera*[*, Inc. v. Forma Scientific,*

*Inc.*, 941 P.2d 284 (Colo. Ct. App. 1998)], so it is not an 'intervening decision of the state's *highest court*.'" (emphasis in original)(quoting <u>Wankier v. Crown Equip. Corp.</u>, 353 F.3d at 866)).

The Tenth Circuit has set forth a stringent restriction on its district courts' ability to independently administer the <u>Erie</u> doctrine. More importantly, the Tenth Circuit's view may be at tension with the above-quoted Supreme Court precedent, as well as its own prior case law. <u>Moore's</u> lists the Tenth Circuit as having been, at one time, a "court[ that] hold[s] that a prior federal appellate decision [interpreting state law] is persuasive." <u>Moore's</u> § 124.22[4] (citing <u>State Farm Mut. Auto. Ins. Co. v. Travelers Indem. Co.</u>, 433 F.2d 311, 312 (10th Cir. 1970)). Still, the Court is bound to abide by the Tenth Circuit's interpretation of <u>Erie</u>. This scheme may be inefficient, because the plaintiffs may appeal, after trial, the Court's ruling on the marketable condition rule. The Tenth Circuit may certify the question to the Supreme Court of New Mexico, and the Tenth Circuit may then have to reverse the Court after a full trial on the merits.

Even knowing the high bar the Tenth Circuit now sets for what constitutes intervening case law, the Court is tempted to conclude that <u>Davis v. Devon Energy Corp.</u> directly and unequivocally overrules <u>Elliott Industries LP v. BP American Production Co.</u>, for three broad reasons. First, the Tenth Circuit analyzed the implied duty to market as a term implied in fact, not one implied in law. An implied-in-fact term is a "real" contractual term, put there by the parties' agreement -- albeit their unwritten and unspoken agreement. Because its origins are in the parties' agreement, direct conflict with a written term of the contract destroys the implied term. Other than having the word "implied" in them, implied-in-fact terms have little in common with implied-in-law terms, like the covenant of good faith and fair dealing, which the courts "imply" onto all contracts -- without the pretense that the parties silently agreed to the term, and, in fact, often in spite of the parties' agreement. When <u>Davis v. Devon Energy Corp.</u> held that the marketable condition rule was an implied-in-law term, reversing the district judge who styled it as an implied-in-fact term, it undermined the logic of <u>Elliott Industries LP v. BP American Production Co.</u>. To the extent that the Tenth Circuit's case can still be read for its narrow conclusion -- now supported only by damaged logic -- that there is no marketable condition rule in New Mexico, the Court will decline to ignore <u>Elliott Industries LP v. BP American Production Co.</u> on this ground.

Second, the Court notes that <u>Davis v. Devon Energy Corp.</u> may have held that there is a marketable condition rule, and its unambiguous disclaimer to the contrary, literally in all-caps and boldface type, that it "do[es] not address the marketable condition rule," may have been mere dicta (albeit clear, and loud, dicta). 2009-NMSC-048, ¶ 14, 218 P.3d at 80 (emphasis omitted). In that case, the district court had concluded that there was a marketable condition rule governing primary conduct in New Mexico, but declined to certify a class action for its breach because the district court thought that the rule was an implied-in-fact term. New Mexico procedure entitles parties to a contract to a parol evidence hearing on all disputed contractual terms, and the district court thought that these hearings -- which would need to be individualized -- would render the class action unmanageable. The Supreme Court of New Mexico reversed on an abuse-of-discretion standard, holding that the marketable condition rule is an implied-in-law term -- for which no parol evidence hearings would need to occur -- and certified the class action. <u>See</u> 2009-NMSC-048, ¶¶ 37, 40, 218 P.3d at 86, 87. The Supreme Court of New Mexico did not purport to hold that the marketable condition rule actually exists, but rather that, if it does exist, it is an implied-in-law duty. If that were the case's holding,

The Court also further described the implied duty to market claim as the Tenth Circuit has described it.  The Court recognized that the duty includes an obligation to market the hydrocarbons for both the lessor's and the lessee's interest, acting as a reasonably prudent operator.  See Second MTD MOO, 27 F. Supp. 3d at 1248.  Nevertheless, because the Plaintiffs claimed that the Defendants breached the duty by improperly deducting costs -- the marketable condition rule sub-part -- the Court concluded that Elliott Industries foreclosed the Plaintiffs' claim and that the Court had already dismissed a nearly identical claim.  Second MTD MOO, 27 F. Supp. 3d at 1248.  Specifically, the Court noted "that it has already dismissed at least part of the claim that the Plaintiffs now style as the twelfth cause of action" in the First MTD MO which dismissed the Plaintiffs' third cause of action.  Second MTD MOO, 27 F. Supp. 3d at 1249.

---

however, the Court cannot see how the district court's error would not be harmless: the district court misconstrued the nature of a cause of action, but the cause of action does not exist -- at least not according to the Supreme Court of New Mexico -- at all, so no legally cognizable harm was done to the plaintiffs.  The Court, however, is reticent to defy the express declaration of a state's highest court in implementing the Erie doctrine, so it will not adopt this view.  Moreover, the Supreme Court of New Mexico declined from deciding whether the marketable condition rule exists, no doubt knowing about the Tenth Circuit's opinion in Elliott Industries LP v. BP American Production Co., and did not take the opportunity to make it clear to the federal courts what the law is.

Third, and perhaps most obvious, whatever else can be said about Davis v. Devon Energy Corp.'s holding, one thing is clear: the Supreme Court of New Mexico permits, even if it does not direct, its subordinate courts to recognize and apply the marketable condition rule.  The Court can, additionally, find no case holding that a district court may decline to recognize the marketable condition rule.  The Court, however, is not confident this holding applies in federal court.  Even if the Supreme Court of New Mexico intended to extend its invitation to adopt the marketable condition rule to the federal courts -- and there is no indication that it did -- New Mexico trial courts have some freedom to be a part of shaping New Mexico law, and recognizing novel or uncertain causes of action may be appropriate for them to do.  The Court, on the other hand, is bound to interpret and apply the state law of New Mexico, without injecting its own policy preferences.  Were it not for its opinion that the marketable condition rule already exists in New Mexico, the Court would likely not consider adopting a state cause of action that was merely permissive as to the state's district courts, and that being so, the Court will not allow its disagreement with the Tenth Circuit to cloud its judgment here.  The Court will apply the Tenth Circuit's holding from Elliott Industries LP v. BP American Production Co., and conclude that it is not free to decide that the marketable condition rule exists under New Mexico law.

In sum, the Court did not consider whether New Mexico's implied duty to market included an obligation on the lessee to obtain the highest obtainable price for the hydrocarbons. Nor did it consider whether <u>Elliott Industries</u> foreclosed such a determination. It simply dismissed the claim as the Plaintiffs pled it. The parties have filed several motions to reconsider in this case. <u>See, e.g.</u>, <u>Anderson Living Trust v. WPX Energy Prod., LLC</u>, 2015 WL 3543011 (D.N.M. May 26, 2015)(Browning, J.). Nevertheless, the Plaintiffs did not file a motion asking the Court to reconsider its dismissal of their third or twelfth cause of action on the grounds that the Court did not consider the assertion that the Defendants failed to obtain the highest obtainable price for the hydrocarbons.[5]

### 3.     The Class Certification Order.

The Plaintiffs sought to certify a class action on behalf of all individuals and entities who own wells operated by WPX Energy and/or WPX Rocky Mountain in the San Juan Basin. <u>See</u> Plaintiffs' Motion and Supporting Brief to Determine That This Matter Proceed as a Class Action at 3, filed January 6, 2014 (Doc. 194)("Class Certification Motion"). The proposed class definition covers approximately 3,157 wells, about 268 of which are in Colorado and roughly 2,889 of which are in New Mexico. <u>See</u> Class Certification MOO ¶ 150, at 30. It covers 507 leases and would include more than 2,300 members. <u>See</u> Class Certification MOO ¶¶ 152-155, at 30. The Court held a two-part class certification hearing with its first portion on March 10, 11, and 12, 2014, and its second portion on April 3 and 4, 2014. <u>See</u> Class Certification MOO at 1.

---

[5]The Defendants also moved the Court to dismiss the claims that the Plaintiffs asserted in <u>Anderson Living Trust v. ConocoPhillips Co., LLC</u>, No. CIV 12-0039 JB/KBM, which were the same as the ones that the Court dismissed in the present case. <u>See</u> <u>Anderson Living Trust v. ConocoPhillips Co., LLC</u> ("May 26 MO"), 2015 WL 3543011, at *42-43. For a third time, the Court described the scope of the implied duty to market and how the Tenth Circuit's decision in <u>Elliott Industries</u> precluded the Plaintiffs' claims.

The Court elected to make formal findings of fact in ruling on the Class Certification Motion.

See Class Certification MOO at 3 n.2.

The Court described in detail the various royalty provisions in the leases:

### a.     The Royalty-Provision Breakdown of the New Mexico Leases.

244.     Sixty-eight of the ninety-nine total New Mexico leases are single-pronged, and thirty-one are double-pronged.   See Lease Language Chart (Defendants' Ex. 191).

245.     Sixty-seven of the sixty-eight double-pronged New Mexico leases pay based on "proceeds on the sale of gas, as such" and the other lease pays on the basis of "net proceeds at the well."  Lease Language Chart (Defendants' Ex. 191).

246.     Twenty-four of the thirty-one double-pronged New Mexico leases pay on the basis of "proceeds if sold at the well, or if marketed off the premises, market value at the well."  Lease Language Chart (Defendants' Ex. 191).

247.     Six of the thirty-one double-pronged New Mexico leases pay on the basis of "gross proceeds for gas used off the premises" and, "if used in the manufacture of gasoline, prevailing market rate."   Lease Language Chart (Defendants' Ex. 191).

248.     One of the thirty-one double-pronged New Mexico leases pays on the basis of "market value at the well of the gas sold or used, provided that on gas sold the market value shall not exceed the amount received for such gas computed as the mouth of the well."  Lease Language Chart (Defendants' Ex. 191).

### b.     The Royalty-Provision Breakdown of the Colorado Leases.

249.     One-hundred fifty-six of the 381 total Colorado leases are single-pronged and 225 are double-pronged.  See Lease Language Chart (Defendants' Ex. 191).

250.     One-hundred forty-three of the 156 total single-pronged Colorado leases pay on the basis of "proceeds on the sale of gas, as such."  Lease Language Chart (Defendants' Ex. 191).

251.     Eight of the 156 total single-pronged Colorado leases pay on the basis of "proceeds at the mouth of the well."  Lease Language Chart (Defendants' Ex. 191).

252.     Four of the 156 total single-pronged Colorado leases pay on the basis of "price [or market price] at the well."  Lease Language Chart (Defendants' Ex. 191).

253.     One of the 156 total single-pronged Colorado leases pays on the basis of "gross proceeds," without reference to the mouth of the well.  Lease Language Chart (Defendants' Ex. 191).

254.    Eighty-five of the 156 total double-pronged Colorado leases pay on the basis of "proceeds if sold at the well, or if marketed off the premises, market value at the well." Lease Language Chart (Defendants' Ex. 191).

255.    Seventy-five of the 156 total double-pronged Colorado leases pay on the basis of "market value at the well of the gas sold or used, provided that on gas sold the market value shall not exceed the amount received for such gas computed at the mouth of the well." Lease Language Chart (Defendants' Ex. 191).

256.    Thirty-four of the 156 total double-pronged Colorado leases pay on the basis of "gross proceeds received for gas sold, used off the premises or in the manufacture of products therefrom, but in no event more than the actual amount received." Lease Language Chart (Defendants' Ex. 191).

257.    Twenty-three of the 156 total double-pronged Colorado leases pay on the basis of "market value at the well if sold or used to manufacture products; on gas sold at the well, net proceeds realized; each after deduction of post-production costs." See Lease Language Chart (Defendants' Ex. 191).

258.    These 23 leases are the only leases to disclaim or negate Colorado's marketable-condition rule. See Lease Language Chart (Defendants' Ex. 191).

259.    Five of the 156 total double-pronged Colorado leases pay on the basis of "gross proceeds for gas used off the premises. If used in the manufacture of gasoline, prevailing market rate." Lease Language Chart (Defendants' Ex. 191).

260.    Three of the 156 total double-pronged Colorado leases pay on the basis of "gross proceeds received when sold at the mouth of the well, market value if not sold at the mouth of the well." Lease Language Chart (Defendants' Ex. 191).

Class Certification MOO ¶¶ 244-260, at 46-48.  The Court observed that approximately "forty of the class leases show signs of alteration from the standard, i.e., were subject to individualized negotiation." Class Certification MOO ¶¶ 271, at 52.

The Court recognized that it had dismissed the third and twelfth causes of action, which both asserted that the Defendants breached variations of the implied duty to market or the marketable-condition rule. See Class Certification MOO ¶ 4, at 77.  It then extensively reviewed the Plaintiffs' arguments for why the Court should certify a class. See Class Certification MOO ¶¶ 12-19, at 84-88. As the Plaintiffs' claims for breach of the implied duty to market were no

longer in the case, the Court did not consider whether to certify a class on the basis of the implied duty to market.

The Court considered whether it could certify a class on the basis of the Plaintiffs' underpayment claims, as well as the Plaintiffs' claims that the Defendants paid their royalties late.  See Class Certification MOO ¶ 70, at 231.  The Court concluded that the late-payment claims failed rule 23(a)'s and rule 23(b)(3)'s requirements.  It determined that, "although the underpayment claims satisfy rule 23(a)'s other requirements, they lack commonality under rule 23(a)(2)," and that they "fail to satisfy rule 23(b)(3)'s predominance requirement."   Class Certification MOO ¶ 70, at 231.

To determine predominance, the Court must characterize the issues in the case as common or not, and then weigh which issues predominate.  See Class Certification MOO at 246 (citing CGC Holding Co., LLC v. Broad & Cassel, 773 F.3d at 1087).  The Court weighed the common evidence against the individualized evidence and concluded that, because it had to consider individual leases, "it will spend the majority of its time hearing individualized evidence and adjudicating individual questions."   Class Certification MOO at 247.  Consequently, after much deliberation, the Court denied the Plaintiffs' requests to certify a class.

**4.      The Motion to Reconsider.**

In their Motion, the Plaintiffs contend that the Court "erred in denying Plaintiffs' motion for class certification by finding that common issues do not predominate under existing case law."   Motion at 1.  They argue that the Court erroneously "found that each of the class members' leases and royalty instruments must be interpreted as a matter of contract law to determine . . . what payment methodology Defendants should have used when calculating royalty."  Motion at 2.  When examined according to contract law, the Court found there could

be as many as forty different categories of class members, which presented forty individual questions.  See Motion at 2.  The Plaintiffs assert that New Mexico law recognizes an implied-in-law duty to market oil and gas, which requires marketing activity to mutually benefit the lessor and lessee.  See Motion at 2.  They contend that their claims "are principally based on the implied duty to market," and that the implied duty to market provides one common question between all of the potential class members' leases.  Motion at 2-3.

The Plaintiffs acknowledge that the Court dismissed the Plaintiffs' third cause of action, which alleged that the Defendants' payment scheme violated the marketable condition rule.  See Motion at 2.  They argue, however, that the implied duty to market is different from the marketable condition rule, and that the Court erred in finding that the implied covenant to market is synonymous with the marketable condition rule.  See Motion at 9.  They state that, in their FAC, they allege in paragraph 12(a) that the leases in the wells "impose, by operation of law, an implied duty of marketability on the lessee."  Motion at 3.  The Plaintiffs argue that this duty "includes the duty to obtain a marketable product at the sole expense of a lessee and the duty of the lessee to market the hydrocarbons produced to the mutual and benefit of both the lessee and lessor."  Motion at 3 (quoting the FAC)(emphasis in Motion).  They assert that they incorporated paragraph 12(a) into each cause of action, including in their claims for breach of contract.  See Motion at 3.  In other words, they argue that, even though the Court dismissed their standalone claim for breach of the marketable condition rule, their breach-of-contract claim includes the claim for breach of the implied duty to market.

The Plaintiffs argue that, because their claims are principally based on the implied duty to market, "any variations in the royalty provisions of the leases and/or overriding royalty instruments at issue do not necessarily bar certification."  Motion at 4.  The key, common class

question, according to the Plaintiffs, is "whether Defendants' sales to their affiliate satisfied its implied covenant to market as a prudent operator for the mutual benefit of both the lessee and lessor." Motion at 17. This question, the Plaintiffs contend, "can be answered without resort to said leases." Motion at 4. See Motion at 9 (citing Davis v. Devon Energy Corp., 2009-NMSC-048, 147 N.M. 157, in which the Plaintiffs contend that the Supreme Court of New Mexico stated that a court need not examine each class members' individual lease provisions to determine whether common issues predominate, at least when the court implies the legal duty in equity). They argue that, although their breach-of-contract claim encompasses a claim for breach of the implied-duty-to-market, "the Court nevertheless overlooked" that "the duty is implied *in law* and, consequently, an examination of each individual lease and royalty instruments [sic] is *not* necessary." Motion at 13.

Furthermore, the Plaintiffs assert that individualized damages determinations should not prevent class certification. See Motion at 22. The Plaintiffs observe that "[n]o request for individualized damages has been made by Defendants here, nor would it be necessary," because New Mexico courts have granted class certification in cases with far more lease variations than the number at issue here. Motion at 23. Finally, the Plaintiffs argue in the alternative that the Court overlooked the common question whether the Defendants are estopped from asserting that each lease must be individually examined because they always paid all class members the same, regardless of any variation in the lease language. See Motion at 4.

### 5. **The Response**.

The Defendants responded on July 7, 2015. See Defendants' Response in Opposition to Plaintiffs' Motion for Reconsideration (Doc. 288), filed July 7, 2015 (Doc. 293)("Response"). They argue that the Plaintiffs "have utterly failed to establish grounds for reconsideration" under

the Court's guideposts for motions to reconsider: (i) the thoroughness with which the Court decided the issue that the motion to reconsider challenges; (ii) the amount of reliance that the Defendants placed in the Class Certification MOO; and (iii) whether the Plaintiffs point to "new law, new evidence, or manifest injustice."  Response at 1.  The Defendants contend that the Plaintiffs instead "attempt to revive their twice-dismissed implied duty to market claim," which the Court has "thoroughly considered and rejected."  Response at 2.  They therefore argue that this "dismissed claim cannot form the basis for reconsideration or class certification."  Response at 2.

They dispute the Plaintiffs' assertion that the implied-duty-to-market claim remains in the case by virtue of the breach-of-contract claim.  See Response at 5 ("Paragraph 12(a) does not, either by itself or in connection with the allegations in paragraphs 98-105 of the FAC, state any other claim for breach of the implied covenant to market.").  The Defendants assert: "Not only did Plaintiffs not seek leave to file any of the claims they now assert on reconsideration, but Fed. R. Civ. P. 10(b) required them to state any such claim in a separate count, and they did not do so."  Response at 5 (internal quotation marks omitted).

The Defendants assert that, even if the Court had not dismissed the implied-duty-to-market claim, the claim would not allow the Court to certify a class, because the Court would still have to determine whether the individual parties overcame the implied duty to market through express contractual language.  See Response at 6-7.  They contend that making that determination would require the Court to "determine the meaning of the parties' royalty instruments by assessing the varied terms of those agreements and individualized extrinsic evidence."  Response at 2.  See Response at 7 (asserting that courts must examine contractual language to determine whether it negates an express term within a contract).  Moreover, the

Defendants argue that the Court must also examine extrinsic evidence to determine whether the parties negated the implied duty to market.  <u>See</u> Response at 8.  They contend: "This evidence demonstrates that Plaintiffs' good faith claim cannot be established by common classwide proof."  Response at 8.  The Defendants assert that, because the Court must still examine each contract's language, its rulings "that these issues are neither common nor predominant would remain 100% applicable."  Response at 2.

The Defendants argue that the Court cannot certify the implied-duty-to-market claim for three additional reasons. First, they argue, the Plaintiffs' contention that the Defendants breached the duty by selling the hydrocarbons to its affiliate for a price set as an index price is not a common question.  <u>See</u> Response at 18.  It cannot be a common question, the Defendants assert, because the hydrocarbons' sales at index prices, and the resulting method that the Defendants used to pay royalties, "are facts, not 'undisputed' issues."  Response at 18.  They argue that a common question must be unresolved or actually disputed to constitute a common question that satisfies rule 23's commonality requirement.  <u>See</u> Response at 18.

Second, they assert, the Plaintiffs' contention that the Defendants' affiliate sales were made at an index price for natural gas only is not a common question, because "it does *not* apply to every class member."  Response at 18.  The Defendants note that they have paid royalties under "at least two policies," one of which does not depend on an index price.  Response at 19.

Third, the Defendants maintain, the Plaintiffs' contention that the Defendants failed to obtain the highest and best price for the gas produced from every class well lacks commonality because of the number of wells at issue.  <u>See</u> Response at 20.  They argue that such claims are not amenable to class certification, because the Court would have to consider the quality and quantity of production from each well, and the market conditions at the time of sale.  <u>See</u>

Response at 20.  Finally, the Defendants assert that the Plaintiffs' argument that the Defendants are estopped from asserting their right to have the Court determine its royalty obligations by interpreting the express contract language is "untimely, fails to account for the factors relevant to reconsideration, and is substantively flawed."  Response at 21.

6.     **The Reply**.

The Plaintiffs replied on August 14, 2015.  See Plaintiffs' Reply Memorandum in Support of Their Motion for Reconsideration of Order Denying Class Certification, filed August 14, 2015 (Doc. 299)("Reply").  The Plaintiffs contend that the Court should grant its Motion on the grounds that it must "prevent manifest injustice to thousands of royalty owners who are unable, individually, to economically prosecute viable claims against Defendants" based on an apparent discrepancy between New Mexico law and two opinions from the Tenth Circuit.  Reply at 2.  They assert that, "even in the absence of the marketable condition rule in New Mexico, their claims satisfy these tests for class certification."  Reply at 2.

They contend that the evidentiary concerns that weigh against predominance, like "parol evidence to interpret the meaning of individual leases" and the "forty different legal standards" based on "the lease-language obligations, the variations in state law, and the situational differences" among the Plaintiffs, do not apply when the Court's main issue is whether the Defendants breached the implied duty to market.  Reply at 2.  They assert that the implied duty is in all of the class members' leases "without resort to an interpretation of the individual lease language."  Reply at 2.  Accordingly, they maintain that the Court must reconsider its Class Certification MOO to prevent injustice.  See Reply at 1.

7.      **The Hearing.**

At the hearing, the Plaintiffs acknowledged the "extremely high burden that we have in order to have our motion granted even in part."  Tr. at 5:15-20.  They stated that, with their burden in mind, they restricted their discussion to a single issue that they thought the Court overlooked in making its ruling: the implied duty to market.  See Tr. at 5:21-6:4 (Brickell).[6]  The Plaintiffs argued that the Court dismissed the cause of action dealing with the implied duty to market, leaving them with their breach-of-contract claim.  See Tr. at 6:8-20 (Brickell).  They asserted that their remaining breach-of-contract claim encompasses a claim for violation of the duty to market, because all of the contracts include an implied duty to market.  See Tr. at 7:20-25 (Brickell); id. at 70:15-19 ("[T]he breach of an implied covenant is a part of a breach of contract case . . . .  This is the breach of the implied term of the contract under the cause of action for breach of contract.").  They argued that the duty to market encompasses a duty to market "for the best interests of the lessor as well as the lessee," and not just a duty to bring the hydrocarbons to market.  Tr. at 13:12-18 (Brickell). The Plaintiffs contended that the Defendants' sale of hydrocarbons was unreasonable and not for the lessors' benefit.  See Tr. at 7:8-17 (Brickell). They argued that the Defendants' alleged violation of the duty to market is the common issue among all plaintiffs.

The Court responded that the parties can alter the implied-in-law covenant to market by agreement in the lease's language.  See Tr. at 14:1-4 (Court).  It noted that, because the parties

---

[6]The Plaintiffs appear to have abandoned their second argument as to why the Court should grant their Motion.  They did not argue it in their Reply, and they did not raise it at the hearing.  Moreover, they repeatedly stated to the Court at the hearing that they limited their argument to the single issue that they thought the Court overlooked -- the implied duty to market. Tr. at 5:21-6:4 (Brickell).  The Court acknowledges that the Plaintiffs focus their energies on the implied-duty-to-market claim.  It will nonetheless address the Plaintiffs' second argument in Part III.

overrode the covenant through the lease language, the implied covenant was no longer at issue and the Court had to examine the individual leases.  See Tr. at 14:5-15 (Court).  The Plaintiffs agreed that the Court must examine the individual leases to "see if the implied covenant to market is expressly negated or even directly addressed by the leases."  Tr. at 14:16-21 (Brickell). They argued, however, that none of the leases overrode the implied duty, leaving it intact.  See Tr. at 15:3-23 (Brickell).  They asserted that, because all of the leases contained the implied duty, the main issue in the case was whether the Defendants complied with the duty to market by getting a reasonable value with their sales.  See Tr. at 16:5-13 (Brickell).

The Court observed that the Plaintiffs were changing their narrative as to which issues are common among all class members.  See Tr. at 16:13-23 (Court).  It stated that, at the class certification hearing, the Plaintiffs argued that they disputed the Defendants' payment method, while at the Motion hearing the Plaintiffs asserted that they disputed whether the Defendants sold the gas for a reasonable amount.  See Tr. at 16:13-23 (Court).  The Plaintiffs responded that the issue whether the Defendants complied with the duty to market, thereby getting a reasonable amount for the gas, is a part of the issue whether the Defendants used a proper payment method. See Tr. at 24:2-5 (Brickell).  They contended that the common dispute -- whether the Defendants sold the gas for a reasonable amount -- is the "starting number" in the royalty calculations.  Tr. at 24:2-5 (Brickell).

The Defendants first contested the Plaintiffs' argument by observing that the Plaintiffs' motion "is predicated on a claim that was dismissed.  It was dismissed not only once.  It was dismissed twice."  Tr. at 27:18-22 (Sheridan).  They continued that, because the Court dismissed the implied duty-to-market claims, the class certification hearing did not consider the arguments that the Plaintiffs made about what issues are common to all class members.  See Tr. at 27:23-25

(Sheridan).   They asserted that the Plaintiffs filed their FAC after the Court dismissed the implied-duty-to-market claim.   See Tr. at 29:9-16 (Sheridan).   They argue that the FAC, however, notes that the Court dismissed that claim.   See Tr. at 29:9-16 (Sheridan). Moreover, the Defendants contended that the Plaintiffs nowhere indicated, in the Motion or the FAC, that "they were proceeding on a basis that the defendants had breached the implied duty to market by selling gas to an affiliate at an index price without paying royalty on NGLs extracted downstream through processing" -- the claim they asserted was common among all class members.  Tr. at 29:20-23 (Sheridan).   They asserted that the Plaintiffs never asked the Court to reconsider its opinion dismissing the implied duty to market claims.   See Tr. at 31:15-23 (Sheridan).  The Defendants also argued that the breach-of-contract claim did not encompass the implied-duty-to-market claim.   See Tr. at 31:15-23 (Sheridan).

The Defendants then asserted that, even if the Court did not dismiss the implied-duty-to-market claim, it would not meet rule 23's requirements.   They asserted that the implied duty to market is "a default rule," in which the defendant can always defend "on the grounds not that the duty is not implied, but rather, that the implied default rule does not apply," because the parties contracted out of it.  Tr. at 47:17-20 (Sheridan).  The Defendants contended that, in this case, the Defendants contracted out of the implied duty to market through the royalty provisions.   See Tr. at 59:23-60:3 (Sheridan).   They argued that, to determine whether the covenant applied, the Court must analyze each contract to determine whether the parties, in each individual case, overrode the implied duty to market by replacing it with specific provisions.   See Tr. at 44:5-14 (Sheridan).   They continued: "[O]nce you got into that, . . . you would wind up with having to make all types of additional individualized proof," which would defeat predominance.  Tr. at 48:8-13 (Sheridan).  They argued that, to determine whether the parties contracted out of the

implied covenant, they would have to depose the parties to see what the preliminary negotiations were, and to determine the course of dealing and industry custom.   See Tr. at 60:15-23 (Sheridan).  According to the Defendants, performing such an inquiry also defeats commonality, because the contracts contain different language, forcing the Court to interpret them each.   See Tr. at 69:13-17 (Sheridan).

The Defendants then discussed the prejudice that they would face if the Court granted the Motion.  They described the time and expense that the parties and the Court had invested:

> We went through an enormous -- at enormous cost and expense -- a five-day evidentiary hearing, which they lost.  And then after the Court spends how many hours, days, and weeks preparing a 285-page opinion with a 65-page appendix, they have the nerve to come in here and say, "Oh, Judge, you misunderstood what our principal claims were."  I think it is deceptive, and I think it ought to be grounds to just dismiss this motion without any further argument.

Tr. at 31:25-32:9 (Sheridan).

The Court reiterated that it had already dismissed the implied-duty-to-market claim because it appeared to be the same as the marketable condition claim, which the Tenth Circuit in Elliott Industries held did not exist in New Mexico.   See Tr. at 70:7-15 (Court).  The Court noted that the Plaintiffs appeared to be asking the Court to define the implied duty to market more broadly than the marketable-condition rule, so that the Court would not have to dismiss the implied-duty-to-market claim.   See Tr. at 70:16-23 (Court).   The Court asked whether the Plaintiffs were now seeking to define the implied duty to market any differently than the marketable condition rule.   See Tr. at 71:1-2 (Court).  The Plaintiffs argued that the implied duty to market was separate from the marketable condition rule, but the Court stated that it had already decided in its first motion to dismiss that the two duties were coextensive.   See Tr. at 75:20-76:13 (Brickell, Court).   The Plaintiffs agreed: they cited the Second MTD MOO, in which the Court defined the implied duty to market's scope.   See Tr. at 77:10-24 (Brickell).  The

Plaintiffs argued that, in this opinion, the Court erroneously defined the duty too narrowly.  See Tr. at 78:1-3 (Brickell)(asserting that the implied duty to market requires not only that the Defendants bring products to market, but also that they benefit the lessors).

The Court stated that the Motion "is probably going back about three motions to the Motion to dismiss and then a separate motion."  Tr. at 89:18-23 (Court).  The Court expressed its concern over the amount of time that the Court and the parties invested in the motion for class certification, and about the prejudice the Defendants would face if the Court granted the Motion.  See Tr. at 90:2-12 (Court).  The Court indicated that, because the Motion sought the Court to change its rulings from opinions it issued long ago -- opinions on which the Court and the parties have relied -- it would likely deny the Motion.  See Tr. at 91:9-15 (Court).

## LAW REGARDING MOTIONS TO RECONSIDER

Except where the Federal Rules of Civil Procedure specify, motions to reconsider fall into three categories:

> (i) a motion to reconsider filed within [twenty-eight] days of the entry of judgment is treated as a motion to alter or amend the judgment under rule 59(e); (ii) a motion to reconsider filed more than [twenty-eight] days after judgment is considered a motion for relief from judgment under rule 60(b); and (iii) a motion to reconsider any order that is not final is a general motion directed at the Court's inherent power to reopen any interlocutory matter in its discretion. See Price v. Philpot, 420 F.3d 1158, 1167 & n.9 (10th Cir. 2005).

Pedroza v. Lomas Auto Mall, Inc., 258 F.R.D. 453, 462 (D.N.M. 2009)(Browning, J.).  See Price v. Philpot, 420 F.3d at 1167; Computerized Thermal Imaging, Inc. v. Bloomberg. L.P., 312 F.3d 1292, 1296 (10th Cir. 2002).

### 1.   Motions for Reconsideration Under Rules 59(e) and 60(b).

Courts may treat motions for reconsideration as a rule 59(e) motion when the movant files within twenty-eight days of a court's entry of judgment.  See Price v. Philpot, 420 F.3d at 1167 n.9.  If the movant files outside that time period, courts should treat the motion as seeking

relief from judgment under rule 60(b).  See Price v. Philpot, 420 F.3d at 1167 n.9.  "[A] motion

for reconsideration of the district court's judgment, filed within [rule 59's filing deadline],

postpones the notice of appeal's effect until the motion is resolved."  Jones v. United States, 355

F. App'x 117, 121 (10th Cir. 2009)(unpublished).  The time limit in rule 59(e) is now twenty-

eight days from the entry of a judgment. See Fed. R. Civ. P. 59(e).

Whether a motion for reconsideration should be considered a motion under rule 59 or rule

60 is not only a question of timing, but also "depends on the reasons expressed by the movant."

Commonwealth Prop. Advocates, LLC v. Mortg. Elec. Registration Sys., Inc., 680 F.3d 1194,

1200 (10th Cir. 2011).  Where the motion "involves 'reconsideration of matters properly

encompassed in a decision on the merits,'" a court considers the motion under rule 59(e).  Phelps

v. Hamilton, 122 F.3d 1309, 1323-24 (10th Cir. 1997)(quoting Martinez v. Sullivan, 874 F.2d

751, 753 (10th Cir. 1989)).  In other words, if the reconsideration motion seeks to alter the

district court's substantive ruling, then it should be considered a rule 59 motion and be subject to

rule 59's constraints.  Phelps v. Hamilton, 122 F.3d at 1324.  In contrast, under rule 60,

> [o]n motion and just terms, the court may relieve a party or its legal
> representatives from a final judgment, order, or proceeding for the following
> reasons:
>
> (1)    mistake, inadvertence, surprise, or excusable neglect;
>
> (2)    newly discovered evidence that, with reasonable diligence, could
>        not have been discovered in time to move for a new trial under
>        Rule 59(b);
> (3)    fraud (whether previously called intrinsic or extrinsic),
>        misrepresentation, or misconduct by an opposing party;
>
> (4)    the judgment is void;
>
> (5)    the judgment has been satisfied, released or discharged; it is based
>        on an earlier judgment that has been reversed or vacated; or
>        applying it prospectively is no longer equitable; or

- 35 -

> > > > > (6)      any other reason that justifies relief.

Fed. R. Civ. P. 60(b).  Neither a rule 59 nor a rule 60 motion for reconsideration

> > are appropriate vehicles to reargue an issue previously addressed by the court
> > when the motion merely advances new arguments, or supporting facts which were
> > available at the time of the original motion. . . .  Grounds warranting a motion to
> > reconsider include (1) an intervening change in the controlling law, (2) new
> > evidence previously unavailable, and (3) the need to correct clear error or prevent
> > manifest injustice.

Servants of the Paraclete v. Does, 204 F.3d 1005, 1012 (10th Cir. 2000).  "[A] motion for

reconsideration is appropriate where the court has misapprehended the facts, a party's position,

or the controlling law."  Servants of the Paraclete v. Does, 204 F.3d at 1012.  A district court has

considerable discretion in ruling on a motion to reconsider.  See Phelps v. Hamilton, 122 F.3d at

1324.

> Rule 60 authorizes a district court to, "[o]n motion and just terms[,] . . . relieve a party or

its legal representative from a final judgment, order, or proceeding for the following reasons,"

including "any other reason that justifies relief."  Fed. R. Civ. P. 60(b).  A court cannot enlarge

the time for filing a rule 59(e) motion.  See Brock v. Citizens Bank of Clovis, 841 F.2d 344, 347

(10th Cir. 1988)(holding that district courts lack jurisdiction over untimely rule 59(e) motions);

Plant Oil Powered Diesel Fuel Sys., Inc. v. ExxonMobil Corp., No. 11-0103, 2012 WL 869000,

at *2 (D.N.M. Mar. 8, 2012)(Browning, J.)("The Court may not extend the time period for timely

filing motions under Rule 59(e) . . . .").  "A motion under rule 59 that is filed more than 28 days

after entry of judgment may be treated as a Rule 60(b) motion for relief from judgment."  12

JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 59.11[4][b], at 59-32 (3d ed.

2012)(citations omitted).  Nevertheless, a court will not generally treat an untimely rule 59(e)

motion as a rule 60(b) motion when the party is seeking "'reconsideration of matters properly

encompassed in a decision on the merits' contemplated by Rule 59(e)."  Jennings v. Rivers, 394

F.3d 850, 854 (10th Cir. 2005).

Under some circumstances, parties can rely on rule 60(b)(1) for a mistake by their

attorney or when their attorney acted without their authority.  See Yapp v. Excel Corp., 186 F.3d

1222, 1231 (10th Cir. 1999)("Rule 60(b)(1) motions premised upon mistake are intended to

provide relief to a party . . . when the party has made an excusable litigation mistake or an

attorney has acted without authority . . . .").  Mistake in this context entails either acting without

the client's consent or making a litigation mistake, such as failing to file or to comply with

deadlines.  See Yapp v. Excel Corp., 186 F.3d at 1231.  If the alleged incident entails a mistake,

then it must be excusable, meaning that the party was not at fault.  See Pioneer Inv. Servs. v.

Brunswick Assocs. LP, 507 U.S. 380, 394 (1993); Cashner v. Freedom Stores, Inc., 98 F.3d 572,

577 (10th Cir. 1996)("If the mistake alleged is a party's litigation mistake, we have declined to

grant relief under Rule 60(b)(1) when the mistake was the result of a deliberate and counseled

decision by the party."); Pelican Prod. Corp. v. Marino, 893 F.2d 1143, 1146 (10th Cir.

1990)(holding that attorney carelessness is not a basis for relief under Rule 60(b)(1)).

Courts will not grant relief when the mistake of which the movant complains is the result

of an attorney's deliberate litigation tactics.  See Cashner v. Freedom Stores, Inc., 98 F.3d at 577.

This rule exists because a party

> voluntarily chose [the] attorney as his representative in the action, and he cannot
> now avoid the consequences of the acts or omissions of this freely selected agent.
> Any other notion would be wholly inconsistent with our system of representative
> litigation, in which each party is deemed bound by the acts of his lawyer agent
> and is considered to have notice of all facts, notice of which can be charged upon
> the attorney.

Pioneer Inv. Servs. v. Brunswick Assocs. LP, 507 U.S. at 397 (quoting Link v. Wabash R.R. Co.,

370 U.S. 626, 633-34 (1962))(internal quotation marks omitted).  The Tenth Circuit has held that

there is nothing "novel" about "the harshness of penalizing [a client] for his attorney's conduct," and has noted that those "who act through agents are customarily bound," even though, when "an attorney is poorly prepared to cross-examine an expert witness, the client suffers the consequences." Gripe v. City of Enid, Okla., 312 F.3d 1184, 1189 (10th Cir. 2002).

Rule 60(b)(6) is a "grand reservoir of equitable power to do justice in a particular case." Van Skiver v. United States, 952 F.2d 1241, 1244 (10th Cir. 1991)(internal quotation marks omitted). "If the reasons offered for relief from judgment could be considered under one of the more specific clauses of Rule 60(b)(1)-(5), those reasons will not justify relief under Rule 60(b)(6)." Moore, supra § 60.48[2], at 60-182. Accord Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 863 n.11 (1988)("This logic, of course, extends beyond clause (1) and suggests that clause (6) and clauses (1) through (5) are mutually exclusive."). "The Rule does not particularize the factors that justify relief, but we have previously noted that it provides courts with authority 'adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice,' while also cautioning that it should only be applied in 'extraordinary circumstances.'" Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. at 863.

Generally, the situation must be one beyond the control of the party requesting relief under rule 60(b)(6) to warrant relief. See Ackermann v. United States, 340 U.S. 193, 202 (1950)("The comparison [of prior precedent] strikingly points up the difference between no choice and choice; imprisonment and freedom of action; no trial and trial; no counsel and counsel; no chance for negligence and inexcusable negligence. Subsection 6 of Rule 60(b) has no application to the situation of petitioner."). Legal error that provides a basis for relief under rule 60(b)(6) must be extraordinary, as the Tenth Circuit discussed in Van Skiver v. United States:

The kind of legal error that provides the extraordinary circumstances justifying relief under Rule 60(b)(6) is illustrated by Pierce [v. Cook & Co., 518 F.2d 720, 722 (10th Cir. 1975)(en banc)]. In that case, this court granted relief under 60(b)(6) when there had been a post-judgment change in the law "arising out of the same accident as that in which the plaintiffs . . . were injured." Pierce v. Cook & Co., 518 F.2d at 723. However, when the post-judgment change in the law did not arise in a related case, we have held that "[a] change in the law or in the judicial view of an established rule of law" does not justify relief under Rule 60(b)(6). Collins v. City of Wichita, 254 F.2d 837, 839 (10th Cir. 1958).

952 F.2d at 1244-45.

## 2.   Motions to Reconsider Interlocutory Orders.

Considerable confusion exists among the bar regarding the proper standard for a district court to apply when ruling on a motion to reconsider one of its prior "interlocutory" or "interim" orders, i.e., an order that a district court issues while the case is ongoing, as distinguished from a final judgment. This confusion originates from the fact that the Federal Rules of Civil Procedure do not mention motions to reconsider, let alone set forth a specific procedure for filing them or a standard for analyzing them. A loose conflation in terminology in Servants of the Paraclete v. Does, which refers to rule 59(e) motions -- "motion[s] to alter or amend a judgment" -- as "motions to reconsider,"[7] compounded that baseline confusion. Fed. R. Civ. P. 59(e) (emphasis added); Servants of the Paraclete v. Does, 204 F.3d at 1005.

---

[7]The Honorable Paul J. Kelly, Jr., United States Circuit Judge for the Tenth Circuit, who authored Servants of the Paraclete v. Does, refers to rule 59(e) motions as "motions to reconsider" several times throughout the opinion. See, e.g., 204 F.3d at 1005. He uses the term "motion to reconsider" as an umbrella term that can encompass three distinct motions: (i) motions to reconsider an interlocutory order, which no set standard governs, save that the district court must decide them "before the entry of . . . judgment," Fed. R. Civ. P. 54(b); (ii) motions to reconsider a judgment made within twenty-eight days of the entry of judgment, which the Servants of the Paraclete v. Does standard governs; and (iii) motions to reconsider a judgment made more than twenty-eight days after the entry of judgment, which rule 60(b) governs. There is arguably a fourth standard for motions to reconsider filed more than a year after the entry of judgment, as three of the rule 60(b) grounds for relief expire at that point.

Much confusion could be avoided by using the term "motion to reconsider" exclusively to refer to the first category, "motion to amend or alter the judgment" exclusively to refer to the

Final judgments are different from interlocutory orders.  See Fed. R. Civ. P. 54(a) ("'Judgment' as used in these rules includes a decree and any order from which an appeal lies.")(emphasis added).  In addition to ripening the case for appeal, see 28 U.S.C. § 1291 ("The courts of appeals . . . shall have jurisdiction of appeals from all final decisions of the district courts . . . ."), the entry of final judgment narrows the district court's formerly plenary jurisdiction over the case in three ways.  First, for the first twenty-eight days after the entry of judgment, when the court can entertain motions under rules 50(b), 52(b), 59, and 60, the district court's jurisdiction trumps that of the Court of Appeals.  See Fed. R. App. P. 4(a)(4)(B).  Even if a party files a notice of appeal, the Court of Appeals will wait until after the district court has ruled on the post-judgment motion to touch the case.   See Fed. R. App. P. 4(a)(4)(B). Second, after twenty-eight days, when the court may consider motions under rule 60, if a party has filed a notice of appeal, the Court of Appeals' jurisdiction trumps the district court's, and the district court needs the Court of Appeals' permission even to grant a rule 60 motion.  Third, after twenty-eight days, if no party has filed a notice of appeal, district courts may consider motions under rule 60.

Final judgments implicate two important concerns militating against giving district courts free reign to reconsider their judgments.  First, when a case is not appealed, there is an interest in finality.  The parties and the lawyers expect to go home, quit obsessing about the dispute, and put the case behind them, and the final judgment -- especially once the twenty-eight day window of

---

second category, and "motion for relief from judgment" exclusively to refer to the third category (and arguable fourth category).  These are the terms that the Federal Rules of Civil Procedure -- and other Circuits -- use to describe (ii) and (iii).  The Court agrees with Judge Kelly -- and all he likely meant by using motion to reconsider as an umbrella term is -- that, if a party submits a motion captioned as a "motion to reconsider" after an entry of final judgment, the court should evaluate it under rule 59(e) or 60(b), as appropriate, rather than rejecting it as untimely or inappropriate.

robust district court review and the thirty-day window of appeal have both closed -- is the disposition upon which they are entitled to rely.  Second, when a case is appealed, there is the need for a clean jurisdictional handoff from the district court to the Court of Appeals.  "[A] federal district court and a federal court of appeals should not attempt to assert jurisdiction over a case simultaneously," as doing so produces a "danger [that] a district court and a court of appeals w[ill] be simultaneously analyzing the same judgment."  Griggs v. Provident Consumer Discount Co., 459 U.S. 56, 58-59 (1982).

The Court of Appeals needs a fixed record on which to base its decisions -- especially given the collaborative nature of appellate decisionmaking -- and working with a fixed record requires getting some elbow room from the district court's continued interference with the case. The "touchstone document" for this jurisdictional handoff is the notice of appeal, not the final judgment, see Griggs v. Provident Consumer Discount Co., 459 U.S. at 58 ("The filing of a notice of appeal is an event of jurisdictional significance -- it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal."  (citations omitted)); Garcia v. Burlington N. R.R. Co., 818 F.2d 713, 721 (10th Cir. 1987)("Filing a timely notice of appeal pursuant to Fed. R. App. P. 3 transfers the matter from the district court to the court of appeals.  The district court is thus divested of jurisdiction.  Any subsequent action by it is null and void."  (citations omitted)); Kirtland v. J. Ray McDermott & Co., 568 F.2d 1166, 1170 (5th Cir. 1978)("[I]t is the filing of the appeal, not the entering of a final judgment, that divests the district court of jurisdiction."  (citations omitted)), but, because the final judgment starts the parties' thirty-day clock for filing a timely notice of appeal, the Federal Rules and the Tenth Circuit have chosen to curtail the district court's jurisdiction over the case in the roughly month-long period of potentially overlapping trial- and appellate-court

jurisdiction that immediately follows the entry of final judgment, see Servants of the Paraclete v. Does, 204 F.3d at 1009 (noting that post-final judgment motions at the district court level are "not intended to be a substitute for direct appeal").

Basically, rather than suddenly divesting the district court of all jurisdiction over the case -- potentially resulting in the district court being unable to rectify easily fixable problems with the final judgment before the case goes to the Tenth Circuit, or even requiring appeal of a case that might otherwise not need to be appealed -- the Federal Rules set forth a jurisdiction phased de-escalation process, wherein the district court goes from pre-final judgment plenary jurisdiction, to limited review for the first twenty-eight days post-final judgment, and, finally, to solely rule 60 review after twenty-eight days.  In defining the "limited review" that rule 59(e) allows a district court to conduct in the 28-day flux period, the Tenth Circuit, in Servants of the Paraclete v. Does, incorporated traditional law-of-the-case grounds -- the same grounds that inform whether a court should depart from an appellate court's prior decision in the same case -- into rule 59(e).  See United States v. Alvarez, 142 F.3d 1243, 1247 (10th Cir. 1998)(departing from the law of the case doctrine in three exceptionally narrow circumstances: "(1) when the evidence in a subsequent trial is substantially different; (2) when controlling authority has subsequently made a contrary decision of the law applicable to such issues; or (3) when the decision was clearly erroneous and would work a manifest injustice")(citation omitted); Servants of the Paraclete v. Does, 204 F.3d at 1012 (incorporating those grounds into rule 59(e)).

Neither of these concerns -- finality nor jurisdictional overlap -- is implicated when a district court reconsiders one of its own interlocutory orders.  The Federal Rules do not specifically mention motions to reconsider interlocutory orders, but rule 54(b) makes the following open-ended proclamation about their mutability:

> When an action presents more than one claim for relief -- whether as a claim, counterclaim, crossclaim, or third-party claim -- or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay.   Otherwise, <u>any order or other decision</u>, however designated, <u>that adjudicates fewer than all the claims</u> or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and <u>may be revised at any time before the entry of a judgment</u> adjudicating all the claims and all the parties' rights and liabilities.

Fed. R. Civ. P. 54(b) (emphases added).  Rule 54(b) thus (i) provides that a district court can freely reconsider its prior rulings; and (ii) puts no limit or governing standard on the district court's ability to do so, other than that it must do so "before the entry of judgment."  Fed. R. Civ. P. 54(b).

The Tenth Circuit has not cabined district courts' discretion beyond what rule 54(b) provides: "[D]istrict courts generally remain free to reconsider their earlier interlocutory orders." <u>Been v. O.K. Indus.</u>, 495 F.3d at 1225.  In the Tenth Circuit, "law of the case doctrine has <u>no</u> bearing on the revisiting of interlocutory orders, even when a case has been reassigned from one judge to another." <u>Rimbert v. Eli Lilly & Co.</u>, 647 F.3d 1247, 1252 (10th Cir. 2011)(emphasis added)(citing <u>Been v. O.K. Indus., Inc.</u>, 495 F.3d at 1225).  In this context, "the doctrine is merely a 'presumption, one whose strength varies with the circumstances.'" <u>Been v. O.K. Indus., Inc.</u>, 495 F.3d at 1225 (quoting <u>Avitia v. Metro. Club of Chi., Inc.</u>, 49 F.3d 1219, 1227 (7th Cir. 1995)).  In short, a district court can use whatever standard it wants to review a motion to reconsider an interlocutory order.  It can review the earlier ruling de novo and essentially reanalyze the earlier motion from scratch, it can review the ruling de novo but limit its review, it can require parties to establish one of the law-of-the-case grounds, or it can refuse to entertain motions to reconsider altogether.

The best approach, in the Court's eyes, is to analyze motions to reconsider differently depending on three factors. Cf. Been v. O.K. Indus., Inc., 495 F.3d at 1225 ("[T]he doctrine is merely a 'presumption, one whose strength varies with the circumstances.'")(citation omitted). First, the Court should restrict its review of a motion to reconsider a prior ruling in proportion to how thoroughly the earlier ruling addressed the specific findings or conclusions that the motion to reconsider challenges. How "thoroughly" a point was addressed depends both on the amount of time and energy the Court spent on it, and on the amount of time and energy the parties spent on it -- in briefing and orally arguing the issue, but especially if they developed evidence on the issue. A movant for reconsideration thus faces a steeper uphill challenge when the prior ruling was on a criminal suppression motion, class certification motion, or preliminary injunction,[8] than when the prior ruling is, e.g., a short discovery ruling. The Court should also look, not to the overall thoroughness of the prior ruling, but to the thoroughness with which the Court addressed the exact point or points that the motion to reconsider challenges. A movant for reconsideration thus faces an easier task when he or she files a targeted, narrow-in-scope motion asking the

---

[8]The Court typically makes findings of fact and conclusions of law in ruling on these motions. At first glance, it appears that the Federal Rules of Civil Procedure set forth additional standards -- beyond that which applies to other interlocutory orders -- for amending findings of fact and conclusions of law:

> **Amended or Additional Findings.** On a party's motion filed no later than 28 days after the entry of judgment, the court may amend its findings -- or make additional findings -- and may amend the judgment accordingly. The motion may accompany a motion for a new trial under Rule 59.

Fed. R. Civ. P. 52(b). This rule appears to limit motions to reconsider orders with findings of fact and conclusions of law to twenty-eight days. The rule's use of the term "entry of judgment," its reference to rule 59, and its adoption of the same time period that applies to motions to alter or amend a judgment, all lead the Court to conclude, however, that rule 52(b) -- and its 28-day time limit -- does not apply to interlocutory orders. The time limit applies only to findings of fact and conclusions of law supporting a case-ending judgment -- such as those entered after a bench trial -- and to those giving rise to an interlocutory appeal that, if filed, divests the district court of its jurisdiction -- such as those entered in support of a preliminary injunction.

Court to reconsider a small, discrete portion of its prior ruling than when he or she files a broad motion to reconsider that rehashes the same arguments from the first motion, and essentially asks the Court to grant the movant a mulligan on its earlier failure to present persuasive argument and evidence.

Second, the Court should consider the case's overall progress and posture, the motion for reconsideration's timeliness relative to the ruling it challenges, and any direct evidence the parties may produce, and use those factors to assess the degree of reasonable reliance the opposing party has placed in the Court's prior ruling.  See 18B CHARLES ALAN WRIGHT, ARTHUR R. MILLER, EDWARD H. COOPER, VIKRAM DAVID AMAR, RICHARD D. FREER, HELEN HERSHKOFF, JOAN E. STEINMAN & CATHERINE T. STRUVE, FEDERAL PRACTICE & PROCEDURE § 4478.1 (2d ed.)("Stability becomes increasingly important as the proceeding nears final disposition . . . .  Reopening should be permitted, however, only on terms that protect against reliance on the earlier ruling.").  For example, if a defendant (i) spends tens of thousands of dollars removing legacy computer hardware from long-term storage; then (ii) obtains a protective order in which the Court decides that the defendant need not produce the hardware in discovery; then (iii) returns the hardware to long-term storage, sustaining thousands more in expenses; and (iv) several months pass, then the plaintiffs should face a higher burden in moving the Court to reconsider its prior ruling that they faced in fighting the motion for protective order the first time.

Third, the Court should consider the Servants of the Paraclete v. Does grounds.  The Court should be more inclined to grant motions for reconsideration if the movant presents (i) new controlling authority -- especially if the new authority overrules prior law or sets forth an entirely new analytical framework; (ii)  new evidence -- especially if the movant has a good reason why the evidence was not presented the first time around; or (iii) a clear indication -- one

that manifests itself without the need for in-depth analysis or review of the facts -- that the Court erred.

These three factors should influence the degree to which the Court restricts its review of a prior ruling, but they do not necessarily mean that the Court should always apply a deferential standard of review. The Court should pause before applying a standard of review to its own interlocutory orders that is more deferential than the standard that the Court of Appeals will apply to it, unless the Court concludes that the alleged error in the prior ruling was harmless, or the party moving for reconsideration waived their right to appeal the alleged error by not raising the appropriate argument. Even in circumstances where the Court concludes that it is insulated from reversal on appeal, there are principled reasons for applying a de novo standard. After all, if the Court was wrong in its earlier decision, then, generally speaking, it is unjust to maintain that result -- although the Court should weigh this injustice against any injustice that would result from upending the parties' reliance on the earlier ruling, which is the balancing test that the three factors above represent.

What the Court means by "restricting its review" is less about applying a deferential standard of review -- although that may be appropriate in some circumstances -- and more about reducing (i) the depth of the Court's analysis the second time around -- thus conserving judicial resources; and (ii) the impositions that relitigation of the prior ruling will impose on the party opposing the motion for reconsideration. The Court should consider the time and expense that the party opposing reconsideration spent in winning the earlier ruling, and should try to prevent that party from having to bear the same impositions again. Basically, even if the Court ultimately analyzes a motion to reconsider under the same standard that it analyzed the motion that produces the earlier ruling, it should analyze the motion in a different way -- one focused on

reducing the litigation burdens of the party opposing reconsideration.  For example, when a party moves the Court for a preliminary injunction, standard practice is that the Court holds an evidentiary hearing as a matter of course, regardless whether it looks as if the party has a good chance of prevailing.  If the party loses and the Court denies the injunction, however, and the party moves for reconsideration, the party should not be entitled to the presumption of an evidentiary hearing merely because he or she received that presumption the first time the Court considered the motion.

In light of these statements, it is perhaps better to characterize the increased burden that a movant for reconsideration faces as one of production, and not of persuasion.  The Court analyzes motions to reconsider by picking up where it left off in the prior ruling -- not by starting anew.  Parties opposing reconsideration can do the same, and they may stand on whatever evidence and argument they used to win the earlier ruling.  Movants for reconsideration, on the other hand, carry the full burden of production: they must persuade the Court, using only the evidence and argument they put before it, that it should change its prior ruling; they must do all of the legwork, and not rely on the Court to do any supplemental fact-finding or legal research; and they must convincingly refute both the counterarguments and evidence that the opposing party used to win the prior ruling and any new arguments and evidence that the opposing party produces while opposing the motion to reconsider.  Unlike the motion that produced the prior ruling, a motion to reconsider is not -- and is not supposed to be -- a fair fight procedurally.  The deck is stacked against a movant for reconsideration, and if such a movant hopes to prevail, he or she must have not only a winning legal position, but the work ethic and tenacity to single-handedly lead the Court to his or her way of thinking.

<u>**ANALYSIS**</u>

The Plaintiffs contend that the implied-duty-to-market claim provides a basis on which the Court can certify a class.  Because the Court dismissed the claim on which the Plaintiffs argue that the Court should reconsider its Class Certification MOO, and because the Plaintiffs provide no other sound reasons for the Court to change its earlier ruling, the Court declines to change its ruling and will thus deny the Motion.

**I.     THE PLAINTIFFS COULD MAKE A CLAIM THAT THE DEFENDANTS**
        <u>**BREACHED THE IMPLIED DUTY TO MARKET.**</u>

The Plaintiffs contend that the Court misinterpreted their claims for breach of the implied duty to market and that, when properly interpreted, this claim allows the Court to certify a class. <u>See</u> Motion at 9.  The Court appropriately dismissed the Plaintiffs' earlier claims for breach of the marketable-condition rule sub-part of the implied duty to market, and the Plaintiffs do not argue otherwise in the Motion.  The Plaintiffs now, however, raise a new basis for their implied-duty-to-market claims.  The Court determines that its earlier dismissals of the Plaintiffs' implied-duty-to-market claim would not require the Court to dismiss the Plaintiffs' new claim. Nevertheless, the Plaintiffs did not properly plead this claim, and it was not in the case when the Court considered the Class Certification MOO, so it cannot be a basis on which to change the Court's prior class certification ruling.

In previous opinions, the Court dismissed the Plaintiffs' claims for breach of the marketable-condition rule sub-part of the implied duty to market on the ground that the Defendants complied with the duty by producing, processing, refining, and selling the hydrocarbons.  <u>See</u> First MTD MO, 952 F. Supp. 2d at 1046-49; Second MTD MOO, 27 F. Supp. 3d at 1248; May 26 MO, 2015 WL 3543011, at *42-43 (dismissing the Plaintiffs' claim for breach of the implied duty to market in <u>Anderson Living Trust v. ConocoPhillips, LLC</u>).  The

Plaintiffs alleged that the Defendants violated the implied duty to market by deducting costs that were unreasonably high and that the Defendants did not actually incur.  See Second MTD MOO, 27 F. Supp. 3d at 1248; First MTD MO, 952 F. Supp. 2d at 1046-49 (dismissing the Plaintiffs' claim that the Defendants unreasonably deducted expenses, which breached the duty to market). Now, in contrast, the Plaintiffs allege that the Defendants breached the duty by selling the hydrocarbons in non-arm's length transactions and, therefore, by failing to sell the hydrocarbons for the highest obtainable price.  See Motion at 9-10.  They assert that, when the Court interprets the duty to include an obligation to obtain the highest obtainable price, the implied-duty-to-market claim allows the Court to certify the class, because the Court need not interpret each class member's individual lease.  See Motion at 9.

The Court has considered the implied duty to market on a number of occasions.  Each time, the Court determined that the Tenth Circuit's opinion in Elliott Industries binds the Court's hands.  Accordingly, each time, the Court concluded that the Plaintiffs could not show how the Defendants violated the implied duty to market.  Under the Plaintiffs' new theory, however, Elliott Industries does not preclude the Plaintiffs' claim.  As the Court has explained in previous opinions, in Elliott Industries, the royalty-owner plaintiffs argued that the operator lessees breached the implied duty to market by improperly deducting costs.  Elliott Industries, 407 F.3d at 1113.  Despite the plaintiffs' contention, the Tenth Circuit stated that the defendants did not breach the implied duty to market because they were "actively producing gas, processing the gas, and selling the refined natural gas and NGLs."  407 F.3d at 1113 ("Thus, Appellees have complied with the implied duty to market as articulated by the New Mexico courts.").

The Tenth Circuit did not consider the claim that the Plaintiffs now assert -- that the defendants did not secure the highest obtainable price, because that was not the basis of the

plaintiffs' claim.  See 407 F.3d at 1113.  Rather, the plaintiffs in Elliott Industries alleged that the defendants breached the implied duty to market because they deducted too many costs.  See 407 F.3d at 1113.  Here, the Plaintiffs have abandoned their allegations that the Defendants' cost deductions constitute the basis for their claim, and now assert that the Defendants' use of non-arm's length transactions and resultant failure to sell the gas for the highest obtainable price violates New Mexico's implied duty to market.  See Motion at 1-3.  Although the Tenth Circuit in Elliott Industries stated that the defendants complied with the implied duty to market, the decision does not preclude the Plaintiffs' new claim, because it did not implicitly define New Mexico's implied duty to market so narrowly as to not include an obligation to secure the highest obtainable price for the hydrocarbons.  In other words, the Tenth Circuit's statement of the duty does not prevent the Court from determining that New Mexico courts would likely conclude that the duty includes an obligation to secure the highest obtainable price.  The Court reaches this conclusion for two main reasons.  First, the plaintiffs in Elliott Industries did not argue that the defendants sold the products for an unreasonably low price per hydrocarbon, so the Tenth Circuit had no reason to consider whether the defendants sold the products at a high enough price to meet their duty.[9]  Second, the Tenth Circuit had no reason to believe that the Defendants did not

---

[9]At first glance, it may appear as though the plaintiffs in Elliott Industries argued that the defendants failed to obtain the highest price possible, and that by finding that the defendants complied with their duty to market, the Tenth Circuit defined the duty as not including an obligation to obtain a high price.  The plaintiffs there, however, did not make the same argument regarding sales price that the Plaintiffs make here.  The plaintiffs in Elliott Industries argued that the defendants did not obtain the highest possible price on the hydrocarbons because the defendants deducted a thirty-nine percent processing fee before they sold the final refined product.  See 407 F.3d at 1099-1100; id. at 1113.  The price of the hydrocarbons in total, therefore, was not as high as it would have been if the defendants had not deducted thirty-nine percent of the NGLs before selling them.  In other words, because the defendants sold a lesser volume of hydrocarbons, the aggregate price they received was not as high as if they had sold a higher volume.  The plaintiffs therefore did not argue that the defendants sold the products at a lower price per hydrocarbon, as the Plaintiffs do here.

sell the products for the highest obtainable price, because they were selling the products in arm's length transactions.  See 407 F.3d at 1113.  Consequently, the Tenth Circuit's conclusion that the defendants in Elliott Industries complied with the duty did not define New Mexico's implied duty to market so as to preclude the plaintiffs' new claim.

The Defendants assert that the defendants in Elliott Industries were on "both sides of the transaction," like the Defendants are here.  Response at 16.  They argue that, because the Tenth Circuit determined that the defendants nonetheless complied with their duty, it must have determined that the duty included no obligation to obtain the highest obtainable price.  See Response at 16.  They contend that the defendants in Elliott Industries each owned fifty percent of the processing plant and that they received as compensation for processing the gas, subject to the plaintiffs' royalty interest, thirty-nine percent of the refined NGLs.  See Elliott Industries, 407 F.3d at 1099-1100.  Although the defendants owned the processing plant, like the Defendants' affiliates do here, the defendants in Elliott Industries did not base the plaintiffs' royalties on a sales price of the raw product to the processing plant, like the Defendants do here. See Elliott Industries, 407 F.3d at 1099-1100.  Rather, they used a net-back deduction accounting method to determine the plaintiffs' royalties.   See Elliott Industries, 407 F.3d at 1099-1100. Under the net-back methodology, "value at the point of valuation is determined by taking the downstream sales price and deducting from it the costs incurred by the working interest owner [] to move the gas from the point of valuation to the actual point of sale."  Elliott Industries, 407 F.3d at 1100 n.2 (quoting Bruce M. Kramer, Royalty Interest in the United States: Not Cut from the Same Cloth, 29 TULSA L.J. 449, 461 (1994)).  Thus, even though the Defendants owned the processing plant, they based the plaintiffs' royalties on the price of the refined product sales, which were sold in arm's length transactions.  Accordingly, the Tenth Circuit could assume that

the defendants would sell the products for the highest obtainable price, because their profits depended upon a high sales price as well.

Here, in contrast, the Plaintiffs argue that the Defendants have no such incentive to sell the products at a high price because they sell the <u>raw</u> products in non-arm's length transactions. According to the Plaintiffs, by selling the raw products for a lower price to their affiliate, the Defendants are allegedly able to pay a lower royalty to the Plaintiffs, and then sell the refined product for a considerably higher price, thus reaping the full benefit of the transaction and depriving the Plaintiffs of the benefit. <u>See</u> Motion at 2-3. <u>Elliott Industries</u> therefore differs from this case because the defendants there sold refined natural gas and NGLs rather than raw gas, and the defendants there based the plaintiffs' royalty calculation on the final arm's length sale price rather than the non-arm's length sale price to their affiliates. By finding that the defendants complied with their duty, the Tenth Circuit could have determined that, because the defendants there were selling refined natural gas and NGLs, they complied with the implied duty to market's obligation to secure the highest obtainable price.

The Court acknowledges that the Tenth Circuit did not consider whether the defendants secured the highest obtainable price, but this does not mean that the Tenth Circuit implicitly determined that lessees have no duty to do so. Courts typically must consider whether lessees secured the highest obtainable price in cases in which the lessee sells the products in non-arm's length transactions, putting the lessors' and the lessees' interest at odds. <u>See, e.g.</u>, <u>Occidental Permian Ltd. v. Helen Jones Found.</u>, 333 S.W.3d 392, 402-403 (Tex. App. 2011). When faced with this situation, other courts consider numerous factors, including: (i) the prevailing market rate; (ii) the prices at which the products have been sold in the area; (iii) the level of detail in the contract selling the products; (iv) the negotiation between the parties over the products' price; (v)

whether the parties were engaged in arm's length transactions; and (vi) the market's competitiveness.  See Occidental Permian Ltd. v. Helen Jones Found., 333 S.W.3d at 402-403 (considering the above listed factors and determining that selling gas in a non-arm's length transaction did not mean that the lessee failed to secure the best price obtainable); Harding v. Cameron, 220 F. Supp. at 468-470 (concluding that a lessee did not obtain the highest price reasonably possible after an extensive consideration of the factors surrounding the lessee's sales of the products).

In contrast, the Tenth Circuit in Elliott Industries did not consider the defendants' sales method and whether they were engaging in arm's-length transactions.  See 407 F.3d at 1113. Nor did it consider whether the prices that the defendants received for the sales of the refined products were reasonable or comparable to market prices in the area.  See 407 F.3d at 1113.  The Tenth Circuit had no reason to make such a detailed consideration, however, because: (i) the plaintiffs did not contend that the defendants did not obtain a fair price per hydrocarbon;[10] and (ii) the defendants sold the refined products, on which they based the plaintiffs' royalties, on arm's length transactions, unlike the Defendants here.  See 407 F.3d at 1113.  The courts that spend the most time considering whether lessees obtain a fair price are usually considering a situation in which the lessees' and lessors' interest do not align, like non-arm's length transactions.  See Occidental Permian Ltd. v. Helen Jones Found., 333 S.W.3d at 402-403; Harding v. Cameron, 220 F. Supp. at 468-470.  Accordingly, the Tenth Circuit's lack of a thorough price consideration does not imply that the Tenth Circuit defined the duty to market so

---

[10]Again, the plaintiffs in Elliott Industries argued that they did not obtain a fair price, but it was because they alleged that the defendants did not sell the full volume of hydrocarbons, thus leading to a lower aggregate price based on the lower output.  See Elliott Industries, 407 F.3d at 1099-1100.

narrowly that it does not require lessees to obtain the highest price reasonably possible. Instead, the Tenth Circuit did not speak to this requirement.

Although New Mexico courts have not specifically stated that the implied duty to market includes a specific duty to obtain the highest price reasonably possible, this silence does not mean that the duty to market does not include such an obligation. It means that New Mexico courts have yet to develop the duty. As state courts were developing the contours of the implied duty to market, scholars argued that the implied duty to market likely includes a duty to obtain the best reasonable price: "At all events, it is well settled that the lessee is impliedly obligated to 'market' to sell or otherwise utilize the production obtainable from a commercial well. Probably this requires the lessee to secure the highest price reasonably obtainable therefor." G. Siefkin, Rights of Lessor and Lessee with Respect to Sale of Gas and as to Gas Royalty Provisions at 182, FOURTH ANNUAL INSTITUTE ON OIL AND GAS LAW AND TAXATION (1953). The development of the implied duty to market has been described as "an evolutionary process." Amoco Prod. Co. v. First Baptist Church, 579 S.W.2d 280, 285 (Tex. Civ. App. El Paso 1979).

One example of the duty's evolution comes from a decision by Texas' Eighth Court of Appeals. Like New Mexico, Texas has adopted a standard under the implied duty to market that the lessee act as a reasonably prudent operator. See Amoco Prod. Co. v. First Baptist Church, 579 S.W.2d at 285-86. In Amoco Production Co. v. First Baptist Church, Texas' Eighth stated that "there is an obligation to market the product once it is discovered." 579 S.W.2d at 285. Like New Mexico, it had yet to determine "whether there is a duty or implied covenant to market at any particular price . . . ." 579 S.W.2d at 285. Texas' Eighth concluded that "there is an implied covenant to exercise good faith in the marketing of gas, and particularly so where the interests of the lessor and lessee are not identical." 579 S.W.2d at 285. It concluded that this

duty requires lessees to obtain the highest price possible.  See 579 S.W.2d at 285.  On further appeal, the Supreme Court of Texas seemingly embraced Texas' Eight's standard, but clarified that "no absolute duty to sell at market value will always exist."  Amoco Prod. Co. v. First Baptist Church, 611 S.W.2d 610 (Tex. 1980).  Thus, Texas courts have determined that the implied duty to market, which requires lessees to act as reasonably prudent operators, includes an obligation to obtain the highest reasonable price.

Courts and scholars have noted the varying standards of the implied duty to market among states.  See Stirman v. Exxon Corp., 280 F.3d 554, 564-66 (5th Cir. 2002)(describing the different duty to market in various states and reversing the district court's class certification on the basis that the "differences in the law of the jurisdictions at issue demonstrate that the law is not uniform as to any implied covenant to market"); Bruce M. Kramer & Chris Pearson, Implied Marketing Covenants, 46 LA. L. REV. 787, 815 (1986)(describing the various standards that states have adopted for determining whether a lessee has breached the implied duty to market).  For example, in Oklahoma, lessees have a duty "to obtain the best price and terms available," but the lessor bears the burden to show that the lessee violated the duty.  Barby v. Cabot Corp., 550 F. Supp. 188, 190 (W.D. Okla. 1981).  In comparison, in Mississippi, lessees must comply with a prudent-operator or due-diligence standard to fulfill their duty to market the gas.  See Piney Woods Country Life Sch. v. Shell Oil Co., 539 F. Supp. 957, 973-74 (S.D. Miss. 1982), aff'd in part and rev'd in part on other grounds, 726 F.2d 225 (5th Cir. 1984).  The court in Piney Woods Country Life School v. Shell Oil Co. determined that the reasonably prudent operator standard required the plaintiffs to obtain the best price for gas sales at the time the parties executed the contract.  Piney Woods Country Life Sch. v. Shell Oil Co., 539 F. Supp. at 975 (concluding that

the defendants complied with the duty to market because the prices "were the best obtainable and the highest known for any gas sale in the United States at the time the contract was executed").

Although states have stated the duty in different terms, no state has concluded that the implied duty to market does not require lessees to sell hydrocarbons for the highest obtainable price.  Rather, courts have stated that lessees must abide by a reasonably prudent operator standard, and considered whether a lessee's behavior in each particular instance complied with that standard.  See, e.g., Texas Corp. v. Hagen, 1987 WL 47847, *2-3 (Tex. 1987).  Because the implied covenant to market "serves to protect a lessor from the lessee's self-dealing or negligence," Occidental Permian Ltd. v. Helen Jones Found., 333 S.W.3d at 403, courts facing situations in which a lessee sells hydrocarbons in non-arm's length transactions typically conclude that the lessee did not behave as a reasonably prudent operator unless it sold the hydrocarbons for the highest obtainable price.  See Yzaguirre v. KCS Resources, Inc., 53 S.W.3d 368, 374 (Tex. 2001).  Courts have emphasized that they must scrutinize transactions in greater detail "where the interests of the lessee and lessor do not coincide."  Amoco Prod. Co. v. First Baptist Church, 579 S.W.2d at 286.  Thus, courts that use the reasonably prudent operator standard need only expressly define the implied duty to market to include an obligation to secure the highest obtainable price in situations in which the lessee has no independent incentive to sell the hydrocarbons for the highest obtainable price.

While New Mexico has not conclusively stated that lessees have a duty to secure the highest obtainable price, it has stated that the implied duty to market requires a lessee to proceed with reasonable diligence, as viewed from the standpoint of the reasonably prudent operator.  See Libby v. DeBaca, 1947-NMSC-007, ¶ 7, 179 P.2d 263, 265.  The reasonably prudent operator standard requires the lessee to act "as an operator of ordinary prudence having regard to the

interests of both the plaintiffs, as lessors, and the defendant, as lessee." Clayton v. Atlantic Refining Co., 150 F. Supp. 9, 13-16 (D.N.M. 1957)(Rogers, J.)(concluding that the standard that the United States Court of Appeals for the Eighth Circuit created in Brewster v. Lanyon Zinc Co., 140 F. 801 (8th Cir. 1905), "is the law in New Mexico").  As seen above, other states that have defined the implied duty to market using this standard have concluded that a reasonably prudent operator would sell hydrocarbons for the highest obtainable price.  See Amoco Prod. Co. v. First Baptist Church, 579 S.W.2d at 285-86; Piney Woods Country Life Sch. v. Shell Oil Co., 539 F. Supp. at 975.  While New Mexico has yet to confront a situation in which it had to develop the standard by specifically stating that the reasonably prudent operator standard requires a lessee to secure the highest obtainable price, the Court concludes that it would likely adopt such a requirement.

In other jurisdictions that have considered the situation in which a lessee sells products in non-arm's length transactions, courts have concluded that a lessee has a duty to secure the highest price obtainable for gas being marketed.  See Greenshields v. Warren Petroleum Corp., 248 F.2d 61, 69 (10th Cir. 1957), cert. denied, 355 U.S. 907 (1957)(concluding that a lessee must see if more favorable terms could be obtained for the gas produced); Harding v. Cameron, 220 F. Supp. 466, 470 & n.4 (W.D. Okla. 1963)(Bohanon, J.)(citing Oklahoma case law as establishing the duty "to obtain a market for gas at the best price obtainable"); Waechter v. Amoco Prod. Co., 217 Kan. 489, 533, 537 P.2d 228, 264 (1975)(Schroeder, J., dissenting)("Under both Oklahoma and Kansas law an implied duty or obligation is imposed upon the lessee to . . . obtain a market for the gas at the best price obtainable."); Johnson v. Jernigan, 475 P.2d 396, 399 (Okla. 1970)(stating that, under Oklahoma law, the lessee must "develop the commodity he has found so that it will bring the highest possible market value"); Kramer & Pearson, supra at 812 n.151

(stating that it "is well established that a lessee has a duty to secure the highest price obtainable for gas being marketed," and citing cases from Texas, Oklahoma, Kansas, and Mississippi establishing such a requirement).  In sum, because the Tenth Circuit's decision in Elliott Industries does not preclude the claim that the Plaintiffs now assert, and because the Court concludes that New Mexico courts would likely determine that the implied duty to market's reasonably prudent operator standard includes an obligation to secure the highest price obtainable, the Plaintiffs could make a claim that the Defendants breached the implied duty to market.[11]

The Plaintiffs allege that the Court defined the implied covenant to market to cover marketing and related activities, "irrespective of the effect of such activities on the lessor." Motion at 10.  This contention is mistaken.  The Court did not state that the duty requires the lessee to perform certain activities without regard to their effect on the lessor.  See May 26 MO, 2015 WL 3543011, at *42.  On the contrary, it quoted New Mexico case law expressly stating that a lessor must market the product with reasonable diligence, "having in mind his own interest as well as that of the lessor."  May 26 MO, 2015 WL 3543011, at *42.  The Court therefore stated the duty as the Tenth Circuit and New Mexico courts have defined it.  See May 26 MO, 2015 WL 3543011, at *42-43 (stating that a lessee "must proceed with reasonable diligence, as viewed from the standpoint of a reasonably prudent operator, having in mind his own interest as well as that of the lessor, to market the product").  The Courts' previous opinions, however, do not limit the Court from describing the fuller implied-duty-to-market standard that it does today.

---

[11]The Court does not decide whether the Plaintiffs can prevail on this claim.  Rather, as the Plaintiffs requested at the hearing, see Tr. at 77:4-78:7 (Brickell, Court), the Court merely concludes that the scope of the implied duty to market is broad enough to allow the Plaintiffs to make this claim.

In its previous opinions, the Court has defined the duty as it related to the Plaintiffs' contentions that the Defendants' cost deductions breached the duty.  It described the duty as an affirmative duty, which requires lessees to produce, process, and sell the refined hydrocarbons for the lessee's and lessor's mutual benefit.  See Elliott Industries, 407 F.3d at 1113.  The purpose of this part of the duty to is prevent the lessee from taking no action to produce and sell the product, in which case the lessor would receive no royalty or a substantially lower "delay rental" payment.[12]  See May 26 MO, 2015 WL 3543011, at *42-43.  This situation is the precise one in which the Supreme Court of New Mexico has interpreted the implied duty to market.  See Darr v. Eldridge, 1959-NMSC-093, ¶ 16, 346 P.2d 1041, 1044 (concluding that, when the lessee of a water well did not produce and process the water, the implied duty to market required the lessee to develop and sell the water rather than letting it sit in the ground so that no one -- neither the lessee, the lessor, nor society -- could reap the benefits of the natural resource).  As Darr v. Eldridge demonstrates, there are situations in which it would be to the lessee's individual advantage not to market the products.  For example, it could be more beneficial to the lessee to reduce output or shut in a well, for instance, when a supply glut exists and the price of gas is too low.[13]  See Maralex Resources, Inc. v. Gilbreath, 2003-NMSC-023, ¶¶ 11-13, 76 P.3d 626, 630-

---

[12]Delay rentals are payments that the lessee makes to the lessor to delay drilling and marketing the products during the early years of a lease.  See Phillips Petroleum Co. v. Curtis, 182 F.2d 122, 125 (10th Cir. 1950); HNG Fossil Fuels Co. v. Roach, 1982-NMSC-156, ¶¶ 10-11, 656 P.2d 879, 882.

[13]The Court recognizes that there are situations in which the parties contractually agree -- in what are known as shut-in royalty clauses -- to allow lessees to postpone drilling and marketing the hydrocarbons when it would not be economically wise to do so.  See Maralex Resources, Inc. v. Gilbreath, 2003-NMSC-023, ¶¶ 11-13, 76 P.3d 626, 630-631; Levin v. Maw Oil & Gas, LLC, 290 Kan. 928, 234 P.3d 805 (2010); RAMA Operating Co., Inc. v. Barker, 47 Kan. App. 2d 1020, 286 P.3d 1138 (2012); BP Am. Prod. Co. v. Red Deer Resources, LLC, 466 S.W.3d 335 (Tex. App. 2015).  Here, however, the Court must consider a lessee's obligation under the implied duty to market in the absence of a shut-in clause.

631 (describing the "situation[] where the lessee decides to stop production because the price of gas is too low."). Refusing to market the products would harm the lessor's interest, because the lessor would not receive the royalty payments to which it would be entitled had the lessee sold the hydrocarbons. Requiring that the lessee act for the lessor's mutual interest in producing, refining, and selling the product therefore confers a significant benefit upon the lessor, who might otherwise receive no royalty payment without the duty. The duty to produce, refine, and sell, however, does not fully protect the lessor's interest without an obligation that the lessee sell the products for the highest obtainable price. See John Burritt McArthur, A Minority of One? The Reasons to Reject the Texas Supreme Court's Recent Abandonment of the Duty to Market in Market-Value Leases, 37 TEX. TECH L. REV. 271, 277 (2005)(stating that the implied duty to market protects the lessor's interest when the lessee has an "independent incentive to get the best price for its own larger share of production").

Without the obligation to sell for the highest obtainable price, the implied duty to market protects the lessor, but only partly. Unfortunately, the lessee could still cheat the lessor out of part of its royalty interest by selling the hydrocarbons cheaply to an affiliate upstream, basing the Plaintiffs' royalty off of the cheaper, affiliate sale, and then selling the hydrocarbons at a much higher price downstream in an arm's-length transaction. See 5 HOWARD WILLIAMS & CHARLES MEYERS, OIL & GAS LAW §§ 853-58.4 (2001); McArthur, supra note 77, at 284 ("They impose a duty to market to get the best price possible, so that operators cannot pay royalties at below market prices, often to affiliates who then sell the production for the higher market price."). Requiring the lessee to sell the hydrocarbons on which the lessor's royalties are based for the highest obtainable price prevents the lessee from basing the lessor's royalty payment off of a cheap sale and excluding the lessor from the benefits of the arm's-length sale. See Henry v.

Ballard & Cordell Corp., 417 So.2d 1334, 1341 (La. 1982)(concluding that a lessee satisfies his obligation "when he pays those royalties based on the price he is receiving under a gas sales contract where the lessee entered into an arm's length, good faith gas purchase contract with the best price and term available").  Even if the lessee sells the hydrocarbons to an affiliate for processing, the implied duty to market requires the lessee to sell the hydrocarbons for a price that it would obtain in an arm's-length transaction.  See Henry v. Ballard & Cordell Corp., 417 So.2d at 1341.  This prong of the implied duty to market protects lessors in a way that requiring them to merely extract the minerals does not.  It therefore ensures that the lessor is fully protected in the absence of a lease provision overriding the implied duty to market.

Tenth Circuit precedent does not limit the Court from concluding that New Mexico courts would adopt such a standard.  When the Tenth Circuit in Elliott Industries defined the duty to market, it stated that lessees have an obligation to "sell" the products.  407 F.3d at 1113. Subsumed within the duty to sell is the duty to secure the highest obtainable price.  See Scott Lansdown, The Implied Marketing Covenant in Oil and Gas Leases: The Producer's Perspective, 31 St. Mary's L.J. 297, 348-49 (stating that, in selling the products, the implied duty to market "requires that a lessee make reasonable efforts to obtain the best price possible.").  Without it, the lessor's interests are not fully protected.  At the time, the Tenth Circuit did not need to explain that New Mexico's requirement that lessees "sell[] the refined products and NGLs" includes an obligation to sell them at the highest obtainable price, because that was not the basis of the plaintiffs' claim.  407 F.3d at 1113.  Accordingly, neither the Tenth Circuit's decisions nor the Court's prior holdings preclude the Plaintiffs' claims of breach of the implied duty to market as they have stated it now.

Although the Court concludes that its past opinions do not preclude the Plaintiffs' new claim, it also concludes that the claim is not in the case and therefore cannot form the basis for class certification or reconsideration of its Class Certification MOO.  The Plaintiffs argue that, although the Court dismissed the implied-duty-to-market claim, the claim nonetheless remained in the case and now forms the basis on which they can certify a class.  See Motion at 12-13.  The Court does not agree with this contention.  The Plaintiffs argue that the factual allegations in paragraphs 12 and 12(a), which the Court has not dismissed or stricken, assert that the Defendants have a duty to market to the lessors' mutual advantage and to market the hydrocarbons "at the highest obtainable price."  FAC ¶ 12, at 5.  See Motion at 13.  They contend that Count I, which alleges a breach of contract, encompasses their implied duty to market claim.  See Tr. at 7:20-25 (Brickell); id. at 70:15-19 ("This is the breach of the implied term of the contract under the cause of action for breach of contract.").  The Court disagrees.

The Plaintiffs' assertion of the implied duty to market at this time is weak, if not nonexistent, and unfair to the Defendants. The Court has considered the Plaintiffs' arguments on the implied-duty-to-market claim on multiple occasions.  In none of those occasions did the Plaintiffs raise the argument regarding their implied-duty-to-market claim that they now present. See First MTD MO, 952 F. Supp. 2d at 1046-47 (noting that the Plaintiffs asserted that the Defendants' practice of deducting the cost of rendering the hydrocarbons marketable from the Plaintiffs' royalty payments violates the implied duty to market); First Amended Complaint for Underpayment for Oil and Gas Royalties ¶¶ 41-53, at 13-16, filed January 12, 2012 (Doc. 1-1)(asserting that the Defendants violate the implied duty to market based on the marketable-condition rule sub-part); Second Amended Complaint ¶¶ 43-55, at 13-16, filed February 16, 2012 (Doc. 10)("SAC")(same); Second MTD MOO, 27 F. Supp. 3d at 1242-44; May 26 MO,

2015 WL 3543011, at *42-43 (concluding that the Plaintiffs again argued that the Defendants' practice of deducting unreasonable costs from the Plaintiffs' royalty payments violates the implied duty to market).

After the Court dismissed their implied-duty-to-market claim the first time, the Plaintiffs asked for leave to amend the claim in hopes of re-pleading it in a way that could state a claim on which the Court could grant relief. They asked for leave to file the FAC on the grounds that the Court had not specifically addressed their "unreasonable or non-existent expenses" allegations in the First MTD MO. Plaintiffs' Motion for Leave to File Fourth Amended Complaint at 5, filed August 28, 2013 (Doc. 114)("Motion for Leave to File FAC"). They argued that "the Court may not have intended to dismiss Plaintiffs' allegations regarding unreasonable or nonexistent expenses," and therefore asked to re-plead their claim for breach of the duty to market. Motion for Leave to File FAC at 4-5. They did not ask the Court to re-plead their claim on the basis that the Court did not consider their argument that the Defendants breached the duty by failing to secure the highest price obtainable. Accordingly, the Court stated that it had considered each aspect of the Plaintiffs' implied duty to market claim:

> When the Court dismissed the third cause of action in its entirety, it recognized that, even if the Court accepted as true the allegation that the defendants passed on nonexistent charges to the Plaintiffs, that set of facts does not state a proper claim for breach of the implied duty to market.

Second MTD MOO, 27 F. Supp. 3d at 1249. Despite the Court's statements, the Plaintiffs did not ask the Court to reconsider its ruling on the basis that the Court failed to consider their implied-duty-to-market claim based on the argument that they now assert -- that the Defendants failed to secure the highest price obtainable. Accordingly, neither the Court nor the Defendants had any reason to believe this claim to be in the case. Both the Court and the Defendants

therefore proceeded to determine whether the Court could certify a class on the basis of the remaining claims.

Even though the Plaintiffs assert their implied-duty-to-market claim under Colorado law in Count Eleven, they do not assert their implied-duty-to-market claim in a separate count of the FAC.  See FAC ¶¶ 98-101, at 30-31.  In a seeming attempt to prevent the Defendants from filing another motion to dismiss, the Plaintiffs state that the Court dismissed the cause of action for the Defendants' alleged breach of the implied duty to market in Count Three.  See FAC at 17.  For the first time, they now allege that the breach-of-contract claim in Count One encompasses their claim for breach of the implied duty to market.  The Court finds it unlikely that the Plaintiffs would state their claim for breach of the implied duty to market under Colorado law in a separate claim, while asserting their claim for breach of the implied duty to market under New Mexico law within another claim.

Additionally, rule 10(b) of the Federal Rules of Civil Procedure requires the Plaintiffs to state any new cause of action founded on a separate transaction or occurrence "in a separate count."  Fed. R. Civ. P. 10(b).  While the Court acknowledges that the Plaintiffs' implied-duty-to-market claim is not based on a separate transaction, it nevertheless determines that changing the Court's prior ruling on a claim that neither the Court nor the Defendants believed to be in the case would defeat rule 10(b)'s purpose.  "The purpose of Rule 10(b) is to promote simplicity and clarity in pleading."  Mackley v. TW Telecom Holdings, Inc., 296 F.R.D. 655 (D. Kan. 2014)(Sebelius, J.)(citing Kjorlie v. Lundin, 765 F. Supp. 671, 673 (D. Kan. 1991)(Saffels, J.) and 5 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 1324, at 736 (3d ed. 2004)).  "Despite the express language of Rule 10(b) that more than one transaction must be involved before separate statements of claims are necessary, the federal courts consistently have

required separate statements when separate claims are pleaded, notwithstanding the fact that the claims arose from a single transaction." 5 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 1324, at 736 (3d ed. 2004).  See Guth v. Texas Co., 155 F.2d 563 (7th Cir. 1946)(stating that two causes of action, for negligence and contract, should be stated separately); Apothecary Dev. Corp. v. City of Marco Island, Fla., 2011 WL 1071448, at *2 (M.D. Fla. 2011)("It is impermissible to combine multiple claims with different legal standards into one count.").  As the Plaintiffs have not properly argued that their breach-of-contract claim includes a claim for breach of the implied duty to market, neither the Defendants nor the Court had any reason to assume that it did.  Furthermore, this is the first time that the Plaintiffs have alleged that their implied-duty-to-market claims constitute "the common, predominated question to be resolved for the entire class."  Motion at 19.  Allowing the Plaintiffs to argue that the claim is now within Count One, especially when they state in the FAC that the Court has already dismissed their implied-duty-to-market claim, defeats rule 10(b)'s purpose of promoting simplicity and clarity.  See Anderson v. Dist. Bd. of Tr. of Centr. Fla. Cmty. Coll., 77 F.3d 364, 366 (11th Cir. 1996).  Accordingly, the Court will not change its prior class certification ruling on the basis of a claim that was not in the case.

## II.   THE COURT WILL NOT CHANGE ITS RULING IN THE CLASS CERTIFICATION MOO.

The Court considers three primary factors in deciding whether to change its ruling in a prior opinion: (i) how thoroughly it considered an issue; (ii) the case's progression; and (iii) the Servants of the Paraclete v. Does factors.  The Servants of the Paraclete v. Does factors are: (i) new controlling authority; (ii) new evidence; or (iii) a clear indication that the Court erred. See 204 F.3d at 1012.  Because the factors all indicate that the Court should not change its ruling, the Court will not do so.

### A.   THE COURT THOROUGHLY CONSIDERED ALL AVAILABLE BASES FOR CLASS CERTIFICATION.

The Court considered every basis for class certification in the case in great detail.  The parties dedicated hundreds of pages to the issue, the Court held a multi-day hearing, and the Court wrote a 349-page opinion.  The Court wrote an opinion containing findings of fact and conclusions of law, along with a detailed explanation for the Court's holding.  See Class Certification MOO at 1-349.  The Court's failure to consider the precise issue that the Plaintiffs seek the Court to reconsider -- whether to grant class certification on the basis of the implied duty to market -- does not constitute an error suggesting that the Court should change its prior ruling, because the implied-duty-to-market claim is not in the case.  See supra 45-47.  The Court therefore considered in detail every viable basis on which to certify the class.[14]  The Plaintiffs do not challenge any of the Court's remaining conclusions regarding class certification.  See Motion at 1-25; Tr. at 5:21-6:4 (restricting the Plaintiffs' objection to the Court's ruling to a single issue that they thought the Court overlooked in making its ruling:  the implied duty to market)(Brickell); Tr. at 80:16-20 ("[W]hile I believe you correctly analyzed what Elliott said about the marketable condition rule and its application, I believe you left part of the analysis short on the implied duty to market itself.")(Brickell).

The Court has stated that a "movant for reconsideration thus faces an easier task when he or she files a targeted, narrow-in-scope motion asking the Court to reconsider a small, discrete portion of its prior ruling," compared to a request that "rehashes the same arguments" from

---

[14]As the Court stated in the Procedural History section, the Plaintiffs appear to have abandoned their second argument as to why the Court should grant their Motion.  They did not argue it in their Reply, and they did not raise it at the hearing.  Moreover, they repeatedly stated to the Court at the hearing that they limited their argument to the single issue that they thought the Court overlooked -- the implied duty to market.  Tr. at 5:21-6:4 (Brickell).  The Court acknowledges that the Plaintiffs focus their energies on the implied-duty-to-market claim.  It will nonetheless address the Plaintiffs' second argument in Part III.

earlier motions and "essentially asks the Court to grant the movant a mulligan on its earlier failure to present persuasive argument and evidence."  Memorandum Opinion and Order at 39, filed June 24, 2015 (Doc. 291)("June 24 MOO").  Although the Plaintiffs assert that they challenge only one issue, their challenge asks the Court to reconsider its First MTD MO, which it issued in June of 2013.  See First MTD MO, 952 F. Supp. 2d at 1046.  They argue that the Court should not have dismissed their implied-duty-to-market claim, and that, because the Court dismissed the claim, it did not consider the implied duty to market as one possible basis for certifying a class action.  See Motion at 9.  They essentially ask the Court to reconsider its opinions dismissing the implied-duty-to-market claim in addition to the Class Certification MOO.  See Tr. at 78:4-18 (noting that the Motion asks the Court to change its rulings in the First MTD MO and Second MTD MOO)(Brickell, Court).  The Plaintiffs do not contend that the Court's reasoning was flawed in its earlier dismissals, or that the Court's reasoning as to their remaining claims was flawed in its Class Certification MOO.  See Tr. at 80:16-20 (Brickell). Rather, they argue that the duty is broader than the Plaintiffs initially argued and that the Court must now consider certifying a class on this basis.  See Tr. at 80:16-20 (Brickell)(arguing that, while the Court correctly analyzed Elliott Industries' holding on the marketable-condition rule, it failed to consider the implied duty to market's full scope).  Because the Court considered the Plaintiffs' claims as they argued them in the first instance, it will not now change its previous opinions on a basis that the Plaintiffs did not present to the Court originally.

### B.   THE CASE HAS PROGRESSED SO FAR THAT CHANGING THE COURT'S DECISION WOULD PREJUDICE THE DEFENDANTS.

In considering the case's overall progress and posture, the Court observes that reconsideration would significantly prejudice the Defendants.  The Motion effectively seeks to challenge an opinion that the Court wrote far earlier in the case: the opinion dismissing the

implied-duty-to-market claim.  See June 24 MOO at 38-39 (stating that the Court will consider the "case's overall progress and posture, the motion for reconsideration's timeliness relative to the ruling it challenges").  As discussed at the hearing, the Defendants would face significant prejudice if the Court changed its ruling at this stage.  See Tr. at 90:2-12 (Court); id. at 31:25-32:9 (Sheridan)("We went through an enormous -- at enormous cost and expense -- a five-day evidentiary hearing, which they lost.").

Thinking that the Court had dismissed the Plaintiffs' implied-duty-to-market claim, the parties wrote hundreds of pages arguing that the Court should or should not certify a class on the basis of the Plaintiffs' then-asserted claims.  Likewise, the Court wrote hundreds of pages to determine that it could not certify a class on the basis of the Plaintiffs' claims.  See Tr. at 90:24-91:3 ("[T]o go back at this point and re-look at what I think the Plaintiffs characterize as a misinterpretation of New Mexico law would really be an undoing of -- of, really, everything we've done in the class certification.").  Now, after all of this work, the Plaintiffs change their asserted principal claim.  See Tr. at 16:13-15 (Court)(observing that the Plaintiffs were changing their narrative as to which issues are common among all class members); id. at 16:15-23 (Court)(stating that, at the class certification hearing, the Plaintiffs argued that they disputed the Defendants' payment method, while at the Motion hearing the Plaintiffs asserted that they disputed whether the Defendants sold the gas for a reasonable amount).  The time and expense that both the parties and the Court expended in reliance on the Court's dismissal of the Plaintiffs' implied-duty-to-market claim weigh in favor of denying the Plaintiffs' Motion.  The Court is especially reluctant to consider certifying a class on the implied duty to market without giving the Defendants the opportunity to present evidence showing that the individual leases negate the implied duty to market.

## C.   NONE OF THE SERVANTS OF THE PARACLETE v. DOES FACTORS INDICATE THAT THE COURT SHOULD CHANGE ITS RULING.

The Tenth Circuit's decision in Servants of the Paraclete v. Does suggests that the Court should be open to reconsidering a prior ruling when the moving party presents: (i) new controlling authority; (ii) new evidence; or (iii) a clear indication that the Court erred.  See 204 F.3d at 1012.  The Plaintiffs present no new authority or new evidence to suggest that the Court's ruling is no longer correct.  Rather, they argue that the Court should consider a new basis for class certification that the Plaintiffs did not argue in the case before filing the Motion to reconsider the Court's class certification ruling.  See Tr. at 80:16-20.  The Court requires a clear showing that it erred -- "one that manifests itself without the need for in-depth analysis or review of the facts."  June 24 MOO at 40.  The Plaintiffs present no such showing.  Their only argument why the Court allegedly erred is that it failed to consider this one basis for certification.  See Tr. at 80:16-20.  As discussed above, however, the implied-duty-to-market claim was not in the case when the Court considered whether to certify the class.  See supra 35-47.  As this is the only basis for the Plaintiffs' Motion, see Motion at 1-25, with the exception of Part III below, the Court denies it.  The Plaintiffs do not argue that the Court erroneously analyzed any other parts of the Class Certification MOO.  See Tr. at 5:21-6:4 (Brickell)(stating that the Plaintiffs restrict their argument to a single issue that they thought the Court overlooked in making its ruling: the implied duty to market).

## III.   THE PLAINTIFFS HAVE FAILED TO ESTABLISH ANY GROUND FOR RECONSIDERATION BASED ON THE DEFENDANTS' COMMON PAYMENT METHOD.

The Plaintiffs contend that the Defendants "paid all class members the same way regardless of the lease language."  Motion at 25.  They argue that the Court must consider whether the "Defendants' uniform treatment of the leases and overriding royalty instruments

constitutes an estoppel and/or waiver of their argument that each lease needs to be examined to determine whether royalty was properly paid."  Motion at 25.  They state that the Defendants' actions "create a common question" whether the Plaintiffs are entitled to a trial on whether the "Defendants are estopped from now asserting that various individual royalty provisions must be treated differently."  Motion at 25.

The Plaintiffs' new argument is untimely and unpersuasive.  First, the Plaintiffs never pled this new theory, making it untimely.  See FAC at 1-33.  They never once alleged that the Defendants' actions estop them from asserting that their royalty obligations depend upon lease language.  They raise estoppel only as a theory to toll the statute of limitations.  See FAC ¶¶ 93-97, at 28-29.  Nor did the Plaintiffs argue that this issue constituted a question of law on which the Court could certify a class.  See Motion and Supporting Brief to Determine that This Matter Proceed as a Class Action at 6-7, filed January 6, 2014 (Doc. 194)("Motion to Proceed as a Class Action").  Moreover, the Plaintiffs presented no argument or evidence to support this theory before or during the class certification hearing.  The Plaintiffs have therefore failed to provide the Court with a proper basis on which to reconsider or change one of its previous rulings.

Second, the Plaintiffs have not demonstrated that the Defendants waived or are estopped from asserting that the Court should consider each individual lease.  An implied waiver requires "unequivocal and decisive acts or conduct of the party clearly evincing an intent to waive, or acts or conduct amounting to an estoppel."  Yates v. Am. Republics Corp., 163 F.2d 178, 179 (10th Cir. 1947).  The Plaintiffs present no evidence to show how the Defendants, by paying royalties using an index price, evinced an "unequivocal" intent to waive their contractual rights and to bind itself to implied contractual duties.  Yates v. Am. Republics Corp., 163 F.2d at 179.

Similarly, equitable estoppel comprises six separate elements.  See Mem'l Med. Ctr., Inc. v. Tatsch Const., Inc., 2000-NMSC-030, ¶ 9, 12 P.3d 431, 435-36.

> In order to find equitable estoppel the following facts must be established as to the party estopped:
>
>> (1) Conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) intention, or at least expectation, that such conduct shall be acted upon by the other party; (3) knowledge, actual or constructive, of the real facts.
>
> Lopez v. State, 1996–NMSC–071, ¶ 18, 122 N.M. 611, 930 P.2d 146 (quoted authority omitted). The following elements must be shown as to the party claiming estoppel:
>
>> (1) Lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) reliance upon the conduct of the party estopped; and (3) action based thereon of such a character as to change his position prejudicially.

Mem'l Med. Ctr., Inc. v. Tatsch Const., Inc., 2000-NMSC-030, ¶ 9, 12 P.3d 431, 435-36.

The Plaintiffs have neither stated these elements nor demonstrated how the Defendants' common payment method established them.  Instead, the Plaintiffs pled, argued, and presented evidence addressing a different issue: whether the Defendants' allegedly inappropriate common payment method constitutes a common, predominant question -- not that the Defendants' common payment method constitutes estoppel or waiver.  See Motion to Proceed as a Class Action at 4-5 (arguing that whether the Defendants' common payment methodology "is appropriate and results in proper payment of royalty[] is a common, predominant Class question").

Furthermore, the Plaintiffs concede that the Tenth Circuit in Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc., 725 F.3d 1213 (10th Cir. 2013)("Roderick"),

concluded that the defendant's uniform payment methodology did not necessarily satisfy rule 23's commonality requirement.  See Motion at 26.  They also admit that the United States Court of Appeals for the Fourth Circuit, in EQT Production v. Adair, 764 F.3d 347 (4th Cir. 2014), held that the defendant's uniform treatment did not satisfy rule 23's commonality requirements.  See Motion at 27.  The case law that the Plaintiffs cite from other federal district courts to support their estoppel theory is similarly unpersuasive.  The cases do not involve a claim that a lessee's common payment method constituted an estoppel.  Rather, the courts decided that a lessee's common payment method supplied commonality.[15]  See Chieftain Royalty Co. v. QEP Energy Co., 281 F.R.D. 499, 503 (W.D. Okla. 2012)(Russell, J.)(concluding that the defendants' common payment method allowed the plaintiffs to establish commonality); Freebird, Inc. v. Merit Energy Co., 2011 WL 13638, at *4 (D. Kan. Jan. 4, 2011)(Vratil, J.)(concluding that the defendants' common payment method allowed the plaintiffs to show commonality because the plaintiffs were proceeding on a theory that the defendants breached the marketable condition rule, which did not require the court to analyze individual leases); Frankhouser v. XTO Energy, Inc., 2010 WL 5256807, at *3 (W.D. Okla. Dec. 16, 2010)(Leonard, J.)(determining that the defendants' common payment method allowed the plaintiffs to show commonality); Beer v. XTO Energy, Inc., 2009 WL 764500, at *4 (W.D. Okla. Mar. 20, 2009)(Leonard, J.)(same); Hill

---

[15]All of these cases were decided before Roderick, and with one exception, before Wal-Mart v. Dukes, 131 S. Ct. 2541, 2551 (2011), which both established more difficult standards to certify a class.  After Wal-Mart v. Dukes, the Tenth Circuit decided whether a lessee's common payment method constituted a common question in two seminal cases.  Roderick, 725 F.3d at 1217-19; Chieftain Royalty Co. v. XTO Energy Co., 528 F. App'x 938, 942-44 (10th Cir. 2013).  The Tenth Circuit determined that a lessee's common payment method did not automatically constitute a common question and therefore vacated the class certifications by the federal district courts.  See Roderick, 725 F.3d at 1217-19; Chieftain Royalty Co. v. XTO Energy Co., 528 F. App'x at 942-44.  Accordingly, to the extent that the district courts in the cases that the Plaintiffs cite determined that a common payment method automatically constituted a common question on which the court could certify a class, Roderick overruled them.  See Roderick, 725 F.3d at 1217-19.

v. Kaiser-Francis Oil Co., 2010 WL 2474051, at *3 (W.D. Okla. June 9, 2010)(Russell, J.)(commonality undisputed); Anderson v. Merit Energy Co., 2008 WL 2484187, at *4 (D. Colo. June 19, 2008)(Babcock, J.)(commonality not genuinely disputed).

Finally, raising a new issue does not serve as a basis for the Court to reconsider its prior rulings. The Court thoroughly considered the issue that the Plaintiffs raised in their FAC regarding whether the Defendants' payment method constitutes a common question based on the claims that were before the Court. See Anderson Living Trust v. WPX Energy Prod., LLC, 306 F.R.D. 312, 438-439 & n.85 ("January 6 MOO"). The Court observed that the Plaintiffs' breach-of-contract claim relies on a comparison between: (i) what royalties the Defendants should have paid; and (ii) what the Defendants actually paid. See January 6 MOO, 306 F.R.D. at 438. The Court determined that the Defendants' payment method addresses only the second prong. See January 6 MOO, 306 F.R.D. at 438. The Court concluded that the first prong looks to "the language in the leases and any implied-in-law terms," which required the Court to consider "textual variations in contractual language." January 6 MOO, 306 F.R.D. at 438. After careful consideration, the Court therefore determined that the textual variations in the leases destroyed both commonality and predominance. See January 6 MOO, 306 F.R.D. at 438. Had the Court considered whether to certify the class based on the implied-duty-to-market, the Court might have considered the fact that the Defendants used one common payment methodology in determining whether the Defendants complied with the reasonably prudent operator standard. Again, however, because that claim was not and is not in the case, the Defendants' common payment method cannot form a basis on which to reconsider its prior holdings. The Plaintiffs present no new authority or evidence for the Court to reconsider its original analysis. The Court

will therefore not change its prior ruling, because the Plaintiffs raise an entirely new -- and unpersuasive -- issue that they have not raised before.

Although the Court will not change its prior rulings, it further defines the scope of New Mexico's implied duty to market in Part I and explains that the Court's dismissals of the Plaintiffs' earlier implied-duty-to-market claims were based on the Plaintiffs' narrow allegation that the Defendants violated the marketable-condition rule sub-part of the duty to market.  See supra 35-47.  The Plaintiffs did not move to amend their Complaint to attempt to properly allege that the Defendants violated the implied duty to market as they allege in their Motion.  If they had properly pled the implied duty to market claim, the Plaintiffs could have moved to certify a class on this new basis.  To be fair to the Defendants, the Court finds that they must have the opportunity to present evidence showing that the leases in this case negate the implied duty to market.  The Defendants must have this chance before the Court considers whether it can certify a class on the basis of the implied duty to market, and they have not had this chance.

**IT IS ORDERED** that the Plaintiffs' Motion for Reconsideration of Order Denying Class Certification, filed June 1, 2015 (Doc. 288)("Motion") is granted in part and denied in part. The Court has carefully reconsidered its ruling in the Memorandum Opinion and Order, filed March 19, 2015, but the Court will not change its decision to deny the Plaintiffs' request that the Court certify a class under rule 23 of the Federal Rules of Civil Procedure.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Stan Koop
Stan Koop, PLLC
Norman, Oklahoma

--and--

Karen Aubrey
The Law Office of Karen Aubrey
Santa Fe, New Mexico

--and--

Brian K. Branch
The Law Office of Brian K. Branch
Albuquerque, New Mexico

-- and --

Stephen R. McNamara
Brian Inbody
McNamara, Inbody & Parrish, PLLC
Tulsa, Oklahoma

--and--

Turner W. Branch
Cynthia Zedalis
Branch Law Firm
Albuquerque, New Mexico

--and--

Bradley D. Brickell
Brickell & Associates, PC
Norman, Oklahoma

-- and --

  *Attorneys for the Plaintiffs*

Sarah Gillett
Dustin L. Perry
Hall Estill Hardwick PC
Tulsa, Oklahoma

--and--

Christopher A. Chrisman
Holland & Hart LLP
Denver, Colorado

--and--

Mark F. Sheridan
Bradford C. Berge
Robert J. Sutphin
John C. Anderson
Holland & Hart LLP
Santa Fe, New Mexico

 *Attorneys for the Defendants*